# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

WILLIAM DAMON AVERY,
WILLIAM DAMEN AVERY, Jr.,
SIRENA ALLINE AVERY,
CYNTHIA LYNN TYLER, and
JALISA JONIQUE AVERY and
NAFIA NICOLE AVERY, minors by their
Father and next friend William Avery,

       Plaintiffs,

  -vs-                                                                              Case No. 11-C-408

CITY OF MILWAUKEE,
DETECTIVE GILBERT HERNANDEZ,
DETECTIVE DANIEL PHILLIPS,
DETECTIVE KATHERINE HEIN,
DETECTIVE TIMOTHY HEIER,
DETECTIVE KEVIN ARMBRUSTER,
DETECTIVE ERIC GULBRANDSON, and
DETECTIVE JAMES DEVALKENAERE,

       Defendants.

# DECISION AND ORDER

William Damon Avery spent six years in prison for a crime he didn't commit: the murder of a drug-addicted prostitute named Maryetta Griffin. Avery was exonerated by DNA testing which excluded Avery and matched the profile of Walter E. Ellis, an accused serial killer.[1]

In this civil rights lawsuit, Avery alleges that certain City of Milwaukee police

---

[1] *See* http://www.innocenceproject.org/Content/William_D_Avery.php.

detectives withheld exculpatory evidence, fabricated a false confession, and procured false testimony from three jail house informants. This conduct, according to Avery, violated his due process rights under the United States Constitution. Avery also brings claims for conspiracy and failure to intervene, a claim against the City under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), and a series of supplemental state law claims for malicious prosecution, negligent infliction of emotional distress, and intentional infliction of emotional distress. Finally, Avery's five children bring claims for loss of companionship.

The defendants now move for summary judgment. Such a motion should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).

Much of the factual background set forth below is based upon Avery's version of events, the veracity of which is disputed by the defendants. For purposes of this motion, the Court views the record in the light most favorable to Avery and draws all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The

Court cannot weigh the evidence or decide which testimony is more credible. *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). In this light, the defendants' motion for summary judgment must be denied to the extent discussed below.

## BACKGROUND

On February 17, 1998, the partially clothed body of Maryetta Griffin, an African American female who abused crack cocaine in the Milwaukee area, was found in an abandoned garage. Griffin died as a result of manual strangulation, likely during the early morning hours of the date her body was found.

In 1998, Avery was a dope dealer, selling crack cocaine out of 2474 North Palmer Street in Milwaukee. Avery sometimes sold drugs to prostitutes through dope dating — selling drugs in exchange for sex.

In the mid-1990's, City of Milwaukee Police Detective James DeValkenaere was assigned to investigate similarities in the murders of perceived street prostitutes, drug addicts or African American women on the north side of Milwaukee, a number of whom had been strangled. During this investigation, Detective DeValkenaere was looking into the possibility that there was one individual responsible for multiple homicides based on similarities in the method of death and in the demographics of the victims. On January 9, 1996, a report was generated within the Milwaukee Police Department as a result of a task force commissioned to review 32 unsolved female homicides which occurred between 1980 and 1995 to determine whether any physical evidence existed that could benefit from DNA testing. The report concluded that there were similarities between recent asphyxiation or suffocation homicide cases of females, including: all were found in or

- 3 -

near vacant buildings; all victims had a history of cocaine dependency; all engaged in the practice of "dope dating;" and all frequented the same social clubs. Detectives in the homicide unit had daily briefings where they discussed the possibility that a serial killer was responsible for these murders.

### Avery interviews

Initially, there were two people of interest in relation to the Griffin murder: Avery, and a person named Lorenzo Frost. Detective DeValkenaere and Detective Daniel Phillips interviewed Avery on March 23, 1998. During this interview, Avery told the detectives that he didn't kill Griffin and he didn't know who killed her.

According to Avery, Detectives DeValkenaere and Phillips wrote a false and fabricated police report of this interview, stating that he told them he had oral sex with Griffin on February 16, 1998, although Avery told them no such thing, and in fact never had sexual relations of any nature with Griffin. Also according to the report, Avery told DeValkenaere and Phillips that on February 16, he was in the attic of the Palmer Street residence with Griffin where they played dominos together, and she said she would be coming back later in the evening. According to Avery, and contrary to the report, Avery last saw Griffin in the early evening hours of February 16, and he had no interaction with Griffin that day while she was present at the Palmer Street residence.

Detective Phillips interviewed Avery again on March 24, this time with Detective Gilbert Hernandez. During this interview, Avery re-proclaimed his innocence and repeatedly asked to speak to a lawyer.

According to Avery, Detectives Phillips and Hernandez wrote a false and

fabricated police report of this interview with Avery, falsely stating that Avery told them he sold "dope" to Griffin February 16; that Avery told them that he was awakened by Griffin going through his pockets and pulling out his money; that he fought with Griffin; that he did not remember what happened but he told "Ronnie" that he thought he "killed this bitch;" and that he was responsible for the murder, but he did not remember.

Later in the day, Avery was interviewed by Detective Katherine Hein (n/k/a Spano). Avery repeatedly told Detective Hein that he didn't kill Griffin and didn't know who did. Detective Hein wrote a fabricated police report of her interview with Avery, falsely stating that she advised Avery of his constitutional rights; that Avery told her that the Palmer residence was used by prostitutes to receive drugs in exchange for sexual relations; that Avery told her he had oral sex, penis to mouth, with Griffin on February 16; and that Avery told her about an incident where a woman known as "Little Bit" was sent out to get alcohol one evening the previous week and falsely reported that this incident happened on February 16.

**Jailhouse informants**

Keith Randolph was an acquaintance of Avery who assisted him with legal documents while incarcerated. On March 21, 2001, Detective Timothy Heier interviewed Randolph at the Milwaukee Police Department Investigation Bureau. During the course of this interview, Detective Heier supplied Randolph with details about the Griffin homicide, coached Randolph into falsely implicating Avery in the Griffin homicide, and promised Randolph that he would help him get his sentence reduced. Detectives Hein and Hernandez did the same during an October 23, 2003 interview with Randolph at the

Stanley Correctional Institution in Stanley, Wisconsin.

Antron Kent was incarcerated during the same period of time as Avery at the Milwaukee County Jail and later at the North Fork Correctional Facility in Sayre, Oklahoma. In July and August of 2002, Detective Kevin Armbruster had more than five telephone conversations with Kent. During these phone conversations, Detective Armbruster supplied Kent with details about the Griffin homicide, coached, threatened, and pressured Kent into making false statements which implicated Avery in the murder, and promised Kent that he would help him get his sentence reduced. This process was repeated during an August 26, 2002 interview at the North Fork Correctional facility, conducted by Detectives Armbruster and Heier; an October 23, 2003 interview at the Green Bay Correctional Institution, conducted by Detectives Hernandez and Hein; and a September 7, 2004 interview at the GBCI, conducted by Detective Heier and Detective Eric Gulbrandson.[2]

Jeffrey Kimbrough was incarcerated during the same period of time as Avery at the North Fork Correctional Facility, although they never had any contact or interaction with each other. Kimbrough was Kent's cellmate and was looking for a reduction in his own criminal sentence. On August 27, 2002, Detectives Armbruster and Heier supplied Kimbrough with details about the Griffin homicide and coached and pressured him into

---

[2] When questioned about these interviews during his deposition, Kent invoked the Fifth Amendment and refused to answer. Adverse inferences can be drawn from Fifth Amendment silence in civil proceedings. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995). Such an inference, standing alone, is insufficient to create an issue of material fact that precludes summary judgment. *See, e.g., Barker v. Int'l Union of Operating Eng. Local 150*, No. 08 C 50015, 2011 WL 6338800, at *6 (N.D. Ill. Dec. 19, 2011). Here, there is more than enough evidence to corroborate the adverse inference that is raised by Kent's invocation of the Fifth Amendment.

falsely implicating Avery in the murder. The same thing happened during an October 20, 2003 interview at the Prairie Correctional Facility in Appleton, Minnesota, conducted by Detectives Hein and Hernandez.

### Legal proceedings

On September 7, 2004, Avery was charged with first degree reckless homicide as a party to the crime, Wis. Stat. §§ 940.02(1), 939.05. On March 7, 2005, Avery was convicted following a three-day jury trial. On May 26, 2005, Avery was sentenced to an indeterminate term of not more than forty years imprisonment.

At Avery's trial, Detective Phillips testified that Avery told him that he awoke early in the morning with Griffin going through his pockets, that they fought, and that Avery said that he was responsible for the murder but did not remember how he killed Ms. Griffin. Detective Hernandez testified to the same effect.

Antron Kent testified that Avery confessed to him while they were incarcerated together. Keith Randolph confirmed that he told police about Avery's confession. On the day he was scheduled to testify, Jeffrey Kimbrough told Detective Heier that he did not want to testify against Avery. Detective Heier told Kimbrough that he "had to do it" and that there was "no going back now." Kimbrough then testified that he overheard Avery confess to Kent while they were incarcerated together.

Avery testified at his trial that he did not confess to committing the murder and that he did not make any inculpatory statements to Kent, Kimbrough or Randolph.

After Avery's trial, Detective Heier testified on behalf of Kent at a hearing related to his sentence, explaining that his cooperation and testimony helped to convict Avery.

Kent's sentence was later reduced by five years.

## Exoneration

On April 5, 2010, Avery wrote a letter to Milwaukee County District Attorney John Chisholm seeking new testing of a DNA sample taken from Griffin's mouth. On April 19, 2010, Assistant District Attorney Norman Gahn sent Avery a letter stating that he received Avery's letter to Chisholm and that the evidence would be submitted for further testing.

On May 6, 2010, Gahn and Assistant District Attorney Mark Williams sent Avery a letter stating that the DNA sample taken from Griffin's mouth was not a match for Avery and was consistent with "another person who is charged with crimes." In May of 2010, Avery was released from prison, and on September 21, 2010, the circuit court vacated the jury's verdict and sentence. On December 12, 2012, the State of Wisconsin Claims Board granted Avery's petition for compensation under Wis. Stat. § 775.05, finding that Avery provided "clear and convincing evidence that he was innocent of the crime for which he was convicted."

## ANALYSIS

All of the individual defendants in this case invoke qualified immunity, which shields them from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010). To determine whether the defendants are entitled to qualified immunity, the Court must analyze whether a constitutional right would have been violated on Avery's version of the

facts, and if so, whether the right was clearly established at the time of the alleged violation. *Viilo v. Eyre*, 547 F.3d 707, 709-10 (7th Cir. 2008). To be clearly established at the time of the challenged conduct, the right's contours must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right," and "existing precedent must have placed the statutory or constitutional precedent beyond debate." *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012). This standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages." *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Reichle v. Howards*, --- U.S. ----, 132 S. Ct. 2088, 2093 (2012)).

**Fabrication of evidence**

Avery argues that the defendants violated his clearly established due process rights by creating false written reports that he confessed, knowing that he had not, and also by manufacturing false testimony from jailhouse informants in order to corroborate the fabricated confession. The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). Moreover, it was clearly established as early as 1935 that a state's presentation of testimony "known to be perjured . . . to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Mooney v.*

*Holohan*, 294 U.S. 103, 112 (1935). Building off of *Mooney* and subsequent cases, the Seventh Circuit held it clearly established as of at least 1987 that the "deliberate manufacture of false evidence contravenes the Due Process Clause." *Whitlock* at 585; *see also Fields v. Wharrie* ("*Fields II*"), 740 F.3d 1107, 1114 (7th Cir. 2014) ("it was established law by 1985 (indeed long before) . . . that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process"); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2005) ("if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit").

The defendants completely ignore this controlling precedent in their opening brief. In reply, the defendants argue that *Whitlock* and *Fields II* are distinguishable because the informants in those cases initiated contact with the police. In this case, by contrast, the jailhouse informants initiated contact with the detectives. The Court fails to grasp how this is a relevant distinction. Fabricated evidence is fabricated evidence. Even if the distinction were relevant, the defendants' argument fails to account for Avery's assertion that his confession was also fabricated.

The defendants argue further that Avery's fabrication claim is barred by *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), but that case involved an entirely different claim, one for malicious prosecution. Insofar as there is a "constitutional right not to be prosecuted without probable cause," such a claim is "knock[ed] out" by the "existence of a tort claim under state law." *Id.* at 750. Avery's fabrication claim does not, as the

defendants argue, amount to a claim for malicious prosecution. Perhaps it used to, *see, e.g., McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003), but no longer in light of *Whitlock* and *Fields II*. *See Petty v. City of Chi.*, 754 F.3d 416, 421 (7th Cir. 2014); *Saunders v. City of Chi.*, No. 12-cv-09158, 2014 WL 3535723, at *2 (N.D. Ill. July 11, 2014) (noting that prior to *Whitlock* and *Fields II*, courts "typically held either that fabricating evidence does not violate due process, or that fabricating evidence may violate due process, but the existence of a state law tort for malicious prosecution dictates that a plaintiff must bring his claim pursuant to state law rather than as a due process claim under Section 1983").

The defendants attempt to link *Newsome* to the instant case through the observation that in *Newsome*, the defendant police officers "encouraged two witnesses to select Newsome from a lineup – which the witnesses did, forming a vital link in the process that led to Newsome's conviction as Cohen's killer . . ." 256 F.3d at 749. If the plaintiff in *Newsome* had pressed a due process claim,[3] it likely would have failed based upon the distinction between coercion and fabrication. In "fabrication cases, the police or prosecutor manufactures evidence that he knows to be false. As we said in *Fields II* and reiterate here, a prosecutor fabricating evidence that she knows to be false is different than getting 'a reluctant witness to say what may be true.'" *Petty*, 754 F.3d at 422 (quoting *Fields II*, 740 F.3d at 1112). Thus, there is no cognizable due process claim in a coercion case, as opposed to an evidence fabrication case where there is a cognizable claim. *Id.*

---

[3] *Saunders*, 2014 WL 3535723, at *3 ("neither *Newsome* nor *McCann* addressed whether fabricated evidence violates a defendant's due process rights").

In *Fields II*, the Seventh Circuit clarified the relevant terminology. "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it. Much testimony is inaccurate, but not deliberately so and therefore not false or fabricated as we are using these words." 740 F.3d at 1110. Avery asserts that the defendants pressured (i.e., coerced) the jailhouse informants into saying that Avery confessed to the Griffin murder, but he also argues that the defendants and the informants all knew that Avery didn't confess. *Id.* at 1112 ("the prosecutor who was sued in *Whitlock* was part of an investigative team that told witnesses what to say *knowing that what the team was telling them was false*. This is different from coercing a reluctant witness to say what may be true") (emphasis added) (internal citations omitted). That the informants were coerced into fabricating evidence doesn't make the evidence any less fabricated. Coercion can be "an essential tool in 'persuading' a witness to fabricate testimony." *Id.* This is, quite clearly, a fabrication case, the hallmark of which is that the defendants "manufactured evidence that they knew to be false." *Petty* at 423. Avery can proceed to trial on his claim that the defendants violated his due process rights in this manner.

### *Brady v. Maryland*

Avery also argues that the defendants violated due process by not disclosing the fact that they coached and manipulated the jailhouse informants into falsely implicating

him in the Griffin murder. This claim arises under *Brady v. Maryland*, 373 U.S. 83 (1963), a "due process case that entitles criminal defendants to be shown any exculpatory evidence (including evidence usable to impeach a prosecution witness) in the possession of prosecutors, . . ." *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003). *Brady* and its progeny apply to investigating police officers when they "withhold exculpatory evidence from prosecutors and the withholding of evidence is 'material.'" *Holland v. City of Chi.*, 643 F.3d 248, 255 (7th Cir. 2011).

In *Gauger*, the plaintiff pressed a similar argument: that detectives were required to give truthful versions of his own statements at an interrogation to the prosecutors to be forwarded to his counsel at his criminal trial. The Seventh Circuit found "the proposed extension of *Brady* difficult even to understand. It implies that the state has a duty not merely to disclose but also to create exculpatory evidence. Indeed, the duty to disclose falls out, because Gauger knew what he had said at the interrogation. The problem was not that evidence useful to him was being concealed; the problem was that the detectives were giving false evidence. Gauger wants to make every false statement by a prosecution witness the basis for a civil rights suit, on the theory that by failing to correct the statement the prosecution deprived the defendant of *Brady* material, that is, the correction itself." 349 F.3d at 360 (internal citations omitted).

Here, the duty to disclose under *Brady* "drops out" because Avery knew what he said (or didn't say) to the jailhouse informants, just like Gauger knew what he said to the interrogating police officers. *See Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007) ("Like Gauger, Harris knew about his relationship, or lack thereof, with Davis. He was

fully capable of challenging the officers' and prosecutors' contention to the contrary"). Avery "seeks an extension of *Brady* to provide relief if a police officer makes a false statement to a prosecutor by arguing that an officer is 'suppressing' evidence of the truth by making the false statement." *Id.* The Seventh Circuit has "foreclosed this extension." *Id.*; *see also Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006) ("Nor can *Brady* serve as the basis of a cause of action against the officers for failing to disclose these circumstances [a coerced confession] to the prosecutor. . . . The Constitution does not require that police testify *truthfully*; rather 'the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies'") (emphasis in original).

**Remaining claims**

The defendants' only argument regarding the balance of Avery's claims is that they should be dismissed due to the absence of a viable, underlying due process claim. Obviously, given the foregoing analysis, summary judgment cannot be granted on that basis. The Court will also retain jurisdiction over the supplemental state law claims.

\*\*\*

Avery's motion to cite additional authority [ECF No. 78] is **GRANTED**. The defendants' motion for summary judgment [ECF No. 69] is **GRANTED-IN-PART** and **DENIED-IN-PART**, consistent with the foregoing opinion.

The trial in this case is scheduled to begin on December 1, 2014. If the parties anticipate that they will be unable to complete this trial in one week (five full days), they should jointly contact the Court to discuss re-scheduling.

Dated at Milwaukee, Wisconsin, this 18th day of August, 2014.

SO ORDERED:

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**