UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------

WILLIAM DAMON AVERY,

                              Case No. 11-CV-408

             Plaintiff,

                              Milwaukee, Wisconsin

    vs.

                              June 1, 2015

**CITY OF MILWAUKEE, et.al.,**

             Defendants.
----------------------------------------------------------------

**VOLUME 1**
TRANSCRIPT OF TRIAL
BEFORE THE **HONORABLE RUDOLPH T. RANDA,**
UNITED STATES DISTRICT JUDGE, AND A JURY


**A P P E A R A N C E S**

For the Plaintiff:              People's Law Office
                          By: **Mr. John L. Stainthorp**
                             **Ms. Janine L. Hoft**
                             **Mr. Ben Elson**
                          Attorneys at Law
                          1180 N. Milwaukee Avenue
                          Chicago, IL  60622


For the Defendant:             Milwaukee City Attorney
                          By: **Mr. Jan A. Smokowicz**
                             **Ms. Jenny Yuan**
                          Assistant City Attorneys
                          200 E. Wells St. - Rm. 800
                          Milwaukee, WI  53202-3551


REPORTED BY:                   HEIDI J. TRAPP
                          Federal Official Court Reporter
                          310, U.S. Courthouse
                          517 East Wisconsin Avenue
                          Milwaukee, Wisconsin 53202


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1                            **I N D E X**

2    **Witness:**                                              **Page**

3     **DEANNA LANKFORD**

4        Direct Examination By Mr. Stainthorp............  36
         Cross Examination By Ms. Yuan...................  74
5        Redirect Examination By Mr. Stainthorp..........  88

6    **WILLIAM DAMON AVERY**

7        Direct Examination By Mr. Elson................  90

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **TRANSCRIPT OF PROCEEDINGS**

2              THE CLERK:  Case Number 11-CV-408, William Damon Avery

3    vs. The City of Milwaukee, Detective Gilbert Hernandez,

4    Detective Daniel Phillips, Detective Katherine Hein, Detective

5    Timothy Heier, Detective Kevin Armbruster, Detective Erik

6    Gulbrandson, and Detective James DeValkenaere.  Called for a

7    jury trial.  May I have the appearances, please.  First for the

8    Plaintiff.

9              MS. HOFT:  Thank you.  Good morning, Your Honor.

10   Janine Hoft, H-O-F-T, on behalf of the Plaintiff.

11             THE COURT:  Good morning.

12             MR. STAINTHORP:  Good morning, Judge.  John

13   Stainthorp, S-T-A-I-N-T-H-O-R-P, also on behalf of the

14   Plaintiff.

15             THE COURT:  Okay.  Good morning.

16             MR. ELSON:  Good morning, Judge.  Ben Elson,

17   E-L-S-O-N, for the Plaintiff.

18             THE COURT:  Good morning.

19             THE CLERK:  And for the Defendants?

20             MR. SMOKOWICZ:  For the Defendants, Assistant City

21   Attorney Jan Smokowicz.  Good morning, Your Honor.

22             THE COURT:  Good morning.

23             MS. YUAN:  Good morning, Your Honor.  Assistant City

24   Attorney Jennie Yuan also appearing for the Defendants.

25             THE COURT:  Good morning.  The case is here for a jury

```
1   trial, and the Court is prepared to proceed.  I believe counsels
2   have a question or something to take up before we bring the jury
3   in?  Is that correct?
4           MS. HOFT:  Not for the Plaintiff, Your Honor.  We're
5   ready.
6           MR. STAINTHORP:  Actually yes, Judge.  I'm sorry,
7   Judge.  John Stainthorp.  On behalf of the Plaintiff, Judge, we
8   have indicated to the Defendants that we do not intend to
9   proceed against one of the Defendants, that being Detective
10  Gulbrandson.  And I believe that we and the Defendants are going
11  to enter into a stipulation to dismiss Officer Gulbrandson with
12  prejudice.
13          THE COURT:  Is that correct, Mr. Smokowicz?
14          MR. SMOKOWICZ:  That is my understanding, Your Honor.
15          THE COURT:  Okay.  The Court will proceed under that
16  anticipated stipulation, and we will proceed against the
17  remaining Defendants.  Anything else?
18          MR. STAINTHORP:  Just one thing on that matter, Judge.
19  That stipulation to dismiss is without costs to either side.
20          THE COURT:  Okay.  With prejudice, without costs to
21  either side.
22          MR. STAINTHORP:  Yes.
23          THE COURT:  All right.  That will be a written
24  stipulation submitted to the Court?
25          MR. STAINTHORP:  Yes.
```

1              THE COURT:  Okay.

2              MR. SMOKOWICZ:  We will do that, Your Honor.

3              THE COURT:  All right.  Then we're ready for the voir

4   dire?

5              MR. SMOKOWICZ:  One other matter, Your Honor.  I have

6   advised the Plaintiff's counsel of this as well this morning.

7   All of the Defendant Officers are present except -- with the

8   exception of Detective Hernandez.  Detective Hernandez, as I

9   understand it, had a medical issue yesterday while cutting the

10  grass.  It's my understanding he was hospitalized overnight for

11  observation and there is testing that is expected to be

12  performed today.  I cannot advise the Court of what, if any,

13  issues there may be as a result of that at this point.

14             THE COURT:  Well, I suppose we can proceed.  Not

15  suppose.  We can proceed.  Was Hernandez going to testify?

16             MR. SMOKOWICZ:  Not today, Your Honor.  But he will

17  testify probably at least twice in this case.  Once in the

18  Plaintiff's case, as I understand, and once in our case.

19             THE COURT:  Well, we'll proceed.  Let's play this by

20  ear.  As soon as he's available, we'll have him in and he can

21  testify in the Plaintiff's case, and then the defense case.

22             MR. SMOKOWICZ:  I just wanted to advise the Court of

23  that so there is no surprise in the event that it is more

24  serious.

25             THE COURT:  Okay.  Well, during the voir dire we will

1  obviously mention, as I say, the Defendant.  And we'll introduce

2  the Defendants to the jury, because the Court will obviously

3  inquire as to whether or not anybody knows any of the parties

4  involved in the case.  The lawyers and the participants.

5  Witnesses and Defendants and the Plaintiff.  So I'll explain at

6  that point, unless there's an objection, that Defendant

7  Hernandez is unavailable because he's -- well, he's just

8  unavailable for say a justifiable reason at this point?

9          MR. SMOKOWICZ:  I think that's fine from our

10  perspective, Your Honor.  I don't think that we need to go into

11  any of the details one way or the other.

12          THE COURT:  Okay.  Anything else before we bring the

13  jury over?

14          MR. SMOKOWICZ:  Judge, the other thing that we did

15  submit to the Court on Friday, I believe, is a proposed

16  stipulation and order to dismiss all of the claims under State

17  law.

18          THE COURT:  Right.  Those were 5 and 6.  And the Court

19  has received that, and so that will be dismissed.  Anything

20  else?

21          MR. SMOKOWICZ:  Not from the Defendants, Your Honor.

22          THE COURT:  Okay.  We'll have the bailiff bring the

23  jury over, and we'll start the voir dire process.  In the

24  meantime, the Court will take a short break while that's being

25  done.

1          (Whereupon a recess was called by the Court.  Upon

2     conclusion of the recess, the proceedings continued with a voir

3     dire selection of the jury panel.  Upon conclusion of voir dire,

4     the proceedings continued as follows:)

5          THE COURT:  Ladies and gentlemen, for those of you who

6     have been selected, as I indicated we're going to start out with

7     the opening statements of the attorneys.  But before we do that,

8     we're going to allow the attorneys some time to set things up.

9     But we also want to familiarize you with the jury room that you

10    will be reporting to each and every time you leave the courtroom

11    and come back.  Do not go back to the jury assembly room.  We

12    have a jury room now where you can put your personal things in.

13    And there are bathrooms and other minimal amenities there that

14    you can take advantage of and you can leave your personal

15    affairs and it will be very, very secure back there also.

16          So we're going to take a break.  And please follow the

17    Bailiff, and we'll have you back here for the opening statements

18    of the attorneys.

19          (Whereupon the jury was excused at 10:42 a.m.)

20          THE COURT:  Okay.  Do the opening statements?

21          MS. HOFT:  Yes, Your Honor.

22          THE COURT:  How much time?  15 minutes?

23          MS. HOFT:  That's what I was thinking, Your Honor.

24          THE COURT:  15?  Okay.  All right.

25          MS. HOFT:  Your Honor, one issue on the opening.  We

1   have a demonstrative evidence that I'd like to use in opening.

2   It was provided to the other side, and it's an Exhibit in the

3   Exhibit book.  It is -- there's a group Exhibit 4, and I was

4   just going to be using the map for 4-A.

5           THE COURT:  Any objection to that?  Use of that map,

6   Mr. Smokowicz?

7           MR. SMOKOWICZ:  I am assuming that someone is going to

8   be able to support this as evidence here.  But assuming that to

9   be the case, I don't have an objection, Your Honor.

10          THE COURT:  Well --

11          MR. SMOKOWICZ:  This is a map that relates to the

12  location of various individuals tied to Walter Ellis.  While I

13  know that the D.N.A. expert will tie Mr. Ellis to certain

14  people, I'm not sure that the D.N.A. -- or the expert is going

15  to have any notion about addresses.

16          THE COURT:  That the D.N.A. what?

17          THE WITNESS:  The D.N.A. expert, Miss Lankford, or

18  whoever they're calling from -- they're calling someone from the

19  State.  I'm assuming that that person will be familiar with who

20  the -- who people were connected to in terms of D.N.A. and

21  Walter Ellis, but I'm not certain that that person will have any

22  notion about addresses.

23          THE COURT:  So the objection is that these may not

24  have occurred at these addresses?

25          MR. SMOKOWICZ:  Well, no.  My objection is they may

1    not be supported -- this may not get into evidence.  I don't

2    know --

3                THE COURT:  Well, then, isn't that the downside of the

4    Plaintiff then to be quickly pointed out that what they have

5    offered is not sustained by the evidence.  But it does have some

6    value as far as placing these people, so the Court will allow

7    it.

8                MR. SMOKOWICZ:  All right.

9                MS. HOFT:  Thank you, Your Honor.

10               THE COURT:  Anything else?  Okay.  We'll take 15,

11   then.

12               (Whereupon a recess was called by the Court.  Upon

13   conclusion of the recess, the proceedings continued as follows:)

14               MR. SMOKOWICZ:  Your Honor, it appears that some

15   members of Mr. Avery's family are here present in court.

16   They -- some of those individuals may have been listed as

17   witnesses.  The Court may recall that the Plaintiff himself

18   requested in motions in limine number 4 to bar all non-party

19   witnesses from the trial.  Obviously the children, as the Court

20   will recall, have been dismissed as parties.  If the

21   Plaintiff -- even if the Plaintiff himself were not interested

22   in this motion, we would obviously want to have witnesses

23   sequestered.

24               MR. STAINTHORP:  Judge, if any party makes a motion,

25   it's granted.  So --

1          THE COURT:  Yeah, which is fine.  There's a

2     sequestration order that was not objected to, so yeah, if

3     they're going to be a witness -- what about opening statements?

4          MR. SMOKOWICZ:  I believe they shouldn't be here for

5     opening statements.

6          THE COURT:  Okay.

7          MS. HOFT:  And it's the Plaintiff's position that they

8     should be here.  Opening and -- opening is not evidence in this

9     matter, and that any possible witnesses could be present for the

10    opening statement.

11         THE COURT:  I usually allow opening statements for the

12    -- well, yeah.  The Court will allow it for opening statements,

13    but not for the trial testimony.

14         MR. SMOKOWICZ:  All right, Your Honor.

15         THE COURT:  Anything else?

16         MR. SMOKOWICZ:  No.  That's it, Your Honor.

17         THE COURT:  Okay.

18         (Whereupon the jury was returned to the courtroom at

19    11:12 a.m. and was duly sworn.)

20         THE COURT:  As indicated, ladies and gentlemen, we're

21    going to start out with the opening statements of the attorneys.

22    And then, of course, we'll take a break for lunch after that.

23    But remember, the opening statements are not evidence.  They are

24    an opportunity for the attorneys to familiarize you with what

25    they think the evidence is going to show.  Miss Hoft, if you're

1    ready, you may proceed.

2           MS. HOFT:  Thank you, Your Honor.  Good morning again.

3    Police are to serve and protect you, not to set up and frame you

4    for murder.  This case is about the Defendant Detectives -- who

5    are no longer in the courtroom -- framing William Avery, sending

6    him to prison with a 40 year sentence for a murder he did not

7    commit.

8           As I said, my name is Janine Hoft and I, along with my

9    law partners, John Stainthorp and Ben Elson -- we represent

10   Mr. William Avery.  And this is Mr. Avery's case.  He's bringing

11   this case to you, and opening statements are our opportunity, I

12   think as the Judge told you, to give you a preview and an

13   overview of what we expect the evidence to show.

14          You saw 5 of the Milwaukee Police Department

15   Detectives who are 5 of the 6 Defendants in this case who are

16   responsible for William being wrongfully convicted of murder.

17   Our civil system of justice includes the right to a jury trial.

18   To have people like you, each and every one of you, to determine

19   justice and compensation should you find a violation of our

20   Constitutional rights.

21          This case is not for the faint of heart.  It involves

22   gruesome details of murder.  Murders.  And an ongoing nightmare

23   for William Avery as the Defendant Detectives fabricated

24   evidence to falsely brand him a murderer.  We thank you for

25   being here, each and every one of you.  We thank you for

1  considering the evidence in this important case.

2          The context of this story begins and ends with a man

3  named Walter Ellis.  Walter Ellis -- he's not a party in this

4  case.  He was dubbed the North Side Strangler.  He eluded Police

5  for more than 20 years, trolling the north side of Milwaukee for

6  those 20-plus years, and murdering at least 10 women.  Preying

7  on them in an area of drugs and prostitution.  Most he strangled

8  and left to die in vacant houses or garages.

9          Debra Harris in October of 1986.  Tanya Miller, Irene

10  Smith, Carron Denise Kilpatrick, Florence McCormick, Sheila

11  Farrior, Jessica Payne, Joyce Mims.  Maryetta Griffin, who is

12  the victim that you will hear the most about in this case.  And

13  Quithreaun Stokes.

14          Deanna Lankford, a forensic scientist from Texas, will

15  tell you that D.N.A. evidence found on each of these victims

16  pointed to Walter Ellis, the North Side Strangler.  Indeed,

17  Walter Ellis was charged and convicted of 7 of these murders,

18  and he has since died in prison.

19          The evidence will show that the ninth victim of Walter

20  Ellis was a woman by the name of Maryetta Griffin.  Her body was

21  found partially clad in an abandoned garage at 3032 North 7th

22  Street on February 17th, 1998.  Miss Griffin had been strangled

23  to death, and it appeared she had been sexually assaulted.

24  Evidence was recovered from her vaginal area, her mouth, and

25  under her fingernails.  The Milwaukee Journal Sentinel, the

1    local newspaper here, published a story about Miss Griffin's

2    death and decried the multiple other unsolved similar murders

3    that had occurred on the north side of Milwaukee.  The Police,

4    however, were resistant to making any kind of connection.  The

5    Police, though, began to question people in the area, and those

6    involved in drugs and prostitution on the north side of

7    Milwaukee.  Maryetta Griffin was reported to have purchased

8    drugs in the area.

9          Now, at this time in 1998 William Avery was in a bad

10   situation.  He struggled with many issues, including abusing

11   substances from a young -- very young age.  His life had not

12   been easy.  His father died before he was a teenager.  His

13   mother struggled with drugs.  At 22 years of age he was shot in

14   the back of the head.

15         Now it's 1998.  He had dropped out of high school.  He

16   was 26 years of age.  He made a horrible decision.  He agreed to

17   help his cousin sell drugs out of a house on North Palmer

18   Street.  The evidence will show that William was convicted of

19   this drug offense, he served his time, and that is not what this

20   case is about.

21         Five weeks after Maryetta Griffin's body was found,

22   the Police left a card at the house where William was staying.

23   And so William called the Police, made an appointment to go in

24   voluntarily to the Police station the next morning, without any

25   further prompting, and that morning he went down to the Police

1 station to talk to the Defendant Detectives James DeValkenaere,

2 Daniel Phillips, Kathy Hein, and Gilbert Hernandez.  Although he

3 did not know it, he was about to begin living a nightmare.

4       You will hear the testimony of a Police expert, Dennis

5 Waller.  He will tell you how a homicide investigation should be

6 conducted.  That such an investigation is a search for the

7 truth.  That evidence must be reliable and cannot be created or

8 falsified.  That these Defendant Detectives who were here this

9 morning, 5 out of 6 of them on trial today, did not follow those

10 rules.

11       After William had voluntarily gone down to the Police

12 station, over the next several days -- this was March 23rd,

13 1998.  Over the next several days the Defendants Detectives

14 DeValkenaere, Phillips, Hein, and Hernandez locked William away.

15 Interrogated him.  He repeatedly denied any involvement in Miss

16 Griffin's murder.  He consistently maintained that he did not

17 kill her.  The Defendant Detectives asked him the same questions

18 over and over again for these days.

19       They at first suggested maybe he didn't remember.

20 That maybe he didn't mean to kill her.  They became more

21 aggressive.  William asked for a lawyer, but was told it doesn't

22 work that way.  One of the Defendant Detectives pushed him,

23 poked him in the chest, and shoved him against a wall.  Another

24 made him stand for hours.  Tapped him in the face and flicked a

25 lighter in his face, threatening to burn him.  They wanted to

1   clear this murder case in the worst way.  That was foremost in

2   their mind.

3          So they gave up talking to William.  They stopped and

4   simply wrote false reports.  Falsely claiming and fabricating

5   that William had confessed to this murder in those reports.  If

6   William wouldn't make up statements incriminating himself, they

7   would just set him up and say he did.  The reports falsely

8   claimed that William said he was responsible.  And that they had

9   engaged in oral sex.  Remember, the Police knew that Maryetta

10  Griffin's -- evidence had been recovered from her mouth.  They

11  wrote false reports indicating that Williams said he strangled

12  her, and asked his cousin to move the body.  Because the

13  evidence will show that where the body -- where the Police knew

14  the body was found was a mile away from where they knew William

15  was at the time.

16         The evidence will show that the Defendants made a

17  number of major mistakes in their attempt to frame William for

18  murder.  They had no evidence against him.  No evidence was ever

19  found in the vehicle they claim he used to move the body.  Of

20  course, his cousin denied having anything to do with this.  And

21  William, back in 1998, in about August, scientists provided

22  information that William was excluded from contributing to any

23  evidence found on Miss Griffin's body, including the D.N.A. or

24  serology, as they called it before, in her mouth, vagina, or

25  under her fingernails.

1    So they were not able to set William up at that time

2  and charge him with murder.  So he began serving his time on the

3  drug offense.  However, at this time a Milwaukee Journal

4  Sentinel newspaper article again was published.  Identified

5  William, and also published the Defendants' false claims that

6  William had confessed.  This was in the newspaper back in 1998.

7  That William implicated himself in Miss Griffin's murder.

8    Within months William, from his prison cell,

9  specifically identified the misconduct of these first four

10  Defendant Detectives and their defamation of him in a Notice of

11  Claim.  What's called a Notice of Claim that was filed in

12  November of 1998 with the Attorney General for the State of

13  Wisconsin.  But Defendants maintained their false reports.  They

14  stuck to their concocted story, and these reports that contained

15  these incriminating statements, and sought to continue their

16  lies and continue to work to successfully frame William for

17  murder.  But they were in no hurry, because William was serving

18  his time on the drug offense.

19    In the meantime, no further physical evidence came to

20  light linking William to the murder.  In fact, no physical

21  evidence would ever link William to Miss Griffin's murder.  And

22  as Miss Lankford will testify, the D.N.A. evidence will

23  implicate and point to serial killer Walter Ellis.  And that it

24  was Walter Ellis's semen found in her mouth.  Miss Lankford

25  works for an independent lab in Texas.  She does not know

1    William.  She does not know any of the Defendants.

2          The campaign to frame William consisted only of

3    Defendants' false claims that he implicated himself.  Thus, how

4    did the Defendants build a case against him?  To continue the

5    house of cards that was built on these fabricated statements

6    that William Avery indicated himself?  Well, they decided they

7    would say he made incriminating statements to others.  And not

8    just anyone.  But three jailhouse informants said that William

9    also made incriminating statements to them while they were in

10   prison together.  Now, isn't that convenient?  William, of

11   course, unequivocally and repeatedly denies that he made any

12   incriminating statements.  As how could he incriminate himself

13   in something he did not do?

14         As Williams' nightmare continued, two additional

15   Defendant Detectives got involved with the original four.

16   Detectives Armbruster and Heier.  And they, along with Hein --

17   or Spano, as she's known now -- and Hernandez interviewed

18   these -- interviewed, and re-interviewed, and rehearsed the

19   testimony of these three jailhouse informants.

20         Within weeks of Williams' release from prison after

21   serving his time on the drug offense, he was charged with this 7

22   year old murder while meeting with his Probation Officer.  He

23   was then convicted and sentenced to 40 years based on the

24   defamatory, false, incriminating statements in Defendant

25   Detectives' 1998 reports, and what was supposedly said to these

1  three jailhouse informants.

2          Police expert Dennis Waller will explain the problems

3  with relying on jailhouse informant testimony by any credible

4  law enforcement official.  You will, in fact, hear live in this

5  courtroom from two of these informants.  They will tell you not

6  only did William never make any incriminating statements to

7  them, but their testimony that helped wrongfully convict William

8  of murder was not accurate.  That their testimony was

9  manipulated, rehearsed, and reviewed by the Defendant

10  Detectives.  And that they testified under duress, and that they

11  are painfully sorry for their part in assisting the Defendants

12  in framing William for murder.

13          The third informant, a man by the name of Antron Kent,

14  you will hear his testimony by way of a deposition.  Mr. Kent is

15  taking the Fifth Amendment.  He's refusing to answer any

16  questions about what he testified to at William's trial so as

17  not to incriminate himself.  Because if he tells the truth about

18  what he lied about on the stand, he fears he will be prosecuted

19  for perjury.

20          While beginning to serve his 40 year sentence for the

21  murder of Maryetta Griffin, William of course maintained his

22  innocence and himself wrote to the prosecutor's office begging

23  that additional D.N.A. testing be done in the Maryetta Griffin

24  case, believing -- and the man's belief system is amazing --

25  believing that somehow the truth would come out that he is not a

1    murderer, and he did not murder Maryetta Griffin.

2            Finally, the evidence from Miss Griffin's body is

3    unequivocally connected to Walter Ellis, the North Side

4    Strangler, and William is released from prison in May of 2010.

5    William served 6 years in prison, from 2004 to 2010, for a crime

6    he did not commit.  He was branded a murderer for many more

7    years.  In prison he had no opportunity to better himself or

8    live as we do in free society.  He was a grown man, but he was

9    told when and what to eat, when and where to go to sleep, when

10   to get up.  He was locked away in a cell.  William had served

11   time before on the drug case, but now he was a convicted

12   murderer.  In 2012 William petitioned the State of Wisconsin for

13   wrongful imprisonment of an innocent person.  The Board found

14   that there was clear and convincing evidence that William Avery

15   was innocent of the crime for which he was convicted.

16           William may be different than you.  He has suffered a

17   unique nightmare.  But he is trying to make a decent life for

18   himself now.  In the 5 years since he was released after serving

19   6 years of this 40 year sentence for murder, William graduated

20   from the Milwaukee Area Technical College with a degree in

21   carpentry.  He has reconnected with his 5 children who are all

22   now in their twenties, and is working to repair and nurture

23   those relationships.  You will hear from some of his kids who

24   support their Dad and know how he was affected by the Defendant

25   Detectives' successful efforts to set up and frame him for

1    murder.  He now has two grandsons.  He has stayed out of

2    trouble, stayed away from drugs, supported by his religious

3    faith, and is trying to support himself by taking carpentry and

4    home improvement jobs.

5              I appreciate your attention.  And in conclusion the

6    evidence will show that William brings claims under the United

7    States Constitution that he was wrongfully convicted of this

8    heinous murder because the Defendant Detectives violated his due

9    process right to a fair trial.  There is nothing so fundamental

10   in our criminal justice system than that those who are supposed

11   to uphold the law may not deliberately fabricate evidence,

12   create false statements, and frame an individual for a crime

13   they did not commit.  Only you, the 9 of you, can stop the

14   maligning and smearing of William Avery.  After you have

15   considered all the evidence, do not allow the Defendant

16   Detectives to get away with their set-up.

17             MR. SMOKOWICZ:  Your Honor, we've gone into argument

18   now.  We're -- I'm going to object.  This is argument, not

19   opening statement.

20             THE COURT:  Well, arguments should be as to what the

21   facts should show, so --

22             MS. HOFT:  And after you've considered all the

23   evidence, all the facts that come in in this case, return a

24   verdict for the Plaintiff and award him substantial damages to

25   compensate him for this nightmare.  Thank you.

1          THE COURT:  Mr. Smokowicz.

2          MR. SMOKOWICZ:  Thank you, Your Honor.  Good morning

3   again, ladies and gentlemen of the jury.  My name is Jan

4   Smokowicz.  I am an Assistant City Attorney for the City of

5   Milwaukee.  I and Jenny Yuan of our office have the pleasure of

6   representing the City and the Defendant Officers who you saw

7   this morning, except for Defendant Detective Hernandez.  They

8   obviously are still Officers with the exception of 1 or 2 --

9   actually, I should say one works for the City, but not as a

10  Detective.  And the other is retired.  In any event, they are

11  not here because they're attending to their duties.

12          This case does not begin with any investigation of

13  Walter Ellis, someone that the evidence will show there was not

14  any evidence about in the course of this investigation until

15  many years after.  Until after -- in fact, until 2009, 2010,

16  when D.N.A. evidence was linking him to various individuals.

17  Nor does this case actually begin with the questioning of

18  William Avery.

19          And, in fact, it begins sadly with the murder of

20  Maryetta Griffin.  Her body was found on February 17th of 1998.

21  We believe the evidence will show that an Officer Kenneth Cecil

22  was dispatched to that location in the 3000 block of North 7th

23  to check for a body found in a garage.  And he indeed found a

24  black female there in a dirty garage, only wearing a letterman's

25  sweater.  Nothing more.  She was at that point in a state of

1    rigor.  Her legs, in fact, were in the air.  And it appeared to

2    the Officers who responded that she had been placed there by

3    someone.

4         Detective Barbian-Gayan, who I believe you will hear

5    from in our case, was sent there and arrived -- or was sent

6    there around 11:30 in the morning on the 17th of February.  The

7    scene was secured.  The body was there.  And as I indicated,

8    also, in her opinion, it is likely that that body had been

9    placed there.  There was no sign of a struggle in the garage.

10   Miss Griffin's feet were not dirty.  The garage was very filthy,

11   on the other hand.  The Medical Examiner pronounced Miss Griffin

12   dead at 12:15 on the 17th of February.  And the woman was

13   identified at that time.

14         You will only hear in this testimony about these

15   Detectives -- a very small slice of this investigation.  Their

16   role that you will hear about in this case doesn't begin until

17   about a month after this homicide.  That investigation had led

18   the Officers, or led Police to understand that Miss Griffin had

19   been in a drug house the night before on February 16th, at 2474

20   North Palmer Street.  And there, in fact, was at least one

21   witness, if not more, who indicated that Griffin was there with

22   that person.  She was at that time a prostitute and a drug

23   addict.  That drug house was operated, as you may know or you

24   may have guessed or inferred from what you've heard a little bit

25   this morning, by two men.  Cousins.  One, Lorenzo Frost.  The

1    other, Mr. Avery.

2              Avery, about a month later, about a month after the

3    homicide, because of his connection, Police wanted to speak to

4    him, and he comes to the Police Department voluntarily.  After

5    he learns that they want to question him about it.  About a

6    homicide.  He is questioned initially by two Detectives.

7    Detective De Valkenaere and Detective Phillips on March 23rd.

8    We believe the evidence will show that that began at about

9    11:30 -- pardon me, in the morning on that day.

10             There is a report of that interview.  That report is

11   typewritten.  That report is included in an extensive homicide

12   file.  That entire file was turned over to the prosecutor, and

13   that entire file is made available by the prosecutor to the

14   defense lawyer for Mr. Avery.  That report is not signed by

15   Mr. Avery.  It's not a statement by him.  It's just a report of

16   what he told Detectives DeValkenaere and Phillips.  That

17   Mr. Avery admits to them that Griffin was at that drug house.

18   And in their report he is reported as having admitted having

19   oral sex.  That is, Miss Griffin performing oral sex upon

20   Mr. Avery.  Most importantly that report, which is provided to

21   the District Attorney and to the defense, reports that Mr. Avery

22   denied killing Miss Griffin.  The questioning lasted until 7

23   o'clock that evening, but there was a break during that time for

24   a lie detector test.  And that break took about --

25             MS. HOFT:  Objection, Your Honor.  The evidence will

1  not show what Mr. Smokowicz is now arguing.  And this was

2  subject to a motion in limine.

3           THE COURT:  Well, then it should be excluded.

4           MR. SMOKOWICZ:  There was a break taken for a

5  different purpose other than questioning Mr. Avery during that

6  first day.  For 3 to 4 hours.  Mr. Avery was held on open

7  warrants as a result of his coming into the Police Department

8  that were unrelated to anything involving Miss Griffin.  The

9  next day, on March 24th, the next day -- after the evening,

10  after the night's rest, Detective Phillips and Detective

11  Hernandez questioned Mr. Avery.  You will not hear anything more

12  about Detective DeValkenaere being involved in any kind of

13  activity in this case.

14           As a result of that questioning, Detective Hernandez

15  sat down and wrote out a statement.  You will hear evidence that

16  what he wrote is what Mr. Avery told him.  You will hear

17  evidence that before that was written out, there was a portion

18  that he was read his Miranda rights.  And that Mr. Avery's

19  signature appears there.  You will hear evidence that the rest

20  of the statement, as I indicated, is what Avery told Hernandez

21  and Phillips.  At the end of that statement, it is not signed.

22  There is no reference to sex in that statement.  There is a

23  statement by Mr. -- or attributed to Mr. Avery that he on that

24  night, on February 16th, or in the early morning hours of

25  February 17th, grabbed and fought with Maryetta Griffin while

1  she was at the drug house.  There is a statement attributed to

2  him that he simply, quote, doesn't remember what happened, close

3  quote.  But that Frost called and that he told Frost to get

4  over, and that he said, quote, I think I killed this bitch,

5  close quote.  In his statement it is not indicated -- in fact,

6  you will hear testimony that he was asked, how did he do it?

7  And that Mr. Avery indicated he didn't know how.  She might have

8  been killed but that he, quote, said I'm responsible.  I just

9  don't remember how, close quote.

10      That interrogation, that questioning, lasted from 10

11  o'clock in the morning until 12:30.  That's it.

12  Hour-and-a-half.  Or two-and-a-half hours, I'm sorry.  My math.

13  Later the same day he is questioned again by Detectives

14  Hernandez and now Detective Spano.  Then her name was Hein.

15  That lasted from 5:30 in the evening until 2:30 the following

16  morning.  Mr. Avery refuses to sign any statement there that's

17  written out for him.  He admits to running the drug house.  He

18  admits that he worked for Frost.  The report indicates that

19  Griffin was there several times before her death, and that she

20  was there on the evening of the 16th.  This report again

21  reflects oral sex by Griffin on Avery.  But the report does not

22  -- and in fact it unequivocally says -- that Mr. Avery denies

23  killing Griffin.

24      Again, all three of these reports, inconsistent in

25  their statements about what happened, are all given to the

1    prosecutor.  All available for the defense when Mr. Avery is

2    charged with a homicide.  Given that evidence and certain others

3    as you heard already this morning, in March 1998 there was a

4    drug charge -- drug house charge issued against Mr. Avery.  He

5    was convicted and he was imprisoned for a number of years.

6              Years go by and this case cannot be solved.  Is not

7    solved.  And as matter of fact, the next thing you will hear is

8    that 3 years later, 3 years later, in March of 2001, Detective

9    Heier is contacted by an attorney.  And that the attorney tells

10   Detective Heier that his client has information about a

11   homicide.  Detective Heier is a homicide Detective.  That

12   attorney's client was a man named Keith Randolph.  And that --

13   and you will hear that Detective Heier met with Randolph and his

14   attorney initially.  That the attorney left after a short period

15   of time, and the attorney actually left the room, left his

16   client alone with a Detective, and that Randolph recounted that

17   Avery had made a statement to him.  Randolph, it turns out, is a

18   friend of the family.  Of the Averys.  He was a pallbearer for

19   Avery's mother.  This is in the report, and this is in the

20   statement.  It was made available to everybody.  It's not

21   hidden.  That Randolph says yes, I read an article about this.

22   But he says in July of 1998 -- not only that, he says he also

23   saw Mr. Avery's statement.  That's in the report, too.  That's

24   not hidden from anybody.  Randolph says that Avery admitted

25   choking Miss Griffin.  Now, Avery -- pardon me, Randolph said

1    that Avery told him not that he had help from Frost, but that he
2    had help from a different man, Little "C".  And that Little "C"
3    and Avery dispose of the body at 9th and Burleigh.  Not on North
4    7th Street.

5         Still nothing happens with this man.  Another year
6    goes by.  July of 2002.  And now, although it's been
7    characterized as Officers looking for -- trying to frame or make
8    a case, instead it's actually a call from a prison in Oklahoma
9    that Detective Armbruster takes out of the blue.  Just simply
10   because he's available.  The caller initially wants to remain
11   anonymous, but it turns out -- we learn later -- it's Antron
12   Kent.  And this caller is saying hey, William Avery is here in
13   prison with me in Oklahoma, and he's confessing to choking a
14   woman.

15        There are several calls.  This report is documented.
16   This call is documented.  There are several calls where there's
17   really nothing added to that.  And he eventually agrees to be
18   identified as Mr. Kent.  And he says -- there's another call
19   that is reported.  And this report is written up and provided
20   again to everybody.  That hey, there's another witness, by the
21   way.  Jeffrey Kimbrough.  He overheard that statement that Avery
22   made to me.  So Detective Armbruster is actually leaving the
23   Homicide Unit at that point.  He's going to be transferred out.
24   But nonetheless, he has enough time on his assignment to go to
25   Oklahoma, after the approval of the District Attorney's Office,

1   with Detective Heier in August of 2002 to interview three

2   people.  Kent, Kimbrough, and Avery.  And they -- that is Kent

3   and Kimbrough, recount a conversation with Avery in prison that

4   Kimbrough overhears.  And in which Avery says he choked a woman,

5   who he identifies sufficiently so that it is connected to

6   Maryetta Griffin.  And that Frost, not Little "C", helped dump

7   the body.  And that Avery believed that she was dead.  And that

8   this is connected to a dope house.

9          As I indicated to you, the evidence will be that those

10  Detectives also go speak to Mr. Avery, who is in prison in

11  Oklahoma.  Who essentially says after awhile I'm not telling you

12  anything.  You want to talk to me?  I'm going to go back to

13  Wisconsin when I'm done with this.  Maybe I'll talk to you then.

14         More than a year after that passes.  October of 2013.

15  Because of the passage in time you will hear Detectives Spano

16  and Hernandez interview Kent and Kimbrough to find out whether

17  they still -- they're in prison -- are willing to testify

18  against Avery.  No promises are made.  You will hear from the

19  Detectives nothing was promised to them.  No coercion was

20  applied.  They did not feed any facts to these individuals about

21  this statement.  And both of them are still willing to testify.

22         Almost a year goes by again.  In September of 2004,

23  early September, Detectives Gulbrandson and Heier interview

24  Kent.  And Kent indicates that he's willing to continue to

25  cooperate.  And they file a report to that, and they file a

report that says oh, by the way, he has another detail. That
the body was left in an area -- in a particular area, and that
the -- for a reason they thought that would allow them not to be
connected to the crime. And that the F.B.I. was investigating
at that time. Avery is out of prison at that point. On
September 7th, a Criminal Complaint is signed by the prosecutor
and by Detective Heier, and Mr. Avery is arrested on
September 21st.

Gulbrandson and Heier go and speak to him after he's
arrested, and they file a statement. A report. Which says I'm
not going to talk to you. I want to speak to my lawyer. And
that's reported, and that's not hidden. Not kept from anybody.
This entire file is brought to the prosecutor, and that entire
file includes the one D.N.A. report that you heard from, that
time frame of August of 1998. That's not made unavailable. And
that does exclude Mr. Avery from the oral swab taken from
Maryetta Griffin after her death.

Ultimately there is no credible evidence that shows
that these stories were fabricated by the Detectives. These
individuals contacted the Police. They contacted Police for
their own purposes. For their own motivation. On their own
terms. The Detectives -- there's no evidence of any motive
there. They didn't know Mr. Avery. They had no reason to focus
on him, as opposed to Lorenzo Frost, for example. And
everything -- all of the warts, all of the good, all of the bad,

1   all of the pluses, all of the minuses, were provided to the

2   prosecutor, available to the defense, and available to use in a

3   fair trial on the homicide charge.  There is nothing in any of

4   that material connecting Walter Ellis.  Nobody knows about

5   Walter Ellis until years after, unfortunately, when D.N.A.

6   science advances.  And I believe you will hear that.  That's the

7   advance in D.N.A. science, and it's the ability to run tests on

8   various individuals who are required to submit samples, that lo

9   and behold, Walter Ellis is finally connected to this matter.

10          And much of what you will hear from Miss Lankford, for

11  example -- all of it, first of all, depends on the tests --

12  almost all of it relies upon tests that are done long after this

13  homicide, and long after the investigation.  And, in fact, after

14  the trial.

15          Lastly, as to the expert Mr. Waller, you will hear

16  that his last work in law enforcement was as Chief of Police in

17  Ripon in 1987.  And that he's been a hired expert since then.

18  The last time he was certified as an instructor of law in

19  Wisconsin, in law enforcement, was 1985.

20          Ultimately the claims here are that Mr. Avery had a

21  group of individual Detectives that for some reason framed him.

22  The evidence does not support that.  Thank you very much.

23          THE COURT:  All right.  Ladies and gentlemen, we're

24  going to take a break for lunch now.  You've heard the opening

25  statements.  After lunch we'll start the offering of evidence

1    and the Plaintiff will present its first witness.  Now, we'll

2    have you back here at 1 o'clock.  Please don't discuss the case

3    among yourselves, or with anyone.  Only after all the evidence

4    is in, one.  And two, if you see someone connected with the

5    case, why, you can acknowledge them, but don't carry on any

6    conversation.  So we'll see you back here after 1 o'clock.  Have

7    a good lunch, okay?

8              (Whereupon the jury was excused at 11:54 a.m.)

9              THE COURT:  Okay.  1 o'clock.

10             MR. STAINTHORP:  Judge, I think there's one matter

11   that we wanted to raise before the break.

12             THE COURT:  Sure.

13             MR. STAINTHORP:  There was a motion in limine in this

14   case, which was to exclude any mention of a polygraph test.  And

15   you made a very clear ruling that that was excluded.  And it's

16   very upsetting to us and mystifying why, in an opening

17   statement, not something that just happens off the spur of the

18   moment, but a prepared opening statement, there would be a

19   reference in Mr. Smokowicz's opening to the polygraph.  And, of

20   course, Your Honor did sustain the objection at that point and

21   told him to move on.  But it's very distressing to us that there

22   would be such a blatant ignoring of your ruling.

23             MR. SMOKOWICZ:  Your Honor, may I?

24             THE COURT:  Of course.

25             MR. SMOKOWICZ:  I'm reading the Court's order from

1  January 20th.  On motion in limine number 11, it bars any

2  reference to any alleged results, findings, or conclusions

3  regarding Plaintiff taking a polygraph examination in 1998,

4  including that Plaintiff voluntarily submitted to the polygraph

5  examination.  Accordingly, the testimony of polygrapher Robert

6  Simons is barred, and Simons' polygraph record may not be used

7  as an exhibit.

8          I was not going to make any statement there as to any

9  results.  I did not indicate that he had volunteered to take it

10  or not.  I simply wanted to -- and I think the jury has a right

11  to understand here that 3 of the 7 hours that day were involved

12  in the examination.  Otherwise it leads them to the mistaken and

13  inappropriate thought that these Officers interrogated him for 7

14  hours.  And so I recognize, Your Honor, that I was at the edge

15  of the Court's order.  If the Court feels I went over, I

16  apologize.  I did not do so intentionally.  That's why I stopped

17  where I was.  And we didn't get any further into it.  However, I

18  do think the jury is entitled to know that there was an

19  examination.  I do think they should be instructed that they

20  should not take any inference from the fact that an examination

21  occurred.

22          THE COURT:  Well, it technically is within the bounds

23  of the Court's order.  And the Court's view is that, one, the

24  polygraph examination could have gone either way.  One.  Two, it

25  could have been voluntary or involuntary.  All of that is

subject to interpretation of those facts.  Can be subject to
interpretation either supporting one side or the other.  So the
Court's ruling that it not be discussed any further, and that
its exclusion by the Court on opening statements, that it did
not conform to what was going to be presented as evidence was
accurate in the sense that the Court's order during the course
of the trial will preclude the offering of the delay as --
offering of delay as a result of the polygraph test.  But
certainly the evidence can be put into the record that the delay
was not related to any interrogation techniques.

So I don't think Mr. Smokowicz's violation was a
direct -- such as it is -- was a violation, if we want to look
at it that way.  In other words, improper motives I don't think
can be attached to it, so the Court is not disturbed by it.
Coupled with the fact that an interpretation could be made both
ways, either supporting, or not, the case of the Plaintiff.  Or
the defense, either way.  And so it's not that significant, in
the Court's view.  But in any event, it's related to what's
going to come forward.

I don't think the defense should be precluded from
stating that there was this hiatus that was unrelated to any
interrogation techniques.  However you want -- not related to
any interrogation techniques.  The polygraph, as I understand
it, and in the Court's experience, takes time to set it up,
blah, blah, blah.  I mean, it's not unusual.  But I don't think

1  it can be considered an interrogation technique.

2        MR. STAINTHORP:  Okay.  But Judge, am I correct in

3  understanding that there should be no mention going forward of

4  polygraph?  We're not going to make an argument that there was

5  an undue amount of time taken up in this interrogation.

6  Certainly --

7        THE COURT:  Well, it sounded like it in the opening

8  statements.  That he was put under heavy duress and pressure and

9  that there was this constant poking with the fire.  Lights.  I

10  mean, it may come out in the evidence, but I think defense has a

11  right to dispel that if they've got evidence to that effect.

12  And the fact that a polygraph examination is done by a

13  polygrapher and that it's not the cops in an interrogation room

14  shaking the client down, or shaking the Defendant or suspect

15  down.  The defense should have opportunity to testify that the

16  interrogation was stopped for other procedures.  Along those

17  lines.  But the polygraph is not going to be mentioned.

18        MR. STAINTHORP:  Fine.

19        MR. SMOKOWICZ:  Other procedures?  Is that the term?

20        THE COURT:  Yeah.  Other procedures unrelated to the

21  Detectives' interrogation that was conducted earlier.  Because a

22  polygrapher is someone separate.  Even though he may be

23  connected to the Department, he's not exactly a part of the

24  process of the interrogation techniques that we're talking about

25  here with investigating Officers pumping the Defendant or

1   potential Defendant -- or in this case the Plaintiff -- for

2   information.  So it won't be mentioned, but it can be mentioned

3   that this hiatus occurred unrelated to the interviewing that was

4   going on previously and then subsequently.

5           MR. STAINTHORP:  Okay.

6           THE COURT:  I think it handles the situation.

7           MR. SMOKOWICZ:  Thank you, Your Honor.

8           MR. STAINTHORP:  Okay.  Thank you.

9           THE COURT:  1 o'clock.

10          (Whereupon a recess was called by the Court.  Upon

11  conclusion of the recess, the proceedings continued as follows:)

12          MS. HOFT:  Your Honor, prior to our first witness

13  testifying, we would be seeking here to move into evidence

14  Plaintiff's Exhibits 1 and 2 pursuant to Federal Rule of Civil

15  Procedure 44, proving an official record.  Exhibit 1 is the

16  Walter Ellis Criminal Complaint, a certified copy of that.  And

17  Exhibit 2 is a certified copy of the Walter Ellis conviction.

18          THE COURT:  Okay.  Any objection to that?

19          MR. SMOKOWICZ:  Object on relevance grounds.  Other

20  than that --

21          THE COURT:  The Court will receive it.

22          (Whereupon the jury was returned to the courtroom at

23  1:13 p.m.)

24          MS. HOFT:  Your Honor, at this time we would move into

25  evidence Plaintiff's Exhibit 1, which is a certified copy of the

1 Criminal Complaint against Walter Ellis.

2         THE COURT:  All right.  The Court will receive them.

3         **DEANNA LANKFORD**, called as a witness, having been

4 first duly sworn, on oath testified as follows:

5         THE CLERK:  Please state your full name and spell your

6 last name for the record.

7         THE WITNESS:  Deanna Lankford.

8         MS. HOFT:  I'm sorry.  Exhibit 2.  And should I set

9 them on the table?  Exhibit 2 is a certified copy of the Walter

10 Ellis conviction.

11         THE COURT:  That will be received.

12         MR. STAINTHORP:  Plaintiff calls Deanna Lankford.

13         THE CLERK:  And now, ma'am, please state your full

14 name and spell your last name for the record.

15         THE WITNESS:  My name is Deanna Lankford,

16 L-A-N-K-F-O-R-D.

17                     **DIRECT EXAMINATION**

18 **BY MR. STAINTHORP:**

19 Q.  Good afternoon, Ms. Lankford.  How are you?

20 A.  I'm well.  And you?

21 Q.  Okay.  And can you tell the jury what you do for a living?

22 A.  Sure.  I'm an Associate Laboratory Director with Cellmark

23 Forensics in Dallas, Texas.  And we're a private D.N.A.

24 laboratory.  We test items of evidence.  Biological substances

25 of items of evidence -- from items of evidence and crime scenes,

1    and we compare that evidence to victims, witnesses, suspects.

2    Q.  And Ms. Lankford, could you summarize for the jury your

3    education and especially your education and training with

4    respect to D.N.A. analysis?

5    A.  I obtained my Bachelor's of Science in Medical Technology

6    from the Middle Tennessee State University.  I then went on and

7    obtained a Certificate in Medical Technology from the St. Thomas

8    School of Medical Technology.  I am actually now in the last

9    semester of my Master's program in Forensic Science, D.N.A. and

10   serology.  Decided to wait many years to get that.  But I should

11   have that in the next couple of months.

12           As far as my training goes?  That's something that is

13   ongoing every year.  We have to obtain a certain number of

14   continuing education hours in order to maintain our

15   accreditation in our laboratory and also to stay proficient in

16   the testing which we perform.

17           As far as each process, we are required to go through

18   rigorous training with each procedure that we perform, and that

19   we have to observe -- be observed, perform competency tests

20   before we're ever able to work on our own.

21   Q.  And can you tell us and tell the jury when you obtained

22   your -- the degrees and qualifications that you referred to?

23   A.  Yes.  Sorry.  That was in 1996.

24   Q.  And since 1996 have you been employed in the area of D.N.A.

25   analysis and reporting results with respect to D.N.A.?

1   A.   I have been.   I've been with my current company in two

2   different locations for the past -- going on 19 years.   So in

3   1996.

4   Q.   Okay.   And with respect to your training and education, have

5   you, since you graduated and obtained your degrees, continued

6   your study of the science of D.N.A.?

7   A.   I have.

8   Q.   Okay.   And since that time has the science with respect to

9   D.N.A. changed?

10  A.   It has changed a lot since -- well, even since before I was

11  in the field.   But when I started in 1996 the technology was, as

12  we call now, archaic.   But it has become more and more advanced

13  throughout the years.

14  Q.   And can you explain to the members of the jury the outlines

15  of the science of D.N.A.?   What is D.N.A.?   Why are we

16  interested in it?   In the forensic field?

17  A.   Sure.   D.N.A. is the basic building block of all living

18  things.   We each have our very own unique D.N.A. profile that

19  we're born with, and we die with that exact same D.N.A. profile.

20  We inherit half of our D.N.A. from our mothers, and half from

21  our biological fathers.   It's what gives you your hair color,

22  your eye color, your skin color.   If you have an identical twin,

23  you will share the same D.N.A. profile.   Other than that, we're

24  all extremely unique, and that is a very helpful tool when using

25  forensic D.N.A. analysis.

1  Q.  When you examine the D.N.A. from a cell in one part of the
2  body -- for instance, if you examine D.N.A. from the person's
3  skin on their nose, is that the same as D.N.A. from another part
4  of the body, such as semen?
5  A.  Yes.  Our D.N.A. is found in the nucleus of all nucleated
6  cells in our bodies.  So that the same D.N.A. that you would
7  find in your skin cells, or your hair root, or sperm cells, or
8  blood cells, would be the same D.N.A. profile.
9  Q.  And I believe you mentioned this, but just again, does your
10  D.N.A. change in any manner over your lifetime?
11  A.  It does not.
12  Q.  And so would it be fair to say, then, that the D.N.A. that
13  you're born with you die with, correct?
14  A.  Correct.
15  Q.  And the D.N.A. from one part of your body is completely
16  identical to the D.N.A. from another part of your body?
17  A.  That is correct.
18  Q.  And has this been established through multiple and reliable
19  scientific studies?
20  A.  Yes.
21  Q.  And is there any doubt in the field about these principles
22  that you've just laid out in terms of D.N.A. staying the same
23  throughout your life, and D.N.A. being the same in every cell of
24  your body?
25  A.  No.

1    Q.   Okay.   Now, with respect to determining D.N.A. from an

2    evidentiary sample, how do you as a D.N.A. scientist go about

3    doing that?   What do you in fact do in practice?

4    A.   We are -- our ultimate goal is to locate biological

5    evidence.   So that biological evidence can be in the form of a

6    blood stain or semen stain.   It can be from the rim of this cup.

7    If I've been drinking out of this water cup, we can find my skin

8    cells or saliva around that.   So our goal is to identify a

9    biological substance from a pertinent item of evidence.   We

10   extract the D.N.A. from the nucleus of those cells, whatever

11   they may be.   Whether it's blood cells or sperm cells.   We break

12   open the D.N.A., we extract it, we break open the nucleus and we

13   extract the D.N.A., and we generate a D.N.A. profile.

14   Q.   And when you say you -- you extract the D.N.A. profile, what

15   does that mean?

16   A.   What that means is we extract the D.N.A. by breaking open

17   the nucleus and actually isolating the D.N.A.   We quantitate how

18   much D.N.A. is actually present.   We put it into a thermocycler,

19   which is what you utilize to perform P.C.R.   And P.C.R. just

20   means that you're making more of a copy.

21   Q.   Okay.   And for the jury can you say what P.C.R. -- what

22   that -- that's initials, obviously?

23   A.   That is an abbreviation for the polymerase chain reaction.

24   So our body is constantly doing this all the time.   We make more

25   cells, more skin cells to cover up the skin cells that we lose

1  throughout the day just brushing on items.  Or if we get a

2  horrible sunburn, we need to replace those cells as well.

3  Q.  And with respect to the use of D.N.A. in the forensic

4  context, so when you're trying to figure something out or figure

5  out the identity of some evidentiary material, are there certain

6  parts of the D.N.A. that are then analyzed to provide values?

7  A.  Yes.  We actually target specific markers or genes or loci.

8  They're all -- those are multiple names for just specific areas

9  on your D.N.A. strand.  We look at ones that do not code for

10  hair color or eye color.  We look at specific ones that code for

11  nothing.  They're just the differences.  That everyone has a

12  different number of repeats in that particular area.

13  Q.  And the loci that you're referring to on the current D.N.A.

14  technology, how many loci do you look at, typically?

15  A.  In my lab we look at anywhere from 13 to 15.  There are

16  newer kits out that you can look at up to maybe 20 or 23.  But

17  the basic core loci would be 13.  The F.B.I. came out with a

18  specific 13 loci that they want laboratories to utilize in order

19  to be able to upload those into the national database.

20  Q.  And as a result of when you obtain values of at these 13

21  different loci, what does that tell you about the evidentiary

22  materials that you're analyzing?  Well, let me strike that.

23  When you get these results, the 13 different loci, are -- are

24  you then able to evaluate the likelihood of a particular person

25  or a particular object being the source of that material?

1  A.   When we obtain a D.N.A. profile from an evidentiary item,

2  there's really a couple things we can figure out at that point.

3  One is we do use a sex marker so we can see whether it's a male

4  or a female.   The other thing we can do is verify if it's a

5  single source profile, or a mixture of more than one individual.

6  But let's just say we do have a single source profile and it is

7  male.   We would then compare that to a suspect, or a victim, or

8  a witness.   And if we do have a match, we would issue some sort

9  of statistics to define just how rare that D.N.A. profile is.

10 Q.   So with respect to these different loci, if you are using a

11 13 loci testing system, you obtain results for all 13 loci, and

12 then you have a sample to which you're comparing it to, which is

13 identical at all 13 loci, what can you say typically about that

14 result?

15 A.   We can say that they're consistent with one another.   We can

16 say they match at all loci.   And if the statistics are high

17 enough, then we can state identity.   That, scientifically

18 speaking, that D.N.A. profile came from that individual, barring

19 that individual having an identical twin.

20 Q.   Okay.   So essentially you can state to 100 percent

21 certainty, in certain cases, if you have sufficient information,

22 that this evidentiary material came from this person or that

23 person's identical twin.   Is that fair to say?

24 A.   With the exception of putting the 100 percent in there.   We

25 do state identity -- that because of the identical twin, and the

1  fact that we don't actually know if they have an identical twin

2  -- they may tell us they do or don't, but we can't say.

3  Q.  Now, if you have results of certain loci, and those results

4  are inconsistent with D.N.A. evidentiary materials that come

5  from a certain person, what can you say about that result?

6  A.  We would say that that individual is excluded as being a

7  contributor to that D.N.A. profile.

8  Q.  So for instance, if there was a -- some evidentiary material

9  that matched 12 of the 13 loci to somebody, but didn't match,

10  and you had a result at the 13th loci, what would you be able to

11  say in that situation?

12  A.  With a match at 12 markers, and then the thirteenth one was

13  an exclusion, I would probably recommend doing just a little

14  additional testing, because chances are they're very related.

15  Q.  Okay.  So the chances are that the people -- that -- that if

16  there's 12 of 13, that then the person who you're testing might

17  be related to the source of the evidentiary material but was not

18  in fact the source?

19  A.  Right.

20  Q.  Him or herself, correct?

21  A.  Correct.

22  Q.  So if you don't match in a single loci, and your results are

23  reliable, you're ruled out?

24  A.  That's correct.

25  Q.  Okay.  Now, when you -- when you examine evidentiary

1  material -- so if you examine a biological sample, let's say of

2  semen, in the course of your work would you -- you would

3  customarily compare that to different evidence, is that true?

4  A.   If we performed D.N.A. analysis on, say, a vaginal swab from

5  a rape, and we obtained a D.N.A. profile, we would want to

6  compare that to reference standards from victims, suspect.

7  Elimination standards.  Or husband, boyfriend.

8  Q.   Okay.  So one of the things you would compare it to is

9  another person, correct?

10  A.   Correct.

11  Q.   And does it also happen on occasion that you don't -- that

12  you don't have another person, but perhaps you have another

13  crime from which you have derived D.N.A. from the evidence?

14  A.   That has happened, yes.

15  Q.   And in that -- so in that case you're examining D.N.A. from

16  one unsolved crime to D.N.A. from another unsolved crime, is

17  that correct?

18  A.   Correct.

19  Q.   And if, in fact, the D.N.A. matches up, then that gives you

20  some important information, is that correct?

21  A.   That's correct.  If that happens in our laboratory we notify

22  the agency that submitted us the evidence.  The cases.

23  Q.   And -- because in that case you would -- you would be able

24  to conclude that evidentiary biological material from one case

25  is identical to evidentiary biological material from another

1  case?

2  A.  Correct.

3  Q.  And in certain instances, then, a reasonable inference from

4  that would be if there was a crime involved in both cases, that

5  the same person had been involved in both crimes?

6  A.  Right.

7  Q.  Okay.  And I think you also mentioned earlier that the

8  F.B.I. maintains a system -- or maintains records of D.N.A.

9  results, is that correct?

10  A.  That's correct.

11  Q.  And what's the name of that?

12  A.  It's called CODIS.

13  Q.  And is it your understanding that States also maintain a

14  CODIS system?

15  A.  They do.  They maintain a State level.  They have different

16  requirements for the upload of those samples.

17  Q.  And in the CODIS system, what records would be maintained in

18  that system?  For instance, would there be records maintained of

19  a specific individual whose D.N.A. had been obtained?

20  A.  They do.  They do maintain the D.N.A. profile in the

21  national system.

22  Q.  And that would be a D.N.A. profile of a specific person?  Or

23  several specific people?

24  A.  Yes.  They -- they have names associated with those.  They

25  also have not just individual offenders in the database, but

1    unknown profiles that they would obtain from a crime where there

2    is no suspect.  But they do obtain a probative profile.  They

3    will upload that into the database as well.

4    Q.  Okay.  So in fact if you obtain D.N.A. results from analysis

5    of a specific piece of evidentiary material, and if you're

6    using -- or if an agency is using the CODIS system, you can

7    attempt to match it to -- or compare it to individuals within

8    CODIS, correct?

9    A.  Yes.

10   Q.  And you can also attempt to compare it to unsolved crimes

11   that are maintained within CODIS?

12   A.  That's correct.

13   Q.  All right.  Now, you said you work for Cellmark, is that

14   correct?

15   A.  Yeah.  We've gone through a couple of name changes.  Today

16   we're Cellmark Forensics.

17   Q.  Oh, Cellmark Forensics.  I'm sorry.  And you are a salaried

18   employee?

19   A.  I am.

20   Q.  Of Cellmark Forensics?

21   A.  Yes.

22   Q.  Okay.  And do you have any financial interest in the outcome

23   of this lawsuit?

24   A.  No.

25   Q.  Okay.  So you get paid the same, whatever the result is, is

1  that fair to say?

2  A.  Yes.

3  Q.  Okay.  With respect to this case -- so the case involving

4  Mr. Avery, what materials did you review?

5  A.  I looked at numerous D.N.A. reports that were issued by the

6  State of Wisconsin Crime Laboratory.  I also looked at some

7  memos generated by the Wisconsin State Crime Laboratory.

8  Q.  And are these the type of materials that experts such as

9  yourself in the field customarily rely on?

10  A.  Yes, they are.

11  Q.  And the materials that you reviewed from the Wisconsin State

12  Crime Lab, and the memos from the Crime Lab, are those generally

13  regarded as reliable information in the field?

14  A.  Yes.

15  Q.  And do State Crime Labs have rules and procedures that

16  govern their operation?

17  A.  Yes, they do.

18  Q.  And is it a fact that with respect to D.N.A. analysis, is it

19  important to follow strictly the procedures in order to obtain

20  reliable results?

21  A.  Yes.

22  Q.  Okay.  And do you have any reason to doubt any of the

23  materials that you relied on in this case to reach your

24  conclusions?

25  A.  No.

48

1   Q.  So if we go to the materials that you've actually relied on

2   in this case -- and I want to start with a memorandum from the

3   26th of October of 2009.  Do you see -- do you have that one?

4   A.  Yes.

5   Q.  In front of you?

6   A.  Yes.

7   Q.  You do?  And can you tell the members of the jury what that

8   is?  What this document is?

9   A.  Sure.  It is a memo to the Milwaukee Police Department from

10  the D.N.A. Data Bank Unit of the Wisconsin State Crime Lab.  It

11  is a note that is -- or memo that is linking case-to-case hits.

12  Q.  Okay.  And when you're saying case-to-case hits, what is

13  that?

14  A.  What that means is originally there were crimes that were

15  worked that -- or evidence from crimes that were processed using

16  D.N.A. analysis.  There were probative D.N.A. profiles obtained.

17  They were entered into the database, and now at this point in

18  this memo 9 of those cases have hit to one another.  So there's

19  a similar -- or actually the same D.N.A. profile in all 9 of

20  those cases.

21  Q.  All right.  And so this memo is from 2009, correct?

22  October, 2009?

23  A.  Yes.

24  Q.  And this is linking 9 separate cases or D.N.A. recovered in

25  9 separate cases all to the same person.  Is that correct?

1    A.   That's correct.

2    Q.   So if we go through these 9 cases, and looking at the

3    memorandum -- so the first case listed in the memorandum -- and

4    there's actually two memorandums the same day, correct?  Do you

5    see that?

6    A.   Yes.

7    Q.   And -- but essentially the same subject matter linking 9

8    cases together?

9    A.   Correct.

10   Q.   All right.  And we'll go through the order that they have

11   listed them here, even though they're not in -- I don't believe

12   they're in order in terms of dates.  The first case -- so now

13   we're looking at the second memorandum on October the 26th.

14   What is the first case that is listed here?

15   A.   The first case listed is the victim Irene Smith.  Also known

16   as Sheila Jones.

17   Q.   And what's the offense date of that case?

18   A.   November 27th, 1992.

19   Q.   And this memo notes what the D.N.A. was recovered from, is

20   that correct?

21   A.   Yes.

22   Q.   All right.  And what does it note?

23   A.   There were oral swabs from the victim's evidence collection

24   kit.

25   Q.   And next case is what?

1   A.  Carron Denise Kilpatrick.

2   Q.  And the date of?

3   A.  October 13th, 1994.

4   Q.  And what was the evidentiary material that was analyzed in

5   that case?

6   A.  This was a vaginal smear and vaginal swabs.

7   Q.  And each of these cases notes that this case -- well, the

8   first two note that they're both homicides, is that correct?

9   A.  Yes.

10  Q.  And they're both stabbings?

11  A.  The first two are homicide stabbings.

12  Q.  The next case that's listed here, which is that case?

13  A.  It's a homicide strangulation case.  Victim Florence

14  McCormick.  Offense date was April 24th, 1995.

15  Q.  And where was that evidentiary material recovered from?

16  A.  From Ms. McCormick's sexual assault kit.

17  Q.  The next case?

18  A.  Also a homicide, strangulation case.  Victim Sheila Farrior.

19  Offense date June 27th, 1995.  And this D.N.A. came from the

20  vaginal swabs from Ms. Farrior.

21  Q.  And the next case is?

22  A.  Another homicide, strangulation.  Victim Debra Harris.

23  Offense date October 10th, 1986.  Again, the evidence D.N.A. was

24  from vaginal swabs from Ms. Harris.

25  Q.  And the next case?

1    A.  Also a homicide, strangulation case.  Victim's name is Tanya

2    Miller.  Offense date was October 11th, 1986.  Evidence also

3    recovered from the vaginal swabs from Ms. Miller.

4    Q.  And the next case?

5    A.  A homicide, strangulation case.  Victim Quithreaun Stokes.

6    Offense date April 27th, 2007.  And the evidence noted was a

7    stain from a pepper spray container.

8    Q.  And the case after that?

9    A.  It's a homicide, exsanguination case.  Victim's name Jessica

10   Payne.  The offense date is August 30th, 1995.  And the D.N.A.

11   came from the vaginal swabs from Ms. Payne.

12   Q.  And the final case as noted in this October, 2009,

13   memorandum?

14   A.  Homicide, strangulation case.  Victim Joyce Mims.  Offense

15   date June 20th, 1997.  And the D.N.A. profile came from the

16   vaginal swabs from Ms. Mims.

17   Q.  And so all of those cases, pursuant to this memorandum, are

18   linked in terms of the same D.N.A. being recovered from the

19   various evidentiary materials that you've described, is that

20   correct?

21   A.  That's correct.

22   Q.  Then in addition to this memorandum, did you -- were you

23   provided with the reports from the Wisconsin Department of

24   Justice, State Crime Lab, in relation to each of those cases?

25   A.  I did receive those.

1    Q.   Okay.  And with respect to those materials, let's start with

2    the first one from the memo, I believe, which is Irene Smith.

3    Yes.  Irene Smith.  Who is also known as Sheila Jones.  With

4    respect to that report, the date on that report, do you see it?

5    September the 14th of 2009?

6    A.   Yes.

7    Q.   And with respect to that report, if you look at the second

8    page, do you see that that -- there's -- right at the bottom

9    that there's D.N.A. results recovered from oral swabs?

10   A.   Yes.

11   Q.   And was the D.N.A. recovered from the oral swabs in that

12   case compared to the D.N.A. from another individual?

13   A.   Yes.  It was compared to Walter Ellis.

14   Q.   Okay.  And it notes that there's a D.N.A. profile developed

15   from Walter Ellis's buccal swab.  Do you see that?

16   A.   Yes.

17   Q.   And what is a buccal swab?

18   A.   A buccal swab is basically a Q-Tip.  Generally just has a

19   swab on one end, and you can collect D.N.A. from the inside

20   cheek of your mouth by just swirling it around on each side of

21   your cheek.  And you will collect epithelial cells from your

22   mouth.

23   Q.   And is a buccal swab a reliable method of obtaining a

24   person's D.N.A.?

25   A.   Yes.  It's the same as collecting blood from your arm.  It's

1  just less invasive.

2  Q.  Okay.  And is that a type of method that is customarily used

3  in your field?

4  A.  Yes.

5  Q.  To obtain D.N.A.?

6  A.  Yes.

7  Q.  Okay.  So based on the Crime Lab report dated September

8  the 14th of 2009, in the Irene Smith homicide, what conclusions

9  can be drawn and were drawn by the State Crime Lab in terms of

10 the source of the D.N.A. recovered from the sperm fraction of

11 the oral swabs?

12 A.  Barring an identical twin, the source of the D.N.A. from the

13 oral swabs was Walter Ellis.

14 Q.  And did the Crime Lab in its report arrive at the

15 determination of how likely it was that this D.N.A. from the

16 oral swab could be from anyone other than Walter Ellis?

17 A.  Yes.  They make a statement in the report that the

18 probability of randomly selecting an unrelated individual with

19 an STR profile consistent with a foreign male profile discerned

20 from the semen on Irene Smith's oral swab is at least as rare as

21 one in 18 billion individuals.

22 Q.  And -- okay.  And how many -- what's the population of the

23 entire world at this point?

24 A.  We're at 6 or 7 billion.

25 Q.  So in terms of this conclusion, that's one in 18 billion,

1    scientifically what does that mean?

2    A.  Well, that's 2 or 3 times the world population.  So

3    scientifically speaking, that D.N.A. profile -- the source of

4    that D.N.A. profile would be Walter Ellis.

5    Q.  Okay.  And with respect to that result in that case, when

6    the report refers to the sperm fraction from the oral swab, what

7    does that mean?

8    A.  What that means is when we expect -- or serological

9    methods -- if we expect there's going to be a mixed D.N.A.

10   profile -- when I say mixed, it's a mixture of sperm and skin

11   cells.  So when you take an oral swab, or a vaginal swab, or

12   pretty much any swab from the female cavity, you're naturally

13   going to be collecting her skin cells.  But you're also going to

14   be collecting those sperm cells.  So we have a D.N.A. extraction

15   method in which we separate the two based on the characteristics

16   of epithelial cells, which are light and fluffy, and you've got

17   your sperm cells, which are dense and heavy and tough.

18           So we perform the D.N.A. extraction.  We're able to

19   separate the cells based on type and characteristics, and we end

20   up with two tubes of D.N.A., one of which is the sperm cells,

21   and the other which is the skin cells.  At least that's the

22   goal.  Sometimes they're still over one way or another, but

23   that's the goal.

24   Q.  So obviously, then, if you're testing the D.N.A. of the

25   sperm cells, you know it doesn't come from the victim if the

1  victim is a woman?

2  A.  That's correct.

3  Q.  And then with respect to this particular case, was there

4  also an attempt to identify what's called a Y-STR profile?

5  A.  Yes.

6  Q.  Can you tell the members of the jury what a Y-STR profile

7  is?

8  A.  A Y-STR profile is a D.N.A. profile that we obtain from a

9  male.  So women have two "X" chromosomes, and men have an "X"

10  and a "Y".  So anytime you generate a Y-STR -- a "Y" profile, it

11  must come from a male.  So -- and it's a more sensitive test.

12  In cases where you have so much female D.N.A., and you may only

13  have a little bit of male D.N.A., we'll use the Y-STR test

14  because it will specifically go after the male D.N.A. and

15  completely ignore any female D.N.A. that's left behind that may

16  dilute out the male D.N.A.

17  Q.  And while the Y-STR is more sensitive, is it less

18  discriminating?

19  A.  It's much less discriminating, because you as a male will

20  have the same Y-STR profile as your father, as your grandfather,

21  as your brothers, as your paternal uncle.  So it follows the

22  whole male -- I'm sorry, the whole paternal side of the male's

23  family.

24  Q.  Okay.  So would it be fair to say that with respect to the

25  Irene Smith case, the D.N.A. from the sperm fraction of the oral

1   swabs comes from Walter Ellis?

2   A.  With regard to the autosomal STR testing, absolutely.

3   Q.  Now, if we go to the next case, the Carron Kilpatrick, do

4   you also have a report dated September the 8th of 2009?

5   A.  I do.

6   Q.  Okay.  And in that case did the Crime Lab obtain -- and I'm

7   sorry -- September the 8th, 2009.  And then on the same case

8   September the 15th of 2009?

9   A.  That's correct.

10  Q.  All right.  And with respect to that case, in particular the

11  September the 15th, 2009, report, did the Wisconsin Department

12  of Justice Crime Lab reach any conclusions about the source of

13  evidentiary materials in that case?

14  A.  Yes, they did.

15  Q.  And first of all, what was the evidentiary materials that

16  was being -- were being analyzed?  In particular, with respect

17  to the September 15th report?  It's actually both of them, but

18  the result is more developed in the September 15th, 2009 report.

19  A.  They were specifically looking at the vaginal smear pellet

20  from the victim's sexual assault kit.  And then also a

21  toothbrush.  Vaginal swabs.

22  Q.  And with respect to the toothbrush, was it your

23  understanding that that toothbrush was something that was Walter

24  Ellis's toothbrush?  Well, I will ask you to assume that it was,

25  in fact, Walter Ellis's toothbrush.  I believe that's

1  established in another memorandum.

2  A.  Okay.

3  Q.  If you have someone's toothbrush, what can you do in terms

4  of the toothbrush to figure out D.N.A.?

5  A.  Well, you can test the cellular material that's left behind

6  on a toothbrush to determine what D.N.A. profile you find from

7  it.

8  Q.  Okay.  So that is a way of getting a D.N.A. profile for a

9  particular person who's using that toothbrush, correct?

10  A.  Yes, that's correct.

11  Q.  In this case with respect to the 2009 case memo in Denise

12  Kilpatrick, the D.N.A. from the evidentiary materials recovered

13  from Denise Kilpatrick was compared to both the D.N.A. profile

14  obtained from the toothbrush, and also from a buccal swab, is

15  that correct?

16  A.  Yes.  The buccal swab from Walter Ellis.  And then the

17  toothbrush purportedly from Walter Ellis as well.  And they all

18  match.

19  Q.  Okay.  And if the buccal swab and the toothbrush match, that

20  would indicate to you that the toothbrush was used by Walter

21  Ellis, correct?

22  A.  More than likely, yes.

23  Q.  And so as a result of this report here in 2009, matching the

24  evidentiary materials recovered from the victim in this case, to

25  the D.N.A. of Walter Ellis, what can be said scientifically

1  about that match?

2  A.  They stated in the report that the most reasonable

3  scientific explanation for these results is that Walter Ellis is

4  the source of the D.N.A. on the sperm fraction of the vaginal

5  smear and the toothbrush.

6  Q.  In fact, if you look on Page 2 of the second memo -- so the

7  one that's on September the 15th -- they actually calculate the

8  frequency for the D.N.A., is that correct?

9  A.  They do.  They calculated the frequency of the D.N.A.

10 profile being rarer than one in 6 trillion individuals, which is

11 approximately 1,000 times the population of the world.

12 Q.  So scientifically is it reasonable to draw the conclusion

13 that the D.N.A. from the evidentiary materials in the Denise

14 Kilpatrick case were left by Walter Ellis?

15 A.  That's correct.

16 Q.  If we go to the next case, Florence McCormick -- and again,

17 this is a -- there's a report June the 1st, September 16th, and

18 an additional one on March the 11th.  But let's deal with the

19 earlier memorandum.

20        MR. SMOKOWICZ:  Excuse me.  I didn't hear a date.

21        MR. STAINTHORP:  The first two are 2009, and there's a

22 final one in 2011.  All on the same case.

23        MR. SMOKOWICZ:  Thank you.  I apologize.

24        MR. STAINTHORP:

25

1  Q.  I'm addressing the 2009 report, and in particular let's just

2  pay attention to the September 16th, 2009 report.  Does that

3  also compare buccal swabs from Walter Ellis to materials

4  recovered from the victim in this case, Florence McCormick?

5  A.  It does.  In this particular case, it was the vaginal swabs

6  and the anal swabs from Ms. McCormick.

7  Q.  And what did they find in terms of the comparison of the

8  evidentiary materials from the victim to the D.N.A. of Walter

9  Ellis?

10  A.  They matched.

11  Q.  Okay.  And again, they have a frequency of -- if you look

12  at -- on the September 16th memo, under the paragraph that says

13  results, they have a frequency determination, is that correct?

14  A.  The calculated frequency of an STR profile is rarer than one

15  in 6 trillion individuals, which is 1,000 times the world -- the

16  estimated world population.

17  Q.  So again, scientifically is it fair to say that you can

18  state with reasonable scientific certainty that those

19  evidentiary materials were attributed to Walter Ellis?

20  A.  Yes.

21  Q.  The next case is Sheila Farrior.  And there's memos dated

22  June and September of 2009, is that correct?

23  A.  That is correct.

24  Q.  And again, these reports are comparing D.N.A. from Walter

25  Ellis to the evidentiary materials in this case, is that

1  correct?

2  A.  Yes.  Specifically September 21st, 2009.

3  Q.  Okay.  And in that -- in that particular report they're

4  comparing the Walter Ellis D.N.A. to what?

5  A.  The vaginal swabs collected from Sheila Farrior.

6  Q.  And what is the determination by the State of Wisconsin

7  Crime Lab with respect to that?

8  A.  Says the most reasonable scientific explanation for these

9  results is that Walter Ellis is the source of the male D.N.A. on

10  the vaginal swabs.  They also gave the statistical calculation,

11  frequency of the D.N.A. profile being rarer than one in 6

12  trillion individuals, which is approximately 1,000 times the

13  population of the world.

14  Q.  So once again, similarly to the other cases, scientifically

15  it is -- can you state to a reasonable degree of scientific

16  certainty that Walter Ellis left that evidentiary material?

17  A.  Yes.

18  Q.  Going to the next case.  Again, this is 2009, and the case

19  of Debra Harris.  And there's memos in both June and September

20  of 2009.  Was a similar type of analysis attempted in that case?

21  A.  Yes, it was.

22  Q.  And in that case was the evidentiary material from the

23  victim, Debra Harris, vaginal swabs?

24  A.  It was.

25  Q.  And what was the result of the examination by the Wisconsin

```
 1   State Crime Lab in that case?
 2            MR. SMOKOWICZ:  Again, I apologize.  Your Honor.  I
 3   didn't hear a date.
 4            MR. STAINTHORP:  It's June 2nd, 2009, and
 5   September 15th, 2009.
 6            MR. SMOKOWICZ:  Thank you.
 7            MR. STAINTHORP:
 8   Q.  So do you remember my question?
 9   A.  Yes, sir.  The D.N.A. profile obtained from Walter Ellis
10   matched the profile obtained from the vaginal swabs of Ms.
11   Harris.
12   Q.  So once more we can say that Walter Ellis is the source of
13   that D.N.A. on the vaginal swabs, correct?
14   A.  Yes.
15   Q.  And again, with respect to these vaginal swabs, that's the
16   sperm fraction of the vaginal swabs?
17   A.  Yes.
18   Q.  So the sperm fraction isolated in a similar way that you've
19   already described, is that correct?
20   A.  Yes, that's correct.
21   Q.  And now if we -- the next case is Tanya Miller.  Do you see
22   that case?
23   A.  I do.
24   Q.  And again, that's in 2009.  And was a similar analysis
25   attempted in that case?
```

1    A.   Yes.

2    Q.   And in that case the D.N.A. from Walter Ellis was tested

3    against the semen in the vaginal swabs, is that correct?

4    A.   That is correct.

5    Q.   And --

6    A.   There is again a match.  Walter Ellis's D.N.A. profile

7    matched the profile from the semen on the vaginal swabs for Ms.

8    Miller.

9    Q.   And in that -- there's also a frequency determination in

10   that case?  Do you see that?

11   A.   Yes.  They also said that this D.N.A. profile is rarer than

12   one in 6 trillion individuals, which is approximately 1,000

13   times the population of the world.

14   Q.   Now, the next case, the next memo -- and this is from 2000

15   -- well, starts off in 2007, and then there's a 2009 -- 3 memos

16   from 2009, and one memorandum from 2010 relating to the case

17   of -- they spell it here Withreaun (phonetic) Stokes.  I think

18   it's really Quithreaun Stokes.  And do you see that?

19   A.   I do.

20   Q.   And in that case the comparison of D.N.A. -- strike that.

21   Initially there was evidentiary material that was recovered from

22   the crime scene relating to Quithreaun Stokes, is that correct?

23   A.   That's correct.

24   Q.   And so D.N.A. was recovered at that point, correct?

25   A.   Correct.

1    Q.  But at that point -- so now we're talking about 2007.  Could

2    it be compared to Walter Ellis?  Or is there any indication that

3    it was compared to Walter Ellis at that time?

4    A.  In '07?  No.

5    Q.  But what happened in the Quithreaun Stokes case with respect

6    to the D.N.A. results that were obtained?  And this is on the

7    fourth page of the 2007 memo.

8    A.  They entered the profile into the case work index of the

9    Wisconsin D.N.A. data bank on June 13th, 2007.

10   Q.  And what results were obtained?

11   A.  They found that the search revealed matches between the

12   evidentiary profile from this case, and evidentiary profiles

13   from two other homicides in Milwaukee.

14   Q.  And those two other homicides were?

15   A.  The Jessica Payne case and the Joyce Mims case.

16   Q.  And if you go back to that -- the 2009 memo, the one that we

17   started with, the one that links all the cases, those are two of

18   the cases that are then linked together in that 2009 memo, is

19   that?

20   A.  Correct.

21   Q.  All right.  And then -- so that's in 2007.  So it's not

22   linked to Walter Ellis, but it is linked to these two other

23   cases that are -- where there's unknown -- there's material from

24   unknown persons, correct?

25   A.  Correct.

1  Q.  And then if you go -- well, then the May, 2009, memo is
2  attempting to link the D.N.A. found from the Quithreaun Stokes
3  homicide to a number of people, is that correct?
4  A.  Yes.
5  Q.  And, in fact, the determination at that point is that --
6  that there's no match, correct?
7  A.  Correct.
8  Q.  But that there's a number of people who are similar to the
9  autosomal D.N.A. profile?
10 A.  That's correct.
11 Q.  And one of those is Akesha (phonetic) Ellis.  Do you see
12 that?
13 A.  I do.
14 Q.  Okay.  And then we go to 2009.  So now later in the year,
15 July 2009.  And then again a memo in September of 2009.  By that
16 time do you see that the evidentiary material from the
17 Quithreaun Stokes case is now being compared to Walter Ellis?
18 A.  Yes.
19 Q.  And in particular that's the -- it's being compared to a
20 buccal swab from Mr. Ellis?
21 A.  That's correct.
22 Q.  And what is the determination with respect to the comparison
23 of the evidentiary material to Mr. Ellis's D.N.A.?
24 A.  There were several items, and the most reasonable scientific
25 explanation for these results is that Walter Ellis is the source

1  of the D.N.A. recovered from these items.

2  Q.  And one of those items that was being checked was fingernail

3  clippings, is that correct?

4  A.  Yes.  Left hand fingernail swabs.

5  Q.  And if you look at the final page of that September, 2009

6  memo, was there a determination made applying the Y-STR analysis

7  as to whether the fingernail clippings were consistent with

8  coming from Walter Ellis?

9  A.  Yes.  As was the blood swab from the pepper spray container,

10  and the neck swabs.

11  Q.  And in homicide cases why are fingernail scrapings in

12  particular examined?

13  A.  It's with the idea that a victim is trying to defend

14  herself, and in cases she may end up scratching or clawing at

15  the assailant and will sometimes get the assailant's D.N.A.

16  under her fingernails in the way of skin or blood.

17  Q.  So in the course of your work are fingernail clippings

18  something that is routinely examined to determine whether there

19  is some evidentiary material, and in particular D.N.A.

20  evidentiary material present?

21  A.  Yes.

22  Q.  And if, in fact, there is D.N.A. evidentiary materials

23  recovered from fingernails, that would indicate that there had

24  been some close contact between the victim and the source of the

25  D.N.A., is that correct?

1    A.   More than likely, yes.

2    Q.   And that certainly, as you say, could be the person

3    defending themselves?

4    A.   Could be, yes.

5    Q.   All right.  All right.  And if we go to the next case, which

6    is Joyce Mims -- and again, this is a memo dated September 15th

7    of 2009.  And also then February 26th, 2011.  But with respect

8    to the 2009 memorandum -- so September 15th, 2009, was there an

9    examination made of evidentiary material from the Joyce Mims

10   homicide to evidentiary material obtained from Mr. Ellis?

11   A.   Yes, there was.

12   Q.   And what was the determination arrived at after that

13   examination?

14   A.   So the D.N.A. of Walter Ellis matched the vaginal swabs and

15   the right thigh swabs.

16   Q.   And so again it would be -- scientifically it would be fair

17   to say that the -- that Walter Ellis is the source of that

18   D.N.A., is that correct?

19   A.   It would be, yes.

20   Q.   All right.  So that those are the memos in relation to some

21   of the 9 cases that were linked in 2009.  I now want -- there

22   was additional material that I provided you in relation to the

23   Maryetta Griffin case, is that right?

24   A.   Yes.

25   Q.   And this is a -- there's a memo dated May 11th of 2010, and

1    then June 16th, 2010.  Do you see that?

2    A.   I do.

3    Q.   And from looking at this, there was certain materials that

4    were taken from the victim in this case, Maryetta Griffin, that

5    was analyzed in the May 11th, 2010, report.  Is that correct?

6    A.   That's correct.

7    Q.   And what were those materials?

8    A.   From her specifically?  Vaginal swabs and oral swabs.

9    Q.   And was that -- so this is material from the homicide

10   victim, Maryetta Griffin, correct?

11   A.   Correct.

12   Q.   That's now being examined or re-examined in 2010.  In May of

13   2010.  And was that then examined to -- compared to D.N.A.

14   materials that were obtained from various other people?

15   A.   Yes.

16   Q.   And the material that was -- the evidentiary material that

17   was obtained from Maryetta Griffin, that included oral swabs and

18   vaginal swabs, correct?

19   A.   Yes.

20   Q.   Or as related in this memo, it did.  And with respect to the

21   oral swabs -- and again, there was -- there was -- a sperm

22   fraction of the vaginal swab was isolated, is that correct?

23   A.   Correct.

24   Q.   And again, as you said before, once you -- once you divide

25   up the D.N.A. into sperm and non-sperm, you can tell which is

1    coming from a male, and which is coming from somewhere else,

2    correct?

3    A.   Correct.

4    Q.   With respect to the sperm fraction of the vaginal swab, were

5    certain persons excluded as the possible source of that profile?

6    A.   Yes.

7    Q.   And who were those people?

8    A.   The individuals that were excluded from the sperm fraction

9    of the vaginal swabs are Derrick Crawley, Samuel Hogans, Lorenzo

10   Frost, William Avery, and Walter Ellis.

11   Q.   No.  I think you misread that.

12   A.   Oops.

13   Q.   The -- if you look at the -- on Page 3, the paragraph next

14   to the bottom.  So we're looking at the oral swabs.

15   A.   Oh, the oral.  I'm sorry.  I thought you said vaginal swabs.

16   Q.   Yes.

17   A.   Okay.  Sorry.

18   Q.   So the vaginal swabs.  Who was excluded as the source of the

19   sperm fraction of the oral swabs?

20   A.   Excluded from the sperm fraction of the oral swabs are

21   Derrick Crawley, Samuel Hogans, Terry Bryson, Lorenzo Frost, and

22   William Avery.

23   Q.   And was there also a determination made with respect to the

24   comparison with Walter Ellis in relation to the oral swabs?

25   A.   Yes.  The D.N.A. profile from the sperm fraction of the oral

1  swabs was consistent to the profile from Walter Ellis.

2  Q.  And was there a frequency determination made with respect to

3  the likelihood of that occurring?

4  A.  There was.  The probability of randomly selecting an

5  unrelated individual who would have a profile consistent to this

6  evidentiary profile is at least as rare as one in 34 billion.

7  Q.  And scientifically speaking, then, is it reasonable to say

8  that this sperm fraction from the oral swab was deposited by

9  Walter Ellis?

10  A.  That's correct.

11  Q.  And then, as you noted earlier, there was an examination of

12  the vaginal swab, correct?

13  A.  Correct.

14  Q.  And that was compared to the D.N.A. of, among others,

15  William Avery, correct?

16  A.  That's correct.

17  Q.  And what was the conclusion with respect to whether Walter

18  Avery could have been a source of the sperm fraction from the

19  vaginal swab?

20  A.  William Avery was excluded.

21  Q.  Okay.  And, in fact, with respect to the vaginal swab there

22  was a determination that the source of the D.N.A. in the sperm

23  fraction of the vaginal swab was Terry Bryson?

24  A.  That's correct.

25  Q.  And other evidence will show Mr. Bryson was, in fact, the

1  boyfriend of Ms. Griffin?

2  A.  Okay.

3  Q.  And my understanding is Walter Ellis was excluded as the

4  source of the D.N.A. in the vaginal swab, correct?

5  A.  That's correct.

6  Q.  All right.  But does that affect in any way the conclusion

7  that he's included -- or that the oral swab is from Walter

8  Ellis?

9  A.  No.

10  Q.  And again, with respect to the Y-STR testing that you've --

11  the one that's male specific, there is testing -- that's Y-STR

12  testing done at that time, is that correct?

13  A.  That's correct.

14  Q.  And what's the result of the Y-STR testing?  And in regard

15  to the oral swab, the sperm fraction of the oral swab, in

16  relation to Walter Ellis?

17  A.  The Y-STR profile from the oral swabs is consistent with

18  Walter Ellis.

19  Q.  And if we go now to the -- another memo in relationship to

20  the Maryetta Griffin case, this one dated June the 16th of 2010?

21  Do you see that?

22  A.  I do.

23  Q.  And at that point they're testing fingernail clippings from

24  Ms. Griffin.  Do you see that?  Both right and left hand?

25  A.  Yes.

1   Q.  All right.  And with respect to the right hand fingernail

2   clippings, what was determined by the Crime Lab with respect to

3   those fingernail clippings for Maryetta Griffin?

4   A.  They developed from the right hand fingernail clippings -- a

5   mixture of at least three individuals.  Due to the limited

6   statistical information obtained from the profile, it may be

7   used for exclusionary purposes only.

8   Q.  And were certain people excluded from being the possible

9   contributors to the D.N.A. found in the fingernail scrapings?

10  A.  Yes.  There were four people excluded.

11  Q.  And was one of those people William Avery?

12  A.  Yes.  He was excluded.

13  Q.  And with respect to -- when -- when we say that there was

14  limited information obtained from those fingernail clippings,

15  what is that referring to?

16  A.  Means that the D.N.A. profile obtained was not a strong,

17  clear profile.  It was -- it was a very low level mixture.

18  They're just too hard to deconvolute.  And so when they don't

19  meet particular reporting guidelines, we just put a cap on it

20  and say that no conclusions can be drawn on it.  Or we can only

21  exclude.

22  Q.  And so then when you have that limited amount of

23  information, you can say that certain people cannot be the

24  source of the D.N.A., correct?

25  A.  Correct.

1  Q.  And you can say that other people could be the source, but
2  you can't definitively say the same way that you can if you have
3  findings that -- 13 loci, or whatever loci?
4  A.  That's correct.
5  Q.  And did they also test the Y-STR with respect to the right
6  hand fingernail clippings?
7  A.  Yes.
8  Q.  And did that also exclude William Avery as a possible
9  source?
10 A.  Yes, it did.
11 Q.  And was Walter Ellis excluded as a possible source of the
12 Y-STR?
13 A.  The presence or absence of D.N.A. from Walter Ellis in that
14 mixture could not be determined.
15 Q.  Which essentially means you can't say one way or the other?
16 A.  Can't say one way or the other.  It's inconclusive.
17 Q.  And with respect to the -- to the certainty expressed in
18 these various reports, it seems that your certainty can range
19 from absolutely this is the person; to, well, this could be the
20 person; or this person's excluded; to we just can't say one way
21 or the other.  Is that fair to say?
22 A.  That's correct.
23 Q.  All right.  And is that because as scientists you're being
24 particularly careful with respect to reporting your results?
25 A.  Yes, we are.

1  Q.  All right.  So examining all these various reports that I

2  have now been showing you for some time, is it scientifically a

3  fact that William Avery is excluded as the source of the D.N.A.

4  in any of the homicides -- in all of the homicides, I should

5  say?

6  A.  Yes.  With the exception of the ones you just noted that

7  were inconclusive, and we can't say one way or the other.  But

8  his D.N.A. was not found in any of these cases.

9  Q.  Okay.  Was there any D.N.A. results obtained from any of the

10  evidentiary materials in any of the homicides that could be

11  attributed in any scientifically reliable way to Mr. Avery?

12  A.  No.

13  Q.  And included in that would be the -- both the oral and the

14  vaginal swabs in the Maryetta Griffin case, is that --

15  A.  Correct.

16  Q.  So then scientifically it would be accurate to say that

17  Mr. Avery is absolutely excluded as being the source of the

18  D.N.A. found in both the oral and vaginal swabs, and in

19  particular the sperm fractions of those swabs, is that correct?

20  A.  That is correct.

21  Q.  And is it also scientifically accurate to say that Mr. Avery

22  is excluded as the possible source of the D.N.A. found in the

23  fingernail scrapings from Ms. Griffin?

24          THE COURT:  I know you said yes before, so -- that was

25  the sample that was found usable only for excludable purposes.

```
 1              THE WITNESS:  Okay.  So --

 2              THE COURT:  Mr. Avery was one of them.

 3              THE WITNESS:  That is correct.  I'm sorry.  I couldn't

 4    remember if that was one of the ones that was inconclusive.  I'm

 5    sorry.

 6              MR. STAINTHORP:

 7    Q.  So with respect to the fingernail scrapings that could be

 8    analyzed in the Maryetta Griffin case, he's absolutely

 9    scientifically excluded as the source of that D.N.A.?

10    A.  That is correct.  My apologies.

11    Q.  Okay.  And with respect to the materials that I have given

12    to you, is it fair to say that all of the those homicides and

13    all of the D.N.A. -- strike that.  Is it fair to say that with

14    respect to the homicide cases that I've had you examine, there

15    is D.N.A. evidentiary material in all of those cases which link

16    to Walter Ellis?

17    A.  Yes.  All of them.

18              MR. STAINTHORP:  All right.  That's all I have, Judge.

19              THE COURT:  Cross examination.

20              MS. YUAN:  Yes.  Thank you, Your Honor.
```

**CROSS EXAMINATION**

```
22    BY MS. YUAN:

23    Q.  Good afternoon, Miss Lankford.  How are you?

24    A.  Good afternoon.  I'm well.  And you?

25    Q.  I'm all right.  My name is Jenny Yuan, and I'm one of the
```

1   attorneys for the defense in this case.  And I just have a few
2   follow-up questions.
3   A.  Certainly.
4   Q.  I think this was established, Miss Lankford, but just so I'm
5   clear, you've been retained by the Plaintiff, correct?
6   A.  My company has, yes.
7   Q.  Your company has.  Okay.  And you didn't perform any
8   independent testing in this case, is that right?
9   A.  We did no testing in our laboratory.  I merely reviewed the
10  materials that had been -- or the testing that had been
11  performed by the Wisconsin Crime Laboratory.
12  Q.  Wisconsin State Crime Lab?
13  A.  Yes.
14  Q.  Okay.  Miss Lankford, you did draft a report -- or actually
15  more specifically an affidavit in support of your opinions in
16  this case.  Is that correct?
17  A.  I did.
18  Q.  Do you have that in front of you?
19  A.  I do.
20  Q.  Okay.  I'm going to refer you to that report.  Now, I'm
21  going to refer you to paragraph 19 of that report.  After
22  reviewing the State Crime Lab reports and other materials that
23  you were submitted by the Plaintiff's attorney, you concluded
24  that as early as May, 2003, there was D.N.A. evidence that
25  linked a couple different unsolved homicides, correct?

1   A.   Um-hum.   Yes.

2   Q.   And that would be Jessica Payne, and then one other

3   homicide, correct?

4   A.   Correct.

5   Q.   Okay.   Now, in that paragraph you indicated it's an unknown

6   D.N.A. profile that was linked, correct?

7             MR. STAINTHORP:   Counsel, what page are you on?

8             MS. YUAN:

9   Q.   I'm sorry, Paragraph 20 says there was unknown male D.N.A.

10  that was linked between --

11  A.   Yes.

12  Q.   Okay.   So at that point what the reports were showing when

13  you looked at it was there was a male D.N.A. profile linked from

14  the Payne case and another homicide, but the identity of that

15  male D.N.A. was not known, correct?

16  A.   Correct.

17  Q.   Does that mean that that male D.N.A. was not in the State

18  crime D.N.A. database?

19  A.   I don't know if it was or not.

20  Q.   The identity, though, was not known in any of the reports,

21  correct?

22  A.   It was not listed on the reports, correct.

23  Q.   And that's in 2003, correct?

24  A.   Yes.

25  Q.   Okay.   Moving to paragraph 23 of your report, you stated

1  there that it was another four years, then.  So June 13th, 2007,

2  this same unknown male D.N.A. then was linked to -- is that 3?

3  Three different homicides?

4  A.  I'm sorry, which --

5  Q.  Paragraph 23?  So in that paragraph you indicate that there

6  was an unknown male profile linked to the Payne case and the

7  Mims case.  And then also to the Stokes case, correct?

8  A.  Yes.

9  Q.  Okay.  So that's three unsolved homicides at that time,

10  correct?

11  A.  Correct.

12  Q.  But it's also still unknown as to who the identity of that

13  male D.N.A. profile was, correct?

14  A.  In '07?  I believe in '07 it was still unknown.

15  Q.  And that's what you said.  You said in your report four

16  years later on June 13th, 2007, the same unknown male D.N.A. was

17  linked, correct?

18  A.  Yes.

19  Q.  In fact, in your report you indicated that it wasn't until

20  -- you testified to this earlier during your direct examination

21  that it was in '09 when Mr. Ellis's name and his identity was

22  really revealed in the State Crime Lab report that you were

23  reviewing, correct?

24  A.  Yes, I see that.

25  Q.  Miss Lankford, do you know when Mr. Avery had his homicide

1  trial involving Maryetta Griffin?

2  A.  I don't.

3  Q.  If I were to represent to you that he had his homicide trial

4  in March of 2005, that would be before any information

5  concerning Walter Ellis was available to the Wisconsin State

6  Crime Lab, correct?

7  A.  According to these reports, yes.

8  Q.  According to the reports that you reviewed, correct?

9  A.  Correct.

10  Q.  That was provided to you by Mr. Avery's attorneys, correct?

11  A.  Right.  I was looking at the D.N.A. reports from the Crime

12  Lab, right.

13  Q.  Okay.  You had testified that you started D.N.A. analysis in

14  1996, is that correct?

15  A.  Correct.

16  Q.  And I think you also testified that the science behind

17  D.N.A. analysis has changed quite a bit since the time when you

18  started in '96?

19  A.  Um-hum.

20  Q.  Okay.  And I'm not sure if you were aware, but the homicide

21  of Maryetta Griffin occurred in 1998.  Were you aware of that?

22  A.  Okay.  I think I read the date a few minutes ago, but I

23  didn't remember the exact date.

24  Q.  Okay.  Did you review in August, 1998, a State Crime Lab

25  report concerning the D.N.A. evidence collected from Maryetta

1   Griffin?

2   A.  Are you referring to one of the reports that we just went

3   through?

4   Q.  No.  And in fact I can provide it for you.  Miss Lankford,

5   I'm showing you what's been marked as Defense Exhibit 1005.  You

6   can take a look at that, please.  And then if you could identify

7   that for me?

8   A.  August 20th, 1998, laboratory report.

9   Q.  That's a State Crime Lab report dated August 20th, 1998,

10  correct?

11  A.  Right.  Wisconsin Department of Justice Crime Lab.

12  Q.  Okay.  And did you review this report in your analysis of

13  the materials provided to you from Mr. Avery's attorneys?

14  A.  We didn't review it today in trial, and I don't remember if

15  I did or not.

16  Q.  That's okay.  Are you able to, looking at this report, tell

17  me if the -- I understand, and I'll be honest with you, my

18  understanding of D.N.A. testing is very limited.  But my

19  understanding is back in 1998 the State Crime Lab utilized the

20  RFLP testing method.  And I believe that the acronym represents

21  restriction fragment length polymorphism?

22  A.  That's correct.

23  Q.  Okay.  Are you aware if that's the type of testing that was

24  available then for D.N.A. analysis back in 1998?

25  A.  Yes.

1   Q.  Okay.  And that's the only testing that was available for

2   D.N.A. analysis back in that time period, is that correct?

3   A.  No.  It was -- it wasn't the only -- it was starting to

4   phase out.  I guess PCR was starting to phase in a little bit.

5   Q.  You said PCR?

6   A.  Um-hum.

7   Q.  Yes?

8   A.  Yes.

9   Q.  Okay.  What's used now is something called STR testing, is

10  that correct?

11  A.  Correct.

12  Q.  And that was not available back in 1998, is that correct?

13  A.  I don't remember which particular year it came out.  I would

14  need to look it up.  I wouldn't want to misstate.  I'm not sure.

15  Q.  That's okay.  Are you able to look at this Exhibit 1005

16  that's in front of you and state that -- what type of testing

17  was used on the evidentiary material gathered from Maryetta

18  Griffin?

19  A.  RFLP.

20          THE COURT:  What is it again?

21          THE WITNESS:  RFLP.

22          THE COURT:  RFLP.

23          MS. YUAN:

24  Q.  So that's what was used back in 1998, is that correct?

25  A.  For this test, yes.

1    Q.    Okay.  Can you describe, what is RFLP testing?

2    A.    RFLP testing is, again, an older method where we require

3    lots and lots of D.N.A.  For instance, in a blood stain you

4    would need probably a quarter sized stain.  And with PCR testing

5    you don't even have to see the stain.  It just requires a few

6    cells.  RFLP testing was performed on an agarose gel which you

7    see a lot of on T.V. when they're showing D.N.A.  And there's

8    really a banding pattern that you look at on those, as opposed

9    to the repeated bases that I mentioned earlier with PCR.  So

10   you're really looking at a banding pattern.

11   Q.    A banding pattern, you said?  Okay.  And how many -- is it

12   loci?

13   A.    Loci.

14   Q.    How many loci is compared under the RFLP method?

15   A.    It depends on the number of probes you use.  You can look at

16   many different areas.  I believe back when I did it we generally

17   looked at -- generally looked at maybe four.

18   Q.    Okay.  And have you had a chance to review this report?  I

19   notice that you may have reviewed it before.  I'd like you to be

20   able to take a look at it and see what the results are.

21   A.    Okay.  I will need a minute.  Can I mark on this?

22   Q.    You may mark on that if you'd like.  I have another copy for

23   the Court.

24   A.    Thank you.  Okay.  I think I am ready to go through the

25   results section.

1  Q.  Thank you very much.  And I do believe it's all found on the
2  last page of that report.
3  A.  Okay.
4  Q.  So there was a vaginal swab conducted of Maryetta Griffin to
5  collect any evidentiary material from that area, along with the
6  oral swab, correct?
7  A.  Yes.
8  Q.  Okay.  And according to the D.N.A. testing that was done
9  back in 1998, the testing done on the evidentiary material found
10 in the vaginal swab excluded Mr. Avery from contributing to that
11 evidentiary material, is that correct?
12 A.  The vaginal swabs?
13 Q.  Correct.
14 A.  Yes.  He was excluded.
15 Q.  Okay.  So Mr. Avery was excluded from contributing to any
16 D.N.A. that may have been found in Miss Griffin's vaginal area
17 back in 1998?
18 A.  That's correct.
19 Q.  Okay.  And also looking at the oral swabs, that was also
20 tested.  And any D.N.A. material found on the oral swabs was
21 tested, and Mr. Avery was also excluded as a contributor for any
22 evidentiary material found on the oral swabs, is that correct?
23 A.  That's correct.
24 Q.  Okay.  Miss Lankford, you also perform D.N.A. testing at
25 your work, correct?

peso

1   A.   Yes.

2   Q.   Okay.  So when you're doing D.N.A. testing off of either an

3   oral swab or a vaginal swab, you can only test the D.N.A.

4   material -- evidentiary material that is on the swab, correct?

5   A.   Correct.

6   Q.   Okay.  So, for example, if you were testing the evidentiary

7   material collected from an oral swab, you are not part of

8   collecting the oral swab, correct?

9   A.   No.  We don't do the collection.

10  Q.   You do not.

11  A.   No.

12  Q.   You -- if you're doing that testing on an oral swab, you

13  don't know who the collectors -- what location in the oral

14  cavity the collector is swabbing, correct?

15  A.   No.  Not unless they list some specifics on the paperwork in

16  the sexual assault kit.

17  Q.   Okay.  And Miss Lankford, is there a general rule in terms

18  of how long D.N.A. -- or how about this.  How long semen can

19  remain in an oral cavity in a live person?

20  A.   I think it's -- it's been discussed, and there are always --

21  there are always reports going up and down with the length of

22  time.

23  Q.   I've been told it was 6 hours.  Is that in the ballpark at

24  all?

25  A.   I have heard that one before as well.  I don't know that

1  I've done enough research to actually have my own opinion, but

2  that is one of the numbers that I have read.

3  Q.  Is it your opinion that semen in the oral cavity does not

4  remain there for a very long time?  When I say that, I mean a 24

5  hour period of time?

6        MR. STAINTHORP:  Objection, Judge.  I believe the

7  witness has indicated this goes beyond her expertise.

8        THE COURT:  Well, that was relative to the last one.

9  And as far as that goes, it goes to weight, not the exclusion.

10  But if she knows the answer to this one, she may give an answer.

11        THE WITNESS:  I mean, I don't know how long.  I don't

12  know.  Six hours or 24 hours.  I think there are a lot of

13  conditions in which it might stay in there longer or you can get

14  rid of it faster.

15        MS. YUAN:

16  Q.  So the enzymes in the mouth.  That breaks down any semen

17  that may be in the mouth, correct?

18  A.  Enzymes definitely work against D.N.A.  If one was, you

19  know, constantly using mouthwash or eating or drinking, you

20  know, I can see that making the sperm, or the -- go away faster.

21  Q.  The only way to -- well, for example, if semen is the only

22  foreign evidentiary material that's in the oral cavity, the only

23  way to be able to test for D.N.A. is if there's still semen in

24  the mouth, correct?

25  A.  I'm sorry?  Repeat that question.

1   Q.  I'll strike that.  That was a bad question.  So if an

2   individual takes a drink of water, that would speed up the

3   process in terms of getting rid of any foreign D.N.A. that may

4   be in that person's mouth?

5   A.  I would say yes.  Assuming there's -- the sperm is located

6   where they're drinking.  You know what I mean?  If it's in the

7   line of where the water is going down.

8   Q.  And the same question.  If a person is eating something and

9   chewing and then swallowing, that would tend to get rid of any

10  semen that may be in the mouth?

11  A.  It would work against it faster as well.

12  Q.  Okay.  Now, do you know if Mr. Ellis -- or did you know when

13  Mr. Ellis's D.N.A. came to light for the Wisconsin State Crime

14  Lab?

15  A.  I don't remember if I read it.

16  Q.  Okay.  In the report that you reviewed, though, and in the

17  materials provided to you by Mr. Avery's attorneys, it appears

18  from your testimony under examination that it was in 2009 when

19  Mr. Ellis's identity was revealed as unknown D.N.A. profile

20  linked to those murders that were discussed earlier, is that

21  correct?

22  A.  I can double-check the reports.  I don't recall if it was.

23  So 2010 -- so 2009 is the earliest so far.  The earliest report

24  I see is in 2009.

25  Q.  Of the materials you were provided by Mr. Avery's attorneys,

1  correct?

2  A.  At least the ones I'm reviewing today.  Yes.

3  Q.  Okay.  Can you tell from the reports that you did review

4  that the D.N.A. testing done when Mr. Ellis's D.N.A. was

5  identified as Mr. Ellis, and then linked to these other

6  homicides, was that method, the D.N.A. testing, was that the STR

7  method of testing?

8  A.  Yes.  With the exception of one that we reviewed today, was

9  RFLP.  Well, two if we count the one that you handed me.

10  Q.  That's okay.  You believe all of them except maybe one or

11  two.

12  A.  Yes.

13  Q.  Because I understand the Maryetta Griffin test, that Exhibit

14  1005 that I handed to you, that August 1998 report was the

15  RFLP method?

16  A.  Correct.

17  Q.  My understanding if there is D.N.A. that was analyzed under

18  the RFLP method, that -- and the profile is unknown, unknown

19  D.N.A. profile, if later on that same D.N.A. is analyzed on the

20  STR testing method, and now that's turned into a profile into

21  the data base, you can't directly compare those two, is that

22  right?

23  A.  That's correct.  They have completely different looking

24  results.

25  Q.  Say that again.

1  A.  They have completely different -- different looking results.

2  The results look different and they can't be compared to one

3  another.

4  Q.  Okay.  So I know that you testified later on in reviewing

5  Wisconsin State Crime Lab reports that Ellis -- Walter Ellis's

6  D.N.A. was eventually in 2010 linked to Maryetta Griffin,

7  correct?  The D.N.A. file on Maryetta Griffin?

8  A.  Yes.  2010.

9  Q.  Okay.  And again, that was the STR testing method that

10  identified Walter Ellis's D.N.A.?

11  A.  Yes.

12  Q.  Okay.  The fact that the D.N.A. materials found in Miss

13  Griffin's oral cavity was tested back in 1998 under the RFLP

14  method, and that was Mr. Ellis, it can be explained by the fact

15  that when you test Mr. Ellis's D.N.A. under the STR method, you

16  can't compare that.  And there wouldn't be a hit in the database

17  because his D.N.A. was tested under the RFLP method back in '98?

18  A.  So -- yeah, you cannot compare Walter Ellis's STR result

19  with Walter Ellis's RFLP result.  They would not -- they just

20  don't read the same language.

21  Q.  Completely different language, you said?

22  A.  Right.

23  Q.  Okay.  So there wouldn't be a hit in the database once

24  Walter Ellis's D.N.A. comes into the database if he's tested

25  under the STR method?

1  A.  If you have a profile in the data base that's in RFLP

2  language, and you upload a person that has the STR language and

3  they're one in the same, they would not know to hit to one

4  another.  They're basically in different sections of the

5  database.

6  Q.  Okay.  Those are all the questions I have.  Thank you.

7  A.  Thank you.

8          THE COURT:  Any redirect?

9          MR. STAINTHORP:  Just very briefly, Judge.

10                 **REDIRECT EXAMINATION**

11 **BY MR. STAINTHORP:**

12 Q.  With respect to the testing that was done in 1998 -- so

13 that's the report that Ms. Yuan -- I'm sorry, Ms. Yuan gave to

14 you just now.  At that point there was no comparison to

15 Mr. Ellis, correct?

16 A.  That's correct.

17 Q.  And then with subsequent testing of the D.N.A. that was

18 recovered from Maryetta Griffin, and in particular the testing

19 of the oral swabs, that testing was -- so now we're dealing

20 about -- with the testing in 2010.  That -- the D.N.A. profile

21 that was developed from that testing was of the sperm fraction

22 of the oral swab, correct?

23 A.  Yes.

24 Q.  Okay.  So that once you're getting a result from the sperm

25 fraction, then you know that that's coming from male sperm and

1    not some other source, such as the person's saliva or anything

2    else.  Is that fair to say?

3    A.  That's the goal is for that entire fraction to be sperm.  It

4    doesn't mean there aren't some epithelial cells in there as

5    well, but the goal is for it to be sperm, yes.

6    Q.  Okay.  And do you have any reason to doubt that in this

7    particular case with respect to the 2010 testing of the sperm

8    fraction of the oral swab, that that was in fact what was

9    tested?

10   A.  No.

11   Q.  So in fact, then, based on those results, then, it's

12   scientifically reliable to say that was Walter Ellis's sperm in

13   Maryetta Griffin's mouth, correct?

14   A.  That would be a fair statement, yes.

15   Q.  And it's also fair to say scientifically that there was none

16   of William Avery's sperm in Maryetta Griffin's mouth, correct?

17   A.  That's correct.

18   Q.  Okay.  That's all I have, Judge.

19              THE COURT:  Any questions?

20              MS. YUAN:  No, Your Honor.  Your Honor, defense moves

21   defense Exhibit 1005 into evidence.

22              THE COURT:  That's the lab report?

23              MR. STAINTHORP:  No objection.

24              THE COURT:  The Court will receive it.  You may step

25   down, Mrs. Lankford.  Thank you.  You're excused, ma'am.

1           THE WITNESS:  Thank you.

2           THE COURT:  Additional witnesses?

3           MR. ELSON:  Plaintiff calls William Avery, Judge.

4           THE COURT:  Okay.  That will be rather lengthy, so why

5    don't we finish off the day with Mr. Avery.  And -- well, I

6    assume it is.  But we'll take the afternoon break at this point,

7    ladies and gentlemen.  Take a short break.  Please don't discuss

8    the case.  Only after all the evidence is in.  We'll see you

9    back here after the afternoon break.

10          (Whereupon the jury was excused at 2:42 p.m.)

11          THE COURT:  Okay.  Take a short break.

12          (Whereupon a recess was called by the Court.  Upon

13   conclusion of the recess, the proceedings continued as follows

14   when the jury was returned to the courtroom at 3:00 p.m.:)

15          **WILLIAM DAMON AVERY**, called as a witness, having been

16   first duly sworn, on oath testified as follows:

17          THE CLERK:  State your name and spell it for the

18   record.

19          THE WITNESS:  My name is William Avery.

20   W-I-L-L-I-A-M.  Last name's Avery, A-V-E-R-Y.

21                       **DIRECT EXAMINATION**

22   **BY MR. ELSON:**

23   Q.  How old are you, William?

24   A.  I'm 43.

25   Q.  Are you married or single?

1  A.  Single.

2  Q.  Do you have any children?

3  A.  Yes, I have 5 children.

4  Q.  What are the names and ages of your children?

5  A.  I have William Avery, Junior.  He's 26.  Sirena Avery, she's

6  23.  Jalisa Avery, she's 21.  And I have Cynthia Tyler, she's

7  23.  And Nafia Avery, she's 21.

8  Q.  And what is the highest level of formal education you've

9  received?

10  A.  I got a carpentry diploma from M.A.T.C., Milwaukee Area

11  Technical College.

12  Q.  When did you receive your carpentry diploma?

13  A.  In 2012.

14  Q.  And how long of a course of study did you go through to

15  receive your carpentry diploma?

16  A.  Two years.

17  Q.  What do you presently do for work?

18  A.  Home improvement.

19  Q.  Do you work for a company?  Or do you own your own business?

20  A.  I started my own business.

21  Q.  What's the name of your business?

22  A.  Avery's Home Improvement.

23  Q.  And what type of home improvement jobs do you do?

24  A.  Some roofing, fencing, decks, windows.  To that nature.

25  Q.  And how has your business been doing?

1  A.  It's struggling, you know, any start -- any new business.

2  Q.  When is the last time you had a home improvement job?

3  A.  Probably about a week ago.

4  Q.  What kind of job was it?

5  A.  I was patching a roof, actually.  Yes.

6  Q.  From the time that you were 34 years old until you turned

7  39, where were you?

8  A.  I was locked up in Waupun Correctional Facility for this

9  murder that I didn't commit.

10  Q.  Let's back up and talk about your childhood.  Where did you

11  grow up?

12  A.  In Milwaukee, Wisconsin.

13  Q.  What part of Milwaukee?

14  A.  The north side.

15  Q.  Who did you live with growing up?

16  A.  Predominantly with my grandmother.

17  Q.  Why did you live with your grandmother and not your parents?

18  A.  Well, my father passed away when I was about 9.  My mother

19  was in and out of correctional institutions.

20  Q.  How did your father die?

21  A.  He passed away of a brain tumor.

22  Q.  And you said you were 9 years old?

23  A.  Yes.

24  Q.  Where did you attend high school?

25  A.  North Division.

```
 1   Q.  Did you finish high school?

 2   A.  No.

 3   Q.  How far did you get?

 4   A.  I went to the ninth grade.

 5   Q.  And what happened after that?

 6   A.  I attended schools.

 7   Q.  But you didn't go anywhere past the ninth grade in high

 8   school, is that right?

 9   A.  Got my G.E.D.  My H.S.E.D.

10   Q.  While you were incarcerated?

11   A.  Yes.

12   Q.  But when you were a teenager did you go past the ninth

13   grade?

14   A.  No.

15   Q.  After you finished school -- after you dropped out of high

16   school did you have any employment?

17   A.  Yes.  I worked for temp services.

18   Q.  What kind of temp service jobs did you do?

19   A.  Doing assembly, working in fast food restaurants, stuff of

20   that nature.  Factory work.

21   Q.  Let's talk about your family.  You mentioned that your

22   father died when you were young.  Is your mother still living?

23   A.  No.  She passed away in December of '98.

24   Q.  When you were growing up, did you have any long term

25   relationships with women?
```

1   A.  Yes.

2   Q.  What was the longest relationship you had?  Who was that

3   with?

4   A.  Longest relationship I had was about 14 years.  That was

5   with Monica Wade.

6   Q.  Did you have any children with Miss Wade?

7   A.  Yes.  William, Sirena, and Jalisa Avery.

8   Q.  And who is the mother of your other two children?  Nafia and

9   Cynthia?

10  A.  Cofe'a Tyler.

11  Q.  I'm going to turn your attention to March 23rd, 1998.  Do

12  you remember that day?

13  A.  Yes.

14  Q.  Tell the jury what happened that day.

15  A.  Okay.  I'm going to start off from the 20th.  On the 20th I

16  got a -- I received a phone call from my grandmother telling me

17  that some Officers had came to her house and left one of their

18  business cards.  Get with them.  That I was to contact squad

19  124, I believe.  So I called them and informed them that I'd be

20  down there that following Monday, which was the 23rd.

21  Q.  And did you go down to the Police station on Monday, the

22  23rd?

23  A.  Yes.  Rode the bus down there, yeah.

24  Q.  And did you have any idea at that time why the Police wanted

25  to talk to you?

1  A.  No.

2  Q.  Where were you taken when you got to the Police station?

3  A.  To the C.I.B.

4  Q.  What's the C.I.B.?

5  A.  The Criminal Investigation Building.

6  Q.  Were you questioned by Detectives?

7  A.  Well, I informed Officer who I was looking for.  He told me

8  somebody be out with me.  I think it was a Detective Phillips

9  who came out and talked to me.  Took me back to the

10  interrogation room.

11  Q.  After Detective Phillips took you to the interrogation room,

12  were you questioned by Detective Phillips and anyone else?

13  A.  Detective Phillips and Detective DeValkenaere.  I was

14  questioned by them.

15  Q.  What were they questioning you about?

16  A.  Well, initially they was telling me that they wanted me to

17  be a witness to a homicide, pretty much, you know.

18  Q.  And did you cooperate with them and answer their questions?

19  A.  Yes.

20  Q.  At some point during this questioning session did they

21  inform you what homicide they were interested in?  Who had been

22  killed?

23  A.  They had shown me a picture of a -- the face of a dead

24  person.  A dead woman.  Asking did I know who that was?  And I

25  didn't know who that was at the time, because when I met that

1  person, she had a wig on, so --

2  Q.  Was that person Maryetta Griffin?

3  A.  Yes.  I know her as Mercedes at the time.

4  Q.  Her nickname was Mercedes?

5  A.  Yes.

6  Q.  And when they showed you the picture of her, you didn't

7  recognize her at first because she didn't have a wig on?  Is

8  that what you're saying?

9  A.  Right.  Right.

10 Q.  But during this first questioning session with these

11 Detectives, they were asking you about the murder of this woman

12 Mercedes, is that right?

13 A.  Yes.

14 Q.  Okay.  When was the last time that you saw Mercedes,

15 Maryetta Griffin?

16 A.  That would have to be around February the 16th, between 5:30

17 and 6:00, I believe.

18 Q.  This was 1998?

19 A.  1998, yes.

20 Q.  Okay.  Let's go over that day, February 16th, 1998.  First

21 of all, starting in early February were you involved in running

22 a drug house?

23 A.  Yes.

24 Q.  And many of the people who came there were prostitutes, is

25 that right?

1    A.   Yes.

2    Q.   And tell the jury what you remember about February 16th,

3    1998?

4    A.   Well, I remember coming over earlier that day.  Being let in

5    the residence by Lucious Goins.

6    Q.   What was the address of this house?

7    A.   2474 North Palmer Street.

8    Q.   You were let in by Lucious Goins.  Who is Lucious Goins?

9    A.   That's Lorenzo Frost's nephew.

10   Q.   Who is Lorenzo Frost?

11   A.   He's the owner of the house at 2474.  A distant cousin of

12   mine.

13   Q.   So you were let in the house by Lucious Goins.  What

14   happened after that?

15   A.   We were -- well, we was sitting around playing dominoes and

16   stuff.  Doc came over around --

17   Q.   You mentioned Doc.  Who's Doc?

18   A.   Lorenzo Frost.

19   Q.   Is Doc Lorenzo Frost's nickname?

20   A.   Yes.

21   Q.   Okay.  So Doc came over to the house at some point?

22   A.   Yeah.  Around -- probably got off work around -- between

23   5:30 and 6:00, yeah.

24   Q.   And what happened after Mr. Frost came over to the house?

25   A.   So -- well, Frost had a Suburban truck.  And the house is

1  located on a hill, so the -- drug addicts in the neighborhood,

2  when they see his Suburban on top of the hill, they knew he was

3  there, so they would start coming by.  So I think Valerie

4  Eubanks and Joanne Hollins had came over at that point.

5  Q.   Who are Valerie Eubanks and Joanne Hollins?

6  A.   Known prostitutes of the neighborhood.

7  Q.   And then they came over to the house after Lorenzo Frost?

8  A.   Yes.

9  Q.   After these two women came over to the house, what happened?

10  A.   They was sitting around, asking for drugs.  At some point

11  between 5:30, 6:00 time, Mercedes came over.

12  Q.   And that's Maryetta Griffin?

13  A.   Yes.

14  Q.   And what happened after Mercedes came over to the house?

15  A.   Like I said, they was sitting around asking for drugs.

16  Eventually I think Frost gave them some drugs, and they got

17  ready to leave so they can go out and hustle.

18  Q.   What do you mean, so they would go out and hustle?

19  A.   Go out, make money.

20  Q.   Who left the house at that point?

21  A.   Everyone in the house left besides me.  I was the only one

22  left there.

23  Q.   Did Maryetta Griffin ever come back to the house that night?

24  A.   No.

25  Q.   What happened after everyone -- Lorenzo Frost and the women

1  left the house and you remained in the house?  What happened

2  after that?  And about what time is this?

3  A.  Between -- you know, it was between 5:30 and 6:00.  That's

4  what my memory is saying.  I went back upstairs and stayed there

5  pretty much over into the night until about 8:30, 9:00.  Then

6  Lakesha Hall came over.

7  Q.  Tell the jury who Lakesha Hall is?

8  A.  Lakesha Hall is Ray, Lucious's girlfriend.  Her purpose

9  coming over that night was we was gonna celebrate Ray's

10  birthday.  Celebrating his birthday.  His birthday was on the

11  17th.  He never showed up.  He went somewhere else.  Fell

12  asleep.  So me and Lakesha start partying.  She brought some

13  marijuana, some beer, and some shoes.  So we start partying with

14  the marijuana and the beer.  Trying to put the moves on Maryetta

15  Griffin (sic).  She wasn't going for it.

16  Q.  You're trying to put the moves on who?

17  A.  Lakesha Kenya Hall.  Yes.

18  Q.  Okay.  And you said she wasn't going for it?

19  A.  No, she wasn't going for it.

20  Q.  Okay.  And what happened after that?

21  A.  Well, after asleep on the couch -- Lakesha fell asleep on

22  the chair, couch, and eventually she got up and went in there

23  and got in the bedroom.  Got in the bed.  Got in the bed and

24  went to sleep.

25  Q.  And did you go to sleep for the night at that point?

1    A.   Yeah.  I was asleep for the night, yeah.

2    Q.   What time did you wake up on February 17th, the next day?

3    A.   I woke up between 4:30 and 5:00, watching the Shepherd's

4    Chapel, Father Murray.  I was watching that.  Went in, looked in

5    on Lakesha.  Went back on the couch watching T.V.  Doze on and

6    off, you know.

7    Q.   And what happened next that day, on the day of the 17th?

8    A.   Sometime that morning I received a call from Miss Hollins,

9    Joanne.  Asked me had I heard that Mercedes had been found dead.

10   And I told her no, she was -- I was like she was over there to

11   the house on Palmer Street yesterday.  I told her she was over

12   there like yesterday.  Like no, I didn't hear that.

13   Q.   And what happened after you received this phone call?  What

14   did you do next that day?

15   A.   I just waited for Doc to come.  He called.  I told him I had

16   received a call from Joanne.  Doc said don't be saying that

17   woman's up there.  You know, be talking like that.  And I ain't

18   think nothing of it.

19   Q.   Did you get into any kind of argument with Maryetta Griffin?

20   A.   No.

21   Q.   On the day or night of February 16th, 1998, when she was at

22   the house?

23   A.   No.

24   Q.   Was Maryetta Griffin alive when she left the house on

25   February 16th, 1998?

1  A.  Yes.

2  Q.  Was that the last time that you saw Maryetta Griffin, when

3  she left the house on February 16th 1998?

4  A.  Yes.

5  Q.  Did you have anything to do with Maryetta Griffin's murder?

6  A.  No.

7  Q.  Let's go back to March 23rd, 1998.  You have told us that

8  you went to the Police station voluntarily?

9  A.  Yes.

10 Q.  And you were being interrogated about the murder of Maryetta

11 Griffin by Detectives DeValkenaere and Phillips.  What kinds of

12 questions were they asking you?

13      MR. SMOKOWICZ:  I'm going to object to the form of the

14 question.  He said they.  These are individual Defendants.  I

15 believe it should be broken down.  Multiple form.

16      THE COURT:  Should be more specific.

17      MR. ELSON:

18 Q.  What kind of questions was Detective DeValkenaere asking?

19 A.  He was asking me did I kill that woman?  Did I know who

20 killed that woman?  Did Frost kill that woman?  Did Ray kill

21 that woman?  Did Frost have one of his girls kill that woman?

22 Do I know who killed that woman?  Those the questions, asking

23 over and over, pretty much.

24 Q.  And what type of questions was Detective Phillips asking you

25 during that interrogation session?

A.   Pretty much the same.  They were tag team.  Did I know who

killed that woman?  Did I kill that woman?  Did one of Frost's

girls kill that woman?  Did Ray kill that woman?

Q.   And in response to both Detectives' questions, what were you

saying?

A.   No.  Absolutely not.

Q.   At a certain point in this interrogation session was there a

break in the interrogation, and then the interrogation by

Detectives Phillips and DeValkenaere resumed?

A.   Yes.

Q.   And after the questioning resumed, tell the jury what

happened.

A.   Well, after that they came in with more of the questions.

Saying, you know, who did it?  They was -- more of the same

questions.  Like you killed that woman.  Tell us you killed that

woman.  Believe DeValkenaere was flickering a lighter in my face

at that time.

        MR. SMOKOWICZ:  I'm sorry.  I didn't hear.  Who is

flickering?

        THE WITNESS:  I believe it was DeValkenaere.  And I

think Phills (phonetic) was open hand punching me, hitting me

with his hand flat in the chest.

        MR. ELSON:

Q.   I think you said Detective Phills.  Did you mean Detective

Phillips?

A.   Detective Phillips, yes.  Having me standing long times in interrogation room.  Handcuffed high to the wall, where I had to stand.  And like I said, it was questions like did you kill this woman?  You know who killed this woman?

Q.   Okay.  I'm going to show you -- well, Judge, I would offer into evidence Plaintiff's Exhibit 11-A, which is the Police report dictated by Detective DeValkenaere.  The report -- the date of the report is March 24th, 1998.

THE COURT:  Any objection to that?

MR. SMOKOWICZ:  One second, Your Honor.  I have to see what it is.

THE COURT:  Is that DeValkenaere and Phillips?

MR. ELSON:  Yes.

MR. SMOKOWICZ:  It is, Your Honor, and I have no objection to 11-A.

THE COURT:  The Court will receive it.

MR. ELSON:

Q.   Okay, William, I'm showing you on your screen Plaintiff's Exhibit 11-A, which is a Police report which purports to be a report of the interview, the interrogation of you by Detective DeValkenaere and Detective Phillips on March 23rd, 1998.  I want to -- this is the first page of the report that I'm showing you, and I want to show you specifically the second page of the report.  And I want to call your attention to the highlighted portion of this report.  And I want to read it for you and then

1  ask you a question.  The highlighted portion of the report

2  states:  He stated -- he, meaning William Avery -- he stated

3  that he and Mercedes had sex, and this was oral sex that she

4  performed on him.  He stated this was not actually a dope date

5  and he didn't pay her anything for this.  It was just that they

6  had sex together.  Do you see that?

7  A.  Yes.

8  Q.  Did you make that -- those statements to Detectives

9  DeValkenaere and Phillips?

10  A.  No.  No.

11  Q.  Did you tell Detectives DeValkenaere and Phillips that you

12  had sex with Maryetta Griffin?

13  A.  No.

14  Q.  Did you have sex with Maryetta Griffin?

15  A.  No.

16  Q.  On February 16th, 1998?

17  A.  No.  No.

18  Q.  At some point did the interrogation by Detectives Phillips

19  and DeValkenaere end?

20  A.  This was around 5:30 when their shift was changing.  That's

21  when I met Detective Hernandez and Detective Katherine Hein.  I

22  told them, like I -- I was telling them that I didn't want to

23  talk to Detective Phillips and DeValkenaere, you know what I'm

24  saying, because they was in there harassing me, trying to force

25  me to say that I knew something about that woman's murder.  And

1    one of the Detectives was like don't worry about that.  Don't
2    worry about that.
3    Q.  What type of questions did Detective Hein ask you during
4    this interrogation?
5    A.  Well, they came in with pretty much more of the same
6    questions, but this time she was -- she was also, you know,
7    getting my name and age and, you know, my history.  My
8    background and stuff at that time.
9    Q.  And Detective Hernandez was also present for this interview?
10   A.  Yes.
11   Q.  And what type of questions was Detective Hernandez asking
12   you?
13   A.  Did I kill that woman?  Did I know who killed that woman?
14   Did Frost kill that woman?  Did I know?
15   Q.  And what were you saying?
16   A.  No.
17   Q.  Did you ask them for a lawyer?
18   A.  Several times.
19   Q.  How did they respond to that?
20   A.  No.  Don't work that way.
21   Q.  Did you tell them that you didn't want to talk to them?
22   A.  Yes.  Several times.  I even sign a paper saying I don't
23   want to talk to you all.
24   Q.  Who told you it didn't work that way when you asked for a
25   lawyer?

1   A.   It was Detective Phillips and Detective Hernandez.

2   Q.   What happened after Detectives Hein and Hernandez finished

3   questioning you during this time period?

4   A.   I was still being handed over to the City Jail.  Up to the

5   City Jail holding cells for the night.

6   Q.   And about what time was that?

7   A.   About 10:30.

8   Q.   Did you go to sleep for the night?

9   A.   Yes.

10   Q.   And when you woke up the next day on March 24th, 1998, were

11   you questioned by any Detectives that day?

12   A.   Yes.

13   Q.   Who were the first Detectives to question you on March 24th?

14   A.   I believe the first Detective -- it was Detective Phills

15   (sic) and Detectives Hernandez.

16   Q.   When you say Phills, you mean Phillips, right?

17   A.   Phillips, yes.

18   Q.   What kinds of questions were -- what kinds of questions did

19   Detective Phillips ask you at that point?

20   A.   It was kind of accusing me at this point.  Like I know who

21   killed that woman.  They was telling me that me and Ron had made

22   a bond.  Lorenzo Frost.  That we had made some type of bond

23   together.  Telling me to forget the bond.  Telling me to --

24   wanted to tell the D.A. that I was cooperative with them.  That

25   I didn't want to start up here with homicide.  Wanted to start

1    down here with manslaughter.  You know, they was -- they was

2    feeding this story now.  Create the story.

3  Q.  And Detective Hernandez was present for this interview?

4  A.  Yes.

5  Q.  What was Detective Hernandez saying to you?

6  A.  Like we almost had you.  Gotta tell us so we can help you.

7    We can't help you out.  We receive many letters from guys

8    coming -- from up north after it's too late.  They done got

9    natural life in prison.  Like that.  Like hypothetically

10   speaking you woke up, caught Miss Griffin in your pocket.  She

11   snatched away.  Fell down the stairs, and that's how we can

12   explain she broke her neck.  Frustrated like yeah,

13   hypothetically speaking that could happen, but it didn't.  Like

14   that stuff.  To that nature.

15  Q.  So Detective Hernandez presented you with a hypothetical?

16  A.  Yes.

17  Q.  And this is the hypothetical that he created?

18  A.  Yes.

19  Q.  And how did you respond to that?

20  A.  I told him yeah, hypothetically speaking that could happen,

21   but it didn't.  It didn't.

22  Q.  Did you ask for a lawyer during this interrogation session?

23  A.  Several times.  All during the interrogation I asked for a

24   lawyer.

25  Q.  And how did these Detectives respond to your request for a

1  lawyer?

2  A.  No, it don't work that way.  I even asked the Lieutenant for

3  a lawyer.

4  Q.  Is that when Detective Phillips said that to you?  That it

5  didn't work that way?

6          MR. SMOKOWICZ:  I'm going to object.  It's leading.

7          THE COURT:  Well, it is, but he may answer, if he can.

8          THE WITNESS:  Yes.

9          MR. ELSON:  I'm going to show you -- I'd like move

10 into evidence another Exhibit, Judge.  This is Plaintiff's

11 Exhibit 11-C.  This is a handwritten report authored by

12 Detective Gilbert Hernandez.  The date is March 24th, 1998.

13         THE COURT:  Any objections?

14         MR. SMOKOWICZ:  No, Your Honor.

15         THE COURT:  The Court will receive 11-C.

16         MR. ELSON:  And I would also move into evidence

17 Plaintiff's Exhibit 11-D, which is the typewritten report of

18 March 24th, 1998, by Gilbert Hernandez.

19         THE COURT:  All right.

20         MR. SMOKOWICZ:  11 what?

21         MR. ELSON:  11-D.

22         MR. SMOKOWICZ:  "D" as in dog?

23         MR. ELSON:  Yes.

24         THE COURT:  The Court will receive those Exhibits.

25         MR. SMOKOWICZ:  No objection.

1          MR. ELSON:

2     Q.  Now I'm showing you Plaintiff's Exhibit 11-C.  This is a

3     handwritten report that purports to be a report of the

4     interrogation that you just described.  And I want to direct

5     your attention specifically to the highlighted portion of this

6     report, and I'm going to read it to you.  It says subject states

7     that he was awakened by Mercedes going through his pockets,

8     pulling out his money.  Subject states that he was startled.

9     Subject states that he got up on his feet and grabbed one of

10    victim hands.  Subject states that Mercedes and him started to

11    fight.  Subject states he was saying, quote, what are you doing,

12    unquote.  Subject states that Mercedes pulled and ran toward the

13    stairs.  Attempt to get away.  Subject states he doesn't

14    remember what happened.  Subject states Ronnie called.  Subject

15    told Ronnie get over here.  I think I killed this bitch.

16    Subject states that Ronnie shouldn't have gotten rid of the

17    body.  Questioned subject as to how he killed Mercedes.  Subject

18    stated, quote, I am responsible, unquote.  I just don't remember

19    how.  Did you make any of those statements to Detectives

20    Hernandez and Phillips when they were questioning you on

21    March 24th, 1998?

22    A.  No.  No.

23    Q.  Did you at any time while they were questioning you admit to

24    being responsible for the death of Maryetta Griffin?

25    A.  No.

1  Q.  At any time when they were questioning you, did you admit to

2  getting into any kind of altercation with Maryetta Griffin when

3  she was going through your pockets?

4  A.  No.

5  Q.  Showing you Plaintiff's Exhibit 11-D.  This is the

6  typewritten version of Detective Hernandez's handwritten report.

7  And I'm again going to read to you the highlighted portion.

8  Subject states that he was laying on the couch and fell asleep.

9  Subject states that he was awakened by Mercedes going through

10 his pockets and pulling out his money.  Subject states that he

11 was startled.  Subject states that he got up on his feet and

12 grabbed one of the victim's hands.  States that Mercedes and him

13 started to fight.  Subject states that he was saying what are

14 you doing?  Subject states that Mercedes pulled and ran toward

15 the stairs, attempting to get away.  Subject states that he

16 doesn't remember what happened.  Subject states Ronnie called.

17 This subject told Ronnie get over here.  I think I killed this

18 bitch.  This subject stated that Ronnie shouldn't have gotten

19 rid of the body.  I questioned the subject as to how he killed

20 Mercedes.  Subject states I'm responsible.  I just don't

21 remember.  Again, did you make any of those statements to

22 Detectives Hernandez and Phillips during that interrogation?

23 A.  No.  No.  Absolutely not.

24 Q.  What happened that day, March 24th, after Detectives

25 Phillips and Hernandez finished questioning you initially?

1  A.  Well, Kathy -- Katherine Hein, Detective Hein, was

2  interrogating me, so she had me go back over the events.

3           MR. SMOKOWICZ:  I'm sorry?  She had to go back what?

4           THE WITNESS:  Back over the events from the 16th

5  leading up to the 17th.

6           MR. ELSON:

7  Q.  And what kind of questions was she asking you?

8  A.  She was asking -- she was telling me that that woman didn't

9  have to die.  Telling me about that woman had children.  That

10  the woman was into church and stuff before she had got mixed up

11  into drugs.  Stuff like that.  She was just getting I guess

12  familiar with me.  Steady asking me questions like did I know

13  that woman?  Did I know where that woman's clothes was?

14  Q.  What were you saying to her in response to these questions?

15  A.  Said no.  Just like I said, don't know nothing about

16  homicide.  I didn't know.

17          MR. ELSON:  Judge, I'd like to move into evidence

18  Plaintiff's Exhibit 11-F, which is the typewritten report by

19  Detective Kathy Hein of her questioning of Mr. Avery on

20  March 24th, 1998.

21          THE COURT:  Any objection?

22          MR. SMOKOWICZ:  With the proviso that it indicates

23  that it was also witnessed by Detective Hernandez.  No

24  objection.

25          THE COURT:  All right.

1          MR. ELSON:

2    Q.   Now, William, I'm showing you Plaintiff's Exhibit 11-F,

3    which is Detective Hein's report.  The first page indicates that

4    this is a report of the interview that she conducted with you on

5    March 24th, 1998.  And I specifically want to call your

6    attention to the second page of the report, to the highlighted

7    portion which I'm going to read.  Says Avery stated that he and

8    Mercedes then had oral sex, penis to mouth, and that Mercedes

9    left after that.  When Detective Hein was questioning you on

10   March 24th, did you ever tell her that you had oral sex, penis

11   to mouth, with Mercedes?

12   A.   No.

13   Q.   Is this a false statement in this report?

14   A.   Yes.

15   Q.   How long did the interrogation session with Detective Hein

16   and Detective Hernandez last?

17   A.   Well, off and on all that -- all that day from like 8:30

18   a.m. to like 2:30 that morning.  That 25th.  It was just -- it

19   was all day.

20   Q.   So it lasted into the morning of March 25th?

21   A.   Yes.

22   Q.   During that interrogation with Detective Hein, did you ask

23   for a lawyer?

24   A.   Several times, yes.

25   Q.   And how were your requests responded to by Detective Hein?

1  A.  You'll get a lawyer soon enough.  You know.  But it don't

2  work that way.  She was like you get a lawyer soon enough.

3  Q.  After she and the other Detectives finished questioning you

4  in the early morning hours of March 25th, what happened next?

5  A.  I was sent back over to the City Jail.  To the City Jail, to

6  the other cells for the night to go to sleep.

7  Q.  And you woke up later in the morning on the 25th?

8  A.  Yes.

9  Q.  What happened after you woke up later in the morning?

10  A.  I was met by Detective Phillips at that time, who came in

11  and said he was ordered to talk to me some more by his

12  Lieutenant because he was studying -- studying this new D.N.A.,

13  telling me how much money he was gonna get for overtime for

14  doing D.N.A. study.  He was getting like a $7,000 raise or

15  something.

16  Q.  After you finished this discussion with Detective Phillips,

17  what happened?

18  A.  Then I was -- I was sent over to booking, over in the County

19  Jail.

20  Q.  And were you ultimately charged with a crime?

21  A.  Yes.

22  Q.  What were you charged with?

23  A.  Keeper of a drug house, and conspiracy to sell cocaine.

24  Q.  Were you charged with the homicide of Maryetta Griffin at

25  that point?

```
 1   A.   No.
 2   Q.   After you were charged with the drug offenses and sent to
 3   jail, were there any newspaper articles written about you?
 4   A.   Could you repeat that question?
 5   Q.   Yes.  After you were charged with the drug offenses and sent
 6   to jail, as you just described --
 7   A.   -- yes --
 8   Q.   -- did you find out that there were any newspaper articles
 9   written about you?
10   A.   Yes.  The Detectives -- Detectives had someone to take -- to
11   scrape my D.N.A., so I was called over to clinical service.
12   Took pubic hair, fingernail clippings, head hairs, and my blood.
13   Once they completed that, Mr. Phillips was getting ready to walk
14   out the door.  He was like choo choo.  And by the way, you made
15   the paper like that.  So when I went back to the pod, that's
16   where I seen that article saying that I confessed to this
17   murder.
18   Q.   What newspaper was that?
19   A.   From the Milwaukee Journal.
20   Q.   And can you describe the article?  How long was it?
21   A.   It was almost a full page.
22   Q.   Did it have a photograph of you?
23   A.   Yeah.  Photograph -- photograph saying that me and Lorenzo
24   Frost--
25            MR. SMOKOWICZ:  Your Honor, we're getting into hearsay
```

1  now.  Objection.

2        THE COURT:  Yeah.  The last part of the answer will be

3  stricken.

4        MR. ELSON:  Judge, I'd like to move into evidence the

5  newspaper article.

6        THE COURT:  Any objection to that?

7        MR. SMOKOWICZ:  What's the --

8        MR. ELSON:  The Defendant's Exhibit is Exhibit 1042.

9        MR. SMOKOWICZ:  Your Honor, this article is not dated.

10       THE COURT:  Well, is it a defense Exhibit?

11       MR. SMOKOWICZ:  It is a defense Exhibit, but it wasn't

12 being offered for the purpose of anything with respect to that

13 date.

14       THE COURT:  How can we substantiate that this is the

15 date that we're talking about then, counsel?

16       MR. ELSON:  I can ask a few more questions and attempt

17 to do that, Judge.

18       THE COURT:  All right.

19       MR. ELSON:

20 Q.  What date were you -- what date were you told by Detective

21 Phillips that you made the newspaper?

22 A.  Maybe it was the 30th.  If I'm not mistaken, I believe it

23 was the 30th.  I can't be for sure.

24 Q.  And you looked at the Milwaukee Journal Sentinel that day?

25 A.  Yes.

1    MR. ELSON: And just for identification purposes I'd
2  like to show the witness Defendant's Exhibit 1042.
3    THE COURT: Okay. All right. He said 3/30. We're
4  talking '98?
5    MR. ELSON: Yes, this is 1998?
6    THE WITNESS: Yes.
7    THE COURT: Okay.
8    MR. ELSON:
9  Q.  Is this the newspaper article that you saw on March -- on or
10  around March 30th, 1998?
11 A.  Yes.
12    MR. ELSON: I'd offer it into evidence, Judge, as the
13  article that he saw.
14    THE COURT: All right. The Court will receive it.
15    MR. ELSON:
16 Q.  All right. And the headline of the article is man admits to
17  killing, report says. Is that accurate, William?
18 A.  Is it accurate?
19 Q.  Yeah. Is this the article that you saw?
20 A.  Yes. Yes, that's the article. Yes.
21 Q.  And you read through the article that day?
22 A.  Yes.
23 Q.  And you saw your photograph in the newspaper?
24 A.  Yes.
25 Q.  What were you thinking when you saw this?

1          MR. SMOKOWICZ:  Objection.  Relevance.

2          THE COURT:  No, no, the Court will allow it.

3          THE WITNESS:  I didn't get a good feeling, you know.

4  I'm saying I didn't commit this crime.  And, you know -- and it

5  ain't good to be falsely accused about a crime you ain't

6  committed.  You know, they putting this stuff in the newspaper

7  for the public to see.  I was uncomfortable with that.  I was

8  scared.  Like, you know, it just ain't me.  It wasn't good.

9          MR. ELSON:

10  Q.  Did you eventually go to trial on the drug charges?

11  A.  Yes.

12  Q.  And you were convicted?

13  A.  Yes.

14  Q.  When were you convicted?

15  A.  I think it was around July of that year I was convicted.

16  Q.  July of 1998?

17  A.  Yes.

18  Q.  Where did you serve your time on the drug offenses?

19  A.  Well, I was shipped out of State due to overcrowding to

20  Sayre, Oklahoma.

21  Q.  This was a prison in Oklahoma?

22  A.  Yeah.  This CCA.  The name of the prison was CCA.  That was

23  the area.  It was in the County or whatever Sayre, Oklahoma, was

24  in.

25  Q.  Okay.  After you were convicted of the drug charge --

1      MR. SMOKOWICZ:  Your Honor, if we're done with the

2    Exhibit, I -- pardon -- apologize for the interruption, but are

3    we done with the Exhibit?

4      THE COURT:  All right.

5      MR. SMOKOWICZ:  Thank you, Your Honor.

6      MR. ELSON:

7    Q.  After you were convicted of the drug charges, did you file

8    any kind of complaint against the Detectives who interrogated

9    you?

10   A.  Yes.  I filed a Notice of Claim with the State's Attorney

11   General complaining -- complaining to them about the misconduct

12   of the Officers.  That I -- you know, was complaining to them

13   about what the Officers -- the misconduct the Officer had did,

14   you know.

15   Q.  Can you explain to the jury what a Notice of Claim is?

16   A.  It's a document that I can put another party on notice that

17   you intend on suing.  You know, reporting on misconduct.

18   Q.  When did you file this Notice of Claim?

19   A.  I believe it was in November of '98.

20      MR. ELSON:  And, Judge, we'd offer into evidence

21   Plaintiff's Exhibit Number 6, which is the Notice of Claim.

22      THE COURT:  Okay.  Any objection?

23      MR. SMOKOWICZ:  I wouldn't object, although certain

24   portions of it may not be appropriate to display to the jury.

25      THE COURT:  What is going to be displayed to the jury,

1   counsel?  The whole thing?  Or --

2          MR. ELSON:  Well, maybe we should have a side-bar

3   about that.  I can explain.

4          THE COURT:  All right.

5          (Whereupon a side-bar conference was held off the

6   record.  Upon conclusion of the side-bar conference, the

7   proceedings continued as follows:)

8          THE COURT:  All right.  The Court will receive that

9   Exhibit subject to the sidebar conference.

10         MR. ELSON:

11  Q.  Showing you Plaintiff's Exhibit Number 6.  Is this the

12  Notice of Claim that you submitted?

13  A.  Yes.

14  Q.  And this indicates that you submitted it to the Attorney

15  General, is that correct?

16  A.  Yes.

17  Q.  And that you submitted it -- or it was notarized on

18  November 27th, 1998?

19  A.  Yes.

20  Q.  And the names of the Detectives who you submitted the claim

21  against are Gilbert Hernandez, Daniel Phillips, Katherine Hein,

22  and James DeValkenaere.  Is that right?

23  A.  Yes.

24  Q.  And can you tell the jury in general terms the allegations

25  that you were making against those Detectives in the Notice of

1  Claim?

2  A.  Yeah.  I pretty much told Attorney General from the 23rd --

3  well, actually from the 20th to the end of the interrogation on

4  the 25th, what took place.  But I explained to them in there

5  that I volunteered down there.  That where alleged confession

6  came from was from predominantly Detective Gilbert Hernandez and

7  Detective Phills (sic).  And just went over the events.  What

8  happened.  That I did not commit this murder, you know,

9  basically.  Telling Attorney General that I did not kill that

10  woman.

11  Q.  All right.  And you testified that at the time you made this

12  claim you were in prison on the drug offenses, is that right?

13  A.  Yes.

14  Q.  And were you interviewed by any Milwaukee Police Detectives

15  while you were serving time in prison on the drug charges?

16  A.  Yeah.  While in Sayre I was -- Detective Heier and Detective

17  Armbruster -- maybe not saying the name right -- came to

18  Oklahoma.  And two -- one or two hours down there Detectives

19  interview me about this -- that homicide again.  Didn't get a

20  good feeling then.  But what was going on, they were still

21  asking me where is this woman's clothes?  Where is this woman's

22  clothes?  Where is this woman's jewelry?  Asking me stuff like

23  that.  Detective Heier and Armbruster.

24  Q.  Had you ever met these two Detectives before?

25  A.  No.  Not to my knowledge, no.

1  Q.  Were these Detectives involved in any way in interrogating

2  you back in 1998 about the Griffin homicide?

3  A.  No.

4  Q.  What were you telling them?

5  A.  I was telling them I don't want to talk to you.  I thought I

6  was done with this.  And I filed a grievance within the

7  institution letting them know that I was contacting my family

8  about a lawyer.  That I don't want to talk to no one without no

9  lawyer, because this nightmare was -- I felt was starting all

10 over again.

11 Q.  How long did this interrogation last with these Detectives?

12 A.  Well, I don't know.  They got it on record.  Like -- I guess

13 I can't be too for sure how long that one lasted.

14 Q.  How did it end?

15 A.  Me getting up, running out that door when that Detective put

16 his feet in that door.

17 Q.  You ran out of the door?  Is that what you said?

18 A.  Yeah.  Yeah.

19 Q.  When were you released from prison after serving your

20 sentence on the drug charges?

21 A.  I believe it was June 2004?  Like in June, 2004.

22 Q.  How did it feel to finish serving your sentence and to be

23 free?

24 A.  Well, it felt good to be released, but I still worried, you

25 know.  Basically Detectives steady come to me about this

1   homicide that I didn't commit, so --

2   Q.  What were you worried about?

3   A.  Being charged with a homicide that I didn't commit.

4   Q.  When you got out of prison in 2004, what were your plans for

5   your life?

6   A.  You know, reunite with my family.  Get my life back

7   together.  Get on track.  Get me -- like I did when I got out,

8   start my own business and raise my -- finish raising my kids.

9   Q.  Now, did something happen then that derailed your plans?

10  A.  Yeah.  I was charged with this homicide.  With Maryetta

11  Griffin's homicide.

12  Q.  All right.  Let's go to the day of September 21st, 2004.

13  What happened that day?

14  A.  Well, that day -- that's the day I had a scheduled

15  appointment with my Parole Officer from the drug conviction.  So

16  I went -- when I got to his house -- I mean to his office --

17  when I was -- when I got to his office, that's when I was

18  arrested.  I was arrested in his office.

19  Q.  Arrested for what?

20  A.  For the homicide of Maryetta Griffin.

21  Q.  What was going through your mind when you were arrested?

22  A.  I am arrested for a crime I ain't committed.

23  Q.  Did you -- were you -- and did you go through a process in

24  the Griffin homicide where you entered a plea of guilty or not

25  guilty?

```
 1   A.  Yes.

 2   Q.  And how did you plead?

 3   A.  Not guilty.

 4   Q.  Did you end up having a trial on the Maryetta Griffin

 5   homicide charge?

 6   A.  Yes.

 7   Q.  Who testified at your trial?

 8   A.  Detective Phillips, Detective Hernandez, Detective Katherine

 9   Hein.

10   Q.  And in terms of those Detectives, in general terms what did

11   they testify to at your trial?

12          MR. SMOKOWICZ:  Objection, Your Honor.  That's

13   irrelevant and subject to immunity.

14          MR. ELSON:  It's not irrelevant, Judge.  It's

15   certainly relevant what happened at his criminal trial that

16   caused him to be convicted.

17          MR. SMOKOWICZ:  Witnesses have absolute immunity, Your

18   Honor.

19          THE COURT:  Well, do we have a copy of the record that

20   was -- is there something in these Exhibits that has a record of

21   that testimony?

22          MR. ELSON:  Yeah.  The -- these three Detectives'

23   testimonies are Exhibits in Plaintiff's Exhibit list.

24          THE COURT:  Well, then we should go to the Exhibit

25   list.  It's a matter of public record.  Overrule the objection.
```

1    He can be cross-examined on it if this witness testified

2    incorrectly.

3              MR. ELSON:

4    Q.   In general terms what did those Detectives testify to at

5    your criminal trial?

6    A.   That I made admissions admitting that I killed Maryetta

7    Griffin.

8    Q.   Who else other than those three Detectives testified at your

9    criminal trial?

10   A.   The jailhouse liars.  Keith Randolph, Antron Kent, and

11   Jeffrey Kimbrough.

12   Q.   Let's start with Antron Kent.  What was your connection to

13   Antron Kent?

14   A.   He was just another fellow inmate in the prison.  I think --

15   you know, we didn't really socialize together.

16   Q.   Where were you incarcerated with him?  Is this in Oklahoma?

17   A.   Yes.

18   Q.   Okay.  And what did Antron Kent testify to in general terms

19   at your criminal trial?

20   A.   Antron Kent testified that at recreation period that I

21   supposedly was feeling bad and remorseful about murdering

22   Maryetta Griffin.  That I said to him that I murdered Maryetta

23   Griffin.  And I did not.

24   Q.   In fact, did you ever tell Antron Kent that you killed

25   Maryetta Griffin?

1    A.  No.

2    Q.  Have you ever had a conversation in your life with Antron

3    Kent?

4    A.  No.

5    Q.  Let's talk about Jeffrey Kimbrough.  What was your

6    connection to Jeffrey Kimbrough?

7    A.  He just another fellow inmate in the prison.

8    Q.  Is he a fellow inmate in Oklahoma?

9    A.  Yes.

10   Q.  And in general terms what did Jeffrey Kimbrough testify at

11   your criminal trial?

12   A.  That he supposedly overheard the conversation with Antron

13   Kent.

14   Q.  And is it possible that Jeffrey Kimbrough overheard a

15   conversation that you had with Antron Kent?

16   A.  No.

17   Q.  What conversation did Jeffrey Kimbrough say he overheard?

18   A.  He say he overheard me supposedly confessing to Antron Kent

19   to the murder of Maryetta Griffin.

20   Q.  Was Jeffrey Kimbrough lying about that?

21   A.  Yes.

22   Q.  Did you know Jeffrey Kimbrough at all when you were

23   incarcerated with him?

24   A.  No.

25   Q.  Let's talk about Keith Randolph, the third jailhouse

1   informant.  What's your connection to Keith Randolph?

2   A.   Keith Randolph?  I know him prior to in prison.  He actually

3   used to date one of my aunts.  But he actually is the one who

4   showed me how to fill out the Notice of Claim.  Like what was

5   the purpose of the Notice of Claim.

6   Q.   So you were incarcerated with Keith Randolph at the time

7   that you submitted your Notice of Claim?

8   A.   Yeah.  1998 in Dodge.

9   Q.   That's Dodge Correctional?

10  A.   Yes.

11  Q.   In general terms what happened with Keith Randolph's

12  testimony at your criminal trial?

13  A.   Well, actually -- he actually got up on the stand to recant,

14  and the prosecutor, Mark Williams, he end up reading the paper

15  stating what he had made prior to the trial.  Because he was --

16  Randolph was up there recanting his statement.

17  Q.   And in general what did the statement that was read into

18  evidence at the criminal trial -- generally what did Keith

19  Randolph say in that statement?

20  A.   That I supposedly had confessed to him about the murder of

21  Maryetta Griffin.  And he --

22  Q.   Did you ever confess to Keith Randolph to killing Maryetta

23  Griffin?

24  A.   No.  No.

25  Q.   And you testified at your criminal trial, right?

```
1   A.   Yes.

2   Q.   What did you testify to at your criminal trial?

3   A.   I testified that I didn't kill Maryetta Griffin.  I did not

4   have sex like the State star witness at the time -- the star

5   witness testified.  What else?  Told them I didn't kill that

6   woman.  I ain't never said I killed that woman.  I ain't never

7   thought I killed that woman.  Like I said, it came from Gilbert

8   Hernandez.  He made that statement.

9   Q.   At the end of your criminal trial, what was the verdict?

10  A.   Guilty.

11  Q.   What were you thinking when you heard that guilty verdict

12  read?

13  A.   Like I'm gonna spend the rest of my life in prison for a

14  crime I didn't commit.

15  Q.   After you were found guilty, did you have a hearing where

16  the Judge sentenced you?

17  A.   Yes.

18  Q.   Tell us about that hearing.  Did you have an opportunity to

19  say anything?

20  A.   Yeah.

21  Q.   What did you say at the sentencing hearing?

22  A.   You know, Miss Griffin's kids was sitting right there.

23  Talked to them, telling them that I did not kill they mother.

24  This just a vicious vendetta from the Police because I wrote the

25  Attorney General telling them about what they -- what they had
```

1   did.  And this is just to further cover their steps.  And that

2   pretty much I did not hurt you all mother.  I didn't kill you

3   all mother.  I don't know who killed your mother.  I didn't have

4   nothing to do with that.  These people just lying, point blank.

5   Q.  What was the sentence that was imposed on you?

6   A.  Sentence me to 40 years in prison.

7   Q.  What was going through your mind when you heard that?

8   A.  All kinds of things.  I was just thinking all kinds of

9   things.  I was thinking about my children.  They gonna have to

10  grow up without a father.  Same type of life I did, growing up

11  without a father.  Like I'm just gonna miss my family, you know

12  what I'm saying?  I'm just -- I'm messed up.  I'm messed up.

13  You know, hope is like -- wow.

14  Q.  What prison were you sent to after you were sentenced?

15  A.  I was sentenced to Waupun Correctional Facility in Dodge.

16  Q.  How many years did you serve in Waupun Prison?

17  A.  About -- I think -- I think I served about 6-and-a-half.

18  About 6 years.  6-and-a-half years.  Something like that, yes.

19  Q.  Can you describe for the jury what the living conditions

20  were like in Waupun Prison?

21  A.  It's a very structured environment.  You know, pretty much

22  when you eat, sleep, get up.  If you gonna work.  Just like

23  extremely cold in the winter, extremely hot in the summer, you

24  know.  You forced to perform random strip searches.

25  Q.  Let me ask you about the strip searches.  Can you describe

1   what a strip search consists of in Waupun?

2   A.  Well, a strip search is like -- well, you like get a visit

3   from an attorney, a family member, or working in the kitchen,

4   you subject to strip all your clothes down, put your hands

5   behind your ears, lift up your tongue, lift up your feet, spread

6   your cheeks.  Bend over.  Cough.  Just humiliating thing, strip

7   searches.

8   Q.  Approximately how many times were you subjected to that kind

9   of strip searching?

10  A.  Like I say, you can be strip searched if you work in the

11  kitchen every day you come in and out.  Or like you get a visit.

12  So it could have been -- 6 years I was there, probably got strip

13  searched maybe -- I don't know, probably 250 times, maybe.

14  Q.  Did you work in the kitchen?

15  A.  Yeah, I worked in the kitchen.

16  Q.  Did you have other jobs in prison?

17  A.  Yeah.  I worked at maintenance.  Building maintenance.

18  Q.  Were you ever attacked in prison?

19  A.  By Dwayne Griffin, one of her -- victim's -- I believe he

20  was a nephew.

21  Q.  Tell the jury about that.

22  A.  Well, we work in the kitchen.  We worked in the kitchen

23  together, and I was telling him -- you know, constantly telling

24  him I did not hurt your kin folks, you know.  And we get in a

25  scrap back there in the kitchen, you know.  One time -- one time

1  he actually bit me, you know.  But yeah, that's -- you know, I

2  was constantly defending that off with her people, by running

3  into her people like that.  I didn't kill her.  I didn't kill

4  her.

5  Q.  Did any of your family members die while you were in prison

6  in Waupun?

7  A.  Two of my uncles.

8  Q.  Who were they?

9  A.  Hank Bentley and Michael Bowers.

10  Q.  Were you very close with them growing up?

11  A.  Yeah.  Hank was more like a father figure, you know.  That

12  was my father's oldest brother.  So --

13  Q.  Were you able to attend their funerals?

14  A.  Oh, no, no.

15  Q.  Were there any other important events that you missed

16  while -- missed out on while you were in prison in Waupun?

17  A.  Yeah, just -- just the fact of being a father to my kids.  I

18  ain't no deadbeat, you know.  Those are my kids.  I love my

19  kids.  I won't deny that.  You know, I missed two of them

20  graduating before I got out.

21  Q.  Who graduated?

22  A.  Sirena and William Avery.

23  Q.  From high school?

24  A.  Yeah.

25  Q.  And I take it you weren't permitted to attend their

1  graduations?

2  A.  No.

3  Q.  While you were in prison, did you make any attempts to

4  appeal your conviction?

5  A.  Yes.

6  Q.  Tell the jury about that.  What did you do?

7          MR. SMOKOWICZ:  Object.  Relevance.

8          THE COURT:  No, overruled.  He may answer.

9          THE WITNESS:  Well, I went through the process of

10  appealing my case through the Courts, and it was denied.  It was

11  denied.

12          MR. ELSON:

13  Q.  After your appeals were denied, did you make any other

14  efforts to overturn your conviction?

15  A.  Yeah.  Because -- yeah.  Well, I really -- I wrote a letter

16  to John Chisholm especially when I seen the similarities to the

17  Walter Ellis case.  I sent him a letter saying -- asking him,

18  begging him to please check the D.N.A. because --

19  Q.  You said you sent a letter to John Chisholm.  Can you tell

20  the jury who John Chisholm is?

21  A.  Milwaukee's attorney.  Assistant attorney.

22  Q.  The District Attorney?

23  A.  Yeah.  He the District Attorney for Milwaukee.

24  Q.  When did you write this letter to District Attorney

25  Chisholm?

```
 1   A.   When I -- when I get out?  I got out in May?  So probably

 2   was in April, because this went pretty fast when I wrote that

 3   letter.  So I think it was around April sometime.

 4   Q.   April of what year?

 5   A.   2010, it had to be, I believe.  Yeah, yeah, 2010.

 6               MR. ELSON:  Judge, I'd offer into evidence Plaintiff's

 7   Exhibit Number 7, which is the letter that Mr. Avery wrote to

 8   District Attorney Chisholm.

 9               THE COURT:  All right.  Any objection?

10               MR. SMOKOWICZ:  None, Your Honor.  Although the record

11   should reflect it's an April 5th letter.

12               THE COURT:  Okay.

13               MR. ELSON:

14   Q.   I'm showing you the April 5th, 2010, letter that you wrote

15   to District Attorney Chisholm.  You see that?

16   A.   Yes.

17   Q.   And I want to call your attention to two highlighted

18   portions of this letter.  The first one, second paragraph, says

19   in 2004 I was wrongly convicted of a murder.  When the homicide

20   occurred the media speculated that she was another victim of a

21   serial killer, slash, rapist who had been preying on prostitutes

22   in that area for years.  We now know that Walter Ellis is

23   responsible for at least 7 of these identical crimes.  So at the

24   time that you wrote this letter to District Attorney Chisholm,

25   had it been pubically reported that Walter Ellis was linked to
```

1    these murders?

2    A.  Yes.  Yes, it was in the media.  It was in the news that

3    Innocent Project -- Wisconsin Innocent Project had tested D.N.A.

4    and stuff and came up in the Shontae Otts (phonetic) case, and

5    they were merged together.

6    Q.  Calling your attention to the second highlighted portion.

7    It reads does the semen in her mouth belong to the killer?  I

8    have no doubt that the D.N.A. under her fingernails, the blood

9    stains on her sweater belong to the person who murdered her.  In

10   the interests of justice I am begging you to test this evidence.

11   You wrote that?

12   A.  Yes.  Yes.

13   Q.  Show you the second page of the letter.  And this portion

14   isn't highlighted, but I want to read from the top.  It says all

15   of the signs point to my being innocent.  Would I really want

16   any of this evidence tested if there was a chance it would be

17   mine?  Did you write that?

18   A.  Yes.

19   Q.  What happened after you sent that letter to District

20   Attorney Chisholm?

21   A.  Well, I think I received a letter a week or so later being

22   advised that they was gonna take a look at it, and look at

23   the -- test the evidence to see, and they be getting back with

24   me shortly.

25   Q.  And who sent this letter to you a week-and-a-half or so

1  later?

2  A.  I think it was John Chisholm, I believe.

3          MR. ELSON:  I'd offer into evidence Plaintiff's

4  Exhibit 8 which is an April 19th, 2010, letter from Assistant

5  District Attorney Norm Gahn that Mr. Avery's referring to.

6          THE COURT:  Okay.  Any objection?

7          MR. SMOKOWICZ:  No, Your Honor.

8          THE COURT:  The Court will receive it.

9          MR. ELSON:

10 Q.  Is this the letter you're referring to that you received

11 back in response to the letter you wrote to District Attorney

12 Chisholm?

13 A.  Yes.

14 Q.  And this was sent to you by an Assistant District Attorney

15 Norman Gahn, is that right?

16 A.  Yes.

17 Q.  And he's telling you that he has decided to resubmit the

18 evidence in your case for additional D.N.A. testing, right?

19 A.  Yes.

20 Q.  And that once that testing has been completed, he will

21 inform you of the results?

22 A.  Yes.

23 Q.  Did you subsequently receive another letter from the

24 District Attorney's Office?

25 A.  Yes.  About two weeks later I received a letter.  It

1  informed me that the results came back not to me, but came back

2  to somebody they was looking at that they had in custody they

3  was investigating.

4  Q.  And who sent you that letter?

5  A.  Either John Chisholm or Gahn.  One of the two.

6      MR. ELSON:  Judge, I'd move into evidence Plaintiff's

7  Exhibit 9, which is the May 6, 2010, letter that Mr. Avery's

8  referring to.

9      THE COURT:  Okay.  Any objection?

10     MR. SMOKOWICZ:  No, Your Honor.

11     THE COURT:  The Court will receive it.

12     MR. ELSON:

13 Q.  I'm showing you Plaintiff's Exhibit 9.  Is this the letter

14 you're referring to that you received from the District

15 Attorney's Office?

16 A.  Yes.

17 Q.  And this is signed by, again, Assistant District Attorney

18 Norman Gahn and Assistant District Attorney Mark Williams.  Is

19 that right?

20 A.  Yes.

21 Q.  Who is Assistant District Attorney Mark Williams?

22 A.  I think that's the dude that's head of homicides.

23 Q.  Was Assistant District Attorney Williams the person who

24 prosecuted you for the Maryetta Griffin homicide?

25 A.  Yes, he was the prosecutor in the case.

1    Q.  And I want to call your attention to that second paragraph

2    that's highlighted.  Says a D.N.A. profile was developed from

3    relevant evidence that did not match you or other standards

4    originally collected during the investigation of the case.  The

5    profile is consistent with another person who is charged with

6    crimes.  You see that?

7    A.  Yes.

8    Q.  Do you know who that other person who was charged with

9    crimes ended up being?

10   A.  Yes.

11   Q.  Who?

12   A.  Walter Ellis.

13   Q.  How did you feel when you received this last letter from the

14   District Attorney's Office?

15   A.  Oh, I was excited.  I was elated.  Actually another inmate

16   was coming past and he was like what's wrong?  I was jumping up

17   and down.  He's like you got some good news from the Court?  I

18   was like no, my daughter had got a good grade in school or

19   something.  I didn't want him to know that, because I was

20   fitting to get up out of there, you know.  They have -- some

21   inmates try to keep you there with them.

22   Q.  Did you then eventually have a hearing where the charges

23   were dismissed?

24   A.  Actually they -- Chisholm, they appoint me -- say they be

25   appointing me a lawyer.  Once I get the lawyer, they set up a

Court date.  And fairly -- they was moving fast.  I was out
pretty fast then.

Q.  And talk to the jury about that hearing where the charges
were dismissed and your conviction was overturned.  How did that
make you feel?

A.  It made me -- I was feeling pretty good, you know.  I was --
when I got released, I was feeling pretty good.  I still was
like can get back to my life.  I can get back to my life.  Be
with my kids.  Raise my kids.

Q.  How many total years were you in prison for the murder of
Maryetta Griffin?

A.  I think 6-and-a-half years.  Yeah.

Q.  What did you do the first night that you were free?  What
did you do, and where did you go?

A.  Got some food I believe from Taco Bell, and I located my
kids.  You know, went and located my kids.

Q.  Now, after your conviction was overturned, did you file a
petition with the State of Wisconsin Claims Board?

A.  Yes.

        MR. ELSON:  Judge, I would move into evidence
Plaintiff's Exhibit Number 10, which is the State of Wisconsin
Claims Board decision.

        MR. SMOKOWICZ:  Object on relevance grounds, Your
Honor.

        THE COURT:  Yeah, what is it?

1          MR. ELSON:  This was the subject of a motion in limine

2    which was denied by Your Honor.

3          THE COURT:  Okay.  The Court will receive it, then.

4          MR. ELSON:

5    Q.  Showing you Plaintiff's Exhibit Number 9.  This is a portion

6    of the State of Wisconsin Claims Board decision having to do

7    with your petition.  That's the first page.  And I'm going to

8    show you the second page, which is the substantive part.  Is

9    this what you received from the State of Wisconsin Claims Board

10   decision in response to the petition that you filed?

11   A.  Yes.

12   Q.  And I want to call your attention to the last paragraph

13   which states based on the totality of the information summarized

14   above and presented at the hearing, the Board concludes the

15   claimant has provided clear and convincing evidence that he was

16   innocent of the crime for which he was convicted and did not, by

17   his act or failure to act, contribute to his conviction.  Do you

18   see that?

19   A.  Yes.

20   Q.  How did it make you feel that the State of Wisconsin Claims

21   Board made that decision with regard to your innocence?

22         MR. SMOKOWICZ:  Objection.  Relevance.

23         THE COURT:  Overruled.

24         THE WITNESS:  It made me feel good.  You know, I could

25   show my kids that -- like this ain't true.  This ain't real.

1  Because my son actually was asking his Mom, did Dad really kill

2  that woman?

3       MR. ELSON:

4  Q.  That's your son William?

5  A.  Yes.

6  Q.  When did he ask her that?

7  A.  It was sometime during -- when I was locked up.  She just

8  had told me he was asking.  I was locked up, and she had just

9  told me, you know, Junior asking me.

10  Q.  Were you able to show William this Claims Board decision?

11  A.  I don't know if I actually showed him this.  I showed it

12  to -- most likely I showed it to my daughter, but he had kind of

13  got the gist of it once I was released.  Like I spent a lot more

14  time with my other daughter than him and me.  He 26.  He doing

15  his thing, you know.

16  Q.  And I just want to show you the last page of the Claims

17  Board decision.  And this contains the signatures of the Board

18  members.  Do you see that?

19  A.  Yes.

20  Q.  Okay.  Let's talk a little bit about your adjustment since

21  you've been exonerated and released from prison, and how it's

22  been since you've gotten out.  Can you talk to the jury a little

23  bit about that?

24  A.  Well, my adjustment back?

25  Q.  Did you find it easy to adjust to life on the outside?

1  A.  Hard to say.  I don't know.  I was still coping with this.

2  I don't know, as far as like -- ask that question again, would

3  you?

4  Q.  I will ask you a different question.  How have your

5  relationships been with your children since you have been

6  released?

7  A.  They've been -- you know, they've been kind of strained, you

8  know.  Kind of individual.  I was out of their lives actually

9  11-and-a-half years concerning this homicide, and it's hard.

10  Them taking advice and stuff from me.  They like who is you?

11  You wasn't even here for me.  And they grew up thinking like my

12  Dad is a murderer.  I mean, you know.  So it's been, you know --

13  just been working on it.  That's all I can say.  Just working on

14  it.  Confident that it will be -- as time go on, you know, you

15  know, guess all of it will come out.

16  Q.  In terms of your emotional state since all this has

17  happened, do you have any kind of trust issues or paranoia

18  issues that you can tell us about?

19  A.  Yeah.  This ain't good, being -- I don't -- I don't trust.

20  As far as when it comes to Police?  No, I don't trust them.

21  When it comes to my life?  My living and my pursuit of

22  happiness?  I do not trust them, no.

23  Q.  How about your relationships with women?  How has this

24  affected that?

25  A.  They not really trust -- they look at me like -- they

1  looking at me sideways.  Like, you know, my cousin told me you

2  gonna wear that jacket for the rest of my life, regardless of

3  this.  We was having a conversation.  Got heated and she was

4  like you gonna wear this jacket for the rest of your life, no

5  matter what.  Then, you know, it's -- girls are like -- you

6  know, they accept truth like okay, you know.  So, no, that

7  wasn't true.

8  Q.  Let me ask you about some positive things.  What are some of

9  your favorite things to do now that you're out of prison?

10  A.  Playing with grandkids.

11  Q.  You've been busy with some of your grandkids?

12  A.  Yeah, been busy with the grandkids.

13  Q.  How many grandkids do you have?

14  A.  Got two grandsons right now.  Isaiah and King (phonetic).

15  Q.  Are you able to spend time with them?

16  A.  Yeah.  Yeah.

17  Q.  What sorts of things do you do?

18  A.  Just play with them.  Feed them, you know.  Buy them

19  something, you know.  What Grandfathers do.

20  Q.  Let me ask you one last question.  Can you tell the jury how

21  it's affected you that you were convicted of this horrible crime

22  that you didn't commit?

23  A.  How did it affect me did you say?  It wasn't a good

24  experience.  I say just being a father, like I say it made it

25  rougher like for relationships, getting jobs, you know.  Certain

1    jobs can't get right to this day, having it on my record.  It

2    haven't been removed from my record.  Like I say, people just

3    look at you different from there, you know.  Like being -- they

4    just look at you different.

5    Q.  What would you have done with those 6 years of your life had

6    you not been in prison?

7    A.  Well, those 6-and-a-half years that I couldn't get back?

8    I'd have been building my life, starting my business.  It just

9    finally got done this time.  Being with my family.  Being

10   married.  I would have been married by now.

11          MR. ELSON:  I have no further questions, Judge.

12          THE COURT:  All right.  Cross examination.  Well,

13   we'll do this, ladies and gentlemen.  We'll break for the day.

14   The first day is always a long day.  You've been very patient.

15   Coming back, getting accommodated to the situation here.  So

16   we're going to break approximately a half hour early, and we'll

17   start the cross examination -- because I'm sure that will be at

18   least -- somewhat lengthy, I should say.  Not as lengthy, maybe,

19   but the Court doesn't know.

20          So you've heard two witnesses -- from two witnesses

21   now.  Please don't discuss the case.  As we get further into the

22   testimony it always becomes more tempting to do so.  Don't do

23   that.  I advise you every time you leave the courtroom because

24   that's important.

25          So we'll see you back here tomorrow morning at 9

1    o'clock and we'll take up the cross examination of Mr. Avery by

2    the defense.  Okay?  Have a good evening.  All right.

3              (Whereupon the jury was excused at 4:30 p.m.)

4              THE COURT:  Okay.  Tomorrow morning at 9 o'clock.

5              MR. SMOKOWICZ:  Your Honor, we should update you with

6    respect to Detective Hernandez.  It's my understanding that the

7    latest -- well, Miss Yuan, you can speak to that better than I

8    can.

9              MS. YUAN:  Yes, Your Honor.  I did speak with

10   Detective Kathy Spano, who's been in touch with him.  The latest

11   I heard was he was still in the hospital.  They were waiting on

12   the test results from this morning.  He had additional -- like

13   an additional testing to perform later today.  I don't know when

14   he's going to be released.  We have already informed Plaintiff's

15   counsel that he's not going to be able to testify tomorrow.

16   We're hoping he's released and can testify on Wednesday, but

17   I'll know more -- I'm going to give him a call once we break

18   from here.

19             THE COURT:  Well, if he's in the hospital, he's in the

20   hospital.  As soon as he gets out, try to get him here.

21   Anything else?

22             MR. SMOKOWICZ:  Not at this point, Your Honor.

23             THE COURT:  Okay.  See you tomorrow morning at 9

24   o'clock.

25                          *     *     *

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF WISCONSIN

3

4           I, HEIDI J. TRAPP, Official Court Reporter for the

5   United States District Court, Eastern District of Wisconsin, do

6   hereby certify that I reported the foregoing Transcript of

7   Proceedings; that the same is true and correct as reflected by

8   my original machine shorthand notes taken at said time and place

9   before the Hon. Rudolph T. Randa.

10

11                              _____

                                Official Court Reporter
12                              United States District Court

13

14  Dated at Milwaukee, Wisconsin,

15  this 13th day of October, 2015.

16

17

18

19

20

21

22

23

24

25