UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
------------------------------------------------------------------

WILLIAM DAMON AVERY,

                               Case No. 11-CV-408

                Plaintiff,

                               Milwaukee, Wisconsin

   vs.

                               June 2, 2015

CITY OF MILWAUKEE, et.al.,

                Defendants.
------------------------------------------------------------------

**VOLUME 2 - PAGE 145**
TRANSCRIPT OF TRIAL
BEFORE THE **HONORABLE RUDOLPH T. RANDA,**
UNITED STATES DISTRICT JUDGE, AND A JURY


**A P P E A R A N C E S**

For the Plaintiff:               People's Law Office
                                By: **Mr. John L. Stainthorp**
                                   **Ms. Janine L. Hoft**
                                   **Mr. Ben Elson**
                                Attorneys at Law
                                1180 N. Milwaukee Avenue
                                Chicago, IL  60622


For the Defendant:              Milwaukee City Attorney
                                  By: **Mr. Jan A. Smokowicz**
                                   **Ms. Jenny Yuan**
                                Assistant City Attorneys
                                200 E. Wells St. - Rm. 800
                                Milwaukee, WI  53202-3551


REPORTED BY:                     HEIDI J. TRAPP
                                Federal Official Court Reporter
                                310, U.S. Courthouse
                                517 East Wisconsin Avenue
                                Milwaukee, Wisconsin 53202


25    Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1                          **I N D E X**

2    **Witness:**                                                    **Page**

3     **WILLIAM DAMON AVERY**

4        Cross Examination By Mr. Smokowicz.............. 147
         Redirect Examination By Mr. Elson............... 198
5        Recross Examination By Mr. Smokowicz........... 200

6     **DANIEL PHILLIPS**

7        Direct Examination By Mr. Stainthorp........... 203
         Cross Examination By Mr. Smokowicz............. 257
8        Redirect Examination By Mr. Stainthorp......... 277

9     **JAMES DEVALKENAERE**

10       Direct Examination By Mr. Stainthorp........... 286

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<center>**TRANSCRIPT OF PROCEEDINGS**</center>

1

2        THE COURT:  We're ready for the cross examination?

3        MR. SMOKOWICZ:  Just one question, Your Honor.  The

4 Court's preference in terms -- I don't know whether we will use

5 it as an Exhibit.  It wasn't premarked as one.  Mr. Avery's

6 original of his deposition transcript.  Do you want us to have

7 that marked as an Exhibit now in case it is used?

8        THE COURT:  No.  Let's mark it when it's used.  Or if

9 it's used.

10        MR. SMOKOWICZ:  Very good, Your Honor.  Thank you.

11        (Whereupon the jury was returned to the courtroom at

12 9:14 a.m.)

13        THE COURT:  Ladies and gentlemen of the jury, we're

14 now ready to proceed with where we left off, and that is the

15 defense's cross examination of Mr. Avery.  Mr. Smokowicz?

16        **WILLIAM DAMON AVERY**, re-called as a witness, having

17 been previously sworn, on oath testified as follows:

18        MR. SMOKOWICZ:  Thank you, Your Honor.

19<center>**CROSS EXAMINATION**</center>

20 **BY MR. SMOKOWICZ:**

21 Q.  Mr. Avery, you recall yesterday you were asked some

22 questions about the interview that you had when you first came

23 to the Police station in March of 1998 that was conducted by

24 Detectives Phillips and DeValkenaere.  Do you remember that?

25 A.  Yes.

1   Q.  Do you remember that interview?

2   A.  Yeah.  Yes.

3   Q.  You do.  Okay.  And in particular yesterday you were asked

4   some questions about the report of this interview, which has

5   been marked as Plaintiff's Exhibit 11-A.  Do you remember being

6   asked about that yesterday?

7   A.  Yes.

8   Q.  And you've seen this report before, right?

9   A.  Yes.

10  Q.  And you saw this report even before you were prosecuted for

11  the -- in connection to the death of Maryetta Griffin, right?

12  A.  I got to see it.  Let me see it.

13  Q.  Absolutely.

14          MR. SMOKOWICZ:  Your Honor, may I approach the

15  witness?

16          THE COURT:  He won't be able to see the Exhibit unless

17  you approach him, counsel.

18          MR. SMOKOWICZ:  Thank you, Your Honor.

19          THE COURT:  And if the witnesses for all counsel need

20  to be given an Exhibit, you don't have to ask the Court's

21  permission.

22          MR. SMOKOWICZ:  I appreciate that, Your Honor.

23          THE WITNESS:  Yes.

24          MR. SMOKOWICZ:

25  Q.  And I'm sorry, Mr. Avery.  I spoke over you a little bit.

1    But my understanding, your answer to the question was yes, you

2    have seen this report?

3    A.   Yes.

4    Q.   Even before you were prosecuted for the homicide, right?

5    A.   Yes.

6    Q.   Okay.  Now, yesterday the focus of the questioning on this

7    report was on Page 2 about a statement about oral sex.  Do you

8    remember that?

9    A.   Yes.

10   Q.   You weren't charged with the crime of prostitution for this,

11   were you?

12   A.   No.

13   Q.   You weren't charged with any crime related to sex with

14   Maryetta Griffin, otherwise known as Mercedes, correct?

15   A.   No.

16   Q.   Just so we're clear on that, you were not prosecuted for a

17   crime related to sex with her, right?

18   A.   No.

19   Q.   Okay.  You were prosecuted for a crime of homicide, right?

20   A.   Yes.

21   Q.   And you didn't understand that sex had anything to do with

22   the prosecution.  It wasn't -- it wasn't part of what the State

23   had to prove in order for you to be convicted of homicide,

24   correct?

25             MR. ELSON:  Objection to the form of the question.

1          THE COURT:  I don't know if the witness is competent

2     to answer that, but the Court will take judicial notice.  The

3     two crimes are separate.

4          MR. SMOKOWICZ:  The two crimes are separate?  Thank

5     you, Your Honor.

6     Q.  All right.  The crime you were prosecuted for was actually

7     party to the crime of her homicide, right?

8     A.  Yes, I believe so.  Yes, yes.  Party to a crime.

9     Q.  And you understood that.  I mean, you obviously had to have

10    that explained to you when you were confronting that crime by

11    your attorney, that that meant that you were just somehow

12    involved in causing her death, correct?

13         MR. ELSON:  Objection to what his attorney explained

14    to him.  Privilege.

15         THE COURT:  Yeah.  Well, party to a crime means just

16    that.  You don't have to be the actual perpetrator, but if

17    you're a party to the crime that's being perpetrated you can be

18    assessed as party -- guilty as party to a crime.  That's the

19    law.  As having participated.  And this witness should not be

20    asked legal questions, because he's not competent to answer

21    them.  He can answer if he's been prosecuted for a crime, but I

22    don't think he should be asked the distinction between the

23    various criminal Statutes.

24         MR. SMOKOWICZ:  Very good, Your Honor.

25    Q.  Mr. Avery, can you see the bottom of -- this is Page 2 of

1    that report?

2    A.  Yes.

3    Q.  And you can see the bottom of it there?  You can read the

4    words there?

5    A.  You want me to read them?

6    Q.  No.  I'm going to read the last line there.  Detective

7    DeValkenaere reports Avery denies that there was any sale of

8    drugs going on in the house.  I want to just stop right there.

9    So what Detective DeValkenaere is reporting is that you said in

10   that first interview that this wasn't even a drug house,

11   correct?

12   A.  Yes.

13   Q.  And in fact that's a truthful reporting.  You said -- you at

14   that time denied that there was any sale of drugs going on,

15   right?

16   A.  You say that's what he said, right?

17   Q.  And, in fact, that's what you also told him, isn't it?

18   A.  I don't know.

19   Q.  When you first met with them -- let me just ask the question

20   again so you're clear, because you don't seem to be real clear

21   about this.  When you first met with Detectives Phillips and

22   DeValkenaere, you in fact even denied that there was any drug

23   selling going on in that house, correct?

24   A.  Yes.

25   Q.  And that was not true, correct?  There was actually -- that

1  was a dope house, wasn't it?

2  A.  Yes.

3  Q.  And you were operating that drug house with your -- as you

4  called him -- distant cousin, Lorenzo Frost, correct?

5  A.  Yes.

6  Q.  Now, going back to that sentence as it continues onto the

7  next page.  He denies he was involved in any type of drug

8  activity, and he further denies any involvement in the death of

9  Maryetta Griffin.  Stop there.  In the report, obviously,

10 whatever happened in that interview, whatever statements were

11 made to you, whatever Detective Phillips and Detective

12 DeValkenaere said or did to you, they report that you said to

13 them you were not involved in Maryetta Griffin's homicide,

14 right?

15           MR. ELSON:  Objection to the form.

16           THE WITNESS:  You asking questions.  Confusing, man.

17 Come on.  Could you ask the question again, please?

18           MR. SMOKOWICZ:  Your Honor, I'll be happy to rephrase

19 it.

20           THE COURT:  All right.

21           MR. SMOKOWICZ:

22 Q.  In that first interview, you denied being involved with the

23 death of Maryetta Griffin, correct?

24 A.  I wasn't involved in the death of Maryetta Griffin.

25           MR. SMOKOWICZ:  Your Honor, would you please instruct

1    Mr. Avery to answer my question?

2           THE COURT:  Yeah.  The question is did you deny that

3    at the time, Mr. Avery?  So you have to answer the question

4    that's asked.

5           THE WITNESS:  Yes.

6           MR. SMOKOWICZ:

7    Q.  And, in fact, Detective DeValkenaere truthfully reports that

8    you denied it, correct?

9    A.  No.  He not reporting truthfully.

10   Q.  Is there any word right there that says that you admitted

11   killing her?  Let's read it again, just in case.  It says and he

12   further denies any involvement in the death of Maryetta Griffin.

13   He reports you denied it, correct?

14   A.  Yes.

15   Q.  And he goes on to say Avery stated that he has no idea of

16   who was responsible for her death or where this would have

17   occurred, correct?  He reports that?

18   A.  Yes.

19   Q.  And that's consistent with what you said to him.  You had no

20   idea who was responsible for her death?

21   A.  Yes.

22   Q.  And how or where this would have occurred, right?

23   A.  Yes.

24   Q.  Those are truthful reports by Detective DeValkenaere as to

25   that statement.  Those statements, correct?

1    A.   Yes.

2    Q.   Mr. Avery, you recall being asked some questions about the

3    handwritten statement in the interview on the next day by

4    Detectives then Hein -- her name is now Spano -- and Detective

5    Hernandez, right?  Do you remember that?

6    A.   Yes.

7    Q.   Before we get to that, Detective DeValkenaere's report

8    indicates that beginning at about 11:30 in the morning on I

9    believe it's March 23rd, they began to interview with you,

10   correct?

11   A.   That's not correct.

12   Q.   Well, let's just read the report here.

13   A.   That's what the report says.

14   Q.   The report says that at about 11:30 a.m. an attempt was made

15   to interview Avery in an interview room at the C.I.B.  Did I

16   read that correctly, first of all?

17   A.   Yes, that's what the report says.  Yes.

18   Q.   And is that consistent with your recollection that it

19   started the morning of the 23rd?  Maybe late in the morning?

20   A.   I came in there about 8:30 that morning.

21   Q.   Well, it says here on Monday -- earlier up on that page --

22   on Monday, 3-23-98 at about 11 o'clock a.m. I, Detective James

23   DeValkenaere, along with Detective Daniel Phillips, Squad 124,

24   was advised by Lieutenant of Detectives David Kane that an

25   individual being sought regarding the death of Maryetta Griffin

1  had come into the C.I.B.  Are you saying you came in -- what?

2  Two-and-a-half hours before 11 o'clock?

3  A.  Yeah.  8:30.

4  Q.  Did you just sit there for two-and-a-half hours waiting to

5  be interviewed?

6  A.  No.

7  Q.  So you believe the interview started earlier in the day?

8  A.  I know it did.

9  Q.  Did you make any notes on when it started?

10  A.  No.

11  Q.  And the interview reflects -- or the report reflects that

12  the interview was terminated with Avery at about 7 o'clock p.m.

13  Is that consistent with your recollection?

14  A.  No.

15  Q.  You believe it went less time than that?

16  A.  I think it went longer.

17  Q.  Did you make any notes on when it stopped?

18  A.  No.

19  Q.  And there was a several hour break in the middle of that

20  interview, correct?

21  A.  Yes.

22  Q.  For other procedures, right?

23  A.  Yes.

24  Q.  Now, do you recall later that day an attempt by Detectives

25  Hein and Hernandez to interview you?

```
 1   A.  Yes.  Yes.

 2   Q.  And you refused to speak with them at that time, correct?

 3   A.  I signed a waiver saying I didn't want to speak to them.

 4   Q.  Yes.  I'm going to show you what's been marked as

 5   Defendant's Exhibit 1029.  May I just put it on the monitor to

 6   show him Your Honor?

 7             THE CLERK:  It is not received into evidence.

 8             MR. SMOKOWICZ:  I would move Exhibit 1029 -- well, let

 9   me have the witness look at it first.

10   Q.  Mr. Avery, do you recognize that document?

11   A.  Yes.

12   Q.  You've seen this document before, correct?

13   A.  Yes.

14   Q.  It bears your signature, correct?

15   A.  Yes.

16   Q.  And you did sign the original of this document, correct?

17   A.  Yes.

18   Q.  And you signed it on March 23rd of 1998, correct?

19   A.  Yes.

20   Q.  I'm going to move Exhibit -- and it reflects an interaction

21   between you and Detectives Hein and Hernandez, correct?

22   A.  Yes.

23             MR. SMOKOWICZ:  Your Honor, I'm going to offer Exhibit

24   1029 at this time.

25             THE COURT:  Any objection?
```

```
 1            MR. ELSON:  No objection.
 2            THE COURT:  The Court will receive it.
 3            MR. SMOKOWICZ:
 4   Q.  Sir, Exhibit 1029 shows that -- or is a statement that was
 5   handwritten by either Detectives Hein or Hernandez, correct?
 6   A.  Yes.
 7   Q.  And you signed it, right?
 8   A.  Yes.
 9   Q.  And it states on Monday, 3-23-98, at 10:40 p.m., I,
10   Detective Kathy Hein, in the presence of Detective Gilbert
11   Hernandez, did advise William D. Avery of his Constitutional
12   rights, which he stated he did understand, and he does not wish
13   to make a statement at this time.  And you signed that, correct?
14   A.  Yes.
15   Q.  And, in fact, Detectives Hein and Hernandez did advise you
16   of your rights at that time or you wouldn't have signed this,
17   correct?
18   A.  They did not advise me of my Constitutional rights.
19   Q.  So you signed something with -- even though you didn't agree
20   to it?  Is that what you're saying?
21   A.  Yeah.
22   Q.  Its true, though, that at that time you were not questioned
23   by Detective Hein and Hernandez about the homicide, correct?
24   A.  Yes, I was questioned by them.
25   Q.  That night?  That March 23rd, 10:40 p.m.?
```

```
1    A.  Yeah.  They came on at 5:30.  That -- from 5:30 to like

2    10:40 they was in there questioning me.

3    Q.  Oh.  Now, the next day you were questioned by Detectives

4    Hernandez and Phillips, correct?

5    A.  Yes.

6    Q.  And you reviewed the report yesterday with your attorneys,

7    indicating that that started at about 10 o'clock, is that

8    correct?

9    A.  I woke up fairly early that morning, so --

10   Q.  And you were in the jail at that time?

11   A.  Yes.

12   Q.  And you were in there being held on other warrants, correct?

13   A.  Yeah.

14   Q.  Now, yesterday you were shown what's been marked as

15   Plaintiff's Exhibit 11-C.  And you indicated this is the

16   handwritten statement, correct, that you made?  Or that was

17   written out, I should say, in front of Detective -- or by

18   Detective Hernandez?

19   A.  No.

20   Q.  He didn't write this?

21   A.  I guess he wrote that.  He didn't write it in front of me.

22   Q.  He wrote it?  You didn't see him write it?

23   A.  No.

24   Q.  It was written at that time, though, correct?

25   A.  No, it wasn't.
```

1  Q.  You did see the statement in the course of the --

2  A.  -- no.

3  Q.  You didn't?

4  A.  No.

5  Q.  Okay.

6  A.  No.

7  Q.  So you never saw anything at that time?

8  A.  Not that statement, no.

9  Q.  And you weren't read this statement?  Is that what you're

10 saying?

11 A.  No.

12 Q.  You're not saying that?  Or were you read it?

13 A.  No, I wasn't read that statement.

14 Q.  So even though you talked to your attorney about this

15 yesterday -- he highlighted all these sentences -- this was

16 never read to you before?

17       MR. ELSON:  Objection.  Mischaracterizes his

18 testimony.

19       THE COURT:  Previous testimony I think was read to him

20 by the Detectives, if I recall.

21       MR. SMOKOWICZ:

22 Q.  So even though you were asked about it, you're stating the

23 Detectives never read this to you?

24 A.  No.

25 Q.  Incidentally, at the top of this statement it states on

1    Tuesday, 3-24-98, at approximately 10 o'clock a.m. I, Detective

2    Gilbert Hernandez, in the presence of Detective Dan Phillips,

3    advised subject of his Constitutional rights, which he

4    understood.  Subject states that he would make a statement.  And

5    there's a signature after that.  That's your signature, isn't

6    it?

7    A.  No.  That's not my signature.

8    Q.  Well, I'm no handwriting expert, Mr. Avery, but if we go

9    back to Exhibit 1029, that is your signature, right?  On that

10   document?

11   A.  Yes.

12   Q.  And you did sign that, correct?

13   A.  Yes.

14   Q.  And you had to agree that the signature that appears on the

15   fifth line there of Exhibit 11-C resembles the signature that

16   you admit that you put on the other document, correct?

17   A.  Yes.

18   Q.  Now, Exhibit 11-C states in the highlighted area subject

19   states that he was awakened by Mercedes going through his

20   pockets, pulling out his money.  Subject states that he was

21   startled.  Subject states that he got up on his feet and grabbed

22   one of the victim's hands.  Subject states that Mercedes and him

23   started to fight.  Subject states that he was saying, quote,

24   what are you doing, close quote.  Subject states that Mercedes

25   pulled and ran toward the stairs attempting to -- attempt to get

away.  Subject states he doesn't remember what happened.
Subject states Ronnie called.  Subject states Ronnie, get over
here.  Quote, I think I killed this bitch, close quote.  Subject
states that Ronnie shouldn't have gotten rid of the body.
Questioned subject as to how he killed Mercedes.  Subject
states, quote -- stated, quote, I'm responsible.  I just don't
remember how.  All right.  First of all, Ronnie is your cousin
Lorenzo Frost, correct?

A.  Yes.

Q.  That was how he was also known.  He was also known as
Ronnie, correct?

A.  Yes.

Q.  His statement said that you told Detectives Hernandez and
Phillips that you were fighting with -- that you started to
fight with Mercedes, correct?  That's what it says?

A.  That's what the report says?

Q.  That's what the -- this statement says, correct?  If you
look here.  Just on this line right there.

A.  Yep.

Q.  Started to fight.  Okay.  And, in fact, you did have a fight
with Mercedes?

A.  No, I didn't.

Q.  And, in fact, that's why this statement came out, because
you had a fight and you just don't know -- you didn't know
whether she was dead.  And then the body is dead a few days

1  later and found, right?

2  A.  No.

3  Q.  This -- at the bottom here it says questioned subject as to

4  how he killed Mercedes.  Subject states I'm responsible.  I

5  don't remember how.  This statement doesn't say anything about

6  choking her, does it?

7  A.  No.

8  Q.  This statement doesn't describe how Mercedes was killed, if

9  she was killed by you, does it?

10  A.  No.

11  Q.  By the way, you did see that statement at some point before

12  you were prosecuted for the party to the crime of her death,

13  right?

14  A.  Yes.

15  Q.  Mr. Avery, I'm going to show you what's been marked

16  Exhibit 1030.

17          MR. ELSON:  Is that in evidence?

18          MR. SMOKOWICZ:  Not yet.  Exhibit 1030 appears to be

19  virtually an identical copy to the document marked by your

20  attorneys as Exhibit 11-C.  Do you want to compare the two?

21          THE WITNESS:  Okay.

22          MR. SMOKOWICZ:

23  Q.  Do you agree with that?  They're virtually the same thing,

24  except there are a couple of small differences there, right?

25  A.  The highlight?  Yeah.

 1   Q.  Okay.  Well, the content is virtually the same, correct?

 2   This is the statement.  The handwritten statement we've just

 3   been talking about.

 4   A.  Yes.

 5         MR. SMOKOWICZ:  Your Honor, I'm going to offer

 6   Exhibit 1030 into evidence.

 7         MR. ELSON:  No objection.

 8         THE COURT:  The Court will receive it.

 9         MR. SMOKOWICZ:

10   Q.  One of the differences here, of course, is that as opposed

11   to what your lawyers have provided, this doesn't have any yellow

12   highlighting on it, correct?

13   A.  Right.

14   Q.  On your attorney's copy, 11-C, you've got a number here, and

15   then something whited out, correct?

16   A.  Yes.

17   Q.  On Exhibit 1030, that number isn't there.  And what was

18   whited out is now apparent, right?  Right above my finger?

19   A.  Yes.

20   Q.  And that's the time that you were with Detectives Hernandez

21   and Phillips.  From 10 o'clock in the morning until 12:30 in the

22   afternoon.  That's consistent with your memory as to how long

23   that statement took, correct?  Two-and-a-half hours?

24   A.  That statement didn't happen.

25   Q.  You did meet with them that day, correct?

```
 1   A.  Yes.  Detective said that.
 2   Q.  They did question you that day, right?
 3   A.  Yes, they did.
 4   Q.  And you did testify yesterday that they wrote something out,
 5   right?
 6   A.  I'm saying whoever wrote that statement, not in front of me.
 7   Not that day.
 8   Q.  And on that day you were only with them about two-and-a-half
 9   hours, correct?
10   A.  Oh, no.  I was with them Detectives all day.  From like 8:30
11   to like 2:30 the next morning.
12   Q.  With those Detectives?  Detectives Phillips and Hernandez?
13   A.  Detective Phillips and Hernandez was the two Detectives that
14   I seen first on that day, and they was in and out of the
15   interrogation room with Katherine Hein.  Katherine Hein would be
16   in there, question me.  They come in and feed me that story.
17   The only thing that reflect is my alibi witness, Lakesha Kenya
18   Hall.  And Detective Gilbert Hernandez switched my alibi witness
19   with Maryetta Griffin.
20           MR. SMOKOWICZ:  Your Honor, this is not responsive at
21   this point.  Move to strike.
22           MR. ELSON:  Objection to that.  He was answering the
23   question he was asked.
24           THE COURT:  No, it's too elaborate.  It's either the
25   time frame of the interview and who was participating -- so --
```

1    and he's also already answered they were with him all day.

2              MR. SMOKOWICZ:

3    Q.  Did you make any notes as to whether or not your time with

4    just these two Detectives, Hernandez and Phillips, was any more

5    or any different than from 10:00 in the morning until 12:30 in

6    the afternoon?

7    A.  You say did I write any times down?

8    Q.  Yes.  Did you write a time down?

9    A.  Yes.  When I wrote the Notice of Claim, if my memory serves

10   me, that's the times I put down.

11   Q.  All right.  You do recall that at some point later that day

12   Detectives Hein and Hernandez were questioning you, as opposed

13   to Hein and Phillips.  I mean Phillips and Hernandez, correct?

14   A.  On the 24th Detective Phillips and Detective Hernandez was

15   questioning me together.  Katherine Hein was in there

16   questioning me, taking what they call my background information

17   and going over the -- what -- going over the events.  Get my

18   information.  Detective Phills (sic) and Detective Hernandez was

19   coming in feeding me they story.

20   Q.  I asked you whether or not at some point later in that day

21   Detective Hein and Hernandez were questioning you?

22   A.  Yes.

23   Q.  And, in fact, you were asked yesterday by your lawyers about

24   your report of that interview, which has been marked as

25   Exhibit 11-F.  Do you remember that?

1    A.   Yes.

2    Q.   And you were asked questions about that report where it had

3    to do -- or there was a statement recounted in there that says

4    Avery stated that he and Mercedes had oral sex, penis to mouth,

5    and that Mercedes left after that.   Do you remember being asked

6    about that?

7    A.   Yes.

8    Q.   You saw this report as well before you were prosecuted for

9    the party to a crime of the death of -- or the homicide of Miss

10   Griffin, right?

11   A.   Which one?   The one you just had on the screen?

12   Q.   Yes.

13   A.   Yes.

14   Q.   So on page 3 of this report you've also had the opportunity

15   to review and be aware of the following statement.   Beginning

16   there, right above my finger.   Avery stated that the last time

17   he saw this victim alive was on Monday evening at about 7:00

18   p.m. after they had sex.   He stated that he cannot remember ever

19   seeing her after that.   He stated that he does not believe he

20   was involved in the death of Mercedes, because when he passed

21   out on the couch, the only person in the house was Keisha, and

22   she was there when he woke up.   You had the opportunity to

23   review this beforehand, too, right?

24   A.   Yes.

25   Q.   And you know that this report not only had some statement

1   about sex, but it also had the statement that you denied to

2   Detectives Hein and Hernandez that you were -- you said you did

3   not believe that you were involved in her death, correct?

4           MR. ELSON:  Objection to the form of the question.

5           THE COURT:  Well, no.  He can be asked whether or not

6   that's what he said there.  So he may answer.

7           THE WITNESS:  Ask the question again.

8           MR. SMOKOWICZ:  You want the same question?

9           THE WITNESS:  Ask it again, please.

10          MR. SMOKOWICZ:

11  Q.  Absolutely.  Be happy to.  You, in fact, told Detectives

12  Hein and Hernandez that you did not believe you were involved in

13  the death of Mercedes, correct?

14  A.  I never told nobody I don't believe or nothing.  I know for

15  a fact that I didn't have nothing to do with Miss Griffin's

16  death.  I never said that.

17  Q.  And this report does say that you do not believe you were

18  involved in her death, correct?

19  A.  I never said I do not believe that I'm involved in Miss

20  Griffin's death.  I never said that.  I know I wasn't involved

21  in Miss Griffin's death.  I'm positive.  Is this behind me

22  saying that?

23  Q.  Now, in addition to that typewritten statement, you've also

24  had the opportunity to review a handwritten statement of that

25  same interview, haven't you?

1   A.   Yes.

2   Q.   And I'm going to show you what's been marked as Defendant's

3   Exhibit 1031.  That's the handwritten statement based upon that

4   interview that was prepared by Detective Hernandez, correct?

5   A.   That's the statement written by Detective Hernandez.

6   Q.   Okay.

7           MR. SMOKOWICZ:  Your Honor, move Exhibit 1031 into

8   evidence.

9           THE COURT:  The Court will receive it.

10          MR. SMOKOWICZ:  Thank you, Your Honor.

11  Q.   Now, right at the top of this Exhibit the Detective writes

12  on Tuesday, 3-24-98, at 5:30 p.m., in Room 419 of the Police

13  Administration Building I, Detective Kathy Hein, in the presence

14  of Detective Gilbert Hernandez -- I apologize, apparently

15  Detective Hein wrote this -- did re-advise William D. Avery of

16  his Constitutional rights, and stated he understands them and

17  wishes to continue speaking with these Detectives regarding this

18  incident.  And underneath that is the words refused to sign,

19  correct?

20  A.   Yes.

21  Q.   Now, on the last page where it says this is a true and

22  correct statement by me regarding this incident, it says there

23  refused to sign as well, correct?

24  A.   I didn't sign that.  I didn't write that.

25  Q.   And where it says underneath that I, William Avery, was

1  given numerous cigarettes, coffee, water, chicken dinner, and

2  bathroom breaks during this interview.  That also says refused

3  to sign there, correct?

4  A.  I didn't write that.

5  Q.  You did refuse to sign this statement, correct?

6  A.  I didn't sign it.

7  Q.  So it's a truthful statement that you refused to sign this,

8  right?

9  A.  It says I refused, yes.

10 Q.  Sir -- just reviewing a few things I think that came out

11 yesterday.  You went to North Division High School, is that

12 correct?

13 A.  Yes.

14 Q.  And you did not get your high school degree from there,

15 correct?

16 A.  No.

17 Q.  You were -- you ended your time there in 9th grade, is that

18 correct?

19 A.  Yes.

20 Q.  And you got your high school -- the equivalency to your high

21 school degree, or high school degree, while you were in prison

22 in Oklahoma in 2000, correct?

23 A.  Yes.

24 Q.  And with your carpentry diploma at M.A.T.C., back when you

25 were deposed in this case in 2013, as of that time you had done

1   some odd jobs in carpentry with your diploma, right?

2   A.  Yes.

3   Q.  And at that time you were renting from your grandmother.

4   That's where you were living?

5   A.  Yes.

6   Q.  Is that still where you're living?

7   A.  Yes.

8   Q.  And in November of 2013 you were not working, correct?

9   A.  November, 2013?  Doing odd jobs and stuff, yeah.

10  Q.  I'm sorry?  What did you say?

11  A.  Doing odd jobs and stuff, yeah.

12          MR. SMOKOWICZ:  Well, maybe we need to have this

13  marked at this point, Your Honor.

14          THE COURT:  All right.

15          MR. SMOKOWICZ:  May I unseal this?  The original?

16  Q.  Mr. Avery, I'm showing you what's been marked 1052 --

17  Exhibit 1052 of Defendants.  You've seen that before.  That's

18  your deposition transcript in this case, right?

19  A.  Yes.

20  Q.  Ask you to turn to Page 8.  I'm sorry.  At the bottom of

21  Page 8, line 24, question:  Are you working at this time?

22  Answer:  No.  I read that correctly?

23  A.  Yes.

24  Q.  You did indicate at that time in the past you had done some

25  odd jobs, correct?

1  A.  Yes.

2  Q.  And that you were self employed at that time in home

3  improvement, correct?

4  A.  Yes.  Yeah.

5  Q.  And you indicated also -- or you testified also -- or strike

6  that.  You had at that time applications out with temporary

7  services, correct?

8  A.  Yes.

9  Q.  There is no question that on February 16th you did have

10  contact with Maryetta Griffin at the house at 2474 North Palmer,

11  correct?

12  A.  Yes.

13  Q.  She was there?

14  A.  Yes.  She come to the house over on 16th.

15          THE COURT:  What was the date on that?

16          MR. SMOKOWICZ:  February 16th, 1998.

17  Q.  And you knew at that time that she was a prostitute and a

18  drug addict, correct?

19  A.  Yes.

20  Q.  And you've indicated -- you now admit that the Palmer Street

21  house was a drug house, correct?

22  A.  Yes.

23  Q.  And you've indicated and you were involved in drug --

24  running that drug house, correct?

25  A.  Yes.

1  Q.  And that was with Lorenzo, correct?

2  A.  Yes.

3  Q.  You were not familiar with Walter Ellis, correct?

4  A.  No.

5  Q.  And you had never heard of any of the women coming to that

6  house speaking of Walter Ellis, correct?

7  A.  No.

8  Q.  That's correct, isn't it?

9  A.  That's correct.

10  Q.  And that house was frequented by a number of prostitutes who

11  were also drug addicts, correct?

12  A.  Yes.

13  Q.  Now, you told the Police that Ronnie or Lorenzo had come

14  back to that house on Palmer Street at noon on February 17th,

15  correct?

16  A.  Yes.

17  Q.  And you told Lorenzo when he returned at noon that one of

18  the women -- Joanne I think it is?  Joanne?  How do you

19  pronounce that name?

20  A.  Joanne.

21  Q.  Joanne.  That Joanne had called and told you that Mercedes

22  was dead at that point, right?

23  A.  Yes.

24  Q.  And that was before noon, right?

25  A.  Yes.  It was sometime that morning, yes.

```
1   Q.  Now, you've never been married?

2   A.  No.

3   Q.  That's correct?  You've never been married?

4   A.  Right.  Never been married.  That's correct.

5   Q.  And you have 5 children, correct?

6   A.  Yes.

7   Q.  And your eldest is William Damon?

8   A.  Yes.

9   Q.  And in 2013, when you were deposed, you did not know what

10  his address was, right?

11  A.  No.

12  Q.  And William's mother is Monica?

13  A.  Yes.

14  Q.  And your next child is Sirena Avery?

15  A.  Yes.

16  Q.  And William was born in May of 1991, correct?

17  A.  Yes.

18  Q.  And Sirena -- when was she born?

19  A.  Sirena.  I think child was born in '89.  He be 26 years old.

20  '89, '90.  '89.  So Sirena had to be born in May of '91.

21  Q.  Well, let's just go back and take a look at Page 45 of your

22  deposition.  On line 17, I will start.  Question:  You said you

23  have 5 children.  What's the next oldest child's name?  Answer:

24  Sirena.  Question:  Could you spell that name?  Answer:

25  S-I-R-E-N-A.  Question:  And does she have a middle name?
```

```
1   Answer:  Alline.  Question:  A-I-L-I-N-E?  Answer:  A-L-L-I-N-E,

2   yeah.  Question:  I'm sorry?  Answer:  That's right.

3   A-L-L-I-N-E.  Question:  And what is her last name?  Avery.

4   Question:  And what is her date of birth?  Answer:  5-7-92.  And

5   back in 2013 you were aware that Sirena lived in Milwaukee,

6   correct?

7   A.  Yes.

8   Q.  But you did not know her address at that time?

9   A.  No, I don't know her address off the top of my head.

10  Q.  So the answer is you did not know her address?

11  A.  No.

12  Q.  And her mother is also Monica?

13  A.  Yes.

14  Q.  And your third child is Cynthia Tyler?

15  A.  Yes.

16  Q.  And when was Cynthia born?

17  A.  November 22nd.

18  Q.  Of what year?

19  A.  1992.

20  Q.  And in 2013 you knew she lived in Milwaukee as well?

21  A.  Yes.

22  Q.  But you didn't know her address, either?  At that time.

23  A.  I believe I know her address.  Yeah.

24  Q.  Let's go to Page 47 of your deposition.  Line 7, question:

25  Her date of birth?  Answer:  November 22 -- or 11-22-92.
```

```
 1   Question:  And where does she live?  Answer:  In Milwaukee.
 2   Question:  Do you know what her address is?  Answer:  Not
 3   off-hand, no.  And you hadn't seen her lately in November
 4   of 2013, had you?  Cynthia?
 5   A.  Like not right at the moment, at the deposition.  But I seen
 6   her, you know.  Not at that moment.
 7   Q.  Page 47, line 13.  And do you see her from time to time?
 8   Answer:  I ain't seen her lately.  Her mother is Cofe'a Tyler,
 9   is that right?
10   A.  Yes.
11   Q.  Your next child is Jalisa Avery?
12   A.  Yes.
13   Q.  And Jalisa Avery was born when?
14   A.  '93, I believe.
15   Q.  '93?
16   A.  I believe so, yes.
17   Q.  Let's go to Page 48, line 13.  Date of birth, question mark?
18   Answer:  September -- I think it's 9-1-94.
19   A.  Yes.
20   Q.  And also at that time in 2013 you knew where she lived, but
21   you -- in Milwaukee -- strike that.  You knew she lived in
22   Milwaukee, but you didn't know where.  You didn't know her
23   address, right?
24   A.  Correct.
25   Q.  And Jalisa's mother is Monica, right?
```

```
 1   A.   Yes.
 2   Q.   And you had last seen Jalisa before your deposition about
 3   two months before then, right?
 4   A.   Yes.
 5   Q.   And you did not know if Jalisa lived with her mother,
 6   correct?  At that time?
 7   A.   Correct.
 8   Q.   I'm sorry.  What?
 9   A.   Yes.  At that time, right.  That's what you said?
10   Q.   Yes.
11   A.   Okay.
12   Q.   Your next child is Nafia?
13   A.   Yes.
14   Q.   And Nafia was born -- it's Nafia Avery, correct?
15   A.   Yes.
16   Q.   When was Nafia born?
17   A.   January 1st, '94?
18   Q.   I'm sorry, what?
19   A.   January the 1st, '94?  I believe.
20   Q.   Go to Page 49.  Line 3.  And your last child?  Answer:
21   Nafia.  Question:  Could you spell that, please?  N-A-F-I-A
22   Nicole Avery.  And her date of birth?  1/30/94, I believe.
23   A.   Yes.
24   Q.   And as of the time of your deposition, you knew she lived in
25   Milwaukee?
```

1    A.  Yes.

2    Q.  But you didn't know her address either, right?

3    A.  Yeah, I know her address.

4    Q.  Line 11.  And do you know the address?  Answer:  No, I don't

5    know her address.  And her mother's name is -- her mother's

6    Cofe'a as well, right?

7    A.  Yes.

8    Q.  Prior to the time that you were questioned by Detectives

9    Phillips and DeValkenaere, you had not previously met with them,

10   correct?  You had never met them before?

11   A.  No, not to my knowledge.  Not at the time.  Not that I knew

12   about, no.

13   Q.  And you're not sure whether you met Detective Hernandez

14   before or not, correct?

15   A.  I believe I had, but I'm not for sure.

16   Q.  You're not sure, right?

17   A.  No.

18   Q.  Now, you mentioned previously that -- Mercedes, you know her

19   as -- Maryetta Griffin, was a prostitute and a drug addict,

20   correct?

21   A.  Yes.

22   Q.  And your previous testimony yesterday, if I recall it

23   correctly, was that she and several other women were there that

24   date, on the 16th?

25   A.  Yes.

1  Q.  And in your previous testimony you indicated that she and

2  those other women were looking for drugs that day, right?

3  A.  Yes.

4  Q.  And in your previous testimony yesterday you indicated that

5  they were asking Ronnie to give them drugs?

6  A.  Yes.

7  Q.  And so your testimony that -- from yesterday is that among

8  those women was -- Maryetta Griffin was asking Ronnie Frost to

9  give them drugs?

10  A.  They was asking Ronnie for drugs, yeah.

11  Q.  They were asking him to give them drugs for nothing?

12  A.  I don't know if they was asking him to give them drugs for

13  nothing.  I'm pretty sure --

14  Q.  Now, you sold drugs to Maryetta Griffin on February 16th?

15  A.  No, I didn't.  No, I didn't.  No.

16          MR. SMOKOWICZ:  I apologize Your Honor, I have so many

17  papers up here today.  I forgot to bring one with me.

18  Q.  Yesterday I believe you testified, Mr. Avery, that you in

19  fact did testify in your -- in the criminal trial on the charge

20  of party to a crime of a homicide of Maryetta Griffin, right?

21  You testified in that case?

22  A.  Yes.

23  Q.  I'm going to show you what's been marked as Defendant's

24  Exhibit 1004.  Represent to you that it's an excerpt from that

25  trial.  It's your testimony in that case.  If you turn to

1    Page 62 there, you will see the first question at line 9.  State

2    your full name.  And the answer is William Damon Avery, correct?

3    A.  62, you said?

4    Q.  Right there.  It's right underneath the cover page.

5    A.  Okay.

6    Q.  Line 9, state your full name.  Answer:  William Damon Avery.

7    A.  Um-hum.

8    Q.  That's you, right?

9    A.  Um-hum.

10   Q.  That's a yes to both of those?

11   A.  Yes.  Yes.

12            MR. SMOKOWICZ:  Your Honor, I'm going to move

13   admission of Exhibit 1004.

14            THE COURT:  Well, the Court will receive it.

15            MR. SMOKOWICZ:

16   Q.  You remember being asked questions by the prosecutor in that

17   case, Mr. Williams?

18   A.  Yes, I was asked questions.

19   Q.  Question at line 2:  Do you remember telling the Detectives

20   Phillips and Hernandez that you sold dope to her for sex?

21   Answer:  No.  Question:  Did you sell dope to her?  Answer:

22   Yes.  Question:  And what would she give you in exchange for the

23   dope?  Answer:  Money.  Question:

24            MR. ELSON:  Objection.  That's not impeaching, Judge.

25            THE COURT:  I'm sorry.  What?

```
1          MR. ELSON:  Objection.  It's not impeaching.  There's

2   no date.

3          MR. SMOKOWICZ:  I don't want this to be taken out of

4   context, so I'm reading -- this is the one which we're talking

5   about.  Question --

6          THE COURT:  Wait a second.  There's an objection.

7          MR. SMOKOWICZ:  Yes, Your Honor.

8          THE COURT:  The objection is relevance?

9          MR. ELSON:  No.  My objection for those first two

10  questions and answers he was asking, was that it's not

11  impeaching.

12         THE COURT:  Not proper impeachment?  Well, the Court

13  will allow it.

14         MR. SMOKOWICZ:

15  Q.  Well, let's make sure that we have these questions and

16  answers connected.  Question at line 5:  Did you sell dope to

17  her?  Yes.  Question:  And what would she give you in exchange

18  for the dope?  Answer:  Money.  And you did that on the date of

19  February 16th, 1998, is that correct?  Answer:  Yes.

20  A.  I wish I could do that --

21  Q.  Now, from your own personal knowledge, you have no reason

22  that you can offer to this jury as to why any of these

23  Detectives --

24  A.  Crooked and dirty cops, period.

25         MR. SMOKOWICZ:  Your Honor, may I move to strike that?
```

1        THE COURT:  Yeah.  Mr. Avery, you can't volunteer

2   information.  You have to respond to the question that's asked.

3   But that will be stricken from the record.

4        THE WITNESS:  Okay.  Yes.

5        MR. SMOKOWICZ:

6   Q.  Sir, you have no reason to offer this jury as to why these

7   Detectives would frame you for the homicide -- or party to

8   killing Maryetta Griffin, as opposed to Lorenzo Frost, for

9   example, right?

10  A.  I think they frame me for the murder of Maryetta Griffin

11  because they crooked and dirty cops.

12  Q.  Let's go to your deposition.  Page 65, line 23.  Question:

13  Do you have any reason to provide me or provide us with why they

14  would make this story up with respect to you, as opposed to

15  Lorenzo, say, for example?

16       MR. ELSON:  Objection.  Speculation.

17       THE COURT:  No, overruled.  He may answer.

18       MR. SMOKOWICZ:  And your answer was:  No.

19  Q.  Detective DeValkenaere did not physically threaten you,

20  correct?

21  A.  He flicked a lighter in my face.  Towards my chin, I

22  believe.

23  Q.  Ask you to turn to Page 70 of your deposition.  Line 16:

24  What about Detective DeValkenaere?  Did he ever physically

25  threaten you?  Answer:  No.  And I'd also like to go up a little

1  farther there on line 9.  Question:  Did Detective DeValkenaere
2  ever threaten you physically?  I know you mentioned about
3  Detective -- I thought it was Detective Phillips with the
4  lighter in your face or near your face.  Answer:  Um-hum.
5  That's right?  That's a yes?  Answer:  Yes.  Detective Hein
6  never threatened you physically, correct?
7  A.  No.
8  Q.  That's correct, right?
9  A.  Correct.
10 Q.  And you never got -- you were never verbally threatened by
11 Detective Hernandez, correct?
12          THE COURT:  By Detective who?
13          MR. SMOKOWICZ:  Hernandez.
14          THE WITNESS:  That's kind of hard to describe.  He --
15 I would say yeah.
16          MR. SMOKOWICZ:
17 Q.  Detective Hernandez never struck you, correct?
18 A.  No, he never actually physically struck me, no.
19 Q.  And he never verbally threatened to strike you, correct?
20 A.  No, he never -- no.  No, I wasn't --
21 Q.  So that's correct, right?
22 A.  That's correct.
23 Q.  Now, I want to go back to the report that Detective Hein did
24 that's been marked by your lawyers as Exhibit 11-F.  Beginning
25 at the paragraph that I've shown on the screen here, it states

1    Avery states that he had never met Mercedes, paren, Maryetta

2    Griffin, close paren, before working at 2474 North Palmer

3    Street.  That's true, correct?

4    A.  That's true.

5    Q.  And stated that she had come to that drug house several

6    times before her death.  That's true also?  That she --

7    A.  Yes, that's true.

8    Q.  He stated that many known prostitutes from the area would

9    come to that residence to buy cocaine and to use that address to

10   dope date.  First of all, it's true that many prostitutes would

11   come to that house, correct?

12   A.  Yes.

13   Q.  And that they would come there to buy cocaine, correct?

14   A.  Yes.

15   Q.  Is it also true they would use that address to dope date?

16   A.  No.

17   Q.  He stated that dope date meant exchanging sex for drugs or

18   money.  That's what dope dating means, correct?

19   A.  Yes.

20   Q.  He stated that most of the drug transactions and drug use

21   would take place in the attic area.  That's true, isn't it?

22   A.  Yes.

23   Q.  And most dope dates would take place in the bedrooms located

24   on the second floor of that residence.  Do you deny that?

25   A.  Yes.  Staying in the house with me?  Come on.

1  Q.  Avery stated that he and Ronnie would rotate transactions.

2  That's true, isn't it?

3  A.  Yes.

4  Q.  Meaning that he was allowed to keep the money from every

5  other drug sale.  That's true, isn't it?

6  A.  Yes.

7  Q.  He stated that Ronnie would usually come after work to pick

8  up the money.  That's true, isn't it?

9  A.  Yes.

10  Q.  Spend time at that location.  That's true, isn't it?  He'd

11  spend time there for awhile after he came to pick up his money.

12  That's true, isn't it?

13  A.  Yes.

14  Q.  And then he would leave.  That's true, isn't it?

15  A.  Yes.

16  Q.  He stated that the drug house was open 24 hours.  That's

17  true, isn't it?

18  A.  Yes.

19  Q.  And as long as the cordless doorbell was outside the door,

20  the girls knew that they could come by.  That's true, isn't it?

21  A.  Yes.

22  Q.  The report goes on to state that during this interview,

23  Avery did view criminal justice booking photographs of Lorenzo

24  Frost and Maryetta Griffin and positively identified these

25  subjects.  That's true, isn't it?

1  A.  No.

2  Q.  You were not shown photographs of the two of them by

3  Detectives Hein and Hernandez?

4  A.  No.

5  Q.  Avery stated that he had a drinking problem all of his life.

6  That's true, isn't it?

7  A.  Yes.  Pretty much.

8  Q.  And as of that time you drank on a daily basis, correct?

9  A.  Yes.

10  Q.  Report goes on to state regarding the date of February 16,

11  1998, Avery stated that he knows the drug house had been closed

12  the day before -- we don't need to go through that.  It reports

13  here Avery stated that he and Mercedes had oral sex.  You deny

14  that, correct?

15  A.  Yes.

16  Q.  But you do agree that Mercedes left the house on the 16th,

17  correct?

18  A.  Yes.

19  Q.  He stated that he was alone during the evening monitoring

20  the dope house.  That's true, isn't it?

21  A.  Yes.

22  Q.  And that Keisha, Ray's girlfriend, came over.  And Keisha

23  had some Colt 45 beer, a 40-ounce bottle, and two blunts.

24  That's true, isn't it?

25  A.  Yes.

1  Q.  Which she brought for Ray because it was his birthday the

2  next day.  That's true, isn't it?

3  A.  Yes.

4  Q.  And he stated that Ray was supposed to meet Keisha there

5  that evening, but he never showed up.  That's true, isn't it?

6  A.  Yes.

7  Q.  Avery stated that he and Keisha began to drink the beer and

8  smoke the blunts.  That's true, isn't it?

9  A.  Yes.

10  Q.  And he stated that he was trying to put the moves on her,

11  but Keisha would not go for that.  That's true, isn't it?

12  A.  Yes.

13  Q.  He stated that sometime around 12:30 a.m. a known

14  prostitute -- a prostitute known as Little Bit came over, and he

15  sent her to the bootleg place to get some more booze.  That's

16  true, isn't it?

17  A.  No.  That happened two weeks prior to that.  That was just

18  put in there.

19  Q.  Okay.  Next page.  Avery stated that he threw -- that he

20  then partied with Keisha for awhile.  That's true, isn't it?

21  A.  Yes.

22  Q.  Drinking beer, and he then laid down on the couch.  That's

23  true, isn't it?

24  A.  Yes.

25  Q.  And Keisha went to bed.  That's true, isn't it?

1   A.  Yes.

2   Q.  He stated the next thing he remembers is waking up on the

3   couch and Keisha was asleep in the west side bedroom.  That's

4   true, isn't it?

5   A.  Yes.

6   Q.  He stated that no one else was in the house at that time.

7   That's true, isn't it?

8   A.  Yes.

9   Q.  He stated that he watched T.V. for awhile, and waited for

10  Doc.  That's true, isn't it?

11  A.  Yes.

12  Q.  And Doc is Ronnie Frost?

13  A.  Yes.

14  Q.  Avery stated that during that time he was waiting for Doc,

15  Joanne, another known prostitute, called several times looking

16  for Doc.  That's true, isn't it?

17  A.  Yes.

18  Q.  Avery stated he could not be sure what time it was, but

19  stated that Joanne told him that Mercedes was dead.  That's

20  true, isn't it?

21  A.  Yes.

22  Q.  Avery stated that he believed Doc came by around 12:00 p.m.

23  or so on Tuesday to pick up some of the money.  That's true,

24  isn't it?  That's true, isn't it?

25  A.  That he came over --

```
1    Q.  Around noon.  12:00 p.m.

2    A.  On the 17th?

3    Q.  Yes.

4    A.  Yes.

5    Q.  Now, you were asked some questions yesterday about being

6    questioned or interviewed in Oklahoma by Detectives Heier and

7    Armbruster, correct?

8    A.  Yes.

9    Q.  And you've seen a handwritten statement of that interview,

10   haven't you?

11   A.  Yes.  I'm pretty sure I have, yes.

12   Q.  Show you what's been marked as Exhibit 1019.  You recognize

13   that?

14   A.  Yes.

15   Q.  Is that the handwritten statement you've seen from Oklahoma

16   that was signed by Detective Heier?

17   A.  Believe so, yes.

18   Q.  And it -- you saw this before you -- or prior to your

19   prosecution for the party to a crime charge on the homicide of

20   Miss Griffin, right?

21   A.  Yeah.  I believe so, yeah.  I believe I did, yeah.

22          MR. SMOKOWICZ:  Move Exhibit 1019, Your Honor.

23          THE COURT:  The Court will receive it.

24          MR. SMOKOWICZ:  Thank you.

25   Q.  Mr. Avery, I'm going to leave -- I'm sorry I'm going to put
```

1    this up on the display.  This report reflects that on Tuesday,

2    August 27, of 2002, at 1:40 p.m. I, Detective Timothy Heier, in

3    the presence of Detective Kevin Armbruster, did read William D.

4    Avery -- and your date of birth is there -- his Constitutional

5    rights, Miranda warnings, at the Northfork Correctional Facility

6    in an interview room in Sayre, Oklahoma.  The Detectives did

7    read you your Miranda rights, correct?

8    A.  Yes, they did.  They read it, yeah.

9    Q.  Now, here the Detectives say -- and you stated that you had

10   -- Avery stated he has never been read his rights before, but

11   has them memorized.  Did you tell the Detectives that?

12   A.  Yeah.  No Officer ever had read me no Constitutional rights.

13   Q.  And you had -- but you had -- even though you signed that

14   one document, right?

15   A.  I say no Officer ever read me my Constitutional rights.

16   Q.  And after having read them to him, he stated that he

17   understood them, and the rights he has memorized were exactly

18   the same as I, Detective, had read to him and he wished to make

19   a statement.  You had them memorized, right?

20   A.  I know them, yes.

21   Q.  And you were willing to talk to the Detectives at that time,

22   correct?

23   A.  No.

24   Q.  You did talk to them for awhile, didn't you?

25   A.  Yeah.  I was forced in that room, yeah.

1  Q.  Well, this report at the bottom says that this interview

2  lasted from 1:40 p.m. until 3:10 p.m.  Does that sound about

3  right to you?  Time wise?

4  A.  That's what they wrote, yeah.  That's what they wrote down

5  there.

6  Q.  And you don't have anything that you know of to dispute that

7  time, right?

8  A.  No.

9  Q.  Would you agree that if we read the rest of this report,

10  nowhere in here do Detectives Heier or Armbruster say that you

11  admitted to killing Maryetta Griffin.  Do you want to read it?

12  Let's read it, okay?

13  A.  Just ask the question again.

14  Q.  Regarding the homicide investigation, victim identified as

15  Maryetta Griffin, black female, 58, which occurred on 2-17-98,

16  Avery stated that he didn't have much to say because he told

17  other Detectives all he knew in a prior statement.  Avery stated

18  how can a 26 year old black man admit to the alleged homicide --

19  alleged is in quotes -- telling how he choked her and he doesn't

20  even get charged.  But the Police find a small amount of dope by

21  the edge of a carpet 6 weeks later, and he gets 10 years for

22  that.  Avery stated that he no longer wished to talk to us now,

23  but will talk to us in February, 2003, when he gets back to

24  Wisconsin, as he wants to think about it.  Avery then stood up

25  and knocked on the door and requested that a guard return him to

1    his cell.  It was at this time the interview was terminated.

2              Nowhere in the rest of this statement do these

3    Detectives report that you ever admitted to killing Maryetta

4    Griffin, right?

5    A.  Right.

6    Q.  Or having a hand in killing Maryetta Griffin?

7    A.  Right.

8    Q.  They didn't make up any statement for you that day, did

9    they?

10   A.  No.  No.

11   Q.  They were truthful in reporting that you had not admitted to

12   killing her, correct?

13   A.  I never told them that.  They never had no reason to.

14   Q.  Now, you were arrested on September 21st of 2004, is that

15   right?

16   A.  Yes.

17   Q.  And you were interviewed that day by Detectives Heier and

18   Gulbrandson, correct?

19   A.  They attempted to interview, yes.

20   Q.  And you exercised your right to remain silent at that time,

21   didn't you?

22   A.  Yes.

23   Q.  And, in fact, they wrote out a statement to that effect, and

24   you verbally agreed that that was true, but you didn't sign it,

25   right?

1   A.  They didn't -- didn't write it out in front of me.

2   Q.  Let's take a look at Exhibit 1027.  Have you seen this

3   document before?

4   A.  Yes.

5   Q.  You have?

6   A.  Yes.

7           MR. SMOKOWICZ:  Your Honor, I'd offer 1027 into

8   evidence.

9           THE COURT:  The Court will receive it.

10          MR. SMOKOWICZ:

11  Q.  The report reads:  This report is being dictated by

12  Detective Erik Gulbrandson, who was assigned to the Criminal

13  Investigation Bureau, squad 125, early shift.  On Tuesday,

14  September 21, 2004, Detective Timothy Heier and I interviewed

15  the subject identified as William D. Avery, 1971, regarding the

16  above incident.  That's correct?  They interviewed you?  Or they

17  attempted to interview you on that date, correct?

18  A.  Yes.

19  Q.  This interview took place in Room 413 of the Criminal

20  Investigation Bureau with a start time of 8:56 p.m. and an end

21  time of 9:04 p.m.  I'm not asking you about the time at this

22  point, but you were interviewed in the Criminal Investigation

23  Bureau, right?

24  A.  Yeah, I was attempted to be interviewed.  Yeah.

25  Q.  And before that statement it says you were offered beverage

1   and food, and you declined that.  That's true, isn't it?

2   A.  Like I said --

3   Q.  You don't remember?

4   A.  Right.

5   Q.  So if this note says that that was offered to you, you have

6   no reason to doubt that, right?

7   A.  Right.

8   Q.  And then the statement that they wrote out was as follows:

9   On Tuesday, 9/21/04, at the below time, while in interview room

10  413 of the C.I.B., I, Detective Gulbrandson, while witnessed by

11  Detective Timothy Heier, did read Avery his Miranda rights, to

12  which he stated he understood.  Avery states that by him

13  understanding his rights, he wished to invoke his right to a

14  lawyer prior to giving a statement.  That's what happened that

15  day, right?

16  A.  The first time my Miranda rights were ever read to me.

17          MR. SMOKOWICZ:  Your Honor, may I have the witness

18  answer the question, please?

19          THE COURT:  You have the question put to you,

20  Mr. Avery, as to whether or not that's correct.

21          THE WITNESS:  Okay.  Repeat the question, please.

22          MR. SMOKOWICZ:

23  Q.  Yes.  That's what happened that day, right?  They read you

24  your statement -- your rights, and you invoked them and asked to

25  have a lawyer, right?

1   A.  Yes.

2   Q.  And then they read that statement to you.  You verbally

3   agreed it was correct, but you refused to sign.  That's all true

4   too, isn't it?

5   A.  Tell you, that was not prepared in front of me.  It was just

6   what's on there.

7   Q.  In any event, when you were arrested for the party to a

8   crime charge, you did not admit to having killed Miss Griffin,

9   correct?

10  A.  No.

11  Q.  And there's no report, no fabricated report stating that you

12  did, correct?  No one tried to write something that you didn't

13  say there, right?

14  A.  Detective Phillips and Hernandez.

15          MR. ELSON:  Objection.

16          THE COURT:  Hold on.

17          MR. ELSON:  Objection.

18          THE COURT:  Hold on.  There's an objection.  The Court

19  will overrule the objection.  I don't know if you heard the

20  answer.

21          MR. SMOKOWICZ:  I did not, Your Honor.

22          THE WITNESS:  Detective Phillips and Detective

23  Hernandez.

24          MR. SMOKOWICZ:

25  Q.  I'm asking about whether on the day of your arrest -- no one

1    wrote a report saying that you admitted that day that you had

2    killed Maryetta Griffin, correct?

3    A.  No.  No.

4    Q.  Before you saw him in Oklahoma, you had never had any

5    contact with Detective Armbruster, correct?

6    A.  No, not to my knowledge.

7    Q.  That's correct?  You had not had any contact, right?

8    A.  Correct.

9    Q.  Being an alcoholic had an affect on your relationship with

10   your children, didn't it?

11   A.  It did.

12   Q.  And that was even in 1998 and before, correct?

13   A.  Yeah.

14   Q.  And the same is also true with your drug use.  Your

15   marijuana and cocaine use, too, correct?

16   A.  Yes.

17            MR. SMOKOWICZ:  That's all I have, Your Honor.

18            THE COURT:  All right.  And we'll take a break, ladies

19   and gentlemen, for any redirect.  Time for the morning break

20   anyway.  So I'm going to have you out a little longer, about a

21   half hour, because I've got another matter to take care of which

22   is a short matter, but it's going to take a little longer.  And

23   then we need a break, too.  So don't discuss the case.  We'll

24   see you after the break when the redirect will occur.

25            (Whereupon the jury was excused at 10:38 a.m.)

1          THE COURT:  Okay.  The Court has to take a plea, and

2    we'll use these tables over here, so you don't have to move

3    anything.  And then we'll -- you can start your break now, and I

4    will be back.

5          (Whereupon a recess was called by the Court.  Upon

6    conclusion of the recess, the proceedings continued as follows:)

7

8          MR. ELSON: Judge, there was one issue we'd like to

9    raise before we bring the jury in.

10          THE COURT:  Okay.

11          MR. ELSON:  During Mr. Smokowicz's examination he

12    pointed out that a portion of Plaintiff's Exhibit 11-C was

13    redacted.  That portion of the time of the interview.  And that

14    was unintentional, and the reason it happened is because there

15    was a Bates stamp at the bottom of the document with the name

16    Ellis on it, and pursuant to the motion in limine ruling, that

17    portion of the Bates stamp was to be removed.  So we redacted

18    the Bates stamp, and it took out the time of the interview as

19    well.  And we were concerned that the jury was left with the

20    impression that, you know, we did that intentionally to obscure

21    the time.  And we have agreed to a stipulation if Your Honor

22    would be willing to read it to the jury.

23          THE COURT:  Sure.  Sure.  Hand me that, and I will

24    read it.

25          MR. SMOKOWICZ:  That may not be as clear as you'd like

1   with respect to the fact that the redacting unintentionally

2   obscured.  But Judge, I would invite you to look at it.

3            THE COURT:  That's kind of you.

4            MR. SMOKOWICZ:  Without my in-put on that change, Your

5   Honor.  And I apologize if you took it that way.

6            THE COURT:  Otherwise we're ready?

7            MR. SMOKOWICZ:  Yes.

8            THE COURT:  Okay.  I may give an explanation as to

9   what redaction is before I read this.  And that will be simply

10  that procedure to in some Exhibits redact information, and it's

11  been done so here.

12           MR. ELSON:  Sounds good.

13           (Whereupon the jury was returned to the courtroom at

14  11:22 a.m.)

15           THE COURT:  We're ready for the redirect, ladies and

16  gentlemen.  Thank you for your patience.  While you were gone

17  there was a stipulation reached between the parties, and that

18  was relative to Exhibit 11-C.  And it's a pretty common

19  practice, that when a variety of Exhibits are offered in this or

20  any other trial, that the parties redact information from the

21  Exhibits because they're not for your consideration.  Or for

22  reasons that are inconsistent with the Rules of Evidence or

23  whatever.  And Plaintiff's Exhibit 11-C was redacted by the

24  Plaintiff's counsel.  There were some redactions there pursuant

25  to my pretrial rulings as to what should be redacted.  And some

1  of that redaction unintentionally obscured a portion of the

2  times indicated on that document.  On that last line of

3  Exhibit 11-C.  So if you see that redaction, it's unintentional.

4  There's nothing else to be concerned about, other than that was

5  an unintentional obscuring of the date on that document.

6            MR. ELSON:  Thank you, Judge.

7            THE COURT:  Mr. Elson.

8                     **REDIRECT EXAMINATION**

9  **BY MR. ELSON:**

10 Q.  William, Mr. Smokowicz asked you some questions about there

11 being times that you didn't see some of your kids after you were

12 released from prison.  Do you remember that line of questioning?

13 A.  Yes.

14 Q.  And can you explain why that was?  Why there were periods of

15 time that you didn't see your children?

16 A.  Well, you know, they off doing their own thing.  They was

17 adults, you know, when I come home.  Like -- I know like they

18 stay on Keefe or something.  I don't know the address.  Like

19 3200 or something like that.  I know they stay on Silver Drive

20 right now.  I don't know the exact address right now.  Like

21 Cynthia was staying over on 35th.  I didn't know her address at

22 the time.  Jalisa, she was out of town doing her thing, you

23 know.  Like I said, they adults.  They go off and do their thing

24 sometimes.  Not that we don't have contact or nothing with each

25 other.  Either of them kids.

1  Q.  And there's been a woman in the courtroom with a baby.  Can
2  you tell the jury who that is?
3  A.  Yeah, that's my youngest daughter and grandson.
4  Q.  And what are their names?
5  A.  That's Nafia and Isaac (phonetic).
6  Q.  Mr. Smokowicz also asked you a series of questions about the
7  March 24th handwritten report by Detectives Hernandez and
8  Phillips.  Do you remember that line of questioning?
9  A.  Yes.
10 Q.  And within that report there was included a scenario about
11 Maryetta Griffin going through your pockets, and you fighting
12 with her, and you allegedly saying that you were responsible for
13 her death.  Do you remember that series of questions?
14 A.  Yes.
15 Q.  Do you know where that information came from in that report?
16 The scenario?
17 A.  Yes.  During -- sometime on the 24th, the in and out
18 sessions, Gilbert Hernandez and Detective Phillips came in
19 feeding me that story.  And at one point when Katherine was
20 sitting in the room the phone ring.  Gilbert -- Captain go out,
21 answer the telephone.  Detective Phillips and Hernandez come in
22 and start feeding that story.  So at one point Detective Gilbert
23 said okay, we have you.  Well, hypothetically speaking just --
24 you woke up, startled, with Miss Griffin going in your pocket,
25 and you supposedly -- you grabbed her and she broke for the

1  stairs and she fell down the stairs and broke her neck.  And I
2  was like yeah, hypothetically speaking that could happen.
3  That's where that came from.  And he start saying, you know, we
4  gonna make you out to be a monster in the newspaper.  And
5  just -- like I said, just feeding them allegations.
6  Allegations, like.
7  Q.  Did you tell them that it did happen that way, though?
8  A.  No.
9  Q.  Did you tell them that it didn't happen that way?
10  A.  Absolutely.  It did not happen.
11  Q.  Did you tell them that?
12  A.  Yes.  Several times.
13  Q.  Did you ever tell the Detectives that you fought with
14  Maryetta?
15  A.  No.  Never.
16  Q.  Did you ever tell the Detectives that you thought you had
17  killed Maryetta Griffin?
18  A.  No.
19  Q.  And that's because you didn't have anything to do with
20  Maryetta Griffin's death, right?
21  A.  Right.
22          MR. ELSON:  No further questions, Judge.
23          THE COURT:  Recross.  Any recross of that?
24          MR. SMOKOWICZ:  Thank you, Your Honor.  Just a couple
25  questions.

1    **RECROSS EXAMINATION**

2    BY MR. SMOKOWICZ:

3    Q.  Sir, the statement from -- that Detective Hernandez wrote

4    out that they report you said in his presence and in the

5    presence of Detective Phillips on March 24th -- that handwritten

6    statement marked as -- among others as Exhibit 1030.  Let me

7    show that to you.  The part that's -- the full part that's shown

8    on the screen reads subject states that Mercedes sat at the

9    table, started to smoke her dope.  Subject states that he was

10   laying on the couch, fell asleep.  Subject states that he was

11   awakened by Mercedes going into his pockets, pulling out the

12   money -- out his money, pardon me.  Subject states that he was

13   startled.  Subject states that he got up on his feet and grabbed

14   one of the victim hands.  Subject states that Mercedes and him

15   started to fight.  Subject states that he was saying, quote,

16   what are you doing, close quote.  Subject states that Mercedes

17   pulled away and ran to -- ran toward the stairs, attempt to get

18   away.  Subject states he doesn't remember what happened.

19   Subject states, quote, Ronnie called, close quote.  Subject told

20   quote, Ronnie, get over here.  Quote, I think I killed this

21   bitch, close quote.  Subject stated that, quote, Ronnie

22   shouldn't have gotten rid of the body.  Questioned subject as to

23   how he killed Mercedes.  Subject stated, quote, I'm responsible.

24   I just don't remember how.

25             Nowhere in that statement is there anything that says

1   she fell down the stairs, right?

2   A.  Right.

3   Q.  Nowhere in that statement is there anything to say that's

4   how she broke her neck, right?

5   A.  Right.

6   Q.  What is in there is a statement that you had a fight with

7   her over money, right?  That's what's in there, right?

8   A.  Yes.

9   Q.  And, in fact, you did have a fight with her that night?

10  A.  No.

11  Q.  And that's why you felt responsible?

12  A.  Absolutely not.

13  Q.  Because she turns up dead the next day, and you think that

14  you -- what you did actually killed her?

15  A.  No.

16          MR. SMOKOWICZ:  That's all I have, Your Honor.

17          THE WITNESS:  Never happened.

18          THE COURT:  Anything else of this witness?

19          MR. ELSON:  Nothing based on that, Judge.

20          THE COURT:  All right.  You may step down, Mr. Avery.

21  Next witness?

22          MR. STAINTHORP:  Judge, the Plaintiff calls Daniel

23  Phillips.  Detective Phillips.

24          **DANIEL PHILLIPS**, called as a witness, having been

25  first duly sworn, on oath testified as follows:

1          THE CLERK:  Please state your full name and spell your

2     last name for the record.

3          THE WITNESS:  Daniel John Phillips.  Last name spelled

4     P-H-I-L-L-I-P-S.

5                      **DIRECT EXAMINATION**

6     **BY MR. STAINTHORP:**

7     Q.  And Mr. Phillips, you are a Defendant in this action, is

8     that correct?

9     A.  Yes.

10    Q.  And you were formerly a Milwaukee Police Officer, is that

11    correct?

12    A.  Yes.  And Police Detective.

13    Q.  Well, you started off as a Police Officer with the City of

14    Milwaukee, correct?

15    A.  Yes, sir.

16    Q.  And that was when?

17    A.  1991.

18    Q.  As a Police Officer?

19    A.  I'm sorry.  1981.

20    Q.  So you started off as a Police Officer in '81, and then you

21    were promoted to a Detective?

22    A.  Correct.

23    Q.  And that was around the early 90's?  I think that was '91,

24    is that correct?

25    A.  Correct.

1  Q.  So certainly as of the time of this investigation in 1998,

2  you were an experienced Detective with the Police Department,

3  correct?

4  A.  Yes.

5  Q.  And you were aware that -- well, strike that.  Part of your

6  responsibility as a Detective with the Police Department was to

7  question suspects, correct?

8  A.  Yes.

9  Q.  And you would also question witnesses?

10  A.  Yes.

11  Q.  Correct.  And when you were questioning suspects, that would

12  be referred to as an interrogation?

13  A.  Oftentimes, yes.

14  Q.  And with respect to when you were questioning or

15  interrogating a suspect in a crime who was in custody, you had

16  to give that person what's called their Miranda rights, is that

17  correct?

18  A.  Yes, sir.

19  Q.  And that would be done prior to -- or you understood that

20  you were supposed to do that prior to the start of the

21  questioning?

22  A.  Correct.

23  Q.  And that pursuant to the decisions of the United States

24  Supreme Court, unless that person waived their Miranda warnings

25  then you couldn't proceed with questioning them, correct?

1  A.  That's correct.

2  Q.  And if a person initially waived their Miranda warnings,

3  they still had the right at some point during that questioning

4  to withdraw that consent to the questioning, correct?

5  A.  That's correct, sir.

6  Q.  And if they did that, if they started off agreeing to talk

7  to you and then subsequently said look, I don't want to talk to

8  you anymore, at that point you had a duty as a Police Officer to

9  cease the questioning and respect that invocation of their Fifth

10 Amendment rights, is that correct?

11 A.  That's correct.

12 Q.  And you would attempt when you were questioning a suspect

13 to -- if a suspect waived their rights, you would attempt to

14 have that suspect sign a statement before the interrogation

15 began that they were waiving their rights, correct?

16 A.  Correct.

17 Q.  So if we look at the Police reports where -- which purport

18 to reflect statements of the parties, the first paragraph has --

19 or should have a portion which states that they are waiving

20 their Miranda warnings, correct?

21 A.  Correct.  The first paragraph, however, may contain

22 information as to where we were.  And then a second paragraph

23 would be devoted to -- directly to Miranda warnings.

24 Q.  Okay.  But certainly it would be prior to any substantive

25 content?

1  A.  Prior to any questions.

2  Q.  And you recognized -- strike that.  So now with respect to

3  your -- the practice of the interrogation of suspects that

4  existed in 1998 in Milwaukee, the practice of the Police

5  Department was not to record those interrogations in any manner

6  that could subsequently be reviewed as a contemporaneous record,

7  correct?

8  A.  That's correct.

9        MR. SMOKOWICZ:  Object to the form of the question as

10 vague.  Recording?

11        MR. STAINTHORP:

12 Q.  Let me make it more specific.  In 1998 the custom and

13 practice of the Milwaukee Police Department was not to videotape

14 interrogations, correct?

15 A.  Correct.

16 Q.  And the practice of the Milwaukee Police Department in 1998

17 was not to audiotape interrogations, correct?

18 A.  Correct.

19 Q.  So if, in fact, there was no contemporaneous record made by

20 either videotape or audiotape, the only record of an

21 interrogation was the record that was made by the Officers

22 involved, correct?

23 A.  Correct.

24 Q.  And, in fact, when you were doing interrogations, the person

25 who was being interrogated, the suspect, would not have access

ing

1  to pen and paper to make any notes about the interrogation,
2  correct?
3  A.  No.  Not likely, no.
4  Q.  Well, did you ever do an interrogation where you allowed the
5  suspect to have a pad and paper to make some notes about what
6  was going on in the interrogation?
7  A.  Yes.
8  Q.  And on how many occasions did you do that in your career as
9  a Detective?
10 A.  Several times, I believe.
11 Q.  How long were you a Detective?
12 A.  Approximately 16-and-a-half years.
13 Q.  And during that time you did thousands of interrogations,
14 correct?
15 A.  I wouldn't say thousands, but very many, certainly.
16 Q.  In this case did you give Mr. Avery a pad and paper to make
17 notes on the interrogation?
18 A.  No, sir.
19 Q.  So essentially, then, with respect to generally the rules as
20 to an interrogation, you as the interrogator would be the only
21 person who would have the ability to make a record of that
22 interrogation.
23 A.  Other than memory, correct.
24 Q.  All right.  And so certainly you recognize that in that
25 situation where there was no videotape, no audiotape record

1  being made of this interrogation, it was important for you as

2  the interrogator to be very accurate in terms of recording

3  exactly what the suspect said, correct?

4  A.  We attempted that, certainly.

5  Q.  Okay.  Well, that was an important role that you had as an

6  interrogator, correct?

7  A.  Correct.

8  Q.  Because you recognize that you were going to be the source

9  of information to any subsequent body, such as a Court that was

10  considering that statement, correct?

11  A.  Yes, sir.  And that's why we had two Detectives present for

12  every interrogation.

13  Q.  And you recognized that if there was any doubt about what a

14  person was saying, that doubt should be -- must be reflected in

15  your record of that interrogation?

16  A.  I'm not sure I understand what you're saying.

17  Q.  Okay.  So if you -- a suspect -- you're interrogating a

18  suspect, and the suspect makes a statement but you're not

19  entirely clear about what the suspect is saying, it's your duty

20  as a Police Officer to make sure that that doubt is either

21  clarified or reflected in your report, correct?

22  A.  We attempt clarification, certainly.

23  Q.  Well, do you recognize that that was your duty to record any

24  potential or any possible doubt about what the person was

25  saying?

1    A.   Yes, sir.

2    Q.   And, in fact, if the person made a statement, you had some

3    doubt about exactly what they were saying, and you did not

4    record that in your Police report, you would essentially be

5    preparing a false Police report, wouldn't you?

6    A.   No, sir.

7    Q.   Okay.  So what you're telling this Court and this jury is

8    that you could conduct an interrogation of a suspect, you could

9    have some question about the reliability of what you believed

10   you heard, and you had no duty as a Police Officer to record

11   that doubt in your Police report?

12   A.   That's not what I'm saying.

13            MR. SMOKOWICZ:  Objection to the form of the question.

14   Misstates the witness's prior testimony.

15            THE COURT:  He may answer, if he can.

16            THE WITNESS:  Would you repeat it, please?

17            MR. STAINTHORP:  Yeah.  Could I have it read back,

18   please?

19            (Whereupon the preceding question was read back by the

20   Reporter.)

21            MR. STAINTHORP:

22   Q.   Well, my prior question was putting to you that if, in fact,

23   you did have a doubt about what a person was saying, and you

24   failed to record that in the Police report, you would be

25   creating a false Police report.  And you didn't agree with me,

1    correct?

2    A.   What I'm saying is that we attempt to record all of the

3    information possible, but it's not verbatim.  It's not an

4    audiotape.  It's not a videotape.  It doesn't record everything.

5    Q.   And that is why it is absolutely critical that if there is

6    some doubt about the -- about what a person is saying, that that

7    doubt, that question be reflected in your Police report,

8    correct?

9    A.   Correct.

10   Q.   And if, in fact, that doubt or that question is not

11   reflected in the Police report, then you are preparing a false

12   Police report?

13   A.   I don't believe you're preparing a false Police report.

14   What you're doing is putting down what you understand of the

15   circumstances that are presented to you and the statement that

16   is being made to you.  So if, for instance, this subject or the

17   person that we are interviewing has some doubt in his mind over

18   something, or raises some question, we attempt to clarify it

19   based on what we're seeing.  But if he has some doubt, I can't

20   read his mind.

21   Q.   I'm not talking about you reading his mind.  I'm talking

22   about you hearing a statement, and you, as the interrogator, not

23   being clear about what that person is saying.  In that

24   situation, you must either seek clarification, or you must

25   record in that Police report that there is some doubt about what

1    the person is saying, correct?

2    A.  Yes.

3    Q.  Okay.  Well, in terms of recording that doubt, that doubt

4    could be critical in terms of the use that is made of that

5    Police report, correct?

6    A.  I'm not certain where -- what you're trying to ask me here,

7    sir.  Is the doubt -- are you talking about the doubt that I may

8    have in my mind when he makes the statement?  Or are you talking

9    about the doubt that the subject has in his mind as he's being

10   interviewed?

11   Q.  Well obviously, sir, you don't know what doubt the person

12   has, so I'm talking about the doubt that's in your mind.  If a

13   person gives you a statement, and you're unsure about exactly

14   what the person is meaning or the person is saying, and you're

15   unable to get clarification, you must record that in your Police

16   report, correct?

17           MR. SMOKOWICZ:  Object to the form of the question.

18   Multiple meaning or saying?  That's a difference there.

19           THE COURT:  Question can be rephrased.

20           MR. STAINTHORP:

21   Q.  If, in fact, you're interrogating a suspect and you have

22   doubt in your mind as to what the person is communicating to you

23   --

24   A.  -- yes, sir --

25   Q.  -- you must reflect that doubt in your Police report, musn't

1  you?

2  A.  I must determine what he means by what he's saying

3  certainly.

4  Q.  And in the event that you cannot determine that, either

5  because a person cannot explain it, or chooses not to, you must

6  in your Police report reflect that doubt, correct?

7  A.  Yes, sir.

8  Q.  And again, if you don't reflect that doubt, and if you just

9  describe the statement, then you are filing a false Police

10  report?

11  A.  Yes, sir.

12  Q.  And when you were conducting interrogations, the practice of

13  the Milwaukee Police Department was not -- you've already said

14  there was no video, no audio.  There wouldn't be a stenographer

15  there either, correct?

16  A.  No, sir.

17  Q.  So the stenographer -- such as the person who's now sitting

18  to your left taking down everything that you say -- would not be

19  present during an interrogation, would he?

20  A.  No, it was not our procedure, policy at that time.

21  Q.  And -- yeah.  So -- and the time we're talking about is

22  1998.  So 1998, it was not your procedure, even if a person gave

23  an inculpatory statement where they were suggesting they were

24  guilty of a crime -- it was not your procedure to then bring in

25  a Court Reporter and have the person make the statement in front

1   of a Court Reporter?

2   A.  No, sir.

3   Q.  So again, the only record that would be able to be made is

4   your own Police report?

5   A.  Correct.  In conjunction with another Detective who is

6   witnessing it.

7   Q.  Well, the practice of the Police Department at that time was

8   that one report would be produced from a -- or one typewritten

9   report would be produced from an interrogation of a suspect,

10  correct?

11  A.  Correct.

12  Q.  And if, in fact, the suspect gave a statement that was

13  considered to be inculpatory, a handwritten version would be

14  created at that time by one of the Detectives, correct?

15  A.  Both ways, sir.

16  Q.  Yeah.  So both ways would be done, correct?

17  A.  Correct.

18  Q.  And -- but it wasn't a situation where both Detectives would

19  produce multiple reports.  There was one report produced that

20  was essentially the report of both of the Detectives who were

21  involved in that interrogation?

22  A.  And signed by both Detectives.

23  Q.  So -- so in fact even if you -- strike that.  So in fact, if

24  you were doing an interrogation with a partner, and the partner

25  produced -- the partner was the one who produced the report, the

1  report that was produced would be just as much your report as

2  the partner's report, correct?

3  A.  Correct.

4  Q.  So you would have equal responsibility for that report?

5  A.  Correct.

6  Q.  Now, with respect to interrogation of suspects, you knew

7  from your experience as a Detective that there were some

8  suspects who you questioned who were much more articulate than

9  others, correct?

10 A.  Yes, sir.

11 Q.  And, in fact, some persons that you questioned you would

12 find had a hard time expressing exactly what they meant?

13 A.  Sometimes, yes.

14 Q.  Okay.  And some suspects who you questioned would, on

15 occasion, speak in ways that may be hard for you to understand

16 what they were saying?

17 A.  Sometimes street slang I'd have to ask for an interpretation

18 of it, for example.

19 Q.  Okay.  Well, it wasn't just street slang.  Some people were

20 able to express themselves easily, and other people could not?

21 A.  Some were more articulate than others, if that's what you

22 mean.

23 Q.  So some people you would have to work at it more to find out

24 what they were saying?

25 A.  Correct.

1  Q.  And certainly, though, you recognize that just because a

2  person was inarticulate, that did not lessen that person's right

3  to have their statement accurately recorded, correct?

4  A.  It did not lessen their right, no.

5  Q.  Didn't lessen their right -- their Constitutional right to

6  waive their -- to request an attorney?

7  A.  No, not at all.

8  Q.  And, in fact, if you were questioning someone who was not

9  extremely articulate, you recognize that your duty to accurately

10 reflect what -- your best understanding of what a person was

11 saying was even more critical, correct?

12 A.  Yes.

13 Q.  Because you recognize in the situation where someone was

14 somewhat inarticulate, there was a greater chance of you not

15 understanding exactly what the person was saying?

16 A.  Possibly, yes.

17 Q.  And that duty that you had to ensure that you understood

18 what a person was saying, and to accurately record it in your

19 Police report -- you recognized that that was your duty as both

20 a Police Officer and under the United States Constitution,

21 correct?

22 A.  Yes.

23 Q.  Now, in terms of interrogation, the goal -- the overall goal

24 was to elicit information from the person that you were

25 questioning, correct?

1    A.  Truthful information, yes.

2    Q.  Okay.  And in doing that, it was generally not a good idea

3    to provide the person with information?

4    A.  Correct.

5    Q.  Because what you're trying to do is get information from the

6    person.  Not just have them repeat back to you information that

7    you had given to them, correct?

8    A.  Correct.

9    Q.  And you recognized that if, in fact, you gave a person

10   information, that in the subsequent questioning you might just

11   be getting regurgitated back to you what you already told them?

12   A.  It would be possible, yes.

13   Q.  But you recognize that that was a danger?

14   A.  Yes.

15   Q.  And so if, in fact, you had given a person who you were

16   interrogating information about a crime, and then subsequently

17   elicited a statement that you considered to be inculpatory, you

18   recognize that it was your duty to accurately record in that

19   Police report that you had previously given them information,

20   correct?

21   A.  Correct.

22   Q.  But what you also did in your practice as a Police Officer

23   was on occasion during interrogations you would use what was

24   called hypotheticals, correct?

25   A.  They could be used, yes.

1  Q.  Well, you used them, didn't you?

2  A.  No.

3  Q.  Okay.  Do you recall being at a deposition in this case on

4  September the 17th, 2012?

5  A.  Yes.

6  Q.  This is at Page 98.  So this is Page 98, line 12.  Question:

7  Do you recall -- was one of the techniques that you were trained

8  in to ask suspects to engage in a hypothetical?  Well, if they

9  had done this crime, how would they do it?  To explain how they

10 would do it.  Answer:  That is a technique that could be used

11 and applied, correct.  Question:  Have you used that technique

12 before with suspects?  Answer:  Yes.  Question:  Is it

13 effective?  Answer:  Sometimes.

14          Do you recall giving those -- being asked those

15 questions and giving those answers?

16 A.  Yes.

17 Q.  So you did, in fact, use hypotheticals in your

18 interrogation?

19 A.  You asked me if I used hypotheticals with Mr. Avery.  The

20 question is no.

21 Q.  Actually that was not my question.

22 A.  The answer was no.

23 Q.  Do you want the question read back?  That was not my

24 question.  My question was whether you --

25 A.  I thought you were asking me if I used hypotheticals with

1    Mr. Avery, or that Detective Hernandez did.  And no, we did not.

2    Q.  My question to you was whether you used hypotheticals in

3    your work as a Detective.  You initially answered no.  And now

4    your answer is yes.  Is that correct?

5    A.  The answer is that is one of the techniques that's used, and

6    I have used that technique in the past, but I did not use it

7    with Mr. Avery, nor did Detective Hernandez, who did the bulk of

8    the questioning.

9    Q.  Okay.  Now, you agree with me that -- that the concept of

10   using hypotheticals is somewhat specialized?

11           MR. SMOKOWICZ:  Your Honor, before we go further, for

12   the purposes of completeness can I read the next question and

13   answer in that deposition?

14           THE COURT:  Well, if it completes it, that's your

15   right under the rule.

16           MR. STAINTHORP: Judge, I object to that.  That wasn't

17   my question.  My question was whether he used it.  The next

18   answer is he claims not to have used it with Mr. Avery.

19           THE COURT:  Well, okay.  Then the Court will not allow

20   it because the witness has already given that answer.

21           MR. STAINTHORP:

22   Q.  The concept of using hypotheticals -- you would agree that

23   that's a somewhat specialized technique used by Detectives in

24   their interrogation, correct?

25   A.  Yes.

1   Q.  And that would be something that would not be generally --

2   that the public at large would not generally be aware of, that

3   that's something you would do, correct?

4   A.  With all the Police shows, movies, everything that's out

5   there now, documentaries on the use of Police techniques,

6   there's quite a bit of information out there.  Some parts of the

7   public might be very much aware of it.

8   Q.  Do you know how Mr. Avery in his Notice of Claim filed in

9   November of 1998 came to allege that you and Detective Hernandez

10  had used hypotheticals with him during his interrogation on

11  March the 24th?

12  A.  No.  I'm not aware that he did.

13  Q.  Okay.  My question was something different.  Do you know how

14  in his Notice of Claim filed in November of 1998 he came to

15  allege that you had used hypotheticals in your questioning of

16  him on March the 24th of 1998?

17          MR. SMOKOWICZ:  Object to the form of the question.

18  Lacks foundation.  Witness has no knowledge.

19          THE COURT:  He may answer, if he knows.

20          THE WITNESS:  I'm not sure I understand your question,

21  sir.

22          MR. STAINTHORP:

23  Q.  Yeah.  Okay.  So in his Notice of Claim that was filed in

24  November of 1998 -- so the same year that you're doing the

25  investigation -- Mr. Avery filed a Notice of Claim naming you as

1  a Defendant, among others.  That claim that hypotheticals were

2  used by you and your partner, Detective Hernandez, in your

3  interrogation of Mr. Avery.  My question to you is this.  Where

4  did he get that information if, in fact, that wasn't what

5  occurred?

6  A.  I guess you'd have to ask him, sir.

7  Q.  Do you have any explanation where he would get that

8  information, if that wasn't what in fact occurred?

9  A.  It didn't occur.

10 Q.  Do you have any information where he could get that

11 assertion if that didn't, in fact, occur?

12       MR. SMOKOWICZ:  I'm going to object to the form of the

13 question.  Also, it's been asked and answered.

14       THE COURT:  If he doesn't know, I think that would

15 result in speculation on his part.  So the objection is

16 sustained.

17       MR. STAINTHORP:

18 Q.  All right.  Now, in fact, the use of hypotheticals, though,

19 as you claimed it could be effective, was an extremely dangerous

20 form of interrogation, correct?

21 A.  It could be if you were feeding information to him that he

22 would mimic back to you.

23 Q.  Okay.  Well, that's what a hypothetical is, isn't it?

24 A.  Yes, sir.

25 Q.  That situation where you're using the hypothetical technique

1  to interrogate someone, you're saying -- you're providing them

2  with the information and saying isn't it possible that it

3  happened this way?

4  A.  If that's the way -- the way you're characterizing it, if

5  that's the way it's done, you're going to get a mimic back.

6  However, if you set up the hypothetical and let them finish the

7  story line, now there could be real information there that you

8  haven't provided to the subject or suspect.

9  Q.  All right.  So you're saying you provide a certain amount of

10  information, and then -- but not the entire amount of

11  information, correct?

12  A.  You leave it open ended.

13  Q.  Okay.  But at least you are providing the person you are

14  interrogating information -- or you're suggesting to them

15  information about how the crime occurred, correct?

16  A.  You set up for a possible crime scenario, and then ask them

17  -- for example, if you are the perpetrator, how would you have

18  done this?  So it's open ended.  Do you understand what I'm

19  saying, sir?

20  Q.  Well, I do understand.  Because you're saying that you are

21  providing a scenario, a factual scenario to the person that you

22  are questioning.

23  A.  Just a very generic scenario.

24  Q.  Well, a hypothetical is a situation where you are describing

25  what your hunch is as to how the crime might have gone down,

1  correct?

2  A.  No.  That's not the way I would set it up.  And that's not

3  the way I used hypotheticals in the past.  It would be an open

4  ended technique, sir.  You would set up a scenario of a homicide

5  scene, but you wouldn't put in all of the details.  You would

6  just set up a situation.  If a drug prostitute was at a dope

7  house and was found later dead, how do you think -- or what do

8  you think might have happened to her?  In your mind, what might

9  have happened to her that she went from that drug house to being

10  dead?

11  Q.  Okay.  Well, you would go a little further than that,

12  wouldn't you?  You'd suggest a possible scenario where that

13  prostitute did end up dead.

14  A.  I'd leave it as open ended as possible so I didn't get the

15  mimicking that we were talking about earlier.

16  Q.  All right.  But with respect to the information that you did

17  provide to the suspect, it would be crucial to you to note in

18  your report of the interview that you had, in fact, given a

19  certain amount of information to the suspect, correct?

20  A.  Yes.

21  Q.  And if you didn't do that in your Police report, that would

22  be a false Police report, wouldn't it?

23  A.  Yes.  Strictly speaking.

24  Q.  Do you have any doubt about that?  That it would be a false

25  Police report?

```
 1   A.   If you were using a hypothetical technique, and you were
 2   setting that technique up -- again, I guess what you're heading
 3   towards, and I'm only guessing here, is that you want to see a
 4   verbatim word-for-word transcription of every word that was said
 5   between the Detectives and the suspect, or the person being
 6   interviewed.  And that doesn't happen in a --
 7   Q.   I agree.  That would be great, wouldn't it?  Because then
 8   there would be no question here about who said what.  So if the
 9   Milwaukee Police Department had used technology that had already
10   been in existence for 20, 30 years by 1998, we wouldn't be
11   having this debate here, would we?
12             MR. SMOKOWICZ:  I'm going to object to this as
13   argumentative, Your Honor.  Also implying a duty that doesn't
14   exist under the law.
15             THE COURT:  Yes.  Well, yeah, it's a little
16   argumentative.  And the conclusion is obvious.  Wouldn't be
17   arguing over something that's already in existence.
18             MR. STAINTHORP:
19   Q.   Okay.  In fact, if there had been a contemporaneous
20   recording, that would protect you as a Police Officer from
21   allegations of misconduct, correct?
22   A.   Correct.
23   Q.   So, in fact, if that technology was used by the Milwaukee
24   Police Department, that would be something that would be --
25   benefit both you as a Police Officer, and the suspect who's
```

```
 1   being interrogated?
 2           MR. SMOKOWICZ:  Objection.  Relevance, Your Honor.
 3           THE COURT:  Yeah, it wasn't part of this factual
 4   scenario.  That's the idea, I suppose.  So I don't know if it's
 5   relevant for this case.
 6           MR. STAINTHORP:  Judge, could he just answer that
 7   question?
 8           MR. SMOKOWICZ:  Your Honor, I objected.  Would
 9   maintain the objection.
10           THE COURT:  Yes, the Court is going to sustain the
11   objection.
12           MR. STAINTHORP:
13   Q.  Now, with respect to your work as a Detective, you would on
14   occasion develop in your own mind scenarios as to what might
15   have occurred, correct?
16   A.  It would depend on who I was interviewing at the time.
17   Q.  Okay.  But there were certainly occasions, especially with
18   respect to crimes that had gone unsolved for a period of weeks,
19   where you would develop scenarios as to what you thought might
20   have occurred, correct?
21   A.  There were theories discussed in our briefings that occurred
22   on each shift, if that's what you're referring to.  Are you
23   talking about in an interview itself?  Or in an interrogation?
24   Q.  Well, you just referred to the discussions that you would
25   have at the shift.  In fact, you and the other Detectives would
```

1  meet on a regular basis to discuss your theories as to what

2  might have happened in the case, correct?

3  A.  At the beginning and ending of each shift, correct.

4  Q.  All right.  And, in fact, there was extensive discussion

5  between Detectives in the Milwaukee Police Department with

6  respect to theories of cases, correct?

7  A.  Certainly.

8  Q.  So when you came on shift, you find out from the prior shift

9  what facts had been developed and what theories had been

10  developed during that shift, correct?

11  A.  Correct.  However, the theories would very often come from

12  supervision.  And then we would discuss them in a virtual round

13  table.

14  Q.  So when you're talking about supervision, you're talking

15  about supervising Officers, correct?

16  A.  Correct, sir.

17  Q.  But you would also have those discussions with other

18  Detectives the same rank as you?

19  A.  Certainly.

20  Q.  And that would occur at the beginning of your shift?

21  A.  Yes, sir.

22  Q.  And you would then work your shift with the knowledge of

23  that theory and during your shift, right?

24  A.  Correct.

25  Q.  And then at the end of your shift you would then have

1  further discussions with other Detectives who were coming on the

2  next shift as to any facts and theories that you had developed

3  during your shift, correct?

4  A.  Yes.

5  Q.  And, in fact, you did have theories about how, in certain

6  instances, prostitutes and drug dealers would end up being

7  victims of violent crime, correct?

8  A.  Yes.

9  Q.  And, in fact, you knew from your experience -- you knew

10 that, and had a theory, that very often a prostitute would hook

11 up with a customer, take them to a remote location, and then

12 rather than engaging in the agreed upon act, which would be sex,

13 that the prostitute would attempt to rob the customer, correct?

14 A.  One possible scenario, certainly.

15 Q.  And that was something that you were aware of having

16 occurred in the course of investigations that you had done,

17 correct?

18 A.  Actual investigations.

19 Q.  Okay.  And you knew that in some of those situations, then,

20 the -- although the prostitute was trying to rob the person she

21 was with, that she would then end up being the person who was

22 the victim of the homicide, correct?

23 A.  Yes.

24 Q.  And that could work both ways.  She could either kill the

25 customer, or the customer could kill her?

1  A.  Correct.

2  Q.  And you knew that could also happen with prostitutes and

3  their -- and other persons who are around them other than

4  customers?

5  A.  Yes.

6  Q.  Because you certainly were aware from your investigation

7  that people who were involved in prostitution often would be

8  involved in other crimes such as robbery, correct?

9  A.  Yes.

10  Q.  And, in fact, that scenario of a prostitute who was killed,

11  having been initially the person who was trying to commit a

12  crime against the person who killed her, that was a very common

13  circumstance, correct?

14  A.  No, I wouldn't say that was a common circumstance.

15  Certainly those -- thousands and thousands of those transactions

16  go on without violence.

17  Q.  All right.  Okay.

18        MR. STAINTHORP:  Referring to Page 65.

19        MR. SMOKOWICZ:  On Page 65?  I do think the witness is

20  entitled to see the --

21        MR. STAINTHORP: I will read it to him.

22  Q.  Sir, do you remember -- you've already stated you remember

23  being deposed in this matter, correct?

24  A.  Correct.

25  Q.  And do you recall being asked this question and giving this

answer.  Well, it starts off with your answer saying -- actually

I think it's mis-transcribed here.  Question:  Drug addicted

prostitutes are very open to becoming victims or -- I'm actually

going to start again.  There's a question, begins on Page 64,

line 23.  And this is just for context.  Question:  Coke head

prostitutes is what you said?  Answer:  Yeah.  Question:  I'm

sorry.  I just missed the first word.  Answer:  Drug addicted

prostitutes are very open to becoming victims or victimized in

crime.  Okay.  Question:  Ah-ha.  Answer:  The number of dead

prostitutes over the course of my homicide career alone was

multiple.  Multiple.  Some got cleared through arrests or

whatever.  A very often common circumstance was that the girl

would hook up with her john, take him to a remote location, and

then rather than doing the agreed upon contract of their

negotiations, she would try to rob him, and then herself become

the victim of a crime when he caught her trying to rob him, or

vice versa.  So we had homicides on both sides.  That was a very

common circumstance.  Do you recall --

        MR. SMOKOWICZ:  That's not the entire answer, and I

want the rest of the answer read for completeness.

        MR. STAINTHORP:  Let me just ask -- I'll get to it.

        MR. SMOKOWICZ:  Your Honor, I would like the rest of

the answer, because it's not interrupted, to be read for

completeness.

        MR. STAINTHORP:  I can read the whole thing, and then

```
1   I'm going to come back to the common circumstance.
2              THE COURT:  Let's read the whole thing.
3              MR. STAINTHORP:
4   Q.  So you continue.  So for them to become prey of a serial
5   killer, for example?  Who better?  I mean, if you want to stand
6   out here as, here, victimize me, a prostitute, especially a drug
7   addicted prostitute, was wide open.  Did we take into
8   consideration that there might be a serial killer involved in
9   all of this, especially the cold cases?  Of course.  It was
10  being considered all the time.  By me personally?  No.  By our
11  supervisors?  Always.  Because they were always looking at cold
12  cases and the opportunity to clear.  Does that make sense?
13             Okay.  That's your entire answer.  But I want to ask,
14  you did answer that it was a very common circumstance for this
15  to occur, correct?
16             MR. SMOKOWICZ:  Your Honor, I'm going to object to
17  this.  It mischaracterizes his testimony.  Was not actually
18  impeaching as to his final answer.
19             THE COURT:  Well, it's a common circumstance relative
20  to the result, as I recall.  The answer speaks for itself.
21             MR. STAINTHORP:
22  Q.  It was, in fact, a common circumstance for that to occur,
23  wasn't it?
24  A.  In a closed set, if we were talking only about homicides
25  with prostitutes, that was a common occurrence.  In the total of
```

1  transactions between prostitutes and their customers?  Violence
2  didn't very often happen.
3  Q.  Certainly when you were questioning Mr. Avery, you had in
4  your own mind that it was a common circumstance, when a
5  prostitute was killed, that that interaction would have started
6  with the prostitute attempting to commit a crime against the
7  person who allegedly killed her, correct?
8  A.  Could go both ways, sir.
9  Q.  I agree.  But in a situation where a prostitute was killed,
10 it was a common circumstance for the prostitute to have
11 initially been the person attempting to commit the crime against
12 the person who killed her?
13 A.  That was not my experience, but --
14 Q.  Okay.  Well, in this answer that I just read to you, didn't
15 you say that in terms of homicides of prostitutes that was a
16 common circumstance?
17 A.  It is a common scenario when violence erupts between the
18 customer and the prostitute, and the prostitute can be the one
19 that is initiating the violence as well, is what I'm saying.
20 Q.  What I'm referring to you is a situation where the
21 prostitute is the one who is deceased.  In that situation it's a
22 common situation, as far as you were concerned, a common
23 circumstance for the prostitute to have been the initial
24 aggressor in the situation?
25 A.  Possibility.  Certainly there, yes.

1    Q.   And that's common.  That was your understanding?

2    A.   It was a common thought and theory at the time, yes, that

3    that was what was going on.

4    Q.   And that was in your mind at the time that you questioned

5    Mr. Avery, wasn't it?

6    A.   I have been exposed to that theory, certainly.

7    Q.   Well, when you questioned Mr. Avery in March of 1998, that

8    was something that was in your mind as a common circumstance?

9    A.   One of the common circumstances, yes.

10   Q.   Okay.  Now, we have already talked a little bit about the

11   importance of accurately recording in Police reports, your

12   Police reports, exactly what occurred, correct?

13   A.   Yes.

14   Q.   And one of the reasons that it was important -- so important

15   to accurately record what occurred in a Police report, is that

16   you understood that those Police reports would be extensively

17   used in both the criminal justice system and beyond, correct?

18   A.   Yes.

19   Q.   And you knew that a Police report that was prepared by you,

20   or prepared by you and your partner, would go to a prosecutor?

21   A.   Potentially, yes.

22   Q.   Well, if there was a prosecution, wasn't potentially.  It

23   would go to a prosecutor?

24   A.   Oh, yes.

25   Q.   And you knew that your Police report would be evaluated by a

1   prosecutor as whether to proceed with charges against the

2   suspect, correct?

3   A.   Correct.

4   Q.   And that a prosecutor would, in fact, rely on the accuracy

5   and the completeness of that Police report?

6   A.   Yes.

7   Q.   So if you didn't list something, if you didn't describe

8   something as having occurred in your Police report, the

9   prosecutor usually wouldn't know about it?

10  A.   Correct.

11  Q.   And besides going to the prosecutor, the Police report would

12  also be read by other Police Officers, correct?

13  A.   Yes.

14  Q.   And other Police Officers who were working on the

15  investigation would read your reports to know what had been

16  going on up to that date in the investigation?

17  A.   In that particular situation and circumstance and that

18  portion of the investigation, yes.

19  Q.   And you would expect the other Officers to rely upon the

20  accuracy and completeness of your Police report?

21  A.   Yes.

22  Q.   And the Police report would also be used by you in terms of

23  any future activity that you had in the case in terms of the

24  refreshing your recollection, correct?

25  A.   Yes.

1  Q.  And that could be used either -- in terms of future work you

2  did in the case, correct?

3  A.  Correct.

4  Q.  Or in terms of future testimony that you gave in the case?

5  A.  Correct.

6  Q.  And there were certainly times when it came time to -- for

7  you to testify in a case that you didn't actually have a live

8  recollection of a particular incident, correct?

9  A.  Yes.

10  Q.  And in that case you would rely upon your Police report to

11  refresh your recollection as to what had occurred?

12  A.  Certainly.

13  Q.  You also understood that a Police report could be released

14  to the media?

15  A.  Sometimes they were, yes.  That decision was not made by

16  Detectives, however.  It was made by supervision.

17  Q.  Understood.  But you recognized that that was a possibility

18  with a Police report that you produced?

19  A.  Correct.

20  Q.  And in that situation if a Police report was -- it was

21  released to the media, then you recognized that there was a

22  possibility that then that would be the basis for a story in the

23  media?

24  A.  I'm trying to remember if I ever was aware of a Police

25  report being provided to media, and I don't know that to be a

1    fact.  But I know information regarding cases was provided to

2    the media, for example, by the Chief of Police.  Maybe reporting

3    to the media over some type of crime spree or whatever the case

4    may be.

5    Q.  So you don't recall in this particular case that there was a

6    media report in the newspaper that was based upon your Police

7    report?

8    A.  No, sir.  I'm not aware.

9    Q.  Okay.  We'll get to that later.  You also recognized that a

10   Police report -- and certainly a Police report that reflected a

11   supposed statement of a party -- could be used at any potential

12   trial of that party, correct?  Let me ask this again.  You also

13   recognized that if, in fact, there was a Police report that

14   reflected that it was a statement of a suspect, that Police

15   report could be introduced as an Exhibit at the trial of the

16   suspect?

17   A.  Yes.

18   Q.  And, in fact, that Police report, whether or not it was

19   signed by the suspect, could be introduced as an Exhibit at the

20   trial of the suspect?

21   A.  Yes.

22   Q.  And in that situation, then, a jury would be presented with

23   your Police report as potential evidence or as -- not potential.

24   As evidence in the criminal proceeding against the person?

25   A.  Yes.  For them to weigh, certainly.

1    Q.  Now, in this case -- in this case you interviewed Mr. Avery

2    with Detective DeValkenaere on March the 23rd of 1998, correct?

3    A.  Correct, sir.

4    Q.  And at the conclusion of that interview Detective

5    DeValkenaere prepared a report of that?

6    A.  Yes, sir.

7    Q.  And have you had occasion to review that report recently?

8    A.  Yes, I did.

9    Q.  Okay.  And you recognize -- and you had occasion to review

10   that report at the time of the investigation, correct?

11   A.  Correct.

12   Q.  Now -- and with respect to that report, the 3/23 report,

13   that was a -- that reported on the interview of Mr. Avery,

14   correct?

15   A.  Yes.

16   Q.  And during that report, during that interview, he denied any

17   involvement in the killing of Ms. Griffin, correct?

18   A.  Correct.

19   Q.  But noted in that report were aspects of his statement that

20   you claimed or that you suggested were suspicious.  Is that fair

21   to say?  You know what?  Let me show you the report.  I'm going

22   to show you -- and this is Plaintiff's Exhibit 11-A, which has

23   already been admitted into evidence.  Do you recognize this as

24   the cover page of the report that you and Detective

25   DeValkenaere prepared?

A.  It's the first page of the report.

Q.  Okay.  And in the course of that report, you recall that the
report purports to state that in the course of the investigation
-- or in the course of the interview, Mr. Avery stated that he
and Mercedes Griffin had oral sex, correct?  And that's the
portion that's highlighted there?

A.  Yes.

Q.  Okay.  And then -- as the report goes on, it then -- and
this is now on the third page of the report.  It purports to
relate Mr. Avery's statement as to when he first became aware of
the death of Ms. Griffin, correct?

A.  I'm reading the report.

Q.  Yeah, that's fine.

A.  He stated that he was -- he had no knowledge of how Mercedes
had been found killed.

Q.  All right.  But he also -- as reflected in this report, it
records the time at which Mr. Avery claimed to become aware of
the death of Ms. Griffin, correct?

A.  Correct.

Q.  And are you done with reading that page?  Because I'm going
to put the fourth page up here.

A.  Yes.

Q.  And then -- well, on the fourth page -- or the -- I'm sorry.
The third to the fourth page, the report notes that in fact
Mr. Avery's statement as to when he became aware that Ms.

1   Griffin was killed was suspicious, correct?

2   A.  Correct.

3   Q.  And the reason that the report purports to note that he was

4   suspicious, was the statement that the body hadn't in fact been

5   recovered until 11:00 a.m.?

6   A.  Correct.

7   Q.  So, in fact, by Mr. Avery's -- according to the report,

8   stating that the body was -- that he was aware of the death at

9   8:00 -- at 8:00 or 8:30 on the morning of February 17th, that

10  was a highly incriminating fact, wasn't it?

11  A.  Certainly.

12  Q.  Okay.  Because that would suggest that he in fact had

13  information about the -- had inside information, essentially,

14  about the homicide?

15  A.  Certainly very suggestive of that.

16  Q.  Okay.  Now, in fact -- and you discussed this with Detective

17  DeValkenaere, correct?

18  A.  Correct.

19  Q.  And you discussed with Detective DeValkenaere how

20  incriminating it was that Mr. Avery would somehow know at 8:00

21  or 8:30 that the body was -- that Ms. Griffin was dead.  When,

22  in fact, the body wasn't reported until 11:00 a.m., correct?

23  A.  Was certainly of concern.  But by the same token, we had to

24  take into account what Mr. Avery's perception of time was.

25  Q.  But certainly if his perception of time was accurate, then

1    the -- his statement that he became aware of the death at 8:00

2    or 8:30 was very incriminating?

3    A.  Very suggestive, yes sir.

4    Q.  And that was something you discussed with Detective

5    DeValkenaere?  How incriminating that was?

6    A.  Detective DeValkenaere and others, certainly.

7    Q.  And others, right.  Because you discussed this at the end of

8    your shift with other people who were coming on to pursue the

9    investigation, correct?

10   A.  Correct.

11   Q.  Now, as a Police Officer, a Detective, it was your duty to

12   be aware of prior Police reports that had been developed in the

13   course of the investigation, correct?

14   A.  Yes, sir.

15   Q.  And certainly you would expect Detective DeValkenaere to be

16   aware of --

17            THE COURT:  Mr. Stainthorp, are we going to another

18   area here?  It's 12:30.  I'm thinking of taking a break at this

19   point.

20            MR. STAINTHORP:  Okay.

21            THE COURT:  And then we'll pick it up at 1:30.

22            MR. STAINTHORP:  All right.  That would be fine,

23   Judge.  Thank you.

24            THE COURT:  Ladies and gentlemen, please don't discuss

25   the case.  We'll see you back here after the break.  Have a good

1  lunch.

2          (Whereupon the jury was excused at 12:29 p.m.)

3          THE COURT:  Okay.  1:30.

4          MR. STAINTHORP:  Judge, I would request that since the

5  witness is on cross examination, he be admonished that he should

6  not be discussing the cross examination during the break with

7  his counsel.

8          THE COURT:  Yes.  So admonished.  So advised.

9          MR. STAINTHORP:  Thank you.

10         THE COURT:  1:30.

11         (Whereupon a recess was called by the Court.  Upon

12 conclusion of the recess, the proceedings continued as follows

13 when the jury was returned to the courtroom at 1:39 p.m.:)

14         THE COURT:  Mr. Stainthorp?

15         MR. STAINTHORP:  Thank you, Judge.

16 Q.  Former Detective Phillips, before the lunch break we were

17 talking about the report that was prepared by yourself and

18 Detective Hernandez after the 3/23 questioning of Mr. Avery.  Do

19 you recall that?

20 A.  3/24 you mean, sir?

21 Q.  No, I mean 3/23.

22         MR. SMOKOWICZ:  Your Honor, I'm going to object.

23 Misstates which Detective he's involved with.

24         THE COURT:  Wait.  Okay.  Run the question by me

25 again.  I didn't quite get it.  What was the --

1          MR. STAINTHORP:  I can rephrase it, if you want.

2          THE COURT:  Go ahead.

3          MR. STAINTHORP:

4   Q.  You questioned Mr. Avery on 3/23?

5   A.  Correct, sir.

6   Q.  And that was with -- I'm sorry.  That was with Detective

7   DeValkenaere.  You're correct.  I misspoke.

8   A.  Correct.

9   Q.  And before the break you were talking about how the -- at

10  the conclusion of that report, it notes that there is a

11  suspicious statement by Mr. Avery with respect to when he first

12  knew that Ms. Griffin was dead, correct?

13  A.  Correct.  The statement was inconsistent with the time the

14  body was found and his apparent knowledge that there had been a

15  homicide.

16  Q.  And you were explaining to us before we took the lunch break

17  that this might be explained by Mr. Avery's bad perspective on

18  time, is that correct?

19  A.  That may have been responsible for it.

20  Q.  Did you have some reason to believe that Mr. Avery had a bad

21  perspective on time?

22  A.  Nothing that I could speak to now, no.

23  Q.  Okay.  Well, was that a concern that you had at the time of

24  the interview?  That it might just be that Mr. Avery had a bad

25  perspective on time?

1  A.  We're talking about 17 years ago.  I don't have any

2  recollection of that at this time.

3  Q.  Okay.  But that would be a potential explanation if there

4  was, in fact, a discrepancy between the time that Mr. Avery said

5  he knew of the body being found, and the time that it was

6  reported to the Police, correct?

7  A.  Possibility, certainly.

8  Q.  All right.  And so you obviously must have noted that in the

9  report that was prepared by you and Hernandez after that

10  interview, correct?

11          MR. SMOKOWICZ:  Hernandez?

12          MR. STAINTHORP:  I'm sorry.  DeValkenaere.

13          THE WITNESS:  The report was documented by Detective

14  DeValkenaere.  There's a possibility that he became aware of

15  that information about when the body was found after the

16  interview.  I can't speak to it.

17          MR. STAINTHORP:

18  Q.  Okay.  In fact, that report -- you know that that report --

19  you just reviewed that report.  That has nothing in that report

20  about this potential -- about the suspicious statement by

21  Mr. Avery being potentially caused by him having a bad

22  perspective on time, correct?

23  A.  No, we didn't record anything along those lines.

24  Q.  Okay.  Because that would be a potential explanation if, in

25  fact, there was a contradiction between the time Mr. Avery said

1  he was aware of the body, and the time that in fact the first

2  people were aware of the body being found?

3  A.  Correct.

4  Q.  Okay.  But you didn't feel it necessary to report that in

5  your report, correct?

6  A.  I didn't say that, sir.

7  Q.  Well, it's not recorded in the report, is it?

8  A.  And there may be other explanations why it wasn't.

9  Q.  Okay.  What I'm asking you is, it is not recorded in the

10 report?

11 A.  If you're asking for a no, then it's no.

12 Q.  Now, in fact, I think you also indicated that it was your

13 duty as a Detective involved in an investigation to be aware of

14 crucial facts in the investigation, correct?

15 A.  Correct.

16 Q.  And certainly Detective DeValkenaere had that same duty,

17 correct?

18 A.  Correct.

19 Q.  And in the event that you were pointing out a suspicious

20 circumstance in a suspect's statement, it was important to check

21 out whether in fact there was a discrepancy, correct?

22 A.  Yes.

23 Q.  Okay.  So I'm going to show you what's previously -- no.

24 There's a -- I'll just show you this.  And this is Defendant's

25 Exhibit 1010.  And if you just take a look at that.  And do you

1    recognize that to be a report that was authored by two

2    Detectives, one of which is Detective DeValkenaere?

3    A.  That's correct.

4          MR. STAINTHORP:  Okay.  Judge, I move for admission of

5    Defendant's Exhibit 1010.

6          MR. SMOKOWICZ:  No objection, Your Honor.

7          THE COURT:  The Court will receive it.

8          MR. STAINTHORP:

9    Q.  And this Exhibit, Defendant's Exhibit 1010, notes an

10   interview that had occurred on February the 18th of 1998, is

11   that correct?

12   A.  Correct.

13   Q.  And this was an interview that was conducted by Detective

14   DeValkenaere?

15   A.  And Detective Cameo Barbian-Gayan.

16          THE COURT:  What was the date of that?

17          MR. STAINTHORP:  February the 18th of '98.

18   Q.  So this is the day after the body was found, correct?  The

19   day after the body was found?

20   A.  Yes.

21   Q.  The 18th.  And this records an interview that Detective

22   DeValkenaere had conducted with Mr. Roy Bradley, correct?

23   A.  Yes.

24   Q.  And Mr. Bradley was questioned about his knowledge of -- I'm

25   sorry.  He was questioned in relation to the finding of the

1    body, correct?

2    A.  Sir, I haven't read this report, so if you're asking -- are

3    you going to ask me to read it through?  Or --

4         MR. SMOKOWICZ:  Your Honor, since the witness has

5    indicated a lack of present knowledge of the report, I'd ask

6    that he be allowed the opportunity to read the full report

7    before he's asked questions about it.  Particularly since he's

8    not the author.

9         THE COURT:  Well, yeah.  Can ask the question as to

10   whether or not it talks about finding the body.  Isn't that

11   right?

12        MR. STAINTHORP:  Yes.

13        THE COURT:  I suppose he will have to read the report

14   in order to answer it.

15        MR. STAINTHORP:

16   Q.  Okay.  Read the first page and then let me know when you're

17   done, and then I will get to the second page.

18   A.  (Witness so responds.)

19   Q.  Are you ready?  Are you ready for the second page?

20   A.  Certainly.

21   Q.  I'm sorry.  I couldn't understand what you said.

22   A.  Yes.  I'm ready.

23   Q.  Are you done?

24   A.  Yes.

25   Q.  Okay.  Now, in fact, this report authored by -- this report

1    authored by Detective Cameo Barbian-Gayan of an interview that

2    was conducted by that Detective and Detective DeValkenaere

3    reports that by 8:00 a.m. on the morning of February the 17th

4    1998, at least three people were aware of the body being in the

5    garage, correct?

6    A.   It appears so, yes.

7    Q.   And those three people would be Lonnie Bradley, correct?

8    With whom the interview was held?

9    A.   Correct.

10   Q.   One would be the woman called Dolores?

11   A.   Yes.

12   Q.   All right.  No last name provided.  But Dolores would

13   also -- was also aware of the body?

14   A.   Correct.

15   Q.   And then Dolores had been told by someone else, name

16   unknown, about the body?

17   A.   Apparently so.

18   Q.   So, in fact, there's no -- nothing suspicious whatsoever

19   about Mr. Avery knowing about the body.  Of knowing that

20   Mercedes had been killed by 8:00 to 8:30 on the morning of

21   February 17th, 1998, is there?

22   A.   Not according to this report, no.

23   Q.   And the type of information that is contained in Defendant's

24   Exhibit 1010, that is the type of information that the

25   Detectives would talk about in their -- in their -- in the

1  course of their investigation, correct?

2  A.  Correct.

3  Q.  And, in fact, identifying when the body was first found

4  would be an important part of that investigation?

5  A.  Yes.

6  Q.  Now, we talked already about the general importance of --

7  oh, before we get to that I want to ask you one other thing.

8  With respect to the information that you had generally about

9  prostitutes who were victims of the homicides often being

10  involved in some criminal activity themselves that gave rise in

11  some way to the homicide, were you aware or did Detective

12  Hernandez tell you that the day before your interview with

13  Mr. Avery on the 23rd, he had interviewed a person by the name

14  of Valerie Eubanks who had, in fact, given him specific

15  information about Griffin -- Mercedes Griffin potentially being

16  involved in robberies or stealing?

17  A.  Again, I don't recollect, sir.

18  Q.  And I'm not going to mark this as an Exhibit for admission,

19  but this is --

20       MR. SMOKOWICZ:  Your Honor, I think if the document is

21  going to be shown to the witness, it should be marked as an

22  Exhibit, however.

23       MR. STAINTHORP:  Judge, I can do that.  I am -- I

24  think there's portions of this that may be admissible, maybe

25  not.

```
 1            THE COURT:  Let's mark it.

 2            MR. SMOKOWICZ:  Your Honor, I am concerned, however,

 3   about one thing.  May I approach?

 4            (Whereupon a side-bar conference was held off the

 5   record.  Upon conclusion of the side-bar conference, the

 6   proceedings continued as follows:)

 7            MR. STAINTHORP:

 8   Q.  Okay.  So Detective Phillips, I'm going to put on the ELMO

 9   here what has now been marked as Plaintiff's Exhibit 33.  And do

10   you recognize the form of this as being a report that Milwaukee

11   Police Officers prepared?

12   A.  Can you pull it down a little bit?

13   Q.  Sure.

14   A.  It's one of our supplemental reports.

15   Q.  All right.  And if you look at this, it appears to be a

16   report prepared by Detective Kathy Hein and Detective Hernandez,

17   correct?

18   A.  Correct.

19   Q.  All right.  And then I'm going to go to the third page of

20   this report and call your attention to the last two sentences of

21   the first full paragraph.  Do you see that?  Do you see the --

22   oh, I'm sorry.  The last -- well, the first full paragraph.  Can

23   you just read that paragraph?  To yourself.

24   A.  (Witness so responds.)

25   Q.  Okay.  You've now had a chance to read it?
```

1  A.  Yes, sir.

2  Q.  And would it be fair to say that this report reports to

3  describe an interview with a Valerie Eubanks.  And I'll go back

4  to the first page.  Do you see that?

5  A.  Yes.

6  Q.  And this was an interview conducted on March the 22nd of

7  1998, is that correct?

8  A.  Correct.

9  Q.  And an interview conducted by Detective DeValkenaere and

10  Detective Kathy Hein, correct?

11  A.  Wrong.  Detective Hein and Detective Hernandez.

12  Q.  I'm sorry.  I apologize.  Detective Hernandez.  Okay.  And

13  the portion of the report that I had you read on the third page,

14  that reflected that Valerie Eubanks had been stating that Ms.

15  Griffin had been -- it appeared that Ms. Griffin had been

16  involved in some theft of money, correct?

17  A.  That was the suspicion on the part of Miss Eubanks, yes.

18  Q.  Because Ms. Griffin was in the possession of a large amount

19  of money?

20  A.  Yes.  And dope as well.

21  Q.  And also the money was in large bills, correct?

22  A.  That's what she describes.

23  Q.  And that certainly appeared suspicious in terms of

24  suggesting that Ms. Griffin might have been involved in theft or

25  robbery?

1  A.  That was her suspicion, as she expressed it.

2  Q.  Okay.  Now, the next day -- I'm sorry.  The next -- two days

3  later you were conducting an interview with Mr. Avery with

4  Detective Hernandez, correct?  So now we're on the 24th?

5  A.  The date of that was February, wasn't it?

6  Q.  No, I think that was March.  Yep.  Let's put it up there.

7  A.  Yes, you're correct.  It's March.

8  Q.  So this is March 22nd, which is a Sunday, correct?

9  A.  Correct.

10 Q.  And then two days later is when you and Detective Hernandez,

11 who also was part of the interview with Valerie Eubanks, were

12 interviewing Mr. Avery, correct?

13 A.  Correct.

14 Q.  And it's during that interview that you claim that Mr. Avery

15 provided you with various inculpatory statements, correct?

16 A.  Yes, he did.

17 Q.  And during the examination of Mr. Avery, those statements

18 have been gone over at some length, but essentially the claim

19 is, based on this report, that Mr. Avery said that he was

20 asleep, that Maryetta Griffin was stealing from him, that he

21 woke up, he was startled, that he grabbed her, that they started

22 to fight.  They stated that Mr. Avery said what are you doing?

23 Mercedes pulled away and ran towards the stairs, correct?

24 A.  Correct.

25 Q.  All right.  And that was a statement that you claim

1  Mr. Avery made in questioning about his interactions with Ms.

2  Griffin on February the 16th to the 17th, correct?

3  A.  Correct.

4  Q.  And certainly that's a highly inculpatory statement, isn't

5  it?

6  A.  Yes, sir.

7  Q.  That statement was the basis of a Police report which I

8  just -- which I just referred to.  This is Plaintiff's Exhibit

9  11-A.  I'm sorry, 11-D, is that correct?

10  A.  Yes.

11  Q.  And that -- we've already gone over in general terms what

12  happens to Police reports.  But, in fact, specifically with

13  respect to this Police report, this and the handwritten version

14  of that report, would be the only recording of that session,

15  correct?

16  A.  Of that interview?  Yes.

17  Q.  Yes.  That Police report would then be tendered to the

18  prosecution, correct?

19  A.  Yes.

20  Q.  And that Police report, 11-D, that would be relied upon by

21  the prosecution.  Or that was your expectation, correct?

22  A.  Yes.

23  Q.  And certainly you would agree that that report was a basis

24  for William Avery being considered a suspect in the killing of

25  Maryetta Griffin?

1    A.  Yes, it was.

2    Q.  And, in fact, that report was also the basis for a newspaper

3    article which states man -- which is headed, man admits to

4    killing.

5    A.  No.

6    Q.  You don't know that.  All right.  So showing you what --

7    A.  If I knew it, sir -- I don't have a recollection of it.

8    Q.  All right.  I'm showing you what's already been admitted as

9    Defendant's Exhibit 1042.  Have you seen that article before?

10   Okay.  Have you now had a chance to review that newspaper

11   report?

12   A.  Yes.

13   Q.  And have you seen that newspaper report before?

14   A.  I may have.  I can't say that I have a vivid recollection of

15   that.

16   Q.  Certainly that newspaper report purports to be relying on a

17   Police report for its assertions that man admits to killing,

18   correct?

19   A.  At the end of the first paragraph it says according to a

20   Police report.  And at the end of another -- near the end of

21   another paragraph it indicates that charges were filed in the

22   drug unit of the District Attorney's Office.  And that

23   information appears to be coming from District Attorney Ron

24   Dague.

25   Q.  But the information in this report is stating -- relates to

1    the killing of Ms. Griffin, correct?

2            MR. SMOKOWICZ:  I'm sorry, I didn't hear the question.

3            MR. STAINTHORP:

4    Q.  The report -- the report, Defendant's Exhibit 1042, is

5    referring to Police reports that report upon the killing of Ms.

6    Griffin?

7            MR. SMOKOWICZ:  I'm going to object to the form of the

8    question.  It misstates the nature of the reports and the nature

9    of the newspaper reporting.

10           THE COURT:  Well, the headline says man admits to

11   killing.  And so that's what it says.

12           MR. STAINTHORP:  Go ahead.

13           THE WITNESS:  Could you repeat the question?

14           MR. STAINTHORP:

15   Q.  Yes.  This newspaper article states that it is obtaining

16   information and reporting information from a Police report,

17   correct?

18   A.  It seems to, yes.

19   Q.  Yes.  And was there any other Police report which you are

20   aware that states that Mr. Avery had admitted killing Ms.

21   Griffin?

22   A.  Not that I'm aware of, no.

23   Q.  So that report that we've already identified as being

24   authored by yourself and Detective Hernandez, that is the sole

25   Police report that claims that Mr. Avery admitted to killing Ms.

1  Griffin, correct?

2  A.  As far as I know, yes sir.

3  Q.  Now, an alleged statement such as you claim that Mr. Avery

4  gave admitting to killing Ms. Griffin, that would be a crucial

5  part of any prosecution for that killing, correct?

6  A.  Would you repeat that, please?

7  Q.  Yes, I will.  A statement by a suspect admitting to killing

8  a person would be a crucial piece of evidence in the prosecution

9  of that person for that murder?

10  A.  Correct.

11  Q.  And, in fact, in this situation that alleged statement by

12  Mr. Avery was a crucial part of the prosecution of Mr. Avery for

13  murder, wasn't it?

14  A.  Subsequently, but not during my tenure as -- in the Homicide

15  Unit of the Milwaukee Police Department.

16  Q.  You're correct.  There was a gap.  But then when the charges

17  were eventually brought against Mr. Avery, you in fact were a

18  witness at the criminal trial of Mr. Avery, weren't you?

19  A.  Yes, I was.

20  Q.  And, in fact, during that testimony you identified the

21  handwritten statement written by Detective Hernandez and

22  attributed to Mr. Avery -- a statement that has been -- the

23  report has been previously marked as Exhibit 11-C and admitted

24  into evidence.  You identified that as the statement of Mr.

25  Avery, didn't you?

1   A.   Yes.

2   Q.   And in the course of that trial, after the statement was

3   identified by you as a statement given by Mr. Avery, that

4   physical statement was entered into evidence, wasn't it?

5   A.   I don't know if I was present in Court when that happened.

6   Q.   All right.  But you're aware of judicial proceedings and how

7   judicial proceedings proceed in the State of Wisconsin?

8   A.   Yes.

9   Q.   Okay.  And so I'm going to just show you a -- this is a

10  portion of Plaintiff's Exhibit 16.  This is Mr. -- former

11  Detective Phillips' testimony at the trial of Mr. Avery.  Now

12  I'll just show it to you and --

13           MR. SMOKOWICZ:  What page?

14           MR. STAINTHORP:  This is pages 16 to 17.

15           THE WITNESS:  Are you asking me to read this?

16           MR. STAINTHORP:

17  Q.   Well, I'm just asking you to look at it and see that you

18  identify the statement that you and Detective Hernandez had

19  prepared on 3/24.  The alleged statement of Mr. Avery as an

20  Exhibit at that trial?

21           MR. SMOKOWICZ:  Your Honor, are we done with 11-C?

22  That's still on the monitor.

23           MR. STAINTHORP:  Oh, sure.  Sure.

24  Q.   Have you had a chance to look at that transcript?

25  A.   Yes.  I'm reading through it.

254

1  Q.  Okay.  Okay.

2          THE COURT:  Mr. Stainthorp, are you asking the

3  question to get this witness to say that this was admitted at

4  the trial?

5          MR. STAINTHORP:  Yes.  First I'm --

6          THE COURT:  Will you stipulate to that, Mr. Smokowicz?

7  That this Exhibit was admitted at the trial?

8          MR. SMOKOWICZ:  I'm afraid that that's not included

9  within this Exhibit.  At least that I saw, Your Honor.  So at

10 this point I'd like to withhold that.

11         MR. STAINTHORP:  Sure.

12 Q.  You see that you identified the Exhibit as Exhibit 3 at the

13 trial?

14 A.  This is not marked here as an Exhibit, but it appears to be

15 a photocopy of some court testimony that I gave.

16 Q.  Okay.  And in that Court testimony -- and there is an

17 agreement that this is in the course of the trial of Mr. Avery

18 for homicide -- an Exhibit Number 3 is marked for identification

19 and identified by you as the recorded statement that Mr. Avery

20 gave you.  Do you see that?

21 A.  Appears that it was a photocopy of an Exhibit Number 3 that

22 he showed me.

23 Q.  Okay.  But that Exhibit is the statement that you -- the

24 actual written -- handwritten statement that you claim that

25 Mr. Avery -- well, strike that.  Exhibit 3 is Detective

1   Hernandez's handwritten account of the statement that you and he

2   claim Mr. Avery gave, correct?

3   A.  That is the statement Mr. Avery gave.

4   Q.  Okay.  And that's identified as Exhibit 3?

5   A.  Correct.

6   Q.  All right.

7            MR. SMOKOWICZ:  Based upon what I've seen, Your Honor,

8   we stipulate that that was admitted into evidence in the

9   criminal trial against Mr. Avery.

10            THE COURT:  Okay.

11            MR. STAINTHORP:  So my understanding is there is now a

12   stipulation that the statement attributed to Mr. Avery was

13   entered into evidence in the criminal trial?

14            MR. SMOKOWICZ:  In the homicide trial, yes.

15            MR. STAINTHORP:  Homicide trial.

16            THE COURT:  And this is reflective of what Exhibit

17   here in this trial?

18            MR. STAINTHORP:  It's actually an addition I just made

19   to Plaintiff's Exhibit -- it's an additional portion of the

20   transcript.  That wasn't in the original Exhibit, but

21   Mr. Smokowicz has agreed that that -- that it was in fact

22   admitted at the criminal trial.

23            THE COURT:  Okay.

24            MR. STAINTHORP:  And we are agreeable to that

25   stipulation.

```
1    Q.  Now, in fact, in terms of that interview on the 24th of

2    March, you really have no present recollection of that, do you?

3    Correct?

4    A.  No.

5    Q.  You don't have any?

6    A.  Only from what I can gather from the reports and reviewing

7    them.

8    Q.  So if it's in the reports, you just know it's in the

9    reports.  But other than that, you have no recollection?

10   A.  No, I'm afraid not.

11   Q.  Okay.

12           MR. STAINTHORP:  Judge, that's all I have.

13           THE COURT:  Clarification, Mr. Smokowicz?

14           MR. SMOKOWICZ:  Your Honor, I think with agreement of

15   Plaintiff's counsel here --

16           THE COURT:  Put your case in also?

17           MR. SMOKOWICZ:  Put the case in as to this witness,

18   since he is no longer with the Department and lives a distance

19   away.

20           THE COURT:  Okay.  Go ahead.

21                    CROSS EXAMINATION

22   BY MR. SMOKOWICZ:

23   Q.  Thank you very much, Your Honor.  Good afternoon,

24   Mr. Phillips.

25   A.  Good afternoon.
```

```
 1   Q.  Where were you born?

 2   A.  City of Milwaukee.

 3   Q.  And where did you grow up?

 4   A.  Milwaukee.

 5   Q.  And did you graduate from high school?

 6   A.  Yes.

 7   Q.  Where did you graduate from high school?

 8   A.  Riverside High School.

 9   Q.  What year did you graduate?

10   A.  1968.

11   Q.  And after high school did you go to any -- have any formal

12   education beyond that?

13   A.  Yes.  I attended night school, college night school, out in

14   California for a couple of years, and then returned to Milwaukee

15   and attended UW-Milwaukee.

16   Q.  Did you obtain a degree from U.W.M.?

17   A.  Yes, I did.

18   Q.  And when did you obtain that degree?

19   A.  Some 7 years later.

20   Q.  So my math is off there.  So '73?

21   A.  '73, '75, somewhere in that area.

22   Q.  And what was your degree in from U.W.M.?

23   A.  I wanted to have an English degree, but I had earned too

24   many credits so they bumped me out and said here's your Bachelor

25   of Arts degree.
```

1   Q.  Any military service?

2   A.  I'm sorry?

3   Q.  Any military service?

4   A.  No, sir.

5   Q.  When you were in California, were you working out there?

6   A.  Yes.

7   Q.  What kind of job did you have out in California?

8   A.  I worked in a plant nursery as a foreman.  I worked in a

9   corrugated box factory.  I managed apartments.  I did almost

10  anything I could get my hands on.  Jobs were few and far between

11  at the time.

12  Q.  What about after you graduated from Riverside, before you

13  went out to California?  Did you work here at all?

14  A.  I worked for Grede Foundries.  I worked for the auto

15  industry here in Milwaukee.  I worked for the Milwaukee Journal

16  as a paper carrier.  Quite a few jobs, actually, through high

17  school.

18  Q.  And after you returned to Milwaukee from California, you

19  went to U.W.M.  Were you going to work at all during that time?

20  A.  Yes.  I worked managing large apartment complexes, and I

21  also had worked for the Red Lobster Restaurants as a manager,

22  and had also worked as a waiter, working my way through college

23  at a steakhouse.

24  Q.  Now, after you graduated from U.W.M., did you look for

25  employment?

1    A.   Yes.

2    Q.   And where did you end up working after U.W.M.?

3    A.   After U.W.M. it was for actually the Red Lobster Restaurant

4    chain, and I worked there for several years.

5    Q.   And then after that?

6    A.   My then wife saw an ad in the paper for Police Officer in

7    the -- for the City of Milwaukee.  And at the time we didn't

8    have any health insurance, and she motivated me to check into

9    the job.

10   Q.   So you applied to become a Milwaukee Police Officer?

11   A.   Correct.

12   Q.   And what year did you -- were you accepted into the Police

13   Department?

14   A.   I was accepted in I believe it was '89, but it took two

15   years before there was a slot available in the Police Academy.

16   Q.   So you started in the Police Academy in what year?  1991?

17   A.   Correct.

18   Q.   Now, who runs the Police Academy?  Is that the Milwaukee

19   Police Department?  Or somebody else?

20   A.   The Milwaukee Police Department runs it, yes.

21   Q.   So everybody who works for the Milwaukee Police Department,

22   do they go through that academy, basically?

23   A.   Yes.

24   Q.   And how long is the Academy training, roughly?  Back then in

25   '91?

1    A.  I want to say it was about 5 to 6 months.  I think they've

2    extended it since then, but I want to say 6 months.

3    Q.  After you graduated from the Academy, what rank did you

4    have?

5    A.  Police Officer.

6    Q.  And where were you assigned as a Police Officer?

7    A.  District Number 5 at 4th and Locust.

8    Q.  And what were your duties as a Police Officer?

9    A.  As a rookie Officer we were assigned to various squads with

10   no permanent partner.  We were the fill-in Officers.  We

11   performed duties such as station security, in which you would

12   patrol the perimeter of the actual District Station.  And

13   other -- whatever other duties that might be assigned to us by

14   the Captain or Lieutenant or Sergeants.

15   Q.  And how long did you remain at District 5?

16   A.  I was there for the entire time that I worked in uniform.

17   From '91 until 2001, 2002.

18   Q.  And what happened in 2001 or 2002?

19   A.  I had taken a series of examinations, and passed them, and

20   was promoted to the rank of Detective.

21   Q.  So you became a Detective in 2001, 2002 roughly?

22   A.  Yes, sir.

23   Q.  Once you became a Detective, is there any -- describe for

24   the jury, please, if you would, what your responsibilities as a

25   Detective were?

1  A.  Once promoted I was assigned to the Police Administration

2  Building down at 749 West State Street.  At that location I was

3  eventually placed in the Robbery Unit of the Milwaukee Police

4  Department Detective Bureau, and worked that assignment for

5  several years prior to accepting the assignment for homicide

6  Detective.

7  Q.  And when were you assigned in the homicide -- as a homicide

8  Detective?

9  A.  I want to say 1995.

10  Q.  And when you were assigned to the homicide Detective, did

11  you have a partner?

12  A.  Yes, I did.

13  Q.  Who was your regular partner?

14  A.  My first regular partner was Dave Orley, O-R-L-E-Y.

15  Q.  And did you have any other regular partners when you were a

16  homicide Detective?

17  A.  Yes.

18  Q.  Who were they?

19  A.  Detective James DeValkenaere.

20  Q.  And when was he your regular partner?  For what time?  Do

21  you remember?

22  A.  For the next 5, 6 years.

23  Q.  And that takes us to what?  I've lost my math now.

24  A.  It would take us right up until 2005, late 2005, early 2006.

25  And then I transferred from the Homicide Unit to the Background

1   Investigation Unit.

2   Q.  And why did you do that?

3   A.  Family pressures.  The Background Investigation Unit was a

4   Monday through Friday job, from 8 o'clock in the morning until 4

5   o'clock in the afternoon.  I had weekends off.  I had two small

6   children.

7   Q.  And how long did you remain in the Background Unit?

8   A.  Until I retired in 2007.  I retired on a Friday, and

9   returned as a civilian investigator for the Background

10  Investigation Unit the following Monday.

11  Q.  And so how long did you work as a civilian investigator?

12  A.  Total I think it came to about 27-and-a-half years.

13  Q.  I'm sorry.  When did you finally leave as an investigator?

14  Do you know?  2009?

15  A.  2008, 2009, yes.

16  Q.  And so what's your current status in terms of the City of

17  Milwaukee?

18  A.  I'm retired.

19  Q.  Do you live in the Milwaukee area?  Or some distance away?

20  I'm not going to ask you where you live exactly.

21  A.  I live in north central Wisconsin.

22  Q.  Now, you've been asked some questions about two interview

23  sessions that you had involving William Avery.  And the first

24  one, as I understand it, was on March 23rd, is that right, with

25  Detective DeValkenaere?

1    A.   Correct.

2    Q.   Now, I recognize you indicated that you don't have a

3    particular memory of either of these interviews, correct?   Is

4    that true?

5    A.   No.

6    Q.   However, if someone were to say, for example, that in the

7    first interview Mr. Avery was handcuffed to the ceiling, would

8    that have ever happened?

9    A.   No.

10   Q.   Can you describe for the jury a little bit how those

11   interviews -- how interviews occur in the Criminal Investigation

12   Bureau in terms of people who are witnesses?

13   A.   Certainly.   Typically the subject that we're going to

14   interview is in the City Jail, which is one floor above us on

15   the fifth floor of the Police Administration Building.   We are

16   assigned by a Lieutenant who's -- runs the and supervises the

17   Homicide Unit.   We are assigned by him to conduct the interview

18   and/or interrogation.   We then proceed to the City Jail, process

19   the subject out of the jail, and bring him down to the fourth

20   floor.

21           There are specific rooms that are set aside for these

22   interviews.   They're cinder block walls painted -- last time I

23   was there they were painted baby blue.   They have linoleum

24   floors.   There's a table and typically four chairs inside of

25   each room.   During the supervision between the jail and the

1  interrogation rooms the subject is handcuffed.  Once he is taken

2  into the interrogation room or interview room, the handcuffs are

3  removed.  He's offered a seat.  Typically he's offered --

4  immediately offered a glass of water, or a cup of water, or cup

5  of coffee.  And we also determine whether he has any bathroom

6  needs.

7  Q.  While he's seated in the interrogation room, would he be

8  handcuffed in that room?

9  A.  No.

10  Q.  Why wouldn't he be handcuffed?  Or she be handcuffed in that

11  room?

12  A.  Just as a matter of discomfort.  And besides which, it's a

13  very secure area, so Officers, Detectives, are not in any kind

14  of serious jeopardy from a subject being interviewed.

15  Q.  Is the room locked?

16  A.  Yes, it can be.

17  Q.  And typically would you -- when you did interviews, would

18  you have it locked or not?

19  A.  Yes.

20  Q.  And how would it be locked?  From the inside?  Outside?  How

21  does that work?

22  A.  It is locked from the outside, and a subject inside the room

23  cannot open it.

24  Q.  How would you be able to get out of the room, then?

25  A.  Knock.

1    Q.   And someone would have to let you out?

2    A.   Correct.

3    Q.   What about firearms when you're in there and interviewing

4    somebody?  Would you have firearms?

5    A.   No.

6    Q.   What would happen to the firearms?

7    A.   Our firearms would be placed in a lock box down in --

8    provided to us down on the fourth floor outside the

9    interrogation rooms.  You would place your weapon inside that

10   lock box, close it, and then it would have one key that you

11   would retain until you went to retrieve your gun.

12   Q.   A lot of us have seen T.V. shows where there's a one way

13   mirror or anything like that.  What about that in these

14   interrogation rooms?  Would there be that sort of thing?

15   A.   No.  We did not have that kind of structure in our

16   interrogation rooms.

17   Q.   How big was the -- would the room be, roughly?

18   A.   They varied in size.  Some were bigger than others.  But

19   typically 6 by 8.  Not much bigger than that.

20   Q.   So getting back to this -- one more thing.  I'm going to

21   show you the first page of what was marked as Exhibit 11-A by

22   the Plaintiffs.  And that's the report -- the initial interview

23   by you and Detective DeValkenaere on March 23rd.  At least

24   that's the first page of it.  And it indicates in the second

25   paragraph that Detective DeValkenaere along with you was advised

1    by the Lieutenant that an individual being sought regarding the

2    death of Maryetta Griffin had come in to C.I.B.  The individual

3    is identified as William D. Avery.  And the question I have is

4    in that situation, would this person even be brought into the

5    room from C.I.B.?  I mean from the jail, as you have mentioned

6    before?  Or is it just comes in and --

7    A.  I don't have any independent recollection other than what

8    the report says.  My thinking, though, is he may have been up at

9    our City Jail and that we were directed to go up and get him

10   from there.

11   Q.  Okay.  In any case, do you have any recollection -- I know

12   you don't have any particular recollection of this incident,

13   but -- or this interview, but if in this interview you had

14   pushed your hand against Mr. Avery's chest, would you remember

15   doing something like that?

16   A.  Oh, yeah.

17   Q.  Why is that?

18   A.  Because that would have meant that he was doing something --

19   representing some kind of threat towards me, and that I needed

20   to defend myself.

21   Q.  Other than that kind of situation, in your collective

22   experience with witnesses, would you have just simply shoved

23   them or pushed them for emphasis to try to get them to answer

24   questions a particular way?

25   A.  No, sir.

268

1   Q.  Would you have ever placed a cigarette lighter under their
2   chin or near their face and threatened them in any fashion with
3   that?
4   A.  No, sir.  I might have lit a cigarette for them, but not
5   pointing to light the cigarette.  Not to make any type of threat
6   with a lighter.
7   Q.  Now, show you that same report by Detective DeValkenaere.
8   Says above that white space Avery stated that he had no idea who
9   was responsible for her death or where this would have occurred.
10  I realize you did not prepare this report, but you don't -- do
11  you have any memory inconsistent with that in that first
12  interview?
13  A.  No.  No.
14  Q.  You have no reason as you sit here today that that isn't a
15  truthful statement.  That Avery at that time told you and
16  Detective DeValkenaere that he had no idea who was responsible
17  for the death of Maryetta Griffin?
18  A.  No.
19  Q.  Or where that would have occurred?
20  A.  No.
21  Q.  And just as with that written statement that we've been
22  asked about before, from the next interview -- we'll get to that
23  in a minute -- reports such as this would have been provided to
24  the prosecutor, correct?
25  A.  Correct.  The reports generated in a homicide investigation

1  go into a separate file which is commonly referred to as an

2  M-file.  And all of those reports are provided to the prosecutor

3  and then ultimately to the defense attorneys.

4  Q.  Now, you were asked some questions this morning about

5  hypotheticals.  And if I recall, you have no memory of any

6  hypothetical being supplied to Mr. Avery in either this

7  interview or the one conducted by Detective Hernandez, correct?

8  A.  By either -- either one.  Either Hernandez or DeValkenaere.

9  Q.  By the way, since this report is prepared by Detective

10  DeValkenaere, as to the first interview on March 23, who would

11  have been questioning Mr. Avery in that interview?

12  A.  Detective DeValkenaere.

13  Q.  And you?  What would you have been doing?

14  A.  Basically there to witness what was said and to corroborate

15  that information.

16  Q.  Let's talk about hypotheticals a little bit more.  What I'm

17  putting on the screen here is the handwritten statement from the

18  next day when Detective Hernandez and you --

19  A.  -- yes, sir --

20  Q.  -- interviewed Mr. Avery, correct?

21  A.  Correct.

22  Q.  And if I go down where my finger is here, subject states

23  that Mercedes sat at the table.  Started to smoke her dope.

24  Subject states that he was laying on the couch.  Fell asleep.

25  Subject states that he was awoken by Mercedes going into his

1    pockets pulling out his money.  Subject states that he was

2    startled.  Subject states that he got up on his feet and grabbed

3    one of the -- one of victim's hands.  Subject states that

4    Mercedes and him started to fight.  Subject states that he was

5    saying what are you doing?  Subject states that Mercedes pulled

6    and ran toward the stairs, attempting to get away.  Subject

7    states he didn't remember what happened.  I will stop right

8    there for a moment.  Those details that we've just read, are

9    those the kind of details that would all be put forth in a

10   hypothetical?

11   A.  No.

12   Q.  So these would be not -- these kind of details would not

13   come from an Officer in an interview?

14            MR. STAINTHORP:  Judge, I object to the leading on

15   direct examination.

16            MR. SMOKOWICZ:  I'll rephrase the question.

17            THE COURT:  All right.  Rephrase.

18            MR. SMOKOWICZ:

19   Q.  Would those kinds of details come from an Officer in an

20   interview?

21   A.  No.

22   Q.  Have you had a chance to review the report from Detective

23   DeValkenaere on the first interview on March 23rd?

24   A.  Yes, sir.

25   Q.  And do you have any reason to believe that that report is

1  inaccurate in any of the details of that interview?

2  A.  No, sir.

3  Q.  As a Detective is it your job to decide issues of

4  credibility?

5  A.  No.

6  Q.  What is your job in terms of suspects?  Or witnesses, for

7  that matter?

8  A.  To conduct a proper investigation and to search for the

9  truth.

10 Q.  Do you have a sense of who beyond that, once you file a

11 report, makes a decision about whether or not that person's

12 credible?

13 A.  Well, our system is set up with checks and balances.  And

14 one of the checks for Police investigations is the District

15 Attorney's Office.  They review what we do and make a

16 determination whether charges should be brought against any

17 individual.

18 Q.  Was it up to you to interview -- I mean -- strike that.  Was

19 it up to you, Detective, to interview William Avery?

20 A.  No.

21 Q.  Before you had that first interview with William Avery, had

22 you ever met him, to the best of your knowledge?

23 A.  No.

24 Q.  Did you have knowledge of him before then?

25 A.  No.

1    Q.  Did you have any reason to want to get him?

2    A.  Absolutely not.

3    Q.  Did you have any reason to want to get him, as opposed to

4    Lorenzo Frost?

5    A.  No, sir.

6    Q.  At the time of these interviews, had you ever heard of

7    anybody talk about Walter Ellis being at that scene?

8    A.  Sorry, no.

9    Q.  Or somehow being involved in this matter?

10   A.  No.

11   Q.  Or anybody having contact with Walter Ellis in that area on

12   February 16th or 17th where Maryetta Griffin would have also

13   been present?

14   A.  No information came up regarding a name of Walter Ellis in

15   any of our reports, or any of the M-file investigation for

16   Maryetta Griffin.

17          MR. SMOKOWICZ:  Your Honor, I don't seem to see

18   Exhibit 1010 up here.

19          MR. STAINTHORP:  I apologize.

20          MR. SMOKOWICZ:  Thank you.  Happens all the time.

21   Q.  Mr. Phillips, you were shown an Exhibit 1010, a report from

22   Detective Barbian-Gayan and Detective DeValkenaere of their

23   interview on February 18th?

24   A.  Yes, sir.

25   Q.  And a man named Lonnie Bradley?

1    A.  Yes, sir.

2    Q.  And there's some reference in there to Mr. Bradley having --

3    Mr. Bradley and perhaps two other people having knowledge of a

4    body at 8 o'clock in the morning?

5    A.  That's the information that the report appeared to indicate,

6    yes.

7    Q.  Now, the report -- the first page of it there is on the

8    screen.  And what's Mr. Bradley's address as reflected there?

9    A.  129 West Townsend.

10   Q.  However, there is a -- there is a different location for

11   that interview, right?

12   A.  Correct.

13   Q.  What's the location of the interview?

14   A.  624 West Chambers.

15   Q.  Okay.  So that's about 6th Street and Chambers?

16   A.  Correct.

17   Q.  If this body was found at 3032 North 7th, do you know how

18   far away that is, approximately?  Well, let me ask you this.

19   First of all, 6th Street is only one block away from 7th Street,

20   correct?

21   A.  Correct.

22   Q.  And if somebody is at a dope house at 2474 North Palmer, the

23   27 -- that's the 2700 block, is that right?

24   A.  Correct.

25   Q.  So that's 27th Street, right?

1    A.  Correct.

2    Q.  Now, your review of this report indicated that Mr. Bradley

3    knew about the body early that morning?

4              THE COURT:  Wait.  Let me just clarify something.  Did

5    you say the 2700 block of Palmer is 27th Street?

6              MR. SMOKOWICZ:  I'm sorry.  I did.  2700 block North

7    Palmer.

8              THE COURT:  2700.  That's quite a bit of difference.

9              MR. SMOKOWICZ:  Yes.  I apologize.

10   Q.  In any event, this report reflects that Lonnie Bradley knew

11   about the body?

12   A.  Not on that page.

13   Q.  Why don't I give you a chance to take a look at that?

14   A.  The report indicates that he refused to go look at the body.

15   He was directed by a female by the name of Dolores to go do so,

16   but he declined.

17   Q.  Okay.  But in any event, he appears to know about a body?

18   A.  Correct.

19   Q.  At 8:00 a.m.?

20   A.  Correct.

21   Q.  Is the location for that body listed in this report?

22   A.  No.

23   Q.  Even if we assume that it's the same body, Maryetta

24   Griffin's, there's also an indication obviously from this that a

25   woman named Dolores knew about the body, right?

```
1    A.   Correct.
2    Q.   Is there any indication that anybody else knew about it at
3    that point?
4    A.   Just information about another black female by the name of
5    Tina Johnson.
6    Q.   But not necessarily that Tina knew about it?
7    A.   Not necessarily that Tina Johnson knew about the body.
8    Q.   Just because these two people knew about a body at a
9    particular location -- strike that.  Do you know when Police
10   discovered the body that day?
11   A.   I believe it was at 11:00 a.m.
12   Q.   Okay.  So it would be potentially suspicious if somebody
13   knows about the body before 11:00 a.m., which would explain why
14   the Officers asked about -- strike that.  Did the Officers in
15   this report ask for the whereabouts of Mr. Bradley that night?
16   A.   Yes.  They asked him where he was at.  He indicated over on
17   Townsend.  Over in the area of Townsend.  And that's when he met
18   Dolores, who was trying to get him to proceed to where the body
19   was located.
20   Q.   Would there be a reason to ask about that, other than how he
21   got the information?  Such as whether he was involved or not?
22             MR. STAINTHORP:  I object.  This is really asking him
23   to speculate.
24             THE COURT:  Yeah.  And I think it's been pretty much
25   covered, so the Court will sustain the objection.
```

1          MR. SMOKOWICZ:

2    Q.   Okay.  If someone knows about a dead body before the Police

3    discover it, is that some reason, some cause for you to be

4    suspicious?

5    A.   Certainly be concerned to find out how they knew about it.

6    Q.   Now, lastly, you were asked about some questioning by

7    Detectives -- or Detective Hernandez and Hein of Valerie

8    Eubanks, and a report that she suspected a theft by Mercedes, or

9    Maryetta Griffin?

10   A.   Correct.

11   Q.   Is that consistent or inconsistent with a statement that was

12   written out by Detective Hernandez on the 24th in which

13   Mr. Avery said to you -- to the two of you that this fight

14   started after she attempted to steal from him?

15   A.   It's not inconsistent with what was said.

16   Q.   This handwritten statement Exhibit 1030, does that represent

17   any attempt by you to frame William Avery?

18   A.   Absolutely not.

19   Q.   Does that represent any attempt by Detective Hernandez to

20   frame William Avery?

21   A.   Absolutely not.

22   Q.   If Detective Hernandez would have simply written out a

23   statement like that and tried to frame Mr. Avery, would you have

24   tolerated that?

25   A.   Absolutely not.  No, that is not the way the Milwaukee

1    Police Department conducts its business.

2    Q.  You would have stopped that kind of thing, wouldn't you?

3    A.  Absolutely, sir.

4    Q.  In this statement Mr. Avery says he doesn't know how it

5    was -- how he did it.  How he killed her, right?

6    A.  Correct.

7    Q.  He doesn't -- does he say in there that he choked her?

8    A.  No.

9    Q.  Does he say in that there that he strangled her?

10   A.  No.

11   Q.  Does he say in there that her neck was broken when she fell

12   down the stairs?

13   A.  No.

14   Q.  In your experience does the newspaper sometimes get things

15   wrong when they try to report on Police reports?

16   A.  Yes, they do.

17          MR. SMOKOWICZ:  Thank you.  That's all I have.

18          MR. STAINTHORP:  Judge, briefly.

19          THE COURT:  Sure.  Go ahead, Mr. Stainthorp.

20                    **REDIRECT EXAMINATION**

21   **BY MR. STAINTHORP:**

22   Q.  With respect to Exhibit 1010, which is the Police report

23   authored on February the 18th of 1998, by Detectives including

24   Detective DeValkenaere, your counsel was suggesting that this

25   might not even be in relation to the body of Ms. Griffin, is

1  that correct?  Is that what you understood?

2  A.  Not -- I don't understand your question, sir.

3  Q.  Okay.  I understood your counsel to be asking you questions

4  suggesting that this report might not even be in relation to Ms.

5  Griffin's body.  Was that your understanding of his suggestion?

6         MR. SMOKOWICZ:  Your Honor, I'm going to object to the

7  form of the question.  Misstates the questions previously asked.

8  Also misstates the testimony.

9         THE COURT:  Well, I don't think the witness can answer

10  what was in the mind of his attorney.  He can answer what was in

11  his mind.

12         MR. STAINTHORP:

13  Q.  Okay.  Did you understand your attorney to be suggesting to

14  you that this report might not even be in relationship to the

15  body of Ms. Griffin?

16  A.  May I review the last page of it?

17  Q.  You can review the whole thing.  Sure.

18  A.  It's suggestive of the finding of Maryetta Griffin's body.

19  Q.  Okay.  And if I could have you look at the first page of

20  this report, it specifically says it's in reference to Maryetta

21  Griffin, doesn't it?

22  A.  Yes.

23  Q.  So there's no question this report is in relationship to the

24  finding of the body of Maryetta Griffin, correct?

25  A.  Doesn't appear so, no.

```
 1   Q.  You don't think this is in relationship to Maryetta Griffin?
 2   A.  That's not what I said, sir.  What I'm saying is this
 3   appears to be tied into the Maryetta Griffin homicide; however,
 4   the witnesses that are being interviewed didn't know that it was
 5   Maryetta Griffin's body, and so they were not talking in those
 6   kinds of specific terms.
 7   Q.  They were talking about a body being found by 8 o'clock in
 8   the morning at 3032 North 7th Street.
 9            MR. SMOKOWICZ:  Well, I'm going to object to that,
10   Your Honor, unless there is a statement in here that directly
11   says that from the witnesses.
12            MR. STAINTHORP:  Judge I don't appreciate these
13   talking objections from counsel.
14            MR. SMOKOWICZ:  I apologize.  I object to the form of
15   the question.  Misstates the report.
16            THE COURT:  Well --
17            MR. STAINTHORP:  I can go at it again, Judge.
18            THE COURT:  Go ahead.
19            MR. STAINTHORP:
20   Q.  Let's look at the top of this report, all right?  And it has
21   an incident.  Homicide.  Do you see that?
22   A.  Yes, sir.
23   Q.  Victim, Maryetta Griffin.  Do you see that?
24   A.  Correct.
25   Q.  Location of incident.  Do you see that?
```

1   A.  Yes, sir.

2   Q.  What's that address?

3   A.  3032 North 7th Street.

4   Q.  Okay.  And if this is in relation to the finding of the body

5   at 3032 North 7th Street, it would refer to the location where

6   the body was found, right?

7   A.  It's reference to it, but there's nothing in the body of

8   this report or the persons that were interviewed that tie

9   Maryetta Griffin, that specific name, to that specific address,

10  sir.

11  Q.  Okay.  So you think that people who file a report in the

12  Maryetta Griffin case would file a report about a completely

13  different body?

14  A.  No, sir.

15  Q.  This is the Maryetta Griffin body, isn't it?

16  A.  Yes, it is.  What I'm --

17  Q.  Okay.  That's fine.  Thank you.  And the address at which

18  Mr. Bradley is located is 624 West Chambers, correct?

19  A.  Correct.

20  Q.  And you know that the street orientation in Milwaukee is

21  that 624 would be between 6th and 7th Street, correct?

22  A.  Correct.

23  Q.  And so 624 would be to the east of 7th Street, correct?

24  A.  Yes.

25  Q.  All right.  And you know based on your knowledge of

1  Milwaukee geography, that Chambers Street is at 3000 north.  You

2  know that, right?

3  A.  Correct.

4  Q.  So this location where they're interviewing these --

5  Mr. Bradley about finding the body, is on the block immediately

6  to the south of where the body was found, correct?

7  A.  Correct.

8  Q.  And, in fact, that house that they're referring to, 624 West

9  Chambers, that house is right on the corner of the alley of --

10  between 6th and 7th Street -- I'm sorry -- yes.  Between 6th and

11  7th Street, at 3000 north, correct?

12  A.  About a block or more away.

13  Q.  You think that's a block away?  How is it a block away?  If

14  Chambers is 3000 north, and the body is found at 3032?

15  A.  Locust is 2900 North, so Chambers is below -- Chambers is

16  below Locust Avenue.  Or Locust Street, I mean.  And so it would

17  be actually several blocks away.

18  Q.  Okay.  So your recollection of the geography of Milwaukee is

19  that Chambers is not 3000 north.  Is that your recollection now?

20  A.  Maybe I have it confused with a different street.

21  Q.  I think you do, sir.  I think you do.

22  A.  I think that's possibly true.

23  Q.  Okay.  So then Chambers -- this address on Chambers would be

24  right at the alley between 6th and 7th Street, about 3000 north.

25  So a few feet from the garage where the body was found, correct?

1  A.  I couldn't say a few feet, but it's closer than I indicated

2  being a block away.  That's true.

3  Q.  All right.  It's certainly in the area where people would be

4  expected, if there was a body there, to know that it was there.

5  Correct?

6  A.  Yes.  And the woman in the report named Dolores seems to be

7  pointing that to Mr. -- his name is Bradley, I believe.

8  Q.  Okay.

9  A.  Pointing in that direction.

10  Q.  All right.  So, in fact, based on this report there is no

11  question that at least three people in the neighborhood were

12  aware of reports of a body by 8 o'clock in the morning?

13  A.  I don't believe that's what the report reflects, sir.  What

14  they're doing his talking about a body being in that vicinity

15  there.  None of them had observed the body, according to the

16  report.

17  Q.  Oh, I see.  So you think that this report, this official

18  Police report, was written about people talking about a body

19  being there, even though a body wasn't there.  Is that your

20  testimony?

21  A.  No, sir.

22  Q.  Now, you're certainly aware that for several people -- or

23  that a number of people, even if they were to see a body, would

24  not be reporting to the Police?

25  A.  That's a possibility, yes.

1  Q.  And for any number of reasons that could be true?

2  A.  Any number of reasons, correct.

3  Q.  All right.  They don't want to have involvement with the

4  Police.  Perhaps they're in some trouble.  Any number of

5  reasons.

6  A.  Correct.

7  Q.  All right.  So in fact the people in the neighborhood may

8  know about the existence of a body in a garage before the Police

9  do?

10  A.  Of course.  Yes.

11  Q.  Now, you talked briefly to your attorney about the Police

12  reports.  And that you fill out in general as a Police Officer.

13  And you not deciding issues of credibility.  Do you remember

14  that?

15  A.  Correct.

16  Q.  All right.  If, in fact, you have a question about the

17  credibility or reliability of information that you have gathered

18  in the course of your Police work, you have an obligation to

19  record that in the Police report, don't you?

20  A.  Report my opinion as to whether they're credible or not?

21  Q.  Yes.

22  A.  No.

23  Q.  If someone gives you information and you --

24  A.  No, sir.

25  Q.  So you're saying if you get information, even if you

1  consider that information highly unreliable, you can put it in a
2  Police report, and you don't have to record that that
3  information appears unreliable?
4  A.  One of the first points of training I received for filing
5  Police reports was not to put my opinion in it.
6  Q.  Okay.  If someone gives you some information, and it appears
7  to you that that information is not reliable, you would just go
8  ahead and put it in the Police report without any reference to
9  its apparent unreliability, correct?
10 A.  I could reference it to information, evidence, other
11 witnesses that indicated that it was perhaps unreliable, then.
12 But to put my opinion as to whether it was reliable or not?
13 Absolutely not.
14 Q.  If you had -- if you got information that appeared to you
15 that that information should not be relied upon, would you go
16 ahead and put it in a Police report without any warning to the
17 reader of that Police report that this information might not be
18 reliable.  Is that correct?
19 A.  What I would likely do in that particular situation that
20 you're talking about is take that to my supervisor.  Explain to
21 him the circumstances, and the witness that I had interviewed.
22 Explain to him that at this point I can neither corroborate nor
23 deny the reliability of this information.  He would then -- if I
24 was unavailable to do it -- assign another Detective to go in
25 and determine that reliability.

```
 1   Q.  Okay.  And that would -- that would depend upon you taking
 2   the initiative to go to a supervisor and report that although
 3   you got this information, it appeared to you that it might be
 4   unreliable.  Correct?
 5   A.  Correct.
 6   Q.  You never did that in the William Avery case, did you?
 7   A.  Did I what?
 8   Q.  You never went to a supervisor in this case and told the
 9   supervisor I got this information, but I believe it may be
10   unreliable.
11   A.  No.
12             MR. STAINTHORP:  That's all I have.
13             THE COURT:  Any other questions?
14             MR. SMOKOWICZ:  No, Your Honor.
15             THE COURT:  All right.  You may step down,
16   Mr. Phillips.  Thank you.  Watch your step, please.  We'll take
17   a break.  Afternoon break, ladies and gentlemen.  Don't discuss
18   the case.  We'll see you back here after the break.
19             (Whereupon the jury was excused at 3:08 p.m.)
20             THE COURT:  Okay.  We'll take about 15.
21             (Whereupon a recess was called by the Court.  Upon
22   conclusion of the recess, the proceedings continued as when the
23   jury was returned to the courtroom at 3:27 p.m.:)
24             THE COURT:  The next witness, Mr. Stainthorp?
25             MR. ELSON:  Yes.  The Plaintiff calls Officer
```

1  DeValkenaere.

2          **JAMES DEVALKENAERE**, called as a witness, having been

3  first duly sworn, on oath testified as follows:

4          THE CLERK:  Please state your full name and spell your

5  last name for the record.

6          THE WITNESS:  James Daniel DeValkenaere,

7  D-E-V-A-L-K-E-N-A-E-R-E.

8                    **DIRECT EXAMINATION**

9  BY MR. STAINTHORP:

10 Q.  Good afternoon.  You were at one point a Milwaukee Police

11 Officer, correct?

12 A.  That's right.

13 Q.  Are you still a Milwaukee Police Officer?

14 A.  No, I'm not.

15 Q.  Okay.  Can you tell us when you became a Milwaukee Police

16 Officer?

17 A.  1976.

18 Q.  And at that point you were a Patrol Officer is that correct?

19 A.  Yes.  I was a recruit Officer in '76.  After completing the

20 academy, I was a Patrol Officer.

21 Q.  And for how long did you remain a Patrol Officer?

22 A.  Until 1991.

23 Q.  And then in 1991 were you promoted?

24 A.  Yes, I was.

25 Q.  And was that to Detective?

1  A.  Yes.  Yes.

2  Q.  Okay.  And at that point in the Milwaukee Police Department

3  were there different types of Detectives?  For instance,

4  homicide, robbery, rape, or --

5  A.  Those were different assignments.

6  Q.  Okay.  And when you became a Detective in 1991, what was

7  your assignment?

8  A.  I was initially assigned to violent crimes.

9  Q.  And for how long did you have that assignment?

10  A.  Only for a couple months.

11  Q.  And what was your next assignment?

12  A.  Homicide.

13  Q.  So probably still in 1991 you became a homicide Detective?

14  A.  Yes.

15  Q.  And for how long did you remain a homicide Detective?

16  A.  For the remainder of my time with the Police Department.

17  Q.  And when did your time in the Police Department end?

18  A.  In 2001.

19  Q.  I'm sorry?  I missed that.

20  A.  2001.

21  Q.  Now, back in 1998, do you recall that you were assigned to

22  the investigation of the homicide of Maryetta Griffin?

23  A.  I recall that because of the discussion I've heard and the

24  reports I reviewed.  I don't have an independent recollection of

25  that investigation.

1    Q.   Showing you -- not offering it into evidence at this

2    point -- what has been marked as Defendant's Exhibit 1009.  Can

3    you just take a look at that.  And I just want to ask you

4    generally, is that a form of report that as a Milwaukee homicide

5    Detective you would complete?

6    A.   Yes, it is.

7    Q.   And does that in fact indicate on the first page that it is

8    a report authored by you?

9    A.   Yes, it does.

10   Q.   Have you had occasion to review that report recently?

11   A.   No.

12   Q.   Okay.  If you just review the initial portion of that, does

13   that indicate that you were assigned on February the 17th, 1998,

14   to the location of 3032 North 7th Street to assist in the

15   investigation of the homicide of Maryetta Griffin?

16   A.   Yes.

17   Q.   Okay.  And recall -- or were you at that point familiar with

18   that area of Milwaukee?

19   A.   Yes.

20   Q.   And would it be fair to say that at that time back in 1998

21   that area of Milwaukee was -- had a lot of issues with drug

22   dealing?  Is that fair to say?

23   A.   I'm trying to recollect if in that particular neighborhood

24   there were any problems.  I can't -- I would say in the

25   vicinity, near vicinity there may have been.  But in that area

1    of 3032 North 7th, 7th and Burleigh, 7th and Chambers, I don't

2    have any information about any specific activity there.

3    Q.  Okay.  Well, do you recall if there was issues with drug

4    dealing in the neighborhood?  I'm sorry.  I just asked that.

5    With prostitution in the neighborhood?

6    A.  Like I say, in the areas adjacent I believe there were.  But

7    that's a primarily residential area, and I'm not aware of any

8    particular issues in that -- on that street.

9    Q.  The report that you have in front of you, that is the type

10   of report that you would complete if you were assigned to do an

11   initial investigation of a body being found, correct?

12   A.  This would be the report I would file regarding the scene

13   investigation where a body was found.

14   Q.  Okay.  And that's the term I was looking for.  So

15   essentially you were doing the scene investigation?

16   A.  Yes, sir.

17   Q.  Okay.  And that would be going to the scene where the body

18   was found, and looking at the scene, and finding any potential

19   witnesses who might have some information?

20   A.  No, I would not be looking for witnesses.  What I would be

21   doing is going to the scene, ensuring that the scene is properly

22   secure, and that anything of an evidentiary nature is taken care

23   of.  Detailing how the victim was found, where the victim was

24   found, that sort of thing.  The supervisor responding to that

25   scene, he would detail other Officers to do a neighborhood

1   search.  Look for witnesses in the area, that sort of thing.

2   Q.  All right.  And -- okay.  That's fine.  Thank you.  But just

3   to make sure, you in fact have no actual recollection of doing

4   that, is that fair?

5   A.  Of doing the scene --

6   Q.  Yes.

7   A.  No, I do not.

8   Q.  Okay.  Now, we've marked and entered into evidence Exhibit

9   1010.  So I'm just going to put this up on the screen here.  And

10  can you see that report?

11  A.  Yes.

12  Q.  All right.  And does that indicate that it's a report of an

13  investigation conducted by you together with Detective

14  Barbian-Gayan?

15  A.  Yes, it does.

16  Q.  Is that a report that you've had occasion to review

17  recently?

18  A.  I had occasion to hear it talked about in Court.

19  Q.  I missed that.  What you said.

20  A.  You were just discussing this while I was sitting in the

21  Court.

22  Q.  So you were sitting in the courtroom while I was talking to

23  Detective Johnson about it, correct?

24  A.  Detective Phillips.

25  Q.  Excuse me.  I'm sorry.  Detective Phillips.  Okay.  And did

1  that refresh your recollection that you had, in fact, been

2  involved in this aspect of the investigation where you'd gone to

3  the scene on the following day, which was February the 18th, and

4  had obtained information about when the body was first found?

5  A.  It doesn't refresh my recollection.  If it's detailed in the

6  report, I believe it happened.

7  Q.  You believe it happened?

8  A.  If it's detailed in the report, I believe that's a factual.

9  Q.  Okay.  And this was -- no question about it, this was in

10  relation to the body of Maryetta Griffin, correct?

11  A.  Yes.

12  Q.  All right.  And no question about it that the location that

13  is noted on there of 624 West Chambers, that's very close to the

14  location where the body was found at 3032 North -- in the garage

15  behind 3032 North 7th Street, correct?

16  A.  I believe that this is going to be slightly to the south,

17  down the block.

18  Q.  Okay.  And with respect to the second page of this report,

19  this would accurately reflect the information that you and

20  Detective Barbian-Gayan had obtained on the 18th of February,

21  1998, with respect to when the body was first reported, correct?

22  A.  Yes.

23  Q.  And that would indicate that persons in the neighborhood

24  were aware of the body at around 8 o'clock in the morning?

25  A.  Well, it indicates that somebody was aware.  I don't know

1   about the other people in the neighborhood.  But these

2   individuals listed were aware.

3   Q.  All right.  And -- all right.  And those individuals being

4   Lonnie Bradley and a person by the name of Dolores, who

5   apparently had been told about the body by someone else?

6   A.  Correct.

7   Q.  Do you have any recollection about your involvement in the

8   ongoing investigation of the homicide of Maryetta Griffin?

9   A.  No, I do not.

10  Q.  And as you're aware, since you were sitting in the courtroom

11  while I was doing the prior examination, you were present and

12  participated in an interview of Mr. Avery, the Plaintiff in this

13  case, on March the 23rd of 1998.  You heard that testimony,

14  correct?

15  A.  Yes, I did.

16  Q.  And do you have any recollection of being involved in that?

17  A.  No, I do not.

18  Q.  Now, you did -- or you -- showing you what has been marked

19  as -- and already entered into evidence as 11-A.  Does that

20  appear to be a report that you prepared with respect to the

21  interview on March the 23rd of 1998?

22  A.  Yes, it is.

23  Q.  And with respect to the portion of that interview that

24  appears towards the end where it's noting Mr. Avery's asserted

25  account of when he became aware of the death of Ms. Griffin --

1    do you see that portion?

2    A.  Are we talking about the bottom paragraph?

3    Q.  Yes.

4    A.  Yes.

5    Q.  Do you see that portion?

6    A.  Yes.

7    Q.  And it's fair to say that in that portion of the Exhibit,

8    you are suggesting that Mr. Avery's reporting that he was aware

9    of the -- that she was deceased at around 8:00 or 8:30 was

10   suspicious, correct?

11   A.  No.

12   Q.  You're not?

13   A.  I'm not suggesting it was suspicious.  I'm suggesting that

14   he provided information that the body was found.  Or he knew

15   about it at 8:30.  We were not called to the scene until 11:00,

16   11:30.  And at that time I had no information how he would have

17   had the information that he had at that time in the morning.

18   Q.  Okay.  So as far as you were concerned, the fact that

19   Mr. Avery was assertively stating that he became aware that Ms.

20   Griffin was deceased at 8:00 or 8:30 was in no way suspicious?

21   A.  It wasn't suspicious.  It was something that needed to be

22   looked into.  As any witness's statement where they provide

23   information, would have to be substantiated.  That there was any

24   sort of discrepancy, would have to be checked out.

25   Q.  All right.  But as far as you were concerned, that didn't

1    tend to indicate that Mr. Avery might have been involved in the

2    homicide?

3    A.  I couldn't form an opinion based on the information we had

4    at the time.

5    Q.  Okay.  So as far as you're concerned, based on your

6    testimony here today, the fact that you were noting this in your

7    report of the interview of Mr. Avery was not reporting to -- or

8    was not attempting to show that he was -- that he had made

9    suspicious statements?

10   A.  No.  That was strictly to point out the fact of the matter.

11   Q.  Now, in addition to -- so do you have any recollection of

12   any -- any other involvement you had in the Maryetta Griffin

13   homicide?

14   A.  No, I do not.

15   Q.  Okay.  So you don't recall any interviews, any searches,

16   anything of that nature?

17   A.  No.  Not based on the number of cases I was involved in over

18   the years, no.

19   Q.  And, in fact, you were involved in a lot of other cases,

20   correct?

21   A.  Yes, I was.

22   Q.  And, in fact, specifically you were involved in several

23   cases that subsequently became associated with a serial killer

24   by the name of Walter Ellis, correct?

25   A.  That's what I'm led to believe, yes sir.

1   Q.  Well, you don't have any recollection of that?

2   A.  I had nothing to do with Walter Ellis, and I had nothing to

3   do with the cases that he was subsequently prosecuted for.

4   Q.  Well, that's not accurate, sir.  You were an investigator in

5   the Jessica Payne case?

6   A.  That's true.  I was.

7   Q.  Okay.

8   A.  But I had nothing to do with Walter Ellis or the --

9   connecting him with any of those cases.

10  Q.  All right.  But you were an investigator in the Jessica

11  Payne case?

12  A.  Yes, I was.

13  Q.  And that was a case of a young woman who was a victim of a

14  homicide, correct?

15  A.  Yes, she was.

16  Q.  And, in fact, her body was found very close to the vicinity

17  of where Ms. Griffin's body was found, correct?

18  A.  I don't recall exactly where her body was found.

19  Q.  Well, would it refresh your recollection if I told you that

20  her body was found at 3116 North 7th Street in Milwaukee?

21  A.  I would have no reason to doubt that.

22  Q.  Okay.  And in the course of the investigation of Jessica

23  Payne -- strike that.  Jessica Payne -- well, in the course of

24  the investigation of the Jessica Payne homicide, you interviewed

25  several people, correct?

```
 1   A.  I'm sure I did.

 2   Q.  And, in fact, you obtained inculpatory statements?

 3            MR. SMOKOWICZ:  Your Honor, I'm going to object.  It's

 4   relevance at this point.

 5            THE COURT:  I haven't heard the question yet.

 6            MR. STAINTHORP:

 7   Q.  In the Jessica Payne homicide you obtained inculpatory

 8   statements from a person by the name of Gwin, G-W-I-N, correct?

 9            MR. SMOKOWICZ:  Your Honor, I'm going to object to

10   this as irrelevant.

11            THE COURT:  Are we going to tie this up somehow?

12            MR. STAINTHORP:  Yes, we are.

13            THE COURT:  All right.  The Court will allow the

14   examination.

15            MR. STAINTHORP:

16   Q.  So let me tie it up right now.  You became aware at some

17   point that Walter Ellis was charged in several homicides of

18   women who were involved in or associated with prostitution and

19   were involved in or close to the drug scene, correct?

20   A.  Yes, he was.

21   Q.  All right.  And you were aware of that prosecution, correct?

22   A.  Only what I saw in the media.

23   Q.  Well -- and you became aware that, in fact, Jessica Payne

24   was one of the persons with whose homicide Walter Ellis was

25   charged, correct?
```

```
 1              MR. SMOKOWICZ:  I'm going to object.  Misstates the

 2    evidence.

 3              MR. STAINTHORP:  Let me withdraw that question.

 4              THE COURT:  All right.

 5              MR. STAINTHORP:

 6    Q.  Did you become aware that Jessica Payne was one of the

 7    homicides in which Walter Ellis's biological material was found?

 8    A.  I did become aware of that.

 9    Q.  Okay.  And in particular in -- the Jessica Payne case

10    involved a homicide and a sex assault, correct?

11    A.  I beg your pardon?

12    Q.  It involved a sexual assault as well as the homicide.  So

13    Ms. Payne was sexually assaulted and killed?

14    A.  That's not my recollection.

15    Q.  Okay.  But at any rate it was -- there was biological

16    material from the Jessica Payne case that was -- was related to

17    Walter Ellis, correct?

18    A.  I believe so.

19    Q.  And in the Jessica Payne investigation, you obtained

20    inculpatory statements from a Mr. Gwin and a Mr. Ott, correct?

21              MR. SMOKOWICZ:  Objection, Your Honor.  Relevance.

22              THE COURT:  The Court doesn't see how that relates.

23    You want to have a side-bar on this, Mr. Stainthorp?

24              MR. STAINTHORP:  Yes.

25              (Whereupon a side-bar conference was held off the
```

```
1    record.  Upon conclusion of the side-bar conference, the
2    proceedings continued as follows:)
3              MR. STAINTHORP:
4    Q.  So Mr. DeValkenaere, in the Ott investigation you got
5    statements from two persons who implicated Chaunte Ott in the
6    murder of Jessica Payne, correct?
7    A.  Yes.
8    Q.  And subsequently examination of biological evidence in that
9    Jessica Payne case implicated Walter Ellis in that crime.  In
10   that homicide, correct?
11   A.  Yes.
12   Q.  And the evidence, the biological evidence that was obtained
13   in that case tended to show that Mr. Ott was not involved in the
14   homicide of Jessica Payne?
15   A.  Well, I suppose it's a matter of argument, but that's what
16   it was determined, yes.
17   Q.  Okay.  Now, I have noted that you were aware that Mr. Ellis,
18   Walter Ellis -- and there already has been testimony in this
19   case that he's been associated -- his biological material has
20   been associated with 10 different people, including Maryetta
21   Griffin.  That Mr. Ellis was charged with 7 of those homicides,
22   correct?  You're aware of those?
23   A.  I'm not aware of the number, but I don't dispute it.
24   Q.  You're aware that he was charged with multiple of those
25   homicides, correct?
```

1    A.   Yes.

2    Q.   And the criminal charges against Mr. Ellis have already been

3    entered into evidence as Exhibit -- Plaintiff's Exhibit 1.  And

4    I wonder, as someone with experience as a homicide Detective in

5    Milwaukee, can you explain to the jury the -- what a Criminal

6    Complaint against someone for homicide is?

7    A.   A criminal Complaint is a document drawn up by the District

8    Attorney, and it does -- it specifies the charges against an

9    individual.

10   Q.   And with respect to Exhibit 1, which I'm now showing you on

11   the screen, that would indicate charges against Walter Ellis, is

12   that correct?

13   A.   That's what it says, yes sir.

14   Q.   And if you look at the different -- I'm going to move it up

15   a little, because they won't -- it won't all fit otherwise.  If

16   you look at the different counts in this Criminal Complaint

17   against Mr. Ellis, it details on the first page 4 separate

18   charges against him.  You see that?

19   A.   Yes.

20   Q.   And that would be -- the first one is Quithreaun Stokes.

21   The second one is Joyce Mims.  The third one is Sheila Farrior.

22   And the fourth one, going onto the second page, is Florence

23   McCormick.  Do you see that?

24   A.   Yes.

25   Q.   And then on the next page it has 3 more counts, so for total

1   of 7, with the fifth count being Irene Smith.  Sixth count,

2   Tanya Miller.  And the seventh count, Debra Harris.  Do you see

3   that?

4   A.  Yes.

5   Q.  And pursuant to the custom and procedure in the Courts in

6   Wisconsin, when a Criminal Complaint is filed, such as this with

7   multiple counts, then the Complaint would then proceed after

8   that to provide some of the details of the complaints against

9   the person, correct?

10  A.  Yes.

11  Q.  And that is what this particular Complaint, does, is that

12  correct?

13  A.  Yes.

14  Q.  So, for instance, with respect to Count 1, which relates to

15  Quithreaun Stokes, it notes that her body was found at 3128

16  North 7th Street.  You see that?

17  A.  Yes.

18  Q.  And then it has certain details with respect to crime scene.

19  Do you see that?

20  A.  Yes, I do.

21  Q.  And then if we go to the next page, the Complaint then

22  contains a report of the autopsy of Ms. Stokes, is that correct?

23  A.  Yes.

24  Q.  And the explanation there -- or the description there is

25  that she died of strangulation, is that correct?

1   A.  Yes.

2   Q.  Okay.  And then going on to Count 2, that would relate to

3   the homicide against Joyce Mims.  Do you see that?

4   A.  Yes.

5   Q.  And then that would note the location where her body was

6   found, that being 2940 North 5th Street.  Do you see that?

7   A.  Yes.

8   Q.  And then if you go down to the final paragraph, then that

9   would -- on that page, it notes the cause of death, and that was

10  asphyxia due to manual strangulation?

11  A.  Yes.

12  Q.  And now going to Count 3, on the next page, this relates to

13  Sheila Farrior.  The homicide of Sheila Farrior?

14  A.  Yes, it does.

15  Q.  And again, notes that -- where she was found, which was 1442

16  West Chambers Street, correct?

17  A.  Yes.

18  Q.  And that's the same Chambers Street we've previously

19  referred to during your testimony, is that correct?

20  A.  Yes.

21  Q.  And again, then notes the cause of death being asphyxiation

22  secondary to ligature strangulation.  Do you see that?

23  A.  Yes.

24  Q.  And ligature strangulation is non-manual strangulation,

25  correct?

1  A.  Yes.

2  Q.  If you go to Count 4, this then relates to Florence -- the

3  homicide of Florence McCormick.  Do you see that?

4  A.  Yes.

5  Q.  And notes that she was found at 618 W. Locust Street in

6  Milwaukee?

7  A.  Yes.

8  Q.  And if you go down, then, to the next paragraph, that notes

9  she died of ligature strangulation?

10  A.  Yes.

11  Q.  And then Count 5, this relates to the homicide of Irene

12  Smith, is that correct?

13  A.  Yes, it does.

14  Q.  And she -- her body was found at 3028 North 7th Street, is

15  that correct?

16  A.  Yes.

17  Q.  Okay.  So in fact that's practically the identical address

18  at which Maryetta Griffin was found, is that correct?

19  A.  Very close.

20  Q.  And her -- the cause of death for Ms. Smith was

21  exsanguination due to stab wounds.  Do you see that?

22  A.  Yes.

23  Q.  And that she was also manually strangled?

24  A.  Yes.

25  Q.  And for Count 6, this relates to the homicide of Tanya

1  Miller?

2  A.  Yes, it does.

3  Q.  And she was found at 2123 North 28th Street?

4  A.  Yes.

5  Q.  And she also died from manual strangulation, correct?

6  A.  Yes, she did.

7  Q.  And Count 7 relates to Debra Harris?

8  A.  Yes, it does.

9  Q.  And she, in fact, was found in the Milwaukee River, correct?

10  Her body was?

11  A.  Yes, she was.

12  Q.  And if we go to the next page of this Exhibit, it notes that

13  the cause of death of Ms. Harris was ligature strangulation?

14  A.  Yes.

15  Q.  All right.  And then going down further on that page, for

16  Counts 1 and 2, it notes that D.N.A. material was -- or D.N.A.

17  was -- was found from the scene and the bodies of the various

18  victims, correct?

19  A.  Yes.

20  Q.  All right.  And then on the next page it notes that the

21  Stokes and the Mims case, the biological material D.N.A. -- the

22  D.N.A. matched in that material, correct?

23          MR. SMOKOWICZ:  I'm sorry.  I missed -- where are you?

24  What page?

25          MR. STAINTHORP:  I'm now on Page 7.

1          MR. SMOKOWICZ:  And what paragraph?

2          MR. STAINTHORP:  So towards the top where it says as

3     to Counts 1 and 2.

4          MR. SMOKOWICZ:  I appreciate that.  Thank you.

5          MR. STAINTHORP:

6     Q.  It notes that the D.N.A. results from the evidentiary

7     materials recovered in both the Stokes and Mims case matched

8     each other, correct?

9     A.  Yes.

10    Q.  And then there's a comparison to D.N.A. that was recovered

11    from Walter Ellis, correct?  The next paragraph?  You see that

12    the scientists developed a male D.N.A. profile from a

13    toothbrush.  Do you see that?

14    A.  Yes.

15    Q.  And that she compares that to the Mims and Stokes cases, and

16    the D.N.A. profiles match?

17    A.  Yes.

18    Q.  And then if you go down to -- as to Count 3, there's a

19    notation that -- that with respect to material recovered from

20    the Farrior homicide, that -- well, they were able to obtain a

21    D.N.A. profile from both -- from the Farrior case.  The next

22    paragraph notes they were able to get a D.N.A. profile from the

23    McCormick case.  Do you see that?

24    A.  Yes.

25    Q.  And as to Count 5, it notes that they were also able to

1    obtain a D.N.A. profile from the Smith case?

2    A.  Yes.

3    Q.  And if we go to the next page, as to Count 6, it notes that

4    there was a D.N.A. profile obtained from the evidentiary

5    material in the Miller case.  And Count 7 indicates there was a

6    D.N.A. profile obtained from the evidentiary material in the

7    Harris case?

8    A.  Yes.

9    Q.  And if you go down further on that page, it notes that the

10   D.N.A. profiles from each of these 7 cases were compared to the

11   D.N.A. profile of Walter Ellis, is that correct?

12   A.  Yes.

13   Q.  And that those D.N.A. profiles from those 7 homicide cases

14   match the D.N.A. profile of Mr. Ellis?

15   A.  Yes.

16   Q.  Okay.  And it also notes a probability of selecting an

17   unrelated person with a profile matching this one and -- states

18   that it's at least as rare as 88 trillion.  Do you see that?

19   A.  That's what it says.

20   Q.  Okay.  And this would be the type of material that would be

21   filed in a criminal case charging someone with a homicide,

22   correct?

23   A.  Yes.

24   Q.  All right.  And now going to show you Plaintiff's Exhibit 2

25   and ask you if you're familiar with this type of document?

1   A.  I'm not really familiar with this document.

2   Q.  Okay.  Do you agree that it tends to -- it appears to be a

3   Judgment of Conviction?

4       MR. SMOKOWICZ:  Your Honor, I'm going to object.  Lack

5   of foundation.

6       THE COURT:  Well, the Court can take -- if it's an

7   official record, take judicial notice of it.

8       MR. STAINTHORP:  Okay.  We'll just take judicial

9   notice of it, Judge.  That's fine.

10  Q.  Well, actually though, with respect to the Judgment of

11  Conviction, this would indicate that it's a Judgment of

12  Conviction of Walter Ellis, is that correct?

13  A.  Yes, sir.

14  Q.  For 7 different counts?

15  A.  Yes.

16  Q.  And all of them being either in first degree intentional

17  homicide, or first degree murder, correct?

18  A.  Yes.

19  Q.  Now, I know you were present for some of the testimony here

20  today, and you heard the testimony about using hypotheticals.

21  Is that something that you used in your investigative strategies

22  and techniques when you were a Detective?

23  A.  No.

24  Q.  And -- but were you aware of other Detectives using that

25  particular technique in order to obtain statements from persons?

1  A.  I have never -- I have never seen somebody do it, no.

2  Q.  Okay.  So as far as you're concerned, that's a somewhat

3  unusual investigative technique?

4  A.  I don't know if it's unusual.  I don't do it, and I'm not

5  familiar with anybody else doing it.

6  Q.  Okay.  Well, certainly you were a member of the Detective

7  Unit for a considerable period of time, correct?

8  A.  Yes, I was.

9  Q.  And you became familiar with the investigative techniques of

10  your colleagues, correct?

11  A.  I wouldn't say that I was familiar with their investigative

12  techniques, no.

13  Q.  Well, you would work with partners as a Detective, correct?

14  A.  Yes.

15  Q.  And so you would see how your various partners conducted

16  investigations?

17  A.  Yes.

18  Q.  And over the course of your period -- what was it?  About 10

19  years?

20  A.  Ten years.  Yes, sir.

21  Q.  About 10 years that you were a Detective.  You worked with

22  multiple different partners, correct?

23  A.  Yes, I did.

24  Q.  You had both regular partners who you would work with on a

25  regular basis for some period of time, and also partners who you

1   would just work with on occasional days?

2   A.  Yes.

3   Q.  And during that time you conducted a large number of

4   interrogations, correct?

5   A.  Yes, I did.

6   Q.  And some of those interrogations were -- you were taking the

7   lead, and some of these interrogations your partner on that

8   particular day was taking the lead?

9   A.  Right.

10  Q.  And in none of those interrogations did you -- did either

11  you or your partner use the technique of hypotheticals, is that

12  correct?

13  A.  I don't recall anybody using it, no.

14  Q.  Is it your understanding that that is, in fact, a very

15  dangerous form of interrogation?  In that you have the risk of

16  supplying information to a suspect that you then just get fed

17  back to you?

18  A.  I never -- I never received any information regarding that

19  technique.  I know caution is always taken not to provide

20  information to the person being interviewed.

21  Q.  Okay.  And that is an extremely important issue in

22  interrogations, correct?  Because you want to make sure that you

23  are getting information from the person.  You're not just

24  getting them feeding back information to you that you've given

25  them?

1   A.   Correct.

2   Q.   And you would recognize, would you not, that if in fact you

3   were using hypotheticals, where you were giving specific

4   information to people, you run the risk of when you get a

5   statement back it being nearly a regurgitation of what you

6   already told them?

7   A.   I don't know that that would be true.  I don't know how the

8   hypothetical would be used.  I don't know what -- if someone

9   were to come up with a wholly fictional scenario and tell

10  somebody this is how this could have happened, or there are

11  other options for how the situation you're involved in could

12  have happened, I don't know that that would taint their

13  statement.

14  Q.   But you would recognize that if, in fact, you gave -- well,

15  was it your practice as a Detective that you would not give

16  information?  Any information?

17  A.   No.

18  Q.   So as -- okay.  So because you were concerned that -- you

19  wanted to make sure that any information you got originated from

20  the person you were interrogating.  Not from you, correct?

21  A.   Correct.

22  Q.   And you recognize that in terms of preparing Police reports,

23  it was very important that you be precise in terms of describing

24  exactly what a person said during the interrogation, right?

25  A.   Not necessarily.  You want to be complete and accurate, but

1    precise I'm not sure would apply.  A Police report is a

2    summation of what was said.  It's not -- it's not intended to be

3    a verbatim recording of everything that was said by the person.

4    Q.  I understand that.  But if, in fact, there was some issue

5    which arose during the interrogation which gave you cause to be

6    concerned about, for instance, the reliability of some

7    information that you got, you would make sure that you included

8    that in your report, correct?

9    A.  No.  I would never -- I would never include my opinion in a

10   report.  That's not the place for it.  When I was detailing

11   somebody's statement, that report is strictly to detail what

12   they had to say.  It's not to include my opinion.  If there's

13   something that discredits that person, then it would be the

14   Detective's responsibility to detail where the discrepancies

15   are.  Either based on facts already in evidence, or on

16   statements that you get from other witnesses that would

17   contradict that person.

18   Q.  All right.  So if, in fact, you got information that you had

19   some other information that tended to show that was unreliable,

20   you would put that in the report.  You would state that in the

21   report and --

22   A.  I would not -- I would not state that the information was

23   unreliable.  I would state that the person said whatever it is

24   the person said, and then I would also ask the question trying

25   to elicit from them why their information is not consistent with

1   other information.  And I would detail whatever they said.

2   Q.  Sure.  But if you had a person saying something, but then

3   also had information that they might have gotten that

4   information from some other source rather than from direct

5   knowledge, you would make sure that you placed that in the

6   Police report?

7   A.  I would do it in the context of asking the person who's

8   giving the information about the information they're providing.

9   It would never be my opinion.

10  Q.  Okay.  But if you -- I understand you're not putting your

11  opinion in.  But if you had factual opinion -- factual

12  information that tended to undermine the reliability of what you

13  had been told, you would also put that factual information in

14  the Police report?

15  A.  I would not put it in the report with that person's

16  statement.  I -- I would most likely file an additional report

17  detailing that the person was interviewed on this date, and that

18  he said "X", "Y", and "Z".  And then I would detail the

19  information that would contradict that.

20  Q.  Well, for instance, if in fact someone were asked to --

21  whether they agreed with a hypothetical scenario, would you

22  agree that the Police Officer who was recording that statement

23  had a duty to record that any response was in response to a

24  hypothetical?

25          MR. SMOKOWICZ:  Object.  Calls for speculation, since

1  this witness has expressed no knowledge of that -- use of that

2  technique.

3          THE COURT:  Well, he said he never used it.  But he

4  may answer, if he can.

5          THE WITNESS:  So unless you've lost me, you're asking

6  if someone used a hypothetical and the person responded to that

7  hypothetical, should it be in the report that the person was

8  responding to a hypothetical situation?

9          MR. STAINTHORP:

10 Q.  Precisely.

11 A.  I imagine it would be.  I've never seen that, but I would

12 imagine it would be.

13 Q.  Well, that would be for -- to provide a context for the

14 suspect's statement, correct?

15         MR. SMOKOWICZ:  Again, I'm going to object to the form

16 of the question.  Calling for speculation, since he had no

17 experience in this.

18         THE COURT:  He may render an opinion, if he has one.

19         THE WITNESS:  I'm sorry.  Could you repeat the

20 question?

21         (Whereupon the preceding question was read back by the

22 Reporter.)

23         THE WITNESS:  I think it would have to be detailed in

24 the context of what was being said.

25         MR. STAINTHORP:

1   Q.  Now, certainly -- I do understand that you don't have any

2   recollection of your interview with Mr. Avery on March the 23rd.

3   But if he had, in fact, indicated any responsibility for the

4   murder of Maryetta Griffin, you would have put that in your

5   report, correct?

6   A.  Yes.

7   Q.  And, in fact, there's no such indication with respect to the

8   murder of Maryetta Griffin in your report, correct?

9   A.  That's correct.

10          MR. STAINTHORP:  Okay.  That's all I have, Judge.

11          MR. SMOKOWICZ:  Your Honor, I would like to reserve my

12  questions for this witness in our case.

13          THE COURT:  Any objection?  I suppose it's your case.

14  You can do that, then.  Are we prepared with another witness?

15          MR. ELSON:  We're prepared to read in the deposition

16  of Antron Kent, Judge.  But there was an issue that I wanted to

17  raise with the Court outside the presence of the jury.

18          THE COURT:  Can we do it at sidebar?

19          MR. ELSON:  Yeah.

20          (Whereupon a side-bar conference was held off the

21  record.  Upon conclusion of the side-bar conference, the

22  proceedings continued as follows:)

23          THE COURT:  Okay.  Ladies and gentlemen of the jury,

24  we're going to have a deposition read.  And this is a deposition

25  that was taken for purposes of this trial.  Or it's -- turned

1  out that it's going to be used for purposes of this trial,

2  because the witness is unavailable.  And so we're going to have

3  someone representing that witness on the stand.  Keep in mind

4  that that's not the person who gave the statement.  And then

5  that person taking the place of -- and the Court is informed

6  it's going to be Mr. Antron Kent.  And that this is actually

7  Antron Kent's testimony in response to questions that he was

8  asked at this deposition.  So you may proceed, Mr. Ellis.

9             MR. ELSON:  Thank you, Judge.

10             THE COURT:  And at the conclusion of it then we'll go

11  home.

12             (Whereupon the deposition of Antron Kent was read to

13  the jury panel.)

14             THE COURT:  All right, ladies and gentlemen.  We're

15  going to break for the day.  We'll be back here at 9 o'clock

16  tomorrow morning.  Take the next witness from the Plaintiff.

17  Please don't discuss the case among yourselves, only after all

18  the evidence is in.  And we'll see you tomorrow morning, 9

19  o'clock.  Have a good evening, okay?

20             (Whereupon the jury was excused at 4:51 p.m.)

21             THE COURT:  The deposition should be marked as an

22  Exhibit.

23             MR. SMOKOWICZ:  It's Defendant's Exhibit 1050, Your

24  Honor.

25             THE COURT:  Ten what?

1          MR. SMOKOWICZ:  1-0-5-0.

2          THE COURT:  1-0-5-0.

3          MR. SMOKOWICZ:  But, Your Honor, we would ask

4  permission to submit it tomorrow, because we need to redact that

5  page.

6          THE COURT:  All right.  Okay.  Tomorrow morning, 9

7  o'clock.

8                              *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF WISCONSIN

3

4           I, HEIDI J. TRAPP, Official Court Reporter for the

5   United States District Court, Eastern District of Wisconsin, do

6   hereby certify that I reported the foregoing Transcript of

7   Proceedings; that the same is true and correct as reflected by

8   my original machine shorthand notes taken at said time and place

9   before the Hon. Rudolph T. Randa.

10

11                          _____

                            Official Court Reporter
12                          United States District Court

13

14  Dated at Milwaukee, Wisconsin,

15  this 18th day of October, 2015.

16

17

18

19

20

21

22

23

24

25