UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------

**WILLIAM DAMON AVERY,**

              Case No. 11-CV-408

      Plaintiff,

              Milwaukee, Wisconsin

  vs.

              June 3, 2015

**CITY OF MILWAUKEE, et.al.,**

      Defendants.
----------------------------------------------------------------

**VOLUME 3 - PAGE 317**
TRANSCRIPT OF TRIAL
BEFORE THE **HONORABLE RUDOLPH T. RANDA,**
UNITED STATES DISTRICT JUDGE, AND A JURY


**A P P E A R A N C E S**

For the Plaintiff:     People's Law Office
            By: **Mr. John L. Stainthorp**
              **Ms. Janine L. Hoft**
              **Mr. Ben Elson**
            Attorneys at Law
            1180 N. Milwaukee Avenue
            Chicago, IL  60622


For the Defendant:     Milwaukee City Attorney
            By: **Mr. Jan A. Smokowicz**
              **Ms. Jenny Yuan**
            Assistant City Attorneys
            200 E. Wells St. - Rm. 800
            Milwaukee, WI  53202-3551


REPORTED BY:       HEIDI J. TRAPP
            Federal Official Court Reporter
            310, U.S. Courthouse
            517 East Wisconsin Avenue
            Milwaukee, Wisconsin 53202


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1                          **I N D E X**

2      **Witness:**                                          **Page**

3        **CAPTAIN TIMOTHY HEIER**

4        Direct Examination By Ms. Hoft.................. 322
         Cross Examination By Mr. Smokowicz.............. 359
5        Redirect Examination By Ms. Hoft................ 367
         Recross Examination By Mr. Smokowicz........... 373
6
7        **JEFFREY KIMBROUGH**

         Direct Examination By Mr. Elson................ 375
8        Cross Examination By Mr. Smokowicz............. 385

9      **KEITH RANDOLPH**

10       Direct Examination By Ms. Hoft................. 400
         Cross Examination By Mr. Smokowicz............. 414
11       Redirect Examination By Ms. Hoft............... 444
         Recross Examination By Mr. Smokowicz........... 446
12
       **GILBERT HERNANDEZ**
13
         Direct Examination By Mr. Stainthorp........... 451
14       Cross Examination By Yuan...................... 508
         Redirect Examination By Mr. Stainthorp......... 523

15

16

17

18

19

20

21

22

23

24

25

1     **TRANSCRIPT OF PROCEEDINGS**

2         THE CLERK:  Case Number 11-C-408, William Avery versus

3     the City of Milwaukee, et.al.  Called for a continuation of the

4     jury trial.  May I have the appearances, please.  First for the

5     Plaintiff.

6         MS. HOFT:  Janine Hoft, one of the lawyers for the

7     Plaintiff, William Avery.

8         MR. ELSON:  Ben Elson for William Avery.

9         MR. STAINTHORP:  John Stainthorp for William Avery.

10        THE COURT:  Good morning.

11        MR. ELSON:  Good morning.

12        THE CLERK:  And for the Defendants?

13        MR. SMOKOWICZ:  Assistant City Attorney Jan Smokowicz.

14    Good morning, Your Honor.

15        THE COURT:  Good morning.

16        MS. YUAN:  Good morning, Your Honor.  Assistant City

17    Attorney Jenny Yuan.

18        THE COURT:  Good morning.  The Bailiff informs me that

19    there's a matter to take up.  The Defendants want to bring

20    something to the Court's attention?

21        MR. SMOKOWICZ:  Just a couple of small items.  First

22    of all, yesterday we did redact, in accordance with the Court's

23    ruling, the question and the answer in Antron Kent's Exhibit,

24    which has been marked as Exhibit 1050.  It was read as part of

25    the Plaintiff's case, and we certainly would be offering it I

1    guess with the Plaintiffs at this time into evidence.

2              THE COURT:  No objection?

3              MS. HOFT:  No objection.

4              THE COURT:  The Court will receive it.

5              MR. SMOKOWICZ:  Second item, Your Honor, is yesterday

6    we did have a side-bar.  Perhaps we should just make a record of

7    what was discussed there, if the Court is willing to do that.

8              THE COURT:  Yes.  Of course.

9              MR. SMOKOWICZ:  We did raise an objection yesterday as

10   to any questions of Detective DeValkenaere with respect to his

11   involvement in the investigation of Jessica Payne.  In

12   particular, with respect to questioning of witnesses that he did

13   of the alleged co-actors.  And the subsequent biological

14   evidence that linked Jessica Payne to Walter Ellis as irrelevant

15   and unfairly prejudicial -- pardon me.  Not irrelevant as --

16   well, inadmissible as a prior bad act, or other bad act, as that

17   being the only purpose that it could be offered for.  I

18   believe -- certainly don't want to speak for them, but I believe

19   the Plaintiffs argued in part that they believed it was relevant

20   to the Monell claim, and the Court entered a ruling allowing

21   limited questioning in that area.

22             THE COURT:  I think that's a correct statement of the

23   sidebar.

24             MR. STAINTHORP:  Yes, Judge.  No disagreement with

25   that.  But I was under the impression that the sidebars were

1    recorded.  Is that incorrect?  Okay.  Fine.

2              THE COURT:  They're not.

3              MR. STAINTHORP:  Okay.  I just saw the Court Reporter

4    working hard while we were at sidebar, so I just presumed that

5    it was -- that it was being somehow transmitted to her.  But

6    okay.

7              THE COURT:  She gives out that impression.

8              MR. SMOKOWICZ:  I was going to say she's always

9    working hard, Judge.

10             THE COURT:  We're ready to go?  All set?

11             MR. SMOKOWICZ:  I believe we are, Your Honor.  Yes we

12   are, Your Honor.

13             THE COURT:  Okay.

14             MR. SMOKOWICZ:  I should advise the Court -- I should

15   advise the Court we have prepared a written stipulation and

16   order for Detective Gulbrandson's dismissal.  I sent it by

17   E-mail, but Mr. Stainthorp hasn't had access to it.  I guess

18   they're going to look at it tonight.

19             THE COURT:  Okay.

20             (Whereupon the jury was returned to the courtroom at

21   9:13 a.m.)

22             THE COURT:  Good morning, ladies and gentlemen of the

23   jury.  We're now ready with the next witness.

24             MS. HOFT:  The Plaintiff, Your Honor, calls Defendant

25   Heier to the stand.

1          **CAPTAIN TIMOTHY HEIER**, called as a witness, having

2    been first duly sworn, on oath testified as follows:

3          THE CLERK:  Please state your full name and spell your

4    last name for the record.

5          THE WITNESS:  Timothy Heier.  T-I-M-O-T-H-Y.

6    H-E-I-E-R.

7                    **DIRECT EXAMINATION**

8    **BY MS. HOFT:**

9    Q.  Good morning, Mr. Heier.

10   A.  Good morning.

11   Q.  How are you?

12   A.  Very good.

13   Q.  What is your current position?

14   A.  Currently I'm a Captain with the Milwaukee Police

15   Department, and I'm assigned to the Internal Affairs section.

16   Q.  And how long have you been working at the Milwaukee Police

17   Department?

18   A.  I'm in my 24th year.  Or actually 25th year.  24 complete.

19   Q.  And have you ever testified before?

20   A.  Yes.

21   Q.  You've testified a number of times before, is that right?

22   A.  Yes.

23   Q.  Would you say you've testified more than 100 times?

24   A.  Yes.

25   Q.  You came into the Homicide Division of the Milwaukee Police

1  Department in 2000, is that about accurate?

2  A.  Yes.

3  Q.  And when you came into the Homicide Department, you were

4  aware that from about 1998 there had been a number of unsolved

5  homicides of females in the area of the north side of Milwaukee,

6  is that correct?

7  A.  No.  Usually what we do is the City of Milwaukee has

8  approximately 90 to 100 homicides.  And basically we just

9  respond to whatever pressing homicide calls in that night and

10  just work forward.  When we get information on older homicides,

11  then we go backwards and look at those.  So in about 2000 I

12  wouldn't have known the trends or anything -- of anything that

13  happened earlier, unless I'm specifically assigned to one of

14  those cases.

15  Q.  Do you recall, though, that a couple years earlier from when

16  you joined the Homicide Department, that a number of prostitutes

17  had been found dead and their murders were unsolved?

18  A.  Yeah.  I have no direct recollection of either working on

19  those cases, or getting follow-up, or knowing much of a trend

20  like that.

21  Q.  I understand you may not have worked on those cases, but

22  were you aware when you came into the Homicide Department in

23  2000, that in 1998 there had been a number of unsolved homicides

24  of prostitutes in the north side of Milwaukee?

25  A.  Yeah.  I have no direct recollection.

1    Q.  Do you recall giving a deposition in this case?

2    A.  Yes.

3    Q.  And that was on July 10 of 2012?

4    A.  Yes.

5    Q.  And did you -- do you recall being asked this question and

6    giving this answer -- and I'm on Page 139, counsel.

7         MR. SMOKOWICZ:  Just a second.  What line?

8         MS. HOFT:  Lines 2 through 8.  9, sorry.

9         MR. SMOKOWICZ:  Thank you.

10        MS. HOFT:

11   Q.  How about when you were there?  Did you have any awareness

12   of a group of unsolved female homicides, particularly in the

13   north Milwaukee area?  Would that be a concern of the

14   Department?  Answer:  Well, obviously.  This was 1998, and I

15   believe there were some before I came here.  I mean, if I came

16   in 2000, this was a couple years earlier when prostitutes were

17   found.  Do you recall giving that testimony?

18        MR. SMOKOWICZ:  Your Honor, for purposes of completion

19   I'd like to read the rest of the answer.

20        MS. HOFT:  Your Honor, we would object.  He can do

21   this on his redirect.

22        THE COURT:  All right.  Let's -- for purposes of

23   smoothness you can do that, Mr. Smokowicz, on your examination

24   of Mr. Heier.

25        MR. SMOKOWICZ:  Very well, Your Honor.  Thank you.

1          MS. HOFT:

2    Q.  Do you recall giving that testimony?

3    A.  Yeah.  The question you asked, would this have been of

4    concern to the Department?  Yes.  Yes, it would be concerning to

5    the Department, anything prior to.  And again, I don't have any

6    independent recollection of working on any of those cases.  But

7    if the question as you stated in the deposition in 2010 was

8    would this be concern to the Department of a lot of deaths of

9    prostitutes in the 1998 -- yes.

10   Q.  Did you -- do you recall me asking you questions at a

11   deposition?

12   A.  Yes, I recall it was I think 710 North Plankinton.  I sat

13   for about 5 hours.

14   Q.  You sat for about 5 hours with a lawyer by the name of

15   Heather Donald.  Do you remember that?

16   A.  Yes, I remember -- yes.

17   Q.  I've never questioned you before?

18   A.  Right.  But I remember staying for about 5 hours, going

19   through lots of questions.

20   Q.  Okay.  And so do you recall now that when you came into the

21   Homicide Department in 2000, you knew that a couple years

22   earlier there had been a number of female prostitutes who'd been

23   murdered on the north side of Milwaukee, and that their cases

24   were unsolved?

25             MR. SMOKOWICZ:  Objection.  Asked and answered.

1          THE COURT:  Well, it's sort of a summation question.

2     He may answer.

3          THE WITNESS:  Could you -- I mean, just for the --

4     because you're going to point this answer that I gave in 2010.

5     Could you repeat that question for us?  Because I remember that

6     question being is it a concern to the Department?  Yeah.  Yes,

7     it's a concern of the Department.  And yes, there were numerous

8     homicides in '98, and I've known that since.  You know, since

9     then I'm aware of that, yes.  If that can summarize what you're

10    trying to get.

11         MS. HOFT:

12    Q.   I hear what you're saying.  Actually, your deposition was in

13    2012.  But I hear what you're saying.  You're trying to remember

14    the question and answer you gave in 2012.  But I'd ask that that

15    last question be read back, and I'd ask you to give an answer

16    today.

17    A.   Sure.  The question from 2010 you're going to read back?

18    Q.   No.  I'm going to ask Heidi, the Court Reporter to read back

19    the question that I asked you.

20    A.   I can probably make it easier.  When I came on in 2012 --

21    and like I stated, we work forward homicides, and whatever

22    historical had taken place on the north side of the women --

23    yes, there were a lot of homicides that occurred back then.

24    I've known a lot more since then.  Would I have known that

25    walking in, in 2000, 2001, of the amount of homicides?  I don't

1  know if I would have known that then.  But yes, I'm aware of

2  that now.  If that helps.

3  Q.  A little bit.  Thank you.

4  A.  Okay.  I'm not trying to dodge your question or anything.  I

5  just want to make it as clear as I can be so everybody

6  understands.  When I came on in 2000, what happened prior?  I

7  didn't have a lot of working on those.

8  Q.  I understand that.  And as the Judge indicated, what I was

9  trying to ask you was a summation question with regard to when

10 you came on to the Homicide Division in 2000, you were aware

11 that there were a number of not just random homicides, but a

12 number of unsolved female homicides of prostitutes in the north

13 side of Milwaukee?

14         MR. SMOKOWICZ:  Objection, Your Honor.  This has been

15 asked and answered.  This is not summation.

16         THE COURT:  Well, are we talking a certain time frame?

17 He came on in 2000.  Was he aware of a number of homicides?  Is

18 that the question?

19         MS. HOFT:  I can ask a different question.

20 Q.  I think the issue is clear about 1998.  That you were aware,

21 around the time of 1998, there were these unsolved female

22 prostitute homicides in the area of north Milwaukee when you

23 came on to the Homicide Division in 2000?

24 A.  No, I had -- I didn't have that much knowledge or

25 recollection of anything that happened prior to in that area.

1   Q.  And when you say prior to, you mean prior to you coming on

2   the Homicide Division?

3   A.  Yeah.  I'm kind of unfamiliar with what direction you're

4   going with the question.  In 2000 when I came on, I didn't have

5   a historical reference of what happened in '98 in those areas,

6   because I was investigating a different -- different types of

7   crimes.  I wasn't involved in homicides.  So coming in new, I

8   didn't know -- I'm new to the homicide.  I'm just learning that.

9   And we're working day-by-day forward.

10  Q.  Where were you working just prior to joining the Homicide

11  Department in 2000?

12  A.  In 2000 I was -- well, I'll give you a little bit more.  In

13  1998, '97 and '98, I was a dispatcher.  So I had not worked the

14  streets in that capacity.  I just dispatched squads.  I worked

15  in an office with a headset, looking at a computer, dispatching

16  squads.  In 1999 I got promoted to a Detective, and I worked

17  just a variety of things.  From burglaries, to robberies, to

18  auto thefts, to violent crimes.  The Milwaukee Police Department

19  has a specialized division which is the Homicide Division.  That

20  when a homicide happens, we put particular people in those

21  assignments to investigate.  So as far as getting trends or

22  briefings, I wouldn't have been part of those until obviously

23  getting on the unit in 2000.

24  Q.  And in 1999 did the Detective Division that you were

25  assigned to -- did it share a building with the Homicide

1  Division?

2  A.  Yes.  As a matter of fact, we not only shared a building, we

3  shared the same floor.  One section is homicide, and one section

4  is everybody else.  But I'll say it's an elite unit because I

5  was part of it.  But the Homicide Division does a lot of things

6  different.  They pass information along to themselves.  They

7  brief in reoccurring shifts before each shift and after each

8  shift, so it's a specialized unit because of the seriousness of

9  these cases, and the ability to solve them.

10  Q.  When were you first made aware of the homicide of Maryetta

11  Griffin?

12  A.  The first time that I was involved in that case?

13  Q.  And I'm not asking you the first time you were involved.

14  I'm asking you the first time you heard about the death of

15  Maryetta Griffin.

16  A.  I would say March of 2001.

17  Q.  So you'd never heard anything about her before that date?

18  A.  No.

19  Q.  And when you came on to the Homicide Division, when you got

20  there -- when you eventually got there, you had meetings and

21  briefings daily with other homicide Detectives.  Is that fair to

22  say?

23  A.  Yes.

24  Q.  And those briefings occurred at the beginning of your shift,

25  and at the end of your shift?

1  A.  Yes.

2  Q.  And do you recall what shift you were working back in 2000?

3  A.  It was early shift, which is 4:00 to midnight.

4  Q.  And in 2001 was that still true?

5  A.  Yes.  It was actually all the way until 2009, when I got

6  promoted.  I was always a 4:00 to midnight.

7  Q.  And part of your job as a homicide Detective was to

8  interview people.  Is that fair to say?

9  A.  Yes.

10  Q.  And when you interview a person, you don't read them Miranda

11  rights, correct?

12  A.  It depends who we interview.  I mean, some people are

13  involved in a crime, and obviously the statement can be used

14  against them.  And we want to advise them and let them know that

15  they're entitled to certain rights.

16  Q.  But unless you're going to question a person and you think

17  you might use their statements against them, you don't give them

18  Miranda rights, right?

19  A.  No, because you don't -- you don't know who you're going to

20  talk to.  I mean, certainly clearly somebody witnesses a

21  homicide, witnesses a robbery, you're not going to Mirandize

22  them.  But if there's a possibility that they have involvement

23  later on, what you don't want to do is take a full statement, in

24  which case they confess.  And oftentimes it's easier just to

25  advise them of their Miranda rights, Constitutional rights.

1  Q.  And maybe my question and your negative answer got a little

2  confused there, but let me ask you this.  You don't Mirandize an

3  individual unless you think they might give a statement that you

4  want to use in court?

5  A.  Yes.

6  Q.  And --

7  A.  To hold against them in court, yes.  That they would be

8  involved.  Sorry I'm walking over you.

9  Q.  Yeah.

10  A.  Go ahead.

11  Q.  And with regard to giving Miranda rights, one of those

12  rights is the right to remain silent?

13  A.  Yes.

14  Q.  And one of those rights is the right to have a lawyer,

15  right?

16  A.  Yes.

17  Q.  And once an individual or a suspect invokes either of those

18  rights, you must immediately stop interviewing, interrogating,

19  whatever you want to call it, with the person, right?

20  A.  Yes.  Generally we stop interviewing, yes.

21  Q.  What do you mean by generally we stop interviewing?

22  A.  If they want to remain silent, it's -- sometimes you don't

23  like just walk out immediately.  Sometimes I've stayed for 5

24  minutes and answer any questions.  And that's it.  Sometimes

25  they don't want to talk about the incident, but then they keep

1    talking and ask more questions, and I can't talk about that.

2    But it's not somebody that's -- if somebody asks for a lawyer

3    you walk away, yes.

4    Q.   Okay.  But if somebody says they don't want to give a

5    statement, or they want to invoke their right to silence, you

6    don't necessarily walk away?

7    A.   No.  What I'm saying is that oftentimes people keep talking.

8    I mean, they say they don't want to talk about something.  Or

9    they say I want my lawyer.  I don't want to talk.  But then they

10   keep talking for 5 minutes later.  And it's something that

11   lawyers look to say well, if you don't ask questions, if you

12   don't continue, if they say hey, I want a lawyer, but I want to

13   tell you something else, I want to tell you -- and they just

14   keep talking, you silently sit there and just listen.  And

15   clearly something -- lawyers have to weigh the use of those

16   statements later on.  But if somebody says they want a lawyer,

17   the questioning does stop.

18   Q.   But if someone keeps talking, you will stay there and

19   listen, as long as they keep talking?

20   A.   That's exactly right.

21   Q.   Okay.  And with regard to the conversations that may come up

22   after an individual has said they want to remain silent, have

23   you ever told -- or get a lawyer, have you ever told a suspect

24   that if they get a lawyer it may be too late for a deal?

25   A.   No.

1  Q.  Is it true that if an individual stops talking to you and

2  says they want a lawyer, that then you can't work with them to

3  get a statement that could be used in their favor or to mitigate

4  their crime?

5  A.  If somebody asks for a lawyer, it stops.  I'll give you an

6  example.  If somebody keeps talking, and wants to talk, and

7  wants to reinitiate, oftentimes what I do is I explain to them

8  okay, with time out you asked for a lawyer.  And these

9  statements are written down.  These are -- nowadays, moving

10 forward, they're recorded.  Back in this case they did not have

11 the technology.  They didn't record these things.  But you

12 oftentimes explain what they did.  And there's a lot that goes

13 on, as far as you asked for a lawyer, but if you want to

14 continue talking, there are ways -- you know, you have to waive

15 again.  So we re-advise them again, because somebody still wants

16 to talk.

17 Q.  Tell me when the technology came in to the Milwaukee Police

18 Department that allowed for the recording of interrogations?

19 A.  Well, this was something that was demanded by the State in

20 1998 -- 2001 -- the recording -- things were recorded.  You

21 actually wrote down statements.  You went over statements.  You

22 had people sign the statements.  Everything was memorialized.

23 Everything was recorded.  In the State of Wisconsin moving

24 forward -- I don't know the exact year they requested that

25 things be audiotaped.  So they presented -- the Departments had

1    to buy recorders that --

2    Q.   I'm sorry.  My -- I don't mean to stop you, but I believe

3    your question is you don't -- the answer is you don't know?

4    A.   I don't know exactly.  It was mandated by the State.  But I

5    don't know what year.

6    Q.   Okay.  In 2000 when you came into the Homicide Division, you

7    had to write reports.  And I think that's what you were

8    explaining to the jury.  That things were recorded.  Not in any

9    technologically advanced way, but in writing on pieces of paper.

10   Right?

11   A.   Yes.

12   Q.   And in 2000 when you came into the Homicide Department, you

13   would write out your documents, documentation of your

14   interviews, and then you would speak into some sort of dictation

15   device or tape recorder so that those reports could be

16   typewritten, right?

17   A.   Yes.  After the fact, yes.

18   Q.   But you had that technology to dictate into a recording

19   device the contents of your statement so that they could be --

20   or your report so that they could be retyped?

21   A.   Yeah.  It was a telephone that you would talk to.  You would

22   pick it up, and you would dictate your -- you'd write verbatim

23   whatever you wrote on a piece of paper, because some people's

24   handwritings are different.  You would dictate into a telephone.

25   And we had secretaries and clerks that would literally type

1  everything we just said into a phone.

2  Q.  And you mentioned previously that in 2001 you first became

3  aware of the death of Maryetta Griffin.  And her death was in

4  1998, right?

5  A.  Yes.

6  Q.  And you had an assignment to go talk to an individual by the

7  name of Keith Randolph, is that right?

8  A.  Yes.

9  Q.  And before you went to talk to Mr. Randolph, did you speak

10  to anyone?

11  A.  I started the day -- it was March 21st, 2001.  I started at

12  4 o'clock, and my assignment that day from my supervisor was

13  Keith Randolph was at our Department with his Attorney.  And my

14  job was to interview him.  He had information on a homicide.

15  Q.  And I'm sorry.  Maybe I missed it in your answer.  But who,

16  if anyone, did you talk to?

17  A.  A supervisor would have assigned me that.

18  Q.  Do you remember what supervisor made that assignment?

19  A.  No.

20  Q.  And after you received that assignment, did you review

21  anything?

22  A.  Not that I recall.

23  Q.  And you don't remember talking to anyone except the

24  supervisor prior to meeting with Mr. Randolph?

25  A.  Yes.  His attorney was present also.  Mr. Caton.

1  Q.  Okay.  So did you speak to the attorney, then, to make the

2  arrangements to meet with Mr. Randolph?

3  A.  Yeah.  The attorney and Mr. Randolph were already at our

4  building at 4 o'clock when I started.  And I don't know if it's

5  a situation where the day shift just didn't get to it, but

6  they're there, it's 4 o'clock, I start.  Talk to this guy.  And

7  that's all -- it happened that fast.

8  Q.  And tell the jury what you mean by Mr. Randolph and his

9  attorney were already at your building.  Mr. Randolph was in

10  custody at the jail, right?

11  A.  Yeah.  Mr. Randolph was in custody.  I don't recall what he

12  was in custody for, but he had wanted to provide information.

13  He came forward to us.  He had information regarding a homicide.

14  His attorney was present, and this is a deal that was brokered

15  with his Attorney.  We oftentimes have people that want to talk

16  to us.  And we don't -- Miranda and the Constitutional rights is

17  a good example.  When they're represented by attorneys, we in

18  this case go through their attorney who says hey, I want to

19  bring him forward.  I want to be present during the interview.

20  And that's exactly what happened.

21  Q.  Okay.  And you met with Mr. Randolph for more than 7 hours,

22  isn't that right?

23  A.  Yes.

24  Q.  And you met with him from 4:30 to almost midnight on

25  March 21st?

1  A.  Yes.  Yes.

2  Q.  And Mr. Joseph Caton was a Public Defender, right?

3  A.  He's an attorney -- yes.  Public Defender Attorney, yes.

4  Q.  And do you recall Mr. Caton leaving your interview with

5  Mr. Randolph?

6  A.  Yes.

7  Q.  And he left after a couple hours, right?  About 6:30?

8  A.  Yes.  After two hours his attorney felt comfortable leaving

9  his client with me.  He didn't want to stay any longer, and he

10  left for the day.  And then I continued without his attorney

11  present.  And it was agreed upon by both parties.

12  Q.  And was there anything in writing about that agreement, to

13  your knowledge?

14  A.  No.  He just said he wasn't staying long.  Staying anymore.

15  And oftentimes when the clients aren't involved in the case, and

16  they're just providing information, and they've had long days,

17  they sit there --

18  Q.  I think you're getting into speculation now about general

19  other experiences you've had.

20  A.  It's practiced -- I mean, practiced attorneys just leave.

21  Here's my client.  I spent two hours.  I'm going to leave for

22  the day.

23  Q.  Okay.  And attorneys -- that happens all the time that

24  attorneys don't stay with their clients while they're speaking

25  to the Police?

1    A.  Correct.

2    Q.  I'd like to have some names.

3    A.  Mr. Caton.

4    Q.  Okay.  Anyone else that you know of?

5    A.  It actually happens a lot, because their clients aren't

6    admitting that they had any involvement.  They're just providing

7    information.

8    Q.  And during this 7 hours that you met with Mr. Randolph, you

9    went out of the room a number of times, right?

10   A.  Yes.

11   Q.  And you're saying that you were alone in the room, then,

12   after Mr. Caton left with Mr. Randolph?

13   A.  Yes.

14   Q.  And we've heard testimony that usually homicide Detectives

15   meet with people in pairs?

16   A.  That's not always the case.

17   Q.  Okay.  Is that something that's individual to the Detective?

18   A.  No.  Some of it has to do with staffing.  Other times

19   it's -- in this case it's a witness, it's not a suspect.  So the

20   degree of danger isn't there.  I've talked to homicide suspects

21   that have killed people alone.

22   Q.  And Mr. Caton told you that Mr. Randolph had some

23   information about William Avery and the Maryetta Griffin murder,

24   right?

25   A.  Yes.

1    Q.  And that was before you started the interview at 4:30,

2    correct?

3    A.  Yes.  I start at 4:00, and the interview started at 4:30.

4    Q.  Okay.  And you've already told us that you went in and out

5    of the room numerous times, and the reason why you went in and

6    out of the room was to go back and review the Griffin file?

7    A.  Yes.

8    Q.  And before 4 o'clock you hadn't looked at the Griffin file

9    at all?

10   A.  Right.  Yes.

11   Q.  But at 4 o'clock when you got this information, you went and

12   read the Griffin file.  Is that accurate?

13   A.  The Griffin file is -- I mean, our homicide files are

14   sometimes thousands of pages.  I could not have read the file

15   from 4 o'clock until 4:30.  I mean, you're just getting to work

16   and setting up.  No, I did not read the file.

17   Q.  Okay.  You -- and maybe you're quibbling with me about

18   reviewing versus reading.  I mean, you went in and out of the

19   room to look at documents within the Griffin file.  Is that fair

20   to say?

21   A.  Yeah.  Throughout the 7 hours I read the file -- or I

22   familiarized myself enough that if they had follow-up questions,

23   I was able to answer them.

24   Q.  And where did you have to go to get the Griffin file?  Where

25   was it located?

1    A.   Our offices are on the fourth floor of the Police

2    Administration Building, which is here on 7th and State.  It's

3    about 10 blocks away.  Our offices and our conference rooms

4    are -- between here and the door is where Mr. Randolph would

5    have been, in a separate room.  But the distance is relatively

6    close.

7    Q.   This was a homicide from 1998 that had remained unsolved,

8    right?  Was there any particular place where those files were,

9    as opposed to active files?

10   A.   No.  We have our files numerical, and each one is given a

11   number moving forward.  And the file had a number, and all the

12   files just continued in sequential order.  So once I find a

13   name, I find a number.  And I just go into a big area and just

14   pull the file.  And again, it's all as close -- the files, the

15   conference room, and the interview rooms are as close as from

16   here to the door, basically.

17   Q.   Let me ask you this.  Do you read the Milwaukee Journal

18   Sentinel?

19   A.   Now it's JS online.  But back then it was the real papers.

20   Yes, I do.

21   Q.   No paper anymore?

22   A.   Yeah.  I'm a Wednesday, Sunday, subscriber.

23   Q.   Okay.  Back in '98 did you read the Milwaukee Journal

24   Sentinel, as it was called?

25   A.   Yes.

1    Q.  Do you remember seeing in 1998 a headline, man admits

2    killing, about the Maryetta Griffin murder?

3    A.  Not that I recall.  I know there are some regarding this

4    case -- there were some newspaper clippings in a file, but I

5    don't recall.  I mean, if I read the paper last Sunday, I

6    couldn't recall many articles.

7    Q.  So you didn't know anything about the Maryetta Griffin

8    murder before you went and retrieved the file on March 21st,

9    2001?

10    A.  No.

11    Q.  And had heard nothing about it being unsolved?

12    A.  No.

13    Q.  Had heard nothing about Mr. William Avery being -- admitting

14    to the killing, but not being charged?

15    A.  No.  Since '98 to 2001 we probably had 300 homicides, so --

16    it could be 400.  I did not know anything about that one.

17    Q.  But you had a pretty good clearance rate on those homicides,

18    didn't you?

19    A.  Yes.

20    Q.  Do you know what -- and tell the jury what a clearance rate

21    is.

22    A.  Clearance rate is when somebody gets arrested for a

23    homicide.  It's considered cleared.

24    Q.  And back when you joined the Homicide Department, what would

25    you say the clearance rates were, if you know?

```
 1   A.   I would say in the upper 80 percent.

 2   Q.   And did that ever change, to your knowledge?

 3   A.   It was into the 90's.

 4   Q.   And what about back in 1998?  Do you know if the clearance

 5   rate was in the 80's back then?

 6   A.   I would estimate it was.

 7   Q.   And when you met with Mr. Randolph, you knew he'd been

 8   around the block many times in investigations himself, right?

 9   A.   Yes.

10   Q.   And Mr. Randolph and you discussed William Avery's

11   involvement in the murder of Maryetta Griffin, right?

12   A.   Yes.

13   Q.   And Mr. Randolph told you that there was an individual by

14   the name of Little "C" that had information about the murder?

15   A.   Yes.

16   Q.   And Mr. Randolph actually didn't discuss William Avery's

17   involvement, other than Mr. Randolph telling you that William

18   Avery had made statements to you while they were both in prison

19   about the Maryetta Griffin homicide?

20        MR. SMOKOWICZ:  Object to the form of the question.

21   Statements to this Captain?  You said statements to you.

22        THE COURT:  Question should be rephrased.

23        MS. HOFT:

24   Q.   What Mr. Randolph was telling you is that he had a

25   conversation with William Avery while they were both in prison
```

1  where William made similar statements to what you saw in the

2  Griffin file with regard to what the Officers Hernandez and

3  Phillips said that William said back in 1998.  Is that fair to

4  say?

5  A.  Yes.

6  Q.  And Randolph also said that there was an individual by the

7  name of Little "C" who had information about the murder?

8  A.  Yeah.  Little "C" would have gotten rid of the body.

9  Q.  Okay.  But you never could -- you never could locate anybody

10  named Little "C", right?

11  A.  Correct.

12  Q.  And Mr. Randolph told you that his ex-girlfriend had

13  information about the identity of Little "C", but when you went

14  to speak to her, she denied having any knowledge?

15  A.  Correct.

16  Q.  And you knew that Mr. Randolph was coming forward seeking

17  cooperation or assistance to reduce his sentence, right?

18  A.  I don't know if he was -- he didn't express that to me, but

19  clearly his attorney had brokered the deal to bring him in

20  because he had information, and that's something that he would

21  have worked with his attorney.  I'm a Detective.  That just is a

22  fact gatherer.  I interviewed him, but we made no -- we did not

23  talk about any considerations.  As a matter of fact, it was the

24  opposite.  That there are -- you know, we don't -- we tell

25  people up front, I'm a Detective and I don't have that ability

1    to get any considerations.

2    Q.  But the fact that he had a Public Defender, and the Public

3    Defender Attorney was bringing Mr. Randolph in to see you, that

4    led you to believe that his attorney was bringing him in for a

5    reason, right?

6    A.  Yes.

7    Q.  And it's fair to say that oftentimes when attorneys get

8    involved, they're trying to seek some type of help for their

9    clients, right?

10   A.  Yes.

11   Q.  And you knew that at the time you were talking to

12   Mr. Randolph, right?

13   A.  That -- the attorney at one point would have -- would ask

14   for something in exchange for his testimony.

15   Q.  And you figured that's why Public Defender Attorney Caton

16   brought Mr. Randolph in to talk to you?

17   A.  Yeah.  But oftentimes they bring people in and it just

18   doesn't work out.  So I still have to find out what Mr. Randolph

19   has to say.  If it's credible and if it's going to help the

20   case.

21   Q.  And it took you 7 hours to find out what Mr. Randolph had to

22   say, right?  That first time?

23   A.  No.  We had to find out who Little "C" is.  I mean, it's not

24   what he had to say.  It's -- you -- what is it?  And then you

25   said Little "C" helped take the body away.  Now it's the whole

1  thing of how can I corroborate this?  How can I identify Little

2  "C"?  What bit of information can I work on to find the

3  girlfriend?  To find a gentleman by the name of Spencer

4  Caldwell.  To find Little "C".  So it's not what information.

5  It's you're giving me information, but now I've got to run with

6  this and get follow-up and find out, you know, what I can do to

7  move the case along.

8  Q.  But during that 7 hours, you didn't make any phone calls to

9  find out who Little "C" was.  You didn't call the girlfriend.

10  You didn't look at anything about Spencer Caldwell, right?

11  During that 7 hours?

12  A.  Spencer Caldwell, yes.  Gentleman was later found out to be

13  with the last name Bentley.  But I didn't know who Spencer

14  Caldwell was.  And right now my main focus was to deal with the

15  person that I had in the room, and follow up later would be to

16  talk to the girlfriend, so forth.

17  Q.  And that happened within that 7 hours on March 21st, 2001?

18  A.  Just dealing with Mr. Randolph.  Not working with the

19  girlfriend or Spencer Caldwell.

20  Q.  And that wasn't the only time that you met with

21  Mr. Randolph, correct?

22  A.  Correct.

23  Q.  And how many times did you meet with Mr. Randolph before he

24  testified at William Avery's homicide trial?

25  A.  The total -- I probably had 3 or 4 interactions with

1    Mr. Randolph.

2    Q.  And during those 3 or 4 times you met with Mr. Randolph

3    after March of 2001, did you spend again several hours with him?

4    A.  No.

5    Q.  Did you go over what Mr. Randolph would testify about?

6    A.  Yes.

7    Q.  And you did this each time you met with Mr. Randolph,

8    correct?

9    A.  No.  I went up to -- I believe it's Red Granite, to a

10   prison, and talked to him there.  And then you have to realize

11   this happened in 2001, and the trial didn't go until 2004.  So

12   it's several years.  I believe I had one prison visit which

13   wouldn't have lasted very long.  And again, it's just touching

14   base.  And then just before the trial was to start, that I

15   talked to him then.

16   Q.  But what you were touching base about was Mr. Randolph's

17   testimony.  Or expected testimony at Mr. Williams Avery's

18   homicide trial?

19   A.  Yes.

20   Q.  And in August of 2002, you went to see a man by the name of

21   Antron Kent, who was incarcerated in Oklahoma, correct?

22   A.  Yes.

23   Q.  And you spent about 3 hours with him, right?

24   A.  Yes.

25   Q.  And as you understood it, Mr. Kent had called the Milwaukee

1    Police Department back in April or May of 2002, right?

2    A.  No.  It was July 24th of 2002.

3    Q.  Right.  So it was your understanding that Mr. Kent called

4    the Police Station in July of 2002.  And he told someone about a

5    conversation he supposedly had with Mr. Avery while they were in

6    prison in April or May of 2002, is that correct?

7    A.  Yes.

8    Q.  And you don't recall asking Kent why he was calling the

9    Department in July about a conversation he had with Mr. Avery

10   back in April or May?

11   A.  He had problems.  He had to deal with the fact that he had

12   information.  He wanted to verify the information.  And it's

13   something that was bothering him.

14   Q.  But that was my question, Mr. Heier.  My question was you

15   don't recall asking Kent why he didn't call the Department

16   between April or May, when the conversation happened, and July,

17   when he actually did?

18   A.  No, I don't think I asked that exact question.  He just said

19   it's something that's been building and bothering him.

20   Q.  And again, before you went to meet with Mr. Kent, you read

21   the entire Griffin homicide file?

22   A.  Yes.

23   Q.  And it was your understanding, wasn't it, that Mr. Kent was

24   under a lengthy sentence for a very brutal crime of throwing

25   acid in his girlfriend's face?

1    A.  Yes, that's correct.  It was bad.

2    Q.  And Kent said his current girlfriend had information about

3    his claimed conversation with Mr. Avery, but she couldn't

4    provide that corroboration, right?

5    A.  No, the girlfriend didn't have any information.  We

6    interviewed the girlfriend to determine if she had information,

7    but ultimately the interaction between Mr. Avery and Mr. Kent

8    would have happened inside the prison.  It would be that -- what

9    did Mr. Kent tell the girlfriend?  Is that something that she

10   had additional information?  So we never had information that

11   the girlfriend had anything.

12   Q.  Right.  But Mr. Kent told you that the girlfriend knew, and

13   then you talked to the girlfriend and she couldn't confirm that,

14   right?

15   A.  No, I don't -- I don't recall the girlfriend having any --

16   well, I know the girlfriend didn't have any information, but I

17   don't know what the girlfriend -- what would the girlfriend

18   know?  It would be secondhand information.

19   Q.  You went to see her, right?

20   A.  Yes.

21   Q.  And Mr. Kent told you to go see her, right?

22   A.  Yeah.  Just to -- because as Detectives we have to ask and

23   investigate.  And is there anything more that we don't know?

24   And that's why we ask other people.

25   Q.  And how many times did you speak to Antron Kent before

1  Mr. Avery's homicide trial?

2  A.  We went to -- obviously I went to Oklahoma in 2002.  I also

3  went up to Green Bay in September of 2004.

4  Q.  That's it?  Just two meetings?

5  A.  And probably before the trial I would have touched base with

6  him.

7  Q.  You actually met with Mr. Kent three times, but only wrote

8  two reports, is that accurate?

9  A.  Yes.  I just said I probably touched base with him before

10  testimony.  So two formal interviews.  One in Oklahoma, one in

11  Green Bay.

12  Q.  And then when you touched base with him, it was to go over

13  what he would testify about at William Avery's homicide trial?

14  A.  Yes.

15  Q.  And that was true for each of the three times that you met

16  with Mr. Kent?

17  A.  Yes.

18  Q.  And let me draw your attention now to an individual by the

19  name of Jeffrey Kimbrough.  Do you recall speaking to Jeffrey

20  Kimbrough?

21  A.  Yes.

22  Q.  And where did you speak to Jeffrey Kimbrough?

23  A.  Jeffrey Kimbrough was also in Oklahoma in 2002.  On

24  August 26th of 2002, the first day we got to Oklahoma, we talked

25  to Mr. Kent, we took his information, and the following day we

1   went back to the prison and talked to the second individual in

2   custody, Jeffrey Kimbrough.  And that was the 27th of August.

3   Q.  And you spoke to Mr. Kimbrough, because the second time that

4   Mr. Kent reached out to the Milwaukee Police Department, he told

5   you oh, and by the way, Jeffrey Kimbrough overheard this

6   conversation in April or May of 2002 that he had with William

7   Avery?

8   A.  Yes.

9   Q.  And Mr. Kimbrough's also serving a lengthy 40 year sentence,

10  right?

11  A.  Yes.

12  Q.  And Mr. Kimbrough is also looking for help on his sentence?

13  A.  No.  Nor was Mr. Kent.

14  Q.  You have no recollection of Mr. Kimbrough wanting help on

15  his sentence?

16  A.  No.  Neither of them asked for any help.  Mr. Kent later on,

17  after the fact.  But neither, in any of the interactions, did

18  they ask for any considerations.  Any help on their cases or

19  anything.

20  Q.  And I think, as you said before, you knew that when an

21  attorney brings a client in, or when a client comes in to talk

22  to the Police who's incarcerated, that you -- that would lead

23  you to believe that they're looking for help, right?

24  A.  Yeah, the attorney would negotiate with the District

25  Attorney or other attorneys to say hey, my client is coming

1   forward.  Later on this is, you know, what can you do for me?

2   In this case Mr. Kent and Mr. Kimbrough had already been

3   sentenced.  They weren't represented by an attorney.  They

4   weren't going through anybody.  They made a cold call to the

5   Homicide Division.  Mr. Kent did, and said I have information on

6   a homicide.  And they're already -- it's -- convicted.  They're

7   done.  So we don't have to work with an attorney.  We just went

8   to the jail and talked to them.

9   Q.  But you understand that in a resentencing it's a factor to

10  -- for a Court to consider on resentencing an individual's

11  cooperation with law enforcement.  You're aware of that, right?

12  A.  Yeah.  In the 9 years or 10 years I've been in the Detective

13  Bureau, I was at one resentencing where somebody got -- they

14  didn't get any consideration at the time.  They were -- and that

15  was Mr. Kent.  He asked for some type of reconsideration, and

16  the Judge denied it at the time.  And that's one in 10 years.

17  Q.  And had you ever appeared at any sentencing hearing for

18  anyone else who cooperated with you, other than Mr. Kent?

19  A.  No.

20  Q.  And did you ever appear in court -- well, let me strike

21  that.  You met with Mr. Kimbrough how many times before his

22  testimony?

23  A.  The only thing I can recall is Oklahoma.  And then it would

24  have been during the Court proceedings before testimony.

25  Q.  So you don't recall meeting with Mr. Kimbrough four times

1    and only writing one report?

2    A.  The only report I wrote was the Oklahoma, and the only other

3    time would have been probably just before court.  I don't recall

4    the other -- I don't recall Mr. Kimbrough going to a prison or

5    anything like that.  But you're correct on the one report.

6    Q.  Okay.  But you're saying I'm not accurate about the three

7    other times without a report that you met with him?

8    A.  No.  The only thing I can recall -- I mean, I may have -- I

9    can only recall offhand the two times.  If there was a third,

10   it's very possible.

11   Q.  Do you recall testifying that you met with Mr. Kimbrough on

12   4 occasions?

13   A.  If I testified at the time -- I would have testified in 2004

14   when the trial was.  My memory would have been accurate at the

15   time.  If I testified to 4, it would have been 4.

16   Q.  And is it fair to say that in 2004, then, in September of

17   that year, the Maryetta Griffin case came back into focus

18   because the Milwaukee Police Department knew that Mr. Avery was

19   being released from jail?

20   A.  No.  We -- it was on our radar in 1998, and then it came

21   back in 2001.  There was no movement on it.  2002 we had a

22   couple guys in Oklahoma, and then it pretty much died from there

23   in 2002.  I was aware that Mr. Avery was going to be released.

24   He told me in 2003 he would be back in Wisconsin, but pretty

25   much it kind of died.

1  Q.  You mean the prosecution of William Avery kind of died

2  during those years?

3  A.  The whole investigation.  I don't believe there was anybody

4  else who came forward after that.

5  Q.  And in September -- September 7th of 2004, you spoke to

6  Mr. Kent to see if he was still on board?

7  A.  Yes.

8  Q.  And you then on that same day, September 7th, 2004, signed a

9  Criminal Complaint against William Avery for reckless homicide,

10  right?

11  A.  Yes.

12  Q.  And Mr. Avery was arrested at his Probation Agent's office?

13  A.  Yes.

14  Q.  And in 2005, during Mr. Avery's homicide trial, you were the

15  lead Detective, right?

16  A.  Yes.

17  Q.  And that meant that you were in court each day?

18  A.  Yes.

19  Q.  And with regard to these 3 jailhouse informants that you

20  worked with, you didn't use any other techniques to determine if

21  they were telling the truth.  You just gathered the info they

22  had, right?

23  A.  No.  We -- at the prison Mr. Kent and Mr. Kimbrough

24  indicated that they were -- had access to Mr. Avery.  We showed

25  them photographs.  Can you identify out of 6 photographs who is

1  Mr. Avery?  So it's more of a verification process.  Checked

2  with the guards.  Could they have logistically been in the place

3  that they claimed to be in to hear these conversations?  And it

4  was verified.  Other things -- some of the details that they

5  provided, it was consistent with where the case was.

6  Q.  But you didn't use any interrogation techniques to sort out

7  or test whether Mr. Kent and Mr. Kimbrough were telling the

8  truth, other than gathering the information.  Do you remember

9  testifying about that?

10      MR. SMOKOWICZ:  Objection, Your Honor.  This has been

11  answered already.

12      THE COURT:  Well, it's a follow-up.  He may answer, if

13  he can.

14      THE WITNESS:  Did I use interrogation techniques?  No.

15  These were voluntarily people coming forward.

16      MS. HOFT:

17  Q.  And you would agree with me that one of the concerns of

18  jailhouse informants is that they may be manufacturing or

19  concocting a story in order to get leniency in their own case?

20  A.  I'm sorry?  Could you repeat that?

21  Q.  Would you agree with me that one of the concerns of

22  jailhouse informants is that they may be manufacturing or

23  concocting a story in order to get leniency in their own case?

24  A.  Yes.  However, the leniency was discussed.  That there are

25  no threats or promises.  So when I talked to them, there was

1  nothing to indicate that they were getting any leniency at all.

2  Q.  And jailhouse informants have a high motivation to lie.

3  Would you agree with me on that?

4  A.  No, I don't know about the high.  I don't know -- I get a

5  lot of people that come forward because they're in jail and

6  people are talking to them.  I don't see the motivation to lie,

7  no.

8  Q.  Let me ask you this.  Jailhouse informants with 30-plus

9  years on a sentence have a high motivation to potentially tell

10  untruths.  Would you agree with me on that?

11  A.  No, because a lot of times people -- they've done their

12  time.  People change so much.  I've been to so many prisons.

13  They change.  They redirected their life.  They found God.  They

14  want to do the right thing.  There's a lot of that going on, and

15  they realize they're locked up forever.  And people tell them

16  stuff, and they -- it's almost like a rebirth.  They want to

17  help people, because in some cases there are victims, and they

18  made mistakes.  And that's why they become preachers in prison.

19  So the motivation to lie?  I don't see a lot of that happening.

20  Q.  And if I understand you correctly, you're saying that in

21  30 -- a 30-plus year sentence is basically the rest of your

22  life?

23  A.  Yeah, I'd say 30 years is pretty much your -- it could be

24  the rest of your life.

25  Q.  And you wouldn't agree with me that a concern with a

1   jailhouse informant who is under a 30-plus year sentence --

2   there being a high motivation to potentially tell untruths in

3   order to get reductions that are beneficial to their own cases.

4   You would not agree with me?

5   A.   I testified I went to one re-characterization of a sentence.

6   Mr. Kent.  I have never seen anybody that got 30 years, or a

7   homicide, or anything else, get any consideration.  I've never

8   seen it.  Clearly in 2005 I didn't.  In 2009.  In 2015.  I've

9   never seen anybody successfully get anything knocked off a 38 to

10  40 year sentence.  I've never seen it.

11  Q.   So you don't think there's a concern, and you would not

12  agree and wouldn't have agreed in your deposition that a

13  jailhouse informant under a 30 year plus sentence has a high

14  motivation to tell untruths?

15  A.   I think that -- but that's why we have the checks and

16  balances.  I don't know about --

17  Q.   Is that a concern, Mr. Heier?

18  A.   I think the word you're using is a high motivation.  I see

19  that there's a motivation.  And that's why we check and balance

20  and try to do as much as we can.  Part of the process is

21  testifying in court.  I mean, they raise their hand and they

22  swear to tell the truth just like everybody does.  I mean,

23  there's processes that go through this.  They have to actually

24  show up, see the accuser, if they're lying.  Those are processes

25  that happen.

1    Q.  Do you recall agreeing that it is a concern that jailhouse

2    informants -- and I'm at page 93 of the deposition.

3              MR. SMOKOWICZ:  Well, if we're going to do this, let's

4    do it by question and answer here.  What line?

5              THE WITNESS:  The question I'm hung up on is the word

6    high.  I mean, do they have motivation?  I testified yes, they

7    have a motivation.  Have a high motivation?

8              MS. HOFT:

9    Q.  Were you hung up on that word high at your deposition?

10   A.  Yes.  No, I'm just saying, if that's -- the word high.  I'm

11   sitting here today saying a high motivation?  Yes.

12   Q.  And you're saying back when you gave your deposition you

13   might not have had a quibble with the word high?

14   A.  You can read the deposition.  And if I said it then, that's

15   fine.

16   Q.  Thank you.  I will read the deposition.  Certainly a concern

17   that you always have as a jailhouse informant --

18             MR. SMOKOWICZ:  Just a second.  I'm sorry.  I object.

19   That's not proper cross examination.  The question and answer

20   should be read.  And I don't know where you're reading from.

21             THE COURT:  Page 93.  What's the line?

22             MS. HOFT:  It's line 19 through 24.

23             MR. SMOKOWICZ:  Well, the question begins at line 18,

24   and the answer goes on to the next page.  And I'd ask that the

25   entire answer be read.

1          MS. HOFT:  Your Honor, this is a statement of a party.

2          THE COURT:  Well, let's read the deposition here.  And

3    for purposes of completeness the full answer should be given, if

4    it's one answer to one question.  Or two questions.

5          MS. HOFT:

6    Q.  Mr. Heier, you've repeatedly told us I believe about

7    testifying at Mr. Kent's resentencing hearing.  And that was the

8    only time you ever did anything like that, right?

9    A.  Yes.  And I testified under subpoena.  I mean, I was

10   subpoenaed to be there.

11   Q.  And that was at Mr. Kent's request, right?

12   A.  Yes.

13   Q.  And you testified at Mr. Kent's resentencing hearing that he

14   gave helpful testimony in William Avery's trial and cooperated

15   with law enforcement, right?

16   A.  Yes.

17   Q.  And after you testified, there was no change in Mr. Kent's

18   sentence, but later there was a subsequent sentencing hearing

19   where Mr. Kent received a year reduction, correct?

20   A.  Yes, at the --

21   Q.  That's the only question I have for you.  And that's the

22   last question I have for you.  Thank you.

23          THE COURT:  Mr. Smokowicz.

24          MR. SMOKOWICZ:  Thank you, Your Honor.  I have a few

25   questions.

1          **CROSS EXAMINATION**

2     **BY MR. SMOKOWICZ:**

3     Q.   Your Honor, I want to start off with the completion of that

4     prior testimony that we had the issue about.  Actually I'm going

5     to pass on that for the moment.  Can't read my own handwriting

6     today.  Captain Heier, you mentioned earlier that with respect

7     to Keith Randolph and his attorney, that the attorney would have

8     asked for something.  Would that attorney, Mr. Caton, have asked

9     you for something?

10    A.   No.

11    Q.   Who would he have asked for something, if anybody, before he

12    allowed his client to meet with you?

13    A.   That would be the charging District Attorney, Mark Williams,

14    in this case.

15    Q.   And do you -- before you met with Keith Randolph that day,

16    and his attorney, were you aware of any terms or any discussion

17    that they had?

18    A.   Absolutely nothing.

19    Q.   Did that influence you in any way in what you did that day

20    in terms of your questioning of Mr. Randolph?

21    A.   No.

22    Q.   In fact, before you walked into that room that day were

23    you -- other than being told that this individual had some

24    information with respect to a homicide, did you even know which

25    homicide?

1   A.   No.

2   Q.   And prior to that day had you worked on -- worked on the

3   Maryetta Griffin homicide, if you know?

4   A.   I know for a fact I did not.  I looked for any reports that

5   I may have written.  Any witnesses.  I was not involved in the

6   case whatsoever.

7   Q.   And can you describe for the jury, how were you able to look

8   for anything that you do in terms of that homicide file?

9   A.   We have a -- we have basically a book that's got victim's

10  names, address names, and file numbers assigned to it.  I would

11  look at the year they said it occurred, the area it occurred,

12  and just find something that references that.  And again, it

13  references to a number.  And I just go into a room and find the

14  file with that number on it, and then it's just a matter of all

15  the reports are there.  All the photographs, all the witness

16  interviews, any suspect interviews, everything is contained in

17  this file.

18  Q.   And with respect --

19           THE COURT:  Excuse me.  Let me ask the witness.  Is

20  that -- for my purposes, is that the M-1 file?  Is that --

21           THE WITNESS:  Yeah.  It's an M-file.  The "M", murder.

22  They started it with murder one, so it's M-1 and it goes

23  forward.  So I don't know what we're up to now.  6,000.  So it's

24  M-6002 is probably what we're at now.  And that just goes back

25  to when they started assigning files.  And you will see numbers

1  written on pages and documents that refer to this.  So all the

2  reports go into the M-file.

3           MR. SMOKOWICZ:

4  Q.  So I know that you were not the author of this report, but

5  if we look at this report -- for example, at the top right hand

6  corner, there's an M-number there for this case?

7  A.  Yeah.  This is a 1998 case, so it's M-3431.  Again, it's the

8  3,400th homicide since they started this numerical system.

9  Q.  Do you know how far back that extends?

10  A.  No, I don't know, but I know we've got M-1.  We've got that

11  original file.

12  Q.  And what number, to your understanding -- I know you've been

13  out of the homicide unit for awhile, but what number are we at

14  at this point?

15  A.  We're in the -- probably five or 6,000 now.

16  Q.  And is that consecutive from year-to-year?

17  A.  Yes.

18  Q.  So this is not the 3,431st homicide, thank goodness, in

19  1998.  This is since whenever number one was assigned?

20  A.  Yes.

21  Q.  Now, you were asked earlier by Miss Hoft about you meeting

22  with Mr. Kent in September 2004, and she asked you whether or

23  not you met with him in order to determine whether he was,

24  quote, still on board, close quote.  Could you explain why you

25  met with Mr. Kent at that time?

A.  Yeah.  Well, I talked to him the first time, again, in
Oklahoma in 2002.  He provided a statement, and I subsequently
interviewed Mr. Kimbrough at the facility.  Now, this is 2002.
We haven't done -- I personally haven't done anything for a
couple years.  And a lot of times we need to touch base with
them to say hey, we remember you, you didn't waste your time
talking to Police, and then we just throw you away and just
forget about you.  We just try to at least touch base with
people.  And in this case, on September 7th of 2004, 2 years
later, the District Attorney was prepared to issue the charge
against Mr. Avery.  Mr. Kent would be one of the witnesses.  And
here I am, two years later.  And I know you talked to me back in
2002, but again, is this still accurate information?  Do you
still remember?  And are you willing to go through?  Because
once we issue the charges, at some point you're going to have to
testify.  And that's something we put in the statement.  Are you
willing to testify?  Is it a true statement?  Are you willing to
testify?

          So two years later, are you still -- when I said the
word on board, are you still willing to testify and cooperate?
Because if he wasn't, or he says no, then I would have to bring
that to the District Attorney, because at some point he may be
called to testify.  And clearly this happens now in 2005.  So
now we are 3 years after my initial contact that he actually had
to testify.

1  Q.  In your experience is there a reason why someone that you've

2  spoken to and who's provided information in prison would

3  subsequently not be willing to go forward with providing

4  testimony?

5  A.  Yeah.  Well, they're called snitches.  I mean, they're in a

6  prison system.  They get threatened.  They see a lot.  And when

7  you go back into a prison, you're labeled.  Because people see

8  this stuff.  We have computers that inmates can just find out

9  information, share information.  When you testify against

10 another inmate, the person -- you're not looked at favorably.

11 And things may have changed in their personal lives, and their

12 experience, and sometimes people say no, I don't want to do

13 this.  I changed my mind.  But it's still something I have to

14 tell the D.A. before we move forward.  Before we issue the

15 charges.  Is he willing to testify?  Is this still true?  Is

16 there anything else you want to add?  And that's the reason for

17 that meeting on the 7th of September.

18 Q.  In your testimony earlier you were asked about being in

19 Court each day and being the lead Detective.  Could you explain

20 to the jury why you would have been in court and been what was

21 called for that trial the lead Detective?

22 A.  Couple different reasons.  I was on the Homicide Unit in

23 2000 but clearly I've grown and matured in 2005.  I was the

24 person that had the last interactions with people.  My 3

25 witnesses ultimately are a key to moving this case forward,

1    because somebody was charged.  I'm also second shift, so I'm

2    able to -- so you don't take away a day shift Officer to sit in

3    trial every single day.  Being second shift, they're not losing

4    a person on the streets.  So I would sit with the District

5    Attorney similar to at the table there.  I would be the

6    co-person able to pull reports, able to get photos, anything

7    that the District Attorney -- it's like a helper to the District

8    Attorney.  And it had to do with my maturing in the Unit.  The

9    fact that I was second shift, and the fact that I had such a

10   familiarity later on in the movement of this case.

11   Q.  Is your role as lead Detective -- or I'm sorry.  As the

12   Detective assisting the District Attorney, is that in any way

13   connected to why you would be meeting with Antron Kent, or Keith

14   Randolph, or Jeffrey Kimbrough during the course of that trial?

15   A.  Yeah.  That's part of the duties, is you meet with the

16   witnesses.  With the D.A., oftentimes.  And also explain the

17   process.  Because, you know, people don't know how this works.

18   You're going to be called.  You're going to sit in this, you

19   know, chair.  There's going to be a microphone.  They're going

20   to ask you questions.  And just -- it's more of -- it's also the

21   comfort level, because it's -- from the sterile setting of being

22   in a prison, to now you're going through hallways, and locked

23   up, and being carted off to various different cells.  Very

24   unfamiliar.  And it's just a reassuring, this is what's going to

25   happen, and this is how it goes.

1  Q.  Earlier you testified about showing a photo array to at

2  least Antron Kent.  Did you also show one to Jeffrey Kimbrough

3  when you met with him in Oklahoma?

4  A.  Yes.

5  Q.  Can you explain what a photo array is for the jury?

6  A.  Certainly.  A photo array is 6 individuals that look

7  similar.  When somebody says hey -- in this case Mr. Avery --

8  hey, he provided information.  Okay.  Now I want to -- part of

9  the checks and balances.  I want to verify is the person that we

10 have as Mr. Avery, can you pick him out?  You know, not that

11 they're giving me a lot of information, and then when I show a

12 picture of them, they go no, I don't know who that is.  You

13 know?  And then it's more of a credibility thing.

14          So it's 6 individual photos, and showing the

15 photographs.  And it's, again, kind of like a test.  Who is the

16 person that you're providing information?  Who's the person that

17 told you this information?  Where is he in this picture?  And

18 can you identify him?  And in the case of Mr. Kent and

19 Mr. Kimbrough, they both were able to.

20 Q.  They were both able to do what?

21 A.  They were able to pick out Mr. Avery from the 6 random

22 photos of people of similar skin color, height, age, weight.

23 Q.  Last but not least, with the Court's permission I'm going to

24 read in that portion of the deposition transcript for

25 completeness.  And I will read the whole question and the whole

1    answer as one.  Question:  Okay --

2              THE COURT:  Is this Page 139?

3              MR. SMOKOWICZ:  Page 139, line 2.

4              MS. HOFT:  Objection, Your Honor.  Foundation.  Page.

5    And is this impeachment?  Is this admissible on some level?

6              THE COURT:  Is this the ruling that the Court made

7    that you can read it at this time?

8              MR. SMOKOWICZ:  What this was, Your Honor, was the

9    Court indicated that you did not want to have the rest of that

10   answer given at that time, but for smoothness in the

11   presentation I'd be allowed to do it now.

12             THE COURT:  Right.  Right.  Okay.

13             MS. HOFT:  And -- I'm sorry.  I would just ask for the

14   page.

15             MR. SMOKOWICZ:  It's Page 139, beginning at line 2,

16   ending at line 14.  Question:  Okay.  How about when you were

17   there?  Did you have any awareness of a group of unsolved female

18   homicides, particularly in the north Milwaukee area?  Would that

19   be a concern of the Detective Department?  Answer:  Well,

20   obviously this was 1998, and I believe there was some before I

21   came there.  I mean, if I came in 2000, this was a couple years

22   earlier when prostitutes were found.  But nothing that -- we

23   didn't have any serial killers that killed more than 2 or 3, you

24   know.  One instance where they killed two people.  Or one

25   incident where they killed three people.  I don't recall ever

1    putting multiple cases together on anybody.

2              Thank you, Your Honor.  That's all I have.

3              THE COURT:  Okay.  Any recross?

4              MS. HOFT:  Just briefly, Your Honor.

5                     **REDIRECT EXAMINATION**

6    **BY MS. HOFT:**

7    Q.  Mr. Heier, one of the issues that you were explaining about

8    testing was to give a photo array to a jailhouse informant to

9    see if they could actually pick out the person they were in

10   jail -- or in prison with?

11   A.  Yes.

12   Q.  And you also mentioned that -- and you used the word

13   snitches in prison have access to computers?

14   A.  Yes.

15   Q.  So that's a concern to you?  That a snitch might get

16   information about a crime from the public domain?

17   A.  No.  I don't know how many computers were back in 2001, but

18   --

19   Q.  I'm just asking you.  That's what you said in your answer to

20   Mr. Smokowicz's question.  So I'm just trying to understand what

21   you just said, which is snitches have access to computers.  And

22   now you're trying to tell me that, well, not really?

23   A.  No, I'm --

24             MR. SMOKOWICZ:  Your Honor, I'm just going to object,

25   if I may.  I'm going to object to the form of the question as

1   misstating his prior testimony.  He did not say snitches have

2   access to computers.

3           THE COURT:  Overruled.  He may answer the question.

4           THE WITNESS:  Okay.  You asked two questions.  One was

5   that people can research things.  And I think you're referring

6   to this 1998 or 2000 incident.  I don't know in 2002 what they

7   could investigate or look up relative to a homicide.  That's

8   what you said.  The other thing is as far as snitches, if you

9   look at -- and obviously you can't do this, because there's some

10  sequestration -- if you look up the William Avery case, it

11  specifically says that there's a witness that testified

12  against -- there are three witnesses that testified against

13  William Avery.  Those three people being --

14          MS. HOFT:

15  Q.  I'm sorry.  Are you telling us now when you Google William

16  Avery this is what you see?  Or this is what you saw back in

17  2002?  When you Googled William Avery?  I'm confused.

18  A.  Okay.  In 2005 when the case went to trial we have

19  witnesses.  If you look at cases -- and prisoners can do this

20  now and in 2005 -- you will see who testified on a specific

21  case.  When people like Antron Kent go back to prison, prisoners

22  can look.  Hey, you went to Milwaukee.  And if information was

23  through friends and family, Antron testified, it can be verified

24  on computers that Antron testified on a case.  Or people testify

25  in a specific case.  Or people put in things.  So when you go

1    back to prisons, you're labeled a snitch because you provided

2    information.  You helped the Police.  And these are things that

3    have checks and balances and can be -- that can be verified

4    through computers.

5    Q.  I see what you're saying.  So -- but is it true that in 2002

6    someone who had access to a computer could have accessed a 1998

7    newspaper article published in the Milwaukee Journal that said

8    man admits to killing?

9    A.  I don't know how advanced it was back then.  I don't know.

10   Q.  Did you have any concerns about whether Antron Kent accessed

11   a computer and received public information about the allegations

12   of Milwaukee Police Detectives that William Avery made

13   statements implicating himself in Maryetta Griffin's murder?

14   A.  Two parts.  I don't know if you can type in 1998 William

15   Avery and find a referencing article in the Journal Sentinel.  I

16   don't know if they scanned those and put them -- because that

17   was an old newspaper.  Moving forward we have JS Online.  And I

18   don't know the archival.  So I don't know if you can even do

19   that today, however many years after the fact.  I don't know

20   that answer.

21          Was it a concern?  There were articles printed in the

22   Journal.  We had them in the file.  Was it -- do we think that

23   people are going to read this?  I don't know.  I mean, I've

24   never been in a situation where somebody put together more facts

25   out of an article.  I think there's more that we look at.  And

1  again, the checks-balances.  This person has to go on the stand

2  and swear that their testimony is true.  Some of the facts that

3  they were with the prisoner at one point is verified.  In

4  Mr. Kimbrough's case, the things that they say -- or I'm sorry,

5  Mr. Randolph -- this is a close family friend that's coming

6  forward and providing information.  You know, this is somebody

7  that was in this case a pallbearer at Mr. Avery's mother's

8  funeral.  This is somebody that's close to him, and yet he's

9  providing information to us.  Ultimately to a confidant.

10 Q.  Did you have any concerns that Mr. Kent saw a newspaper

11 article in 1998 or at any point that was headlined man admits to

12 killing?  Did you have any concerns about that?

13 A.  No.  It never came to my mind.

14 Q.  Yeah.  And you've indicated that you didn't tell anybody

15 that you were going to testify at Mr. Kent's sentencing hearing

16 until you received a subpoena from Mr. Kent's lawyer, right?

17 A.  What do you mean, I didn't tell anybody?  I mean, I

18 testified and the D.A. testified, too.  So there were more

19 than -- it's not a secret, because the D.A. is also somebody.

20 Q.  But you and the D.A. testified at the Antron Kent, the acid

21 thrower sentencing hearing, that Antron Kent cooperated with law

22 enforcement and testified against William Avery in his homicide

23 trial, right?

24 A.  Yes.

25 Q.  And had you let anybody know beforehand -- or had you told

1  Mr. Kent hey, if you subpoena me for your sentencing hearing, I
2  will come and I will testify that you helped us and you
3  cooperated with us.  Had you told -- had you told him that, you
4  would have had to disclose that fact to Williams' defense
5  attorney before his homicide trial, right?
6  A.  I didn't tell him that.
7  Q.  Right.  But if you had, you would have had to disclose it,
8  right?
9  A.  Okay.  We can get subpoenaed --
10 Q.  And the reason is, you would have had to disclose --
11       MR. SMOKOWICZ:  I object.  She's arguing with the
12 witness and not allowing him to answer.
13       THE COURT:  Let's let him answer the question.  The
14 question is you would have to disclose that if you made that
15 offer to him.
16       THE WITNESS:  If I made the offer to him, it would be.
17 But I didn't.  I wrote down that there are no threats, promises.
18 I write this down and tell them because I can't do anything for
19 them.  I don't have that power.  If later on he gets -- he was
20 not represented by an attorney.  And if he later on gets an
21 attorney and they subpoena me, and the D.A., and anybody else,
22 we have to show up.  We don't have those choices.
23       MS. HOFT:
24 Q.  You had the power to testify on behalf of Mr. Kent at a
25 sentencing hearing, right?

```
 1            MR. SMOKOWICZ:  I'm going to object, Your Honor.
 2    Misstates his prior testimony.
 3            THE COURT:  Well, I assume he voluntarily showed up
 4    and testified?
 5            MR. SMOKOWICZ:  But, Your Honor, he says he was
 6    subpoenaed and that's why he testified.
 7            THE COURT:  Right.
 8            MS. HOFT:
 9    Q.  Well, I'm just saying you had the physical personal power to
10    get up into the witness stand at Mr. Kent's sentencing hearing
11    and testify on his behalf.
12    A.  I like the word you use.  Power.  But I --
13            MS. HOFT:  Nobody else did.  Thank you.
14            MR. SMOKOWICZ:  Your Honor, he can answer?
15            THE WITNESS:  I was subpoenaed and I was asked
16    questions, just like we're asking questions.  And did he
17    cooperate?  Yes.  Did he testify truthfully?  Yes.
18            MS. HOFT:
19    Q.  And had Williams' defense lawyer known at William's homicide
20    trial that you were going to testify for Antron Kent, he could
21    have used that to discredit Mr. Kent's motive for coming
22    forward, isn't that right?
23            MR. SMOKOWICZ:  Objection to the form of the question.
24    Assuming facts not in evidence.  That is about any kind of
25    arrangements.
```

1          THE COURT:  Well, it is a hypothetical, and the Court

2     will advise the jury that the witness can be asked a

3     hypothetical question.  But if the evidence doesn't show that

4     the facts supporting the hypothetical are proven, then you are

5     to disregard the answer to the hypothetical.  That's perfectly

6     clear, isn't it?  He may answer the hypothetical, though.  Go

7     ahead, counsel.  I forgot the exact nature of the --

8          MS. HOFT:  I'll try again, Your Honor.  Thank you.

9     Q.  If your testimony at Mr. Kent's sentencing hearing had been

10    told to William's lawyer during the homicide trial, he would

11    have been able to use that to discredit Mr. Kent's motives for

12    testifying?

13    A.  Yes.

14         MS. HOFT:  No further questions, Your Honor.

15         THE COURT:  Anything else?

16         MR. SMOKOWICZ:  I do have one thing, Your Honor.

17         THE COURT:  Okay.

18         MR. SMOKOWICZ:  Just clarification.  And obviously we

19    are intending to recall our client back in our case here, so I

20    will confine my question to the examination this morning.

21                        **RECROSS EXAMINATION**

22    **BY MR. SMOKOWICZ:**

23    Q.  Captain Heier, in terms of the sequence of these things

24    here, Antron Kent's testimony in William Avery's criminal trial

25    and your being subpoenaed for testifying in some resentencing

1    hearing, what was the sequence there?

2    A.   The sequence was he testified at Mr. Williams Avery's trial

3    months, years -- I don't know when.  I mean, there's

4    documentation we could re-call.  It was quite a ways after.  And

5    again, he wasn't --

6    Q.   What was quite a ways after?

7    A.   The request for consideration and resentencing.  That was

8    far afterwards.  And when I was there, he was denied.

9    Q.   So was there any subpoena issued to disclose?

10   A.   No, I would not disclose anything.  I didn't know that it

11   was happening.  I was not subpoenaed ahead of time.

12            MR. SMOKOWICZ:  Thank you.  That's all I have.

13            THE COURT:  Anything else?

14            MS. HOFT:  No, Your Honor.

15            THE COURT:  All right.  You may step down, Captain

16   Heier.  Thank you.  Watch your step, please.  Ladies and

17   gentlemen, we're going to -- well, let's -- is the next witness

18   going to be Mr. Kimbrough?

19            MS. HOFT:  Mr. Randolph, actually.

20            THE COURT:  Or Mr. Randolph.  And so we'll take the

21   morning break, in any event.  And we'll take that witness when

22   you get back, ladies and gentlemen.  Again, please don't discuss

23   the case among yourselves.  Only after all the evidence is in.

24            (Whereupon the jury was excused at 10:35 a.m.)

25            THE COURT:  Okay.  Take a break until we get

1    Mr. Randolph.

2         MR. STAINTHORP:  Mr. Randolph is here, Judge.  He's

3    not in custody.

4         THE COURT:  Oh, he's not in custody?  Good.  Will have

5    to take a little longer break because Mr. Kimbrough is in

6    custody.  Okay.

7         (Whereupon a recess was called by the Court.  Upon

8    conclusion of the recess, the proceedings continued as when the

9    jury was returned to the courtroom at 11:06 a.m.:)

10        **JEFFREY KIMBROUGH,** called as a witness, having been

11   first duly sworn, on oath testified as follows:

12        THE CLERK:  And pull the microphone down.  State your

13   full name and spell your last name for the record.

14        THE WITNESS:  Jeffrey Kimbrough.  K-I-M-B-R-O-U-G-H.

15                        **DIRECT EXAMINATION**

16   **BY MR. ELSON:**

17   Q.  Good morning, Mr. Kimbrough.  How old are you, sir?

18   A.  38.

19   Q.  And are you presently incarcerated?

20   A.  Yes.

21   Q.  Where are you currently incarcerated?

22   A.  Prairie du Chien.

23   Q.  And that's a prison?

24   A.  Yes.

25   Q.  You're in prison for child abuse and reckless homicide, is

1  that right, sir?

2  A.  Yes.

3  Q.  And when were you convicted of those crimes?

4  A.  '98.  1998.

5  Q.  And what is your sentence?

6  A.  40.

7  Q.  40 years?

8  A.  40 years.  Yes, sir.

9  Q.  Now, in 2005 you testified at William Avery's criminal

10 trial, is that right?

11 A.  Yes.

12 Q.  And you were called as a witness for the prosecution?

13 A.  Yes.

14 Q.  And you testified that you overheard William Avery have a

15 conversation with Antron Kent, right?

16 A.  Yes, I did.

17 Q.  And that in this conversation William Avery had with Antron

18 Kent, you said you overheard William Avery say that he choked

19 and killed a woman and got one of his guys to help him get rid

20 of the body, is that right?

21 A.  Yes, I said that.

22 Q.  Was that testimony true or false, sir?

23 A.  It's false, sir.

24 Q.  Did you ever overhear William Avery confess to Antron Kent

25 that he choked and killed a woman?

1   A.  No, sir.

2   Q.  Prior to Mr. Avery's criminal trial, were you interviewed by

3   Milwaukee Police Detectives?

4   A.  Yes.

5   Q.  And I want to ask you some questions about the initial

6   meeting that you had with the Milwaukee Police Detectives.  Tell

7   the jury how that came about.

8   A.  Talking the first time when they came down to -- down to

9   Oklahoma?

10  Q.  The first time that you ever met with a Milwaukee Police

11  Detective in relation to William Avery.

12  A.  Okay.  I was working in the kitchen.  I come -- I came back.

13  Antron Kent had told me that the Police come down to talk to me.

14  Q.  Where were you at this point?

15  A.  I was on the unit.

16  Q.  You were in prison?

17  A.  Yes, I was in prison.

18  Q.  What prison were you in?

19  A.  Oklahoma.

20  Q.  Okay.  And what year was this?

21  A.  Like 2002.

22  Q.  Okay.  And you were saying that Antron Kent told you that

23  some Police wanted to speak with you?

24  A.  Yes.

25  Q.  And what happened next?

```
1    A.  They called me down and -- to interview me.  And I talked to
2    them.  They asked me a couple questions.
3    Q.  How many Police Officers were there?
4    A.  It was two guys.
5    Q.  What were their names?
6    A.  Only one I know is Tim Heier.  I don't know the other one.
7    Q.  Timothy Heier?
8    A.  Yes.
9    Q.  And where did you meet with Detective Heier and this other
10   Detective within the prison?
11   A.  It was little room off to the side by the property room.
12   Q.  Okay.  And describe what happened during this meeting with
13   Detective Heier and the other Detective.
14   A.  He asked me some questions about --
15           MR. SMOKOWICZ:  Your Honor, since there are two people
16   there, I'd like to know which Detective.
17           MR. ELSON:
18   Q.  You said he asked you some questions.  Which Detective?
19   A.  That was Tim.
20   Q.  Officer Heier asked you some questions?
21   A.  Yes.
22   Q.  What questions was he asking you?
23   A.  Just asked me some general questions about my family, me.
24   And then he went on to talk about the incident.
25   Q.  What did he say to you about the incident?
```

1  A.  He asked me -- he said yeah, I heard that you had some

2  information about what you just told me.  And I talked to him

3  about it.  And, you know, told him that -- I told him some

4  things that wasn't true.

5  Q.  Did Detective Heier during this interview provide you with

6  any details about the incident?

7  A.  He -- he told me that she was killed at some house or

8  something.

9  Q.  And prior to speaking with Detective Heier that day, did you

10 know that she'd been killed at some house?

11 A.  No.

12 Q.  Did -- other than Detective Heier telling you that she'd

13 been killed at a house, did he provide you with any other

14 details?

15 A.  Well, he said that she was -- she was thrown in a dumpster

16 or something.  And then I made that story up, you know -- about,

17 you know, Antron.  And about the rec thing.

18 Q.  Can you tell the jury what you mean about the story and the

19 rec thing?

20 A.  Well, Antron Kent, he provided some information about, you

21 know, what supposedly had happened.  And I went along with it.

22 Q.  How long did this interview with Detective Heier and the

23 other Milwaukee Detective in Oklahoma last?

24 A.  It was awhile.  I don't know how long.

25 Q.  A number of hours?

1  A.  I don't know.  Wasn't no clock or nothing around.

2  Q.  After this initial interview concluded, did you have another

3  meeting with Milwaukee Police Detectives after that at any

4  point?

5  A.  I remember coming to Jackson like before the first trial.

6  It was like 2005.

7  Q.  This was a different prison you were in?

8  A.  Yes.

9  Q.  And this was in 2005?

10 A.  Yes.

11 Q.  In-between the first meeting that you just told us about

12 with Detective Heier in 2002, and this second meeting three

13 years later in 2005, did you have any other meetings with any

14 Milwaukee Police Detectives?

15 A.  No.

16 Q.  Tell me about the meeting in Jackson Correctional

17 Institution in 2005.  Which Detectives did you meet with at that

18 time?

19 A.  It was only one that came.

20 Q.  And who was it?

21 A.  It was Heier.

22 Q.  And where did you meet with Detective Heier on this

23 occasion?

24 A.  It was a little conference room.

25 Q.  And can you describe for the jury what happened during this

1   meeting?

2   A.  Just went over some -- over the statement.  That was just

3   about it.  Just went over the statement before court.  And that

4   was it.

5   Q.  Did you at any point meet with Milwaukee Police Detectives

6   Katherine Hein and Gilbert Hernandez?

7   A.  Yes.

8   Q.  When did that meeting occur?  Was that meeting before this

9   meeting you just told me about at Jackson?

10   A.  No -- yes.  It was -- it was in 2004?

11   Q.  Okay.  And you were in prison at that time?

12   A.  Yes.

13   Q.  Were you in a different institution at that time?

14   A.  Yes.

15   Q.  Where were you?

16   A.  Appleton, Minnesota.

17   Q.  And you were interviewed by Detectives Hein and Hernandez on

18   this occasion?

19   A.  Yes.

20   Q.  And what -- tell us about that interview.  What happened

21   during that interview?

22   A.  They just -- they came to talk to me.  Went -- kind of went

23   over the statement.  I guess they came up for him, because I

24   didn't know who they were.

25   Q.  Came up for whom?

1  A.  I want to say for Heier.

2  Q.  And they went over the statement that you'd given to Heier

3  previously?

4  A.  Yes.  Yes.

5  Q.  And then how long did that meeting last with Detectives Hein

6  and Hernandez?

7  A.  It wasn't long.  It was real short.

8  Q.  Okay.  And you've already told us about the next meeting,

9  which was the meeting at Jackson Correctional Institution?

10 A.  Yes.  Yes.

11 Q.  After the meeting at Jackson Correctional Institution, what

12 is the next contact you had with Detective Heier, if any?

13 A.  I seen him right before the jury trial.

14 Q.  Okay.  And tell us what happened when you saw him before the

15 jury trial.

16 A.  He had me in a holding cell, and I talked to him.  I told

17 him that I don't want to continue with the statement, because it

18 wasn't true.  And he made me, you know, come in there and

19 finish.

20 Q.  How did he make you do that?

21 A.  He told me that I had to go in there.  And I told him, I

22 said I don't want to do it.  So I -- you know, I went along with

23 it.  Came in there and said those things.

24 Q.  And you did, in fact, testify at William Avery's criminal

25 trial, right?

```
 1   A.  Yes.
 2   Q.  And you testified that you overheard William Avery have a
 3   conversation with Antron Kent at the trial, right?
 4   A.  Yes, I said that.
 5   Q.  And we've already been over this.  That testimony was false,
 6   right?
 7   A.  Yeah.
 8   Q.  Your testimony that --
 9   A.  -- yes --
10   Q.  -- you overheard William Avery telling Antron Kent that he
11   choked and killed a woman and then got rid of her body.  That
12   was false testimony, right?
13   A.  Yes.
14   Q.  Now, did you ever overhear William Avery tell Antron Kent
15   that he choked and killed a woman?
16   A.  No.
17   Q.  Did you ever overhear William Avery tell Antron Kent that he
18   got one of his guys and got rid of the body?
19   A.  No, I never heard him.  I just went off of what Kent
20   provided.
21   Q.  Did you ever overhear William Avery have any kind of
22   conversation with Antron Kent?  Ever?
23   A.  No.  I want to say I remember him being in the drug program,
24   and they don't -- they don't let the program guys go with
25   general population to rec.  So, you know, that was -- he wasn't
```

1  present.  That was false.

2  Q.  So the conversation at rec couldn't have happened?  Is that

3  what you're saying?

4  A.  No, no.  Because they go to rec by themselves.

5  Q.  Have you had any contact with William Avery since your

6  criminal trial?

7  A.  No.

8  Q.  Why have you decided to come forward now and tell the truth

9  about what happened?

10          MR. SMOKOWICZ:  Objection.  Leading.

11          THE COURT:  Overruled.

12          MR. ELSON:

13  Q.  You can answer.

14  A.  It was the rightful thing to do.  I didn't know anything

15  about it, and when it brought -- it was brought up to me about

16  like 13 years ago, I wasn't -- I wasn't thinking, you know.  I

17  kind of let him persuade me to do that.  But now it's the

18  rightful thing to do, you know.  It wasn't true.

19  Q.  And Mr. Avery is here in court?  You see him?

20  A.  Yes.  Yes.

21  Q.  Is there anything you want to stay to Mr. Avery now that you

22  have the opportunity?

23          MR. SMOKOWICZ:  Objection.  Relevance, Your Honor.

24          THE COURT:  Yeah.  Sustained.

25          MR. ELSON:  No further questions, Judge.

1          THE COURT:  Cross examination.

2          MR. SMOKOWICZ:  Thank you, Your Honor.

3                    **CROSS EXAMINATION**

4  **BY MR. SMOKOWICZ:**

5  Q.  Sir, you met with the attorneys for Mr. Avery before you

6  testified today?

7  A.  No.

8  Q.  You don't recall meeting with any of the individuals at the

9  table here today?

10 A.  No, I don't talk to nobody before coming.

11 Q.  When Detective Heier and the other Detective came to

12 Oklahoma to meet with you, did they write out a statement for

13 you?

14 A.  Yes, they wrote.

15 Q.  And was the statement based upon what you were telling them?

16 A.  Yes.  Yes.

17 Q.  And did they show you that statement?

18 A.  Yes.

19 Q.  And did they have you sign that statement?

20 A.  Yes.

21 Q.  And you signed it freely and willingly?

22 A.  Yes, I did.

23          MR. SMOKOWICZ:  Your Honor, may I display this to the

24 witness?

25 Q.  Have you seen this statement before?

1  A.  Yes.

2  Q.  That's the statement that you gave in Oklahoma.  That was

3  signed by you in Oklahoma, I should say?

4  A.  Yes.

5          MR. SMOKOWICZ:  Offer defense Exhibit 1018, Your

6  Honor.

7          MR. ELSON:  No objection.

8          THE COURT:  The Court will receive it.

9          MR. SMOKOWICZ:

10  Q.  The top of the statement here has some information about

11  your family, correct?

12  A.  Yes.

13  Q.  And the bottom part of the statement here where my finger

14  is, the interview took place at the North Fork Correctional

15  facility in Sayre, Oklahoma.  That's correct, right?

16  A.  Yes.

17  Q.  And he, meaning you, is in prison for a 40 year sentence for

18  first degree reckless homicide, and has done 4 years.  That was

19  true at that time?

20  A.  Yes.

21  Q.  And he has been here since September 15th, 1999.  I take it

22  that was true?

23  A.  Yes.

24  Q.  And you were shown a photo array, correct?  You were shown a

25  series of pictures?  Do you not recall that?

1    A.  No, it's been so long.  I have --

2    Q.  Okay.  Well, let me read this here just so that we maybe can

3    refresh your memory about it.  He was shown photo I.D. 10303 and

4    pointed out the person in position number 4 as William Avery,

5    stating that he is the person he got the information about a

6    homicide.  Does that refresh your memory that you were shown a

7    handful of photographs?

8    A.  Yes.  Yeah.  Yeah.

9    Q.  And you did pick out William Avery from those pictures?

10   A.  Yes, I did.

11   Q.  So you knew at that time what William Avery looked like?

12   A.  Yes.  I seen him all the time.

13   Q.  And it goes on to state that you met William Avery through

14   his cellmate, Antron Kent.  First of all, was your cellmate at

15   that time Antron Kent?

16   A.  Yes.

17   Q.  And did you meet William Avery through your cellmate?

18   A.  No.  No.

19   Q.  Goes on to state he sees William every day in computer

20   class.  Whoops.  I'm so sorry.  The word is on the previous

21   page.  He sees William every day in computer class.  Did you

22   write that -- or did you -- did you see him every day in

23   computer class?

24   A.  Yes, I seen him going to classes.

25   Q.  And you were in computer class with him?

1    A.   No, I wasn't in computer class.   Just the same building.

2    Q.   Okay.   Goes on to state the first time he met Avery was out

3    at a recreation area.   He believes was in March of this year,

4    2002, with Antron Kent.   Did you tell the Detectives that?

5    A.   Yes.

6    Q.   And was that true?

7    A.   No, it wasn't true.

8    Q.   And that was untrue?   That was something that Antron Kent

9    told you to say?

10   A.   Yeah.   That was -- that was information that Kent had.

11   Q.   Goes on to state that recreation starts at 1:40 p.m., then a

12   second rec period starts at 2:35 p.m., ending at 3:30 p.m.   Was

13   that correct?

14   A.   I think so.   I can't remember the time.

15   Q.   Antron -- goes on to state Antron told Avery that when he

16   gets out, he wants to go to church.   Did you hear Antron Kent

17   tell Avery that?

18   A.   No.

19   Q.   So that was not true?

20   A.   No, that wasn't true.

21   Q.   This was something that Mr. Kent told you to say?

22   A.   Yes.

23   Q.   He said that because Antron's Dad is a pastor, Avery said he

24   wanted to "put this all behind him".   First of all, was Antron's

25   Dad a Pastor?

```
1    A.  His grandfather was, from what he told me.

2    Q.  This is what he told you, though, is that -- to say -- to

3    tell the Police that his Dad was a Pastor?

4    A.  Yes.

5    Q.  Goes on to state Avery said he can't sleep anymore.  Did you

6    tell the Police that?

7    A.  Yeah, I told them.

8    Q.  And was that true?

9    A.  No, it wasn't.

10   Q.  And was that something Antron Kent told you to say?

11   A.  Yes.

12   Q.  Antron said what did you do?  Did Antron Kent tell you to

13   ask that?  To say that he asked Avery that question?

14   A.  I can't -- I can't remember on that one.

15   Q.  Avery said that he had a spot getting his money.  Okay.  Did

16   Antron Kent tell you to talk about a spot where Avery would get

17   his money?

18   A.  Yes.

19   Q.  He was dope dating a hype, and he had sex for dope.  Is that

20   something Antron Kent told you to tell the Police?

21   A.  No, he didn't.  He didn't tell me that.

22   Q.  Did you add that in there?

23   A.  Yeah.

24   Q.  He gave her some dope and she smoked it.  Did Kent tell you

25   to say that?
```

1  A.  No, he didn't tell me to say that.  It's just something that

2  I --

3  Q.  That you added in?

4  A.  Yeah.  I had information on this -- you know, it was --

5  Q.  Details to make the story out?

6  A.  Yes.

7  Q.  He gave her some dope and she smoked it.  He said they went

8  to sleep that night, and when he woke up in the morning time she

9  was smoking his shit and had the dope bag.  Is that something

10  Antron Kent told you to say?

11  A.  That was kind of like made -- it was made up.  He kind of

12  gave me information, but some of the stuff was -- it was -- it

13  was added in.

14  Q.  You added that detail in on your own.  He said he just,

15  quote, snapped and choked the bitch, close quote.  Is that

16  something that Antron Kent told you to say?

17  A.  Yes.  He basically came over most of the story.  I just said

18  some -- some things in there that wasn't true.

19  Q.  He demonstrated to Antron with his hands how he did this,

20  and said her eyes rolled in the back of her head and she made a

21  gagging sound.  Is that something Antron Kent told you to say?

22  A.  Yeah.  He came up with all that.  Told me to make it seem

23  like that.  He -- you know, he said those things.

24  Q.  He said she stopped breathing.  And is that what Antron Kent

25  told you to say?

1  A.  Yes.

2  Q.  Antron made a comment about his long fingernails.  Is that

3  something Antron Kent told you to say?

4  A.  I can't even remember.  It's a lot of stuff.

5  Q.  He realized that he had killed her, so he called his guy to

6  help him get rid of her.  Is that something Kent told you to

7  say?

8  A.  Yeah.  He went over that.

9  Q.  Avery said that his guy had a truck and dumped her

10  somewhere.  Is that something Antron Kent told you to say?

11  A.  Yeah.

12  Q.  States there were things that he didn't hear because he was

13  walking behind Antron and Avery approximately 4 to 5 feet.  Is

14  that something you just added?

15  A.  No.  He made the story up.

16  Q.  So Antron told you that part of it, too?

17  A.  Yes.

18  Q.  Antron Kent.  Sir, is that your signature there?

19  A.  Yes.

20  Q.  And also is that your signature there?

21  A.  Yes.

22  Q.  And this was all read to you and you signed it?

23  A.  Yes.

24  Q.  And you signed it -- did you tell the Detectives there that

25  you were willing to testify against William Avery?  I'm reading

1  the sign here, he is willing to testify against William Avery.

2  You told the Detectives that, right?

3  A.  Yes.

4  Q.  It says Detective Armbruster and Detective Heier made no

5  promises to Jeffrey regarding reducing his sentence or in

6  regards to any promises at all.  You put -- that's your

7  signature right after that statement?

8  A.  Yeah.  No, they didn't make no promises.

9  Q.  They made no promises right?  Before coming to testify

10  today, did you have the opportunity to review your testimony

11  from the criminal trial against Mr. Avery?

12  A.  No, I just kind of -- no.

13  Q.  No one's given you a copy of that testimony?

14  A.  Yeah, I had got a copy of it.

15  Q.  Who gave you that copy?

16  A.  It was -- I can't think of his name.  The guy right there.

17  I forgot his name.  Kind of nervous a little bit.

18  Q.  One of the gentlemen at the table behind me here?

19  A.  Yes.

20  Q.  Which one?  There are 2.  Three, actually.  Could you

21  describe what he's wearing?  Or color of his hair?

22  A.  His hair is blond.

23           MR. ELSON:  Stipulate I gave him a copy of his

24  testimony.

25           MR. SMOKOWICZ:  Your Honor, I'm going to offer Exhibit

1    1002, the testimony of Jeffrey Kimbrough at the trial of State

2    of Wisconsin versus William Avery.

3             MR. ELSON:  No objection.

4             THE COURT:  That's 1002?

5             MR. SMOKOWICZ:  It is, Your Honor.

6             THE COURT:  The Court will receive it.

7             MR. SMOKOWICZ:  Thank you, Your Honor.

8    Q.  Beginning on Page 72, at line one.  See at the top of the

9    page there.  You were asked by the District Attorney:  Were you

10   housed with the Defendant in a correctional institution?  And

11   you answered the question yes.  That was true, correct?

12   A.  Yes.

13   Q.  Before we get any farther -- before you testified that day,

14   you raised your right hand and swore to tell the truth, didn't

15   you?

16   A.  Yes.

17   Q.  The next question you were asked is that you were also

18   housed with Antron Kent?  And your answer was:  Yes.  That was

19   true also, wasn't it?

20   A.  Yes.

21   Q.  Next you were asked whether you had any classes or did you

22   have contact with the Defendant in that institution?  And you

23   answered:  I went to school in the same building.  I went to

24   computer class.  That was true?

25   A.  Not the computer class part, because I didn't have that

1  class.

2  Q.  And the next question you were asked about contacting

3  Mr. Avery.  Did he ever talk to you?  And you answered:  No.

4  That was true, wasn't it?

5  A.  Yes.

6  Q.  The next question.  Did you ever -- did you ever overhear

7  him talking to Antron Kent?  And you answered:  Yes.

8  A.  Yeah, I said that.

9  Q.  You said that?

10  A.  Yeah.

11  Q.  After raising your right hand and swearing to tell the

12  truth, you said that you had overheard this conversation?

13  A.  Yes, I said that.

14  Q.  Next question.  And did you ever hear him talking about

15  Mr. -- Mr. Kent about a homicide?  And your answer to that was:

16  Yes.

17  A.  Yeah.

18  Q.  You said that as well, right?

19  A.  Yeah.

20  Q.  And you said that after raising your right hand and swearing

21  to tell the truth, right?

22  A.  Yeah.

23  Q.  The next page, 73, beginning at line one.  Did you ever hear

24  him saying anything to Mr. Kent about a homicide?  Your answer

25  was:  Yes.  You swore to tell the truth when you answered that

1  question, right?

2  A.  Yes.  That was at trial.  I didn't want to go along with

3  that, but I said those things because I was made to come and say

4  it.

5  Q.  Next question you were asked was:  What did you hear him

6  say?  And your answer was:  Well, Tron -- he was talking to

7  Antron and he was talking about his father was a Pastor.  That

8  was your answer to that question.  Was that true?

9  A.  He mentioned something about his father or something was a

10  Pastor.

11  Q.  Whose father was that?  And your answer was:  Antron.

12  A.  Yeah.

13  Q.  Next question at line 12 there.  And what did you hear him

14  say to Antron?  And your answer was:  Well, he had mentioned

15  that he had -- he had this spot and -- and that's your testimony

16  there, right?

17  A.  Yes.

18  Q.  That's what you swore to tell the truth to, right?

19  A.  Yes.

20  Q.  Next question after that.  What's a spot?  And your answer

21  was:  A spot is a place, you know, where they have dope and

22  stuff.  And he said he had a dope date, and he said that when he

23  had woke up he said that he had noticed that his dope was gone

24  and so he choked the lady.  That was your answer to that

25  question, right?

1    A.   Yes.

2    Q.   And you had sworn to tell the truth when you answered that

3    question, right?

4    A.   Yeah, I was -- I said that.

5    Q.   You had sworn to tell the truth, correct?

6    A.   Yeah.  But I didn't want to go along with it because --

7            MR. SMOKOWICZ:  Your Honor, the witness has answered

8    the question.  I ask he be admonished to simply confine his

9    answers to the question.

10           THE COURT:  Okay.  You have to do that, Mr. Kimbrough.

11   You have to just answer the question that you're asked.

12           THE WITNESS:  Okay.

13           MR. SMOKOWICZ:

14   Q.   The next question.  And where were you in reference to

15   Antron and Mr. Avery when you heard this?  And your answer was:

16   We was at rec.  That was your answer to that question, right?

17   A.   Yes.

18   Q.   And you swore to tell the truth when you answered that

19   question?

20   A.   Yes.

21   Q.   And your next question that you were asked was:  And did he

22   describe how he choked the young lady?  And your answer was:

23   When he scratched her, his nails had dug in her.  That was your

24   answer to that question, wasn't it?

25   A.   Yes.

1  Q.  And you swore that you would tell the truth when you
2  answered that question?
3  A.  Yes.
4  Q.  Going down to the question at line 5.  Did he ever
5  demonstrate that -- when you saw him talking to Antron how he
6  choked the lady?  And you answered:  Yeah.  That was your answer
7  to that question, wasn't it?
8  A.  Yes.
9  Q.  And then you were asked:  Can you show the jury how he
10 demonstrated to Antron?  And your answer was:  I'm behind him
11 but he was talking to Antron.  And that was your answer to that
12 question as well, wasn't it?
13 A.  Yes.
14 Q.  Going on further on down the page, the line begins at
15 question 17.  Did he tell you what type of woman this was that
16 he choked?  And your answer was:  Yeah, she was a hype.  That
17 was your answer to that question?
18 A.  Yes.
19 Q.  And you swore to tell the truth when you answered that one,
20 right?
21 A.  Yes.
22 Q.  Next question you were asked is:  What does a hype mean to
23 you?  And the answer was:  Dope fiend, right?
24 A.  Right.
25 Q.  And the next question you were asked:  And did he tell you

1  what he had done with that lady, if anything, before he choked

2  her?  And your answer was:  Well, when he choked her, you know,

3  he said she gagged and he had killed her, so him and his guy got

4  rid of her.  That was your answer to that question?

5  A.  Yes.

6  Q.  And you swore to tell the truth when you answered that

7  question?

8  A.  Yes.

9  Q.  Question next was:  Did he tell you how he and his guy got

10  rid of the woman?  And your answer was:  He just said they had a

11  truck and they got rid of her.  That was your answer to that

12  question?

13  A.  Yes.

14  Q.  At line 8, the question you were asked:  And did you come

15  forward and tell the Police this?  And your answer was:  Antron,

16  he did at first, and he talked me into going ahead and coming

17  forward.  That was your answer to that question, right?

18  A.  Yes.

19  Q.  And that was true, actually?  About him talking you into

20  coming forward?  Antron Kent did that, right?

21  A.  I mean, he talked.

22  Q.  Next question you were asked was:  And did you come forward?

23  And your answer was:  I thought -- excuse me.  The next question

24  was:  And why did you come forward?  And your answer was:  I

25  thought it was the right thing to do.  That was your answer to

1  that question, right?

2  A.  I said that, yes.

3  Q.  And you swore to tell the truth when you were asked why did

4  you come forward, right?

5  A.  Yes.

6  Q.  And then you were asked:  Has anyone promised you anything

7  for this?  And you said:  No.  True?

8  A.  True.

9  Q.  And do you expect anything?  And your answer was:  No.

10  True?

11  A.  True.

12  Q.  And why are you doing this was the last question you were

13  asked by the prosecutor.  And your answer was:  Just doing it

14  out of free will.  You answered that question that way, didn't

15  you?

16  A.  I said that.

17  Q.  And you swore to tell the truth when you answered that

18  question as well?

19  A.  I did.

20              MR. SMOKOWICZ:  That is all I have, Your Honor.

21              THE COURT:  Any redirect?

22              MR. ELSON:  Just one minute, Judge.

23              THE COURT:  Sure.

24              MR. ELSON:  Nothing based on that, Judge.

25              THE COURT:  Okay.  All right.  Then the witness is

1  excused.  Let's have a side-bar here.

2          (Whereupon a side-bar conference was held off the

3  record.  Upon conclusion of the side-bar conference, the

4  proceedings continued as follows:)

5          THE COURT:  We're waiting for some conveyance?

6          MS. HOFT:  Oh, because Mr. Stainthorp just went to get

7  the next witness.

8          THE COURT:  Well, he'll have to wait in back.

9          **KEITH RANDOLPH**, called as a witness, having been first

10 duly sworn, on oath testified as follows:

11         THE CLERK:  Please state your full name and spell your

12 last name for the record.

13         THE WITNESS:  Keith Roosevelt Randolph.  Last name

14 R-A-N-D-O-L-P-H.

15                    **DIRECT EXAMINATION**

16 **BY MS. HOFT:**

17 Q.  Good morning, Mr. Randolph.

18 A.  Good morning.

19 Q.  How old are you?

20 A.  50 years of age.

21 Q.  And did you testify at a homicide trial against William

22 Avery?

23 A.  Yes.

24 Q.  And was that in March of 2005?

25 A.  Yes.

1   Q.  Were you called to testify by the State?

2   A.  Yes, I was subpoenaed by the State to the Wisconsin

3   Department of Corrections.

4   Q.  And were you in custody at that time?

5   A.  Yes, I was at that time.

6   Q.  Are you in custody now?

7   A.  No.

8   Q.  How long have you been a free man?

9   A.  Since November 17th of last year.

10  Q.  And do you know an individual by the name of William Avery?

11  A.  Yes.

12  Q.  How do you know Mr. Avery?

13  A.  I met Mr. Avery in '95 actually through a former girlfriend

14  of mine, slash, fiancee.  Her name was Lorraine Bowers

15  (phonetic).

16  Q.  And were you -- were you ever incarcerated with Mr. Avery?

17  A.  Yes, actually one time we were in general population at

18  Dodge Correctional Center, which is in I believe Waupun,

19  Wisconsin.

20  Q.  And did Mr. Avery ever share with you any of his legal

21  papers?

22  A.  Later, yeah.  At some point.  He was incarcerated on drug

23  charges.

24  Q.  And do you know why he did that?  Why he shared those papers

25  with you?

1  A.  He knew that I had knowledge of the law libraries, and my

2  grandfather had been a lawyer.  And I'm not a lawyer, but I was

3  I guess what you call a jailhouse lawyer, for lack of better

4  words.

5  Q.  And did you communicate with the Police prior to being

6  subpoenaed to testify at William's trial?

7  A.  Yes.

8  Q.  And tell me the first time that you spoke to any Milwaukee

9  Police Detectives about Mr. Avery?

10  A.  That would have been -- it was actually -- I remember the

11  day, because it was on my birthday.  March 21st of 2005, I

12  believe.  2005.

13  Q.  How many years ago --

14  A.  I mean 2001.  I'm sorry.  I'm sorry.

15        MR. SMOKOWICZ:  2001?

16        THE WITNESS:  Yes.  2001.

17        MS. HOFT:

18  Q.  And who did you meet with in March of 2001 from the

19  Milwaukee Police Department?

20  A.  A couple of Detectives.  I think one of them's name was

21  Auer, Eier (phonetic), something like that.  Another one, I

22  don't remember his name.  I was transported from the House of

23  Corrections, which is in Franklin, Wisconsin, where I was being

24  housed, due to overcrowding at the Milwaukee County Jail,

25  downtown to interrogation.  And my lawyer, who is a State Public

1  Defender, was there.  His name was Attorney Joe Canton or Caton.

2  Q.  And what happened at that first meeting with the Milwaukee

3  Police Detectives where you discussed Mr. Avery?

4  A.  I had never been in there with homicide Detectives.  I never

5  been involved with anything violent.  And they took me in a

6  room.  This particular room was smaller where they could cuff

7  you to the wall.  And they had a camera in the room.  I remember

8  that.  And they asked me if I wanted cigarettes, sodas.  Of

9  course I accepted both, even though I wasn't much of a smoker.

10  I was a little nervous.  And my attorney was there initially.

11  Joe Caton.  He came in and spoke to me and says well, they want

12  to speak to you.  Find out anything you know about this Avery

13  guy.

14  Q.  And then what happened during that first meeting?

15  A.  Well, what the part -- the beginning of the meeting was

16  strange to me, because my knowledge of the law is that you have

17  a right to have counsel present.  And my attorney left the room.

18  And left me in with these homicide Detectives alone.  And I

19  found that very strange.  Made me very uncomfortable.

20  Q.  Did those homicide Detectives provide you any information

21  about William Avery or what they wanted to talk to you about?

22  A.  Yeah.  In a -- what I call a round about way, if I may say

23  that word.  Began to tell me things like a street called

24  Burleigh.  Which I know what Burleigh is, because I lived in

25  Milwaukee.  But I had no knowledge that this particular street,

1  this particular location.  They had a folder in front of them.

2  It had some photographs in it.  And on that folder there was

3  some names written on it.  I saw my name, and I saw another name

4  of a Melvin someone.  And then they began to ask me about

5  Mr. Avery's background with women.  Had I ever known him to be

6  violent?  Have I ever seen him strike a woman?  Do I think he'd

7  be capable of harming a woman?  Seriously.  And I told them no,

8  I know him from my girlfriend.  That yeah, he had had a few

9  arguments with girlfriends in the past, but nothing that would

10 lead me to believe he would actually seriously harm someone.

11 Q.  And during that -- you mentioned during that first meeting

12 that the Police gave you a street name of Burleigh.  And you

13 know where that is?

14 A.  Sort of, kind of.  You know, when I used to live in

15 Milwaukee, I was on the south side.

16 Q.  When is the last time you were in Milwaukee?

17 A.  Oh, my God --

18 Q.  Before today.

19 A.  Before today it was January 2nd, I believe, 2007.  I flew in

20 an airplane to St. Louis for an interstate compact.  And my

21 parole from Wisconsin was transferred with me to Illinois.

22 Q.  During that first meeting with the Milwaukee Police

23 Detectives, did they make any promises to you?

24 A.  Yeah.  That they come to my sentencing hearing.  That they

25 speak favorably of me.  Because I was locked up at that time for

1  prescription drug fraud.  And that they'd do all they could to
2  help me.  And that they know I had heard in the past how
3  Detectives make all these promises, but they would really come.
4  And they actually did come to my sentencing for the prescription
5  drug fraud.
6  Q.  And do you know which Detective came to your sentencing from
7  the Milwaukee Police Department?
8  A.  I don't remember his name.  I remember my sentencing,
9  because the Judge said in his entire years on the bench he'd
10 never had a sentencing hearing that lasted hours.  And the Judge
11 found it strange that they wanted to bring up a homicide
12 Detective, when he had a guy in front of him with a non-violent
13 prescription drug.
14 Q.  And did you ever meet with Milwaukee Police Department
15 Detectives again after that first time on your birthday in March
16 of 2001?
17 A.  Yes, actually I did.  When -- okay, after that March meeting
18 on my birthday, I pled guilty -- had to be -- I don't know the
19 exact date.  Six to eight weeks later, which would have been in
20 May of 2001.  I was sentenced.  Took a plea bargain.  I was sent
21 to Dodge Correctional from Milwaukee.  You know, House of
22 Corrections, which is the process.  When I was in Dodge they
23 decided to keep me in general population, which they sometimes
24 do to non-violent.  You know, the population at Dodge, for lack
25 of a better word, is considered -- you have to be less

1    aggressive.  You can't be a very violent inmate, because it's

2    receiving.

3         And so when I was there in receiving, they called me

4    one day.  Said Mr. Randolph, you have a visitor.  And I found

5    that strange.  Because I'm from East St. Louis, Illinois, and I

6    don't have one biological family member in Wisconsin.  And they

7    would let me know if they were coming.  So I go to the visiting

8    room and there's City of Milwaukee homicide Detectives.

9    Q.  And during that first meeting, was there any discussion

10   about William Avery being responsible for the murder of Maryetta

11   Griffin?

12   A.  Yeah.  That's when much more detail came out.  Like I said,

13   that first meeting, there was just a little file, you know, with

14   my name, and a Melvin name, and some other -- some notations

15   wrote in.  I don't remember all the notes that were on the file.

16   But then when they came into Dodge, and I'm a State prisoner

17   now, now I see a photo -- it was almost like someone -- they

18   wanted me to accidently see it.  Because I'm not stupid.  The

19   photo slid out, and it was a deceased person, and there was a

20   photo -- looked like what would be human remains or something

21   rolled up in a carpet.  And so then they began to ask me, had I

22   seen Mr. Avery?  I said no.  Informed me that he had been

23   convicted.  Informed me that they were going to have him moved

24   to general population to purposely be closer to me, with the

25   hopes of obtaining I guess more information, if you will.  On

1    him somehow opening up to me and confessing to a murder.

2    Q.  And do you remember who those Milwaukee Police Department

3    Detectives were?

4    A.  No.  Nor do I remember the exact day.

5    Q.  And how many times did you meet with Milwaukee Police

6    Detectives about William Avery?

7    A.  Oh, a bunch of times.  Now, that -- that's the one time at

8    Dodge, like I said.  And then they met with me -- I was at a --

9    I went to several prisons in Wisconsin.  I was transferred to

10   one called Stanley, which is a newer -- well, it was then -- up

11   north.  And I worked in the law library there as a law clerk.

12   And then they transferred me to Prairie du Chien, which used to

13   be a youthful offender like juvenile, slash, near the Iowa

14   border past Madison.  But they sent me there as an older inmate,

15   because even though the population wasn't in my age range, my

16   behavior had indicated that I would be a positive influence,

17   which I was, on the young men there.  I was a basketball coach

18   at Prairie du Chien prison.

19          And they -- the homicide Detectives came to Stanley to

20   see me.  So that would be visit number two.  They came to

21   Prairie du Chien Correctional Center at least 3, 4 times.  So if

22   I were to sum total it while I was in the Illinois Department of

23   Corrections, I got at least 6 visits from homicide Detectives.

24   And as I tried to say formerly, because there seems to be some

25   confusion about that -- the Wisconsin Department of Corrections,

1  when you visit someone, there's a record of that.  Whether it's

2  your Mom, your Dad, your lawyer, you cannot step grounds on a

3  State prison and visit a State inmate without it being logged

4  in.

5  Q.  And did you discuss with the Milwaukee Police Department

6  Detectives that William had confessed to you to having sex with

7  and strangling Maryetta Griffin?

8  A.  At one point, yeah.  Because when they came and visited me,

9  it was as though with each visit -- again, this is my

10  perception.  And this -- I'm the one speaking on behalf of it --

11  I was being fed information.  I was being, you know, paint a

12  picture.  I was like okay, yeah.  You guys came to my sentencing

13  hearing for this non-violent prescription drug fraud, but now

14  you're coming and visiting me, and I'm already sentenced, I've

15  accepted a plea, and you keep coming and visiting me, and you're

16  telling me this and telling me that.  And we're going over this

17  again, that you -- last time you met with me, well this.  And

18  want to look at that, Keith?  What you told us last time?  Well,

19  it kind of like a script was being put together, for lack of a

20  better word.  And that's really what happened, you know.  I

21  guess I was going to be used as what you call a jailhouse

22  informant, you know.  A rat.  A snitch in the real world.

23  Whatever you call it.

24  Q.  How many total times did you meet with the Milwaukee Police

25  Department Detectives when they went over and over the testimony

1   you were expected to give at Mr. Avery's trial?

2           MR. SMOKOWICZ:  I'm going to object to the form of

3   this question as leading.

4           THE COURT:  It is, but he may answer, if he can.

5           THE WITNESS:  They came more rapidly as it got closer

6   to the trial.  What I mean by that is the trial was in 2005.  I

7   was at Prairie du Chien, past Madison.  And instead of the

8   usual, here's the homicide Detectives again, once a year, or

9   once every -- you know, 9 months.  Now they came once, came back

10  again, and then that's when -- I'll be honest with you, in my

11  mind I saw what was going on.  The picture on the wall, okay?

12  They want Mr. Avery.  They want to convict him of a murder.  But

13  in my mind as a convict, as a man incarcerated, here they were

14  coming to see me in 2005, and I'm at this sweet prison with

15  these little minors.  You know, it's like a college campus.  And

16  I go home in 18 months.  And I got the best job at the prison.

17  I got the best situation for doing time in Wisconsin, if you

18  want to call it that.

19          And -- but when they came then it was like, okay, read

20  over this, read over that.  They didn't leave me a copy ever of

21  anything.  I won't say that.  But look over this.  Get ready,

22  because we're going to go to trial.  And we want you to remember

23  what you told us.

24          MS. HOFT:

25  Q.  Did you have any knowledge of the Maryetta Griffin murder?

1    A.  Absolutely not.  I mean, my initial knowledge -- if my

2    memory serves me right, I was in the House of Corrections in

3    Franklin.  And they have these T.V.'s in the day room.  You can

4    hardly hear them because it's so crowded in the House of

5    Corrections.  And they had on the news one day that a female was

6    found murdered, strangled.  And I remember I had saw one before

7    or something, so at that time they weren't sure yet, but they

8    were looking at a possible linkage, slash --

9            MR. SMOKOWICZ:  Your Honor, this is not responsive and

10   it's hearsay.

11           THE COURT:  Well, it's his impressions of what he saw.

12   The Court will allow it.

13           MS. HOFT:

14   Q.  Were you done with your answer?  I can ask you another

15   question.

16   A.  Yeah.

17   Q.  Did William Avery ever tell you he murdered or strangled

18   Maryetta Griffin?

19   A.  Absolutely not.

20   Q.  Did the Milwaukee Police Department Detectives -- well, let

21   me ask you this.  Do you recall ever being visited by a

22   Detective Hernandez from the Milwaukee Police Department?

23   A.  Yeah.  I'm not positive Hernandez.  I believed it was.

24   That's the name that came to my mind.  Because people often

25   confuse me as being partially Latino because I have curly gray

1  hair or whatever. And I remember this Detective, and I knew he
2  was, you know, Hispanic. And so I guess Hernandez -- I won't
3  say I grab the name out of the air, but it was the name I
4  remember.
5  Q.  And do you remember any promises that Detective Hernandez
6  gave to you?
7  A.  Oh, yeah.  That this guy said he would specifically speak --
8  because I was concerned.  Because like I said, this is 2005.
9  I've been locked up since -- I got locked up on day before
10 Valentine's Day, 2001.  So now I'm serving my sentence, truth in
11 sentencing in the State of Wisconsin, and I go home in under two
12 years.  So now I'm like Burger King.  You know, what you gonna
13 do for me?  Gonna have it my way.  What's in this for me?
14         And so part of that thinking that I had in my little
15 criminal mind at that time was speaking with him -- he says --
16 he promised me he would speak with the State's Attorney handling
17 the William Avery case about getting me something as a jailhouse
18 informant.  You know, out of the deal.  And specifically
19 something being not money.  Not -- you know, going home earlier
20 from prison.  And I remember -- okay, I brought that up, you
21 know, because of my knowledge.  Then when he came back to visit
22 me, which wasn't long, back at Prairie du Chien again, I says
23 yeah, I spoke with the State's Attorney.  I got good news.
24 They're going to be willing to help you, Mr. Randolph, go home.
25 You're gonna go home before January 2nd, 2007.  But they don't

1   want to put it in writing, because when they subpoena you, and

2   you come to Mr. Avery's trial, and you're asked possibly on open

3   record has anyone made you a promise, they want you to be able

4   to say no.  In other words, kind of -- I saw it as a way around

5   perjury, if you will.

6   Q.  Mr. Randolph, I'm going to show you Defendant's Exhibit

7   1049.

8              MR. SMOKOWICZ:  What's the number?

9              MS. HOFT:  1049.

10             MR. SMOKOWICZ:  Thank you.

11             MS. HOFT:

12  Q.  Do you recognize what Defendant's 1049 is?

13  A.  This is a statement from the day of that initial

14  interrogation when I was in the House in Franklin, but taken

15  downtown to the Milwaukee main interrogation bureau.

16  Q.  And on this day Detective Heier wrote out this four page

17  statement.  You didn't write it out, correct?

18  A.  No.  No.

19  Q.  But you signed this document I guess on the front?  First

20  page?

21  A.  Yeah.  And I notice I signed it a couple spots.  Where I

22  initialed, rather, where there's some misspelling of my name or

23  something.  My initials K.R. are on it.

24  Q.  And is the contents -- or are the contents of this Exhibit

25  true or false?

1  A.  False.

2          MS. HOFT:  I have no further questions, Your Honor.

3          THE COURT:  All right.  Cross examination.  But we'll

4  take that after lunch.  Will be extensive cross examination, so

5  now it's five after, approximately.  So we'll have you back here

6  after lunch.  Please don't discuss the case, with anyone, only

7  after all the evidence is in.  The Court has to take another

8  matter unrelated to this case, so you're going to get a little

9  longer lunch today, to 1:30.  Okay?  So we'll see you after

10  lunch.

11          (Whereupon the jury was excused at 12:05 p.m.)

12          THE COURT:  Okay.  1:30.

13          (Whereupon a recess was called by the Court.  Upon

14  conclusion of the recess, the proceedings continued as follows:)

15          MS. HOFT:  Your Honor, before Mr. Smokowicz begins his

16  cross examination, he's agreed that we can move into evidence

17  Plaintiff's Exhibit 24 with no questioning on it or anything.

18          THE COURT:  Okay.

19          (Whereupon the jury was returned to the courtroom at

20  1:34 p.m.)

21          MS. HOFT:  Your Honor, at this time the Plaintiff

22  would move into evidence Plaintiff's Exhibit 24, Keith

23  Randolph's criminal trial testimony against William Avery,

24  March 7th, 2005.

25          THE COURT:  All right.  The Court will receive that as

1    an Exhibit 24.  Mr. Smokowicz.

2                MR. SMOKOWICZ:  Thank you, Your Honor.

3                      **CROSS EXAMINATION**

4    **BY MR. SMOKOWICZ:**

5    Q.  Sir, outside of the courtroom in this case you provided some

6    testimony back in January of this year, true?

7    A.  Deposition, yes, sir.

8    Q.  Yes.  And prior to that deposition, you met with Mr. Avery's

9    attorneys to go over your testimony in the case, right?

10   A.  No.  Not to go over my testimony.

11   Q.  You met with them in the restaurant across the street from

12   the Court Reporter's offices, didn't you?

13   A.  No, I actually met with them at my home.

14   Q.  The day before?

15   A.  No.  The day of.  Rode with them to Belleville, Illinois,

16   which is next to East St. Louis, where I'm from.  I was hungry,

17   asked to stop at Steak and Shake.  Went there, bought my own

18   lunch, and proceeded across the street for the deposition.

19   Q.  Well, when you met with them you reviewed the materials that

20   related to you in this matter, right?

21   A.  No, not really.  I scanned them.  I didn't have time to meet

22   for hours.  And I sat there and --

23   Q.  It's true that you are friends with William Avery, correct?

24   You have been in the past?

25   A.  In the past, yeah.

1   Q.  And it's true that you were a pallbearer at his mother's

2   funeral?

3   A.  I was listed.  I didn't actually carry it, but I attended

4   the service.

5   Q.  You were listed as a pallbearer, but you didn't carry the

6   casket?

7   A.  Honorary.  In the African-American community, we have

8   honorary.

9   Q.  And you didn't actually attend the funeral?

10  A.  Yes, I did.

11  Q.  Oh, you did.  I'm sorry.  I misunderstood.  Now, it's true

12  that you've given a prior statement where you indicated that

13  you'd celebrated many occasions with William Avery's family.

14  True?

15  A.  With William Avery.  I mean, with some of his family.

16  Q.  And he was actually part of your family in some ways at that

17  time, true?

18  A.  To an extent, yeah.  He was associated with my fiancee.

19  Q.  Sir, I'm going to show you a document that's been marked

20  Exhibit 1049.  Ask you to take a look at it.  It's actually in

21  front of you already.  And you've testified that you recognize

22  this document?  You've seen this before?

23  A.  Only when it was shown to me later.

24  Q.  And that's your signature on the first page of it?

25  A.  Yes, sir.

1    Q.  Eight lines down?

2    A.  Yes, sir.

3    Q.  And it's also your signature on the last page?

4    A.  Yes, sir.

5    Q.  About 7 lines down?

6    A.  Yes.

7    Q.  And there are certain locations in this document where there

8    are either words added, or sometimes scratched out, and there

9    are initials there.  Do you see those?

10   A.  Yes.

11   Q.  And those are your initials that are there?

12   A.  Yes.

13   Q.  And you wrote your initials there at those locations?

14   A.  Yes.

15           MR. SMOKOWICZ:  I don't know if this Exhibit's been

16   offered, Your Honor.  But I would offer Exhibit 1049.

17           THE COURT:  The Court will receive it.

18           MR. SMOKOWICZ:

19   Q.  Now, this statement reflects that you spoke to Detective

20   Timothy Heier on March 21, 2001.  Right there on the first line.

21   Does that refresh your recollection that that's when you spoke

22   with him?  First?

23   A.  Yes.  As I said earlier, that's my birthday.

24   Q.  And it's 2001, not 2002, correct?

25   A.  2001.

1    Q.  And it indicates in that first line that you began speaking

2    with him at 4:30 in the afternoon.  Does that sound

3    approximately correct to you from your memory?

4    A.  Could be.  Could be.

5    Q.  As you sit here today, you can't dispute that that's when

6    this began, right?  You have no reason to doubt that?

7    A.  No reason to dispute.

8    Q.  And if we go to the last page right above your signature

9    there, it shows a time of 11:56 p.m., correct?

10   A.  Yes, sir.

11   Q.  And is that the time that your interrogation, as you call

12   it, but the questioning by Detective Heier ended on that day?

13   A.  As I recall, yeah.  To the best of my recollection.

14   Q.  Again, you have no reason to say that's wrong as you sit

15   here today?

16   A.  No.

17   Q.  I'm going to ask you to go back to Page 1.  Continuing on

18   with that first paragraph, it states I, Detective Timothy Heier,

19   did read Keith R. Randolph -- that's your date of birth there --

20   his Constitutional rights, Miranda warnings, in Room 407 of the

21   Criminal Investigation Bureau.  Not sure if that's 951, but it's

22   West James Lovell Street.  Do you remember being read your

23   rights at that point?

24   A.  No, but I can't dispute that they did.

25   Q.  Also goes on to state also present when Constitutional

1   rights were read and during the interview was Randolph's

2   attorney, Joseph R. Caton, C-A-T-O-N, Junior, of the State

3   Public Defender's Office.  First of all, is that the attorney --

4   that's the attorney you've talked about before, right?  Attorney

5   Caton?

6   A.  Right.

7   Q.  And he was present at the beginning of this interview?

8   A.  No, he was not.  No, he was not.

9   Q.  So he came -- he came in and left immediately?

10  A.  They transported me down there from the House of

11  Corrections.  He was in the room waiting on me.  We talked

12  briefly.  He kind of sensed my apprehension.  He informed me the

13  basic -- the best of his knowledge what was about to transpire.

14  And then when the Detectives came in the room, he left.  And I

15  stated earlier, I found that strange.  Because I thought you had

16  the right to be questioned when counsel present.

17  Q.  And again, sir, you recall that you were deposed in this

18  case on January 8th of 2015?

19  A.  Yes.

20          MR. SMOKOWICZ:  I'm going to offer Exhibit 1051 into

21  evidence.  Transcript of the deposition.

22          MS. HOFT:  Objection, Your Honor.  The entire

23  deposition?

24          MR. SMOKOWICZ:  Yes.  I'm not going to read the entire

25  deposition.  I'm only using it for purposes of questioning the

1    witness today.

2            THE COURT:  Admitted into evidence for purposes of its

3    use as you're using it.

4            MR. SMOKOWICZ:

5    Q.   57 and 58.  Beginning at line 23 on page 57, and going to

6    line 17 on page 58.  Question:  So you -- well, after that your

7    signature is right underneath the time there, 11:56 p.m., right?

8    Right.  Question:  So my arithmetic isn't nearly perfect, but

9    from 4:30, to 5:30, 6:30, 7:30, 8:30, 9:30, 10:30, 11:30, that's

10   7-and-a-half hours, isn't it?  Answer:  Give or take a few.

11   Question:  Yeah.  And it's not two hours, is it?  Answer:  No,

12   but again, the two hours was referring to the two hours with my

13   attorney -- without my attorney present.  Question:  So you --

14   answer:  Not the entire.  Question:  So are you saying your

15   attorney was there for 5 hours?  Answer:  My attorney was there

16   when I first got there.  My attorney was there when I left.

17   Yeah, my attorney was there.  Question:  He was there the whole

18   time?  Answer:  Somewhere, but for two hours he wasn't in the

19   room with me.  Okay.  Answer:  But he was there when I got there

20   and when I left.

21           Now, it's your signature there on that eighth line on

22   that first page of Exhibit 1049, right after the statement that

23   you had been read your rights on at least 10 prior occasions and

24   understood each of those times, and understands them now, and

25   wishes to make a statement.  Correct?

1   A.  Yes, that's my signature.

2   Q.  The statement goes on to read Randolph states that he has

3   known William Avery, a/k/a Jodi, 32 years, black male, since

4   1993, and knows his family, even being a pallbearer at the

5   funeral of -- now, there's your initials there, right?  Where

6   that word Ralph is scratched out?

7   A.  Um-hum.

8   Q.  That's yes.

9   A.  Yes.

10  Q.  Avery's mother, Barbara Avery.  So you did tell Detective

11  Heier, did you not, that you had been a pallbearer at the

12  funeral of Avery's mother, Barbara, correct?

13  A.  I don't remember.

14  Q.  So you wouldn't -- since this is written here, you wouldn't

15  dispute that you told him that at that time, would you?

16  A.  I can't, because I don't remember.

17  Q.  Goes on to state Randolph was an inmate at the House of

18  Correction, and while in, quote, Court staging, close quote,

19  Randolph was to appear in court.  Randolph saw and spoke to

20  Avery in a housing cell, number 2, briefly.  This was around

21  March 26, 1998.  You told Detective Heier those things, did you

22  not?  That you were an inmate in the House, in court staging,

23  and while you were there you saw Mr. -- you saw William Avery

24  briefly, correct?

25  A.  I don't remember that.

1  Q.  And again --

2  A.  I had been in the House of Correction prior, though, on a

3  number of occasions.

4  Q.  It's consistent with your memory, in fact, that you were in

5  the House of Correction about that time, correct?

6  A.  Yes.  Yes.

7  Q.  Goes on to state:  About one week later Randolph saw a

8  newspaper article in the Journal about Avery and actually wrote

9  him a letter telling him to keep his spirits up, close quote.

10  You told Detective Heier that this had happened, right?  That

11  you'd seen an article and that you wrote William Avery to tell

12  him to keep his spirits up?

13  A.  I don't remember that.

14  Q.  As you sit here today, do you have any reason to dispute

15  that you told him that?

16  A.  Yeah, because if I was in the House of Correction, I was

17  probably a felony charge.  I've never had a misdemeanor in my

18  life.  And I probably went to prison, and in prison you can't

19  write other -- they monitor who you write.  So I would not have

20  written Mr. Avery.

21  Q.  So you're telling me that this would be an untruthful

22  statement if you made it to the Detective?

23  A.  Yes.  Yes.

24  Q.  This goes on to state:  At the end of July, 1998, while at

25  the Dodge Correctional Facility, Randolph saw Avery again while

1    in the general population.  Did you tell Detective Heier that

2    you were in Dodge in July, 1998, when you saw Avery in the

3    general population?

4    A.  I believe I did.

5    Q.  So in fact if you saw William Avery in the general

6    population in Dodge in 1998, that was about 3 years before you

7    ever spoke to Detective Heier, correct?

8    A.  Yes.

9    Q.  So you did not speak to Detective Heier before any claimed

10   arrangements were made to place you in general population at

11   Dodge Correctional after meeting with some Detective, right?

12   A.  Wrong.  I did.  And they did make that happen.  They visited

13   me at Dodge Correctional Center.  Mr. Avery was not in general

14   population.  After their visit Mr. Avery was moved to general

15   population.

16   Q.  This goes on to state:  Randolph and Avery also ended up

17   working together in the dining room servery (sic).  Did you tell

18   Detective Heier that you had worked with Avery in the dining

19   room servery?

20   A.  I believe so.

21   Q.  Goes on to state:  Randolph and Avery started getting close,

22   as Avery's brother died and they had this in common and needed

23   each other.  You told that to Detective Heier as well, didn't

24   you?

25   A.  I don't remember that.  I don't even remember his brother

1    passing.  But I could have told him that.

2    Q.  You could have said this in 1998 -- or pardon me.  In 2001

3    to Detective Heier?

4    A.  I could have.

5    Q.  And you have no reason to dispute this at this time, right?

6    A.  No.

7    Q.  Goes on to state:  Randolph started looking at appellate

8    issues, as Randolph has his Associate's Degree and is familiar

9    with some legal -- and there again your initials appear, right?

10   K.R.?

11   A.  Yes.

12   Q.  And that's -- you wrote the K.R. there, right?

13   A.  Yes.

14   Q.  Legal workings.  You told Detective Heier, did you not, that

15   you started looking at some appellate issues, and that was for

16   William Avery, because you had your Associate's Degree at that

17   time, and you were familiar with legal workings, correct?

18   A.  Correct.

19   Q.  Goes on to state:  Avery presented Randolph with about eight

20   pages of discovery, which included a handwritten statement.  You

21   told Detective Heier that, didn't you?

22   A.  I don't remember.  I could have.  I can't say no, I didn't.

23   Q.  And, in fact, when you were working with William Avery on

24   his legal issues at Dodge Correctional in 1998, you did look at

25   certain pages of discovery, including a handwritten statement?

1  A.  Yes.  Pertaining to criminal drug charges.

2  Q.  Yes.  And that handwritten statement was -- included a

3  statement where Mr. Avery indicated that he had been responsible

4  for the death of a woman, didn't it?

5  A.  No, it did not.  Best of my memory, it indicated a statement

6  where he just simply admitted seeing the young lady.  Or he was

7  selling her narcotics, or something like that.

8  Q.  Do you recall seeing this statement which has been marked as

9  Exhibit 1030?

10  A.  No.

11  Q.  You don't recall this?

12  A.  No, I don't.  I'm not gonna tell you I recall, if I don't.

13  Q.  So it's your testimony that you never saw, in part of your

14  legal work for William Avery, while you were acting as a sort of

15  jailhouse lawyer, this statement where he admits responsibility

16  for killing Maryetta Griffin?

17          MS. HOFT:  Objection.  Mischaracterization.

18          THE COURT:  Well --

19          MR. SMOKOWICZ:  I'll rephrase it, Your Honor.

20          THE COURT:  Okay.

21          MR. SMOKOWICZ:

22  Q.  So it's your testimony, sir, that you never saw this

23  statement that's been marked as Exhibit 1030?

24  A.  It's my statement that I don't remember seeing anything like

25  this.

1  Q.  Okay.  Now getting back to Exhibit 1049, which is the

2  handwritten statement that you signed, it goes on to read

3  Randolph had read the statement and he was out at the walking --

4  and that's your initials right before the word walking -- track.

5  Those are your initials before the word walking, right?

6  A.  Yeah.  K.R., yes sir.

7  Q.  At Dodge.  And that's your initials right before at Dodge,

8  right?  That's a K.R. there, right?

9  A.  Yes.

10 Q.  Talking to Avery one-on-one, with no one around to listen?

11 A.  Um-hum.

12 Q.  You told Detective Heier that you had read the statement out

13 at the walking track to Avery one-on-one with no one around to

14 listen, correct?

15        MS. HOFT:  Objection.  Mischaracterization, Your

16 Honor.

17        THE COURT:  Well, if the document says what it says,

18 you have to ask the question in conformance with the document.

19        MR. SMOKOWICZ:  I thought I did, Your Honor.  But I

20 will restate my question to make it clear.

21        THE COURT:  Okay.

22        MR. SMOKOWICZ:

23 Q.  Looking at this last sentence, you told Detective Heier the

24 information contained there, right?  That you had read the

25 statement, and it was out at the walking track, talking to Avery

1  one-on-one with no one around to listen.  You told him that,

2  right?

3  A.  If I might, you're using word play, sir.  When I said the

4  statement, that is written in the thing.  But I'm talking about

5  from the -- above, in the sentences earlier.  The 8 pages of

6  discovery items, of which the thing you just showed me a second

7  ago I was not referring to.

8  Q.  I understand that.  I understand that's your testimony.

9  What I'm asking is whether you said to the Detective at the time

10  what's written in this statement, which is you read a statement,

11  whichever one it was, handwritten.  And it was out at the track

12  talking to Avery one-on-one with no one to listen.  You told

13  Detective Heier that, right?

14  A.  Right.

15  Q.  All right.  Let's go to the next page.  Goes on to state

16  there:  Randolph knows this to be the summer of '98.  Late

17  August.  Did you tell the Detective that?

18  A.  What page are you on, sir?

19  Q.  Page 2 of 4.  Right at the top.

20  A.  Yes, sir.

21  Q.  Goes on to state:  Randolph brought up his past violent

22  behavior with women that Randolph knows firsthand, having saw

23  the beatings Avery inflicted on his, Avery's, woman.  Having had

24  given one girl two black eyes.  Now, this is a little --

25  apparently a little misstated, but it apparently refers to Avery

1    having beaten women, including having given one two black eyes.

2    First of all, do you recall telling Detective Avery (sic) this

3    statement?

4         MS. HOFT:  Objection.  I object to the

5    characterization.  I think you misspoke.  You said Avery.

6    Detective Avery.

7         MR. SMOKOWICZ:

8    Q.  Do you recall telling Detective Heier this statement?

9    A.  No, I don't, but I remember when I first met this Detective

10   Heier, him telling me --

11   Q.  -- so you don't remember --

12   A.  -- that he knew.  No, I don't.

13   Q.  I think you've answered the question.

14   A.  I don't know.

15   Q.  Is it possible you told him about Avery having trouble with

16   women and you just don't remember that at this time?

17   A.  No, because I -- something like that I would remember about

18   Avery.

19   Q.  Goes on to state Avery asked if he could confide in Randolph

20   what had happened regarding -- and that's in initials there,

21   K.R., above the word homicide.  Those are your initials, right?

22   A.  I see regarding, and I see my initials.  But I don't see a

23   word homicide.

24   Q.  Okay.  May I see your copy?  Because if you look at the

25   screen, you can see right there on the left hand corner of the

1  screen there, about 6 lines down.

2         THE COURT:  Mr. Smokowicz, what I'm looking at is

3  there's an "H" and half an "O" missing from the side.

4         MR. SMOKOWICZ:  Right.  What is there is

5  O-M-I-C-I-D-E, right?

6         THE COURT:  Yes.  Half an "O".

7         THE WITNESS:  What might be an O-M-I-C-I-D-E.

8         MR. SMOKOWICZ:

9  Q.  Okay.  And I'll read on the rest of the statement.  And said

10  in the exact words quote, man, what really happened, close

11  quote, is I kept choking the bitch but I (sic) didn't pass out

12  as I said in the statement to Police.  And those are your

13  initials right there before the words to Police, correct?

14  A.  Yes.

15  Q.  And, in fact, you told Detective Heier that day in 2001 that

16  William Avery had said these things to you?

17  A.  No, I told him whatever he wanted to hear that day.  So

18  yeah, I could have.

19  Q.  This continues.  Avery continued stating then I stopped to

20  check my pockets to see how much of the work the bitch had

21  stolen.  You told Detective Heier that at that meeting, did you

22  not?

23  A.  I could have.

24  Q.  Goes on to state:  I wasn't sure how much she stole, but

25  know some was missing.  You told Detective Heier that Avery told

1  you that, right?

2  A.  I could have.

3  Q.  Goes on to state:  Randolph asked what happened next?  And

4  Avery said that he slapped the bitch again, and then she -- then

5  started choking her some more until she collapsed.  You told

6  Detective Heier that, didn't you?

7  A.  I would have told him whatever he wanted to hear.  And

8  whoever wrote this -- I didn't write it.  I would have told him

9  Mickey Mouse did it.

10  Q.  Goes on to state Avery said that he then had another shot of

11  Crown Royal and lit a joint, stating -- and your initials are

12  right before the word stating there, right?

13  A.  Yes, sir.

14  Q.  Fuck that bitch.  You told Detective Heier this, didn't you?

15  A.  I could have.

16  Q.  Avery stated that he noticed that she wasn't coming to like

17  the first time.  Avery -- like the first time.  I'm sorry.

18  That's where the sentence ends.  You told Detective Heier that,

19  didn't you?

20  A.  I don't remember.  I could have.

21  Q.  Goes on to state Avery said, quote, then I panicked, close

22  quote.  You told Detective Heier that, didn't you?

23  A.  I could have.

24  Q.  Goes on to state Avery said that he, quote, called a worker,

25  close quote.  And -- then your initials are right there, K.R. --

1  had her -- those are your initials.  You wrote those in there,

2  right?

3  A.  My initials.  That's not my handwriting after it, but yeah,

4  those are my initials.

5  Q.  Those are your initials.  And then -- and had her wrapped up

6  in a rug or something.  You told Detective Heier that, didn't

7  you?

8  A.  No, that I didn't tell him, because I don't even talk like

9  that.  A worker?  So that I know I definitely didn't tell him.

10  Q.  Okay.  You're saying that you didn't say, though, any of

11  those words?  Or just the word worker?

12  A.  In that context.  The word worker.  But again, I would have

13  told him whatever he wanted to hear that day.

14  Q.  Okay.  And while we're on the subject, you said you saw a

15  picture of a dead woman in a rug.  Is that what you said before?

16  Today?  At some point a Detective showed you a photograph of a

17  deceased woman wrapped up in a rug.  Is that what you -- you

18  said that earlier in testimony when Miss Hoft was questioning

19  you, right?

20  A.  In prison.

21  Q.  In prison.  One of the Detectives showed you a --

22  A.  Not on this date at the --

23  Q.  Not on this date, right?  But you were saying one day while

24  you were in prison and talking to some other Detective, you were

25  shown a photograph of a woman wrapped in a rug, correct?

1   A.   Appeared to be a woman, correct.

2   Q.   Appeared to be a woman.  And appeared to be a rug, right?

3   A.   Right.

4   Q.   Avery said he then woke up Little "C" --

5          THE COURT:  Mr. Smokowicz, I can't see that on my

6   screen.

7          MR. SMOKOWICZ:  Oh, I'm sorry.  I appreciate, Your

8   Honor.  I forget that the whole page sometimes isn't here.

9   Q.   I begin again where I was.  Avery said he then woke up

10  Little "C".  You told Detective Heier that Avery told you that

11  he had woken up Little "C"?

12  A.   I could have.

13  Q.   And then it says:  She was dead at this time.  That's what

14  you told Detective Heier, right?

15  A.   I could have.

16  Q.   Goes on to state Little "C" -- and those are your initials

17  right after that word, right?

18  A.   Um-hum.  Twice.

19  Q.   Twice, right?  Because two words were struck.  So I'll read

20  it without the struck words.  Little "C" came in the room and

21  said what the -- and it looks like F-U-C and I'm assuming it's

22  what the fuck, unfortunately, you do.  You told Detective Heier

23  that Little "C" came in the room and said that, didn't you?

24  A.   No.  I'm gonna keep saying no.  I would have told him

25  whatever he want to say.  Give me cigarettes.  And whoever wrote

1   this --

2   Q.  I think you've answered the question.

3   A.  Okay.

4   Q.  It goes on to state:  Avery stated that he was still fucked

5   up, and Little "C" and the worker took the girl out to the

6   Blazer, and they all left and took her and they dumped her.

7   That's what you told Detective Heier, right?

8   A.  I don't remember that.

9   Q.  So it is possible that that's what you told Detective Heier?

10  A.  It's possible.

11  Q.  And, in fact, it's possible that what you told him is that

12  not one but two people helped dispose of the body, right?  In

13  addition to Mr. Avery?

14  A.  I could have told him that.

15  Q.  Goes on to state:  Randolph asked where did they take her

16  and Avery said to the area of 9th and Burleigh.  I'm going to

17  stop there.  You mentioned earlier that you had heard the street

18  name Burleigh, right?

19  A.  Right.

20  Q.  And what you've told Detective Heier in this meeting in this

21  interview was that the body had been taken to 9th and Burleigh,

22  right?

23          THE COURT:  Mr. Smokowicz, again I can't see what

24  you're referring to.

25          MR. SMOKOWICZ:  I apologize.

```
 1            THE WITNESS:  I didn't tell him that, because I
 2   wouldn't have known nothing about 9th and Burleigh, so --
 3            MR. SMOKOWICZ:
 4   Q.  Well, you mentioned it earlier today in answering questions
 5   from Miss Hoft, that you talked about a street name Burleigh?
 6   A.  Yeah.  When the Detectives came and saw me in prison.
 7   Q.  And you mentioned that -- you talked about a street named
 8   Burleigh, correct?
 9   A.  That they had mentioned.  Not me.  A street name Burleigh.
10   Q.  It goes on to state that was -- and there's your initial
11   right there on that line, K.R., right?
12   A.  Yes.
13   Q.  And you wrote that right there?
14   A.  Initials, yes.
15   Q.  That it was Little C's idea.  Goes on to state Avery said
16   that the girl was put in Little C's Blazer or sport utility
17   vehicle, and this area was, quote, hot, close quote.  That's
18   what you told Detective Heier at that time, correct?
19   A.  No.  No.
20   Q.  Goes on to state at the third page that:  Randolph inquired
21   from Avery the identity of Little "C", and Avery reminded
22   Randolph of a meeting they had -- and that's your initials right
23   there that you wrote in K.R., right?
24   A.  Yes.
25   Q.  With a friend Spencer Caldwell -- I don't know what that
```

1   letter is before the slash, and "M", 50 or 51, a/k/a Hank, who

2   lived north of Keefe on Port Washington Road.  You told that to

3   Detective Heier, correct?

4   A.  I could have.

5   Q.  He goes on to state:  Caldwell is his, Randolph's,

6   girlfriend's brother.  You told that to Detective Heier, didn't

7   you?

8   A.  I could have.

9   Q.  Goes on to state Avery described Little "C", and Randolph

10  then remembered him as a B-M -- which I assume stands for black

11  male -- 36, 6 foot 1 inch or 6 foot 2 inch, slim to medium.  You

12  told Detective Heier that, didn't you?

13  A.  I could have.

14  Q.  Curl.  That refers to hairstyle, right?

15  A.  I don't know what it refers to.

16  Q.  Did you tell him curl?

17  A.  No.

18  Q.  Did you tell him 175 pounds?

19  A.  No.

20  Q.  Goes on to state:  Avery stated that the woman -- and

21  there's also your initials again, K.R. that you wrote in,

22  correct?

23  A.  Yes.

24  Q.  And that's before the word in parentheses, victim, came over

25  late afternoon to evening and spent all her money and wanted to

1  dope date.  You told that to Detective Heier, didn't you?

2  A.  I could have.

3  Q.  Avery had oral sex and intercourse with her.  You told that

4  to Detective Heier, didn't you?

5  A.  No, I would have never told him he had oral sex with a

6  prostitute, no.

7  Q.  You would never have told anything about any form of sex

8  with a prostitute?

9  A.  I could have, but not oral sex.

10 Q.  Are you saying you wouldn't have used those words?  Or are

11 you saying that William Avery would never have had oral sex with

12 a prostitute?

13 A.  The William Avery I would know would never have oral sex

14 with a prostitute.

15 Q.  The William Avery you know might have intercourse if it was

16 protected with a condom with a prostitute?

17 A.  Oh, you'd have to ask him that.  I don't know.  But I've

18 never known him to have sex of any type with a prostitute.

19 Q.  Goes on to state:  Avery did not give specifics as to when

20 the girl was choked, but stated that the body was taken out in

21 the early morning and placed in the back of the vehicle.  You

22 told Detective Heier that, didn't you?

23 A.  I could have.

24 Q.  Goes on to state:  Avery stated that the worker and Little

25 "C" unloaded the dead body, because he said he was still wasted

1  and couldn't help.  You told Detective Heier that, didn't you?

2  A.  I don't remember that, but I could have.

3  Q.  Goes on to state:  The offense occurred Keefe Street drug

4  house on 19th Street.  That's what you told Detective Heier,

5  isn't it?

6  A.  No.  He had showed me something about some girl last seen at

7  a drug house on Keefe Street, and so that's where this comes

8  from, yeah.

9  Q.  Okay.  So this comes from showing you something about a girl

10  last seen at Keefe Street, right?

11  A.  I'm assuming that's what this comes from.  You'd have to ask

12  the writer of this.

13  Q.  Well, you just told me that he showed you something relating

14  to a woman being found at Keefe Street drug house.

15  A.  No, no.  A woman being last seen.

16  Q.  Last seen at a Keefe Street drug house?

17  A.  Right.  Right.

18  Q.  And you -- that's what you recall him showing you.

19  Something about a woman being last seen at a Keefe Street drug

20  house?

21  A.  Or mentioning it to me, or something.  We were in there 7, 8

22  hours.

23  Q.  Goes on to state:  Randolph stated that he had been there

24  previously to pick him up as he had never been inside himself.

25  You told the Detective that, didn't you?

1  A.  I probably did.  I'd have told him whatever he wanted to
2  hear.
3  Q.  Goes on to state here -- and you had scratched out those
4  first three words, right?  Spencer Caldwell is?
5  A.  No, I didn't.  I never scratched out anything in this
6  document.
7  Q.  All right.  Those three words were scratched out.  But you
8  wrote those initials above it, right?
9  A.  Those are my initials.
10  Q.  And you wrote them there, right?
11  A.  Yes.  Yes.
12  Q.  And it goes on to state there after that scratch out:
13  Spencer Caldwell was on Division of Intensive Sanctions at the
14  address of North Port Washington Road at the time Randolph was
15  at Caldwell's home and saw Little "C".  You told that to
16  Detective Heier, didn't you?
17  A.  I could have.
18  Q.  Goes on to state:  Randolph states his girlfriend is
19  Lorraine Bowers.  Got a date of birth there.  Address of 4712
20  North 18th Street, and was also present at -- and there's a
21  scratch out there with your initials above the scratch out,
22  right?
23  A.  Next to the scratch out above the words S-P something.
24  Q.  And you wrote those initials there, right?
25  A.  Yes.

1  Q.  Caldwell's -- and then there's another scratch out and you

2  wrote your initials right above there, right?

3  A.  Yes.  Yes.

4  Q.  On the date in '98 when she and Randolph met Little "C".

5  Right?  Now, you told this to Detective Heier, didn't you?

6  A.  I could have.

7  Q.  Goes on to state:  Randolph stated that Avery never provided

8  anymore information on the worker who helped after the victim

9  had died.  You told that to Detective Heier, didn't you?

10 A.  I don't remember that, but I could have.

11 Q.  It goes on to state:  Randolph viewed numerous CJIS photos

12 of subjects, and was unable to identify Little "C" from the

13 photos shown.  Let's go to the next page.  Strike that.  We can

14 go back to that previous page.  I'm sorry.  That was at the end

15 of that sentence.  Let's break this down a little bit.  During

16 this interview with Detective Heier, he showed you a number of

17 photographs in an effort to try to identify Little "C", didn't

18 he?

19 A.  Yes.  I remember that.

20 Q.  And you were unable to identify Little "C" from those

21 photographs, correct?

22 A.  Right.

23 Q.  Now let's turn to the next page.  It states there Randolph

24 identified CJIS photo 817448179 -- as William Avery.  You did --

25 you were shown a picture of William Avery by Detective Heier,

1  weren't you?

2  A.  Yeah.  I think that says Willie Avery.

3  Q.  And you did identify that picture as Mr. -- as William

4  Avery, right?

5  A.  I don't remember.  Yeah.  Again, whatever they wanted me to

6  say.  I didn't write this, but yeah.

7  Q.  Then let's read the last sentence right above your signature

8  there.  This is a true and correct statement which has been read

9  to me as I followed along with Detective Heier.  You wrote your

10  signature after that sentence, right?

11  A.  Yeah, at the bottom.  Not after the sentence.  My signature

12  is a couple lines down, underneath the date and time.

13  Q.  And next to your signature, and just one line above, says

14  not handcuffed.  You were not handcuffed during this time,

15  right?

16  A.  Yes, I was handcuffed one hand to the wall.  Given

17  cigarettes, which aren't listed.  Oh, yeah.  They are listed.

18  Four cigarettes.  But it was more than four.

19  Q.  So you signed your name even though you say you were

20  handcuffed on one hand?

21  A.  Yeah.

22  Q.  And even though it said not handcuffed?

23  A.  Yeah, I was handcuffed, because I remember that thing on the

24  wall to handcuff you to.

25  Q.  And it says give three cups of coffee, cream and sugar.  You

1    had three cups of coffee?

2    A.  At least.  At least.

3    Q.  And it says one phone call.  You phone called somebody, too?

4    A.  I don't remember that, but I may have tried to call someone.

5    Q.  And two bologna sandwiches underneath that, right?

6    A.  Probably.

7    Q.  Now, this interview with Detective Heier, as reflected there

8    this occurred after an -- apparently after your attorney, Mr.

9    Caton, brought you to the Police, right?  Told the Police that

10   you had something to tell them about a homicide?

11   A.  My attorney didn't bring me to the Police.  The House of

12   Correction staff transported me in the van.  My attorney wasn't

13   present.  I didn't see my attorney until I arrived and was in a

14   room.

15   Q.  This all happened after you talked to your attorney and told

16   him you had some information to provide the Police about a

17   homicide, isn't that correct?

18   A.  What do you mean when you saying this all happened?  What?

19   Q.  This interview happened after you told your attorney,

20   Mr. Caton, that you had information to provide to the Police

21   about a homicide?

22   A.  No, no, no.  My attorney set this meeting up, though.  If

23   that's what you're referring to, I remember that.

24   Q.  He set this up after you told him you had some information

25   to provide to the Police, right?

1  A.  Could have.  I could have said that.

2       MR. SMOKOWICZ:  Deposition page 36, line 23, to page

3  37, line 3.  Or pardon me, line 7.  Or line 11.  I'm sorry.

4       MS. HOFT:  You're on Page 33?

5       MR. SMOKOWICZ:  36, starting line 23, going to page

6  37, line 11.  Or -- yes, line 15.

7  Q.  Question:  He did tell you that and -- answer:  He told me,

8  quote, first I need to go talk to them, Keith, close quote.

9  Okay.  Answer:  Quote, and share some of the stuff you said and

10 see if they want to talk to you.  Question:  And so you had --

11 and so you said some things to Mr. Caton that made him

12 apparently, what you could perceive, to be of interest perhaps

13 to the Milwaukee Police Department, right?  Answer:  Right.

14 Question:  Okay.  And so it was something you said that led your

15 lawyer to make an arrangement to have a meeting with Detective

16 Heier and perhaps some other Detective, is that --.  Yes.  What

17 you're saying?  And, in fact, what you told your lawyer was that

18 you had some information about William Avery.  Isn't that right?

19 Right.

20       All right.  Before we started this area of

21 questioning, your lawyer marked as an Exhibit some testimony.

22       MS. HOFT:  Objection, Your Honor, to the

23 characterization.

24       MR. SMOKOWICZ:  Can I finish the question, Your Honor?

25       MS. HOFT:  Well, he referred to me as Mr. Randolph's

1  lawyer.

2           MR. SMOKOWICZ:  I'm sorry.  I apologize.

3  Q.  Right before we started this questioning, Mr. Avery's lawyer

4  had marked as an Exhibit some testimony that you provided in the

5  criminal case against Mr. Avery.  You did, in fact, provide some

6  testimony in that case, correct?

7  A.  Yes.

8  Q.  But, in fact, when you got to that trial, you did not

9  testify consistently with what's in that statement that we just

10  read, correct?

11  A.  Correct.

12  Q.  However, during the course of your effort -- of your

13  testimony in that case, there were certain questions asked of

14  you where you could have said that I was forced to provide that

15  statement.  Or I was told what to say.  Isn't that true?

16           MS. HOFT:  Objection to the form, Your Honor.

17           THE COURT:  No, he may answer, if he can.

18           THE WITNESS:  Just saying I could have -- I said what

19  I meant at the trial.

20           MR. SMOKOWICZ:

21  Q.  Okay.  And let me ask it this way.  You never said in the

22  trial of William Avery that the Police had forced you to say

23  anything against William Avery, correct?

24  A.  No one ever asked me that.  I would have answered it, had

25  they.

1   Q.  So even Mr. Avery's lawyer never asked you that question?
2   A.  No.  In fact, I was hoping that Mr. Avery's lawyer would
3   declare me hostile or something, and that his lawyer would come
4   at me.
5   Q.  Well, in fact you were called by the State of Wisconsin as a
6   witness, were you not?
7   A.  Yes.  Subpoenaed.
8   Q.  You were asked questions by the State prosecutor, weren't
9   you?
10  A.  Yes.  You're referring to at Mr. Avery's trial?
11  Q.  Yes.
12  A.  Yes.
13  Q.  Page 85 of Plaintiff's Exhibit 24.  From your testimony.
14  Question at line 17:  Did he ever tell you about harming a
15  woman?  Answer:  He told me about a case that he had been
16  charged with.  Of course we were in general population.  He
17  knows that I have some background in certain legal aspects.  I'm
18  not a practicing attorney, but what you call a jailhouse
19  attorney.  And because he knew me from the street, he had asked
20  me to look at some things.  And one of the things I looked at
21  was a statement that the Police had supposedly got from him
22  concerning a woman being harmed.
23          That's your answer to that question, right?
24  A.  Yes.
25  Q.  At that trial, right?

1    A.   Yes.

2    Q.   And the next question:  And in that statement -- you read

3    that statement, is that correct?  And your answer was:  Yeah.

4    A.   Yes.

5    Q.   And the next question:  And in that statement he admitted

6    responsibility for the murder, but said he passed out and didn't

7    know what happened, is that correct?  And your answer was:  Yeah

8    in that statement.  Correct?  That's your testimony?

9    A.   Yes, that was my testimony in the courtroom.

10   Q.   Page 89.  Beginning at line 6.  Question:  With all this

11   background, what did -- what did Mr. Avery tell you about the

12   homicide?  Answer:  Mr. Avery, you know, told me that, you know,

13   he had sadly, you know, sadly made the statement to the Police

14   implicating himself in the drug charges, and that in relation to

15   the homicide that, you know, he was kind of blurred about that.

16   I know Mr. Avery drinks, and I've drunken with him.  I've smoked

17   marijuana with him.

18        That was your answer to that question, was it not?

19   A.   Yes.

20        MR. SMOKOWICZ:  Those are all the questions I have,

21   Your Honor.  Thank you.

22        THE COURT:  Redirect?

23        MS. HOFT:  Just briefly, Your Honor.

24        THE COURT:  Okay.  Redirect.

25                      **REDIRECT EXAMINATION**

1   **BY MS. HOFT:**

2   Q.  Mr. Randolph, so Mr. Smokowicz went over with you some of

3   the testimony from William's homicide trial where you testified.

4   Was there earlier testimony that you remember where you

5   attempted to recant?

6   A.  Yes.

7   Q.  Do you remember what you testified to earlier in that

8   testimony that Mr. Smokowicz went over?

9           MR. SMOKOWICZ:  Your Honor, if there's testimony of

10  that sort, I ask it be displayed to the jury.

11          THE COURT:  It should be, if there's reference to it,

12  so --

13          MS. HOFT:  I'm trying to find it, Your Honor.  I mean,

14  it is a criminal transcript, and I'm just going to ask him what

15  he remembers and I'll finish.

16          MR. SMOKOWICZ:  Your Honor, I'm going to object if

17  there is no evidence of this.

18          MS. HOFT:  Well, there is evidence.

19          THE COURT:  Said the witness testified to it, so -- if

20  you want to cross examine, say it's false, that's fine.

21          MR. SMOKOWICZ:  What I'm concerned about is --

22          THE COURT:  Looking for it, and the witness has

23  answered that he said it.  So we'll see.

24          MR. SMOKOWICZ:  Okay.

25          MS. HOFT:  I'm done.

1          **RECROSS EXAMINATION**

2     **BY MR. SMOKOWICZ:**

3     Q.  Mr. Randolph, I thought earlier your testimony, when I asked

4     you questions, you said that no one ever asked you whether any

5     of this was untrue in Mr. Avery's criminal trial, correct?

6               MS. HOFT:  Objection, Your Honor.

7     Mischaracterization.

8               THE COURT:  Well, he's been asked if that is a

9     mischaracterization.  He may answer.

10              THE WITNESS:  I thought you asked me something like

11    could have said I was forced to make this statement.  Could I

12    have said.  Something else you said, and --

13              MR. SMOKOWICZ:

14    Q.  Well, in the testimony -- in the testimony that I did read,

15    where you were asked questions by Mr. Williams about what

16    Mr. Avery said about this homicide, you never said to

17    Mr. Williams, quote-unquote, that's a lie.  Mr. Avery never said

18    anything about any homicide to me, did you?  We read it.  Those

19    words --

20    A.  No, no, no, no.  Can I have -- no, no, no, no sir.  She's

21    right.  Earlier in those transcripts there is a statement where

22    I'm saying the State was visibly upset because as they were

23    asking me the questions did Mr. Avery tell you I choked this

24    woman?  I'm saying no.  The truth.  I'm in open court.

25    Q.  Okay.  Fine.  Let's go to the previous page.  Because you

1    said earlier, right --

2    A.   What I'm saying is there was a lot more in that.

3    Mr. Avery's trial transcripts.

4    Q.   Fine.  Let's --

5    A.   Other than what you read that was asked of me and answered

6    by me.

7    Q.   All right.  Let's look at the beginning of your testimony on

8    page 84.  Question:  Mr. Randolph, do you know the Defendant,

9    William Avery?  Your answer was:  Yeah.  Right?

10   A.   Um-hum.

11   Q.   And you knew him, right?

12   A.   Yes.

13   Q.   Question:  How do you know him?  And your answer was:  From

14   my girlfriend.  From a friend himself.  That's true, isn't it?

15   A.   Yes.

16   Q.   Question:  How long have you known him?  And your answer

17   was:  Since around 1993.  That's an approximately correct, isn't

18   it?

19   A.   Right.  Approximately.

20   Q.   Might be 1994, 1995?

21   A.   '95, yeah.

22   Q.   And that's what we went around in your deposition about,

23   isn't it?

24   A.   Yes.

25   Q.   Question:  And you know him from the streets?  And your

1  answer was:  Yeah.  And that's true too, right?

2  A.  Yeah.  After meeting him.  I didn't know him in the streets

3  before.

4  Q.  And question:  Were you ever housed with Mr. Avery in a

5  prison?  And your answer was:  Yes.  Yes.  And that's true,

6  isn't it?

7  A.  Yes.

8  Q.  Question:  And that was in a State prison, is that correct?

9  And your answer was:  Yeah, Wisconsin State Prison.  That's

10  correct, isn't it?

11  A.  Yes.

12  Q.  Question:  Do you know a man named Antron Kent?  And your

13  answer was:  No.  Correct?

14  A.  Correct.

15  Q.  Question:  Do you know a man named Jeffrey Kimbrough?  And

16  your answer was:  No.  Correct?

17  A.  Correct.

18  Q.  And that's true, isn't it?

19  A.  True.

20  Q.  Question:  Now, you were housed with Mr. Avery in the State

21  prison in Wisconsin.  Did you ever talk to him about things?

22  Personal things?  And your answer was:  Yes.  Some things about

23  my family.  You know, some personal things.  That's what you

24  testified to, isn't it?

25  A.  Yes.

1  Q.  And that was true, wasn't it?

2  A.  Yes.

3  Q.  Next question:  And could you tell us a little bit about

4  your educational background?  Answer:  High school graduate from

5  East St. Louis Senior High School in 1983.  Associate Degree

6  from Illinois Central College in East Peoria.  Bachelor's Degree

7  from Ohio State University.  While in prison this time I

8  finished that with correspondence courses.  That's the way you

9  testified, right?

10  A.  Yes.

11  Q.  And that was all true, right?

12  A.  Yes.

13  Q.  Question:  Did Mr. Avery ever tell you that he wanted to

14  confide in you?  And your answer was:  Mr. Avery and I have

15  always confided in each other.  That was your answer there,

16  right?

17  A.  Yes.

18  Q.  And that was true, wasn't it?

19  A.  Yes.

20  Q.  Question:  Did Mr. Avery every tell you that there was

21  something bothering him he had to get off his chest?  And your

22  answer was:  No, not in those words.  That was your testimony,

23  wasn't it?

24  A.  Yes.

25  Q.  And that was true, wasn't it?

1    A.  Yes.

2    Q.  Question:  Did he ever tell you about harming a woman?  And

3    I believe this is the answer that we started with when we looked

4    at your transcript.  He told me about a case that he had been

5    charged with.  Of course we were in general population.  He

6    knows that I have some background in certain legal aspects.  I'm

7    not a practicing attorney, but what you call a jailhouse

8    attorney.  And because he knew me from the street, he had asked

9    me to look at some things.  And one of the things I looked at

10   was a statement that the Police had supposedly got from him

11   concerning a woman being harmed.  That was your testimony at

12   that time, right?

13   A.  Yes.

14   Q.  And that was true, wasn't it?

15   A.  Yes.

16            MR. SMOKOWICZ:  That's all I have, Your Honor.

17            THE COURT:  Anything else?

18            MS. HOFT:  No.  No questions, Your Honor.

19            THE COURT:  All right.  You may step down,

20   Mr. Randolph.  Additional witnesses?

21            MR. STAINTHORP:  Yes, Judge.  The Plaintiff calls

22   Defendant Hernandez.

23            **GILBERT HERNANDEZ**, called as a witness, having been

24   first duly sworn, on oath testified as follows:

25            THE CLERK:  Please state your full --

1    MR. STAINTHORP:  Good afternoon, Mr. Hernandez.

2    THE WITNESS:  Good afternoon, sir.  How are you?

3    MR. STAINTHORP:  And is it Detective Hernandez?

4    THE CLERK:  Counsel, one minute.  Please state your

5  full name and spell your last name for the record.

6    THE WITNESS:  My full name is Gilbert Hernandez.  And

7  my last name is spelled H-E-R-N-A-N-D-E-Z.

8                      **DIRECT EXAMINATION**

9  **BY MR. STAINTHORP:**

10 Q.  I'm sorry for jumping the gun there.  Is it Detective

11 Hernandez or former Detective Hernandez?

12 A.  I'm a retired Detective.

13 Q.  And that's with the Milwaukee Police Department, correct?

14 A.  Yes, sir.

15 Q.  When did you become a Police Officer with the Milwaukee

16 Police Department?

17 A.  I basically started in 1977.  That was immediately after

18 high school.  It was like an apprenticeship.  And in 1979 I was

19 promoted to Police Officer.

20 Q.  So you became a Police Officer, promoted to Police Officer

21 in 1979.  At some point you became a Detective, is that correct?

22 A.  Yes.  That would have been 1993.

23 Q.  All right.  And then in 1993 were you assigned to any

24 particular section of the Detective division?

25 A.  From 1993 through 1995 I basically worked violent crimes,

```
 1    which are your shootings, your stabbings.  Subsequently in '95 I
 2    was put into the Homicide Division.
 3    Q.   And how long did you stay in that division?
 4    A.   Until I retired in 2012.  And now I'm currently working with
 5    the Division of Criminal Investigation with the Wisconsin
 6    Department of Justice.  That's as one of their Special Agents.
 7    Q.   Okay.  Now, in the course of your employment with the
 8    Milwaukee Police Department -- and I'm not just talking about
 9    one particular time now, but throughout your employment with the
10    Police Department as a Detective, you became familiar with the
11    facts of the Maryetta Griffin homicide, correct?
12    A.   Yes, I did.
13    Q.   And you have learned from your work with -- in the
14    Department, first of all, that she was a woman, correct?
15    A.   Yes.
16    Q.   You learned that she was a prostitute, correct?
17    A.   Yes.
18    Q.   You learned that she was a drug abuser?
19    A.   Yes.
20    Q.   You learned that she was essentially almost a street person.
21    She lived on the street a lot?
22    A.   Yes.  That's correct.
23    Q.   You learned that with respect to her homicide, she had been
24    strangled?
25    A.   That's correct.
```

1  Q.  And in addition to being strangled, she appeared to have

2  been beaten in some other way.  She had some injuries to her

3  face.  Do you recall that?

4  A.  I don't recall the exact injuries.  They may have.  I just

5  don't know.

6  Q.  And you recall that there was evidence that she had been

7  sexually assaulted?

8  A.  Yes.

9  Q.  And you also learned that her body was recovered in what

10 appeared to be an abandoned garage?

11 A.  That is correct.

12 Q.  Or at any rate a derelict garage.  One that wasn't in active

13 use, correct?

14 A.  I know it was a garage, sir.

15 Q.  Okay.  And that was off of an alley, correct?

16 A.  Yes.

17 Q.  And you also learned that her body had been recovered on the

18 north side of Milwaukee, correct?

19 A.  Yes.

20 Q.  Now, also in the course of your employment as a Detective

21 you became familiar with certain -- several homicides that were

22 connected to a serial killer, Walter Ellis, correct?

23 A.  No, that's not correct, sir.

24 Q.  You never became familiar with the Walter Ellis cases?

25 A.  I was involved with the Walter Ellis cases, and I was

1  involved with the multiple women that Walter Ellis was involved

2  with, yes.  I'm sorry.

3  Q.  So obviously you misunderstood what I was asking.  You were

4  familiar with the -- with several homicides that were connected

5  to Walter Ellis, correct?

6  A.  Yes, sir, that's correct.

7  Q.  And those cases -- all of the victims that were connected to

8  Walter Ellis were female, correct?

9  A.  That's correct.

10  Q.  They were all either engaged in prostitution, or in one case

11  close to prostitution, correct?

12  A.  That's correct.

13  Q.  And the one exception that I'm referring to is Jessica

14  Payne, who probably wasn't directly involved in prostitution,

15  but was very -- was essentially being prostituted by someone

16  else.  Someone was attempting to force her into prostitution.

17  A.  I did work on the Jessica Payne case, but there are so many

18  of the cases that I've worked on, I don't want to get it

19  confused.

20  Q.  Well, let me tell you about Jessica Payne.  She was the 16

21  year old.  Does that refresh your recollection?  And she -- of

22  all these women, she's the only non-African-American woman.

23  She's white.

24  A.  Okay.

25  Q.  Still doesn't refresh your recollection?

1  A.  No.  But I did work on it, sir.

2  Q.  Okay.  Fine.  At any rate, the cases that were connected to

3  Walter Ellis were all prostitutes.  Or close to prostitution.

4  You would agree with that?

5  A.  Yes, sir, I would.

6  Q.  And they were all persons who were involved in drug use,

7  correct?

8  A.  That's correct.

9  Q.  And they were all people who were either street people, or

10  close to street people?

11  A.  Yes.

12  Q.  And many of the victims of the homicides that were linked to

13  Walter Ellis were strangled, correct?

14  A.  Yes.

15  Q.  And some had additional injuries besides being strangled?

16  A.  Some may have had some defense wounds.

17  Q.  Okay.  And I think there were 1 or 2 that maybe additionally

18  were stabbed.  Do you recall that?

19  A.  I don't recall that.  I'm sorry.

20  Q.  So primarily you recall that these victims were -- the cause

21  of death was strangulation, correct?

22  A.  Yes.

23  Q.  And I think you already said, many had wounds beyond that,

24  correct?

25  A.  I don't -- I wouldn't disagree with you, sir, on that.

1   Q.  And that in these cases they had been sexually assaulted?

2   A.  Yes.

3   Q.  And that many of these bodies were left in abandoned areas,

4   correct?  In derelict areas?

5   A.  Yes.

6   Q.  And that the majority -- in fact I think 9 out of the 10

7   cases, the bodies were recovered -- might even be 10 out of

8   10 -- they were recovered on the north side of Milwaukee?

9   A.  Yes.  Most of them were from the north side of Milwaukee.

10  Q.  And that's where the bodies were recovered?

11  A.  Yes.

12  Q.  And, in fact, there were 10 total cases that were associated

13  to Walter Ellis, correct?

14  A.  That number sounds pretty close.

15  Q.  Okay.  And, in fact, in 7 of those cases he was actually

16  criminally charged with the homicides, correct?

17  A.  Yes.

18  Q.  And then there were 3 other cases -- one of them being

19  Jessica Payne -- do you recall that?

20  A.  Yes.

21  Q.  And he wasn't, in fact, charged with the Jessica Payne case,

22  because in fact someone else was charged with that case,

23  correct?

24          MR. STAINTHORP:  I don't think there was an objection.

25          THE WITNESS:  I'm sorry.  I know that there were some

1  cases that were not charged.

2        MR. STAINTHORP:

3  Q.  Okay.  But they were nevertheless associated with having

4  been committed by Walter Ellis, correct?

5  A.  Yes.

6  Q.  And that association was that his biological material was

7  found in or on the bodies, or close to the bodies, of all these

8  10 women, correct?

9  A.  Yes.

10  Q.  And in many cases that was biological material that was

11  semen that was found either in the vaginal, oral, or rectal

12  cavities of the women, correct?

13  A.  On the body, yes.

14  Q.  Well, precisely.  And in one case -- I believe Ms. Stokes --

15  the material was actually found on the body.  On her left thigh.

16  Do you recall that?

17  A.  Yes, I do.

18  Q.  So all of these 10 cases all have biological material

19  recovered from them that is associated with Mr. Ellis.  It's his

20  semen, correct?

21  A.  Yes.

22  Q.  And so of the seventh case he's charged with, it's the

23  Jessica Payne case.  You recall that?

24  A.  Yes.

25  Q.  And, in fact, someone else was originally convicted of the

1  Jessica Payne case, correct?

2  A.  That's correct.

3  Q.  And that was based upon statements that --

4        MS. YUAN:  Your Honor --

5        MR. STAINTHORP:  That were alleged to inculpate

6  someone else?

7        MS. YUAN:  Your Honor, I'm going to object.  Can we

8  have a sidebar on this?

9        MR. STAINTHORP:  Judge, I think we dealt with this

10 yesterday.

11       THE COURT:  We went over this yesterday.  It's -- the

12 Court is going to allow the examination.

13       MR. STAINTHORP:

14 Q.  So the person who's charged in the Jessica Payne case, that

15 was Chaunte Ott?  Correct?

16 A.  I've not -- I know there were some cases that weren't

17 charged.

18 Q.  But you know in the Payne case someone else was originally

19 convicted of that homicide?

20 A.  I believe you're correct.

21 Q.  All right.  And that subsequently after the connection to

22 Walter Ellis was made, that conviction was vacated.  You

23 understand that?

24 A.  Which conviction was vacated?

25 Q.  The conviction -- the person, Mr. Ott, who was convicted of

1   the Jessica Payne case.  You know that that conviction was

2   vacated?

3   A.  Yes.

4   Q.  And that subsequently -- strike that.  And another case that

5   was connected to Walter Ellis was one where by the time the

6   biological material had been discovered, and connected to Walter

7   Ellis, someone else had been tried and acquited.  You recall

8   that?

9   A.  I wouldn't disagree with you on that.

10  Q.  And that was the Kilpatrick case?

11  A.  That one I can't remember.

12  Q.  You don't know the name.  But you do recall there was a case

13  where someone other than Mr. Ellis had been tried, acquited?

14  A.  I do recall that there were some cases that were not

15  charged.

16  Q.  Right.  And that was before any connection was made to

17  Mr. Ellis.  Do you recall that?

18  A.  No, I don't.  I'm sorry.

19  Q.  And then the 10th case is this case, isn't it?

20  A.  Yes.

21  Q.  And this case, the Maryetta Griffin case, the biological

22  evidence in the case is identical to the -- identical in form to

23  the biological evidence in the other 9 cases that were

24  associated with Mr. Ellis, correct?

25  A.  Yes.

1    Q.  Now, you've indicated to the jury that you had some

2    involvement in the investigation of these cases that were

3    associated eventually with Mr. Ellis.  But that didn't happen

4    for -- until approximately 2009, correct?  The association?

5    A.  Yes.

6    Q.  And so until that time, there had been some -- there had

7    been some connections made between the various unsolved

8    homicides of these women, but no identity given to the person

9    who had allegedly committed these crimes.  Do you want me to try

10   that one again?

11   A.  Would you mind, please?

12   Q.  Yeah.  Sure.  You know, I'm going to ask it a different way.

13   As of 2009, D.N.A. was recovered from Mr. Ellis, correct?

14   Walter Ellis?

15   A.  Yes.

16   Q.  And it was then compared to D.N.A. that had been recovered

17   from evidentiary materials in relation to several of the other

18   at that point unsolved homicides of women?

19   A.  We basically compared it to a large number of cases in our

20   city.

21   Q.  And at that point, with respect to 7 of the cases that you

22   compared it to, there was a match between Mr. Ellis's D.N.A. and

23   the D.N.A. recovered from biological material in the homicides,

24   correct?

25            MS. YUAN:  I'm just going to object to the form, given

1    the time frame.

2            THE COURT:  The question was there were 7 cases that

3    this D.N.A. was connected to?

4            MR. STAINTHORP:  I'm asking -- yeah.  The time frame

5    I'm asking about, 2009.  So in 2009.

6            THE COURT:  That was established previous to that, so

7    the Court will overrule the objection.

8            MR. STAINTHORP:

9    Q.  Go ahead.  Do you remember the question?  Or shall I --

10   A.  If you're asking for the exact time frame, I don't know.

11   Were these cases coming in with Walter Ellis's profile?  Yes,

12   they were.  I can't tell you what time they were at.

13   Q.  That's fine.  But would you disagree with me -- actually, as

14   the Judge notes, it's already been established that in 2009

15   there was a connection made between the D.N.A. that was

16   recovered from Mr. Ellis, and the D.N.A. that was associated

17   with 7 of these other unsolved homicides.  Do you have any

18   reason to disagree with that?

19   A.  No, I would not disagree with that.

20   Q.  Okay.  And as a result of that, Mr. Ellis was charged with 7

21   of those counts of homicide, correct?

22   A.  Yes.

23   Q.  All right.  All right.  You actually before you had that --

24   strike that.  In 1998 -- so now I'm going back, from 2009 to

25   1998.  You were involved in the investigation into the Maryetta

1  Griffin homicide, correct?

2  A.  Yes.

3  Q.  And my understanding is that you have determined, looking at

4  Police reports, that you were engaged in interviews with Mr.

5  Avery on March the 23rd and March 24th of 1998, correct?

6  A.  That's correct.

7  Q.  Now -- and with respect to the March 24th, 1998, interview,

8  or interrogation, that at that point Mr. Avery was being treated

9  as a suspect in the Griffin homicide, correct?

10  A.  Yes.

11  Q.  With respect to the general manner in which you conducted

12  interrogations back in 1998, and in particular in March of 1998,

13  it was the policy of the Milwaukee Police Department not to have

14  any contemporaneous recording via technological means of those

15  interrogations, correct?

16  A.  Yeah, we didn't have the -- the ability to do it.  It wasn't

17  set up at all.  It was just --

18  Q.  So there was no video, no audio, no stenographer such as the

19  --

20  A.  -- it would be nice, but no --

21  Q.  -- the woman sitting next to you.  And, in fact, the only

22  persons present during those interrogations would be the Police

23  Officers and the person being interrogated?

24  A.  That's correct.

25  Q.  And you generally, as a matter of practice, would not do an

1  interrogation with the suspect and someone else there also

2  who -- unless in the unusual circumstance a lawyer was present.

3  But otherwise you wouldn't have the person's friend there?  You

4  wouldn't have someone else?

5  A.  No.  It would normally be the -- two of the investigators.

6  If a lawyer was present -- I've done it also with a lawyer

7  present.  And the potential suspect.

8  Q.  Okay.  And so -- and the person who was being interrogated

9  would generally not have any means to make contemporaneous notes

10 of the progress of the interrogation.  That would not be your

11 practice, would it?

12 A.  If he wanted a pad of paper to take notes, I would be more

13 than happy to give him a pad of paper.

14 Q.  Was that a normal practice, that you would give a person

15 being interrogated a pad and paper?

16 A.  I never had anyone request one.

17 Q.  Okay.  So if it wasn't requested, you didn't do it.

18 A.  No, I wouldn't.

19 Q.  Right.  And actually in terms of the general method of doing

20 interrogations back in 1998, it was the practice of the

21 Milwaukee Police Department if a person were giving a statement,

22 that that statement would be handwritten out by the Detective

23 who was doing the interrogation, correct?

24 A.  Yes.

25 Q.  And it was not your practice as a general rule to have the

1  person who was being interrogated write it out?

2  A.  That's correct.

3  Q.  So, in fact, the only record that was made of interrogations

4  back in 1998 was the record that was made by you as a Detective,

5  correct?

6  A.  That's correct.

7  Q.  Then if you did an interrogation, you would normally file a

8  Police report, correct?

9  A.  Yes.  Correct.

10 Q.  So if the person gave a statement, you would hand write it

11 out at the time, and then attempt to have the person sign it.

12 Correct?

13 A.  You would ask, yes sir.

14 Q.  In addition to that, you would create a typewritten Police

15 report, correct?

16 A.  Yes, sir.

17 Q.  And that would be created by the Detective actually

18 recording the Detective's account of the -- of the content of

19 the interrogation, correct?

20 A.  Yes.  I would read the handwritten report, and I would

21 dictate it.  And one of the typists downstairs would type it up

22 for me.

23 Q.  But it wasn't like you were dictating directly to a typist.

24 You were directing to some kind of recording?

25 A.  You're right.  You're right.

1    Q.  Okay.  So even though there wasn't a recording of the

2    suspect who was being interrogated, there was a recording of

3    your version of of --

4    A.  -- yes --

5    Q.  -- what the suspect said, right?

6    A.  Yes.  That's correct.

7    Q.  So again, the record of what occurred was your record.  It

8    was not the suspect's record, correct?

9    A.  That's correct.

10   Q.  You also knew as an experienced Detective in 1998 that if

11   you prepared a report of an interrogation and represented that

12   certain things occurred, that if the suspect subsequently denied

13   that those occurred, and there was no physical evidence that

14   undermined your account, you knew that your account was going to

15   be the one that was credited, correct?

16   A.  I don't understand the question, sir.

17   Q.  Okay.  If you prepared a report and said the suspect said

18   certain things during the interrogation, unless there was some

19   physical evidence that undermined your account of what the

20   suspect said, you knew that it was your account that was going

21   to be credited, correct?

22        MS. YUAN:  I'm going to object to the form of the

23   question, Your Honor.  I think that calls for speculation.

24        THE COURT:  Overruled.  It's -- what the witness said

25   is relied upon in the Detective reports.

 1           THE WITNESS:  What -- I'm going to try to answer your

 2    question.  When I'm interviewing a suspect --

 3           MR. STAINTHORP:

 4    Q.  Sir, I don't think you're answering my question.

 5    A.  Start the question over again, please.

 6    Q.  Let's try it again.  I'll make it more specific.  You knew

 7    that if you wrote an account of what occurred in an

 8    interrogation, that unless there was physical evidence that

 9    undermined your account, the prosecutor was going to credit your

10    account of the interrogation?

11    A.  Would you explain to me what you mean by undermined?

12    Q.  Okay.  What I mean by undermine is that unless there was

13    some physical evidence that tended to show that your account of

14    the interrogation was unreliable or incorrect, the prosecutor

15    was going to accept your version over the version of the

16    suspect?

17    A.  I don't believe -- I don't -- I don't understand the

18    question.  I don't -- I do not understand the question.  I'm

19    sorry.

20    Q.  Fine.  I'll try it again.  You knew in 1998 that if you

21    wrote up a report of an interrogation that claimed a suspect

22    said something --

23    A.  -- okay --

24    Q.  -- and the suspect subsequently said no, I didn't say that,

25    that unless there was some physical evidence that definitively

1  undermined your version, the prosecutor was going to believe

2  your version over the suspect's?

3  A.  No.  Totally?  No.  I would --

4  Q.  No, no, no.  You answered my question.  How many

5  occasions -- how many occasions did you write an account of an

6  interrogation in which you claimed the suspect said something

7  and the suspect said no, I didn't, and the prosecutor said you

8  know what?  I think you're lying.  How many times did that occur

9  to you in your career?

10 A.  I -- it's never happened to me, sir.

11 Q.  Never happened, right?  How many times did it happen that

12 you wrote up an account of an interrogation.  The suspect said

13 no, that didn't happen.  There was no evidence to undermine your

14 version, and the prosecutor said I don't think you accurately or

15 reliably recorded that suspect's statement?

16 A.  I document what the suspect said.

17 Q.  Sir, do you understand my question?

18 A.  I'm trying to answer your question, sir.

19 Q.  No.  I'm asking how many occasions did a prosecutor say you

20 know what?  You said the suspect said such and such.  The

21 suspect says he didn't.  I think your version, you, Detective

22 Hernandez, is not accurate or reliable?

23       MS. YUAN:  Your Honor, this has been asked and

24 answered.

25       THE COURT:  It has.  He said it's never happened.

1          MR. STAINTHORP:  My initial question was lying.  Now

2    I'm going to accuracy and reliability, Judge.  That's the

3    difference.  The only difference.  But perhaps --

4          THE COURT:  The question was asked whether or not a

5    prosecutor would say that the denial by the suspect is more

6    reliable than that of the Officer?  Is that -- that's the

7    question?

8          MR. STAINTHORP:  Yes.

9          THE COURT:  All right.  It's a different degree, so he

10   may answer.

11         MR. STAINTHORP:

12   Q.  Do you remember my question?  Or do you want it over again?

13   A.  I -- if you're asking me if my opinion or the suspect's

14   opinion is higher, it would have to show on the evidence of the

15   investigation -- what comes out that office, that statement,

16   it's got to corroborate with the investigation.  That's what you

17   follow.  Your evidence.  And you're going after the truth.  We

18   always are.  It's -- I'm not better than he is, he's not better

19   than me.  I document the statement, and then with the

20   evidence -- the District Attorney was the one that is going to

21   make the final decision.

22   Q.  Sir, sir, I think you've answered.

23   A.  I tried my best.

24   Q.  I think you answered it in the first sentence.

25   A.  Just trying to do my best, sir.

1    Q.  So in fact, if there was no physical evidence that

2    undermined your version of what occurred in an interrogation,

3    there have been no occasions on which a prosecutor has said I

4    find the suspect's version of the interrogation more accurate

5    and reliable than you, Detective Hernandez?

6    A.  I've been at the District Attorney's Office numerous times

7    where I have been sent -- okay, we need more evidence.  This is

8    not going to make it.

9    Q.  Not my question, sir.

10   A.  Okay.

11   Q.  My question is, that I'm understanding from your answer that

12   there have been no occasions during your career as a Detective

13   where a prosecutor, confronted with both your account of an

14   interrogation, and a suspect's contrary account of an

15   interrogation, has said that -- the prosecutor did not find your

16   account accurate and reliable unless there was some evidence

17   that undermined it.  Is that correct?

18   A.  If there's evidence that supports that document and it's

19   truthful.

20   Q.  But you know that the prosecutor is going to go with your

21   version.

22   A.  I can't -- I can't tell you what the prosecutor is going to

23   say.

24   Q.  Have you had any occasions -- any occasions on which the

25   prosecutor did not go with your version, where there was not

1    evidence to undermine your version?  Where it was just a matter

2    of credibility?  You said one thing, the suspect said another

3    thing.

4    A.  If it's supported by evidence, there's more of a chance that

5    he might -- he will believe what the statement was.  What the

6    report was.

7    Q.  I'm going to ask you one more time, because I still think

8    you're not quite answering it.  But then I'm done.  Can you

9    identify a single case in which your account of an interrogation

10   was not accepted as accurate and reliable by the prosecutor

11   because it was contradicted by a contradictory account of the

12   suspect?  Can you name me --

13   A.  I'm sorry.  I would answer it the same way.  I apologize,

14   sir.

15   Q.  No, I want to know if you can name a single case where that

16   occurred?

17   A.  I've been doing this for 37 years, sir.  I can't tell you.

18   Q.  Okay.  Well, during that 37 years can you recall a single

19   case where that occurred?  I gather the answer is no, because

20   there's been a long delay here.

21   A.  I'm thinking.  I can't.  I'm sorry.

22   Q.  Okay.  Now, in addition to the prosecutor having your

23   report, your report would also go to other Police Officers,

24   correct?

25   A.  Yes.  They would go into a file that the homicide Detectives

1  have.

2  Q.  And you would expect those reports to be reviewed and relied

3  upon by other Police Officers involved in the investigation?

4  A.  That's correct, sir.

5  Q.  Now, in addition, in this case are you aware that the Police

6  report, your Police report, was released to the media and was

7  the source of a newspaper article in the Milwaukee newspaper?

8  A.  I'm not aware of that, sir.

9  Q.  Okay.  Well, we previously marked -- it's actually marked as

10  a Defendant's Exhibit, and it's already in evidence, so I'm just

11  going to ask you a little bit about this.  Do you see that this

12  appears to be a newspaper article headlined:  Man admits to

13  killing, report says?

14  A.  Yes, I see that.

15  Q.  And if you go to the end of the first paragraph of that, it

16  attributes this story to a Police report.  Is that correct?

17  A.  Yes.  Correct.

18  Q.  Okay.  So does that refresh your recollection that on

19  occasion Police reports were released to the media and became a

20  source of media reports?

21  A.  Well, I'm aware that there's an open record policy.  I'm not

22  sure how that works or how they pick reports.

23  Q.  So you're aware that a Police report -- and you were aware

24  back in 1988 -- excuse make, 1998, that a Police report that you

25  prepared could be released to the media and could then provide a

1  source for a media article?

2  A.  Yes.  Any report can be, I guess, through open records.

3  Q.  And you expected, in that circumstance, that the media

4  report would rely upon the reliability and accuracy of the

5  Police report, correct?

6  A.  I assume so.

7  Q.  Now, in addition to the prosecutor, other Police Officers,

8  and the media, your Police report in the regular course of

9  business would often become an evidentiary material in criminal

10  proceedings, correct?

11  A.  That's correct, sir.

12  Q.  And you knew that your Police report could both be used

13  for -- to help you in testimony in a criminal case?

14  A.  True.

15  Q.  And it could also in certain circumstances, especially if it

16  purported to be a statement of a suspect who was then criminally

17  charged, could become an actual physical Exhibit in the criminal

18  proceedings?

19  A.  That's correct, sir.

20  Q.  And so that physical Exhibit would be entered into evidence

21  the same way we're entering matters into evidence here, and

22  would go before the jury, correct?

23  A.  Yes.

24  Q.  So now we have the situation where your Police report, as a

25  general matter of practice, was something that was authored by

```
1    you, you were the only witness besides the suspect to what --
2    and I'm talking about an interrogation here -- you were the only
3    witness as to what occurred during that interrogation.  And that
4    Police report could have results both with the prosecutor, with
5    other Police, with the media, with the Courts, with juries, with
6    Judges, and with guilty verdicts, correct?
7    A.  That's correct, sir.
8    Q.  So you had a huge responsibility when you filled out a
9    Police report to get it right, didn't you?
10   A.  That's correct.
11   Q.  And you recognized that if you didn't get it right, the
12   responsibility fell on you, correct?
13   A.  No.
14   Q.  Okay.
15   A.  It's not my -- if I go in there and I go in for an
16   interview, whether or not I come out --
17   Q.  Sir, I think you've answered the question.
18            MS. YUAN:  Your Honor, I'd ask that the witness be
19   allowed to complete his answer.
20            MR. STAINTHORP:  I don't think he's answered it.
21            THE COURT:  He may answer.
22            MR. STAINTHORP:  I'm sorry, Judge?
23            THE COURT:  He can finish the answer.
24            THE WITNESS:  I've done thousands and thousands of
25   interviews and interrogations.  If I walk out of there with a
```

1   blank sheet of paper?  That's fine.  That's fine.

2          MR. STAINTHORP:

3   Q.  And as I thought, you're not really answering the question.

4   With respect to the significance of the Police report that you

5   created, you have now acknowledged that that Police report would

6   have reverberations in several different matters.  With the

7   District Attorney, with the prosecutor, with other Police

8   Officers, with the media, with the Courts, with Judges, with

9   juries, and with potential convictions, right?  You've

10  acknowledged that?

11  A.  Yes.

12  Q.  Okay.  So my question to you is this.  If you didn't get

13  that Police report right, the responsibility for all those

14  consequences going forth from now is yours, correct?

15         MS. YUAN:  I'm going to object.  Vague.

16         THE COURT:  It is vague.  I don't know what you mean

17  by responsibility.

18         MR. STAINTHORP:

19  Q.  If you didn't get it right in the Police report, it was you

20  who had caused all these effects going forward from that Police

21  report.  That being the prosecutor, other Police, the media, the

22  Courts, juries, and verdicts, correct?

23         MS. YUAN:  Same objection, Your Honor, as to the word

24  right.

25         THE COURT:  It's still pretty vague.  I mean, if --

1           MR. STAINTHORP:  Okay, Judge.  I'll re-ask it.

2    Q.   If you didn't get your Police report accurate and reliable,

3    the effects of that inaccuracy and that unreliability

4    reverberating on from that interview years into the future, that

5    was caused by you, correct?

6    A.   My reports are always accurate as far as what occurs in that

7    room, sir.  And I take my job very seriously.

8    Q.   But my question is this.  If you didn't get it accurate and

9    reliable -- if your Police report was not accurate and reliable,

10   and that is our assertion in this case, the responsibility for

11   the consequences of that is yours, correct?

12   A.   Myself and the person who's in that -- the other Detective

13   in there.  That's how we make sure that the report is correct

14   and accurate.  That's why we ask the suspect let's read it.

15   That's why we make corrections right there in that room.  If

16   that individual sees something wrong with that report, he's

17   asked well, we're going to change it.  You can initial it.

18   These are checks and balances between the two Detectives that --

19   Q.   -- I'm sorry.  Did someone tell you to talk about checks and

20   balances again?

21           MS. YUAN:  Objection, Your Honor.  He's arguing with

22   the witness, and I'd ask that the witness be allowed to finish

23   his answer.

24           THE COURT:  The appropriate objection is

25   non-responsive.

```
 1              MR. STAINTHORP:
 2    Q.   Okay.  If you didn't get that report accurate and reliable
 3    and complete, the people who should be held responsible are the
 4    Detectives who were in that room doing that interrogation and
 5    producing that report, correct?
 6    A.   Once again, when I walk out of that room I do the best I can
 7    --
 8    Q.   -- can you answer my question?  If you don't get that report
 9    accurate, reliable, and complete, should you and your partner in
10    that room doing that interrogation with no contemporaneous
11    record other than yourself, be the persons who are held
12    responsible?
13    A.   Again, I would tell you that there are checks and balances
14    that that report is accurate, sir.
15    Q.   Again I'm going to ask you one more time.  Give you one more
16    opportunity to answer this question.  If you didn't get your
17    Police report accurate, reliable, and complete, should you and
18    your partner, the only witness other than the suspect who's in
19    that interview room, be the persons who are held responsible for
20    the failure to produce an accurate, reliable, and complete
21    Police report?
22    A.   I would say that you're speculating that it's wrong.  And
23    I'm telling you that it's right when I walk out of that room.
24    That's why I asked, again, the suspect to go over the report.
25    And my partner.
```

1  Q.  I think you understand my question, don't you?

2          THE COURT:  I think the last question was understood,

3  which focusses on -- Mr. Hernandez, it's a hypothetical.  If

4  this report is inaccurate, it wasn't reliable, it wasn't

5  complete, and you did the report, you would be responsible for

6  the inaccuracy, the unreliability, and the incompleteness,

7  right?

8          THE WITNESS:  Yes.  Yes, Your Honor.

9          THE COURT:  Okay.

10         MR. STAINTHORP:

11  Q.  And you would be responsible for all the effects of --

12         THE COURT:  Now that was asked four times, and this

13  witness is not competent to answer that question.

14         MR. STAINTHORP:  Fine.  I'll move on.

15         THE COURT:  Because he doesn't know what the broad

16  effects are of this report.  We've established that it is the

17  foundation, the spearhead of any criminal investigation.

18         MR. STAINTHORP:

19  Q.  Now, in this case as we've already talked about, you

20  conducted an interview with Mr. Avery on March the 24th of 1998?

21  A.  Yes.

22  Q.  And that was with Detective Phillips, correct?

23  A.  That's correct.

24  Q.  Now, before you conducted that interrogation, you knew

25  several facts about the case, correct?

1  A.  Yes.

2  Q.  And you had actually discussed your interrogation with

3  Detective Phillips before you went into the interrogation?

4  A.  I probably would have discussed the case and reviewed the

5  case, yes.

6  Q.  All right.  And you knew that Detective Phillips had

7  actually talked to Mr. Avery the day before, that being March

8  the 23rd, a Monday?

9  A.  I believe -- yeah, you're probably right.  Correct.

10  Q.  And Detective Phillips told you before the start of the

11  March 24th interview that he was very suspicious of Mr. Avery,

12  in particular -- for several reasons, but one reason being that

13  Mr. Avery on March the 23rd said he knew that Ms. Griffin was

14  dead at around 8:00 or 8:30 in the morning.  But, in fact,

15  according to Detective Phillips no one knew about the body until

16  11:00 a.m. that morning.

17        MS. YUAN:  I'm just going to object, Your Honor.  This

18  mischaracterizes Detective Phillips' testimony.

19        THE COURT:  Well, if the witness can answer -- the

20  Court doesn't recollect exactly what that testimony was.  So the

21  jury will have to rely upon their collective memories for that.

22  But the Court will allow the answer to the question.

23        THE WITNESS:  I'll say that it's normal to discuss a

24  case with my partner before I go do the interrogation.  I can't

25  tell you the contents of that communication, sir.

1          MR. STAINTHORP:

2    Q.  All right.  Detective Phillips in his testimony -- and I

3    will represent to you -- said he considered it highly suspicious

4    that Mr. Avery on the 23rd said he knew about the death of Ms.

5    Griffin at 8:00 a.m. or 8:30 a.m. when, in fact, the body was

6    not recovered or was not found until 11:00 a.m.  That was

7    something that he would have shared with you before you began

8    the interrogation, correct?

9    A.  I don't remember, but I assume he might have shared that

10   with me.

11   Q.  I mean, that would be something that Detectives would share.

12   The kind of information Detectives would share before beginning

13   an interrogation, correct?

14   A.  I don't recall that, but it's common that we discuss before

15   we go in the room to talk.

16   Q.  And you also had information from an interview that you

17   conducted two days before -- that being the Sunday -- with a

18   person called Valerie Eubanks, in which she had told you about

19   an incident where the victim in this case, Ms. Griffin, had had

20   a large amount of money in large denominations.  She considered

21   that very suspicious and thought that likely Ms. Griffin had

22   robbed someone.  You had that information when you went into the

23   interview?

24   A.  I remember reading one like that, yes sir.  I remember

25   having that interview.

1    Q.  So you had that information with respect to Ms. Griffin.  In

2    addition to that, Detective Phillips -- yeah, Detective Phillips

3    testified that it was his theory that when a prostitute was a

4    victim of a violent crime, including homicide, that in many

5    cases it was the prostitute who had initiated the conduct by

6    attempting to steal or rob from the -- either the customer or

7    her pimp.

8            MS. YUAN:  Again objection, Your Honor.  I think that

9    misstates, mischaracterizes Detective Phillips' testimony.

10           THE COURT:  I don't think it does, so the Court will

11   allow the answer.

12           THE WITNESS:  Can you ask the question one more time?

13   I apologize.

14           MR. STAINTHORP:  Could I have it read back, please?

15           (Whereupon the preceding question was read back by the

16   Reporter.)

17           THE WITNESS:  I can't agree to that.  Just so many

18   situations.  Not -- it's not always 100 percent that it's the

19   prostitute that was aggressive and this is the reason why she

20   got beat up.  We don't know.  I can't say for 100 percent, sir.

21           MR. STAINTHORP:

22   Q.  No, I agree.  And I'm not suggesting it's 100 percent.  But

23   in many cases in your career --

24   A.  In some cases, yes, you're right, sir.

25   Q.  You had determined that that was the genesis of the eventual

1  homicide of the prostitute, correct?

2  A.  Of this homicide, sir?

3  Q.  No, no.  Just in general.  I'm talking about general.

4  A.  In general, yes.  I mean, it can go either way, as far as

5  who's the more aggressor.

6  Q.  In this case you also had information by the time you went

7  to interview Mr. Avery on the 24th that there was no question

8  that Mr. Avery and Ms. Griffin had been together at some point

9  on the day before her body was found.  Her body was found on the

10 17th, and so this would have been on the 16th that they had been

11 together during that day.  You had that information, correct?

12 A.  I had that?  I can't tell you if I had that information

13 before, but I know that after the interview with Mr. Avery that

14 I -- that he did indicate that he was with her.

15 Q.  If, in fact, there had been information generated before

16 your 3/24 interview with Mr. Avery that he had, in fact,

17 acknowledged that he was with Ms. Griffin on the day before her

18 body was found, you would expect that to be information that you

19 had when you did the interrogation of Mr. Avery?

20 A.  Yes.

21 Q.  And in that situation you would have gone into the

22 interrogation with at least a hunch that Mr. Avery was involved

23 with the homicide of Ms. Griffin, correct?

24 A.  Yes.

25 Q.  And you would have given all this information that you now

1    had with respect to Ms. Griffin and Mr. Avery -- you would have

2    had a strong suspicion that Mr. Avery was guilty of involvement

3    in the homicide of Ms. Griffin?

4    A.  He was a suspect, yes.

5    Q.  Well, you had a strong suspicion that he was involved with

6    it?

7    A.  I can't remember exactly back 17 years ago exactly what my

8    mind thought was back then.  But I know he was a suspect.

9    Q.  And you were interrogating him on the 24th as a suspect in

10   the killing of Ms. Griffin, correct?

11   A.  Yes, sir, I was.

12   Q.  Now, Detective Phillips also told us that he had an

13   interrogation technique which he sometimes used which involved

14   the use of hypotheticals.  I don't think you were present for

15   that testimony?

16   A.  No, I wasn't.

17   Q.  But hypotheticals were situations in which he would lay out

18   a certain scenario and then ask the person if they would either

19   agree with that or add to that.  So that is what a hypothetical

20   is.  Is that an interrogation technique that you have used?

21   A.  No, I haven't used that.

22   Q.  Are you aware of other Detectives using that interrogation

23   technique?

24   A.  I've -- yes, I've seen it.  Yes.

25   Q.  Okay.  So in that situation where you are using a

1  hypothetical, you, the investigator, would lay out a certain

2  possibility of how a crime occurred, and see if the suspect

3  would agree with that or disagree with that, correct?

4  A.  Yes.

5  Q.  And so you could lay out a certain way in which the crime

6  had transpired, and then ask the suspect, is that what happened?

7  A.  I don't use that style, sir, so I'm not really -- how should

8  I say?  I -- I'm not quite sure -- I'm sure that there's been

9  examples where they ask the subject.  I'm sure some Detectives

10  have done that.  I don't know who they are, but I haven't

11  practiced that, sir.

12  Q.  I understand you said you didn't, but you are somewhat

13  familiar with that technique?

14  A.  Yes, I am.

15  Q.  You would agree with me, would you not, that that is a

16  dangerous interrogation technique because you are in fact --

17  then are supplying information to the person you are

18  interrogating?

19  A.  You're not -- and again, I'm just saying is it dangerous?  I

20  don't know.  I don't -- it depends how -- what kind of example

21  you're using.  If you're using examples from the crime scene or

22  from the incident itself, yes, it's extremely dangerous.  But if

23  you're -- let's say -- take an example like totally different,

24  not even close to the scene or this investigation, then it's

25  probably okay.  But I -- that's how I would answer your

1  question.

2  Q.  Okay.  And so as an interrogation technique it's dangerous,

3  because then you don't quite know whether you're getting back

4  information that you have fed to the suspect, or information

5  that is originating from the suspect, correct?

6  A.  Well, the information that you gain back from your suspect

7  should be somehow trying to match with the evidence and the

8  statements of witnesses.  That's how you kind of determine if

9  it's the good stuff that you're getting out of that interview or

10 interrogation.

11 Q.  But when you're doing an interrogation, you want to make

12 sure you know what information is coming from the suspect, and

13 what information is coming from you, the interrogator?

14 A.  Yes.  You have to be careful that you don't feed them, if

15 you would.

16 Q.  Because, in fact, then you would be contaminating the

17 interrogation, wouldn't you?

18 A.  A possibility, yes.

19 Q.  And if that occurred, then in any Police report that was

20 prepared you would have to be vigilant to record exactly what

21 information you had provided to the suspect, correct?

22 A.  What is recorded on that report is what the individual

23 suspect is reporting, because that's his statement.  It's not

24 the investigator's statement.

25 Q.  But if the individual suspect reported a certain version of

1    the incident, and you had previously given information to the
2    suspect which tended to support that version of the event, that
3    would be something that you would have to record in your Police
4    report?
5    A.  No.  You record what the suspect is telling you.
6    Q.  Okay.  So your practice was you would record what the
7    suspect was telling you, but not necessarily what information
8    you had given to the suspect, is that correct?
9    A.  Right.  It comes to a part where -- let's say you may want
10   to share with your investigators as far as an example that you
11   may have used.  But as far as what goes on that report, is his
12   final statement.
13   Q.  Okay.  And not the context for the statement?
14   A.  Pardon me, sir?
15   Q.  Not the context for the statement?
16   A.  The context is what the suspect is reporting to us.
17   Q.  So the context is what the suspect is saying to you?  Not
18   what you said to the suspect?
19   A.  That's correct, sir.
20   Q.  Now, in fact, you have no actual recollection of that 3/24
21   interrogation, correct?
22   A.  Just what's on my report, sir.
23   Q.  Okay.  So -- but beyond what's on your reports, you have no
24   live memory of that interrogation?
25   A.  17 years ago.  No.

1    Q.   Okay.

2    A.   I mean, something could click, but as of right now -- I'm

3    not sure what you're looking for.

4    Q.   Well, no.  I know that you've previously given testimony in

5    this matter, and that in that testimony you said I don't

6    remember this interrogation.  And I'm just confirming that.

7    A.   Yeah.  That's true.

8    Q.   That's still the case?

9    A.   Yes.

10   Q.   You have no recollection of this?

11   A.   No.

12   Q.   And obviously you prepared for your testimony here today?

13   A.   I read some reports, sir.

14   Q.   Okay.  Well -- and you prepared for your deposition in this

15   case?

16   A.   When I took my deposition, yes.  Yes.

17   Q.   All right.  And after preparing both for the deposition and

18   for today's proceeding, you have no actual recollection of this

19   interrogation other than what's in your reports?

20   A.   Yes, sir.

21   Q.   Okay.  Now I'm going to show you what has previously been

22   marked as 11-C and ask you if this is the report that you

23   prepared -- one of the reports that you prepared of your

24   interview of 3-24-98?

25   A.   Yes, sir.

1    Q.   Okay.  And because it won't all fit on one page, we're just

2    going to slide it up -- and I understand that the markings in

3    yellow were not on the report when you prepared it, is that

4    correct?

5    A.   That's correct.

6    Q.   But other than the markings on yellow, and the number that's

7    here at the bottom, the Bates stamp, this is the report that you

8    prepared, correct?

9    A.   That's correct, sir.

10   Q.   And this is your handwriting, correct?

11   A.   Yes, I'm afraid it is.

12   Q.   And this is the report that became a permanent record in

13   this case, correct?

14   A.   I'm sure it is, yes, sir.

15   Q.   Became a permanent record in the criminal proceedings

16   against Mr. Avery?

17   A.   Yes.

18   Q.   In addition to this, you did prepare a typewritten report,

19   is that correct?

20   A.   Yes, I did, sir.

21   Q.   And I'll show you what's previously been marked as 11-D.

22   And again, ignoring the portion that's highlighted, does this

23   appear to be the typewritten report that was prepared?

24   A.   Yes, sir, it is.

25   Q.   And going to the bottom of this Exhibit 11-D, that is your

1  signature that appears on this report, is that correct?

2  A.  Yes, it is, sir.

3  Q.  And right above your signature, right above where it says

4  reporting Officer, is the initials G.H.  That's you?

5  A.  Yes, sir.

6  Q.  Slash C.N.L.  would that be the person who -- the typist who

7  typed it up?

8  A.  I believe that's correct, sir.

9  Q.  Okay.  Now, this -- after -- strike that.  The reports that

10  were prepared by you in this case, they contain certainly highly

11  incriminating admissions by -- which are attributed to

12  Mr. Avery, correct?

13  A.  Yes, sir.

14  Q.  Okay.  And those include that there was a fight between

15  Mr. Avery and Ms. Griffin?

16  A.  Yes.

17  Q.  That Mr. Avery was awakened by Ms. Griffin going into his

18  pockets and pulling out his money, correct?

19  A.  Yes.  You're right.

20  Q.  That Mr. Avery grabbed Ms. Griffin's hand -- you see that?

21  A.  I don't see it, but you're correct.

22  Q.  That Ms. Griffin and he started to fight.  And that's at the

23  bottom of the paragraph which is highlighted in yellow.  Do you

24  see that?

25  A.  Yeah, I see started to fight.  Yes.

Q.   That Ms. Griffin, who is referred to here as Mercedes,
pulled away and ran towards the stairs, attempting to get away.
You see that?

A.   That's correct, sir.

Q.   And that he then allegedly calls Ronnie and says get over
here, I think I killed this bitch.  Do you see that?

A.   Yes, I do.

Q.   And in this situation -- and -- oh, and then that there's
then reference to getting rid of the body.  You see that?

A.   Yes.

Q.   All right.  Now, in this case there was no question that Ms.
Griffin was the victim of a homicide, correct?

A.   I'm sorry?

Q.   I'm sorry.  Yeah.  I stepped away from the microphone.  In
this case there was no question that Ms. Griffin was the victim
of a homicide?

A.   Yes.

Q.   So there was no question, this was not an accidental death?

A.   No.

Q.   Okay.  And based on the statement as recorded in your
report, you actually went to the District Attorney to seek
homicide charges against Mr. Avery?

A.   I -- there wasn't enough on that report to get a homicide
charge on that report.

Q.   Sir, my question was you went to the District Attorney?

```
1   A.  That's correct.

2   Q.  To attempt -- not just any District Attorney.  You went to

3   the homicide District Attorney?

4   A.  Yes, I did.

5   Q.  And you were attempting to get homicide charges, correct?

6   A.  No, sir.

7   Q.  Well, in fact charges were denied at that point, correct?

8   A.  That's correct, sir.

9   Q.  But you attempted to get charges, didn't you?

10  A.  No, sir.  I can add more if you'd like, sir.

11  Q.  That's okay.

12  A.  Okay.

13  Q.  Well, you do recall giving a deposition in this case -- and

14  I'm on Page 9, at line 11.  And were you asked this question and

15  did you give this answer.  Question:  In what capacity were you

16  involved in developing Mr. Avery as a suspect?  Answer:  I would

17  have to -- what I -- excuse me, what I remember is that I was

18  doing a lot of interviews with a lot of prostitutes in the area.

19  And I remember that there was a certain house pointed out, and I

20  remember that house being associated with Mr. Avery and his

21  brother, Lorenzo Frost.  I remember taking this matter over to

22  the District Attorney's Office, where it was reviewed by I want

23  to say Ron Dague.  And charges were denied at that point due to

24  the amount of evidence at that point.

25          MS. YUAN:  Your Honor -- sorry, I thought you were
```

1    finished.

2              MR. STAINTHORP:  Okay.  I'm actually done.

3              MS. YUAN:  Your Honor, I just wanted to ask -- there's

4    another portion I think that should be read in as to this

5    particular question for completeness sake.

6              MR. STAINTHORP:  I'll finish.  Was Ron Dague a D.A. in

7    the drug unit or the homicide unit?  I want to say the drug

8    unit.  Yeah.

9              MS. YUAN:  But that's not the portion I was thinking

10   of.  I need a minute to find it, but that's particularly related

11   to your question to Detective Hernandez.

12             MR. STAINTHORP:

13   Q.  Okay.  And then Page 105, question at line 5.  Question:

14   You're pretty sure you went to the homicide Detective for --.

15   "And" -- is your answer.  Question:  Just let me finish the

16   question.  To the best of your ability what is your recollection

17   about what charges you went to pursue?  Answer:  I went there to

18   the homicide -- I went to the Homicide Unit.  I felt like I did.

19   And what are the reasons why?  How I felt about it, there's --

20   there's -- there's like not a protocol, but most of your arrests

21   for homicide, it normally goes in front of the homicide D.A., so

22   he can sign off on it.  Administratively sign off.  So that may

23   have been the reason I went to Mark first, so he can look at it

24   anyway, and so he can sign off.  Do you remember being asked

25   those questions and giving those answers?

1  A.  Yes sir, I do.

2  Q.  All right.

3          MS. YUAN:  And, Your Honor, I'd ask that the next

4  question and answer that goes onto Page 106 of this deposition

5  be read in for completeness sake.

6          MR. STAINTHORP:  Judge, I think counsel can do that.

7          THE COURT:  You can do it on cross.

8          MS. YUAN:  Thank you.

9          MR. STAINTHORP:

10 Q.  Now, as you know, in this case charges were -- homicide

11 charges based on the information at that date were not approved,

12 correct?

13 A.  Yes, sir, that's correct.

14 Q.  But you in fact continued your investigation, continued your

15 work in this case, correct?

16 A.  That's correct, sir.

17 Q.  And you continued your efforts to have Mr. Avery -- or you

18 made efforts to have Mr. Avery charged with homicide, correct?

19 A.  I continued my investigation to see where my investigation

20 would lead to.

21 Q.  And, in fact, you -- in 2003 you picked up on this

22 investigation again.  Do you recall that?

23 A.  Um --

24 Q.  Okay.  So let me tell you what you did in 2003.  In 2003,

25 one person you went to see was Valerie Eubanks, correct?

1   A.   That's correct.

2   Q.   You went to see her.  She was in the jail, correct?

3   A.   That's correct, sir.

4   Q.   And Ms. Eubanks is the person who'd given you the

5   information before you had the interview with Mr. Avery about

6   Ms. Griffin apparently having a large amount of money shortly

7   before the homicide, correct?

8   A.   Correct, sir.

9   Q.   So you went to see her in the jail to see if you could get

10  some more -- some information about Mr. Avery, correct?

11  A.   Yes.

12  Q.   And you didn't get any, did you?

13  A.   Can you -- more information?

14  Q.   Correct.  You didn't get anything to incriminate Mr. Avery?

15  A.   I don't recall what I got out of there, but -- I remember

16  dealing with her, but I don't remember the contents of that

17  interview.  I'm sorry.

18  Q.   You don't recall any incriminating evidence of Mr. Avery

19  that you got from Ms. Eubanks?

20  A.   I don't, no.

21  Q.   Now, you also went to Prairie Correctional Center, correct?

22  A.   Excuse me, sorry.

23  Q.   Do you need some water?

24  A.   No.

25  Q.   You went to Prairie Correctional Center and met with

1  Mr. Kimbrough, who was here today?

2  A.  Yes, sir.

3  Q.  And that was on October the 20th of 2003?

4  A.  Yes, sir.

5  Q.  And the same day you also met -- went to see a person called

6  Antron Kent at the Green Bay Correctional facility?

7  A.  That's correct, sir.

8  Q.  And then shortly thereafter you went to see a Mr. Randolph

9  at the Stanley Correctional Center in Wisconsin, correct?

10  A.  Correct, sir.

11  Q.  And in each of those cases you were attempting to develop

12  evidence to use against Mr. Avery in a potential homicide

13  charge, correct?

14  A.  Yes.

15  Q.  Okay.  And my understanding is that you actually have no

16  memory of those interviews?

17  A.  I don't.  I don't, sir.

18  Q.  And certainly that's how you testified before, and that's

19  still the case, is that correct?

20  A.  Yes, sir.

21  Q.  And that's after preparing for your deposition, preparing

22  for trial.  There is no memory of what occurred there?

23  A.  Just what's in my report, sir.

24  Q.  Okay.  Now, you're aware that -- that subsequently, shortly

25  after Mr. Avery was released from prison on the drug charges

1  that he was convicted of, he was charged with the homicide of

2  Ms. Griffin, correct?

3  A.  Yes, sir.

4  Q.  And you've testified at the trial of Mr. Avery, correct?

5  A.  Yes, I did.

6  Q.  And you testified to the content of the statement that you

7  claimed that he gave in March -- or on March the 24th of 1998?

8  A.  That's correct, sir.

9  Q.  And that statement was introduced into evidence and used

10 against Mr. Avery in the criminal trial?

11 A.  That's correct.

12 Q.  And Mr. Avery was convicted of the homicide of Ms. Griffin,

13 correct?

14 A.  That's correct.

15 Q.  And was sentenced to prison on that conviction?

16 A.  That's correct.

17 Q.  And that's where the matter stood until 2010, correct?

18 A.  Yes.

19 Q.  And that's when the case fell apart, correct?

20 A.  The case fell apart?

21 Q.  The case against Mr. Avery for the homicide of Ms. Griffin

22 fell apart?

23 A.  Yep.  That's when they found out something, yes.

24 Q.  Because that's when Mr. Avery requested that the biological

25 material from the Maryetta Griffin case be tested for D.N.A.,

1   correct?

2   A.  That's correct.

3   Q.  And he specifically noted in his letter that he wanted it

4   tested against the D.N.A. of Mr. Ellis, correct?

5   A.  That's correct.

6   Q.  Because he noted that there were significant similarities

7   between the case -- the homicide of which he was convicted and

8   the homicides with which Mr. Ellis was charged?

9   A.  I don't know what his thoughts were, but that request was

10  made by Mr. Avery.

11  Q.  You had nothing to do with that request?

12  A.  No, sir.

13  Q.  And your understanding is that when the biological material

14  from the Griffin homicide was tested, the oral swab showed semen

15  from Mr. Ellis?

16  A.  That's correct.

17  Q.  Right?

18  A.  That's correct.

19  Q.  And under the factual scenario that you had developed, there

20  was no possibility of Mr. Ellis being involved in a way that

21  would leave his semen in the mouth of Ms. Griffin?

22  A.  Can you ask that question one more time, please?

23  Q.  Yes.  Under the factual scenario as you had developed and

24  laid it out in the statement from Mr. Avery, there was no

25  possibility of Mr. Ellis's semen being found in the mouth of Ms.

1   Griffin?

2   A.  If you're asking me -- ask the question one more time.  I

3   apologize, sir.

4   Q.  So the scenario that you had --

5   A.  -- correct --

6   Q.  -- was Ms. Griffin going over to this drug house on North

7   Palmer sometime in the early evening, correct?

8   A.  Correct.

9   Q.  Being there for some extensive period of time during the

10  evening, correct?

11  A.  Correct.

12  Q.  Then at some time in the early morning hours of the next

13  day -- so this would be Tuesday, the 17th -- there being this

14  fight that you record?

15  A.  That's correct.

16  Q.  And Ms. Griffin being killed at that point?

17  A.  That's correct.

18  Q.  Right.  And then her body being discovered sometime the next

19  day, correct?

20  A.  That's correct.

21  Q.  And that that -- and were you aware that the autopsy -- the

22  time of death is probably between 5:00 and 7:00 a.m.?

23  A.  I was not.

24  Q.  Okay.  At any rate, under the scenario as laid out in the

25  statement that you claim Mr. Avery made, Mr. Ellis could not

1  possibly have been involved in that, correct?

2          MS. YUAN:  I'm just going to object.  Misstates the

3  evidence in the record.  Detective Hernandez has taken multiple

4  statements from Mr. Avery.

5          MR. STAINTHORP:

6  Q.  Okay.  I'm clearly referring to the statement of March the

7  24th.  The only one that you claim where Mr. Avery says he's

8  responsible for the death of Ms. Griffin.  With respect to that

9  statement, there is nowhere in there that Walter Ellis has any

10 role, correct?

11 A.  In that statement?

12 Q.  Correct.

13 A.  No.  Right.  Correct.

14 Q.  So according to the version of events that you laid out in

15 this report that was presented to the jury at the trial of

16 Mr. Avery, Mr. Ellis had no involvement in this homicide?

17 A.  On this statement you are correct.  Walter Ellis is not

18 mentioned in there.

19 Q.  Okay.  Now -- and you were aware that based upon this new

20 evidence that now involved Mr. Ellis's semen with the semen that

21 was found in the mouth of Ms. Griffin, you're aware that

22 Mr. Avery's conviction was vacated?

23 A.  Yes.

24 Q.  And you're aware that he got a determination that he was

25 actually innocent of this crime?

499

1          MS. YUAN:  I'm going to object to the form.

2          THE COURT:  Well, if the witness knows, he can

3    testify.  If he knows what actual innocence means.

4          MR. STAINTHORP:

5    Q.  Well, are you aware that the State of Wisconsin Claims

6    Board -- and this is Plaintiff's Exhibit 10 -- found, based upon

7    the D.N.A. evidence that had been discovered in 2010 that linked

8    Walter Ellis to the murder the homicide of Ms. Griffin -- that

9    the Claims Board found that Mr. Avery has provided clear and

10   convincing evidence that he was innocent of the crime for which

11   he was convicted and did not, by his act or failure to act,

12   contribute to his conviction.  Were you aware of that?

13   A.  This is the first time I saw this, sir.

14   Q.  Okay.  So it sounds like you were not aware that the Claims

15   Board had found that he's actually innocent of the charge?

16   A.  This is the first time I saw that document, sir.

17   Q.  And you recognize it as a -- there's a big difference

18   between being found not guilty and being found actually

19   innocent?

20   A.  I do.

21   Q.  Okay.  And there is no question, is there, that the

22   statement contained in your March the 24th report, handwritten

23   by you, is flatly contradictory to a determination that

24   Mr. Avery is innocent?

25   A.  No.  It shows me that -- that Walter Ellis had sex with her.

1  Q.  Okay.  So as far as you're concerned, you don't agree with

2  the State of Wisconsin Claims Board decision that he has

3  proven that he's actually innocent?

4  A.  I feel that -- that Mr. Walter Ellis had sex with her.

5  That's what it proves.  It doesn't prove that he killed her,

6  although that is his pattern.  But we don't know.  We know that

7  he had sex with her.

8  Q.  Well, you've already acknowledged to me that the evidentiary

9  material in the Griffin case, the actual evidentiary material --

10  not statements, but the actual physical evidence in the Griffin

11  case -- is identical to the physical evidence in the 7 cases

12  that Mr. Ellis was charged with?

13  A.  I'm aware of that, yes sir.

14  Q.  Right.  It's the same?

15  A.  Yes, sir.

16  Q.  And you're aware that Mr. Ellis pled guilty to those 7

17  homicides?

18  A.  I was present.

19          MS. YUAN:  Objection.  That misstates the record.

20          MR. STAINTHORP:  I'm sorry.  Let me restate that.

21  Q.  You're aware that Mr. Ellis was found guilty of those 7

22  intentional homicides?

23  A.  Yes.

24  Q.  Yet nevertheless you would say that in this case, out of all

25  of those 10 cases that are linked to Mr. Ellis, this evidentiary

1   material does not show that Mr. Avery is innocent, but merely

2   shows that Mr. Ellis had sex with her?

3   A.   That's correct.

4   Q.   So you are in flat disagreement with the decision of the

5   Wisconsin Claims Board that he has shown by a high preponderance

6   of evidence that he's innocent of this?

7   A.   I took that statement, and I believe that -- that statement

8   that I took.  And I think that Mr. Walter Ellis had sex with

9   her, or we don't have all the pieces.  We may not have all the

10  pieces here.  But I believe that -- the statement that Mr. Avery

11  gave me that day.  And I believe that Mr. Ellis had sex -- may

12  have been there.  I don't have all the pieces.  I'm not perfect.

13  I try to do the best we can with what the evidence shows us.

14  Q.   What evidence do you have that Mr. Ellis had sex with Ms.

15  Griffin in a time period that would allow for his semen to be

16  found in her mouth after she's -- her body is found?

17        MS. YUAN:  I'm just going to object.  This witness

18  isn't qualified --

19        THE COURT:  I think you said Mr. Ellis.  Did you mean

20  Mr. Avery?

21        MR. STAINTHORP:  I'll have to do it again, Judge.

22        THE COURT:  Go ahead.

23        MR. STAINTHORP:

24  Q.   What evidence do you have to show that Mr. Ellis had sex

25  with Ms. Griffin in a time period that would allow his semen to

1  be found in her mouth at the time that her body is found by

2  Police around 11:00 on the 17th?

3  A.  What I can tell you is that as far as the time -- or I can't

4  answer that, but the semen in her mouth just tells me that they

5  had sex.

6  Q.  What evidence did you develop in the course of your

7  investigation, when you were investigating this case, that

8  showed Walter Ellis had any -- I'm sorry, that -- yes.  That

9  Walter Ellis was in any way involved with Ms. Griffin?

10  A.  I didn't.  I didn't.

11  Q.  Your theory in the case didn't have Mr. Ellis mentioned in

12  the case, did it?

13  A.  That's correct.  I'm not disagreeing with you.  You're

14  correct.

15  Q.  Okay.  So where does Mr. Ellis come from?  Does he jump out

16  of the wall at the drug house?  Where does he come from?

17  A.  I'm just -- sir, I'm answering your question.  I'm telling

18  you the semen in her mouth just tells me that Walter Ellis had

19  sex with her.

20  Q.  Okay.  And Walter Ellis had sex with her, and then she is

21  found dead, correct?

22  A.  Yes.

23  Q.  The identical evidence that -- in the 7 cases presented

24  against Mr. Ellis he pled guilty to, correct?

25  A.  That's correct.

1  Q.  That was the only evidence against him in those cases,
2  wasn't it?  There were no statements.  There were no people who
3  saw him in the vicinity?
4  A.  I would agree with you there.
5  Q.  So this was it.  It was the D.N.A. evidence that linked him
6  to biological material, mostly semen, I believe, on the victims
7  that came from Walter Ellis.  Exactly the same evidence as
8  exists in this case, correct?
9  A.  That is correct, sir.
10  Q.  So -- do you question whether Mr. Ellis was guilty in the 7
11  other cases?
12  A.  I'm familiar with this case because I'm the one that took
13  the statement.
14  Q.  Okay.  Do you question whether Mr. Ellis is guilty in those
15  other cases?
16  A.  No, I don't.
17  Q.  So the only difference between those cases and this case is
18  the statement that you claim Mr. Avery gave, correct?
19  A.  The statement, and the statement from witnesses that put
20  Maryetta Griffin walking into that house and never coming out
21  again.
22  Q.  Okay.  There's no question that Ms. Griffin was in that
23  house on the 16th, correct?
24  A.  That's correct.
25  Q.  You did have evidence that she left?

1  A.  Excuse me, sir?  I apologize.

2  Q.  You had evidence that she had left in the early evening?

3  A.  Yeah, when we found her body the next day in the garage.

4  Q.  No.  You had evidence that she had left the house in the

5  early evening?

6  A.  I have evidence?

7  Q.  You did have evidence, didn't you?

8  A.  That she left the house?  That Maryetta Griffin left the

9  house?  You said I have evidence that she did leave?

10  Q.  Yes.

11  A.  I can't recall that right now.

12  Q.  In fact, every other statement given by -- asserted to be

13  given by Mr. Avery, other than yours, had Ms. Griffin leaving

14  that house around 6:30, 7 o'clock in the evening, didn't it?

15  A.  I don't -- I'm sorry.  Repeat that question.

16  Q.  Every other statement attributed to Mr. Avery in this case

17  had Ms. Griffin leaving that house around 6:30 to 7:00 in the

18  evening on the 16th?

19  A.  That was Mr. Avery's account.

20  Q.  Well, it was more than Mr. Avery's account, wasn't it?

21  There were other witnesses there.

22  A.  Ronnie Frost.  Got that individual.

23  Q.  How about Lakesha?

24  A.  I can't recall Lakesha's statement.  These are the

25  individuals that were involved in the drug house.

1   Q.  Not Lakesha.

2   A.  Okay.

3   Q.  If any other evidence had been available besides the

4   statement of Mr. Avery that you claim you got, that would have

5   been presented at his homicide trial, wouldn't it?  Any other

6   evidence?

7   A.  Oh, yes, yes.  Yes, I agree with you.

8   Q.  So other than the statement that you claim you got from

9   Mr. Avery --

10  A.  -- yes, sir --

11  Q.  -- you would agree that there is no difference between the

12  evidence in this case and the evidence in the cases for which

13  Mr. Ellis was found guilty?

14  A.  I can't disagree with you, sir.

15  Q.  And the account -- or the evidence that you developed in

16  your investigation did not account in any manner for Mr. Ellis

17  having sex with Ms. Griffin prior to her getting to the drug

18  house on North Palmer, did it?

19  A.  I'm sorry.  I don't have any kind of indication of that,

20  sir.

21  Q.  All right.  So, in fact, your statement here today -- your

22  testimony here today that you think Walter Ellis had sex with

23  her, but Mr. Avery killed her, is rank supposition, isn't it?

24  A.  What I'm trying to explain to you, sir, is that we don't

25  have all the pieces here.  I have --

1    Q.  And what I'm saying to you is that you have no evidence

2    whatsoever, other than your assertion of Mr. Avery's statement,

3    that your theory of the case has any validity whatsoever?

4    A.  Mr. Avery said he was responsible, yes.  That's what I have.

5    Q.  That's it?

6    A.  And witnesses having seen her walk in there, sir.

7    Q.  And the fact that that is contradicted by the physical

8    evidence in the case doesn't bother you a bit, does it?

9    A.  What physical evidence?

10   Q.  The physical evidence that shows Walter Ellis's semen in

11   Maryetta Griffin's mouth.

12   A.  I'm not disagreeing with that, sir.

13   Q.  All right.  But in terms of explaining that evidence, which

14   is uncontradicted, you have no evidence that would explain how

15   that happened, and yet at the same time Mr. Avery be the person

16   who killed Ms. Griffin?

17   A.  All -- what I'm telling you -- like I said to the jury, we

18   don't have all the pieces here.  I have Mr. Avery saying that

19   he's responsible.  Come get this body, what he told his brother.

20   And all what I have is his statement to me and the witnesses

21   having that victim walk in that house.  Yes, is Mr. Ellis's

22   semen in Maryetta Griffin's mouth?  Yes.  It shows me he had

23   sex.  That's what I have.  And it's my feeling that we're

24   missing something here.

25   Q.  Okay.  And you had a chance --

1   A.  Just my feeling, sir.

2   Q.  All right.  Well, you had a chance to develop that feeling

3   over the years you were a Detective, correct?

4   A.  Yes, sir.

5   Q.  And you were never able to develop any evidence, as opposed

6   to supposition, that Mr. Ellis could have sex with Maryetta

7   Griffin, and yet Mr. Avery be the person who killed her,

8   correct?

9   A.  I've never found any further information besides my

10  statement.  And the witnesses that have her walking in there,

11  sir.

12          MR. STAINTHORP:  Okay.  I'm finished.  That's all I

13  have.

14          THE COURT:  All right.  Take a break, and then we'll

15  do the -- is this witness going to be called in defense case in

16  chief?

17          MS. YUAN:  He will be.  I do have some cross

18  examination.

19          THE COURT:  Yes.  I just was worried about the time.

20  I don't want to end past 5 o'clock.

21          MS. YUAN:  Yes.  Yes.

22          THE COURT:  Okay.  Don't discuss the case.  See you

23  after the break.

24          (Whereupon the jury was excused at 4:02 p.m.)

25          THE COURT:  Okay.  Take about 15.

1          (Whereupon a recess was called by the Court.  Upon

2     conclusion of the recess, the proceedings continued as follows

3     when the jury was returned to the courtroom at 4:17 p.m.:)

4          THE COURT:  Miss Yuan.

5                    **CROSS EXAMINATION**

6     **BY YUAN:**

7     Q.  Good afternoon, Detective Hernandez.  How are you?

8     A.  Good.  Thank you.

9     Q.  I just wanted to clarify a few points that you -- that came

10    out during your testimony.  There was one point where Attorney

11    Stainthorp was questioning you and asking you if at one point

12    after your first interview with Mr. Avery if you then went to

13    the District Attorney's Office.  Do you recall that?

14    A.  Yep.  Yes.

15    Q.  Okay.  And then there's a portion of your deposition that

16    was read in.  And if I recall correctly, part of your answer in

17    terms of what you did when you went to the District Attorney's

18    Office was to have it administratively released.  You mentioned

19    administratively released.

20    A.  That is correct.

21    Q.  Can you explain what that means?

22    A.  Of course.  You have your D.A.'s that handle the sexual

23    assaults.  You have the D.A.'s that handle general crimes.  And

24    then you have the homicide District Attorneys, that that's all

25    they do is they concentrate on the City's homicides.  If I go

1    out there and I arrest an individual on a homicide charge,

2    and -- as with Mr. Avery, we're going to bring him in and the

3    contents of that statement -- it wasn't my opinion. It wasn't a

4    confession, okay? But I still had to go through the homicide

5    District Attorney to sign off on the homicide charge. I will go

6    back to the homicide D.A. Sit there with him and just discuss

7    the case. What was said. What was done. And then he would

8    just sign off. And then that would relieve him of ever being --

9    of having that charge on his record, because at that point we

10   didn't have it.

11   Q. You said at that point we didn't have it. And you also said

12   you didn't believe you had a confession?

13   A. That's correct.

14   Q. Did you believe that statement when you were interviewing

15   Mr. Avery with Detective Phillips -- that the admissions that

16   Mr. Avery made -- and I can show the statement again in a

17   minute. You don't believe that that was enough for a

18   confession?

19   A. It was not. It was not.

20   Q. And why is that?

21   A. When you're interviewing someone and you want to make sure

22   you've got the right suspects, you need more. You need more

23   meat. I mean, it's got to tell me things. Like how he did it

24   or how he choked her, if he did. Or how he beat her. He's got

25   to give me the facts from the crime scene. Or facts that the

1   witnesses have.  If he just walked in and says I just killed

2   this person, that's nothing.  That's meat.  I mean, myself, and

3   most of the investigators wouldn't be comfortable with that.  I

4   wouldn't be comfortable with that.  That's not a confession.

5   Q.  I'm just going to put a statement up, too, for you to look

6   at.  This is Defense Exhibit 1030.  It's already been admitted

7   into evidence.  And Detective Hernandez, showing you this

8   statement.  But actually I'm going to -- I know I can't display

9   the entire statement all at the same time.  But if you look

10  towards the bottom, there's a description of what happens when

11  Mr. Avery is with the victim.  Starting where my finger is

12  pointing.  Subject states that Mercedes and him started to

13  fight.  Do you see that?

14  A.  Yes.

15  Q.  Subject states that he was saying what are you doing?

16  Subject states that Mercedes pulled and ran toward the stairs,

17  attempt to get away.  Subject states that he doesn't remember

18  what happened.  Subject states, quote, Ronnie, end quote,

19  called.  Subject told Ronnie get over here.  I think I killed

20  this bitch.  Subject stated that Ronnie shouldn't have gotten

21  rid of the body.  Questioned subject as to --

22          THE COURT:  Can you move that up a bit?  I can't see.

23          MS. YUAN:  Oh, I'm sorry.  Thank you.

24  Q.  I'll just repeat that.  Subject stated that, quote, Ronnie

25  end quote, shouldn't have gotten rid of the body.  Questioned

1    subject as to how he killed Mercedes.  Subject stated I'm

2    responsible.  I just don't remember how.  And you wrote down

3    what Mr. Avery told you in this statement?

4    A.  That's correct.

5    Q.  And the portion I read -- and if you need to look at the

6    entire statement, I'd be happy to hand you this one page

7    statement.  Do you recall if there's any description of how

8    Mr. Avery -- how Mr. Avery killed Mercedes if, in fact, he did?

9    A.  There was no description.

10   Q.  So Mr. Avery didn't -- when you're interviewing him with

11   Detective Phillips on March 24th, 1998, Mr. Avery didn't tell

12   you that he choked or strangled Mercedes?

13   A.  No.  No, he didn't.

14   Q.  He didn't tell you that he removed portions of her clothing

15   that was missing that you know from your review of the crime

16   scene?

17   A.  No.  He gave no details at all.

18   Q.  Did Mr. Avery tell you that he dumped her body in the

19   garage?

20   A.  No.

21   Q.  Are those the type of facts that are important to you for it

22   to be deemed a confession?

23   A.  Yes, I would be more comfortable with something like that

24   than what this was.

25   Q.  Actually one more second here on this statement.  I wanted

1  to draw your attention to the bottom there.  That's your

2  signature at the bottom, is that right?

3  A.  That is correct.

4  Q.  Okay.  And then there's the date March 24th, 1998.  And then

5  there's also the time there, 10:00 a.m. to 12:30 p.m.?

6  A.  That's correct.

7  Q.  That's the length of time that this interview took place?

8  A.  Yes.  Two-and-a-half hours.

9  Q.  Two-and-a-half hours.  Okay.  Detective Hernandez, you were

10  also asked about whether or not you use hypotheticals when

11  you're interviewing a suspect or interrogating a suspect.  Do

12  you recall that?

13  A.  Yes.

14  Q.  And your answer was you do not use -- or you never used

15  hypotheticals when you interrogate a suspect.  Is that correct?

16  A.  That's correct.

17  Q.  Okay.  Explain to the jury what your style of interrogation

18  is.

19  A.  Most of the individuals that I interview or interrogate, I

20  find out -- I find more -- I get more information by being

21  respectful.  Listening almost like a parent would talk to their

22  child.  A lot of these individuals have lived a rough and pretty

23  violent life, and they're not -- if you confront them, or if you

24  get them irritated, you're going to break that line of

25  communication.  You almost have to sit there -- you have to be

1    patient.  And you have to talk to this individual.

2            What you don't want to get caught up is in -- in one

3    of these situations where you start using examples.  And if you

4    find out that -- if that individual knows -- if you use an

5    example, and that individual knows that you're lying, that the

6    investigator's lying, then you might as well quit right there

7    because he doesn't trust you.  And he knows that you don't got

8    anything.  Okay?  So you want to be honest -- honest.  Don't get

9    caught up with like what if this, and what if this.  Because you

10   can put yourself out there and destroy your credibility.  Keep

11   it truthful.  Almost like a son -- talking to your daughter or

12   your son.  And be compassionate.  And that's what works.

13   Q.  And you would agree different individuals, different

14   Detectives, have different interrogation styles, correct?

15   A.  Just like different personalities, yes.

16   Q.  And you just described your interrogation style, correct?

17   A.  Yes.

18   Q.  Would you ever provide details of how a homicide occurred to

19   a witness or a suspect of a homicide?

20   A.  That's the golden rule of homicide investigation.  You keep

21   the facts to yourself.  You let the individual witness or

22   suspect tell you, because once you start putting that evidence

23   out there, then you don't -- how do you measure the credibility

24   of your suspect or of your witness if you give them information.

25   No.  You just zip it and let them tell you the facts.  And

1    that's how you evaluate if someone is being truthful or not.

2    Q.  Detective Hernandez, while you were -- you did -- let me ask

3    it this way.  With the Maryetta Griffin homicide, was that one

4    of your primary cases when that occurred?  When that homicide

5    occurred?

6    A.  Back then we were getting close to 90-some homicides a year.

7    So we were constantly busy.  You're still working on an old one,

8    and the next thing -- the next week it comes and you end up with

9    3 new homicides over the weekend.  And you try to get back to it

10   because the family members are asking for answers on their loved

11   ones, and you try to get back to them, but you've still got to

12   take the fresh ones, because the sooner you start working on the

13   fresh ones, the window of opportunity to try to solve is

14   greater.  And it's -- as the cases go on longer, unsolved

15   longer, it gets more difficult.  But yeah, we had a large case

16   load back then.

17   Q.  So you had a large case load.  And Maryetta Griffin, that

18   homicide was also one of the cases that you worked on?

19   A.  Yes, it was.

20   Q.  Okay.  And back in 1998 when the homicide occurred, you and

21   all the other homicide Detectives then were doing a lot of

22   investigating on that matter?

23   A.  Yes.

24   Q.  Do you recall if the name Walter Ellis ever came up in 1998

25   while you're investigating Maryetta Griffin's homicide?

1    A.   It never came up.

2    Q.   Did you ever speak with a witness or somebody that gave you

3    any information that would have led you to the name Walter

4    Ellis?

5    A.   Spoke to a lot of witnesses, and we never came up with the

6    name Walter Ellis.  We were checking other sexual assaults that

7    may be close to the pattern, and we never came up with any

8    Walter Ellis.  We were checking our databank.  Or not -- I don't

9    think back then we were checking the databank but we were

10   checking every resource that we had available to us to try to

11   identify the person responsible for this.

12   Q.   And you mentioned having a lot of -- I think you said 90,

13   approximately, homicides in 1998.  And so, of course, every year

14   there's more homicides that were being -- occurring in the City

15   of Milwaukee, is that correct?

16   A.   Yes.

17   Q.   And you were a homicide Detective.  Can you tell the jury,

18   were a majority of the victims prostitutes?

19   A.   We had female prostitutes, and we had male homicides.  We

20   had -- we had all kinds of homicides.  I mean, all of our

21   homicides varied from the south to the north.  We had prostitute

22   homicides.  Of course we did.  Did we have any idea that there

23   was a serial killer there?  I didn't.

24   Q.   And you're talking back in 1998?

25   A.   Yes.

1  Q.  You were -- can you tell the jury in terms of once you

2  became a homicide Detective, what your focus was within the

3  Department.  First it was general homicide Detective, is that

4  right?

5  A.  Well, when I was assigned to the Homicide Unit, that's -- I

6  basically just worked all homicides.  That's basically what I

7  did.  I worked homicide investigations, and worked with the

8  homicide D.A.  Those were basically my functions.

9  Q.  At some point did you have a more specialized focus within

10  the Homicide Department?

11  A.  Back in 2007, since I was one of the older ones, we started

12  a Cold Case Unit.  And it was myself with Detective Kathy Hein,

13  now Detective Spano.

14            THE COURT:  What did you start?

15            THE WITNESS:  I'm sorry.  Back in 2007, the Milwaukee

16  Police Department decided to start a Cold Case Unit to work on

17  some of these cold case homicides.  I think back then we were --

18  like we had close to about 500 unsolved homicides.  And they

19  wanted to have a team to start to work on these cases and

20  concentrate most of their time on these cases.

21  Q.  And so back in 2007 you and Detective Spano were part of the

22  Cold Case Unit?

23  A.  Yes.

24  Q.  And during your work in the Cold Case Unit, did you

25  eventually develop Walter Ellis as a suspect?

1   A.  Yes.  What happened was myself and Detective Spano at the

2   time -- we went to a couple seminars on how to run this Cold

3   Case Unit properly.  And we were learning a lot that --

4   regarding D.N.A.  And one of the things that we learned is that

5   the technology of D.N.A. has improved so much that cases -- they

6   were recommending that cases after -- or before 2000 should be

7   resubmitted because the D.N.A. process has gotten way better.

8   You used to need like a quarter size of blood.  Now you could

9   only use like a pinpoint of blood.  And they can develop a

10  profile.

11          So one of my main responsibilities was I would start

12  pulling out boxes of some of these homicides where there was

13  possible physical evidence of D.N.A.  Like if there was a fight,

14  maybe underneath the nails.  If there's a sexual assault, maybe

15  get some of the old vaginal slides that could have the profile.

16  And that was one of my main duties.  I was basically grabbing

17  boxes of evidence and shipping them out to the Crime Lab.

18          Eventually I think -- I don't remember the time

19  window, but then we ended up getting like three female homicides

20  where it was the same profile.  And then I think it was a couple

21  months later maybe another three came.  And again, I'm not sure

22  of the sequence, but all of a sudden, we got a problem here.

23  These are all killed by possibly the same profile.  One

24  individual.  And that's when we started to ask for more help,

25  because we were overwhelmed.  And that's when we went to our

1  supervisors.  And eventually we started a task force which

2  consisted of a couple more individuals that were added to the

3  Unit to help us keep up with the volumes of evidence that had to

4  go out, and the volume of Crime Lab reports that came back

5  identifying numerous victims.  And we just -- we also got the

6  Walter Ellis victims, but now we started getting more victims.

7  Other females of other homicides.  So it was overwhelming.

8  Sorry.

9  Q.  No, not at all.  I wanted to clarify one point.  You had

10  said at one point there was a link of 3 female -- 3 homicides,

11  female victims, to one profile.

12  A.  Yes.

13  Q.  Was that an unidentified profile?  Where there was a link of

14  3?

15  A.  It was -- I'm sorry.  It was an unknown profile.  We didn't

16  identify that profile.  We didn't know about Walter Ellis yet.

17  Q.  Okay.  Because you mentioned the Walter Ellis homicides.

18  That's because at this point you know --

19  A.  --now I know, yes --

20  Q.  -- who Walter Ellis is.

21  A.  Right.

22  Q.  Okay.  So you were describing how when you formed the Task

23  Force because you needed more help.  Is that right?

24  A.  Exactly.

25  Q.  Maybe I should have had you explain a cold case.  Maybe it

1  seems obvious.  That's when a case hasn't been solved, is that
2  right?
3  A.  That's correct.
4  Q.  So your focus and Detective Spano's focus in 2007 was on
5  unsolved homicides?
6  A.  That's correct.
7  Q.  Okay.  How is it, then, that you were able to hone in and
8  identify Walter Ellis?
9  A.  Well, after checking our data base -- I think in Wisconsin
10 might be approximately like 600,000 profiles they have on file.
11 And we were checking them against all of these profiles, and we
12 weren't getting a match.  We were checking again.
13 Q.  Let me stop you one second.  What were you checking?  Were
14 you checking the unknown profiles?
15 A.  We were checking the unknown profiles.
16 Q.  That was linked to the 3 homicides?
17 A.  Yes.
18 Q.  So you're checking that profile against the Wisconsin
19 database?
20 A.  Right.  And there was so many search engines that we had.
21 We had one with -- checking the sexual assaults, again.
22 Anything that -- that could be that same -- like a woman found
23 in a vacant -- like most of the victims were found in vacant
24 properties.  Anything close to that.  But anyway, what happened
25 was we did what was called an offline search.  And the offline

1  search is basically requested through the F.B.I., and where they

2  check the N.C.I.C. -- which is the National Criminal information

3  Center.  And there's a name that popped up.  Like for 3 or 4 of

4  the homicides where this individual was stopped.  And this

5  individual was stopped like again on 4 of the -- on the days of

6  4 of the homicide victims that were killed.  And that kind of

7  put up a red flag, because this individual was not in the D.N.A.

8  databank.

9  Q.  Should he have been in the databank?

10 A.  He wasn't -- well, we didn't know what the profile was, so

11 we were checking it just to see if we got lucky.  But we weren't

12 getting lucky there, either.  Basically what happened was we

13 eventually started looking for this individual, and we went to

14 his home.

15 Q.  Who was this individual?

16 A.  This is Walter Ellis's -- we ended up going to his home.

17 Q.  So his name had popped up in relation to 3 or 4 --

18 A.  The offline -- the offline search gave us a couple names.

19 And we looked at Walter Ellis.  And now we wanted to speak to

20 Walter Ellis, because he was kind of in the same area, and he

21 was out -- stopped when the homicides occurred.  And when we

22 went to go talk to Walter Ellis --

23 Q.  And I want to ask, did you actually go?  Were you one of the

24 Detectives that went physically to Walter Ellis's home?

25 A.  Yes.  Myself and Detective Spano went, along with two other

1   Detectives.

2   Q.  Do you remember what year that was?

3   A.  I can't off the top of my head right now.  Sorry.

4   Q.  That's okay.

5   A.  And I ended up speaking with the girlfriend.

6   Q.  Walter Ellis's girlfriend?

7   A.  Yes.  And she didn't want to let us in.  And she said Walter

8   was at work, and I gave her my business card.  And by the time I

9   got back to the office, Walter Ellis is calling me on the phone,

10  wanting to know what was going on.  And I indicated to him that

11  I'd like to speak with him and set up an appointment.  And he

12  said okay.  The next morning at 9:00 a.m.  And I said sure, that

13  would be good.  And then what happened was the next morning I

14  went to the house and no Walter Ellis.  And it was at that time

15  that we ended up getting a search warrant for the residence of

16  that house, and --

17  Q.  Stop you for one second.  So you went to Walter Ellis's

18  house the next day after you had made an appointment with him?

19  A.  Yes.

20  Q.  And he was not there?

21  A.  That's correct.

22  Q.  And then you testified to obtaining a search warrant for the

23  house?

24  A.  Yes.

25  Q.  And did you remain at the house?

1   A.   Yes.

2   Q.   So you waited for the search warrant to come back

3   authorizing a search of the house?

4   A.   Yes.

5   Q.   And then what happened?

6   A.   We ended up going into the house, and Walter Ellis was not

7   in the house.  And we had actually ended up getting a toothbrush

8   from his medicine cabinet.  This toothbrush was subsequently

9   taken out to the Crime Lab.  And I want to say within a week of

10  that profile from that toothpaste (sic) matched all of our

11  unknown females.  I mean of the unknown profiles that were found

12  in the female victims.

13  Q.   I'm sorry.  You said tooth --

14  A.   Toothbrush.

15  Q.   Toothbrush.

16  A.   Yes.

17  Q.   So the D.N.A. found on the toothbrush was matched?

18  A.   Right.  Subsequently that night one of the supervisors

19  decided to put out a felony -- a temporary felony warrant, which

20  is if an Officer will come across this individual, he could --

21  he's authorized to arrest him.  Mr. Walter Ellis was found in

22  one of our southern suburbs.  I want to say it was Franklin, but

23  I'm not sure.  And he was in a hotel where he was located and

24  arrested.

25           MS. YUAN:  Thank you.  Those are all of the questions

1    I have for you right now.  I am reserving my direct examination.

2              THE COURT:  Okay.  Redirect?

3              MR. STAINTHORP:  Yes.  Briefly, Judge.

4                    **REDIRECT EXAMINATION**

5    **BY MR. STAINTHORP:**

6    Q.  So with respect to the statement that you claim you got from

7    Mr. Avery on the 24th, while it was not as complete as you would

8    like, you definitely understand that as reported by you that was

9    an extremely inculpatory statement?

10   A.  It's an important statement, yes.

11   Q.  It's inculpatory of Mr. Avery, correct?

12   A.  Yes.  Yes.

13   Q.  I mean, there's no question that Ms. Griffin is murdered,

14   and there's no question that he, in that statement as reported

15   by you, is claiming responsibility for that murder?

16   A.  Besides I'm responsible.  I'm responsible.

17   Q.  So he's saying he's responsible, right?

18   A.  Yes, sir.

19   Q.  And he's providing some basis for -- according to you, for

20   how that homicide occurred in terms of finding her robbing him,

21   a fight starting, and then her ending up dead, correct?

22   A.  That's correct, sir.

23   Q.  And based on that statement as reported by you, there's no

24   question that she is killed at the location of the drug house?

25   A.  That's correct, sir.

1    Q.  So while he doesn't have yet a lot of facts in there that

2    you would like to have in a confession, there's no question that

3    that is significant evidence against Mr. Avery, that statement

4    as reported by you, correct?

5    A.  I would agree, sir.

6    Q.  All right.  But partly because you recognize that it -- that

7    you needed more, that's why you pursued the investigation in the

8    early 2000's, going to the various other witnesses that you went

9    to, including the ones we've talked about.  Mr. Kent,

10   Mr. Kimbrough, Mr. Randolph, Ms. Eubanks again?

11   A.  That's correct, sir.

12   Q.  So at that point you were seeking to have homicide charges

13   brought against Mr. Avery, correct?

14   A.  I was conducting an investigation.  Where that investigation

15   would lead?  That's where I would go.

16   Q.  But certainly the focus of your investigation at that time

17   was Mr. Avery?

18   A.  I can't -- I was aware of Avery's statement.  I was not

19   focusing just on Mr. Avery.  I would do my interview -- or where

20   my interview would lead me to, that's where I would go to.

21   Q.  Well, you were going to these various people and asking them

22   about Mr. Avery?

23   A.  I was working on the Maryetta Griffin case and I was asking

24   about the case itself.

25   Q.  And you were asking -- well, you didn't ask Mr. Kimbrough,

1    Mr. Randolph, Mr. Kent about the case in general.  You asked

2    about Mr. Avery, correct?

3    A.  They called us and they had information to offer me.  I

4    didn't go there and start to interview him.  They called us.

5    Q.  All right.  The information you were trying to develop from

6    those people was in relationship to Mr. Avery?

7    A.  Yes.  They told us that they had information regarding

8    Avery, yes sir.

9    Q.  And that was to support a homicide charge against Mr. Avery?

10   A.  If that's where that led to, yes sir.

11   Q.  Now, you've described the -- your involvement with the Cold

12   Case Unit?

13   A.  Yes, sir.

14   Q.  When you became involved in that unit, you recognized that

15   several of the victims of these unsolved homicides share a

16   profile with Ms. Griffin, correct?

17   A.  Yes.  Correct.

18   Q.  But you didn't seek to have any biological material from Ms.

19   Griffin's case examined, did you?

20   A.  We did send out some evidence from the Griffin homicide.

21   Q.  You only did that after Mr. Avery --

22   A.  That's correct.  That's correct.

23   Q.  You didn't do that, did you?

24   A.  No, I didn't.  No.

25   Q.  No.  With the other cases you -- you were involved in the

1   process of getting evidentiary material, sending it out to the

2   Crime Lab, getting D.N.A. results from the Crime Lab, and then

3   comparing those results both to each other and then eventually

4   to a profile of Mr. Ellis, correct?

5   A.  We didn't know about Mr. Ellis until those 3 profiles came

6   up, because they were the same.  And then we were kind of

7   concerned.  We got the same individual that just -- possibly

8   killed 3 women.

9   Q.  Exactly.  So you were involved in getting the -- in having

10  the evidentiary material, the biological material, from lots of

11  homicides analyzed.  In fact, more than the 10 that eventually

12  got connected to him, right?

13  A.  A lot of them, sir.

14  Q.  Right.  And then you found in your examination at that time

15  that initially -- of the cases you had, 7 of them connected up

16  to Mr. Ellis.  Those were the 7 he got charged with, correct?

17  A.  That's correct, sir.

18  Q.  And even though you recognized that the profile of the

19  victims matched Maryetta Griffin, you didn't attempt to have the

20  evidentiary materials from her case sent out for updated D.N.A.

21  analysis, did you?

22  A.  The case -- that case was cleared, along with probably

23  five-other-thousand cases that were cleared.  I wouldn't be

24  pulling out 5,000 cases that were already found guilty.  I'm

25  worried about my open cases.  I'm not -- those are -- were all

1  resolved and sentences were out.  Those cases were already --

2  there was convictions on them.  So I normally concentrate on the

3  open cases.

4  Q.  You knew that in this case Mr. Avery had denied that he was

5  guilty?

6  A.  No.  In my statement Mr. Avery told me he was responsible,

7  sir.

8  Q.  In the statement as reported by you?

9  A.  Yes, sir.

10  Q.  Unsigned by Mr. Avery?

11  A.  And my partner also observed.

12  Q.  You and your partner?

13  A.  Yes, sir.

14  Q.  Unwitnessed by anyone else?

15  A.  And the evidence matched, too, sir.

16  Q.  Unrecorded in any other manner, that claimed that Mr. Avery

17  had made a statement acknowledging responsibility for the

18  homicide.  Agreed?  But -- but none of the other Police reports

19  that were filed in this case claimed that Mr. Avery had made a

20  statement acknowledging that he was responsible for the homicide

21  of Ms. Griffin, correct?  It was yours and Detective Phillips?

22  A.  That's correct.  That's correct.

23  Q.  And that's both before and after your Police report.  You

24  know he was -- he was questioned again, after --

25  A.  -- I talked to him again the second day, sir.  Yes.

1    Q.  And he denied it?

2    A.  That's correct, sir.

3    Q.  He denied any involvement in the homicide of Ms. Griffin at

4    that point?

5    A.  That's correct.

6    Q.  And you were with a different Detective at that point?

7    A.  That's correct.

8    Q.  Who was that?  That was Ms. Hein?

9    A.  Detective Spano, sir.

10   Q.  Who was then known as Detective Hein?

11   A.  Yes.

12   Q.  All right.  And you understood, because you had testified at

13   the trial of Mr. Avery, that he had pled not guilty to the

14   charges against him, correct?

15          MS. YUAN:  Your Honor, this is getting out of the

16   scope of redirect.  Or recross.

17          MR. STAINTHORP:  Judge, if there's some issue of

18   scope, then I think the questioning by Ms. Yuan --

19          THE COURT:  Yeah, he may answer the question.

20          THE WITNESS:  One more time.  I apologize.

21          MR. STAINTHORP:

22   Q.  Yes.  All right.  So I'll start this process again.

23   A.  Yes, I was aware that he pled guilty.  Not guilty.

24   Q.  Pled not guilty?

25   A.  That's correct.  I'm sorry.

1  Q.  And you knew that he was denying that he had given this

2  statement to you acknowledging responsibility for the death of

3  Ms. Griffin, correct?

4  A.  Yes.  That's why he went to trial, yes.

5  Q.  Yet even knowing that, knowing that the profile of the

6  victim, Ms. Griffin, matched the profile of these other cases

7  that were still getting -- that were now getting connected up to

8  Ellis, you did not seek to have any of the materials from the

9  Maryetta Griffin case sent out for an updated D.N.A. analysis,

10 did you?

11 A.  I didn't know that the profile matched Maryetta Griffin,

12 sir.  I didn't know that the profile matched Maryetta Griffin at

13 that time.  I didn't know what the profile was.

14 Q.  Of course you didn't.  I understand.  No one did.

15 A.  Right.

16 Q.  Because it hadn't been tested using that method of testing,

17 had it?

18 A.  But that case was closed because Mr. Avery was found guilty

19 of that, sir.

20 Q.  And he was found guilty based primarily on that statement

21 that you claim he gave?

22 A.  Yes.  Yes, sir.  That's correct.

23 Q.  And so you, now, in charge of this Cold Case Unit, where you

24 could have sent out that material from the Maryetta Griffin case

25 to get it analyzed using updated D.N.A. testing materials, which

1  could have shown a match to Walter Ellis, you chose not to do

2  that?

3  A.  I had -- that case was closed, and Mr. Avery was sentenced.

4  I had no -- I was concentrating on my open cases.  If I took

5  out -- and I wouldn't mind doing it, but in my mind I thought it

6  was solved.  He was found guilty.  And now I want to work on my

7  open cases.  Then why not stop there and take every other case

8  40 years from now that people were convicted and bring these

9  back?  Maybe we should start bringing all those back, too.  But

10  I didn't -- I was dealing with my open cases at the time.  Which

11  were, like I said, hundreds.

12  Q.  Sir, you knew that this case, the Maryetta Griffin case,

13  shared a fairly unusual set of circumstances with the cases that

14  were connected to Mr. Ellis.  That being prostitute, drug

15  abuser, strangulation, found on the north side of Milwaukee, in

16  a --

17  A.  That fits every homicide that has occurred in this -- in the

18  City of Milwaukee.  It's either drugs, prostitution -- it's

19  all -- it's the same.  You can almost match them all together.

20  Q.  So you're saying all the homicide cases in the City of

21  Milwaukee are drugs, homicides, prostitutes?

22  A.  Gang related.

23  Q.  They all share that characteristic?

24  A.  Those are -- in one hand those are probably the most reasons

25  why homicides happen in this city.  Drugs, alcoholism,

1   prostitution, gangs.

2   Q.  You know that all the homicides in the City of Milwaukee

3   don't have all of those characteristics.  They may have 1 or 2,

4   but --

5   A.  Oh, another one is domestic violence.

6   Q.  They don't have all of those characteristics.  You knew that

7   this was a pretty unusual profile, where there were drug users,

8   prostitutes, mostly African-American women whose bodies were

9   found on the north side of Milwaukee, who were for the most part

10  killed by strangulation.  That's a fairly --

11  A.  Maryetta Griffin's homicide --

12  Q.  Excuse me, sir.  That's a fairly unusual profile?

13  A.  I wouldn't say so, sir.

14  Q.  So you think that happens all the time?

15  A.  If I may, Maryetta Griffin walked into a drug house which

16  was occupied by other people.  And with most of Walter Ellis's

17  homicides, women were meeting him in vacant buildings to have

18  sex.  This building, with Maryetta Griffin's situation, that

19  wasn't a vacant building.  It was occupied.

20  Q.  Sir, sir, once again you're depending on your version of the

21  facts.  In fact, where --

22  A.  You're asking me, sir, and I'm telling you.

23  Q.  In fact, where Ms. Griffin's body was found was in an

24  abandoned building.  So if in fact --

25  A.  But it started off in an occupied building, sir.  And

1  that's -- Walter Ellis would not be moving bodies around.  He

2  was meeting them in vacant buildings.  This is totally different

3  from what you're trying to compare with that.  And it's not.

4  Q.  This was a garage that was essentially --

5  A.  This was an occupied home, sir.

6  Q.  But it was a garage that was essentially unused at the time.

7  It was derelict?

8  A.  That's correct, sir.  But --

9  Q.  And that fit the profile of Walter Ellis having sex in

10  abandoned or derelict buildings, correct?

11  A.  You're taking it from the back end.  I'm taking it from the

12  front end, where I have live witnesses that have this young

13  woman walking into his drug house and never coming out.

14  Q.  Okay.  How about Rhondalyn (phonetic) Scott?  Do you

15  remember Rhondalyn Scott?

16  A.  No, I don't.

17  Q.  Okay.  Rhondalyn Scott -- the report where she's seen late

18  at night on the 16th to the 17th walking the streets right in

19  the vicinity of where her body is found.  Do you recall that?

20  A.  I don't recall that.

21  Q.  You don't recall that because, in fact, you're not going to

22  look at any evidence that contradicts your asserted statement

23  that Mr. Avery claimed that he -- that Mr. Avery said he was

24  reliable for the --

25  A.  Mr. Avery asked to have his case looked at, and it was done.

1    Like that.

2    Q.  Not because of you?

3    A.  I had no reason to go back and check his case.  He was

4    convicted already.

5    Q.  All right.  So as far as you were concerned, based on your

6    statement Mr. Avery was consigned to prison for the rest of his

7    life?

8    A.  Mr. Avery was last with Maryetta Griffin, and she's dead.

9    Q.  You said he was classed?

10   A.  Last seen.

11   Q.  I can't --

12   A.  I'm sorry.  Maryetta Griffin was last seen walking into

13   Mr. Avery's house.

14   Q.  Sir, that's -- substantial evidence in your case indicates

15   otherwise, including the biological material that was related to

16   Walter Ellis, and including the --

17   A.  I understand that.

18   Q.  From Rhondalyn Scott, is that she was seen --

19   A.  I don't recall that one.  I don't recall Rhondalyn Scott.

20   Q.  Because you were going to ignore that evidence, correct?

21   A.  I'm telling you, sir, that I don't recall it.

22           MR. STAINTHORP:  Okay.  Nothing further.

23           THE COURT:  Anything else of this witness?

24           MS. YUAN:  No.

25           THE COURT:  All right.  You may step down,

1    Mr. Hernandez.

2              THE WITNESS:  Thank you, sir.  Judge.

3              THE COURT:  And we'll take a break.  It's 5 to 5:00.

4    We'll see you back at 9 o'clock.  We'll take the next witness.

5    Please don't discuss the case, only after all the evidence is

6    in.  We'll see you tomorrow morning at 9 o'clock.

7              (Whereupon the jury was excused at 4:56 p.m.)

8              THE COURT:  Tomorrow morning, 9 o'clock.

9              MS. HOFT:  Thank you, Your Honor.

10                        *      *      *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WISCONSIN

3

4            I, HEIDI J. TRAPP, Official Court Reporter for the

5    United States District Court, Eastern District of Wisconsin, do

6    hereby certify that I reported the foregoing Transcript of

7    Proceedings; that the same is true and correct as reflected by

8    my original machine shorthand notes taken at said time and place

9    before the Hon. Rudolph T. Randa.

10

11                         _____

                                Official Court Reporter

12                              United States District Court

13

14   Dated at Milwaukee, Wisconsin,

15   this 23rd day of October, 2015.

16

17

18

19

20

21

22

23

24

25