UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------

**WILLIAM DAMON AVERY,**

                                            Case No. 11-CV-408

                        Plaintiff,

                                            Milwaukee, Wisconsin

        vs.

                                            June 4, 2015

**CITY OF MILWAUKEE, et.al.,**

                        Defendants.
----------------------------------------------------------------

**VOLUME 4 – PAGE 536**
TRANSCRIPT OF TRIAL
BEFORE THE **HONORABLE RUDOLPH T. RANDA,**
UNITED STATES DISTRICT JUDGE, AND A JURY


A P P E A R A N C E S

For the Plaintiff:              People's Law Office
                                By: **Mr. John L. Stainthorp**
                                    **Ms. Janine L. Hoft**
                                    **Mr. Ben Elson**
                                Attorneys at Law
                                1180 N. Milwaukee Avenue
                                Chicago, IL  60622


For the Defendant:              Milwaukee City Attorney
                                By: **Mr. Jan A. Smokowicz**
                                    **Ms. Jenny Yuan**
                                Assistant City Attorneys
                                200 E. Wells St. - Rm. 800
                                Milwaukee, WI  53202-3551


REPORTED BY:                    HEIDI J. TRAPP
                                Federal Official Court Reporter
                                310, U.S. Courthouse
                                517 East Wisconsin Avenue
                                Milwaukee, Wisconsin 53202


Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

1                          **I N D E X**

2    **Witness:**                                              **Page**

3      **DETECTIVE KATHERINE SPANO**

4        Direct Examination By Ms. Hoft................... 539
         Cross Examination By Ms. Yuan................... 567
5        Redirect Examination By Ms. Hoft................ 575

6      **LT. KEVIN ARMBRUSTER**

7        Direct Examination By Mr. Elson................ 577
         Cross Examination By Mr. Smokowicz............. 593
8        Redirect Examination By Mr. Elson.............. 596

9      **CYNTHIA TYLER**

10       Direct Examination By Ms. Hoft................. 597
         Cross Examination By Ms. Yuan.................. 608
11

12     **DEBRA FENCEROY**

         Direct Examination By Ms. Hoft................. 613
13       Cross Examination By Ms. Yuan.................. 619

14     **SIRENA AVERY**

15       Direct Examination By Ms. Hoft................. 630
         Cross Examination By Ms. Yuan.................. 638
16

17     **DENNIS WALLER**

         Direct Examination By Mr. Elson................ 642
18       Cross Examination By Mr. Smokowicz............. 661
         Redirect Examination By Mr. Elson.............. 699
19       Recross Examination By Mr. Smokowicz........... 703

20

21

22

23

24

25

1                    **TRANSCRIPT OF PROCEEDINGS**

2              THE CLERK:  Case Number 11-C-408, William Avery vs.

3      The City of Milwaukee, et.al.  Called for a continuation of the

4      jury trial.  May I have the appearances, please.  First for the

5      Plaintiff.

6              MS. HOFT:  Janine Hoft, Plaintiff.

7              MR. STAINTHORP:  John Stainthorp, Plaintiff.

8              MR. STAINTHORP:   Ben Elson for the Plaintiff.

9              THE COURT:  Good morning.

10             THE CLERK:  And for the Defendants?

11             MR. SMOKOWICZ:  For the Defendants, Assistant City

12     Attorney Jan Smokowicz.  Good morning, Your Honor.

13             THE COURT:  Good morning.

14             MS. YUAN:  Good morning, Your Honor.  Assistant City

15     Attorney Jenny Yuan.

16             THE COURT:  Good morning.  We're ready with the next

17     witness?

18             MR. SMOKOWICZ:  We are, Your Honor.

19             MS. HOFT:  Yes.

20             (Whereupon the jury was returned to the courtroom at

21     9:13 a.m.)

22             THE COURT:  Good morning, ladies and gentlemen of the

23     jury.  Trust you had a good evening.  We're ready to take the

24     next witness.  And if you would stand, please raise your right

25     hand and be sworn by the clerk.

1          **DETECTIVE KATHERINE SPANO**, called as a witness, having

2     been first duly sworn, on oath testified as follows:

3              THE CLERK:  Please state your full name and spell your

4     last name for the record.

5              THE WITNESS:  My name is Katherine Spano.

6     K-A-T-H-E-R-I-N-E.  Last name is Spano, S-P-A-N-O.

7                          **DIRECT EXAMINATION**

8     **BY MS. HOFT:**

9     Q.  Good morning, Miss Spano.

10    A.  Good morning, ma'am.

11    Q.  And back in 1998 you went by your maiden name, Hein,

12    H-E-I-N?

13    A.  Correct.

14    Q.  And so when we see reports in this case that refer to a

15    Detective by the name of Hein, that's you, right?

16    A.  It is.

17    Q.  And I'm a little confused as to the term cold case.  Can you

18    tell me what that means?

19    A.  The Cold Case Unit, at least the unit that I work on --

20    Q.  I'm sorry.  I'm not asking what the unit does or what the

21    unit is.  I'm just asking about what you mean when you say a

22    cold case.  What constitutes a cold case?

23    A.  An unsolved homicide.  A homicide that's gone unsolved for

24    maybe -- at least two, maybe three years.

25    Q.  And the optimal time to solve a homicide is within a

1  relatively shorter period than that.  Would that be fair to say?

2  A.  Yes.

3  Q.  And optimally you would want to solve a homicide within a

4  maximum of 30 days?

5  A.  In 1 day, 2 days, I would love to solve a homicide.

6  Q.  So the sooner you do it --

7  A.  -- sure --

8  Q.  -- the better?

9  A.  Yes, ma'am.

10  Q.  And you've testified before, have you not?

11  A.  Yes.

12  Q.  And is it fair to say you've testified hundreds of times?

13  A.  Yes.

14  Q.  And in 1998 you were assigned to investigate the homicide of

15  Maryetta Griffin?

16  A.  Yes.

17  Q.  And do you -- although you don't have any independent

18  recollection as you sit here today about what you did in that

19  investigation, you've had the opportunity at least over the last

20  few days to review some of the reports in that case, is that

21  fair?

22  A.  I do have a recollection of the case, and I did have an

23  opportunity to review the reports, yes.

24  Q.  Okay.  Great.  Do you recall, then, that you learned that

25  Maryetta Griffin was strangled and found in a basically unused

1  garage on the north side of Milwaukee?

2  A.  Yes.

3  Q.  And that the address of that building in front of the garage

4  was 3032 North 7th Street?

5  A.  Yes.

6  Q.  And do you recall that Miss Griffin's body had scratches

7  around the neck?

8  A.  Yes.

9  Q.  And Miss -- and those scratches around the neck -- in your

10  investigative capacity you thought might have come from

11  fingernails?

12  A.  Yes.

13  Q.  And in addition, the condition of the body included a half

14  an inch to three-quarter inch laceration to her head?

15  A.  Yes.

16  Q.  And in addition to that, her body was found partially clad,

17  and it appeared that she had been sexually assaulted?

18  A.  Her body was partially clad.  I couldn't say from the crime

19  scene photos that I knew she was sexually assaulted.

20  Q.  Well, her pants were off, right?

21  A.  Correct.

22  Q.  And she didn't have any underwear on?

23  A.  Correct.

24  Q.  And she had other bruising to her body?

25  A.  I believe she did.

1  Q.  And you knew that the evidence collection team of the

2  Milwaukee Police Department took evidence from Miss Griffin's --

3  the body of Miss Griffin's mouth, vagina, and under her

4  fingernails?

5  A.  Correct.

6  Q.  And is there any reason to take evidence from someone's

7  mouth except in the instance of thinking that there might be

8  some evidence in the mouth that could be connected to the

9  perpetrator?

10  A.  Sure.  It could show that -- who she was with last.  It

11  could show that she was involved in sexual activity.  Or it

12  could show signs that she was sexually assaulted.

13  Q.  Okay.  And from February 17th, when Miss Griffin's body was

14  found, until March 23rd of 1998, you were actively involved in

15  this investigation, correct?

16  A.  Yes, I was.

17  Q.  And you had some leads, and you had some suspects, but

18  nothing panned out during that period of time?

19  A.  Correct.

20  Q.  And some of those suspects and leads included the individual

21  who found the body, Derrick Crowley?

22  A.  Correct.

23  Q.  And Miss Griffin's boyfriend, who had sexual intercourse

24  with her that night, Terry Bryson?

25  A.  Correct.

1   Q.   And also an individual by the name of Lorenzo Frost?

2   A.   Correct.

3   Q.   And there's also mention in the reports of a guy named

4   Fitzgerald, who was reported to be assaulting prostitutes.  Do

5   you remember that?

6   A.   Yes, I do.

7   Q.   And on March 23rd, you recall Mr. William Avery voluntarily

8   coming to the Milwaukee Police Department, right?

9   A.   Yes.

10  Q.   And that was 5 weeks after Miss Griffin's death?

11  A.   Yes.

12  Q.   And over the course of the next three days, from March 23rd

13  24th and 25th, you and others interrogated Mr. Avery multiple

14  times?

15  A.   Yes.

16  Q.   And on the first occasion that you interrogated Mr. Avery,

17  it was on March 23rd, correct?

18  A.   Correct.

19  Q.   And I believe we've identified this Exhibit as 11-B.  And

20  I'm going to try and find it on the table here.

21           MS. YUAN:  Counsel, it hasn't been admitted yet.

22  11-B.  11-B hasn't been --

23           MS. HOFT:  That's what we're talking about.

24           MS. YUAN:  I'm just letting you know.

25           MS. HOFT:

1    Q.  I apologize for the delay.  I'm going to show you what we've

2    marked as 11-B and ask you if you recognize those two pages?

3    A.  Yes, I do.

4    Q.  And what is that?  What are those two documents?

5    A.  The first document is what we call a pedigree form.  It's a

6    form that we fill out kind of line-by-line, just trying to get

7    some background, some pedigree information from the person that

8    we're talking to.  So this consists of background information

9    that Mr. Avery provided to me during that interview.

10   Q.  And the second page?

11   A.  The second page is an actual statement or a paragraph

12   written by myself that we had advised Mr. Avery of his rights.

13   His Miranda warnings.  He indicated to us that he understood his

14   rights, and he didn't want to make a statement to us at that

15   time.

16   Q.  And how long did you speak with Mr. Avery on March 23rd?

17   A.  You know, I don't remember the exact time.  And I should

18   have documented the exact time, that I started with the pedigree

19   form.  So I don't believe it would have been a very lengthy

20   maybe -- maybe half an hour, 45 minutes.  But the time that's

21   documented when he indicated that did not want to answer

22   questions was at 10:40 p.m.

23   Q.  And were you aware that Mr. Avery presented himself early

24   that morning?

25   A.  Yes.

1    Q.  And so was it your understanding that he was interrogated

2    prior to the time that you spoke with him?

3    A.  Yes.

4           MS. HOFT:  And I would move for the entry into

5    evidence of Exhibit 11-B.

6           MS. YUAN:  No objection.

7           THE COURT:  The Court will receive it.

8           MS. HOFT:

9    Q.  Do you know why the pedigree information wasn't taken from

10   Mr. Avery prior to you?

11   A.  I have no idea why the Detectives chose not to.

12   Q.  And -- so the conversation started sometime before 10:40 and

13   basically ended at 10:40.  Is that fair to say?

14   A.  That's fair to say.

15   Q.  And this, that the jury is seeing for the first time, you

16   identified as what you called a statement that you took from

17   Mr. Avery on March 23rd about 10:40 p.m., correct?

18   A.  Correct.

19   Q.  And you've also told us that Mr. Avery didn't wish to make a

20   statement at that time.  And you've put that in your report.

21   This is your handwriting, right?

22   A.  Yes, ma'am.

23   Q.  And you put in your report:  Does not wish to make a

24   statement at this time.  Right?

25   A.  Yes.

1    Q.   And were those words, at this time -- was that a quote of

2    Mr. Avery?

3    A.   I don't remember.  I really don't remember.

4    Q.   And this document does not constitute -- well, let me ask

5    you this.  Subsequent to 1998, you testified I think it was in

6    2005 at a Miranda-Goodchild hearing.  Do you recall that?

7    A.   I may have.  I don't recall it, but I probably did.

8    Q.   Do you know what a Miranda-Goodchild hearing is?

9    A.   Yes.

10   Q.   What is it?

11   A.   It's a motion that a defense -- or defense attorney will

12   make for their client challenging the statements that were

13   provided.  Whether or not they were provided willingly and

14   voluntarily.

15   Q.   And you testified at that hearing that Mr. Avery was willing

16   to talk about Maryetta Griffin.  He just wanted to sleep and

17   would talk to us the next day.  Do you recall that?

18   A.   Yes.  Now that you mention that, I recall that.

19   Q.   And you didn't put in this 1040 statement that William Avery

20   indicated he was willing to talk about the Maryetta Griffin

21   case, did you?

22   A.   Just that he didn't want to talk at this time.

23   Q.   Right.  And you didn't put in this statement that Mr. Avery

24   just wanted to sleep and would talk to us the next day.  You

25   didn't put that in this statement, either?

1   A.  No, I didn't.

2   Q.  And when you testified that Mr. Avery indicated -- although

3   you didn't put it in your report -- that he was willing to talk

4   to us, you were referring to Milwaukee Police Department

5   Detectives, right?

6   A.  Correct.

7   Q.  And the next day, March 24th -- let me ask you this.  What

8   was your shift back then in March of 1998?  Do you recall?

9   A.  Yes.  I worked the early shift, which is 4:00 p.m. to

10  midnight.

11  Q.  And on March 24th, when you came in at 4:00 p.m., you were

12  advised that Detectives Hernandez and Phillips had interrogated

13  Mr. Avery and gotten incriminating statements from him, right?

14  A.  I was told about that, yes.

15  Q.  And, in fact, Detectives Hernandez and Phillips told you

16  that Mr. Avery had confessed to them?

17  A.  Yes.

18  Q.  And --

19  A.  Excuse me.  Not confessed, but had made some admissions

20  about his involvement.

21  Q.  Well, okay.  You thought it was a confession, though, didn't

22  you?

23  A.  No, I didn't.  No, I did not think that was a confession.  I

24  thought it was an admission.  An admission of some facts.

25  Q.  An inculpatory admission of some facts, right?

1    A.   True.  Yes.

2    Q.   I mean, at that time you thought Mr. Avery was guilty of

3    this offense, right?

4    A.   I was trying to find out whether or not he was guilty of

5    this offense.

6    Q.   Well, did Hernandez and Phillips tell you that they had

7    gotten William Avery to tell them that he woke up with Maryetta

8    Griffin going through his pockets, and he fought with her.  He

9    doesn't remember what happened.  But he then called a friend and

10   told the friend I think I killed the bitch.  Do you recall that?

11   A.   Detective Hernandez told me that that's what Mr. Avery told

12   him, yes.

13   Q.   And then on March 24th at 5:30, about an hour-and-a-half

14   after you got to work, you and Detective Hernandez commenced to

15   interrogate Mr. Avery, right?

16   A.   Correct.

17   Q.   And you interrogated him for approximately 9 hours.  From

18   5:30 p.m. until 2:30 the next morning?

19   A.   We were with him for a long time, yes.

20   Q.   And as a result of that interrogation, you created a

21   three-and-a-half page document that you dictated and somebody

22   else typed, right?

23   A.   Yes, ma'am.

24   Q.   We think this is Exhibit 11-F.  But let me show it to you

25   and see if you can identify it as the interrogation statement

1    that you dictated after speaking to Mr. Avery for about 9 hours.

2    A.  No, ma'am.  This is the report of an interview I did with

3    Valerie Eubanks.

4    Q.  Gotcha.  Thank you.

5    A.  Sure.

6    Q.  I'm going to show you what -- let me show you what we've

7    marked as 11-F.

8    A.  Yes, ma'am.

9         MS. HOFT:  Okay.  So we would move into evidence

10   Plaintiff's Exhibit 11-F.

11        MS. YUAN:  Your Honor, there's no objection.  Maybe my

12   notes are wrong.  I thought they were moved in on Monday by the

13   Plaintiff.

14        THE COURT:  I think that's correct.

15        MS. HOFT:  It was?

16        THE CLERK:  Yes.

17        MS. HOFT:  Okay.  I can't seem to find it on the

18   table, however.  Ah, yes I can.  So thank you.  Yes, Plaintiff's

19   11-F.  Let me show you this one, all right?  That would probably

20   be better.  Other than the yellow markings, is that again the

21   statement you took after interrogating William Avery for

22   approximately 9 hours, between March 24th into the morning of

23   March 25th?

24   A.  Yes, it is.

25   Q.  Okay.  And in that statement -- and let's see -- I think we

1  talked about it being three-and-a-half pages long.  Maybe the

2  half is stretching it a little, because that's the fourth page,

3  right?

4  A.  Correct.

5  Q.  Okay.  And in that -- within that statement -- and I -- I

6  don't want to go line through line with you, through it.  But

7  you reported in this statement that William Avery told you he

8  had oral sex -- and you're very specific, penis to mouth -- with

9  Maryetta Griffin, correct?

10  A.  Yes, he did.

11  Q.  And -- but at the end of this statement -- well, you also

12  hand wrote this statement before it was dictated, right?

13  A.  Yes, I did.

14  Q.  And in the handwritten version at the end of it you ask

15  Mr. Avery to sign this statement, right?

16  A.  I did.

17  Q.  And he refused to sign this statement, right?

18  A.  Yes, he did.

19  Q.  His signature does not appear on that statement?

20  A.  It does not.

21  Q.  And did he tell you that some of what you had written you

22  had gotten inaccurate?

23  A.  He did not.

24  Q.  Did he tell you anything that you wrote was not true?

25  A.  He did not.

1  Q.  Did you -- did he tell you why he refused to sign the

2  statement?

3  A.  He did not explain why he didn't want to sign the statement.

4  That's certainly his prerogative.

5  Q.  And you found out eventually that it was not true that

6  William Avery had oral sex with Maryetta Griffin on

7  February 16th or 17th before she died, didn't you?

8  A.  I certainly did not.

9  Q.  You didn't -- you didn't review the D.N.A. evidence that

10  indicated it was Walter Ellis's D.N.A. in Miss Griffin's body,

11  not William Avery's?

12  A.  You're talking -- you would like me to -- obviously you want

13  me to explain my answer?

14  Q.  No, I don't.  I just want to ask you a question.  Did you

15  later subsequently learn that William Avery had not had oral

16  sex, penis to mouth, with Miss Griffin?  Because there was no

17  D.N.A. evidence in the oral cavity of Maryetta Griffin.

18  A.  I did not learn that.

19  Q.  That is not what I'm asking.

20  A.  I knew that -- let me answer your question.  I certainly

21  learned that William Avery's D.N.A. was not in the oral -- on

22  the oral swabs that were taken from the victim.  However, that

23  did not preclude --

24  Q.  -- thank you --

25  A.  -- him from having sex 12 hours before.

1  Q.  Thank you.

2  A.  Okay.

3  Q.  You had D.N.A. evidence that Walter Ellis had oral sex with

4  Maryetta Griffin, correct?

5  A.  Yes.

6  Q.  You know that?

7  A.  Yes.  Yes, of course.

8  Q.  And after you spoke to -- after this 9 hour interrogation

9  that went on until 2:30 in the morning on March 25th, you went

10  home that day, right?

11  A.  Eventually.

12  Q.  And at the time I guess the day before on March 24th, when

13  Detective Hernandez and Detective Phillips were telling you that

14  they had gotten William Avery to make incriminating statements

15  to them, you were an experienced Detective at that time, right?

16  A.  I would think so.

17  Q.  And you were as experienced as Detective Hernandez, weren't

18  you?

19  A.  Sure.

20  Q.  And you were as experienced as Detective Phillips, right?

21  A.  Sure.

22  Q.  Did -- and you didn't consider that they were better at

23  getting suspects to talk to them than you were, did you?

24  A.  No.

25  Q.  Did it seem strange to you that William had made these

1  incriminating statements to them, and he would not say anything

2  incriminating to you except that he had oral sex with the victim

3  right before she died?

4  A.  Did I think that was unusual?

5  Q.  Sure.

6  A.  No.

7  Q.  It was unusual.

8  A.  No.  People retract their statements all the time.

9  Q.  Did he -- well, let me ask you this.  After 9 hours of

10 interrogation by you and Detective Hernandez, he never repeated

11 any of those incriminating statements to you, right?

12 A.  He did not.  Not in regards to having sex with Maryetta

13 Griffin.

14 Q.  And at the time that you wrote your report, you believed

15 that the statement of William Avery that he had oral sex, penis

16 to mouth with Miss Griffin, was incriminating of him, didn't

17 you?

18 A.  Yes.

19 Q.  And -- because you knew or you thought she may have been

20 sexually assaulted and you knew the D.N.A. was being tested from

21 her mouth, right?

22 A.  Correct.

23 Q.  And did you ever ask Detectives Hernandez or Phillips how

24 they were able to get William to confess or make these

25 incriminating statements?

1    A.   Not really.

2    Q.   Did you ask them hey, did you use any effective techniques

3    that I could learn from?

4    A.   Not really.

5    Q.   Did you ask what particular techniques they used in order to

6    get Mr. Avery to make these supposed incriminating statements?

7    A.   I've been in enough interviews with Detective Hernandez to

8    know the style that he uses.  I just assumed it was his normal

9    way of interviewing people.

10   Q.   And I'm going to show you what we've marked as Plaintiff's

11   Exhibit 11-G.  Do you recognize Plaintiff's 11-G?

12   A.   Yes, I do.

13   Q.   And what is it?

14   A.   This is a paragraph that I wrote indicating that on

15   March 25th of 1998 myself and Detective Hernandez re-advised

16   William Avery of his Constitutional rights.  Obviously we wanted

17   to question him some more, but he did not want to make a

18   statement at that time.

19            MS. HOFT:  We would move the admission of Plaintiff's

20   Exhibit 11-G into evidence.

21            MS. YUAN:  No objection.

22            THE COURT:  The Court will receive it.

23            MS. HOFT:

24   Q.   And the jury is now looking at what we've identified as

25   Plaintiff's Exhibit 11-G, and what you've told us was a

1  statement that you took from Mr. Avery on March 25th at

2  8:30 p.m., right?

3  A.  That's correct.

4  Q.  And that was some -- I guess the other statement ended at

5  2:30 in the morning.  So this was about 6 hours later?

6  A.  No, this is P.M.  P.M.

7  Q.  Right.  2:30 in the morning you had -- you had interrogated

8  him from March 24th at -- what was it?  5:30 to 2:30 a.m. March

9  25th.  And now we're at 8:30 at night on March 25th, correct?

10 A.  Correct.  About 18 hours.

11 Q.  Okay.  Same day, though.  March 25th?

12 A.  Yes.  Same day.

13 Q.  2:30 in the morning March 25th is when the last statement

14 ended?

15 A.  Yes.

16 Q.  Okay.  I gotcha.  And at this time you indicated -- you

17 indicated that Mr. Avery did not wish to make a further

18 statement?

19 A.  Yes, he didn't want to talk to us anymore.

20 Q.  And you're referring to -- when you say further, you're

21 referring to the March 24th report where he supposedly made

22 incriminating statements or admissions to Detectives Phillips

23 and Hernandez, correct?

24 A.  No.  I was referring to all of the conversations that we had

25 with Mr. Avery.  He just did not want to talk with us anymore.

1  Q.  Further?

2  A.  Further.  Sure.

3  Q.  Right.  But what I'm saying is that was one of the

4  conversations that the Milwaukee Police Department Detective,

5  Homicide Division, had with Mr. Avery was on March 24th in which

6  you claim that Mr. Avery made incriminating statements to

7  Detectives Phillips and Hernandez, right?

8  A.  That included all his statements.

9  Q.  Right.  But that included that?

10  A.  Yes.

11  Q.  That included your 9 hour interrogation, and the Exhibit

12  that we've gone over.  But when you're saying he doesn't wish to

13  make any further statements, that includes all the statements

14  that he made, including the supposed incriminating statements on

15  his March 24th, right?

16  A.  Correct.

17  Q.  And did Mr. Avery tell you that he wanted an attorney at

18  this time?

19  A.  He never asked for an attorney.

20  Q.  And Mr. Avery refused to sign this document on March 25th at

21  8:30 p.m.  Did he tell you that there was something not true in

22  the statement?

23  A.  I specifically would have asked him that.

24  Q.  Okay.  And the statement is, you know, 6 lines long?

25  A.  What's your question, ma'am?  I'm sorry?

1   Q.  This statement is a very short statement, right?  But he
2   didn't tell you --
3   A.  -- yes --
4   Q.  -- that there was anything within this statement that we're
5   all looking at that was not true?
6   A.  Not within this statement, no.
7   Q.  And he didn't make any corrections?  Or initial anything?
8   A.  He did not.
9   Q.  And he didn't give you any reason for refusing to sign?
10  A.  He did not.
11  Q.  Now, the next day, March 26th, do you recall proceeding into
12  the -- at about 8 o'clock in the evening going to execute a
13  search warrant on the address of 474 North Palmer?
14  A.  Yes, I vaguely remember the search warrant.
15  Q.  And in that search warrant you were looking for evidence
16  related to the homicide of Maryetta Griffin, right?
17  A.  Related to the drug charges and the homicide of Maryetta
18  Griffin.
19  Q.  And you didn't find any evidence related to the homicide,
20  right?
21  A.  No.
22  Q.  And you found I believe .5 grams of cocaine under a rug in
23  the residence, right?
24  A.  I remember that.  Yes.
25  Q.  Okay.  And then on March 31st, you had identified who you

1  thought was the -- well, let me ask you this.  On March 31st you

2  conducted a search of Lorenzo Frost's Suburban automobile,

3  right?

4  A.  I did.

5  Q.  And as a result of that search, you found nothing of

6  evidentiary value, right?

7  A.  Correct.

8  Q.  And in August, then, of 1998, you knew from the state of the

9  technology at the time, that William Avery was excluded from all

10  D.N.A. found on Maryetta Griffin, right?

11  A.  I cannot tell you what day I learned that.  I can't tell you

12  what day I read that Crime Lab report.  I don't know if it was

13  August or if it was later.  I just don't remember when I first

14  learned that.

15  Q.  Okay.  But you would agree with me that the Crime Lab report

16  excluding William Avery from depositing any D.N.A. whatsoever on

17  Maryetta Griffin was generated in August of 1998?

18  A.  Could you rephrase that -- or restate that question?  Could

19  you ask that question again?

20  Q.  Maybe we should have it read back, if you don't mind, Heidi.

21         (Whereupon the preceding question was read back by the

22  Reporter.)

23         THE WITNESS:  Yes.

24         MS. HOFT:

25  Q.  And did you know in -- well, let me ask you this.  You were

1  notified in November or December of 1998 that William Avery had

2  made a claim -- a Notice of Claim that included allegations

3  against you, correct?

4  A.  I did not know that.

5  Q.  Have you ever been notified of that?

6  A.  You are the first person telling me that, yes.

7  Q.  Okay.

8  A.  I have no -- I don't have a memory of that.  I could have.

9  I don't remember it.

10  Q.  Have you ever received any notifications of -- Notice of

11  Claims filed with the Attorney General's Office?

12  A.  I don't remember that.  I don't remember that.

13  Q.  And I'm going to switch to the topic of jailhouse

14  informants, okay?  Did you -- well, let me ask you this.  You

15  didn't have any training at the Milwaukee Police Department with

16  regard to jailhouse informants, right?

17  A.  No.

18  Q.  And there were no specific policies that were written and

19  distributed by the Milwaukee Police Department about jailhouse

20  informants, right?

21  A.  No.

22  Q.  And that might be my bad question.  But when I say right,

23  and you say no, we're not sure of what you mean.  But just so

24  we're clear, there were -- it is accurate to state that there

25  were no written policies with regard to jailhouse informants?

1   A.  Not that I'm aware of.

2   Q.  And in October 2003, you interviewed an individual by the

3   name of Jeffrey Kimbrough?

4   A.  Yes.

5   Q.  And you were here in court yesterday when he testified?

6   A.  Yes.

7   Q.  Is that the Jeffrey Kimbrough that you spoke to?

8   A.  Appeared to be.

9   Q.  And at the time you interviewed Mr. Kimbrough, you knew he

10  had spoken previously to Detectives Heier and Armbruster, right?

11  A.  I did know that, yes.

12  Q.  And when you met with Mr. Kimbrough, you went over the

13  supposed statements that Jeffrey Kimbrough had given earlier to

14  Detectives Heier and Armbruster?

15  A.  Correct.

16  Q.  And you didn't do anything to determine whether

17  Mr. Kimbrough's knowledge of the facts supposedly in this case

18  came from Mr. Avery or from another source, did you?

19  A.  I personally did not.

20  Q.  And you did no further follow-up or investigation with

21  regard to Mr. Kimbrough's statements, right?

22  A.  Again, I personally did not.

23  Q.  And the purpose in your meeting with him was to see if he

24  was still on board, right?

25  A.  To see if he was -- if the statement he had given originally

1    was truthful, and to determine if he was still willing to

2    cooperate, yes.

3    Q.  And to get him ready to testify, right?

4    A.  Not so much to get him ready to testify, but to see if he

5    was still willing to testify.

6    Q.  But you went over his statement and what he was going to

7    testify about, right?

8    A.  Yes.  I didn't know if he was going to be testifying, at

9    that point.  I did not know that.  I didn't -- don't think the

10   case had gotten that far yet.

11   Q.  And in October -- I guess several days later, you

12   interviewed an individual by the name of Antron Kent, right?

13   A.  Yes, I did.

14   Q.  And Antron Kent -- I don't know if you were in court when

15   his deposition testimony was read, where he took the Fifth

16   Amendment to every question he was asked?

17   A.  I was not.

18   Q.  Okay.  Were you aware that Mr. Kent is taking the Fifth

19   Amendment and refusing now to speak about his supposed

20   statements and testimony in court against Mr. Avery?

21   A.  I read that -- learned that recently from the City

22   Attorney's Office.

23   Q.  And again, you didn't do anything personally to determine

24   whether Mr. Kent's knowledge of the facts came from Mr. Avery or

25   from another source?

1  A.  I did not.

2  Q.  And another source could be Police reports or the autopsy

3  report that indicated that Miss Griffin was strangled?

4  A.  I'm sorry.  Could you repeat that?

5  Q.  Well, what I'm asking is at the time in 1998 all -- actually

6  the City of Milwaukee and every homicide Police Detective knew

7  that Miss Griffin had been strangled?

8  A.  I knew she had been strangled.

9  Q.  And the way you get strangled is that you're choked, right?

10  A.  Correct.

11  Q.  And again, similarly with Mr. Kent, you are meeting with him

12  to find out if he's still willing to testify, and to go over

13  what he's going to say.  Is that fair to say?

14  A.  Yes.

15  Q.  And again on that same day you interviewed an individual by

16  the name of Keith Randolph, correct?

17  A.  Yes.

18  Q.  And again, you went over the statements that Mr. Randolph

19  supposedly previously gave to other Officers, right?

20  A.  I did.

21  Q.  And again, you made sure that Mr. Randolph was still willing

22  to testify, still able to be on board, and going over the

23  testimony that he might provide?

24  A.  Made sure?  I guess I don't like that terminology you're

25  using.  I asked him if he was -- if the statement was the same.

1    If it was truthful, and if he was still willing to cooperate.

2    Q.   And in 2004 Mr. Avery was arrested on murder charges,

3    correct?

4    A.   Correct.

5    Q.   And that was within I think the -- it was a couple weeks

6    from his release from prison on the drug charges.  Were you

7    aware of that?

8    A.   I learned that, yes.

9    Q.   And you testified at his criminal homicide trial, correct?

10   A.   I did.

11   Q.   And he was convicted?

12   A.   He was.

13   Q.   And at the time of Mr. Avery's trial, you testified that

14   Mr. -- you testified to the incriminating statement attributed

15   to Mr. Avery that Mr. Avery admitted to having oral sex with

16   Maryetta Griffin before she died?

17   A.   Yes.

18   Q.   And later you became involved in the Walter Ellis case,

19   right?

20   A.   I did.

21   Q.   And, in fact, you were the complaining witness on the

22   Criminal Complaint against Walter Ellis?

23   A.   I was.

24   Q.   And you -- and what does that mean to be the complaining

25   witness?

1  A.  I'm the Detective that signed the Criminal Complaint and

2  swore to the information that was in the Criminal Complaint that

3  was drafted by the District Attorney's Office.

4  Q.  And there were 7 counts in that Criminal Complaint, correct?

5  A.  Correct.

6  Q.  I'm going to show demonstrative Exhibit 4, the timeline.

7  Okay.  And we've gone through I think the 7 counts in the

8  Complaint.  But do you recall that one of the counts was the

9  murder of Debra Harris on October 10th, 1986?

10  A.  Yes, I was.

11  Q.  And Tanya Miller, October 11th, 1986?

12  A.  Yes.

13  Q.  Irene Smith, 11/28 1992?

14  A.  Yes.

15  Q.  Florence McCormick, April 24th, 1995?

16  A.  Correct.

17  Q.  Sheila Farrior?

18  A.  Farrior.

19  Q.  Farrior.  Thank you.  June 27th, 1995?

20  A.  Correct.

21  Q.  Joyce Mims, June 20th, 1997.  And is it Quithreaun --

22  A.  Quithreaun.

23  Q.  Quithreaun -- thank you -- Stokes, on April 27th, 2007.

24  Those were the 7 counts of murder that Walter Ellis pled no

25  contest to and was convicted of, correct?

```
1    A.  That's correct.

2    Q.  And those 7 cases, Walter Ellis was implicated in through

3    D.N.A. evidence, correct?

4    A.  That's correct.

5    Q.  And in addition to those 7 cases, there were 3 additional

6    cases where Walter -- where Walter Ellis's D.N.A. was implicated

7    in 3 other homicides, correct?

8    A.  Correct.

9    Q.  And of those three other homicides, one was of Carron

10   Kilpatrick on October 13th, 1994, correct?

11   A.  Correct.

12   Q.  And in that case a man by the name of Curtis McCoy, who I

13   believe was Miss Kilpatrick's boyfriend at the time, was charged

14   with her murder?

15   A.  Yes.

16   Q.  And Mr. McCoy went to trial and he was acquitted?

17   A.  That's my understanding, yes.

18   Q.  And Mr. McCoy was not deprived of a fair trial.  He got a

19   fair trial and was acquitted, correct?

20   A.  Yes.

21   Q.  And so I think we're up to 8?  Seven plus one.  Eight, the

22   homicide of Jessica Payne.

23   A.  Yes, ma'am.

24   Q.  Now, an individual by the name of Chaunte Ott was charged

25   and convicted of her murder?
```

1  A.  He was.

2  Q.  And he served I think it was 12 or 13 years, right?

3  A.  I believe he did, yes.

4  Q.  And when this D.N.A. evidence came to light, Chaunte Ott was

5  released from prison, correct?

6  A.  He was.

7  Q.  And Chaunte Ott was exonerated by the Wisconsin Board of

8  Wrongful Convictions, correct?

9         MS. YUAN:  Your Honor, I'm going to object again to

10  the relevancy of this.

11        THE COURT:  Well, we already know that from the

12  records.  It's repetitive.

13        MS. HOFT:  I agree, Your Honor.  Okay.

14  Q.  And the tenth case involved the murder of Maryetta Griffin,

15  who was killed between the homicides of Joyce Mims and

16  Quithreaun Stokes, correct?

17  A.  Correct.

18  Q.  Let me just ask you just about -- and again, of those 10

19  cases -- and I think the jury saw this on opening, but these 10

20  cases -- Maryetta Griffin is number 9?  Right here?

21  A.  Yes, ma'am.

22  Q.  Does that look like a pattern to you?

23  A.  Yes.

24        MS. HOFT:  No further questions.

25        THE COURT:  Miss Yuan.

1          MS. YUAN:  Yes.  Thank you.

2                    **CROSS EXAMINATION**

3     **BY MS. YUAN:**

4     Q.  Good morning, Detective Spano.

5     A.  Good morning.

6     Q.  I just want to go back to Plaintiff's Exhibit Number 4 that

7     you were just shown.  This timeline?

8     A.  Yes, ma'am.

9     Q.  And you were asked questions in terms of when homicides

10    occurred along this timeline that were eventually linked by

11    D.N.A. evidence to Walter Ellis, correct?

12    A.  Yes.

13    Q.  I believe you were in the courtroom yesterday when Detective

14    Hernandez was testifying?

15    A.  Yes.

16    Q.  And he was one of your partners when he was with the

17    Department?

18    A.  Correct.

19    Q.  And you and Detective Hernandez -- were you two involved in

20    the Cold Case Unit at the Milwaukee Police Department?

21    A.  Yes, we were.

22    Q.  Were you the two that were the first individuals in the Cold

23    Case Unit?

24    A.  Yes.  In late 2007 Detective Hernandez and I were assigned

25    to the Cold Case Unit.

1  Q.  Were you involved in locating Walter Ellis?

2  A.  Yes.  Investigating.

3  Q.  Investigating Walter Ellis?

4  A.  Yes.

5  Q.  I mean, I guess it took awhile before there was evidence to

6  tie --

7  A.  Yes.  Yes.

8  Q.  It took awhile.  So you were identifying and trying to

9  locate and solve these cold case murders?

10  A.  Absolutely.

11  Q.  And that led to Walter Ellis as a suspect?

12  A.  Yes.

13  Q.  How was his D.N.A. even collected?

14  A.  Once Walter Ellis was developed as a suspect, we went to the

15  home where he was living with a girlfriend.  I think it was the

16  following day, when Walter Ellis was not there, that Detective

17  Hernandez and I think other Detectives obtained a search warrant

18  and got into the home where Ellis was living and obtained a

19  toothbrush from the home where he lived.  And that toothbrush is

20  what the D.N.A. profile was obtained from.

21  Q.  And when did that occur?

22  A.  That would have been in -- I want to say late August or

23  early September of 2009.

24  Q.  2009?

25  A.  Yes.

1   Q.  So this timeline ends at 2007.  And I did not create a

2   timeline, but just for demonstrative purposes, Walter Ellis was

3   discovered in 2009?

4   A.  Correct.

5           MS. HOFT:  Object the term discovered.

6           MS. YUAN:

7   Q.  His identity was discovered in 2009?

8   A.  Yes.

9   Q.  Do you remember, when looking at the timeline of these

10  homicides, when they were linked to Walter Ellis and his

11  identity?

12  A.  It would have been anywhere from -- just the D.N.A. profile

13  you mean?

14  Q.  No.  When it's linked -- when it's linked to Walter Ellis's

15  profile and it was known this is Walter Ellis?

16  A.  That was in September of 2009.

17  Q.  You were asked a few questions about the interview that you

18  had with Mr. Avery on March 24th, 1998, beginning at 5:30 p.m.

19  Do you remember that?

20  A.  Yes, ma'am.

21  Q.  Okay.  Do you recall that interview?  Would it help you if

22  you took a look at the report?

23  A.  I think I recall the interview.

24  Q.  Okay.  Can you describe for the jury what Mr. Avery told you

25  and how that interview went, to your recollection?

1  A.  We went and retrieved Mr. Avery from the jail cell and

2  brought him to an interview room.  Introduced myself again.

3  Told him while we were there what we wanted to talk with him

4  about.  Advised him of his rights.  He was willing to speak with

5  us.  And we talked for a long time.  Talked about his life, his

6  problems, his -- we talked about his involvement in the drug

7  house, his involvement with Maryetta Griffin, the prostitutes

8  that he was serving.  The events -- I think we went into the

9  events from the day before Maryetta Griffin had been at the

10  house.  What he did after he had learned.  We talked about all

11  of those things.  And we verbally -- talked verbally.  We had

12  quite a bit of conversation.  I can't remember how soon it was

13  that he told me the story, but we went over the story several

14  times.  That's usually what I try to do is verbally go over a

15  story or a statement to make sure I've got it right.

16          And then we would have -- I would have written down

17  his statement in the presence of Detective Hernandez.  I would

18  have read that statement back to him.  I certainly would have

19  told him that this statement is your statement.  These are your

20  words.  This is your story.  It's got to be right.  If there's

21  anything you don't like with this story, please let me know.  We

22  can change it.  You can -- that's the reason why I always

23  explain to the people that I interview that by signing the

24  report, it shows that this is your story.  It kind of gives a

25  little more credence to the truthfulness of it.  And so I

1    encourage them to do that.  But it's their right.  They don't

2    have to sign anything.  So the interview ended during that

3    interview.  We had quite a few breaks.  We would have had a

4    briefing.

5    Q.  What do you mean, a briefing?

6    A.  Well, shift-to-shift there's always a briefing on

7    developments that are happening in all of the homicides that are

8    going on around the city, and cases that are making progress.

9    So at the midnight shift Gilbert -- Detective Hernandez and I

10   would have had to be pulled out for a briefing.  The bosses

11   would have wanted to know what's happening with this case, and

12   we would have to explain that to them.

13          We took a lot of breaks with Mr. Avery.  We went out

14   and got him something to eat.  We gave him cigarettes, soda, a

15   lot of bathroom breaks.  So it was a long interview.  But we

16   ended it with reading the report, going over it with him, making

17   sure that it was his story.  And that was it.

18   Q.  Thank you.  I do want to show you what's been -- already

19   been entered in evidence as Defense Exhibit 1031.  Detective

20   Spano, is this your handwriting?

21   A.  It is.

22   Q.  Okay.  So this is the first page of this Exhibit, you can

23   see.  I don't expect you to read all of this.  I just wanted to

24   show this to you.

25   A.  Sure.  Sure.

1  Q.  It's -- as already been discussed, this is a

2  three-and-a-half page statement that you hand wrote out for

3  Mr. Avery, is that correct?

4  A.  Yes.

5  Q.  Okay.  And you had testified to how you conduct interviews

6  with a suspect after you hand write a statement such as the one

7  I just showed you.  You would then go over it with the

8  individual?

9  A.  Absolutely.

10 Q.  And is that the opportunity for someone to tell you if

11 anything is incorrect or inaccurate?

12 A.  That's exactly what I tell them I want them to do, is let me

13 know if there's something that I don't have right.

14 Q.  What happens if they tell you that after you've already

15 written out the statement?

16 A.  I would change it.  I would cross it off.  I would ask the

17 person to sign it or initial it so that they know I didn't

18 change it.  But in this case nothing was changed.

19 Q.  If the person does not want to initial any changes, is there

20 anything you can do about that?

21 A.  No, there's nothing I can do about it.

22 Q.  If the person does not want to sign the statement, is there

23 anything you can do about that?

24 A.  There's not.

25 Q.  And you had mentioned breaks.  And I think it just might be

1   easier to -- I want you to see the report.  I just want to draw

2   your attention to the bottom.  And this is -- well, I will show

3   you the beginning.  This is what has already been entered as

4   Plaintiff's Exhibit Number 11-F.  And I believe that this is

5   your -- the typewritten version --

6   A.   -- it is --

7   Q.   -- of the report for this March 24th, 1998, interview?

8   A.   Yes, it is.

9   Q.   Okay.  I'm showing you the third page towards the bottom

10  where you're discussing when the interview terminated, at 2:30

11  in the morning, correct?

12  A.   Yes.

13  Q.   You indicated that you had read the report back to

14  Mr. Avery, correct?

15  A.   Yes.

16  Q.   However, William Avery refused to sign.  And the PA45, what

17  is that?

18  A.   That's the actual report.  The form number.  The report

19  number.

20  Q.   Is that the written statement?

21  A.   Yes.  That's the written form.  The form that the written

22  statement is on.

23  Q.   I see.  So he refused to sign the PA45 report indicating

24  that it was a true and correct statement, and he refused to sign

25  the statement indicating that he was given cigarettes, coffee,

1　water, and a chicken dinner, and numerous bathroom breaks?

2　A.　Correct.

3　Q.　And so here you documented exactly what kind of creature

4　comforts you may have provided to Mr. Avery, is that correct?

5　A.　Correct.　Yes.

6　Q.　So you provided him a chicken dinner while -- during that

7　time frame?

8　A.　Yes, we did.

9　Q.　If Mr. Avery had asked you or told you he wanted to stop the

10　interview, what would have happened?

11　A.　The interview would have stopped.

12　Q.　Is it unusual for an interview to be -- to take 9 hours?

13　A.　No.

14　Q.　In your experience?

15　A.　No, not in my experience.

16　Q.　You were questioned about the statement -- or the

17　information that's in Mr. Avery's statement concerning oral sex

18　with the victim, Maryetta Griffin.

19　A.　Correct.

20　Q.　And this information was gathered from Mr. Avery on March

21　24th, 1998, from you and Detective Hernandez?

22　A.　Yes.

23　Q.　At that time was there any D.N.A. evidence excluding

24　Mr. Avery from any sexual -- I'm asking a bad question.　Back in

25　March 24th, 1998, was there any D.N.A. results back from -- that

1  had been collected from the victim?

2  A.  No, there were not.

3  Q.  And I think you testified to the fact that it was an August,

4  1998, report from the State Crime Lab that excluded Mr. Avery

5  from the oral swab and the vaginal swab?

6  A.  Yes.

7  Q.  So you didn't have that information at the time that you

8  were questioning Mr. Avery?

9  A.  I did not.

10          MS. YUAN:  Nothing further.  Thank you.

11          MS. HOFT:  Just briefly, Your Honor.

12          THE COURT:  Okay.

13                      **REDIRECT EXAMINATION**

14  **BY MS. HOFT:**

15  Q.  Miss Yuan went over the handwritten report, and then the

16  typewritten report with you from March 24th.  That 9 hour

17  interrogation, correct?

18  A.  Yes.

19  Q.  And the typewritten report, again, was created after you

20  dictated the handwritten report into a recording device,

21  correct?

22  A.  Yes.

23  Q.  Now, Miss Yuan was indicating that way out here in 2009

24  Walter Ellis was discovered, correct?

25  A.  Yes.

1   Q.  And do you recall -- well, let me ask it this way.  The

2   Wisconsin Crime Lab on May 19th, 2003, connected the D.N.A. from

3   Jessica Payne to Joyce Mims.  Do you recall that?

4   A.  Yes, I do.

5   Q.  And back in 19 -- well, the mid-90's, there were other

6   unsolved female homicides that were being investigated by

7   Eric -- by Milwaukee Police Department Detective Eric Moore,

8   correct?

9   A.  By all of us.

10  Q.  Well, wasn't Detective Moore specifically assigned to

11  investigate some additional unsolved homicides back in the

12  mid-90's?

13  A.  I'm not aware of his assignment.  I know he did work on

14  several of the unsolved female homicides, yes.

15  Q.  And he assigned others, including Ricky Burms (phonetic) to

16  further investigate cold cases back then in the mid-90's,

17  correct?

18  A.  He was a Detective, and Ricky Burms was his partner at the

19  time, so they worked together.  They probably were both asked to

20  do that work.

21  Q.  Okay.  But they were reviewing cold cases of unsolved

22  homicides back in the mid-90's, right?

23  A.  I don't know.  I'm really sorry, I don't know.  I know they

24  worked on some, yes.

25          MS. HOFT:  Nothing further, Your Honor.

1          MS. YUAN:  Nothing from me.

2          THE COURT:  Any additional?

3          MS. YUAN:  No.

4          THE COURT:  Okay.  You may step down, Miss Spano.

5   We'll take the morning break at this point, ladies and

6   gentlemen.  You haven't been in the box that long.  But we are

7   starting another witness, so it's a natural break.  So don't

8   discuss the case.  We'll see you back here after the break,

9   okay?

10          (Whereupon the jury was excused at 10:19 a.m.)

11          THE COURT:  Okay.  We'll take about 15.

12          (Whereupon a recess was called by the Court.  Upon

13   conclusion of the recess, the proceedings continued as when the

14   jury was returned to the courtroom at 10:40 a.m.:)

15          MR. ELSON:  Plaintiff calls Defendant Armbruster.

16          THE COURT:  All right.

17          **LT. KEVIN ARMBRUSTER**, called as a witness, having been

18   first duly sworn, on oath testified as follows:

19          THE CLERK:  Please state your full name and spell it

20   for the record.

21          THE WITNESS:  It's Kevin, K-E-V-I-N.  Armbruster,

22   A-R-M-B-R-U-S-T-E-R.

23                      **DIRECT EXAMINATION**

24   **BY MR. ELSON:**

25   Q.  Are you currently employed with the Milwaukee Police

1    Department, sir?

2    A.   Yes.

3    Q.   And what's your rank?

4    A.   Lieutenant of Police.

5    Q.   Lieutenant, you became a Milwaukee Police Officer in 1990,

6    is that right?

7    A.   Yes.

8    Q.   And you became a Detective in 1997?

9    A.   Yes.

10   Q.   And a Detective with the Homicide unit in 1999?

11   A.   Yes.

12   Q.   And you're a Defendant in this case, right?

13   A.   Yes.

14   Q.   And you weren't involved in the initial investigation in the

15   Maryetta Griffin homicide in 1998, right?

16   A.   Correct.

17   Q.   You weren't in the Homicide Unit at that point, right?

18   A.   Correct.

19   Q.   You became involved in the Maryetta Griffin homicide

20   investigation in 2002?

21   A.   Yes.

22   Q.   And your involvement in the Griffin homicide investigation

23   consisted primarily of dealing with two jailhouse informants,

24   right?

25   A.   Yes.

1   Q.  And that was Antron Kent and Jeffrey Kimbrough?

2   A.  Correct.

3   Q.  Now, would you agree with me that credibility is always a

4   concern when dealing with a jailhouse informant?

5   A.  With any informant it is, yes.

6   Q.  But particularly with a jailhouse informant, right?

7   A.  I think it's across the board.  Any informant.  Credibility,

8   reliability.

9   Q.  Is your answer that there's no increased concern when you're

10  dealing with a jailhouse informant, compared to any other person

11  that's giving you information in a case?

12  A.  I don't see the difference.

13  Q.  Okay.  So there's no increased concern on your part about

14  the reliability of a jailhouse informant, is that right?

15  A.  Correct.

16  Q.  Okay.  You never received any formal training from the

17  Milwaukee Police Department on how to obtain a statement from a

18  jailhouse informant, is that right?

19  A.  Yes.

20  Q.  And no training in the Police Academy, right?

21  A.  Correct.

22  Q.  And at least in 2002, at least as far as you're aware, there

23  was no policy in the Milwaukee Police Department that dealt with

24  how to deal with and obtain statements from jailhouse

25  informants, isn't that right?

```
 1   A.  Not on jailhouse informants, correct.

 2   Q.  Now, you claim you were contacted by Antron Kent on

 3   July 24th, 2002, right?

 4   A.  Yes.

 5   Q.  And you claim that he called the Police Department, and you

 6   answered the phone and had a phone conversation with him, right?

 7   A.  No.

 8   Q.  He called the Police Department and the phone call was

 9   directed to you, is that right?

10   A.  I believe they had paged for any Detective -- homicide

11   Detective to pick up the phone call.

12   Q.  And in any event, you took the call, right?

13   A.  Yeah.  I believe no one else was picking up, and the boss

14   told me to answer it.

15   Q.  And you claim that in this initial conversation that you had

16   with Antron Kent, he told you that he was incarcerated with a

17   man named William Avery, and that Avery had admitted to him that

18   he killed a woman.  Is that right?  Generally?

19   A.  Generally speaking.

20   Q.  And after you spoke with Antron Kent this first time, you

21   determined that the woman he was talking about was a woman named

22   Maryetta Griffin, is that right?

23   A.  After -- yes.  After I received the information, correct.

24   Q.  And then at some point, maybe that day, maybe over the next

25   couple days, you reviewed the Police reports from the Griffin
```

1  homicide investigation, right?

2  A.  Yes.

3  Q.  And that would have been whatever was in the Police file,

4  right?

5  A.  I don't recall which -- where I reviewed it from.

6  There's -- you can do it online, like the data form of all the

7  supplement reports that were in there.  Or you can look up the

8  actual folder.

9  Q.  Okay.  But regardless of where you reviewed it, you reviewed

10  the Police reports in the Griffin homicide file, right?

11  A.  Yes.

12  Q.  And the reports in the homicide file would have included any

13  reports of any interviews or interrogations that had been

14  conducted with William Avery back in 1998, right?

15  A.  Yes.

16  Q.  So there -- if there was a report of an interview with

17  William Avery in 1998 where he admitted to being responsible for

18  the Griffin homicide, you would have reviewed that report,

19  right?

20  A.  At this time?  Or later?

21  Q.  When you reviewed the file.

22  A.  At first, initially, it was very brief.  I wanted to know,

23  you know, what he was talking about.  And the information he

24  gave me.  Did it match anything?  You know, I had to search and

25  find out what case he was talking about.  And at that point it

1  was just the initial portions of the day, date, time where it

2  happened.  And eventually as the case went on, or as phone calls

3  went on, I looked deeper.  And I had consulted with some of the

4  District Attorneys regarding that.

5  Q.  But in this initial period of time you reviewed the Maryetta

6  Griffin homicide file, you would have reviewed the reports of

7  any interviews with William Avery, correct?

8  A.  Yes.

9  Q.  And if one of those reports purported to be an interview of

10 Avery where he made admissions, you would have reviewed that

11 report during this time frame, right?

12 A.  Yes.

13 Q.  Now, you claim that you had another phone call with Antron

14 Kent on August 19th, 2002, right?

15 A.  Yes.

16 Q.  And I'm going to show that to you.  This is Defendant's

17 Exhibit 1021.  Is this the report of your August 19th, 2002,

18 phone conversation with Antron Kent?

19 A.  Yes.

20       MR. ELSON:  Judge, I would move into evidence

21 Defendant's Exhibit 1021.

22       MR. SMOKOWICZ:  No objection.

23       THE COURT:  The Court will receive it.

24       MR. ELSON:

25 Q.  Now, if you take a look at the second paragraph of this

1  report, which states that on Monday, August 19th, 2002, at

2  9:05 a.m., you were contacted by an inmate at the Sayre,

3  Oklahoma, Correctional Facility -- do you see that?

4  A.  Yes.

5  Q.  And that inmate was Antron Kent, was that right?

6  A.  Yes.

7  Q.  And that goes on to say that you had spoken to him on

8  numerous occasions in the past, and that he would like to remain

9  anonymous at this time.  Do you see that?

10  A.  Yes.

11  Q.  Now, how many times had you spoken to Antron Kent up until

12  August 19th, 2002, the date of this report?

13  A.  It would probably be -- I can't recall the exact amount, but

14  I would say more than 5.  More than 5, maybe.

15  Q.  And that's what you meant by numerous?  More than 5?

16  A.  Yeah.

17  Q.  And up until that point, you had only written one report of

18  a conversation that you had with Antron Kent, isn't that right?

19  A.  Yes.

20  Q.  And that report was of the initial conversation you had with

21  Antron Kent, right?

22  A.  Correct.

23  Q.  But you had had numerous other conversations with Antron

24  Kent in that approximately one month period of time that you

25  didn't write any reports, isn't that right?

1  A.  Yes.

2  Q.  And you don't recall what he said to you, or what you said

3  to him in those numerous conversations, do you?

4  A.  No, I -- word for word?  Or -- I can tell you what they're

5  about.

6  Q.  Okay.  Well, do you remember giving a deposition in this

7  case, sir?

8  A.  Yes.

9  Q.  One of the pieces of information that Antron Kent gave you

10 in those numerous phone calls was that there was another inmate

11 who had information about William Avery, is that right?

12 A.  Yes.

13 Q.  But other than that piece of information, which you didn't

14 record in a Police report at the time, you don't recall what

15 Antron Kent said to you, or what you said to Antron Kent in

16 those phone calls, isn't that right?

17 A.  I did know generally what I talked about or what was said in

18 --

19 Q.  Well, deposition page 61.  Line 7?

20          MR. SMOKOWICZ:  Your Honor, going to --

21          MR. ELSON:  Line 24.

22          THE COURT:  7 to 24?

23          MR. ELSON:  Yes.

24 Q.  Question:  Okay.  And did you make a Police report for every

25 phone call you had with Mr. Kent?  Answer:  No.  Question:  How

1   many phone calls do you think you had with him before you went

2   to Oklahoma?  Answer:  I don't recall.  I mean, I would -- there

3   was more than 5, that's for sure.  Question:  Okay.  What new

4   information did Mr. Kent share with you over the course of those

5   5 phone calls?  I believe one of the things was there was an

6   additional inmate who had been present during the conversation

7   with Mr. Avery.  What other additional information did Mr. Kent

8   relate to you over the course of those 5 phone calls?  Answer:

9   I can't recall what other -- what the other information was, but

10  I remember -- I remember him giving me other information that

11  may be generated in another report.

12       Do you remember being asked those questions and giving

13  those answers?

14  A.  Yes.

15  Q.  And you didn't make any reports of those numerous phone

16  calls you had with Antron Kent where he was giving you

17  information, right?

18  A.  That's correct.

19  Q.  And these numerous phone conversations that you had with

20  Antron Kent occurred after you reviewed the Maryetta Griffin

21  homicide file, right?

22  A.  Portions of it, yes.

23  Q.  And there's no record of what you and Mr. Kent talked about

24  during those phone calls, right?

25  A.  The two -- the two ones that had substance to it I did, yes.

1   Q.  The numerous phone calls in-between the first phone call and

2   the phone call that's documented in the report that I showed

3   you, there's no record of what you and Mr. Kent talked about in

4   those numerous contacts?

5   A.  That's correct.

6   Q.  You knew what Mr. Kent was in prison for, right?

7   A.  Yes.

8   Q.  And you knew it was a high profile case where he poured acid

9   on his girlfriend at a mall, right?

10  A.  Yes.

11  Q.  And you knew that he was serving a long prison sentence,

12  right?

13  A.  Yes.

14  Q.  And it was a 30 to 40 year prison sentence.  Something in

15  that range?

16  A.  Correct.

17  Q.  And in these initial conversations that you had with

18  Mr. Kent, he told you that he was doing this to get a reduction

19  in his sentence, right?

20  A.  Yes.

21  Q.  And you asked -- in fact, you asked him why he was doing

22  this, and he -- and that's what he told you, to get a reduction

23  in his sentence, right?

24  A.  Yes.

25  Q.  Now, as we've discussed, at some point Mr. Kent told you

1  that another inmate named Jeffrey Kimbrough had information with

2  regard to William Avery, correct?

3  A.  Yes.

4  Q.  And after Mr. Kent gave you Mr. Kimbrough's name, did you

5  investigate to see what Kimbrough was in prison for and how long

6  his sentence was?

7  A.  I can't recall.

8  Q.  Would you agree with me that it would be useful information

9  to find out what he was in prison for, and what his sentence

10  was, in order to judge his reliability?

11  A.  Yeah.  Eventually I did, yes.

12  Q.  Okay.  And you were aware that -- well, were you aware that

13  Kimbrough had been convicted of homicide and child abuse for

14  shaking a 5 month -- 5-and-a-half month old baby to death?

15  A.  I don't recall that.

16  Q.  Were you aware that he was sentenced to 40 years in prison

17  for that?

18  A.  I knew he had a longer sentence.  He was from Racine.

19  Q.  Were you aware that evidence was presented at Kimbrough's

20  trial that he had borderline intelligence, with an I.Q. in the

21  mid-70's, and that his intellectual --

22          MR. SMOKOWICZ:  -- Your Honor, I'm going to object --

23          MR. ELSON:  -- age was that of a 12 year old child?

24          MR. SMOKOWICZ:  Your Honor, I'm going to object to the

25  form of this question and -- object to the form of the question

1  as containing evidence that has not been admitted.  Calls for

2  speculation.  Lack of foundation.

3          MR. STAINTHORP:    I have a good basis for asking that

4  question, Judge.  It's in the public record.

5          THE COURT:  Well, I don't see any facts in the record

6  to ask that question.  Okay -- if.  You can put it in the form

7  of a hypothetical.  If Mr. Kimbrough was of limited

8  intelligence, et cetera, et cetera, would that be important?

9          MR. STAINTHORP:

10 Q.  If you knew, or if you were aware of Mr. Kimbrough having

11 borderline intelligence, with an I.Q. in the mid-70's, and that

12 his intellectual age was that of a 12 year old child, would that

13 be information that would have been useful to you in judging his

14 reliability?

15 A.  Yes.

16 Q.  Did you do anything to investigate the facts of

17 Mr. Kimbrough's criminal case?

18 A.  No.  I didn't know much about him.

19 Q.  Did you know that there was an Appellate Court opinion that

20 had been issued in his criminal case, which -- with details of

21 the crime that he had committed and other details about

22 Mr. Kimbrough?

23 A.  No, not at all.

24 Q.  You have access to documents like that, right?  You know how

25 to find opinions from Courts and get information about that as a

1   Milwaukee Police Officer, isn't that right?

2   A.  I don't know about Appellate stuff.  Not at all.

3   Q.  You don't know how to access an opinion from a Court in

4   Wisconsin dealing with a criminal case?

5   A.  I'd have to Google it.

6   Q.  Okay.  Well, that's one thing you could do, right?  You

7   could Google it?

8   A.  I could.

9   Q.  Okay.  But you would agree with me that it would be useful

10  to have information about Mr. Kimbrough, and his criminal case,

11  and his sentence in order to judge his reliability as a witness.

12  As an informant, right?

13  A.  Yes.

14  Q.  Now, you interviewed Kent and Kimbrough in Sayre, Oklahoma,

15  in August, 2002, right?

16  A.  In August, yes.

17  Q.  You and Detective Heier?

18  A.  Correct.

19  Q.  And you took statements from each of them, right?

20  A.  Yes.

21  Q.  And during your interview with Kent in Oklahoma, he told you

22  again that he wanted to know what benefit he would receive for

23  testifying against Mr. Avery, right?

24  A.  I'm not sure if we talked about it or not down there, but

25  that -- I already knew that that was --

1   Q.  You already knew that he wanted to receive a benefit?

2   A.  Yes.

3   Q.  All right.  Deposition, page 82, line 25 through page 83,

4   line 11.

5           MR. SMOKOWICZ:  Just a second.

6           MR. ELSON:

7   Q.  Question:  So let's talk about what was discussed at the

8   meeting with Mr. Kent in Oklahoma.  At some point during that

9   meeting he inquired about what benefit he would obtain for

10  testifying in this case, correct?

11  A.  Yes.

12  Q.  Answer -- I'm reading the question, sir.

13  A.  Oh.

14  Q.  Answer:  Right.  Question:  And he -- the benefit he was

15  looking for was a reduction in his sentence on his conviction,

16  correct?  Answer:  Yes.  Question:  Okay.  And is it fair to say

17  that Mr. Kent wanted to know or was looking to know what he

18  would -- what reduction he could possibly get?  Answer:  Yes.

19          Do you remember being asked those questions and giving

20  those answers?

21          MR. SMOKOWICZ:  Your Honor, for the purpose of

22  completeness I ask that I be allowed to read the next question

23  and answer.

24          MR. ELSON:  Judge, he can do that in his portion of

25  the examination.

1          THE COURT:  All right.  You can save it.

2          MR. SMOKOWICZ:  Am I to ask it now?

3          THE COURT:  You can save it for your examination.  I'm

4    sorry.

5          MR. ELSON:

6    Q.  Did you suggest any information to Mr. Kent during the

7    interview that you had with him in Sayre, Oklahoma?

8    A.  Suggest?  As far as --

9    Q.  Did you give him any information?

10   A.  No.  I guess I -- that seems kind of vague.

11   Q.  Just one moment, Judge.  In your interview with Mr. Kent in

12   Sayre, Oklahoma, with Detective Heier, isn't it true that either

13   you or Detective Heier suggested the name Lorenzo Frost to

14   Mr. Kent during that interview?

15   A.  At some point, yes.

16   Q.  You did?

17   A.  Lorenzo.

18   Q.  Lorenzo.

19   A.  Not Lorenzo Frost.

20   Q.  But Mr. Kent didn't know the name of the person when you

21   suggested the name Lorenzo to him, isn't that right?

22   A.  There were several names associated with it, but Lorenzo was

23   one, yes.

24   Q.  And you gave him that name during that interview, right?

25   A.  It's one of several names in a series.  You're picking out

1  his name, but yes.

2  Q.  Yes, you gave him the name Lorenzo during your interview

3  with him, right?

4  A.  Yes.

5  Q.  Now, you claim that when you interviewed Kimbrough he said

6  that he overheard Kent and Avery have a conversation where Avery

7  admitted to killing a woman, right?

8  A.  Can you say that again?

9  Q.  When you interviewed Kimbrough, Kimbrough told you that he

10  overheard Antron Kent and William Avery having a conversation

11  where Avery admitted to killing a woman?

12  A.  Yes.

13  Q.  And what was your impression of Kimbrough when you met with

14  him?

15  A.  I thought he was cooperative.  I mean, nothing --

16  nothing like you said before about the diminished capacity.

17  Q.  It didn't appear to you that he might be vulnerable to

18  suggestion?

19  A.  No.

20  Q.  It didn't appear to you that he might have any diminished

21  intellectual capacity?

22  A.  I did not think so.

23  Q.  And you don't recall doing anything to verify that Kimbrough

24  had any independent knowledge of the circumstances of the death

25  of Maryetta Griffin beyond Antron Kent, isn't that right?

1  A.  I did not.

2  Q.  Now, are you aware that Detective Heier testified at Antron

3  Kent's resentencing hearing?

4  A.  No.

5  Q.  Are you aware that Antron Kent ultimately received a

6  reduction in his sentence?

7  A.  I am not.

8  Q.  But that's what he was told -- that's what Antron Kent told

9  you from very early on, that the reason he was doing this was to

10  receive a reduction in his sentence, right?

11  A.  Yes.

12        MR. ELSON:  No further questions.

13        THE COURT:  Mr. Smokowicz.

14        MR. SMOKOWICZ:  Thank you, Your Honor.

15                    **CROSS EXAMINATION**

16  **BY MR. SMOKOWICZ:**

17  Q.  Lieutenant Armbruster, first thing.  You were asked some

18  questions this morning about numerous phone calls, and perhaps

19  more than 5, and that there were no reports with respect to

20  those -- some of the phone calls.  Can you explain to the jury

21  why certain of the phone calls with Antron Kent would not have

22  had an individual report?

23  A.  Because he was in a prison, he would have to call the Police

24  Department.  He would call, and -- I would have him call and

25  check in in case there was some type of status or update.  I did

1  not know if we would be coming down there to interview him or

2  not.  Or if it was just going to be -- I didn't know the status

3  of the case.  So he would call in.  Sometimes it would just

4  be -- you know, thanks for calling.  Or if I'm too busy, or --

5  it's just generalization of conversation.  It really was nothing

6  to be documented.

7  Q.  So there was some mention of a detail with respect to an

8  additional inmate who might have knowledge.  Did that enter --

9  did that end up, that detail, end up being in a report, do you

10  remember?  Let's just take a look at it.  I don't mean this to

11  be a memory test.  You were shown a portion of Exhibit 1021

12  before.  I need to blow this up a little bit.  Now, going to go

13  back to the top of this a little bit.  Is this a report that you

14  prepared, Detective?

15  A.  Yes.

16  Q.  Or Lieutenant.  I'm sorry.  And what's the date of this

17  report?

18  A.  8-19-2002.

19  Q.  And towards the bottom of this report could you just read

20  for the jury the last paragraph?

21  A.  This individual further states that another person on this

22  pod named Jeffrey Kimbrough, a black male, who is up here from

23  Racine County, had also listened to conversations told to them

24  by William Avery about this offense.

25  Q.  And so does this report include the conversation that you

```
 1   had where you were identified -- where it was identified for you
 2   the first time that Mr. Kimbrough had knowledge of this?
 3   A.  Yes.
 4   Q.  You were read some testimony before from your deposition.
 5   And for completeness I'm going to re-read the -- or at least a
 6   portion that Plaintiff's counsel read before, Page 83.  And then
 7   the next question and answer.  Question:  Okay.  And is it fair
 8   to say that Mr. Kent wanted to know or was looking to know what
 9   he would -- what reduction he could possibly get?  Answer:  Yes.
10   Question:  Okay.  And what did you relay to him in response to
11   that inquiry?  Answer:  Everything will be given to the District
12   Attorney.  It's not up to us to decide.
13           Did you, in fact, tell Mr. Kent words to that effect?
14   A.  Yes.
15   Q.  Did you ever make any promises to him for a sentence
16   reduction?
17   A.  Never.
18   Q.  Did you make any other kind of promises to him?
19   A.  No, not at all.  I routinely tell informants in general
20   that -- just put yourself in the best position you can.
21   Q.  Is it up to you to make any decisions after that?
22   A.  No.
23   Q.  Did you tell him details other than suggesting several
24   names, including Lorenzo, to Mr. Kent?
25   A.  Yes.
```

1    Q.  I mean, you told him several names, right?  Other than

2    Lorenzo?

3    A.  Right.  I wouldn't come out right with just saying Lorenzo.

4    Q.  Other than that, did you tell him any of the other details

5    that he told you about the conversation -- Avery saying he

6    killed this woman.  Anything like that?

7    A.  No.  Those details came from him.

8             MR. SMOKOWICZ:  Those are all the clarification --

9    those are all the clarification questions I have at this time,

10   Your Honor.

11            THE COURT:  Anything else?

12            MR. ELSON:  Just briefly, Judge.

13                      **<u>REDIRECT EXAMINATION</u>**

14   **BY MR. ELSON:**

15   Q.  In terms of the credibility of these two informants, you

16   knew that they both had approximately 40 year prison sentences,

17   right?

18   A.  Yes.

19   Q.  And you knew the nature of their crimes?

20            MR. SMOKOWICZ:  Your Honor, beyond the scope at this

21   point.

22            MR. ELSON:  These are just foundational questions,

23   Judge.

24            THE COURT:  Well, but that's been asked and answered,

25   so the foundation has been laid.  But what's the question

1   emanating from that?

2           MR. ELSON:

3   Q.  The question is, you had no concerns about either one of

4   these men's credibility, did you?

5           MR. SMOKOWICZ:  Your Honor, this is also beyond the

6   scope.

7           THE COURT:  Yeah.  It's a credibility issue, and his

8   concerns were covered.  And I don't think Mr. Smokowicz touched

9   on that at all.  The objection will have to be sustained.

10          MR. ELSON:  All right.  No further questions.

11          THE COURT:  You may step down, Detective Armbruster.

12  Any additional witnesses?

13          MS. HOFT:  Yes, Your Honor.  If I may just retrieve

14  one --

15          THE COURT:  Okay.

16          **CYNTHIA TYLER**, called as a witness, having been first

17  duly sworn, on oath testified as follows:

18          THE CLERK:  Please state your full name and spell it

19  for the record.

20          THE WITNESS:  Cynthia Tyler.  C-Y-N-T-H-I-A.

21  T-Y-L-E-R.

22                      **DIRECT EXAMINATION**

23  **BY MS. HOFT:**

24  Q.  Good morning, Miss Tyler.  How are you?

25  A.  Good.  How are you?

1    Q.  Good.  How old are you?

2    A.  23.

3    Q.  I'm going to have you tell us a little bit about yourself

4    first.  So just relax and we'll get through this.  Can you tell

5    me where you live, generally?

6    A.  The north side of Milwaukee.

7    Q.  Okay.  So who do you live with?

8    A.  My aunt and uncle.

9    Q.  And how are you related to that aunt and uncle?  Through

10   your Mom or your Dad?

11   A.  My Mom.

12   Q.  And how far have you gone in school?

13   A.  In my third year at Alverno.

14   Q.  And what are you studying at -- in Alverno?

15   A.  Psychology.

16   Q.  And when did you decide to make psychology your course of

17   studies?

18   A.  About a few months ago -- at first I was studying nursing,

19   but I realized I didn't like the classes so much, so psychology

20   has been something that I've been interested in since a kid.

21   Q.  And what aspirations do you have in using a psychology

22   degree?

23   A.  Maybe doing counseling in high schools, or with people with

24   drug addiction.

25   Q.  And are you currently employed?

```
 1   A.   Yes.
 2   Q.   And where are you employed?
 3   A.   Home Care Assistance.   I'm a home health aide.
 4   Q.   And tell the men and women of the jury what that means.
 5   What do you do on a daily basis?
 6   A.   So I go into people's homes -- I can go into a living
 7   facility as well.   So I help them get dressed, or I help them
 8   with medications that they need.   Medication reminders.   I can
 9   get them dressed.   I can feed them if they need that.   So
10   basically helping people with disabilities, or just the elderly
11   with day-to-day living.
12   Q.   And how many days a week do you work?
13   A.   Six days a week.
14   Q.   And how long have you been doing this type of home health
15   care work?
16   A.   Since I was 13.   I've been taking care of my
17   great-grandparents.   And my Mom got sick at one point, too, so I
18   helped take care of her.   And then I started working as a
19   professional at 16.
20   Q.   So when you say as a professional, the work you did before
21   you became a professional you didn't get paid for?
22   A.   No.
23   Q.   Right?   And I don't know if I'm blocking him -- I guess I
24   probably am -- do you know William Avery?
25   A.   That's my Dad.
```

1   Q.  Okay.  And what family does your Dad have here in Milwaukee?

2   A.  Well, there's a lot of us.  He has siblings, aunts, uncles,

3   cousins.

4   Q.  And do you have siblings?

5   A.  Yes.

6   Q.  Who are your siblings?

7   A.  Nafia, that's in the back of the room.  Jalisa; Sirena;

8   Junior.  I have -- from my Mom I have another 6, so that's --

9   Q.  Another 6?

10  A.  Yes.

11  Q.  Okay.

12  A.  Do I need to list all their names?

13  Q.  No.  That's okay.  But you have 4 siblings through your Dad?

14  A.  Yes.

15  Q.  Okay.  And what were your earliest memories of your father?

16  A.  Just me and my siblings like being at the house with him, or

17  going to the zoo, going to the park with our cousins, or just

18  doing a lot of outings.  We did a lot of family outings

19  together.

20  Q.  And I'm going to draw your attention now to 2004.

21  A.  Okay.

22  Q.  Do you remember how old you were in 2004?

23  A.  About 12, turning 13.

24  Q.  And did you see your Dad in 2004 at some point?

25  A.  For a short period.

1    Q.   Okay.  And where did you see him?

2    A.   We were at my house.  I lived with my Mom.  We were at his

3    house.  We went to the park.  Still the same stuff.  Just walked

4    around.  Hanging out.

5    Q.   And do you know if that time period -- short time period you

6    talk about in 2004, when you saw your Dad, do you know if he had

7    any difficulty finding you?

8    A.   Yeah.  Me and my Mom had -- and my siblings had recently

9    moved from our great-grand --  my great-grandparent's house.  We

10   didn't move far away, but my Dad had told me that he was on his

11   way home.  And I told him the first thing I wanted him to do was

12   find me.  Come and get me first.  And he couldn't find me

13   because me and my Mom had just recently moved.  So he was like

14   do you remember what you asked me to do?  And I was like no.

15   And he was like well, I came looking for you, and I couldn't

16   find you.  So, yeah.

17   Q.   And when you say he was on his way home, do you mean he was

18   being released from prison?

19   A.   Yes.

20   Q.   And at some short time later did you learn of your Dad being

21   re-arrested and charged with murder?

22   A.   I know he was re-arrested.  But I didn't know exactly why.

23   Q.   And did you talk to your Dad after he'd been arrested that

24   time?

25   A.   Yeah, we spoke on the phone or through letters.

1  Q.  And how did he seem?

2  A.  He seemed kind of like distracted.  Like if we were having a

3  conversation, he would probably like take pauses here and there,

4  like as if he was in like deep thoughts or just really focusing

5  on something.

6  Q.  And had you noticed that about him before?  In other

7  conversations?

8  A.  No.

9  Q.  And after 2004, did you ever hear about why your Dad went

10 back to prison?

11 A.  Yes.  Just overhearing adults talk about it.  No one ever

12 like specifically told me what was exactly going on.  We

13 didn't -- I didn't find out right away.  Maybe months after the

14 fact that I knew exactly what was going on.

15 Q.  And what did you learn?

16 A.  That he was being charged with murder.

17 Q.  And did he talk to you about that?

18 A.  Yeah.  I didn't really ask a lot of questions, because I was

19 still a kid.  Really nervous about it.  But he did just let me

20 know what was going on, and that he was innocent, and he was

21 going to do everything he could to get back home to me and my

22 siblings.

23 Q.  And how did he appear when he was telling you this?  How did

24 he seem?  I mean, I imagine this is a phone conversation?

25 A.  Yeah.  He was distraught and hurt and confused.  That he

1    didn't really know what was going on.  He just knew that it

2    was -- he was wrongfully accused of something.  Like I just know

3    he didn't do something like that.  And he wouldn't do something

4    like that.

5    Q.  And was he, for lack of a better word, energized to kind of

6    tell you his side of the story?

7    A.  He made it clear what was going on, and he made it clear

8    that he was innocent.  I felt that he was just wanting to let me

9    know what was going on so that I could have my own opinion, and

10   that he was telling me as being my father what predicament he

11   was in.

12   Q.  And how old were you when your Dad was released -- oh,

13   before I get to that, let me ask you, did you -- did you ever

14   visit your Dad in prison from 2004 to 2010?

15   A.  I tried.

16   Q.  Tell me about that.

17   A.  Me and my sister, Nafia, we were with my aunt and uncle.

18   They drove us up to visit him in Waupun, I think it was.  And we

19   tried to visit him, and we were -- we were denied the visit.

20   And we didn't really get any specific reasons why.  We just were

21   denied the visit.  They were really rude and act like they were

22   agitated that we were there.  So after that, it was -- I was

23   shocked and like didn't want to go back.

24   Q.  And during that time period from 2004 to 2010 while your Dad

25   was wrongfully convicted and serving time in prison for murder,

1   did you have any communication with him other than this one

2   attempted visit?

3   A.   Yeah.   We spoke on the phone.   We wrote letters to each

4   other a lot.   So we talked weekly.   We spoke or had contact

5   weekly.

6   Q.   How old were you when your Dad was released in 2010?

7   A.   About 17.

8   Q.   And when did you first see him after he was released in

9   2010?

10  A.   I seen him that same day.

11  Q.   And where did you see him?   What location?

12  A.   We all met up at the location he lives at now.   So we were

13  all at like my grandmother's house.

14  Q.   And how many of you were there?

15  A.   I don't have an exact number, but it was just my siblings,

16  my aunts and uncles.   So like I said, it's a lot of us, so it

17  could be over 15, 20 people at one time.

18  Q.   And how did your Dad appear when you saw him for the first

19  time after he'd been released from prison in 2010?

20  A.   He seemed somewhat relieved.   He was very excited to see

21  everybody.   He was happy that we were all there in the same

22  house, and that we can actually hug him and talk to him how --

23  you know, we wanted to.   And have personal conversation without

24  people looking over your shoulder or feel like you were being

25  watched or something.

1  Q.  And your Dad's physical appearance.  How did it seem when

2  you first saw him in 2010?

3  A.  He look like his clothes were too big, but he looked like

4  hisself.  He looked like hisself.  He just was older.  As I was.

5  Q.  And when your Dad was first -- I'm going to talk to you now

6  about the time period from 2010 to today.  And I realize that's

7  a pretty long time period.  But when your Dad was first released

8  from prison, in 2010, did you observe him having any

9  difficulties?

10  A.  Probably just adjusting to -- that all -- me and my siblings

11  are older now and doing different things and have individual

12  lives.  He seemed more -- he was -- he always seem like a

13  reserved person to me, but he was a little more closed in, it

14  seemed like.  Not toward me, but just overall.

15  Q.  And when you say closed in, what do you mean?

16  A.  Like it was maybe he didn't -- he was -- he's always been

17  like a social guy.  To me he seemed like he was outgoing, but

18  still kept the distance from people.  So it seemed like he just

19  wanted to be around me and my siblings and his siblings and stay

20  in the house more, versus us going out and doing things.  Me and

21  him and my siblings always did things in outings.  Like going to

22  a park or something.  But more so we stayed in the house, and we

23  talked in the house, or we did just sit down and chat versus

24  being outdoors.

25  Q.  And were there -- well, let me ask you this.  How would you

1  describe your Dad?

2  A.  He's a quiet person.  He's funny at times.  He's really

3  caring.  He's always like attentive to me, I feel like.  He's

4  real supportive.

5  Q.  Have there been times over the last 5 years when, you know,

6  you think your Dad has wanted to see you more than you've been

7  able to see him?

8  A.  Yeah, that's been an adjustment, just as far as me working

9  and being in school.  So taken away from the time we could be

10  spending together from that.  So I think that was like a hard

11  adjustment, because normally growing up he was always okay,

12  we're going to go here.  We're going to make this plan.  And

13  then we can all just hop on board.  But now it's like well, I'm

14  doing this one -- this job today, and that doesn't fit my

15  schedule.  Or one of my my siblings are doing something.  So we

16  all can't get together.  And I think that was really hard for

17  him to adjust, because all he wanted to do was like make up for

18  the time that we lost.

19  Q.  And would you say that you see -- well, let me just ask you,

20  how often do you see your Dad now?

21  A.  Physically I probably see him maybe like once a week.  But

22  we speak daily.  Or he'll text, and things like that.

23  Q.  And what kind of texts does your Dad send?

24  A.  He'll say hey, how are you doing?  Or he sends out morning

25  prayers.  Or just morning scripture to like stay encouraged or

1  stay motivated.  Or just some words about God, and make sure

2  that we're praying every day and reading the word.

3  Q.  And what kinds of things do you and your Dad do together?

4  A.  Well, we talk a lot.  We eat a lot.  We'll walk, because he

5  likes to exercise, but I don't, but I'll still walk.  So me and

6  my Dad are like -- I feel like I'm most like him out of all --

7  me and my siblings.  So me and him just communicate on a

8  different level, I think.  Like we're real -- we're close.  And

9  we understand each other, I feel.

10 Q.  And since your Dad was released from prison in 2010, has he

11 provided you any assistance?  Helped you in any way?

12 A.  Absolutely.  He's always very helpful.  Recently my car

13 messed up.  He helped me with that.  He's always trying to find

14 parts.  Or like I'll break something in the house.  I recently

15 broke a picture frame that he still has and he's fixing, because

16 I broke it.  Or I have moved four times this past year, and he

17 helped me each and every time, which I was very grateful for.

18 And he didn't mind doing it.  He was just like okay, but we have

19 to do this in one day.  So he pushed me to get it done.

20 Q.  How have you observed being wrongfully convicted of murder

21 affected your Dad?

22 A.  It affected him in a really, really big way.  I feel like it

23 made him question people more, and it made -- it was just a

24 really big blow, because it was something towards his character.

25 And I feel like he makes his word his bond.  If he -- his yes is

1  yes, and his no is no.  And I feel like he's a real upstanding

2  guy.  He never -- I never felt like he just abandoned me.  I

3  never felt like he didn't want me.  I never felt like he didn't

4  love me.  But to be taken away from me and my siblings, and to

5  be taken away from his own siblings, it was heartbreaking.  And

6  you can still see that today in just how he values being around

7  us.  And he values just spending time with us and his grandsons.

8  And just being around daily.  How he just cherishes that moment.

9  And it was -- it was something that he'll never be able to fully

10 feel like -- that he'll be relieved from this.

11          MS. HOFT:  Thank you, Miss Tyler.

12          THE COURT:  Any cross examination?

13          MS. YUAN:  Just a few.  Thank you.

14                    **CROSS EXAMINATION**

15 **BY MS. YUAN:**

16 Q.  Good morning, Miss Tyler.

17 A.  Good morning.

18 Q.  I have just a few questions.  So you said that you're 23

19 right now?

20 A.  Um-hum.

21 Q.  What is your birthday?

22 A.  11-22-91.

23 Q.  Thank you.  And in March of 1998 how old would you have

24 been?  I think that was approximately 17 years ago, so I did the

25 math.  Six years old?  Does that sound about right?  Five to

1  six?

2  A. Okay. Yeah.

3  Q. Did you ever live with your father?

4  A. No.

5  Q. And you testified -- you said -- I think you were asked a

6  question. Things that you would do with your father. Things

7  that may have changed since you've seen him from 2010 to the

8  present. And you had said prior to 2010 to the present you and

9  your Dad would go out more? Or go out to the park and things

10 like that?

11 A. Um-hum.

12 Q. When would that be? How old were you -- when you would go

13 to the park with your Dad?

14 A. We went every time he was home, up until the point he was in

15 prison. We always went out and did things together, all the

16 time. Even though we didn't live -- I didn't live in the same

17 household with him, I seen him daily as a child.

18 Q. Okay. You -- when you were 6 years old in 1998, you know

19 your Dad was incarcerated at that time?

20 A. Um-hum.

21 Q. Do you remember that?

22 A. I remember him going away for awhile.

23 Q. You do?

24 A. Yeah.

25 Q. And do you know that he was in prison, then, from 1998 until

1    2004?

2    A.  That's right?  I'm not for sure the exact dates.

3    Q.  Sure.  I understand.  You said that there was a time when

4    you knew he went away for a little while, correct?

5    A.  Um-hum.

6    Q.  Yes?

7    A.  Yes.

8    Q.  And I'm just saying that for the Court Reporter.  We just

9    need a yes or no.  Thank you.  How old would you have been then?

10   Would that be 6 to 12, approximately?

11   A.  At which point?

12   Q.  From 1998 to 2004.  To September, 2004.

13   A.  He was incarcerated I guess there -- yeah, 6 to 12.

14   Q.  Do you know where he was incarcerated?

15   A.  I'm not exactly for sure, so I wouldn't be able to answer

16   that, no.

17   Q.  That's okay.  Do you remember having phone conversations

18   with your Dad when you were between the ages of 6 and 12?

19   A.  Yes.

20   Q.  How often would that happen?

21   A.  Like I said, I spoke or had some type of contact with him

22   weekly.  If I didn't speak to him over the phone, we wrote

23   letters all the time and compared notes about our handwriting.

24   Q.  And that's since you were 6 years old?

25   A.  Yeah.  Since -- since the first time he was incarcerated.

1   Q.  So whenever your Dad would go away for awhile and was

2   incarcerated, you would still have contact by with him by phone?

3   A.  Absolutely.

4   Q.  Or letters, you said?

5   A.  Um-hum.

6   Q.  Yes?

7   A.  Yes.

8   Q.  Did you ever visit your Dad in prison?

9           MS. HOFT:  Objection.  Mischaracterizes her prior

10  testimony.

11          MS. YUAN:

12  Q.  I understand you testified about trying to visit your --

13          THE COURT:  Well, there was a refusal at one point,

14  but ever is ever.  She may answer the question, if she knows.

15          MS. YUAN:  I'll just clarify my question.

16  Q.  I know you testified earlier that you had tried to go see

17  your father in Waupun and was denied.  Was not able to see him

18  that day, correct?

19  A.  Correct.

20  Q.  I'm wondering if you ever were allowed to visit your father,

21  whether he was incarcerated back in 1998, or the various times

22  --

23  A.  I remember that one specifically, because it was like really

24  traumatic for me at that time.  So I do remember that, going to

25  visit him.  Or trying to visit him.

1    Q.  That one time?

2    A.  Yes.

3    Q.  Do you remember any other time?

4    A.  Not that I can recall.  I know that it was a lot of me and

5    my siblings, so it would have been really hard for my Mom to try

6    to get me and 6 other little people in a car and go and travel

7    to see him.

8    Q.  So your Mom was a Mom of 6 children?

9    A.  Seven, altogether.

10   Q.  Seven children?

11   A.  Seven children, yes.

12   Q.  Who's your Mom?  What's her name?

13   A.  Cofe'a Tyler.

14   Q.  Do you know if she's on good terms with your father?

15   A.  Yeah, they speak often about me and my sister, and about

16   their new grandson.  So yeah, they speak pretty often.

17            MS. YUAN:  I don't have any other questions for you.

18   Thank you for your time.

19            THE COURT:  Anything else?

20            MS. HOFT:  I don't have any other questions.  Thank

21   you.

22            THE COURT:  You may step down, Miss Tyler.  Thank you.

23            MS. HOFT:  The next witness uses a cane, so might take

24   her a bit.

25            THE COURT:  Well, why don't we adjourn until 1

1    o'clock, then?

2            MS. HOFT:  She should be in the witness room right

3    next door.

4            THE COURT:  How long could it be?

5            MS. HOFT:  Just as long as this last witness or less.

6            THE COURT:  Okay.

7            **DEBRA FENCEROY**, called as a witness, having affirmed,

8    on oath testified as follows:

9            THE CLERK:  Will you please state your full name and

10   spell it for the record?

11           THE WITNESS:  Debra Fenceroy, Debra, D-E-B-R-A.

12   Fenceroy, F-E-N-C-E-R-O-Y.

13                         **DIRECT EXAMINATION**

14   **BY MS. HOFT:**

15   Q.  Good morning, Miss Fenceroy.  How are you?

16   A.  I'm blessed.

17   Q.  And may I ask you how old you are?

18   A.  58.

19   Q.  And where do you currently live?

20   A.  In Milwaukee.  4723 North 89th Street in Milwaukee,

21   Wisconsin.

22   Q.  And how long have you lived there?

23   A.  21 years.

24   Q.  And who do you live there with?

25   A.  My husband, my daughter, and my great-great-nephew.

1  Q.  And how far did you go in school?

2  A.  I finished high school and got a nursing degree, and I did

3  some -- nursing degree.

4  Q.  And was that an R.N. degree that you had?

5  A.  Yes.  R.N., yes.

6  Q.  And are you currently employed?

7  A.  No, I'm not.  I'm retired.

8  Q.  And what did you retire from?

9  A.  Registered nurse, Milwaukee Sheriff's Department.  County

10  Sheriff's Department.

11  Q.  How long did you work for the Milwaukee County Sheriff's

12  Department?

13  A.  I had 34 years with the County.  I worked nine-plus in the

14  Corrections Department.

15  Q.  Nine-plus years?

16  A.  Um-hum.  With the County Jail.

17  Q.  And what -- what did you do?

18  A.  I was a registered nurse.  I assessed patients.

19  Q.  And I guess you can see -- do you know William Avery?

20  A.  Yes.  That's my nephew.

21  Q.  And have you kept in touch with him over the years?

22  A.  Yes.

23  Q.  How long have you known him?

24  A.  All his life.  I was there at birth.  When he was delivered.

25  Q.  And drawing your attention to 2004, did you -- well, let me

1   ask you this.  Before 2004, tell us what you -- how would you
2   describe your nephew before 2004?
3   A.  He's quiet.  Somewhat introverted.  Loner.  He's a good --
4   he always was a good kid.  He was highly respectful to me.  Out
5   of all of my nieces and nephews, he never once was disrespectful
6   toward me.  I could trust him.  Whatever -- we could confide in
7   each other.  He was like my son.
8   Q.  And in 2004 did you know he was arrested and later convicted
9   of murder?
10  A.  Yeah, I heard of it, but I -- you know, when the incident
11  was going on, you know, when it was first happened I didn't.
12  But I heard of it because of, you know, media.
13  Q.  So did you actually see articles in the Milwaukee Journal
14  Sentinel about your nephew?
15  A.  Yes.  Yes.
16  Q.  And did you have any conversations with individuals who
17  heard about your nephew being charged with the Maryetta Griffin
18  murder?
19  A.  Yes.
20  Q.  Tell me about that.
21  A.  Well, they were saying that he had killed this young lady.
22  And it was -- they didn't -- the people that were talking, they
23  didn't know that I was his aunt.  And I just let them go on
24  talking.  And they said some harsh things, and that prompted me
25  to really dig down to see if this was true with him.

```
1    Q.  What do you mean by that?

2    A.  I contacted him.

3    Q.  Okay.  And what happened?

4    A.  And I asked him -- I asked him, I said is this true?  What

5    I'm hearing.  And from a little boy on, he never -- I mean,

6    he -- even if it got him in trouble, he wouldn't lie to me.  He

7    never would lie to me.  And I asked him -- we had -- we had a

8    good rapport in that sense.  I mean, good or bad, he would tell

9    me the truth.  And when I asked him, I said did you do that?  He

10   said no, Tee, I didn't do that.  And I believed him.

11   Q.  And how did he appear when he was confronted by you about

12   this?

13   A.  He -- well, he was adamant that he didn't do it.  I mean, he

14   was upset.  And, you know, he was saying Tee, you know, I

15   wouldn't do nothing like that.  And I knew from -- he was close.

16   He was like my child.  And in my heart of hearts I didn't

17   believe that he did it.  But I wanted to hear from him.  Did you

18   do this?  Because I was -- I wouldn't have nothing to do with

19   him if this was true.  But in the heart to hearts I felt that he

20   didn't do that.  But I wanted to hear it from him.

21   Q.  Have you spent time with your nephew since he was released

22   in 2010?

23   A.  Yes.

24   Q.  And --

25   A.  A lot of time.
```

1   Q.   Spent a lot of time?

2   A.   Yeah.  I spent a lot of time.  God blessed me.  Beat stage

3   four cancer.  And he went through with me, you know.

4   Q.   And when was that?  When was your diagnosis?

5   A.   I was diagnosed latter part of 2010.  He went through

6   treatment with me.  Then again I got diagnosed, that's stage

7   four, tonsil cancer.  Then I got diagnosed with breast cancer.

8   He went through it with me.

9   Q.   And when you say he went through it with you, what do you

10  mean?

11  A.   He went to my treatments with me.  He went to all my

12  treatments.  He taking me back and forth to the Doctor.  He

13  went -- he went to church with me, praying.  He said a prayer a

14  lot.

15  Q.   Did you -- have you observed your nephew engaged in any work

16  since 2010?

17  A.   Yes.  When he got out, I spoke with him, and I told him, I

18  said don't let this define you.  And he was -- he would say

19  well, Tee, I can't get a job.  I said well, you're handy, you

20  know.  You got to make your own way.  Go back to school.  Get

21  some type of training or something.  And he did.  He went back

22  and got his carpentry.

23  Q.   Have you actually seen his carpentry work?

24  A.   Yes, I have properties.  Rental properties.  And he worked

25  on them.  And he refurbished them for me.  And he does a good

1    job.  He did a good job.  One, I -- because one I thought was

2    lost.  And he did a good job on the two units.  And he's doing

3    good.  He's doing very good.

4    Q.  Do you observe -- well, let me ask you this.  What, if any,

5    differences have you observed about your nephew, William Avery,

6    since he's been released in 2010?

7    A.  Paranoia.

8    Q.  What do you mean by that?

9           MS. YUAN:  I didn't hear the answer.  What was that?

10           THE WITNESS:  Paranoia.  He's -- you know, him and I

11   are very close.  Very close.  And I can say I can feel a little

12   distance.  You know, it's like I got to force, you know,

13   conversation and what have you.  But I just keep doing what I

14   have to do to keep him, you know.

15           MS. HOFT:

16   Q.  And have you ever observed him make any abrupt moves when

17   he's been at your house that concerned you about his behavior?

18   A.  Well, we've talked about that, yeah.  He -- he's paranoid,

19   you know.  He leery of people.  We talked about that.

20   Q.  And do you know how your nephew, William Avery, has gotten

21   through this nightmare of being wrongfully convicted of murder?

22   A.  Family support.  Prayer.  And me, I'm like the constant

23   vision over him.  His family support.  His children.  You know,

24   we keep -- make sure, you know -- we touch bases with him.  Keep

25   him going.

1    Q.  Have you seen him interact with his children or his two

2    grandsons?

3    A.  Oh, yeah.  He's doting over the grandchildren for sure,

4    yeah.  He's protective of his children.

5           MS. HOFT:  Thank you, Miss Fenceroy.  I don't have any

6    questions.  But Miss Yuan --

7           THE COURT:  Cross examination.

8           MS. YUAN:  Very briefly, Your Honor.

9                    **CROSS EXAMINATION**

10   **BY MS. YUAN:**

11   Q.  Good morning, Miss Fenceroy.

12   A.  Good morning.

13   Q.  I have just have a few questions for you.  You testified

14   about your close relationship with your nephew, Mr. Avery?

15   A.  Yes.

16   Q.  And you were asked questions mostly about your interaction

17   with him from 2010 to the present, since he was -- he was

18   released from prison for the wrongful conviction of Maryetta

19   Griffin, is that right?

20   A.  Yes.

21   Q.  Yes.  Okay.  Did you know that Mr. Avery was incarcerated in

22   1998 until 2004?

23   A.  Yes.

24   Q.  And did you have any contact with him during that period of

25   time?

```
1    A.   Yes.

2    Q.   What kind of contact did you have?

3    A.   We would write.

4    Q.   Letters?

5    A.   Yes.

6    Q.   Did you have any phone calls?

7    A.   Yes, we would call.

8    Q.   How often would you have phone calls?

9    A.   Not -- the phone calls wasn't frequent.

10   Q.   Was not frequent?

11   A.   No.

12   Q.   And I'm asking just for the time period from '98 to 2004.

13   A.   I can't recall that.

14   Q.   You can't recall any phone calls?

15   A.   I recall him telling me come pick him up.  Pick him up from

16   prison.

17   Q.   When he was being released?

18   A.   Yeah.

19   Q.   And that's in 2004?

20   A.   Yeah.  If that's the date.  I'm not -- I'm not for sure all

21   of the dates.

22   Q.   Okay.  That's all right.  Do you know why he was in prison

23   from 1998 to 2004?

24   A.   Yes.  I just learned of that.

25   Q.   You just learned?
```

1    A.  Recently.

2    Q.  Recently?

3    A.  Yes.  What it was for.

4    Q.  How did you learn of that?

5    A.  Through speaking with the attorneys and the newspaper.

6    Q.  So you learned that Mr. -- your nephew, Mr. Avery, was --

7    why he was incarcerated in 1998 to 2004 through his attorneys?

8    A.  Well --

9           MS. HOFT:  Objection.  Form and characterization.

10          MS. YUAN:  You can answer, if you understand.

11          THE WITNESS:  Well, yeah -- I mean, I've heard it, you

12   know, from the attorney.  You know, from various people.  And

13   the newspaper.

14          MS. YUAN:

15   Q.  About -- and I'm talking about why Mr. Avery was in prison

16   in '98 to 2004.  You heard it from his attorneys, why he was in

17   prison?

18   A.  Yes.

19   Q.  So Mr. Avery didn't tell you why he was in prison in '98 to

20   2004?

21   A.  Yeah.

22   Q.  So he did?

23   A.  Yeah.

24   Q.  When did he tell you that?

25   A.  Sometime in -- during his incarceration.  Just to say I

1  don't know -- to say pinpoint.  I really can't say.

2  Q.  That's okay.

3          MS. YUAN:  I don't have any other questions for you.

4  Thank you for your time.

5          MS. HOFT:  Nor do I.  Thank you, Miss Fenceroy.

6          THE COURT:  You may step down, Miss Fenceroy.  We'll

7  take a break, ladies and gentlemen of the jury, until 1 o'clock.

8  Please don't discuss the case, as I told you repeatedly.  We'll

9  see you back here after your lunch.  Have a good lunch.

10          (Whereupon the jury was excused at 11:55 a.m.)

11          THE COURT:  Okay.  1 o'clock.

12          MS. HOFT:  Thank you, Judge.

13          MR. SMOKOWICZ:  Thank you.

14          (Whereupon a recess was called by the Court.  Upon

15  conclusion of the recess, the proceedings continued as follows:)

16          THE COURT:  There's a matter to take up before the

17  jury comes back?

18          MR. ELSON:   Yes, Judge.  In relation to

19  Mr. Kimbrough.  I would ask that the Court take judicial notice

20  of the Wisconsin Court of Appeals opinion in State of Wisconsin

21  vs. Jeffrey Kimbrough, 2001, WI at 138.  And specifically

22  Paragraph 10 of the opinion, which states at trial both the

23  State and the defense called clinical psychologists, who agreed

24  that Kimbrough was of borderline intelligence with an I.Q. in

25  the mid-seventies.  Kimbrough's psychologist describes him as

1   having a limited knowledge of common words, and underdeveloped

2   social comprehension.  His mental capacity was, quote, roughly

3   comparable to a mental age of an average 12 year old child,

4   unquote.  The State's psychologist was, quote, more in agreement

5   than disagreement, unquote, with the defense psychologist.

6        MR. SMOKOWICZ:  Your Honor, we would object for -- not

7   for the reason that this is incapable of being the subject of

8   judicial notice, but we would object for the following reasons.

9   That it's irrelevant.

10        First of all, the item that counsel for the Plaintiff

11   just read doesn't establish that the individual was incapable of

12   providing assistance to the defense counsel.  Testifying in his

13   own behalf, or testifying with an accurate memory.  Secondly, it

14   would -- counsel also -- I mean, pardon me, the Court of Appeals

15   in that opinion also states at Paragraph 15 the following.

16   Quote:  With respect to Kimbrough's limited intellectual

17   capacity, we note that while expert testimony established he had

18   below average intelligence, it did not establish that he is

19   mentally retarded.  In addition, while the State's psychologist

20   testified that Kimbrough's general ability to anticipate

21   consequences was underdeveloped compared to an average person,

22   the testimony did not establish that Kimbrough was unable to

23   appreciate the risk of shaking a baby.  Although Lidoritz

24   testified that large numbers of the population do not recognize

25   the serious consequences that can result from such action, he

1  also commented that with regard to, quote, people who don't read

2  a lot, but watch T.V., there are T.V. spots that say never shake

3  a baby.  And that closes both the quote from the psychologist

4  and the quote in the opinion.

5      The Court of Appeals in that case also affirmed the

6  conviction of Kimbrough in that case, in spite of the fact that

7  he had argued that he had ineffective assistance of counsel in

8  part because of his limited intellectual capacity.  Therefore,

9  what we're going to get in here, Your Honor, is nothing that's

10  relevant.  The witness -- the Detectives didn't know about it.

11  Nobody -- nobody indicates that it was information that was

12  withheld from Avery in his criminal trial.  No one indicates

13  that Avery's counsel could not have discerned this on his own.

14  In fact, this opinion comes from 2001.  One would expect that

15  Mr. Avery's counsel in the criminal -- in the homicide trial

16  would have had equal access and equal ability to locate this

17  case and use it in cross examination of Mr. Kimbrough at trial.

18      So this becomes irrelevant and unduly confusing to the

19  jury, and unfairly prejudicial to us.  This is not a case where

20  we're talking about the intellectual capacity, in fact, of a

21  witness that the Plaintiffs -- the Plaintiff himself brought to

22  this Court and asked questions of.  One would think that if

23  this -- if the Plaintiff's position is that he cannot be trusted

24  as a witness, he should not have been presented as a witness on

25  their part.

1          THE COURT:  Okay.  Anything else?

2          MR. ELSON:  Judge, I'd like to respond to that.

3          THE COURT:  Sure.  Go ahead.

4          MR. ELSON:  Your Honor, that argument misses the

5     point.  Detective Armbruster acknowledged that this information

6     would have been useful to him in determining Mr. Kimbrough's

7     reliability as a jailhouse informant.  The information was in a

8     public document prior to his contact with Kimbrough.  And, you

9     know, what -- the Court's finding in this case isn't -- isn't

10    what I'm driving at.  It's the fact that there's information in

11    this opinion about Mr. Kimbrough's mental capacity, including

12    what I read, that would have been useful for Detective

13    Armbruster to have known about.  He could have accessed this,

14    and he didn't.  And that was the point of the examination.

15         MR. SMOKOWICZ:  Your Honor, if I may.  Lieutenant

16    Armbruster said he did not -- was not aware of this, and would

17    generally not have had access to this kind of information.

18         THE COURT:  Okay.  Anything else?

19         MR. ELSON:  Nothing else, Judge.

20         MR. SMOKOWICZ:  Actually, Your Honor, I do have one

21    other thing.  What's particularly troubling here in this

22    situation now is this is really the subject of expert testimony.

23    If someone were to come -- if someone were -- if the Plaintiff

24    is now to be allowed to say that one of their witnesses was an

25    unreliable witness and is an unreliable witness, in a particular

1  fashion, first of all you don't have that kind of psychological

2  examination.  You have the psychological examination of a level

3  of intellectual capacity for purposes of understanding the

4  consequences of the physical action of shaking a baby.  You

5  don't have any kind of psychological examination of the ability

6  of this witness to testify as a witness.  And that should have

7  been the subject, if it were going to be a subject at all, of an

8  expert.  That's what -- this is sort of back door expert

9  testimony, and there's been no disclosure of this kind of expert

10  testimony.  It would be the stuff, I assume, of argument in

11  closing to the effect of not only that the Detective should have

12  been -- the Detective indicated he might have been concerned

13  about it, but that the concern was substantial and legitimate

14  and would have caused the witness to be deemed unreliable.  And

15  that leads the expert -- and we don't have that expert here,

16  Your Honor.  That also adds to the potential for jury confusion

17  and unfair prejudice here.  If we were going to have an expert

18  testify that -- from the Plaintiff that Jeffrey Kimbrough was an

19  unreliable witness and should have been deemed so at the time he

20  was interviewed back in 2002 and 2003, that should have been

21  produced long ago.  That's not here.

22          MR. ELSON:  Judge, I'm not arguing that this opinion

23  proves that Mr. Kimbrough was an unreliable witness.  The point

24  of the examination was that the information contained in this

25  Appellate Court opinion would be -- are factors that Detective

1  Armbruster could have considered in judging Mr. Kimbrough's

2  reliability and credibility.  And it was information that was

3  out there.  It doesn't have anything to do with expert testimony

4  or anything like that.  I'm not trying to prove that

5  Mr. Kimbrough was unreliable through this.  I'm just showing

6  that this information existed, and it was in a public record,

7  and it was accessible.  And that Detective Armbruster said it

8  would have been useful to know.

9          THE COURT:  Anything else?

10          MR. SMOKOWICZ:  No, Your Honor.

11          MR. ELSON:  No, Your Honor.

12          THE COURT:  The Court is going to exclude it; however,

13  the information that we have on record from Mr. Armbruster is

14  that that would have been information that he should have had --

15  not should have had, but would have been information that would

16  have been usable in assessing the credibility of Mr. Kimbrough.

17          The trouble with the Court establishing fact through

18  expert testimony in the Appellate Court opinion -- and I don't

19  know what the other experts would have said.  Obviously the

20  challenge was as to his capacity to understand the proceedings.

21  And that, coupled with his argument about ineffective assistance

22  of counsel, led to the indication or the implementation or the

23  use of expert witnesses to determine that.  I don't think that

24  the Court taking recognition of a Court of Appeals opinion which

25  came out in -- what was that?  2001?

1              MR. SMOKOWICZ:  2001, Your Honor.

2              THE COURT:  Which is just shortly before the phone

3    call from Mr. -- was that Kent?

4              MR. SMOKOWICZ:  Yes, Your Honor.

5              THE COURT:  And then the phone calls from Kimbrough

6    that a Police Officer, getting a cold call like that would then

7    be required to search Court of Appeals opinions to determine the

8    reliability of a witness when it is, from all appearances, his

9    view that this witness was reliable.  And there's no challenge

10   as to the unreliability of the witness.  Just as to his --

11   according to this opinion, his capacity to be influenced.

12             Another thing -- trouble with that is, if you get into

13   extraneous matters -- and that is where the argument relative to

14   this being brought up before this period of time is relevant.

15   This is something that I think should have been hashed out

16   relative to Mr. Kimbrough before he was called so that that

17   foundation could be laid relative to the examination of

18   Mr. Armbruster.  But it can be argued that Detective Armbruster

19   said that this would have been for him useful information, and

20   he didn't do it.  He just -- he just didn't feel the need or --

21   well, he just didn't do it.

22             The argument can be made to the jury you heard

23   Lieutenant Armbruster say that if indeed Mr. Kimbrough was of

24   limited capacity, knowledge of that would have been useful to

25   him in assessing the credibility of the witness.  Or the

```
 1    reliability of the witness.  But now you've -- counsel said it
 2    isn't a matter of reliability.  You're not arguing that.  It's
 3    just that this was something he should have taken into account.
 4    Something he should have taken into account, right?
 5              MR. ELSON:  Yes.  I mean --
 6              THE COURT:  So you can say that.  Armbruster said it
 7    would have been useful information, and he didn't do any
 8    examination to determine whether or not that was the case.  But
 9    I don't want to put in from an Appellate opinion an expert
10    opinion as to the capacity of Mr. Kimbrough, because it gets
11    into extraneous matters.  And I don't think it's fair to raise
12    such a pretty convoluted and complex issue at this point during
13    the trial.  So there's a slight bit of confusion that could
14    lead to -- lead the jury to also.  But that's minimal, in the
15    Court's view of the rules.
16              So in any event, I'm going to exclude taking judicial
17    notice of the Court of Appeals opinion from 2001.
18              MR. ELSON:  Thank you, Judge.
19              THE COURT:  Anything else?
20              MR. SMOKOWICZ:  Not at this time from us.
21              MS. HOFT:  No, Your Honor.
22              THE COURT:  Ready for the next witness?
23              (Whereupon the jury was returned to the courtroom at
24    1:21 p.m.)
25              THE COURT:  We're ready with the next witness, ladies
```

1  and gentlemen of the jury.

2          MS. HOFT:  Yes, Your Honor.

3          THE COURT:  Okay.  Miss Hoft.

4          **SIRENA AVERY**, called as a witness, having been first

5  duly sworn, on oath testified as follows:

6          THE CLERK:  Please state your full name and spell your

7  last name for the record.  And speak right into the microphone.

8          THE WITNESS:  My name is Sirena Alene Avery.  My last

9  name is spelled A-V-E-R-Y.

10                    **DIRECT EXAMINATION**

11  **BY MS. HOFT:**

12  Q.  Hello Sirena, how are you?

13  A.  I'm fine.

14  Q.  Have you ever been in a courtroom like this?

15  A.  No.  I'm a little nervous.

16  Q.  Okay.  Just relax.  I'm going to ask you some questions

17  about yourself, and then I'm going to ask you some questions

18  about somebody else, okay?

19  A.  Okay.

20  Q.  How old are you?

21  A.  I'm 24.

22  Q.  And where do you live?

23  A.  I live at 5444 West Silver Leaf Lane.

24  Q.  In Milwaukee?

25  A.  Yes.

```
 1   Q.  And who do you live there with?

 2   A.  My mother.

 3   Q.  And anybody else?  Any little people?

 4   A.  Yes.  I have two younger sisters, my stepfather, and my

 5   sister Jalisa also lives there.

 6   Q.  And do you have any children?

 7   A.  Yes.

 8   Q.  And how many children do you have?

 9   A.  I just have one.  I have a three month -- year old son.

10   Q.  And how far -- and what's your son's name?

11   A.  His name is Antwan.

12   Q.  Everybody calls him King?

13   A.  Yes.

14   Q.  Is that his middle name?  Or why do they call him King?

15   A.  That's his middle name.

16   Q.  And how far have you gone in school?

17   A.  I'm currently enrolled in college at M.A.T.C.  I go to

18   school for criminal justice.  I'm in a criminal justice program.

19   I want to work in probation and parole.

20   Q.  Okay.  And why do you want to do that?

21   A.  Well, I feel like I can help a lot of people.  Deter them

22   from committing crimes.  Getting in more trouble.  Giving them a

23   second chance.

24   Q.  And do you know a gentleman by the name of William Avery?

25   A.  Yes.
```

1    Q.   How do you know him?

2    A.   That's my father.

3    Q.   And you've known your father all your life?

4    A.   Yes.

5    Q.   What's the earliest memory you have of your father?

6    A.   I would say maybe like three years old.

7    Q.   Okay.  What do you remember about that?

8    A.   I just really remember I would go to visit him by my

9    grandmother's.  I have lived in the home with him before, so

10   basically he's always been around.

11   Q.   Okay.  I'm going to draw your attention to 2004.  Your Dad

12   had been in prison prior to that, right?

13   A.   Yes.

14   Q.   And in 2004 were you made aware that he was released from

15   prison?

16   A.   Yes.

17   Q.   How were you made aware of that?

18   A.   Well, I was actually at Court when he was exonerated for

19   everything, and they said he would be coming home.  So when he

20   did come home, we were there basically waiting on him.  Staying

21   at my grandmother's house.  We basically had a family

22   get-together like we usually do.

23   Q.   And what year was that?

24   A.   In 2010.

25   Q.   Yeah.  Okay.  So let's back up a little bit to 2004.

1    A.   Okay.

2    Q.   Your Dad had been serving some time on a drug charge.  Were

3    you aware of that?

4    A.   Um-hum.  Yes.

5    Q.   And then he was released in 2004 for a short period of time,

6    right?

7    A.   Yes.

8    Q.   Did you see him during that short period of time?

9    A.   Yes.

10   Q.   Okay.  What -- tell me about that?

11   A.   Well, I went to spend a couple of nights with him at his

12   house.  My aunt, she had a birthday party.  She actually at the

13   time lived around the corner from us, so he basically came to

14   our house and got us and we went to my aunt's party.

15   Q.   Did you at some point later learn that he had been

16   re-arrested?

17   A.   Yes.

18   Q.   Did you learn at some point later what he'd been re-arrested

19   for?

20   A.   It was like maybe -- kind of like years later, because this

21   was hidden from us.  I wasn't directly told what my father was

22   in jail for, so I really didn't know.  I just knew that he was

23   back in jail.

24   Q.   Okay.  Did you see any kind of identification card or

25   anything after your father was re-arrested in 2004, and before

1    he was exonerated in 2010?

2    A.   Yes.   I was home with my mother, and she had like an I.D.

3    card of my father like on her dresser or something.   And it said

4    sex offender on there.   And I asked her a question about that,

5    and she never really gave me any specifics.   She just told me

6    that my father got into some trouble.

7    Q.   And did you ever talk to your father about that?

8    A.   No.

9    Q.   And during the years 2004 to 2010 before your Dad was

10   exonerated, did you have any communication with him while he was

11   in prison?

12   A.   Yes.   I went to visit him I would say maybe once or twice,

13   and he would always write me letters and birthday cards.   And I

14   remember one time I went to see him with my mother and my

15   younger sister, Jalisa.   And like he was playing in my hair, and

16   I -- I used this specific hair lotion for my hair.   And he told

17   me like if he ever went blind, he would remember the scent of

18   that to know who I was.

19   Q.   Ah, the scent of that?

20   A.   Yes.   Of my hair.

21   Q.   And I think the -- you told us a little bit already about

22   when your Dad was exonerated and released.   You saw him for the

23   first -- you were actually in court when that happened.   Tell me

24   about that.

25   A.   Basically we were in the courtroom, and they told us that he

1  would be released.  And we're thinking that he's going to be

2  released, but he didn't get released.  Actually he was still

3  locked up for I think a couple of days, maybe because of -- they

4  were still trying to give him probation for another charge that

5  he had, which I didn't understand.  But for whatever reason he

6  didn't get out.

7  Q.  And then when did you see him?

8  A.  About 3 or 4 days later when he first came home.

9  Q.  And how did he appear to you?

10 A.  He was a little smelly.  Like he was not really being taken

11 care of while he was there.  He was hungry.  He didn't appear to

12 be showered at all.  And he was excited to see us, my sisters

13 and my brother.  Hugging us really tight.

14 Q.  And have you -- since your Dad's release from prison in

15 2010, have you observed him struggle with any issues with regard

16 to being out here in the free world?

17 A.  Yes.  I think he sometimes sheltered hisself from people.

18 He's not really like trustworthy of a lot of people.  I think he

19 tries to keep hisself around his family, because our family is

20 really close with each other.  And I just feel like it's hard

21 for him to trust people that he doesn't know.  He's very

22 cautious about who he'll be around, and say stuff around, and do

23 things around.

24 Q.  And what about the relationship between yourself and your

25 father?  Has there been an adjustment period in that -- in your

1 relationship over the last 5 years?

2 A.  Yes.  I would say yes.

3 Q.  Were there -- tell me about that.  Or tell us about that,

4 sorry.

5 A.  Well, basically I think it's -- my Dad -- he's always wanted

6 a relationship with his children.  And him being gone sometimes

7 affects our communication.  Sometimes I might not see him as

8 much as he would like for me to.  Or as much as I would like to

9 see him.  Just because of I'm an adult now, so I'm free to go

10 see who I want to see.  And sometimes he might want to see me.

11 Might want to have lunch with me, and I'm busy doing something

12 that I want to do.  Or like I said, I'm in school.  He's been in

13 school.  So sometimes our schedules don't -- conflict together.

14 Q.  Did your father ever express any concern to you about what

15 you and your sisters thought of him being wrongfully convicted

16 of murdering a woman?

17 A.  Yes.  He's always said to me that he didn't do this.  As

18 long as I can remember, he's always said I didn't do this.  I

19 don't know how somebody could think that he would do this.

20 Basically because I've never seen my father do any harm to

21 anyone.  I might have seen him yell or raise his voice, but I've

22 never seen him physically attack anyone or any of that.

23 Q.  And did it appear to you that your father was concerned

24 about what you thought of him?

25 A.  Yes.  Most definitely, because he has 4 girls.  He has 4

1　children that are girls.  And like I said, I don't see my father

2　being this monster that they were saying that he was.

3　Q.  And what kinds of things -- well, let me ask you this.  Over

4　the course of the last 5 years have you seen your father more

5　often?

6　A.  Yeah, probably.  But like I said, I've been around my father

7　all my life.  So when I was able to see him, I would see him.

8　Q.  And what kinds of things -- how often do you see your father

9　now?

10　A.  Probably every other day.

11　Q.  And what kinds of things do you do together?

12　A.  He helps me do all type of stuff.  He might help me work on

13　my car.  Just recently I was having some problems with my

14　refrigerator.  It was crazy.  But he was helping me with that.

15　Goes to the grocery store all the time.  Like I said, we go to

16　lunch.  Like we always meet up at my grandmother's.  She's a big

17　cooker.  She cooks all the time for our entire family there.

18　Pretty much -- he takes me to school sometimes.

19　Q.  And so have you observed your father interacting at family

20　gatherings?

21　A.  Yeah.

22　Q.  What have you observed?

23　A.  Basically always interacts with his children, his sisters,

24　and his sons, and my grandmother.

25　Q.  Have you seen him interact with your son?

1    A.   Yeah.

2    Q.   What kinds of things does he do with your son?

3    A.   He is the proudest grandfather.

4            MS. HOFT:   Thank you.   Miss Yuan might have some

5    questions for you.   That's all I have.

6            THE WITNESS:   Okay.

7                    **CROSS EXAMINATION**

8    **BY MS. YUAN:**

9    Q.   Good afternoon, Miss Avery.

10   A.   Good afternoon.

11   Q.   You said you are 24 years old?

12   A.   Correct.

13   Q.   What is your birthday?

14   A.   May 7th of '91.

15   Q.   Do you know how old you were in March of 1998?

16   A.   Seven?

17   Q.   About 7 years old?

18   A.   Um-hum.

19   Q.   Yes?

20   A.   Yes.

21   Q.   And you testified that you lived with your father before?

22   A.   Correct.

23   Q.   When did you live with your father?

24   A.   I was probably about 4, 5 years old.

25   Q.   So your father lived at home with you and your Mom?

```
1    A.  Yes.
2    Q.  And also your siblings?
3    A.  Yes.
4    Q.  You testified -- I believe you were asked if you -- you
5    testified about your father being in prison from 2004 to 2010?
6    A.  Yes.
7    Q.  And you were there when he was released in 2010?
8    A.  Yes.
9    Q.  But you also testified to knowing that your father had been
10   in prison before 2004?
11   A.  Yes.
12   Q.  Was he in prison in 1998?
13          MS. HOFT:  Objection.  Form.  Foundation.
14          MS. YUAN:
15   Q.  Do you know if your father was in prison in 1998?
16   A.  Not sure.
17   Q.  Do you know if your father was around in the summer of 1998?
18   If you remember.
19   A.  I don't remember.
20   Q.  So when you were 7 years old, do you remember seeing your
21   Dad around?
22   A.  I'm not sure.
23   Q.  You had said that you knew that your Dad was in prison
24   before 2004.  Do you know how long he was in prison?
25   A.  Well, maybe like 2 years?
```

```
 1   Q.   Sorry?  What was that?

 2   A.   Maybe 2 years?

 3   Q.   Two years?  So you're not aware that your Dad was in prison

 4   from 1998 until 2004, when he was released?

 5   A.   Yeah.

 6   Q.   You do know that?

 7   A.   Yes.

 8   Q.   Okay.  So that's about 6 years.  So that would have been

 9   when you were about 7 years old until, what?  When you were

10   about 13, is that correct?

11   A.   Correct.

12   Q.   Did you speak with your Dad during that period of time?

13   A.   Yes.

14   Q.   How would you communicate with your Dad?

15   A.   Like I said, he would send me birthday cards.  Write me

16   letters.

17   Q.   And any other type of communication?

18   A.   I'm pretty sure I went to visit him.

19   Q.   Did you visit your Dad in prison?

20   A.   Yes.

21   Q.   And that's when you were between 7 and 13.  You visited him

22   at that age?

23   A.   Yes.

24   Q.   How many times?

25   A.   Well, about once or twice.
```

1   Q.  Once or twice?

2   A.  Um-hum.

3   Q.  Yes?

4   A.  Yes.

5   Q.  And would that be when he would have been in Wisconsin?

6   A.  Yes.

7   Q.  You never left Wisconsin to visit him?

8   A.  No.

9   Q.  Do you know why he was in prison back from 2008 to 2000 --

10  I'm sorry.  1998 to 2004?

11  A.  At the time I wasn't aware of it.  I'm aware of it now, yes.

12  Q.  When did you become aware of it?

13  A.  After -- after he was exonerated.

14  Q.  So after 2010?

15  A.  Um-hum.

16  Q.  Yes?

17  A.  Yes.

18  Q.  From the time that your Dad was in prison in 1998 to 2004,

19  do you think that's affected your relationship with him?

20  A.  Yes.

21          MS. YUAN:  I have nothing further.  Thank you for your

22  time.

23          MS. HOFT:  I have no further questions.  Thank you.

24          THE COURT:  All right.  You may step down, Miss Avery.

25          MR. ELSON:  Plaintiff calls Dennis Waller.  I'll go

1   get him, Judge.

2           THE COURT:  Okay.

3           **DENNIS WALLER**, called as a witness, having been first

4   duly sworn, on oath testified as follows:

5           THE CLERK:  Please state your full name and spell your

6   last name for the record.

7           THE WITNESS:  Dennis Keith Waller, W-A-L-L-E-R.

8                   **DIRECT EXAMINATION**

9   BY MR. ELSON:

10  Q.  Mr. Waller, are you what's referred to as a Police practices

11  expert?

12  A.  Yes, sir.

13  Q.  And can you tell us your educational background?

14  A.  I have a Bachelor of Science Degree in Police Administration

15  from Michigan State University.  I have a Master's Degree in

16  Public Administration from Florida International University.  I

17  have also received over 3,500 hours of law enforcement training

18  over a lot of years.

19  Q.  Have you had a career in law enforcement?

20  A.  I have.

21  Q.  Tell the jury about your career in law enforcement.

22  A.  I served in a variety of positions.  Police Officer, Field

23  Training Officer, Detective, Sergeant, Lieutenant, Department

24  Training Officer, Chief of Police in two different

25  jurisdictions.  I've also been a certified law enforcement

1  instructor in Michigan, Florida, North Carolina, and Wisconsin.

2          I was a director of a regional Police training

3  academy.  I've also received specialized certifications in law

4  enforcement as a Police firearms instructor, defensive and

5  arrest tactics instructor, O.C. or pepper spray instructor.

6  P.S.D.I. instructor.  Psychomotor skills design instructor.

7          I've been certified as an assessor for the commission

8  on accreditation through law enforcement agencies.  I also

9  achieved the status of a diplomat on the American Board for Law

10 Enforcement Experts, and a fellow of the American College of

11 Forensic Examiners.

12 Q.  What was your last position in law enforcement before you

13 retired?

14 A.  Chief of Police.

15 Q.  And when was that?

16 A.  I left the Ripon Police Department in 1987, but then I

17 served as Interim Chief at the University of Wisconsin

18 Platteville, where I was teaching in the Criminal Justice

19 Department.  Served as the Interim Chief for about five or six

20 months in 1989.

21 Q.  What sorts of cases did you investigate during your years in

22 law enforcement?

23 A.  A wide variety.  I was lead investigator on a couple of

24 homicides, and assisted in investigating probably a half a dozen

25 armed robberies, burglaries, that sort of thing.  I've also

1  investigated Officer misconduct, excessive force, that sort of

2  thing.

3  Q.  Would it be fair to say that over the course of your career

4  in law enforcement, and your career since law enforcement, that

5  you've developed an expertise in how to conduct criminal

6  investigations?

7  A.  Yes.  Both during -- I guess before, during, and after.

8  Yes, sir.

9  Q.  And you mentioned that you provide training to law

10  enforcement?

11  A.  I have in the past.  And that included criminal

12  investigation and crime scene investigation at the recruit

13  academy level, and then some specialized investigative training.

14  Either in-service or advanced training.

15  Q.  Okay.  Now I'd like to turn to your present consulting work.

16  Can you tell the jury a little bit about that what your

17  consulting work consists of?

18  A.  I serve as a consultant primarily in the field of Police

19  practice.  So in cases involving Police activities that result

20  in litigation, such as in this case.  I've been retained over

21  600 times in 36 states and the District of Columbia.  I have

22  been retained both by Plaintiff's counsel, the people who are

23  suing.  And defense counsel, the people who are defending the

24  Police.  I've been retained by the Attorney General's Office in

25  Pennsylvania, and Texas, and Arizona to serve as a consultant

1  and expert witness.

2           The three primary areas that I work in are use of

3  force, investigative issues, and vehicle pursuits.  And then

4  also training and policy matters.

5  Q.  You mentioned that you've been hired by both the Plaintiff's

6  side and the defense side.  What would you say is the proportion

7  between the two of them in terms of the consulting work that you

8  do?

9  A.  In my early years it was a preponderance on the defense

10  side, because my mentor, who got out of the consulting business,

11  did probably 95 to 98 percent defense work.  And then over the

12  years it has changed a bit, so I would say that it's probably

13  now -- in total it's probably 40, 45 percent defense, and 55 to

14  60 percent Plaintiff.  It varies by State and even area of the

15  State.

16  Q.  Now, if an attorney brings you a case, tell the jury what

17  steps you take to review it?

18  A.  Well, typically I'll speak with the attorney and get a

19  thumbnail sketch.  And if it's something -- an area, a subject

20  matter where I feel comfortable with, and I think I can be of

21  assistance, I would tell them that assuming the facts are

22  consistent with how you've presented it -- because sometimes

23  attorneys have ownership of a case and don't see it

24  objectively -- I said then there's -- I can probably be of

25  assistance.

1          I then review the facts, basically the information

2    that is provided to me by the attorneys, and make a

3    determination -- an objective assessment of those facts and

4    advise the attorneys of my opinions.  Now, sometimes they use it

5    and ask me to write a report.  Sometimes they say well, your --

6    your opinions aren't helpful to our case, and so then they tell

7    me goodbye and that's the end of the relationship.

8    Q.  How much of this expert testimony work do you do in a year?

9    A.  It varies.  You know, there's good years and slow years.  I

10   generally probably review somewhere between 20 and 30 cases.

11   Some of those are relatively simple, and process in and out in a

12   fairly short amount of time.  Others are very complex, and I

13   might be involved in them -- developing opinion for -- and spend

14   literally hundreds of hours reviewing materials.  So it varies.

15   So there is no, say, average case.  But I typically bring in

16   about 20 or 30.  And some of those process quickly, others take

17   a long time to review and come up with an assessment of the

18   facts.

19   Q.  And you mentioned that it can be a lot of work to get into a

20   case and review the material.  How are you compensated for this

21   work?

22   A.  I receive an initial retainer which covers the first

23   20 hours.  That's $4,000.  And then it's 200 an hour after that.

24   Q.  And what is your compensation in this case, sir?

25   A.  I believe to date it's been about 8,900.  Somewhere -- to

1    900.   Somewhere in there.

2    Q.   And can you tell the jury what you've reviewed in this case

3    generally?  An overview, without being specific about every

4    single thing you've reviewed?

5    A.   I had 3 or 4 binders that are about as thick as this.  I

6    attempted to compile it down to -- for ease of carrying and

7    locating.  But it was the depositions of the various Milwaukee

8    Police Department Detectives who were involved in the

9    investigation of this case; the Milwaukee Police Department

10   reports; various documents that related to the investigation.

11   Documents that were related to the recantation of the jailhouse

12   informants who testified.  There were documentation of other

13   jailhouse informants that offered to testify that they didn't

14   use or even follow-up on.

15          I looked through the Milwaukee Police Department

16   policies and directives as it related to the use of Police

17   informants.  And then I also relied upon my -- I'd been involved

18   in this -- in consulting since 1988, and so I relied on the

19   totality and my training, education, and experience in law

20   enforcement as a Police trainer, as a Police educator, and also

21   as a consultant.

22          So I've reviewed a lot of other cases since 1988 that

23   involved the use of informants and things such as that, and

24   investigative procedures.  So -- and I maintain a library in my

25   office of current standards and also past standards.  Hasn't

1  really changed that much.  And also various textbooks that are
2  relevant to the issues.
3  Q.  And does the approximately $9,000 that you've been paid in
4  this case, does that feel fair to you for the amount of work
5  you've done?
6  A.  Yes.  I mean, consistent with the amount of materials that I
7  had to review and the drafting of the report.
8  Q.  Okay.  And would you say that if you weren't doing this
9  work, you would have had other opportunities professionally that
10  you could have done?
11  A.  Absolutely.
12  Q.  Okay.  Now, once you reviewed the materials in this case,
13  did you form opinions and write a report?
14  A.  I did.
15  Q.  And let's talk about some of the opinions and concepts in
16  your report.  One of the fundamental concepts referenced in your
17  report is the purpose of a homicide investigation.  Can you
18  explain to the jury the purpose of a homicide investigation?
19  A.  Well, the purpose of a homicide investigation, or any
20  investigation, for that matter, is to determine the truth about
21  what happened.  And -- so you have to keep an open mind.  You
22  have to be willing to accept things that don't necessarily
23  comport with the theory that you may have developed.  Keep it
24  open and consider everything that comes in, and then do
25  follow-up with that to determine what you can prove and what you

1    can't prove.  And then be honest with it.

2    Q.  One of the other concepts referenced in your report is this

3    idea of Detectives developing and considering only evidence that

4    fits their theory of the crime.  Kind of a tunnel vision type

5    concept.  Can you explain that to the jury?

6    A.  Well, that's a trap that Detectives sometimes -- or

7    investigators sometimes fall into.  They make a decision that

8    this occurred in a certain way, and will only consider things

9    that support their initial opinion.  And anything that doesn't

10   support that -- instead of investigating it further, they just

11   disregard.  Or actually, you know, don't look at it any further.

12   Q.  And the primary focus of your report, your opinions in this

13   case, is the use of jailhouse informants.  Can you generally

14   tell the jury about the use of jailhouse informants and what

15   that involves?

16   A.  In law enforcement they're considered the lowest of the low.

17   It's a last resort effort if nothing else is available.  And if

18   you resort to that -- I mean, generally they expect something in

19   return.  They have nothing to lose.  They're locked up.  So

20   they're going to attempt to give you information -- a Detective

21   information that he or she wants in return for some favor.  A

22   sentence reduction, consideration, maybe dropping a charge.  And

23   so that's why they offer their services.

24          You know, there are other types of informants.

25   Shopkeepers.  You know, the minister at the church and

1   everything who -- a businessman.  An average working Joe who may

2   see something as they're going to and from, you know.  And will

3   follow their civic duty and call in and tell the Police what

4   they observed.

5           Jailhouse snitches are not like that.  They're people

6   who are locked up many times for extremely serious crimes, and

7   they're looking for any way -- in any way, manner, or form that

8   they can to get some favorable treatment to help them out of

9   their situation.

10  Q.  Now, let's talk about the investigation of the Maryetta

11  Griffin homicide.  I'm going to show you a timeline to start

12  off.  And this is Plaintiff's Exhibit 4, I believe.

13          MR. SMOKOWICZ:  What's the number of that?

14          MR. ELSON:  4.

15          MR. SMOKOWICZ:  Thank you.

16          MR. ELSON:

17  Q.  Now, one of your opinions in this case has to do with this

18  pattern of homicides that occurred on the north side of

19  Milwaukee.  Is that right?

20  A.  Correct.

21  Q.  Can you tell the jury your opinion about the pattern of

22  homicides in Milwaukee, and how the Maryetta Griffin homicide

23  fit into that pattern, and your opinions on the steps that

24  Detectives in the Griffin homicide investigation took or didn't

25  take in relation to that?

1  A.  There were a number of murders in that general area of the

2  city, and specifically on about the 300 block -- or 3000 block,

3  excuse me, of North 7th Street.  I think there were 4 or 5 in

4  very close proximity, graphically speaking, that occurred over

5  several years.  The common link between them was the victim was

6  a prostitute and/or involved as a drug abuser.  So there was a

7  link between the prostitution and the abuse of drugs, and the

8  distribution or obtaining the drugs.

9       So over a period of years law enforcement was finding

10 bodies.  The manner of death was very similar.  You had

11 strangulation.  In a few cases the individual was also stabbed

12 or cut.  In most of those cases, there was an indication that

13 the victim was sexually abused.

14      So I was involved in another one of these cases and

15 have reviewed all -- pretty much to a certain extent the

16 investigation conducted by the Milwaukee Police Department into

17 these various homicides.  And the one thing that I determined

18 was that they never looked at -- they developed a suspect.  They

19 never looked at that suspect either during the investigation or

20 afterward to try to link the suspect with these other homicides.

21 To me that was a no-brainer.

22 Q.  And I want to show you the other part of Exhibit Number 4,

23 which is the -- includes a map.  Can you reference on this

24 Exhibit what you are speaking about in terms of the location of

25 these homicides?

1   A.  Well, I did the same thing from the various homicide reports
2   and information that I had with this and in an accompanying
3   case, and developed a map to look at so I could visualize where
4   these homicides were occurring and when they were occurring that
5   were so similar.
6   Q.  Now, as you mentioned before, the focus of your report is
7   the handling of the jailhouse informants in the context of the
8   Maryetta Griffin homicide.  And there's been testimony in this
9   case that Detectives Armbruster, Heier, Hein and Hernandez
10  obtained statements and dealt with three jailhouse informants.
11  Can you tell the jury your opinion on the way the jailhouse
12  informants were handled in this investigation?
13          MR. SMOKOWICZ:  Your Honor, if we are moving beyond
14  this question of the map here, I'd ask that that be taken down.
15          THE COURT:  All right.
16          MR. SMOKOWICZ:  Thank you.  I apologize for the
17  interruption between question and answer.
18          THE WITNESS:  The first step, if you're going to use a
19  jailhouse informant, would be to try to determine where they got
20  their information.  And is that information consistent with any
21  other information that was readily available?  In this
22  particular case, there were I think at least 6 jailhouse
23  informants who came forth and volunteered that somebody who --
24  had made a confession or statement that they were involved in
25  the Griffin homicide, one of which wasn't Mr. Avery.

1          So that they -- but they didn't use those three -- or

2     didn't explore that any further.  But what they should have done

3     was -- and what you would do if you were an investigator using

4     an informant, is to attempt to determine their trustworthiness

5     and their reliability.  And how you do that is -- because these

6     people aren't known for truthfulness -- is you look at what --

7     where did they get their information?  Or what past acts did

8     they use to establish reliability?  Did they give information in

9     the past to law enforcement that assisted in the apprehension or

10    prosecution of a criminal case?

11         And so you attempt as best you can to determine their

12    reliability.  Also what is their motivation?  I mean, the

13    obvious motivation here was for a reduction in their sentence

14    or, you know, getting some time off in return.  And one of the

15    Detectives indicated -- I think it was Armbruster -- that when

16    he talked to Kent the first time, about 5 times on the phone

17    before they went out to Oklahoma to talk to him in person, he

18    said hey, I want my sentence reduced.  I want your help.  I want

19    to do this.  So clearly that person is saying I'm willing to do

20    anything if you give me something in return.  That's not

21    establishing trustworthiness or reliability.

22         MR. ELSON:

23    Q.  Let's talk about Antron Kent.  Were the statements that the

24    Detectives obtained from Antron Kent obtained in a way that a

25    reasonable Police Officer legitimately trying to get to the

1  truth would obtain a statement, in your opinion?

2  A.  No.  I think that they would have investigated it further.

3  You want the informant to provide you with details that were

4  readily available.  And that wasn't the case here.  There's an

5  indication that Mr. Avery had newspaper articles and the

6  discovery materials, the Criminal Complaint from his conviction

7  for being involved in drugs with him in his cell.  And Kent was

8  a pod-mate, meaning that he was in that general -- assigned to

9  that general area of the prison where Mr. Avery was.  And

10 nothing in the information he provided wasn't already mentioned

11 in the newspaper article or in the discovery materials that

12 Mr. Avery had.  That -- that was a -- would be a big warning

13 bell.  First, I'll help you if you help me.  And secondly, what

14 information do you have that couldn't be obtained from another

15 source?

16 Q.  In your review of the materials with regard to Antron Kent,

17 did you come across any evidence that in your mind indicated

18 that he was given information or suggested anything related to

19 the homicide of Maryetta Griffin?

20 A.  Yes.  The -- what I found really fascinating was that they

21 never took a recorded or a sworn statement from him, at least

22 that was reflected in the files, to pin him down.  Because these

23 people, the jailhouse informants are notorious for changing

24 their mind or trying to negotiate for more time at the end.  But

25 that wasn't done.  Instead, I think that they're including the 5

1   or more telephone calls.  There were I believe 4 visits to

2   Antron Kent.

3           And then the -- interestingly enough, in the last

4   visit they got additional information.  And they -- the

5   additional information was recorded as Avery told us that he

6   moved the body to that area of the city.  Because the F.B.I. was

7   investigating a series of murders there, and they would just

8   think that that body belonged to that other investigation.  Now,

9   that wasn't in any material that was widely disseminated.  The

10  Milwaukee Police Department in this case or another case had --

11  or the multitude of cases that had been unsolved had requested

12  the F.B.I. assistance in a program called ViCAP, violent

13  criminal apprehension program, or something similar.  And where

14  the F.B.I. would use sophisticated computers and things to

15  compare and link all these different cases and facts so that

16  they could look for some commonality that wasn't known.  Avery

17  didn't know that.  And Antron Kent didn't know that.  Who knew

18  that?  The Police.

19          So the Police had already admitted giving Kent some

20  information.  The name of Lorenzo Frost.  They also obviously

21  gave him that information, which Detective Gulbrandson stated in

22  his deposition about the F.B.I., to try to firm up his statement

23  before it went to court.

24  Q.  Let's talk a little bit about the other jailhouse informant.

25  One of the other jailhouse informants, Jeffrey Kimbrough.  Same

1  question.  Were the statements that the Detectives obtained from

2  Jeffrey Kimbrough -- were they obtained in a way that a

3  reasonable Police Officer legitimately, trying to get to the

4  truth, would obtain a statement?

5  A.  No.  They only talked to him twice, I believe.  Once in

6  Oklahoma, and once in Appleton, Minnesota, where he was housed

7  for his offense.  And what I found disconcerting was that

8  Detective Hein, now Lieutenant -- excuse me, Heier, now

9  Lieutenant Heier, indicated he -- or admitted that he spoke to

10  Mr. Kimbrough 4 times before he testified.  But only one of

11  those times was recorded in his reports.  Why are you going to

12  talk to somebody multiple times?  You already documented what

13  they've said.  Unless you're coaching them.

14  Q.  Let's talk about the third jailhouse informant, Keith

15  Randolph.  Tell us your thoughts on the handling of Keith

16  Randolph by the homicide Detectives?

17  A.  Again, when they -- Detective Heier first met him, I believe

18  it was -- I have to look it up.  I believe it was 2001 or

19  thereabouts.  He was at the Public Defender's Office.  And

20  looking to -- let's -- let's make a deal.  And again, he didn't

21  have any other information that hadn't already been in the

22  newspaper.  It was very generalized.  And he brought that forth.

23  Now, my understanding -- and I didn't read the transcript of the

24  trial -- but from his statement recanting that he told the

25  Police -- or what he told the Police was true, indicated that he

```
 1   refused to testify, and that they -- he was surprised when they
 2   read in his statement.
 3              MR. SMOKOWICZ:  Your Honor, I would move to strike
 4   this as lacking foundation.  The witness has admitted he didn't
 5   read this trial testimony.
 6              MR. ELSON:  I think he's basing that answer on a
 7   document that he did review, Judge.  Which was an affidavit.
 8              THE COURT:  Let's find out so we can establish a
 9   foundation.
10              MR. ELSON:
11   Q.  What's the basis of the testimony you just gave?
12   A.  The affidavit that Mr. Randolph wrote or signed as a sworn
13   statement that he gave when he recanted his statement that
14   Mr. Avery may have confessed to him.
15   Q.  You were provided his affidavit in addition to the rest of
16   the materials that you reviewed?
17   A.  Correct.  I did.
18   Q.  Okay.  Let me ask you another question.  In terms of your
19   reliability and credibility of each of these informants, did you
20   form an opinion as to whether the Detectives who were involved
21   in dealing with each of them properly investigated their
22   credibility and reliability?  And you can start with Antron
23   Kent.
24   A.  No, they did not.  They didn't do anything to investigate
25   further.  They said well, I know we're -- I mean, Detective
```

1   Heier indicated he knew they were supposed to check further.

2   But he said no, we believe them. I believe them. So we'll let

3   it go at that.

4   Q.  And Jeffrey Kimbrough?

5   A.  Same thing. He was Kent's cellmate. So he was in the same

6   pod or general area. And he only indicated that he overheard

7   Avery confessing to Mr. Kent one time. But yet they -- you

8   know, in his subsequent recantation he indicated Kent came to

9   him and said look, I'm going to get some time off. Or try to

10  get some time off. You could get some time off, too, if you

11  back me up. And that's why he did that. But after he testified

12  against Mr. Avery, and Mr. Avery was wrongly convicted, he said

13  no, I lied when I did that.

14  Q.  And with regard to Keith Randolph, did you form an opinion

15  as to whether the Detectives who were involved with Keith

16  Randolph properly investigated his reliability and credibility?

17  A.  I believe he indicated that they were pushing him to tell

18  things that he wasn't aware of also.

19  Q.  Now -- and is that how a reasonable Police Officer would

20  conduct a homicide investigation, in your opinion?

21  A.  That's not how a reasonable, ethical, honest Detective would

22  conduct a homicide investigation consistent with their training

23  and standards.

24  Q.  Now, you noted in your report that some of the evidence that

25  you reviewed indicated that in the M.P.D. -- the Milwaukee

1  Police Department, homicides are sometimes cleared to boost the

2  clearance rate.  Can you tell the jury what you reviewed in that

3  regard, and what opinion you formed?

4  A.  Yes.  A Ricky Berms (phonetic), who was a homicide

5  Detective, Milwaukee Police Department.  And -- he made a

6  complaint before the Milwaukee Fire and Police Commission, a

7  formal complaint indicating that the standards for conducting

8  homicide investigations were being ignored in favor of simply

9  clearing cases.  And his -- and in fact one of -- within that

10  complaint to the Milwaukee Police and Fire Commission, he made a

11  specific accusation about Lieutenant Jessup (phonetic).  And he

12  said Lieutenant --

13       MR. SMOKOWICZ:  Your Honor, I'm going to object to

14  this as irrelevant.  Lieutenant Jessup is not a Defendant.  No

15  evidence that he was involved in this investigation.

16       MR. ELSON:  Judge, it's part of Mr. Waller's opinion,

17  which the Court dealt with in a motion in limine.  Was one of

18  his opinions, and it goes to the claims in this case.

19            THE COURT:  Let's have a sidebar conference on this.

20            (Whereupon a side-bar conference was held off the

21  record.  Upon conclusion of the side-bar conference, the

22  proceedings continued as follows:)

23       MR. ELSON:

24  Q.  You can continue with your answer.  We were discussing your

25  opinion concerning the homicide clearance rate in the Detective

1  Bureau.

2  A.  Detective Berms indicated that Lieutenant Jessup said do you

3  really care about these people?  These people are pieces of

4  shit.  All that I care about is clearances.  And Lieutenant --

5  or excuse me, Detective Berms subsequently was removed from his

6  position as a homicide Detective and sent to a position of

7  lesser status.

8  Q.  Now, Mr. Waller, are the stakes pretty high when it comes to

9  homicide investigations?

10  A.  Oh, definitely.

11  Q.  Can you explain why that is?

12  A.  If -- if you're investigating a homicide, it means there is

13  somebody who has taken a life.  A killer out there.  In this

14  case it involved a serial killer who killed -- pled no contest

15  to 7 homicides.  And there is similar or substantial evidence to

16  convict him in another 3 or 4 that he hasn't been charged with.

17  Now, if you don't do the right thing, don't conduct a proper

18  investigation, not only do you impact the person that you arrest

19  and send away to prison, but you also risk the lives in the

20  public who may be exposed to this killer.  And I know there was

21  at least one additional homicide because they didn't do it

22  right.

23        MR. ELSON:  No further questions, Judge.

24        THE COURT:  Cross examination.

25        MR. SMOKOWICZ:  Thank you, Your Honor.

1                    <u>**CROSS EXAMINATION**</u>

2    **BY MR. SMOKOWICZ:**

3    Q.  Good afternoon, sir.

4    A.  Good afternoon, Mr. Smokowicz.

5    Q.  Mr. Waller, in performing your work as an expert witness for

6    the Plaintiff in this case, you submitted a curriculum vitae at

7    some point, correct?

8    A.  Yes, sir.

9    Q.  And I'm going to show you what's been marked as

10   Exhibit 1053.  Do you recognize that document, sir?

11   A.  Yes, I do.

12   Q.  That is, in fact, the curriculum vitae that you prepared and

13   submitted in this case for yourself, correct?

14   A.  Yes.

15   Q.  And as of the time of submission -- which was maybe a little

16   bit more than a year ago I would say?

17   A.  I'd have to look at the date, but I believe it was like in

18   February or March when I submitted the report.

19   Q.  Okay.  This curriculum vitae was correct as of that time and

20   complete and accurate, true?

21   A.  Yes.

22           MR. SMOKOWICZ:  Your Honor, I'm going to move

23   Exhibit 1053.

24           MR. ELSON:  No objection.

25           THE COURT:  The Court will receive it.

1        MR. SMOKOWICZ:

2    Q.  Mr. Waller, before I forget, how old are you?

3    A.  66.

4    Q.  Mr. Waller, I'm going to have to retrieve the original from

5    you so I can put it on the ELMO here.  Thank you.

6    A.  Certainly.

7    Q.  Now, you testified -- strike that.  On the first page of

8    this Exhibit it appears to be listing your professional

9    experience, correct?

10   A.  Yes.

11   Q.  And that's actually the heading that -- I'll bring it down a

12   little bit so the jury can see it.  That's the heading of those

13   various items after the -- after the first one, which is

14   consultant, slash, expert witness.  Correct?

15   A.  Police practices consultant, slash, expert witness, yes,

16   sir.

17   Q.  And in terms of consultant and expert witness, it states law

18   enforcement matters related to use of force, personnel,

19   training, vehicle pursuits, and the assessment of departmental

20   administration, policy, procedures and practice.  Correct?

21   A.  Yes.

22   Q.  Now, let's go down here a little bit.  This goes in

23   chronological order from the bottom to the top in terms of the

24   most distant in time, to the most recent in terms of your actual

25   positions as a law enforcement Officer, correct?

1   A.  Correct.

2   Q.  So your first position was in the Sheriff's Department in --

3   around Ann Arbor, Michigan, right?

4   A.  Well --

5   Q.  Is that what's stated here on this resume?

6   A.  That's what's stated, correct.

7   Q.  And that's 1970 to '71, correct?

8   A.  Yes.

9   Q.  And your next position in law enforcement was as a Regional

10  Police Manager for the Southeast Michigan Council of Governments

11  in '70 and '71 as well, correct?

12  A.  Well, that was my full time position while I worked part

13  time with the Sheriff's Department.

14  Q.  So in 1970 to '71 you were only a part time Sheriff's

15  Department member, right?

16  A.  Correct.

17  Q.  And that your position was a Deputy Sheriff?

18  A.  I'm sorry?

19  Q.  Was the position as a Deputy Sheriff?

20  A.  Correct.

21  Q.  And your next position was not in Michigan, but in Florida,

22  correct?

23  A.  Yes.

24  Q.  And you held that position for one year?

25  A.  Actually it was about -- between a year-and-a-half and two

```
 1  years.
 2  Q.  Well, it says 1971 to 1972, right?
 3  A.  Well, that's two fiscal years, so --
 4  Q.  So in 1971 to 1972 you were a uniformed Police Officer in
 5  the Metro Dade Police Department in Miami, Florida, is that
 6  right?
 7  A.  Correct.
 8  Q.  Then the next position that's listed is as a Carroll
 9  Management Company Investigator from 1973 to 1974.  Is that
10  correct?
11  A.  Yes.
12  Q.  And that's not in -- you weren't a sworn Police Officer at
13  that time in that position, were you?
14  A.  No, I was not.
15  Q.  Your next position is in the South Miami Police Department
16  as a Sergeant, correct?
17  A.  I was with South Miami, correct.
18  Q.  And that's a uniform position, correct?  You wore a uniform
19  every day?
20  A.  No.  I served in a variety of positions.  I was a -- started
21  off as a Patrol Officer.  I was then a field training officer,
22  then Detective, then promoted to Sergeant, and served as an
23  acting Lieutenant, and then Detective Sergeant before I left.
24  Q.  Well, this only lists you as a Sergeant in that Department,
25  right?
```

1  A.  Correct.

2  Q.  And it lists you as in that Department for only two years.

3  From 1974 to 1976, correct?

4  A.  Believe it's two-and-a-half.  That was January of '74 to I

5  believe July of '76.

6  Q.  And in that two year time frame you're saying you went from

7  Police Officer, to Detective, to Sergeant, to -- what was the

8  last Sergeant position you had?

9  A.  I was -- went back to be the Detective Bureau.

10  Q.  As a Detective Sergeant?

11  A.  Detective Sergeant.

12  Q.  So you had, as a Detective, something less than two years of

13  actual experience, is that correct?

14  A.  Correct.

15  Q.  And in that position, that was in 19 -- what?  '74?  Or '75?

16  Or '76?  Somewhere in that time frame?

17  A.  Correct.

18  Q.  So it's been 40 years since you have investigated anything

19  as a Detective, correct?

20  A.  No, that's not correct.

21  Q.  Well, let's look at the next one, then.  Coordinator,

22  criminal justice program, Craven Community College in New Bern,

23  North Carolina, from 1976 to 1978.  That was your next law

24  enforcement position?

25  A.  Wasn't law enforcement, although we did provide training for

1    law enforcement.

2    Q.  So in that position -- again, you did not work as a sworn

3    law enforcement Officer, correct?

4    A.  That's correct.

5    Q.  Your next position as a sworn law enforcement Officer was as

6    a Lieutenant in the North Carolina State Fairgrounds Police

7    Department in Raleigh, North Carolina, is that correct?

8    A.  It is.

9    Q.  And you were a Lieutenant in the Fairgrounds Police

10   Department for, what?  Three, four years?

11   A.  Correct.

12   Q.  And I assume that in that position you did not perform the

13   function of being a Detective?

14   A.  At times, but very little follow-up.

15   Q.  Let me ask it this way.  Did you have -- did you have -- did

16   you have a title of Detective at any time, even though it's not

17   listed here, in the Fairgrounds Police Department?

18   A.  No.  I was Lieutenant, slash, Executive Officer.

19   Q.  Is it fair to say that during those 3 years there were few

20   or no homicides committed at the North Carolina State

21   Fairgrounds?

22   A.  That is correct.

23   Q.  The next position, again, that you had was not as a sworn

24   law enforcement Officer.  It was as a training individual,

25   correct?  Director of training?

1   A.  I was Director of Law Enforcement Training.  I operated a

2   regional Police training academy in Raleigh, correct.

3   Q.  So that was at Wake Technical College in Raleigh, is that

4   correct?

5   A.  I'm sorry?

6   Q.  That was at Wake Technical College in Raleigh, North

7   Carolina?

8   A.  That is correct.

9   Q.  And that was in 1978 to 1970 -- 1983?

10  A.  Correct.

11  Q.  Incidentally, Mr. Waller, where were you born?

12  A.  Where?

13  Q.  Where.

14  A.  Garden City, Michigan.

15  Q.  And where did you go to high school?

16  A.  Ypsilanti, Michigan.  Ypsilanti High school.

17  Q.  So you are not a Wisconsin native, correct?

18  A.  That is true.

19  Q.  But you did, finally, in your law enforcement career come to

20  Wisconsin in 1983, correct?

21  A.  Correct.

22  Q.  And that was to be the Chief of the Ripon Police Department,

23  correct?

24  A.  Yes.

25  Q.  And you held that position for 4 years, correct?

1    A.   Little over 4 years.

2    Q.   And that was from 1983 to 1987, correct?

3    A.   Yes.

4    Q.   And in the position of Chief of Police of the Ripon Police

5    Department you commanded approximately how many law enforcement

6    Officers in 1983 to 1987?  Would that be somewhere less than 50?

7    A.   Oh, yeah.  Approximately 16 sworn.

8    Q.   Sixteen sworn Officers?

9    A.   Yes.

10   Q.   And of those 16 sworn Officers, how many of them were

11   Detectives?  Held the rank of Detective?

12   A.   I had one basically full time investigator.

13   Q.   And was he called or she called an investigator?  Not a

14   Detective?

15   A.   That's semantics, but yes.

16   Q.   Uniform or not uniform?

17   A.   Mostly -- well, pretty much non-uniform.

18   Q.   Okay.  And in those four years, how -- the City of Ripon.

19   Is it smaller than 50,000 people at that time?  In 1983 to 1987?

20   A.   Yeah.  Approximately 7,500 to 8,000 population.

21   Q.   So 7,500 to 8,000 total population in the City of Ripon?

22   A.   Well, plus we had Ripon College, which added another 800 or

23   a thousand.  So somewhere in there.

24   Q.   So you had perhaps under 10,000 people living within your

25   jurisdiction at that time?

1  A.  We did.

2  Q.  And during the period of time from 1983 to 1987, is it fair

3  to say that there were no -- or no homicides in the City of

4  Ripon that were investigated?

5  A.  Well, we investigated a number of deaths.

6  Q.  I'm asking you whether there were any homicides?

7  A.  Well --

8  Q.  I'm not asking about farm accidents.  I'm not the asking

9  about people who may have been injured in an industrial

10  accident, or falling down a large grain elevator.  I'm asking

11  homicides.

12  A.  Okay.  By the strict definition, I think there were at least

13  two.  And they were subsequently determined to be suicides.  But

14  they were shooting deaths, so they were investigated as

15  homicides.

16  Q.  Okay.  I take it that in those two suicides there was no

17  cause to ever talk to any jailhouse informants, correct?

18  A.  Correct.

19  Q.  Your next position was with Kevin Parsons and Associates in

20  1987 to 1988 as Vice President of Litigation Support Service?

21  A.  Correct.

22  Q.  And in that position in 1987 to 1988 you were serving

23  essentially as an expert witness, correct?

24  A.  No, that's not correct.

25  Q.  You were serving as a consultant?

1   A.   That's when I first started consulting.  Kevin Parsons or

2   Dr. Parsons was one of the premier experts on use of force in

3   the country.  And he was leaving that to pursue other interests,

4   so he was -- served as my mentor and he also referred cases to

5   me.  So that started as a side line in 1988.

6   Q.   And his expertise was in the area of use of force, correct?

7   A.   I'm sorry.  I'm having trouble hearing you.

8   Q.   His expertise -- and I don't know what the problem is with

9   the microphone here -- but his expertise was in the use of

10  force, correct?

11  A.   Correct.

12  Q.   And is that where primarily your work was done on the

13  defense side of civil litigation matters in that one year time

14  frame?

15  A.   In the what?

16  Q.   In that one year or two year time frame?

17  A.   No.  Actually I only did I think one case in 1988 as an

18  expert witness, and that was my first one.

19  Q.   And A.P.I. in Milwaukee, Wisconsin, 1991, 1992, regional

20  manager, principal investigator.  Is that a private

21  investigation firm?

22  A.   It is.  Or was.

23  Q.   And in 1988 to '90 you worked for you said 6 months as -- in

24  a position as director -- interim director of the University of

25  Platteville Police Department, right?

1    A.   The Campus Police Department.  I was the director.

2    Q.   And the City of Platteville has its own Police Department,

3    does it not?  At that time?

4    A.   It does.

5    Q.   And in addition to that -- that's Grant County, isn't it?

6    A.   Correct.

7    Q.   And Grant County has its own Sheriff's Department, does it

8    not?

9    A.   It does.

10   Q.   And in a rural jurisdiction like that, primarily if there is

11   a homicide, murder investigations are done by someone in the

12   Sheriff's Department, correct?  Or they might even farm it out

13   to the State Attorney General's Office, true?

14   A.   Well, it would depend where the homicide occurred.  If it

15   was -- occurred in the City of Platteville, then the Platteville

16   Police Department in all probability would have handled the

17   initial investigation.  And they may or may not seek assistance

18   from the State.  The same way if it occurred in the

19   unincorporated part of the County.  The Sheriff's Department

20   would initiate the investigation, and then they may or may not

21   request assistance from the State.

22   Q.   But in any event, presumably there were no homicides that

23   were -- had to be investigated in that 6 month time frame at the

24   University of Platteville.  Or Wisconsin Platteville, correct?

25   A.   Correct.

1    Q.  And your experience, your work since 1988 to the present,

2    has been as a consultant-slash-expert witness, slash certified

3    legal investigator, correct?

4    A.  Sure.  I've done consulting, and expert witness testimony,

5    and done investigations since that time.

6    Q.  Do you recognize this?  What's been explained here as a

7    portion of the last page of that resume?  Of your resume?

8    A.  Yes.

9    Q.  And focussing on the portion that's labeled professional

10   designations, the first sub-grouping that you have there is

11   Certified Police Instructor, correct?

12   A.  Correct.

13   Q.  And the last time you were certified as a Police instructor

14   in Wisconsin was 1985, correct?

15   A.  No.  That's when I -- I think I received the certification.

16   I continued doing training in law enforcement until '91 '92, at

17   that time period.

18   Q.  So the last time you've done any law enforcement training is

19   in 1991 or 1992.  Is that what you're saying?

20   A.  Correct.

21   Q.  So that's been, what?  14, 15 years?

22   A.  I'd say it's more like 22 or 23.

23   Q.  23.  Okay.  And in terms of your certifications there,

24   you're certified as a Police defensive tactics instructor,

25   correct?

1   A.  Correct.

2   Q.  And you're certified as a psychomotor skills design

3   instructor, right?

4   A.  Yes.

5   Q.  And as a firearms instructor, right?

6   A.  Correct.

7   Q.  And as a legal investigator, right?

8   A.  Well, certified legal investigator.  There's one -- one of

9   approximately 100 in the country.

10  Q.  And you're certified as an O.C. instructor, right?

11  A.  Yes.

12  Q.  Okay.  And in terms of these certifications, there is no

13  individual certification here, what we have read through, the

14  rest of them, that focusses on acting or working as a Detective,

15  correct?

16  A.  Well, that's not correct.  I mean if you're --

17  Q.  I'm sorry.  You may have misunderstood the question.  Is

18  there any one here that focusses on -- we see here, for example,

19  firearms instructor.  That is obviously focussed on firearms,

20  right?

21  A.  Correct.

22  Q.  And O.C., that obviously -- O.C. stands for oleoresin

23  capsicum, right?

24  A.  It does.

25  Q.  And O.C. is -- it's a fancy way of saying the pepper spray

1  that the Police Officers have, right?

2  A.  Correct.

3  Q.  And you're an instructor.  You were certified as an

4  instructor back in 1992 as to how to use O.C., right?

5  A.  It's how to train Officers how to use it properly, correct.

6  Q.  There is no listing in here for you as a separate certified

7  instructor in the art of -- or the skill of being a Detective in

8  law enforcement, correct?

9  A.  Well, I disagree.  If you look at 2013, certified internal

10  affairs investigator.  It's certainly law enforcement

11  investigation, and it involves the same investigative techniques

12  and procedures as you would any other type.

13  Q.  We need to clarify that a little bit.  Internal affairs is

14  the investigation of law enforcement Officer misconduct, right?

15  A.  Alleged misconduct.  Or ensuring that the conduct was

16  appropriate for law enforcement, correct.

17  Q.  And you're not certified as an instructor in that, are you?

18  You've just been certified as an investigator, right?

19  A.  Correct.

20  Q.  There is no listing in your resume of you having a position

21  as a homicide Detective, correct?

22  A.  That is correct.

23  Q.  And there's also no listing in your resume of your being a

24  homicide department supervisor, correct?

25  A.  Correct.

1  Q.  Now, you mentioned that you did review the Milwaukee Police

2  Department investigative file relating to the homicide of

3  Maryetta Griffin in this matter, correct?

4  A.  Yes.

5  Q.  And that consisted of, what?  A thousand?  Two thousand

6  pages worth of documents?

7  A.  There were a lot of documents, correct.

8  Q.  You wouldn't -- you wouldn't disagree with a thousand or two

9  thousand pages worth of investigative materials, would you?

10  A.  I didn't count them or look at a page count, but I know it

11  was rather voluminous, correct.

12  Q.  Three or four inches thick?

13  A.  Yes.  At least.

14  Q.  At least.  Now, you mentioned before that you did review the

15  homicide investigation files related to certain other homicides

16  that were conducted by the Milwaukee Police Department, correct?

17  A.  Correct.

18  Q.  Which of those, if any of those, do you recall having any

19  investigations where jailhouse informants were relied upon?

20  A.  Well, in the wrongful conviction of --

21  Q.  Just a second.  I'm asking about which investigation, not

22  any kind of case or prosecution.  Which investigation that you

23  reviewed?

24  A.  The death of Jessica Payne.

25  Q.  Is that the only one?

1   A.  No.  I did --

2   Q.  I'm not asking if that's the only one you reviewed.  Just so

3   we're clear on this.  Is that the only one where you saw any

4   reports of any interviews of jailhouse informants where the

5   jailhouse informants were relied upon as witnesses?

6   A.  In the Jessica Payne homicide investigation there was

7   reference to --

8   Q.  Is there another one that was referenced in there?  Other

9   than this one?

10  A.  The Jessica Payne homicide.

11  Q.  But other than that one.  I'm sorry.  That's why I

12  interrupted, because I want to make sure.  We got Jessica Payne

13  in.  We got this one in, obviously.  Anyone else where

14  there's -- reports where there are jailhouse informants that are

15  relied upon.

16  A.  I don't recall the specifics in the other 7 or 8 of the

17  Walter Ellis homicides that were -- where I think that there was

18  another 1 or 2 possibly that may have -- involved some type of

19  use of jailhouse informants or informants.

20  Q.  You mentioned before that in your review in this case you

21  looked at certain Milwaukee Police Department policies about

22  Police informants.  Those were policies that related to

23  confidential informants, correct?

24  A.  I believe they also referenced jailhouse informants.  But I

25  can check for you, if you'd like.

1    Q.  Please do.  And please give me the citation to the number,

2    if you will.

3    A.  Confidential informants in drug search warrants.  3, slash,

4    970.00 guidelines.

5    Q.  And where is the reference in that jailhouse informants?

6    A.  I would say it would be under item "C" and item "D" in the

7    guidelines.

8    Q.  And that's in 3, slash, 970.00?

9    A.  Correct.

10   Q.  Thank you.  Now, you have testified earlier this afternoon

11   that jailhouse informants were sort of the lowest of the low, is

12   how you described it?

13   A.  That's accurate.

14   Q.  And that they often want something in return?

15   A.  Yes.

16   Q.  And it's true, Mr. Waller, that that would not come as a

17   secret to any lawyer representing a criminal Defendant who's

18   charged with a crime?

19   A.  The lawyer or the Defendant?

20   Q.  The lawyer.  Or the Defendant, for that matter.

21   A.  That what would -- I'm -- I don't understand your question.

22   Q.  Oh, sure.  Let me ask it again.  Recognizing your experience

23   may be somewhat limited in these matters, it would not come as a

24   surprise to you --

25              MR. ELSON:  Objection to the commentary.

```
1            THE COURT:  Yeah.
2            MR. SMOKOWICZ:  I'll withdraw that and I'll ask the
3    question -- re-ask the question, Your Honor.
4            THE COURT:  Okay.
5            MR. SMOKOWICZ:
6    Q.  Recognizing that your experience in relying upon jailhouse
7    informants might be limited, it would not come as a surprise to
8    you, would it, that a defense lawyer -- criminal defense lawyer
9    in a case would know that a jailhouse informant is the lowest of
10   the low?
11   A.  No, that wouldn't surprise me.
12   Q.  They would be as aware as anybody of the motivation of
13   jailhouse informants, wouldn't they?
14   A.  They may be.
15   Q.  Their client would be aware of that kind of motivation as
16   well, wouldn't they?
17   A.  Again, I don't follow you.
18   Q.  Well, anyone who has spent any time in jail might have been
19   exposed to people who were trying to snitch on other -- other
20   people in the jail.  So that they could get a break, right?
21   A.  Certainly.
22   Q.  Now, you mentioned in reference to the timeline and the
23   stars on the map that we sadly saw before, that that to you
24   appeared to be a pattern.  Correct?
25   A.  Correct.
```

1   Q.  With respect to that timeline -- strike that.  With respect
2   to those two documents, are you a resident of the City of
3   Milwaukee?
4   A.  No.
5   Q.  Have you ever worked for the City of Milwaukee Police
6   Department?
7   A.  No.
8   Q.  Have you ever lived in that neighborhood?
9   A.  No.
10  Q.  Have you studied the crime statistics for that neighborhood
11  for the year 1998?
12  A.  No, I did not.
13  Q.  Would you know how many homicides there were within a 7
14  block area, square block area of the 3000 block of North 7th
15  Street in the City of Milwaukee in, let's say, the years 1986 to
16  the years 2007?
17  A.  No.
18  Q.  It would not be surprising to you let's say in that 20 year
19  time span, for example -- that's about 20 years, right?  That in
20  that 7 block area, square block area, there would be dozens and
21  dozens of homicides, wouldn't there?
22  A.  I was looking at commonalities.  Not dozens and dozens of
23  disparate shootings and robberies and what have you.
24  Q.  Let's work towards that, Mr. Waller.  First of all, can you
25  answer my question?  In that 20 year time frame it would not be

1  surprising to you, even within that 7 block -- square block

2  area, that in that 20 years there would be dozens and dozens of

3  homicides?

4  A.  I couldn't tell you.

5  Q.  Okay.  And you certainly couldn't tell this jury, or anyone

6  else, for that matter, how many of those homicides involved

7  prostitutes in that 20 year time frame?

8  A.  Correct.  I could not.

9  Q.  Or how many of them involved prostitutes who were involved

10  in drug use as well, correct?

11  A.  Correct.  Specifically.

12  Q.  And you never asked for that kind of information in this

13  case, did you?

14  A.  Counselor, I wasn't investigating the case.  I was reviewing

15  what the Milwaukee Police Department did or should have done.

16  Q.  Well, you were working with Mr. Avery's attorneys, right?

17  A.  I made an objective assessment of the information that they

18  provided me, and gave them my opinions.  I was not investigating

19  the matter in any shape or form.

20  Q.  And one of the opinions you gave them was an opinion that

21  there was a pattern here, right?

22  A.  Yes, sir.  And there was an obvious pattern there, and it

23  was identified by certain people, but -- within the Department,

24  but not acted upon.

25  Q.  And that pattern that you believe existed, and that you say

1  was identified by the Department, you have no information

2  whether that is part of a larger pattern of homicides in general

3  in that area of prostitutes, or prostitutes who use drugs,

4  correct?  Because you haven't looked at those figures, have you?

5  A.  No.  My basis for information would be what was subsequently

6  attributed to Walter Ellis, and the commonality of those

7  homicides.

8  Q.  And before you offered that opinion in this Court, you

9  didn't investigate it further by asking for other information

10  about other homicides in that area, did you?

11  A.  I did not think it was relevant to the issues at hand.

12  Q.  You stopped your investigation once you found something that

13  conveniently fit your theory of the case, didn't you?

14  A.  Mr. Smokowicz, I did not conduct an investigation, period.

15  Q.  One of your criticisms of the Detectives in this case --

16        THE COURT:  Mr. Smokowicz, I hate to interrupt, but I

17  need a break, ladies and gentlemen of the jury.  So we're going

18  to have to take a break at this point.  We'll take the afternoon

19  break at this point.  Don't discuss the case.

20        (Whereupon the jury was excused at 2:53 p.m.)

21        THE COURT:  Okay.  We'll take the 15.

22        (Whereupon a recess was called by the Court.  Upon

23  conclusion of the recess, the proceedings continued as follows

24  when the jury was returned to the courtroom at 3:12 p.m.:)

25        THE COURT:  Mr. Smokowicz.

1        MR. SMOKOWICZ:  Thank you, Your Honor.

2   Q.  Mr. Waller, where we left off right before the break, I was

3   beginning to ask you about your opinion -- or the testimony that

4   you provided in response to Mr. Elson's questions about your

5   feeling or your opinion that the Milwaukee Police Detectives

6   should have investigated various individuals who were suspects

7   in these various prostitute homicides more than just those

8   cases.  Is that -- was that your opinion?

9   A.  No.  I said they should have looked for -- in those cases

10  where there were common elements.  Prostitutes involved in drug

11  abuse, strangulation, and that -- the geographical area.  Those

12  are the common links, and the manner of death.

13  Q.  So you're saying, for example, just to give it -- to make

14  that concrete, in this case, for example, we had a victim,

15  Maryetta Griffin, who was a prostitute, right?  You understand

16  that?

17  A.  Correct.

18  Q.  And you understand that she was a drug user as well?

19  A.  Yes.

20  Q.  And you understand that she was connected as to a drug house

21  that was run by a suspect in that matter, William Avery, right?

22  A.  That she had frequented that drug house at times, correct.

23  Q.  She had connection to that drug house, right?

24  A.  She had frequented the drug house.

25  Q.  And he obviously became a suspect in that case, right?

1    A.   Yes.

2    Q.   And so what you're saying is that the Milwaukee Police

3    Department, once he became a suspect in that case, should have

4    also investigated whether he was involved in the Irene Smith

5    homicide?

6    A.   No.  I believe what I said was that they should have at some

7    point made an effort -- and I did not see any in any of the

8    investigative reports -- that -- to determine if there was a

9    link with that particular suspect, before or after he was

10   arrested and/or convicted, to the other homicides.  And I did

11   not see that as a practice of the Milwaukee Police Department.

12   Q.   And you recognized one of those homicides to be that of

13   Irene Smith, right?

14   A.   One of them.

15   Q.   And another one of them would have been -- well, let's just

16   get the list.  Another one of them would have been Debra Harris,

17   right?

18   A.   I believe.  If you'd like me to get the list out, I'd be

19   happy to do that.

20   Q.   Sure.  Well, if you can, this -- did you prepare this map?

21   This Exhibit 4?

22   A.   No, sir.  I prepared something similar on this or another

23   case.  Just for my --

24   Q.   Do you know who prepared this?

25   A.   Excuse me.  Excuse me.

1  Q.  Do you know who prepared this Exhibit?

2  A.  No, sir.

3  Q.  So one of the victims that's listed here is Sheila Farrior,

4  is that right?

5  A.  Correct.

6  Q.  And another is Jessica Payne?

7  A.  Correct.

8  Q.  And you're saying that in Sheila Farrior's case, these

9  Detectives should have also investigated whether William Avery

10  was connected to Sheila Farrior in that homicide?

11  A.  Or like in the Jessica Payne case --

12  Q.  Can you answer my question about Sheila Farrior?  First of

13  all, should they have investigated any connection between him

14  and Sheila Farrior?

15  A.  At some point, yes.

16  Q.  Should they have investigated any connection between him and

17  Jessica Payne?

18  A.  Him and who?

19  Q.  Jessica Payne.

20          THE COURT:  Mr. Smokowicz, when you said him, who are

21  you referring to?

22          MR. SMOKOWICZ:  William Avery.

23          THE WITNESS:  The -- either -- the person they

24  convicted for Jessica Payne with this homicide.

25          MR. SMOKOWICZ:  Your Honor, I'm going to move to

1   strike that last portion.  The Officers did not convict anybody.

2            THE COURT:  Well, the question is those two people.

3   Should they have been -- should he have been investigated on

4   those two people.  Is that the question?

5            MR. SMOKOWICZ:

6   Q.  Yes.  Should he have been investigated for killing Jessica

7   Payne?

8   A.  At some point I think that an effort should have been made

9   to link or determine if there was some commonalities between the

10  various homicide suspects and the various victims.

11  Q.  And so you feel that Mr. Avery should have been investigated

12  also for any possible link to the homicide of Joyce Mims?

13  A.  It's possible.  Again, I would have to look at the

14  circumstances surrounding that particular case.  I believe at

15  the time it was unsolved.

16  Q.  Now, you're not saying, for example, that he should have

17  been investigated for any link between him and -- William Avery

18  and Quithreaun Stokes, are you?  Are you?

19  A.  Sir, I'm having trouble understanding you, because you keep

20  turning away from the mic, so if you --

21  Q.  I'm sorry?

22  A.  If you'd speak into it clearly, I will do my best to answer

23  your questions.

24  Q.  You're not saying that he should have been investigated for

25  any link to the homicide of Quithreaun Stokes, are you?

1  A.  I don't recall that one in isolation.  But I think that any

2  unsolved homicide with similar factors, then, they have an

3  obligation to try to clear that up.  So if you have a prior case

4  where you had convicted somebody, then surely look at them to

5  see if there's a link.  Likewise, if you currently convict

6  somebody with a similar fact pattern, then go back and check

7  those unsolved cases.  And ultimately that's what they did with

8  Walter Ellis.  And they were successful.

9  Q.  I realize you didn't prepare this Exhibit, but if I

10  represent to you that the date that Quithreaun Stokes was

11  murdered is April 27th, 2007 -- I'm going to ask you to accept

12  that.  Are you aware of when William Avery was in prison?

13  A.  I believe he was imprisoned in 2004.

14  Q.  And he was in prison until 2010?

15  A.  Correct.

16  Q.  So he would have been in prison when she was killed, right?

17  A.  Correct.  Which is another indication that since it's a

18  similar homicide, he probably -- or could not, or may not, have

19  done that.

20  Q.  There are two homicide victims on the left hand side of this

21  page from 1986.  Are you saying that Mr. Avery should have been

22  investigated for any connection to those two?

23  A.  Based on the commonalities at the time, that surely he

24  should have been looked at.

25  Q.  And Florence McCormick also in 1995?

1    A.   Again, if it was an unsolved, and they were realistic that

2    Avery was a homicide suspect, then certainly they should have.

3    Q.   Now, you fault the Detectives in this case for failure to

4    make any determination about the trustworthiness or reliability

5    of the three individuals, Keith Randolph, Antron Kent, and

6    Jeffrey Kimbrough, is that correct?

7    A.   I think that's an accurate assessment.

8    Q.   Now, you're aware from your review in this matter, are you

9    not, that Keith Randolph was a friend of the family?  Of the

10   Averys, right?

11   A.   I don't recall specifically that he was or was not.

12   Q.   Mr. Waller, you recognize this document?

13   A.   It's one of the documents that I reviewed.

14   Q.   This is the handwritten statement written out by Detective

15   Heier and signed by Keith Randolph, correct?

16   A.   Yes, he signed it in a number of different places.

17   Q.   And you did read the part about the middle of the page that

18   states Randolph states that he has known William Avery, a/k/a

19   Jodi, since 1993, and knows his family, even being a pallbearer

20   at the funeral of Avery's mother, Barbara Avery?

21   A.   Correct.

22   Q.   You recall reading that part before?

23   A.   I do.

24   Q.   And assuming this to be true -- strike that.  You were not

25   present for any of the testimony in this case prior to today,

1  correct?

2  A.  Correct.

3  Q.  So you were not present for any testimony from Keith

4  Randolph in this case, correct?

5  A.  No, I was not.

6  Q.  But assuming that Mr. Randolph then, as now -- now as then,

7  rather, would agree that -- strike that.

8  A.  Please speak into the microphone.

9  Q.  Assuming that Mr. Randolph now, as then, in that statement

10  said -- admits that he was a family friend -- I want to ask you

11  to assume that.  All right?

12  A.  Sure.

13  Q.  Apparently in this statement what Mr. Randolph is saying is

14  that his friend, someone he's known for some time, admitted to

15  him that he killed a woman while they were -- and he made this

16  admission while they were in Dodge Correctional Institution.  Do

17  you recall that?

18  A.  I recall that's what he -- that's what is written in the

19  report, correct.

20  Q.  And that would be -- that would -- the fact that someone is

21  a friend of the family, and a friend of the Defendant, and still

22  is willing to come forward and say my friend told me that he

23  killed someone, that would be a sign of reliability?  Or a

24  signal of reliability, wouldn't it?

25  A.  To me you're enforcing or supporting my contention that

1  they're the lowest of the low.

2  Q.  So it would be more reliable if he said I have barely known

3  this guy and I'd only met him in prison?

4  A.  No, sir.

5  Q.  Okay.

6  A.  The reliability would be determined by what information he

7  was aware of, and what sources were publicly known.  So if that

8  information was in a newspaper article, for example, then -- and

9  he had nothing else, nothing more specific that only the Police

10  knew, or the -- Mr. Avery would have known, then that's how you

11  determine reliability in a situation like this.

12  Q.  And so that's the only way to determine reliability in your

13  mind, is if they have additional details?  That are not publicly

14  known?

15  A.  Or where did they get their information?  And what access

16  did they have to that information?

17  Q.  Well, in this case Mr. Randolph, according to his statement,

18  said he got the information from Mr. Avery himself, right?

19  A.  Well, he also subsequently said he got a lot of the

20  information from the Police Officers.  So --

21  Q.  Well, he says in that statement, does he not, that he got

22  this information from Mr. Avery?

23  A.  In that statement he does.

24  Q.  And are you telling this jury that you believe

25  Mr. Randolph -- that you're forming your opinion based upon your

1  belief that Mr. Randolph is telling the truth about it?  That he

2  got it from the Police, as opposed to his prior statement where

3  he said he got it from William Avery?  Are you making a judgment

4  about credibility here?  Based on Mr. Randolph?

5  A.  No.  Just trying to clarify facts.

6  Q.  So you don't know it's a fact, do you?  That Mr. Randolph

7  got any information from any Officer, do you?

8  A.  Other than what he gave in his sworn affidavit, no, I don't.

9  Q.  And, of course, he gave Court testimony as well, right?  As

10  these two other men did, right?

11  A.  I'm assuming that was done here.

12  Q.  And I mean he gave Court testimony in William Avery's

13  criminal trial, right?

14  A.  I'm not sure.  According to his recantation, it -- I think

15  that it read to me that he refused to give it because of a

16  guilty conscience.  And then -- so he was surprised when he

17  learned later that Avery was found guilty because they read his

18  statement into the record.  Or his alleged statement.

19  Q.  Well, the only circumstance that's here, though, so far that

20  we talked about is William Randolph -- or Keith Randolph, by the

21  way.  And you understand that even though there was that

22  statement, Mr. Avery was not charged at that time with the

23  homicide, correct?

24  A.  What time frame are you talking about?

25  Q.  The day on the bottom.  March of 2001.  You see that?

1    A.  I do.

2    Q.  Avery was not charged with any homicide in March of 2001,

3    correct?

4    A.  That is correct.

5    Q.  But this isn't where everything stops now, is it?  There are

6    other people who come forward, right?

7    A.  Correct.

8    Q.  One of them is Antron Kent, correct?

9    A.  One of about 6 is Antron Kent, correct.

10   Q.  And Mr. Kent doesn't come forth for another year, right?

11   A.  I'd have to check the dates, but probably 2002, 2003,

12   somewhere in there.

13   Q.  Now, the information according to that statement from Keith

14   Randolph was that Keith Randolph had that information from Avery

15   while he was in Dodge Correctional Institution.  You recall

16   that?

17   A.  Yes.

18   Q.  And Dodge Correctional Institution is located in Dodge

19   County, right?  In Wisconsin?

20   A.  I believe so.

21   Q.  It's in the geographical City of Waupun, Wisconsin, right?

22   A.  I don't know if that's Dodge Correctional or that it's in

23   Fox -- not Fox Point, but -- I'm not sure.  But it -- I think

24   Waupun is a separate facility from Dodge Correctional.

25   Q.  I didn't ask you whether it's in Waupun.  I asked you

1  whether it's in the City of Waupun.  I'm sorry if that was

2  unclear.

3  A.  My understanding -- I don't -- I don't know for a fact, but

4  I -- my -- Waupun Prison and Dodge Correctional I think are two

5  separate institutions.

6  Q.  But they're in Wisconsin, nonetheless, right?

7  A.  Correct.

8  Q.  Now, Antron Kent, when he calls he's not at Dodge

9  Correctional, is he?

10  A.  No, sir.

11  Q.  And Antron Kent isn't in the State of Wisconsin, is he?

12  A.  No.

13  Q.  And, in fact, Antron Kent is in Oklahoma, isn't he?

14  A.  Correct.  He's a pod mate with Mr. Avery in a prison in

15  Oklahoma.

16  Q.  Have you been in that State of Oklahoma prison?

17  A.  Have I what?

18  Q.  Have you ever been inside that prison in Sayre, Oklahoma?

19  A.  No, sir.

20  Q.  So are you familiar with the physical layout of the pods

21  there?

22  A.  No, I'm not.

23  Q.  Are you familiar whether one prisoner is allowed to go into

24  another prisoner's cell to look at their papers?

25  A.  My understanding in general terms, and not specifically, is

1  that pods are relatively open.  That that's a general area where

2  they come out of their cells, where they could be specifically

3  locked down.  But the cells are open during periods of the day,

4  and the prisoners are allowed to move around in the common area.

5  Q.  In the common area, but not in one another's cells, right?

6  A.  You're talking about a prison full of criminals.  They

7  wouldn't be there if they followed the rules.

8  Q.  Do you have any evidence that Antron Kent went into William

9  Avery's cell?  Or are you just speculating?

10 A.  I think he admitted to Detective Hein that he read the

11 discovery.  In other words, the Criminal Complaint and a

12 newspaper article.  And so -- and I'm sure she gave sworn

13 testimony to that fact in her deposition.

14 Q.  Okay.  So your belief is that he told her, and she reported

15 that?  Is that what you're saying?

16 A.  I don't think she reported that.  I think that's what she

17 testified happened when she was deposed.

18 Q.  Do you have -- do you have that --

19 A.  Excuse me.  Excuse me.  I don't know that she put it in a

20 Police report.

21 Q.  Do you have that sworn testimony tabbed right there in front

22 of you?

23 A.  Pardon me?

24 Q.  Do you have that testimony tabbed in front of you?

25 A.  Her deposition, page 97 --

1    Q.   Just a second let me go get it.  Before we get to that, are

2    you aware that Mr. Randolph in that statement says that he got

3    to see the discovery?

4    A.   I'd have to look at his recantation, but give me a second.

5    Q.   I'm going to just ask you about the statement that Detective

6    Heier had him sign.  Which reads in part:  At the end of July,

7    1998, while at the Dodge Correctional facility, Randolph saw

8    Avery again wherein the general -- while in the general

9    population together.  Randolph and Avery also ended up working

10   together in the dining servery.  Randolph and Avery started

11   getting close, as Avery's brother died, and they had this in

12   common and needed each other.  Randolph started looking at

13   appeals issues, as Randolph has his Associate's Degree and is

14   familiar with some legal workings.  Avery presented Randolph

15   with about 8 pages of discovery, which included a handwritten

16   statement.  Randolph had read the statement and it was out at

17   the walking track at Dodge talking to Avery one-on-one, with no

18   one around.

19            So this statement produced by Detective Heier does

20   reflect that discovery was shown to -- by Avery to Randolph,

21   right?

22   A.   That particular document, correct.

23   Q.   Nothing is concealed about that, right?

24   A.   Correct.

25   Q.   In any event, you have a third person, Jeffrey Kimbrough,

1    also in that facility in Oklahoma, who says he overhears that

2    conversation as well, correct?

3    A.  Yes, sir.

4    Q.  Now, you had some concerns about the statement that the --

5    that's reflected in the final report about -- I believe it's

6    Antron Kent and the statement to the effect of that area was hot

7    and that the body was deposited there, and that there was an

8    F.B.I. investigation going on at that time?

9    A.  That was added on the fourth time, the fourth visit by

10   members of the Milwaukee Police Department, including -- I think

11   Gulbrandson and Heier were the two that -- that was credited

12   with that.

13   Q.  Okay.  Are you aware from your experience in -- I guess it

14   would be Miami, which is the only large city you worked in.  Are

15   you familiar from your experience in Miami that individuals on

16   the street are pretty adept at identifying law enforcement cars?

17   A.  Sure.  I think in general terms, unmarked and marked, that

18   they can identify, you know, a typical unmarked Police car.

19   Q.  Might even be able to identify a vehicle operated by the

20   F.B.I.?

21   A.  Only if they could see the wing tips, but --

22   Q.  You're referring to the shoes, right?  That they all wear?

23   So it's not true that only the Police might have known about

24   F.B.I. operations.  Someone astute on the street might have

25   known about that as well?

1  A.  Well, they weren't on the street.  Kent was locked up in

2  prisons, and so was Mr. Avery at the time.

3  Q.  Yeah.  But Mr. Kent in that statement wasn't talking about

4  when they were locked up in prison.  He was talking about the

5  night that Maryetta Griffin was killed in 1998.  And the two

6  people who purportedly put a body in that place.  They weren't

7  in prison at that time, right?

8  A.  Well, I'm not sure that when he came up with this additional

9  information, that -- and I don't believe they were, but that

10 Mr. Avery and Mr. Kent were in the same prison at that time.  So

11 where did he get it?  And why didn't he present it earlier, if

12 he had it?  And why did he say F.B.I., when that would have only

13 been known to the Milwaukee Police Department, and not to

14 Mr. Avery as a fact?

15 Q.  And all of those things cause you to be concerned about the

16 credibility of that statement?  Is that what you're saying?

17 A.  That, and that he refuses to -- he pled the Fifth and

18 refuses to talk about it after he got a sentence reduction based

19 on the --

20 Q.  Mr. Waller, all -- I'm not asking you about anything but

21 your assessment of the credibility of that statement.  And your

22 assessment is that you have some question about it, because of

23 the inclusion of the F.B.I. reference, true?

24 A.  It's true --

25 Q.  -- okay --

1    A.  -- because where else would he have gotten it?

2    Q.  Now, Mr. Waller, that in and of itself -- if that causes you

3    questions about credibility -- particularly as to you it points

4    that someone is feeding information to him.  Doesn't it stand to

5    reason that if there was an attempt to frame or to provide a

6    false statement against William Avery by Police, that that

7    wouldn't have been included in the statement?

8    A.  Well, I don't think it was included in the Police report,

9    but it was included in the sworn testimony of Detective

10   Gulbrandson.

11   Q.  Isn't it included right in the report there?  You don't know

12   that it's in the report?

13   A.  The fact that the F.B.I. I don't believe is.  I believe that

14   comes from Mr. -- or Detective Gulbrandson's testimony.  It's

15   Bates Number 6976.

16   Q.  Our documents, Milwaukee Police Department documents don't

17   have Bates stamp numbers on them.  But I'm going to show you

18   what's been marked as Exhibit 1026, and see if you recognize

19   this report.

20   A.  Yes.  It's the same one.

21   Q.  You have seen that report before in this case, correct?

22   A.  It's contained in my notebook, yes, sir.

23   Q.  And this is the report of Detective Gulbrandson with his

24   interview on September 7th of Antron Kent that was conducted

25   along with Detective Heier, correct?

1  A.  That's what is represented, correct.

2          MR. SMOKOWICZ:  I'm going to offer 1026 into evidence.

3          MR. ELSON:  No objection.

4          THE COURT:  The Court will receive it.

5          MR. SMOKOWICZ:

6  Q.  Reading the last paragraph, it states when comparing the

7  information provided by Kent, with the information he provided

8  on two previous statements, it was found to be consistent in

9  nature.  Kent did add during this interview that he recalled

10  Avery telling him that the reason he dropped the body off in the

11  area where the body was found was because other bodies had been

12  dropped at that location, and he felt that this body could not

13  be linked to him.  Kent stated that Avery went as far as

14  mentioning that he believed that because of these other bodies

15  in the area, the F.B.I. had gotten involved in this

16  investigation.  Kent stated that other than this addition, all

17  other information that he had previously provided was true and

18  he had nothing further to add at this time.

19          So this report by Detective Gulbrandson does refer --

20  does not conceal, does refer to this claim that that was why the

21  body was dumped there.  Because of the involvement of the

22  F.B.I., right?

23  A.  Correct.

24  Q.  To your knowledge -- incidentally, Ricky Berms was not in

25  any way directly involved in the investigation of the homicide

1  of Maryetta Griffin, correct?

2  A.  I don't believe he was.

3  Q.  Also, lastly, with respect to the two inmates in Oklahoma

4  and Keith Randolph, there is no indication or information, to

5  the best of your knowledge, that those three individuals knew

6  one another, correct?

7  A.  Which three?

8  Q.  That other than -- that Keith Randolph knew Antron Kent, for

9  example.  There's no information?

10  A.  No, there's no information that he was aware of the other

11  two.

12  Q.  And that Keith Randolph knew Jeffrey Kimbrough.  He didn't

13  know him, either, right?

14  A.  No.  Kent and Kimbrough were cellmates, but Randolph was

15  separate and apart.

16  Q.  And they never -- to the best of your knowledge, they never

17  had any interaction with one another, correct?

18  A.  To the best of my knowledge.

19        MR. SMOKOWICZ:  Thank you.  That's all I have.

20        THE COURT:  Redirect.

21        MR. ELSON:  Yes, Judge.

22                    **REDIRECT EXAMINATION**

23  **BY MR. ELSON:**

24  Q.  Mr. Waller, can you explain to the jury why you're qualified

25  to give an expert opinion in this case?

1    A.  I think it's --

2              MR. SMOKOWICZ:  Objection, Your Honor.  That's

3    improper testimony, for an expert to pass upon his own

4    qualifications.

5              THE COURT:  Yeah.  He can restate his C.V. or --

6              MR. ELSON:

7    Q.  I'll ask it in a different way.  How many times have you

8    been qualified as a Police practices expert by Courts?

9              MR. SMOKOWICZ:  I'm going to object to that, Your

10   Honor.  Courts don't qualify witnesses.

11             THE COURT:  Courts don't what?

12             MR. SMOKOWICZ:  Courts don't qualify witnesses.

13             THE COURT:  Well, okay.  When you say Court, the Court

14   will allow the answer to the question how many times have you

15   been qualified in a Court of law?

16             THE WITNESS:  Yes.  I've been qualified as an expert

17   witness to give testimony I would estimate between 50 to 100

18   times in various Federal Courts and State Courts, including

19   Federal Courts in the Eastern and Western Districts of

20   Wisconsin.

21             MR. ELSON:

22   Q.  And is that related to Police practices and procedures?

23   A.  Correct.

24   Q.  And are you familiar with Police policy and practice

25   standards that should apply in jurisdictions that are larger

1  jurisdictions?

2  A.  Yes.

3  Q.  And can you explain how you become familiar with those

4  policies and practices?

5  A.  By reviewing them and applying them to fact specific

6  situations.  Whether you're a small Department or a large

7  Department, unless it's a matter of quantity, the same

8  principles and standards would apply.  Whether it's Ripon Police

9  Department, with 16 sworn, or New York City with 36,000 sworn,

10 the same standards apply.

11 Q.  And although you haven't been an active Police Officer since

12 1986, how do you continue to keep up to speed with Police

13 practices and procedures?

14 A.  Well, like I said, I probably receive 20 to 30 new cases a

15 year.  That varies, but -- and I'm also -- so I review that

16 based on the actions of the Officers, based on what the

17 standards are, in attempt to see if those -- the actions are

18 consistent with the standards and the training and the policies.

19 So I'm constantly reviewing policies from a variety of different

20 agencies, including Milwaukee Police Department.

21         Also I attend on average 40 to 60 hours of law

22 enforcement training annually to keep up to date.  So I've been

23 trained as an assessor by the Commission on Accreditation for

24 Law Enforcement Agencies, which are how to apply or determine if

25 a law enforcement agency has an appropriate policy, and their

1  actual practice is reflected in that policy.  So that, plus my
2  experience, plus I taught at the college and university level
3  probably 9 years full time, and 7 or 8 years part time.  And
4  among those classes was criminal investigation, crime scene
5  investigation, interviewing and interrogation, and a number of
6  others.
7  Q.  Do you have your report in front of you?  I want to call
8  your attention to Page 13 of your report.  And it's number 6.
9  You were asked some questions by Mr. Smokowicz about your
10 opinion concerning the Detectives' failure to link these
11 homicides in this particular area.  Can you explain what you
12 meant with your opinion at number 6 on Page 13 regarding that?
13 A.  Well, they arrested a number of people, including Mr. Avery,
14 for the homicide of Miss Griffin.  At the time they arrested,
15 they were aware of the commonality with other homicides that
16 occurred in the area, with similar victim characteristics,
17 similar cause of death, same geographical area.  So when they
18 arrested those people, they should have looked at them for
19 physical evidence that would link them to the other homicides
20 also.  So they arrested and released 5 or 6 different people,
21 but they really didn't do anything that's reflected in the
22 reports that I reviewed to attempt to -- if they weren't
23 involved in this, were they involved in one of the other
24 homicides?
25          MR. ELSON:  No further questions.

1          THE COURT:  Any recross of that testimony?

2          MR. SMOKOWICZ:  Just a couple questions, Your Honor.

3                    **RECROSS EXAMINATION**

4    **BY MR. SMOKOWICZ:**

5    Q.  At Page 3 of your report, you have a section where you list

6    the materials that you reviewed in order to provide your

7    opinions in this case, correct?

8    A.  Correct.

9    Q.  And you've referred to a number of them already.  Criminal

10   pleadings, civil pleadings, depositions, that sort of thing.

11   True?  Affidavits, correct?

12   A.  Correct.

13   Q.  With respect to the Milwaukee Police Department, you

14   reviewed one Rule, 3, slash, 970.0, confidential informants,

15   correct?

16   A.  Correct.

17   Q.  And you --

18            MR. ELSON:  I'm going to object as outside the scope.

19            MR. SMOKOWICZ:  It is not, Your Honor.  I'm going to

20   tie it up to what has been asked about in terms of what he

21   reviewed in order to formulate his opinions in this matter.  He

22   said he reviews various things all the time in order to be able

23   to provide opinions about --

24            MR. ELSON:  I was asking about his expertise, not

25   about what he reviewed in this case.

1          THE COURT:  It would seem to be -- and he was asked

2    about the item relative to CI's or confidential informants

3    previously.

4          MR. SMOKOWICZ:  Shorten this up, Your Honor.

5          THE COURT:  Okay.  Ask him another question.

6          MR. SMOKOWICZ:

7    Q.   You mentioned in response -- in redirect to Mr. Elson's

8    questions, that you review cases all the time, and you have

9    standards that you look at all the time, right?

10   A.   Correct.

11   Q.   There is no listing of any of those kinds of standards that

12   you reviewed, other than the M.P.D. standard operating procedure

13   and rule on confidential informants, and the L.E.O. Criminal

14   Handbook on confidential informants in this list, correct?

15   A.   That's correct.

16   Q.   Okay.  Now, as you sit here today, can you cite for us the

17   name of the standard and the source of the standard that you

18   reviewed to provide your opinions on how to investigate a

19   homicide case when you are questioning jailhouse informants?

20   What did you look at?  What's the name of the standard, of the

21   treatise, of the book, of the article, and who is the author?

22   A.   Well, one of the --

23   Q.   And it's not listed here, right?

24   A.   May I answer the question?

25   Q.   Absolutely.

1    A.   On an ongoing basis I review a number of things, including

2    probably 6 or 8 either paper or online law enforcement journals.

3    I review various books from time to time.  One of which would

4    apply here would be investigating homicides by Vern Geberth,

5    which is considered in some circles as one of the Bibles.

6    Reviewed that.  I looked at that recently.  Not necessarily in

7    the guise for this case, but for another case.  Likewise, the

8    Model Policies by the International Association of Chiefs of

9    Police dealing with confidential informants.  I think I have a

10   copy attached in my notebook.

11          I didn't list everything, but I did state that my

12   opinions were based on the totality of my training, education,

13   and experience in law enforcement as a law enforcement trainer,

14   as an educator, and as a consultant.  And so it's based on the

15   totality.  And unless I specifically quoted a document, I

16   probably didn't mention all of that.  I'm not going to go give a

17   bibliography of every book I have in my office, or every model

18   policy that I have in my office.  But I will list it when I

19   write a report when it's -- has particular relevance.

20   Q.   Well, if you had listed the book on investigating homicides,

21   it would have been possible to look at that book, find the page

22   you cited, and see if the author did say that something, some

23   "X" should be done.  Isn't that true?

24   A.   But I didn't use that as a treatise or a Bible of sorts.

25   It's just one of many that I reviewed in doing what I do.  I

1   probably reviewed, over the years, either used to teach in a

2   class or read, for consideration of using, 10 or 12 criminal

3   investigation textbooks.  I don't list every one of them.

4          Now, I probably had two or three books that deal

5   specifically with homicides that are highly considered.  The

6   authors are highly considered.  I didn't list all those

7   specifically.  I don't think it's necessarily appropriate to say

8   Milwaukee Police Department didn't do what this author mentioned

9   on Page 172.  But in general terms, they missed the boat.  I'm

10  talking about general standards and guidelines.

11         MR. SMOKOWICZ:  Your Honor, now we're going beyond the

12  answer to the question.

13         THE COURT:  What was that?

14         MR. SMOKOWICZ:  We're going beyond the scope of that

15  question at this point.  Now we're talking about opinion again.

16         THE COURT:  Well, the Court will allow that last

17  answer to stand.

18         MR. SMOKOWICZ:  Okay.

19  Q.  Mr. Waller, you mentioned lastly that you go to some

20  training each year?

21  A.  Generally.  Somewhere 40 to 60.  Depends on my schedule and

22  personal considerations.

23  Q.  In the State of Wisconsin can anybody be a law enforcement

24  Officer?  I mean, can they just tomorrow put a badge on and say

25  hi, I'm a law enforcement Officer?  No.  Can't do that, right?

1  Got to be certified, isn't that true?

2  A.  Correct.

3  Q.  In order to have arrest powers in this State, you have to

4  have a certification.  That you're a certified law enforcement

5  Officer, correct?

6  A.  Yes.

7  Q.  And you don't have arrest powers in this State, right?

8  A.  Correct.

9  Q.  You are not certified as a law enforcement Officer?

10  A.  Not anymore, no.

11  Q.  And you haven't been certified as a law enforcement Officer

12  in this State since you were Chief of Police in Ripon, true?

13  A.  No, that's not correct.

14  Q.  Since Platteville?

15  A.  Correct.

16          MR. SMOKOWICZ:  Thanks.  That's all.

17          MR. ELSON:  Nothing based on that.

18          THE COURT:  Okay.  You may step down, Mr. Waller.

19  Thank you.  Additional witnesses?  Sidebar conference?

20          MR. STAINTHORP:  Yeah, let's have a side-bar.

21          (Whereupon a side-bar conference was held off the

22  record.  Upon conclusion of the side-bar conference, the

23  proceedings continued as follows:)

24          THE COURT:  All right.  Ladies and gentlemen of the

25  jury, we're going to give you a short break while we take up

1  some matters that require a little more extended discussion.  I

2  will have you back here after that, okay?  Please don't discuss

3  the case, all right?

4            (Whereupon the jury was excused at 4:02 p.m.)

5            THE COURT:  You need some time to go through that?

6            MR. STAINTHORP:  Yes, Judge.  Couple minutes.

7            THE COURT:  Short break, then.

8            (Whereupon a recess was called by the Court.  Upon

9  conclusion of the recess, the proceedings continued as follows:)

10           THE COURT:  So we can bring the jury back and admit

11  the Exhibits?

12           MR. STAINTHORP:  We're going to admit the Exhibits,

13  Judge.  There's three issues that we have questions about.  If

14  you want, we can --

15           THE COURT:  Do it after we excuse?

16           MR. STAINTHORP:  Yes.  Yes.

17           THE COURT:  Okay.

18           (Whereupon the jury was returned to the courtroom at

19  4:15 p.m.)

20           THE COURT:  Any additional witnesses at this time from

21  the Plaintiffs?

22           MR. STAINTHORP:  Judge, at this time the Plaintiff has

23  no additional witnesses.  The Plaintiff rests and moves the

24  admission of the Exhibits which have previously been accepted

25  by -- into evidence by the Court.

 1          THE COURT:  Okay.  The Court will receive those

 2    Exhibits, unless there's some objection.  There hasn't been.

 3          MR. SMOKOWICZ:  They've been received, Your Honor.

 4    So -- they've been received.

 5          THE COURT:  Well, ladies and gentlemen, you've heard

 6    the Plaintiff's case in chief, and so now it's time for the

 7    defense to present testimony and evidence.  But we usually take

 8    a break at this point.  There are some things that the Court

 9    takes up which aren't for your consideration at this juncture.

10    But that means that you're going home now.

11          MR. SMOKOWICZ:  There was not sadness in the jury box?

12          THE COURT:  You're supposed to say oh, nuts.  But

13    you've heard the Plaintiff's case, and the admonition about not

14    discussing the evidence still holds.  And it gets more tempting

15    to do so as you get further into the evidence.  But please

16    don't.  Only after all the evidence is in, you heard the closing

17    arguments, my instructions, and you're actually in the jury room

18    deliberating on the case.  But we'll start again tomorrow at 9

19    o'clock, okay?  So have a good evening.

20          (Whereupon the jury was excused at 4:16 p.m.)

21          THE COURT:  Okay.  Some issues?

22          MR. STAINTHORP:  Yes, Judge.  So the three issues are

23    there's three Exhibits, each of which is the testimony from the

24    criminal trial of Mr. Avery.  The first issue is Plaintiff's

25    Exhibit 20.  This is the testimony of Antron Kent at the

1   criminal trial of Mr. Avery.  So -- because Mr. Kent took the

2   Fifth Amendment and wouldn't answer any questions, we did not

3   have a chance to establish the -- or to enter this portion of

4   the testimony into evidence during the testimony; however, I

5   think there's no question that -- we have the transcript.

6   There's no issue about whether this in fact is the transcript.

7   We need this in to show that in his testimony he actually

8   testified as to what we claim is the false statement that was

9   given with respect to Mr. Avery.  So that's the first issue.

10  And I don't believe that the Defendants have any objection to

11  the admission of that portion of his testimony.

12          MR. SMOKOWICZ:  We don't have any objection to it,

13  Your Honor.  My only concern as to that one, and perhaps to the

14  other two as well, is that we don't believe that that entire

15  transcript should be going back to the jury as an Exhibit for

16  them to consider.  There's been no presentation exactly what was

17  said in open Court by Antron Kent in that criminal trial.  But

18  as long as the entire transcript doesn't go back there for them

19  to peruse without any kind of witness or explanation, we have no

20  objection.

21          THE COURT:  All right.  Well, as the Court said at

22  sidebar, we can take that up if indeed the jury requests that

23  Exhibit.  So the Court will receive it at this point.

24          MR. STAINTHORP:  Thank you, Judge.

25          THE COURT:  Also if need be, if we receive it and

1    there are some objections to some things, maybe we can do some

2    redaction and editing, too.  But we'll cross that bridge when we

3    come to it.

4           MR. STAINTHORP:  And the other two issues, Judge, are

5    both Detective Phillips and Detective Hernandez testified during

6    their examination that they testified at the criminal trial of

7    Mr. Avery, and that during that criminal trial they identified

8    the statements that they claim Mr. Avery gave to them.  However,

9    we did not mark as an Exhibit during their testimony their --

10   the actual transcript of their testimony.  And so Plaintiff's

11   Exhibit 28 is the trial testimony of Detective Gilbert

12   Hernandez, and we would be requesting that that be entered as an

13   Exhibit.  Plaintiff's Exhibit 29 is the testimony of Detective

14   Phillips at the criminal trial of Mr. Avery, and the

15   admissibility reasons are the same as for Hernandez.  That he

16   testified as to the statement that he claims that Mr. Avery

17   gave, which is the -- obviously the basis of one of our claims

18   in this case.  So we would -- for both those, 28 and 29, we'd be

19   moving the admission of those transcripts.

20          MR. SMOKOWICZ:  We would object to those, particularly

21   Phillips.  Because he's been called in both parts of the case.

22   On both sides of the case now by agreement.  My concern here,

23   Your Honor, is that the evidence that's pertinent -- that is,

24   that they testified in that case and that they have testified

25   about what William Avery said -- that's been established by

1   their own testimony.  There's no dispute about that.  Any other

2   content of their testimony is irrelevant.

3        MR. STAINTHORP:  Well, if need be, Judge, I would

4   suggest that -- then that the transcript be admitted at this

5   point.  If the jury requests that transcript, that if need be

6   there can be redaction of the transcript -- but I'll tell you,

7   looking through Phillips, the Phillips transcript, which is a

8   total of 4 pages, every portion of it appears to be in relation

9   to the statement that they claim they got from Mr. Avery.  And

10  while Detective Hernandez is slightly longer -- I think it's 5

11  pages -- it appears to me that -- 6.  I'm sorry, 6 pages.  It

12  appears to me that every portion of that also relates to the

13  statement that he's claimed to have been given.  However, as to

14  both of those we would agree that if counsel could point out

15  some portion of that that would be improper to go to the jury,

16  we'll agree to that redaction.

17       MR. SMOKOWICZ:  Again, my concern, Your Honor, is that

18  the testimony in and of itself -- the document is not relevant.

19  It's already been -- the evidence that's relevant has been

20  admitted, which is that the Detectives testified that they did

21  provide this testimony, and that's what they said in their

22  testimony.  It wasn't used to cross examine to the point of

23  saying you didn't say that or what have you.  We don't need to

24  duplicate evidence here.

25       THE COURT:  All right.  Well, let me do this.  Let

1    me -- it wasn't used on cross -- I think we just used depos

2    to -- or you used deposition testimony to impeach or attempt to

3    impeach the witnesses, Hernandez or -- Hernandez and Phillips.

4    Is that correct?

5          MR. STAINTHORP:  Yes, that is correct, Judge.

6          THE COURT:  So the transcripts weren't used.

7          MR. STAINTHORP:  They were used only in so much as we

8    established that in their testimony they testified to the

9    statement which they claim Mr. Avery gave, which we claim he did

10   not give.  So that is -- it's not in as impeachment testimony.

11   It's just to show the significance of the statement that they

12   claim Mr. Avery gave.  And that's it.

13         MR. SMOKOWICZ:  Your Honor, if it was going to be to

14   show that, it would have been marked as an Exhibit, offered to

15   the witness.  He could have corroborated that that's his

16   testimony, and that would have been that.  But that wasn't done.

17   It was short circuited with did you testify?  Yes.  Did you

18   testify that he gave a statement?  Yes.  And the contents of the

19   statement?  Yes.  And that was it.

20         MR. STAINTHORP:  And, Judge --

21         MR. SMOKOWICZ:  I'm sorry.  I don't believe there's

22   any dispute --

23         THE COURT:  Mr. Hernandez is going to be called back,

24   isn't he?

25         MR. SMOKOWICZ:  He will, Your Honor.  And perhaps we

 1    need to cross that bridge if it comes up again.

 2              THE COURT:  And Mr. Phillips?

 3              MR. SMOKOWICZ:  He will not.  He has been -- by

 4    Plaintiff's consent --

 5              THE COURT:  That's right.  You had put in what you

 6    wanted to put in with him on Plaintiff's case.  Well, let me

 7    take a look at the transcripts and I'll make a decision on it.

 8    There's no immediate need to do that.  If I agree, we'll just

 9    have them put in as -- even if the defense starts its case, I

10    can always admit this.

11              MR. STAINTHORP:  Okay.  Thank you, Judge.

12              MR. SMOKOWICZ:  We would have no objection, if that's

13    the process.

14              THE COURT:  Okay.  All right.  And the Court will take

15    the steps necessary, or what it thinks is necessary at that

16    time.  Anything else besides that?

17              MR. STAINTHORP:  Nothing from the Plaintiff's side,

18    Judge.

19              MR. SMOKOWICZ:  Your Honor, as I indicated in the

20    sidebar, we would be making a motion under Rule 50 for judgment

21    as a matter of law at the end of the Plaintiff's case.  Because

22    things went a little bit more quickly than we anticipated, we

23    would -- I think it would benefit the Court if we give you a

24    very brief memorandum first thing tomorrow morning.  Will have

25    it electronically filed tonight.  We will have paper copies here

1    tomorrow to make sure that nobody has to worry about locating it

2    on the computer at the hotel or what have you.  And we'll try

3    to -- I will try to -- since it's mine, I will try to confine it

4    to 5 pages, Judge.

5              THE COURT:  Okay.  Fine.  Anything else?

6              MR. STAINTHORP:  No.

7              MR. SMOKOWICZ:  No, Your Honor.

8              THE COURT:  Good.  Have a good evening.

9                        *     *     *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WISCONSIN

3

4             I, HEIDI J. TRAPP, Official Court Reporter for the

5    United States District Court, Eastern District of Wisconsin, do

6    hereby certify that I reported the foregoing Transcript of

7    Proceedings; that the same is true and correct as reflected by

8    my original machine shorthand notes taken at said time and place

9    before the Hon. Rudolph T. Randa.

10

11                         _____

                             Official Court Reporter
12                           United States District Court

13

14   Dated at Milwaukee, Wisconsin,

15   this 27th day of October, 2015.

16

17

18

19

20

21

22

23

24

25