UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**WILLIAM DAMON AVERY,**

Plaintiff,

vs.

**CITY OF MILWAUKEE, et.al.,**

Defendants.

Case No. 11-CV-408

Milwaukee, Wisconsin

June 5, 2015

---

**VOLUME 5 - PAGE 717**
TRANSCRIPT OF TRIAL
BEFORE THE **HONORABLE RUDOLPH T. RANDA,**
UNITED STATES DISTRICT JUDGE, AND A JURY

**A P P E A R A N C E S**

For the Plaintiff:

People's Law Office
By: **Mr. John L. Stainthorp**
**Ms. Janine L. Hoft**
**Mr. Ben Elson**
Attorneys at Law
1180 N. Milwaukee Avenue
Chicago, IL 60622

For the Defendant:

Milwaukee City Attorney
By: **Mr. Jan A. Smokowicz**
**Ms. Jenny Yuan**
Assistant City Attorneys
200 E. Wells St. - Rm. 800
Milwaukee, WI 53202-3551

REPORTED BY:

HEIDI J. TRAPP
Federal Official Court Reporter
310, U.S. Courthouse
517 East Wisconsin Avenue
Milwaukee, Wisconsin 53202

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

# I N D E X

**Witness:** **Page**

**SHARON POLAKOWSKI**

Direct Examination By Ms. Yuan.................. 720
Cross Examination By Mr. Stainthorp............. 732
Redirect Examination By Ms. Yuan................ 741

**PATRICIA McCOY**

Direct Examination By Ms. Yuan.................. 742
Cross Examination By Ms. Hoft................... 754
Redirect Examination By Ms. Yuan................ 764

**OFFICER KENNETH CECIL**

Direct Examination By Ms. Yuan.................. 766
Cross Examination By Mr. Elson.................. 771

**CAMEO BARBIAN-GAYAN**

Direct Examination By Ms. Yuan.................. 773

**JAMES DeVALKENAERE**

Direct Examination By Mr. Smokowicz............. 777
Cross Examination By Mr. Stainthorp............. 821
Redirect Examination By Mr. Smokowicz........... 824

**CAPTAIN TIMOTHY HEIER**

Direct Examination By Mr. Smokowicz............. 827

**TRANSCRIPT OF PROCEEDINGS**

THE CLERK: Case Number 11-CV-408, William Damon Avery vs. City of Milwaukee, et.al., called for continuation of the jury trial. May I have the appearances, please. First for the Plaintiff.

MS. HOFT: Good morning. Janine Hoft for the Plaintiff.

THE COURT: Good morning.

MR. STAINTHORP: John Stainthorp for the Plaintiff.

THE COURT: Good morning.

MR. ELSON: Good morning, Judge. Ben Elson for the Plaintiff.

THE COURT: Good morning.

THE CLERK: And for the Defendant?

MR. SMOKOWICZ: Assistant City Attorney Jan Smokowicz. Good morning, Your Honor.

THE COURT: Good morning.

MS. YUAN: Good morning, Your Honor. Assistant City Attorney Jenny Yuan.

THE COURT: Good morning. Well, the case is back on for presentation of the defense case. Defense has submitted a motion pursuant to 50(a). I take it the Plaintiffs have had a chance to read the motion?

MR. STAINTHORP: Judge, we really haven't. We've been preparing for the Defendants' side of the case, and we haven't

had a chance to look at it yet. We would request at least the weekend to respond.

THE COURT: Well, that's fair. Are we ready with the first defense witness?

MR. SMOKOWICZ: We are, Your Honor.

THE COURT: Okay.

(Whereupon the jury was returned to the courtroom at 9:23 a.m.)

**SHARON POLAKOWSKI**, called as a witness, having been first duly sworn, on oath testified as follows:

THE CLERK: Will you please state your full name and spell it for the record.

THE WITNESS: Sharon Polakowski. S-H-A-R-O-N. P-O-L-A-K-O-W-S-K-I.

THE COURT: Before we start, good morning, ladies and gentlemen of the jury. Thank you for your patience. I had to take up a matter that wasn't for your consideration, and so that's why we were delayed. So we're ready to begin with the defense case. Miss Yuan?

**DIRECT EXAMINATION**

**BY MS. YUAN:**

Q. Good morning, Miss Polakowski. Can you please tell the jury a little bit about your educational background and where you're currently employed?

A. I'm employed as a forensic scientist in the D.N.A. Analysis

Unit at the Wisconsin State Crime Laboratory in Milwaukee. I have a Bachelor of Science Degree in recombinant genetics with a minor in chemistry that I received in 1992 from Western Kentucky University.

Q. And when did you start at the -- it's the Wisconsin State Crime Lab?

A. Yes, it is.

Q. And when did you begin working there?

A. I began working at the State Crime Laboratory in October of 1993.

Q. So you began in 1993. When you started in 1993, what was your -- what was your title at that time?

A. At that time I was still a forensic scientist. I was employed in what was then the Serology Unit, which was sort of the forerunner to the D.N.A. Analysis Unit.

Q. And how long did you remain in that position?

A. It's pretty much the same position. Just that the name of what we do has changed over the years. It was serology to start with, then it was serology D.N.A., and then it just became D.N.A. analysis.

Q. When did it just become D.N.A. analysis?

A. I don't really recall. We still do some serological techniques to identify stains and some of the other testing that we do. We just don't do the characterization of stains that we did using enzymes. And A-B-O blood typing that were part of

serology because D.N.A. has replaced those.

Q. I see. And you've had extensive training, then, in D.N.A. testing and analysis?

A. Yes, I have.

Q. Can you explain a little bit about the type of training you've had? Or -- I mean, other than the education that you've described.

A. The vast majority of my training has been at the State Crime Laboratory. When I started there initially I had training in all the serological methods that we were using for characterizing stains, identifying stains, looking at hairs microscopically. I trained in a type of D.N.A. testing known as restriction fragment length polymorphism, or RFLP testing. It's an older type of testing that was done in many crime laboratories. I then trained in the testing that we are doing today which is called short tandem repeat or STR testing.

Q. And you're here today to testify about the work you did -- or the D.N.A. analysis that you did involving the Griffin homicide. Do you recall that matter?

A. Yes, I do.

Q. And do you recall that that was back in 1998?

A. Yes. Initially.

Q. The initial testing that you did was in 1998?

A. Yes, it was.

Q. I'm actually showing you what's already been admitted as

Defense Exhibit Number 1005. I gave you a copy. You can also see the copy that's on the screen there to your left. At the top of that -- of this Exhibit, I see the name Sharon Tagg. Was that your maiden name?

A. Yes, it was.

Q. Okay. So you were the D.N.A. analyst that performed the testing that then -- and you created this report as well?

A. Yes, I did.

Q. I'd ask if you could -- have you had a chance to review this report recently?

A. Yes, I have.

Q. Okay. Do you recall, then, what your results were? What the findings were after you did the testing in this case? And I can flip -- I think the results are on the last page.

A. They should be close to the last page, yes. They actually start on Page 3, but the results of the D.N.A. typing start on page -- I believe it's Page 4, yes.

Q. And I'm actually going to turn your attention -- because I know you did some testing not just on the biological material retrieved from Miss Griffin's body, but also there was additional biological material that you tested from the crime scene. So I'm actually going to direct your attention to the last page. And I'll put this up on the screen as well. So this is the last page of your report. And I'm directing your attention to that paragraph that begins a profile foreign to

Maryetta Griffin.

A. Yes.

Q. Actually I'm going to go to the next paragraph, because this next paragraph here, a profile foreign to Maryetta Griffin, was developed from the vaginal swabs. That is indicating that there was biological material retrieved from the vaginal swabs, and you determined that there was foreign D.N.A. Meaning D.N.A. that wasn't associated with the victim, is that correct?

A. Yes, that is.

Q. And in the middle of that paragraph you see the foreign band profile is consistent with bands from the profile of Terry Bryson?

A. Yes.

Q. And what does that mean?

A. This particular type of testing that was done on the case in 1988 is the RFLP testing. And what we looked at then was bands and band lengths to see what would match to -- one person to another to compare a standard from an individual to these bands to see if they could come from the same person. So when we say there's bands present, it's what we're looking at. It means -- meaning that it's consistent -- it's consistent with the profile from Terry Bryson, and could have come from him.

Q. And so in order for you to be able to render that opinion, you had to have D.N.A. from Terry Bryson and have compiled a -- would you say a standard? A D.N.A. standard profile for Terry

Bryson?

A. Yes, I had a standard sample from Terry Bryson. A standard is taken from an individual. It's either a blood stain or more -- now what we usually do is a buccal swab from inside the mouth. And the D.N.A. on that item is known to have come from that individual. Therefore, the profile developed from that item is their D.N.A. profile. So those standards are used to compare to evidentiary samples to see if we can make an association or not.

Q. And why would you have had a D.N.A. -- a standard profile for Terry Bryson? Would that have been something that the Milwaukee Police Department would have provided to you? Samples for his D.N.A. for you to compile that standard?

A. Yes. They provided all the samples in these cases. Both the standards and the evidentiary samples.

Q. And further down you can see with the paragraph that starts Lorenzo Frost. States Lorenzo Frost and William Avery are excluded as possible contributors of the foreign profile on the vaginal swabs. And what does that mean?

A. That means that based on their standards, and what was seen on the evidence, they are not -- their D.N.A. is not present on that item.

Q. So from the vaginal swabs Lorenzo Frost and William Avery were excluded as possibly contributing to that biological material?

A. That's correct.

Q. The next paragraph states a foreign -- a profile foreign to Maryetta Griffin was developed from the oral swabs. And again, that's the same thing, right? Where there was oral swabs, and you were given the oral swabs and you were able to see the biological material and test that, and see that that was foreign, meaning it was not the D.N.A. of the victim, Maryetta Griffin?

A. That's correct. It does say no foreign profile was developed for one of the genetic locations. And I'm not sure if that means there was nothing foreign to her, or if there was no profile developed there. So -- but the other locations listed, there is a foreign profile to her there.

Q. And can you explain for the jury what you mean -- what is -- is that how you can test back then? Is that the RFLP method where you'd have different locations that you can look and see if there's something -- test the D.N.A. at those locations?

A. Yes. With RFLP we were looking at 6 locations of D.N.A. to develop profiles from those.

Q. So the fact that you're talking about one location there was no foreign, is that significant to you?

A. No. Like I said, I don't know if it means there was no profile there at all, or if it looked like it could have come from Maryetta Griffin. So at that particular location I just stated nothing foreign. The rest of them, though, the other 5

locations, did have a profile that was foreign to her.

Q. Okay. And further on in the middle of that paragraph it states the foreign profile from the oral swabs is inconsistent to the profiles from Maryetta Griffin, Lorenzo Frost, William Avery, and Terry Bryson, and, therefore, could not have come from any of them. Could you explain that to the jury, please?

A. Basically it means that none of those people could have contributed to the foreign profile on the oral swabs.

Q. And the last there says the foreign profile from the oral swabs will be maintained in the Wisconsin D.N.A. database for searching against other databank profiles. So basically at this point from the oral swab taken from Maryetta Griffin there is a foreign profile, meaning that there is a D.N.A. profile that's unidentified, unassociated with somebody's identity. Is that correct?

A. That's correct.

Q. And one other follow-up to that. There was mention of it being put in the Wisconsin D.N.A. databank. So when you do testing, it gets uploaded into the State of Wisconsin D.N.A. databank?

A. Currently when we do testing and we have samples that are eligible to be put into the databank, they go in at one of three different levels. We have three levels within our databank. One is our local level, which would be the Milwaukee laboratory, or the Madison laboratory because they have one also. The State

level, which encompasses all of Wisconsin. And then the national level, which is part of the combined D.N.A. index system, or CODIS, which is maintained by the F.B.I. and run by them. A foreign profile from an item such as this would be eligible to go all the way to the national level. So it would be uploaded at the local level, sent to the State level, and then sent to the national level to be maintained and searched on a regular basis. And that was done in this case. At some point, however, the RFLP profiles stopped being searched because we changed over to STR testing, and the two of them cannot be compared to one another. Just based on the nature of the testing.

Q. So do I understand you correctly, that this foreign profile from Maryetta Griffin's oral swab, then, was uploaded into -- up to the national level, the CODIS level, along with the State level D.N.A. bank?

A. It should have been at some point. I'm not absolutely certain when we joined the national level. In 1998 a lot of the D.N.A. processes were still getting started in a lot of the States, including ours, and not everyone joined the national level at the same time. And I'm not exactly certain when we did. It would have been the late 90's, somewhere in there. At some point I believe it went to the national level, but I'm not absolutely certain.

Q. Whether or not it went to the national level you can say,

given what was stated in this report, that that foreign profile was uploaded into the State D.N.A. database?

A. Yes, it was.

Q. I just want to turn your attention to the first page. The date of the report is August 20th, 1998. Is that the date that you would have completed your testing, then?

A. That is the date -- it's the date -- I'm not sure if it's the date when I -- it's the date of the report. I'm not sure when I wrote the rough draft of the report. I don't have that with me. Today the date that's on the report is very, very close to the date it's actually signed off on and issued. And there's further initials and dates on the report to show when the reviewer -- and when the designated -- you can see the designated signature underneath mine -- when they sign off on it. That's not present on these. We weren't doing that at the time, so I'm not -- the testing would have been done prior to August 20th in order for the report to be issued, though.

Q. Okay. You talked a little bit about how the biological material collected from Maryetta Griffin was tested under the old method, the RFLP method. When did the State Crime Lab start doing testing under the new method? STR method?

A. STR started being used in our laboratory on case work that -- I'm not exactly certain. I started on them in 2001 on case work. I was one of the last people who was trained on it. So probably around 2000. Maybe 1999. I'm not sure of the exact

date, because we were still kind of doing both testing for awhile, and then we stopped the RFLP and just went straight to STR completely.

Q. But you started doing STR testing in 2001?

A. Yes.

Q. And it took a little while before the State Crime Lab completely started only doing STR testing for D.N.A.?

A. Yeah. And I'm not sure how long it took, actually.

Q. And you spoke a little bit about how a D.N.A. profile uploaded -- or a D.N.A. profile was tested under the RFLP method and is uploaded into the Wisconsin databank system. Is that searchable, then? If that same profile was tested under the STR method, would there be a hit?

A. There's no way to compare the two types of profiles developed from the two types of testing. So no.

Q. Now, going back to the testing that you did do from the biological material collected from Miss Griffin, did you collect that biological material?

A. I did not.

Q. Do you know who does?

A. In this case I believe it was the Milwaukee County Medical Examiner's Office.

Q. The Medical Examiner's Office. Not the -- Milwaukee County.

A. Right.

Q. Not with the Milwaukee Police Department?

A. That's correct.

Q. So if you don't collect the sample -- and this may be an obvious question, but I'm going to ask it. You don't know -- when that person is collecting it, you can only test the biological material that's on the swab, correct?

A. That's correct.

Q. So, for example, if you're testing an oral swab, you can only test the biological material on that swab, and you don't know where the collector actually swabs in the oral cavity.

A. That's correct.

Q. Are you able to tell the jury how long -- are you able to tell the jury how long sperm cells last --

MR. STAINTHORP: Judge, objection. And ask to be heard at sidebar.

THE COURT: All right. Unless foundation is laid before that question is asked.

MR. STAINTHORP: No, Judge. I believe this is going into an area which has not been identified, and should have been --

THE COURT: All right. Let's have a side-bar, then.

(Whereupon a side-bar conference was held off the record. Upon conclusion of the side-bar conference, the proceedings continued as follows:)

THE COURT: Okay. Miss Yuan?

MS. YUAN: Thank you, Your Honor. I'm just looking at

my notes really quick. I don't have anything further for you. Thank you. Attorney Stainthorp may have some questions for you.

THE COURT: Cross examination.

**CROSS EXAMINATION**

**BY MR. STAINTHORP:**

Q. Ms. Polakowski, the agency at which you are a part is the Wisconsin State Crime Lab, correct?

A. That's correct.

Q. And that is an independent entity from the Milwaukee Police Department?

A. Yes, it is. It is part of the Wisconsin Department of Justice.

Q. Now, you've testified that you did testing in 1998, and then you subsequently did some additional testing in this case in 2010, correct?

A. That's correct.

Q. All right. With respect to the 1998 testing -- so the testing that you did using the RFLP, you've testified that the -- that you tested sperm fraction of the vaginal swabs from Ms. Griffin, correct?

A. That's correct.

Q. And when you say sperm fraction, there -- you had the ability back in 1998 to isolate sperm cells from other cells, correct?

A. Yes, we -- part of our -- one of our extraction methods that

we use in cases where sperm is or may be present.

Q. And so once you've isolated sperm cells, you know that you're testing something that is not produced by the female victim in the case, correct?

A. That's correct. Sperm is only produced by males.

Q. And you testified that Mr. Avery was excluded under the testing that you conducted back in 1998 as the source of the sperm fraction of the vaginal swabs, correct?

A. Yes, he was excluded as the source of the RFLP D.N.A. profile that I obtained.

Q. Okay. And he was also excluded as a possible contributor to the sperm fraction of the oral swab that you tested?

A. That's correct.

Q. And in -- back in 1998, even though the RFLP was a less discriminating and -- a less discriminating form of testing the D.N.A. than is currently in operation, an exclusion -- if you had an exclusion, that was 100 percent, correct?

A. For the RFLP results, yes. Besides being slightly --

Q. That's okay. That's all I wanted. Okay. And the RFLP was less discriminating in terms of possible inclusion, correct? That even though it could include some people as the source, it was less discriminating than the current method of testing?

A. Yes. And it's also less sensitive.

THE COURT: It's also less what?

THE WITNESS: Sensitive.

MR. STAINTHORP:

Q. Okay. Now, the -- and with respect to your testing in 2010, at that point you were testing biological samples from Ms. Griffin using STR testing, is that correct?

A. That is correct.

Q. And that is, when you did that testing, Mr. Avery was also excluded as a potential source from the vaginal and oral swabs, correct?

A. Yes, he was.

Q. And at that time, in terms of the vaginal and oral swabs, a Walter Ellis was identified as the contributor of -- strike that. With respect to the oral swabs in 2010, Walter Ellis was identified as the source of the semen -- of the sperm fraction of the oral swabs, correct?

A. He was -- the profile was consistent with his standard. It did not meet our criteria to say that he was the source. But it was consistent with him, and I don't remember the exact probability of inclusion. I think it was around -- the probability of randomly selecting someone else who would be consistent was about one in maybe 30 million. I don't have the number in front of me.

Q. Well, I'll just show you for identification purposes whether you recognize this as a report that you completed in May of 2010, I believe?

MS. YUAN: And counsel, I'm sorry. I don't have a

copy of that.

THE WITNESS: Yes. This is a copy of the report that I issued in 2010 regarding the STR testing in this case. Or some of the STR testing.

MR. STAINTHORP: Okay. Let me just show counsel.

THE COURT: Is there an Exhibit number?

MR. STAINTHORP: I didn't mark it as an Exhibit, Judge.

Q. And just calling your attention to the -- calling your attention to the third page of this May 11th, 2010, report. You note that you developed a partial male STR profile from the sperm fraction of the oral swabs, is that correct?

A. That's correct.

Q. And that Mr. Avery is excluded as a possible source of the profile?

A. Yes, he is.

Q. And that then you compared the profile to the buccal swab standard for Mr. Ellis?

A. Yes.

Q. And that the buccal swab standard for Mr. Ellis is consistent to the profile, correct?

A. Yes.

Q. And you then note that the probability of randomly selecting an unrelated individual who would have a profile consistent to this evidentiary profile is at least as rare as one in 34

billion, correct?

A. That is the correct number, yes.

Q. And do you know the current population of the world?

A. It's --

MR. SMOKOWICZ: Million or billion?

MR. STAINTHORP: Billion.

THE WITNESS: Billion. Yes, I was incorrect before when I was trying to recall it. It is 34 billion.

MR. STAINTHORP: Okay.

THE WITNESS: The current population of the world is between, I think, 6 and 7 million.

MR. STAINTHORP:

Q. So it is, in effect, for all reasonable terms, scientifically an exclusion -- I mean, an inclusion of Mr. Ellis, correct?

A. It is an inclusion. The statistic that I put in the report gives the weight of it. Our source attribution in our laboratory is -- must be at least as rare as one in 7 trillion. So that didn't meet our cutoff to say that, yes, he's the source. However, he was consistent with it, and it is a very strong association.

Q. And after you had reported that result, you actually got a call from a member of the Milwaukee Police Department, correct? Let me refresh your recollection. Do you remember getting a call from Detective Hernandez at the Milwaukee Police

Department?

A. I believe he called me, yes.

Q. And he wanted you to do some additional testing of the biological samples from Ms. Griffin, correct?

A. Yes. I believe he was asking about the fingernail clippings.

Q. And you did, in fact, then do testing of the fingernail clippings, correct?

A. Yes, I did.

Q. And you are aware that D.N.A. recovered from fingernail clippings could be important information in terms of the development of evidence in a case, correct?

A. Yes, it can be.

Q. And that is because people, when they're in a fight, will often -- if they're in a struggle, will often get evidentiary materials from their attacker under their fingernails?

A. They can. It's -- I don't know how often it happens.

Q. Okay. But that's -- certainly that's your understanding of the reason for checking fingernail clippings, correct?

A. Yes. Yes. That would be why we would want to check fingernail clippings.

Q. And you recall that you then did the D.N.A. testing on the fingernail clippings, correct?

A. Yes, I did.

Q. And you actually got some results from that testing,

correct?

A. I believe there were some limited results.

Q. Okay. And I'll -- I'm not asking you to guess at what your results were. So here's the report, just to refresh your recollection. June 16th, 2010?

A. Yes.

Q. And that's your report, correct?

A. Yes. This is a copy of my report.

Q. And that indicates that you did D.N.A. testing on the -- well, you attempted to do on both the right and left hands, correct?

A. Yes.

Q. And, in fact, you got some results from the right hand, correct? Go ahead.

A. Yes.

Q. And, in fact, the result of the testing of the right hand fingernail clippings, first of all, showed biological material that was consistent with Ms. Griffin, correct?

A. From the right hand fingernail clippings? No. There was limited information from the fingernail clippings, and so I could use it for exclusion purposes only to state that someone is not there. Not to say that anyone actually is there.

Q. True. But the D.N.A. from the fingernail clippings was consistent with Ms. Griffin.

A. No. She -- she is --

Q. Why don't you read that paragraph.
A. All right. The STR profile developed from the right hand fingernail clippings, in parentheses item AD-1, is a mixture of at least three individuals. Due to limited statistical information obtained from this profile, it may be used for exclusionary purposes only. Based on the results obtained, the possible contribution of D.N.A. from Maryetta M. Griffin, Walter E. Ellis, and Terry L. Bryson in this D.N.A. mixture profile cannot be determined. Derrick Crawley, Samuel H. Hogans, Lorenzo Frost, and William Avery are excluded as possible contributors to this D.N.A. mixture.
Q. Okay. So based on these findings that you made in this June 2010 report, you could exclude Mr. Avery 100 percent as being the source of any biological materials in the fingernail clippings, correct?
A. For the right hand fingernail clippings, yes, he was excluded as a contributor.
Q. All right. And since you -- let's just go to the left hand fingernail clippings. And I believe your findings on that were that there really just wasn't enough material to make any significant findings. Is that correct?
A. That's correct. There were actually two types of STR testing done on both sets of fingernail clippings. The first set we talked about for the right hand fingernail clippings. And that's -- it's what's known as autosomal testing. Or when

someone talks about D.N.A. testing, this is usually what they're referring to. And it looks at all -- at D.N.A. from males and females.

The other type of STR testing that we can do is called Y-STR testing. And that focusses solely on the "Y" chromosome, which is produced in males. So for samples where we have a very large amount of female D.N.A. mixed with a small amount of male D.N.A., we can focus solely on the male D.N.A. and look at the profile from that, and having -- ignore the female. We do that in cases like this, or in sexual assaults where there's a big difference between amounts of D.N.A. Because to do the autosomal testing, we would only see the female. It would sort of wash out the male, and it wouldn't be there.

The limitations of Y's are that you can't identify an individual with them. They are inherited paternally, so a man and his son and his brothers should all have the same "Y" profile, barring any mutations. And other males in the population can't have that as well.

So there was Y-STR testing also done for both sets. For the left hand fingernail clippings, for the autosomal testing there was no way to make any meaningful comparisons based on the profile. It was a low level D.N.A. mixture, and I couldn't do any comparisons. For the "Y" testing for the left hand fingernail clippings, I obtained no results at all.

Q. Okay. So as a result of your May and June -- or the testing

that was reported in May and June of 2010, to the extent you could determine any results from the biological material, Mr. Avery was excluded as the source of that material. Do you need your report back?

A. Yes. I just believe that the report from June actually probably went out in July. If you look on the top part, the reviewer -- the date -- the report is dated June 16th; however, it would have gone out -- it was dated July 22nd by the reviewer. It would have been sent out after that.

Q. Okay.

A. But yes, Mr. Avery was excluded.

MR. STAINTHORP: Okay. That's all I have, judge.

THE COURT: Redirect?

**REDIRECT EXAMINATION**

**BY MS. YUAN:**

Q. Very briefly. Miss Polakowski, do you remember if you were the analyst that developed the standard for Walter Ellis?

A. Yes, I developed the standard.

Q. And that means, again, that you identified -- you linked the D.N.A. profile for Walter Ellis with his actual identity? His identity was known when you tested and created the standard?

A. Yes. That's what the standard was for. To have his D.N.A. profile linked to him.

Q. And when was that?

A. That was in September of 2009.

Q. And William Avery was excluded from any of the biological material collected from Maryetta Griffin back in 1998, correct?
A. Yes. With the RFLP testing.

MS. YUAN: Thank you. I have nothing further.

MR. STAINTHORP: Nothing further, Judge.

THE COURT: All right. You may step down, Mrs. Polakowski. Additional witnesses?

MS. YUAN: Your Honor, the defense calls Patricia McCoy.

**PATRICIA McCOY**, called as a witness, having been first duly sworn, on oath testified as follows:

THE CLERK: Will you please state your full name and spell it for the record.

THE WITNESS: Patricia M. McCoy.

**DIRECT EXAMINATION**

**BY MS. YUAN:**

Q. Good morning, Miss McCoy.
A. Good morning.
Q. Miss McCoy, are you from Wisconsin?
A. No.
Q. Where are you from?
A. Fargo, North Dakota.
Q. And where do you currently live?
A. Fargo, North Dakota.
Q. Do you have family here in Wisconsin?

A. Yes.
Q. And where do they live?
A. In the Milwaukee area.
Q. In the Milwaukee area? And do you know or did you know a woman named Maryetta Griffin?
A. Yes, I did.
Q. And did you actually know her by a nickname?
A. Mercedes.
Q. And how did you know her?
A. Well, we was hustling on the streets together, and we had drug activities going on at the time.
Q. And this is back in 1998?
A. Yep.
Q. Is that when you knew her, was back in 1998?
A. Yep.
Q. And you said you were hustling together. Can you -- and I'm not trying to embarrass you, but just so the jury understands --
A. Well, it was a prostitution thing going on, and I was pretty much the watch person. So I was on the streets with them.
Q. You were the watch person?
A. Yep. I watched their back while they did what they did.
Q. So in case something got out of hand, you were there to render assistance?
A. Yep. Yep.
Q. And you said that you also had a drug habit?

A. Yes. I used to, yes.
Q. And that was in the past?
A. Yes.
Q. And that was back in 1998 when you knew Maryetta Griffin?
A. Yes.
Q. And did you say that you and her would use together?
A. Yes.
Q. And I want to call your attention -- I mean, you're aware that Maryetta Griffin passed away February 17th, 1998, correct?
A. That's right.

MS. HOFT: I'm going to object to the leading nature of these continuing questions, Your Honor.

THE COURT: Well, it's in the record, so the Court will allow the last answer.

MS. YUAN:

Q. Can you tell the jury what you remember about the last time you saw Maryetta Griffin? And when that was?
A. We were together the 16th of February. We was hanging out on the streets, and I had left to go to my Auntie's house, and she had got in the car with someone. And I guess in the midst of me being there, and her in the car, she robbed the guy. And so she came to my Auntie house and got me, and so we went to the drug house on Palmer Street. But before we got in there, I had asked her not to take all that money in there like that, you know. I say, you know -- because, you know, never know what

happen, you know. And I was just scared for her to have the money on her.

Q. I'm going to slow you down just a little bit so the jury understands, and so I understand the story here. You said the drug house on Palmer Street. Do you remember the address to that house?

A. 2474 North Palmer.

Q. 2474 North Palmer? Is that a yes?

A. Yes.

Q. And you said you were at your Auntie's house. Where did she live?

A. She stayed on 2nd and Meinecke.

Q. She was on 2nd and Meinecke?

A. Yeah.

Q. Had you been to this drug house on North Palmer Street before? Before February 16th, 1998?

A. Yes.

Q. Do you remember how many occasions?

A. Numerous times.

Q. So you were familiar with the drug house before February 16th, 1998?

A. Yes, ma'am.

Q. Were you familiar with who would frequent the drug house?

A. Yeah. Quite a few of us. I pretty much knew pretty much everybody. So --

Q. Did you know the individuals that ran the drug house?
A. Yes, I did.
Q. And who were they?
A. Loke (phonetic) and his cousin, Ronnie.

MS. HOFT: Objection.

THE COURT: No, overruled. She said she frequented it. The Court will allow it. Goes to weight, not the admissibility.

MS. YUAN: Thank you.

Q. You said Loke and who?
A. His cousin, Ronnie.
Q. And is Loke a nickname for somebody?
A. William Avery.
Q. So you knew William Avery as Loke?
A. Yep.
Q. And you see a gentleman seated here at the table in front. Is that who you know as Loke?
A. Yes.
Q. And you said his cousin, Ronnie? Yes?
A. Yes.
Q. Did you know who -- Ronnie was known by another name?
A. Frost.
Q. Frost?
A. No -- his name is Lorenzo Frost. No, we called him Ronnie.
Q. You called him Ronnie. But do you know if his name was

Lorenzo Frost?

A. Yeah, that's his name. Yeah.

Q. So you know that Loke and Ronnie ran the drug house on North Palmer Street?

A. Yes.

Q. So I interrupted your story. So you said you and Maryetta Griffin went to 2474 North Palmer Street February 16th, 1998?

A. Yes.

Q. And what time was that? Do you remember?

A. You know, over the years I've been, you know, really thinking about this. They sent me to the store. It was at night. So the store closes around 9:00 or 10:00. So I think I said before that it was late night, but after thinking, rethinking stuff, you know, it had to be during that hour between -- 9:00 and 10:00 p.m. hour at night.

Q. So you believe it was between 9:00 or 10:00 p.m. that you and Maryetta Griffin went to the drug house?

A. No. It was before that. But they sent me to the store -- Mr. Avery sent me to the store. So when I come back, I wasn't allowed to go back in. And I asked him where was she at, and they said she had left. And then I waited. Then I went back and looked for her again. And they said she still wasn't there. So I left, and next thing I know, the homicide Detectives looking for me.

Q. So you said --

THE COURT: I didn't understand that last part. What was that?

THE WITNESS: Sir?

THE COURT: What was the last answer?

THE WITNESS: The homicide Detectives looking for me.

THE COURT: Okay. Madam reporter, could you -- I didn't catch that, so could you --

(Whereupon the preceding answer was read back by the Reporter.)

MS. YUAN:

Q. So you -- the way you -- as you thought about matters now, you believe that you and Maryetta Griffin went to the drug house sometime before 9:00 or 10:00 p.m. on February 16th, 1998?

A. Yes.

Q. And you said when you went there, were you and Maryetta Griffin allowed to go into that drug house?

A. We were let in, but I was sent to the store. And so I don't know what happened after that.

Q. And why did you and Maryetta Griffin go to that drug house that night?

A. Because she wanted to get a quantity of drugs.

Q. She wanted to buy some drugs?

A. Yeah.

Q. And so you and Maryetta Griffin were let into the drug house, and then you said you were sent to the store?

A. Yeah.

Q. By who?

A. Mr. Avery, right there.

Q. What did he send you to the store for?

A. Cigarettes and beer.

Q. Did he give you money for that?

A. Yes.

Q. And when you left, was Maryetta Griffin still at the drug house?

A. Yes.

MS. HOFT: Objection, leading, Your Honor.

THE COURT: Overruled.

MS. YUAN:

Q. And after you left the drug house, what happened? Did you go to the store?

A. Yes, I went to the store. And when I returned I gave Mr. Avery the bag.

Q. And I'm going to stop you one second. When you returned, did you actually go back into the drug house?

A. No. They just opened the door and took the bag and shut --

Q. And -- one second. You said they. Do you actually --

A. Well, him, actually. Mr. Avery.

Q. Was there more than one person at the door?

A. There was more than one person in the house. But Mr. Avery is the one that sent me to the store, so I gave him the

merchandise back.

Q. Do you know who else was in the house?

A. His cousin, Ronnie. And it was other people there, too, getting high and stuff, so --

Q. When you say there were other people there, do you mean there were other people there when you went into the drug house with Maryetta Griffin?

A. There was people already up there in the attic.

Q. So you saw other people there when you went inside the drug house?

A. I saw one or two people.

Q. And when you came back with -- did you come back with cigarettes and beer?

A. Yeah, but I wasn't let past that -- that threshold. He just opened the door, got the bag, and that was it. And I went back for her. They said she still wasn't there. So I don't know what happened after that.

Q. So when you went back to the house and gave the cigarettes and beer to Mr. -- it was only Mr. Avery at the door?

A. Um-hum.

Q. Yes?

A. Yes.

MS. HOFT: Objection, leading, Your Honor. And asked and answered.

THE COURT: Well, it is, but the Court will allow it.

MS. YUAN:

Q. You weren't let back into the house, correct?

A. Right.

Q. So you don't know if other people were in the house, other than Mr. Avery when he answered the door and took the bag from you?

MS. HOFT: Objection.

THE WITNESS: I don't know who's in there at that point. I don't know.

MS. HOFT: Objection.

THE COURT: Well, the question can be rephrased.

MS. YUAN:

Q. Do you know if there was anybody else in the house when you returned from the store?

A. No, I don't know that.

Q. Other than Mr. Avery?

A. That's all I saw, ma'am.

Q. Now, you were interviewed by homicide Detectives back in 1998 after Maryetta Griffin was found dead, correct?

A. Yes.

Q. Did you tell them this story when they interviewed you back in 1998?

A. No, I did not.

Q. Why didn't you tell them that?

A. Because I had got death threats to my mother and my kids, so

I wasn't gonna tell nobody nothing. So after some years passed, you know, and talking to her family, and then I know his family, you know -- and, you know, I'm just tossed up in the air. So I'm not trying to hurt him, and I'm not trying to hurt her, but we need closure somewhere with all of this, you know. I need closure. I've been dealing with this 20 years. So I just wanted to do what's best for him and her. Not trying to hurt nobody.

Q. And I want to make sure we understand what you're talking about when you say him and her. When you say you don't want to hurt him, you don't want to hurt her, do you mean Mr. Avery for him?

A. Yeah.

Q. But you also don't want to hurt Maryetta Griffin?

A. Family, yeah.

Q. Her family?

A. Correct.

Q. So you said you got death threats back in 1998. What do you mean by that?

A. I was told that if I told the Police --

MS. HOFT: Objection, Your Honor.

THE COURT: Overruled. She may answer.

THE WITNESS: I was told if I told the Police what was going on --

MS. HOFT: Objection. Hearsay, Your Honor.

THE COURT: Well, it goes to her state of mind. The Court will -- it's not offered for the truth of the matter asserted, ladies and gentlemen, so disregard that. But it's why she did what she did. So that's a distinction in the Rules of Evidence that allows her to answer. But not -- doesn't allow you to take the substance of it into account.

MS. YUAN:

Q. Do you remember the question?

A. No, no. I'm just nervous right now. What was the question?

Q. I was asking you about the death threats.

A. Well, I had quite a few people came up to me and told me if I said anything about this situation, that my mother and my kids would come up dead. So I didn't say nothing.

Q. Were you scared because your friend had just ended up dead?

A. Yes.

Q. Were you scared of Mr. Avery? Or Ronnie?

A. I was scared of everybody at that point.

MS. HOFT: Objection.

MS. YUAN: Your Honor, may I continue? I'm sorry. I thought she had an objection.

THE COURT: Yes.

MS. YUAN: Okay. Thank you.

THE COURT: Was there an objection? I didn't hear one. So go ahead.

MS. YUAN: Thank you.

Q. Miss McCoy, do you recall testifying at Mr. Avery's homicide trial?

A. Yes, I do.

Q. Do you recall -- and I think you said some of this. You were explaining about your remembrance at the time when you went to the drug house. But do you recall at his drug trial you testified that it was late -- late in the evening February 16th or early in the morning February 17th when you went to the drug house?

A. Well, originally thought it was, you know -- for some reason I thought it was late at night. But, you know, now that I'm clean and I can think, you know, I pretty much refreshed my memory with pretty much the details of that day. So it wasn't -- it wasn't late at night. Had to be in the hours of 9:00 and 10:00, because that's what time the stores close.

Q. Okay. Well, I appreciate your time. That's all the questions I have for you right now.

THE COURT: Okay. Cross examination.

MS. HOFT: Thank you.

**CROSS EXAMINATION**

**BY MS. HOFT:**

Q. Good morning, Miss McCoy. I'll try not to take up too much more of your time, either. So just -- let's go back. Miss Yuan was just asking you about the time that -- now you remember that you and Maryetta got to the Palmer Street address to buy drugs.

And that was, you think -- now you realize, because you're thinking clearly, that that was sometime before 9 o'clock that you guys arrived there?

A. Yes. It has to be.

Q. And you also remember testifying at the criminal trial that on the Palmer Street address there was a house full of people when you guys were there, right?

A. Right. Like I say, when I first got there, there were people there. But once I went to the store, and come back, I don't know who was there.

Q. Right. Because you didn't go inside.

A. I never come back in. So I don't know.

Q. But when you left, before you went to the store, there was a house full of people?

A. Yes, ma'am.

Q. And you currently live in Fargo, North Dakota, right?

A. Yes, ma'am.

Q. How is that?

A. It's going well for me.

Q. Good. Good. And that's over 100 miles away from where we are today, correct?

A. Actually 500 miles.

Q. Okay. And you received a subpoena in this case?

A. Yes.

Q. And how -- who served that subpoena on you?

A. I don't know. Went to my daughter's house. So my daughter signed for it, so I don't know who -- who was the person.
Q. So it came to your daughter's house here in Milwaukee?
A. Yes.
Q. And did you then drive from Fargo to here?
A. Yes, I did.
Q. Do you have a valid driver's license?
A. No. I didn't drive. Wife and her daughter drove. But we altogether.
Q. Okay. You've had some issues in North Dakota with driving on a suspended, revoked license?
A. Yes, I have.

MS. YUAN: Your Honor, I'm just going to object to the relevance.

THE COURT: Well, the Court will allow it.

MS. HOFT:

Q. And you've also had some issues about operating a motor vehicle without insurance in North Dakota?

MS. YUAN: Same objection, Your Honor.

THE WITNESS: Only had that once.

THE COURT: The Court will allow it.

MS. HOFT:

Q. And back in 1998 you actually learned of your friend, Miss Griffin's death, by the Police, right?
A. Yes.

Q. And you learned about -- and I'm sorry for your loss, and we're all sorry for the loss of Miss Griffin. You learned about it when the Police the next day, after February 16th, kicked in your mother's door, right?

A. Yes.

Q. And they took you out of your house on February 17th in handcuffs, right?

A. Yep.

Q. And at that point you were scared of the Police, right?

A. I mean -- yeah. I was scared of the Police. I was scared of the whole situation. I didn't want to be involved in this.

Q. And when you first spoke to Detective Hein, do you remember that -- I guess she's married and now she goes by Spano?

A. Yeah.

Q. When you first spoke to her about Maryetta Griffin, you were in jail, right?

A. Yes.

Q. And you spoke to the homicide Detectives, would it be fair to say, numerous times about Maryetta Griffin?

A. Yes. That's true.

Q. And a lot of those times you were in jail when you talked to them?

A. Yes. That's true.

Q. And when the Police took you out in handcuffs from your Mom's house, on February 17th, they took you to -- do you know

it as the C.I.B.? Or the Homicide Division?
A. Yeah, they took me to the Homicide Division. Locked me up there until they was ready.
Q. And you were held there for a number of days?
A. Yes.
Q. And when you were there, you were actually told that you were the primary suspect of Maryetta Griffin's death?
A. Yes. Yes.
Q. And when you were there they threatened to charge you with her murder, and that you would get 13 years to life?
A. Yes, they did tell me that.
Q. And let me tell you this -- the Police -- or let me ask you this. Sorry. The Police told you that strands of your friend Maryetta Griffin's hairs had been found in Lorenzo Frost's Suburban automobile, right?
A. Yes.
Q. Did you ever learn that that was false?
A. No. I was under the impression that they -- from what I was being told that, you know, people talking in the area that they did it. So I don't know. I didn't see nobody do it.
Q. Right. And you never learned that a search warrant for the Suburban yielded nothing of evidentiary value in the Maryetta Griffin murder? Did you ever learn that?
A. That ain't what I was told. I heard that they found blood spots and hair in that Suburban. So I don't know.

Q. The Police put it in your head that William Avery and Lorenzo Frost killed Maryetta Griffin, didn't they?
A. Well, it was -- it was said. But also people in the prison were saying that he -- he said he did it. So I didn't know. But at that point I started to believe what the Police was telling me.
Q. I hear 'ya. So the Police also told you that there were other jailhouse informants who had said that William had made statements to them?
A. Yes. I heard that.
Q. And in May of 2003, do you recall pleading guilty to a felony possession of a controlled substance?

MS. YUAN: Your Honor, objection again. This is irrelevant.

THE COURT: No, there's wide latitude to cross examine the witness and the witness's credibility, so --

THE WITNESS: You say what now?

MS. HOFT:

Q. Thank you. I was asking if you remembered back in May of 2003 pleading guilty to a felony possession of a controlled substance charge?
A. Yes, ma'am.
Q. And you were sentenced on that charge to I think a year sentence. Does that sound about right?
A. I think it was 13 or 14 months.

Q. Okay. And after that time you talked to Detectives in this case. Catherine Hein Spano in October of 2003, right?
A. Um-hum.
Q. And that's a yes?
A. Yes.
Q. Because it's hard to spell. We all use those phrases, but --
A. Yes. Yes.
Q. And did they tell you that if you testified at the trial of William Avery that two prostitution charges that you had would be dismissed?
A. No, I don't remember.
Q. Do you remember talking to a Kevin Fisher, an investigator in Fargo, North Dakota?
A. Um-hum.
Q. Okay. Do you recall telling Kevin Fisher that?

MS. YUAN: Your Honor, I'm going to object. This is hearsay.

THE COURT: Well, it's what she said, so she may be asked the question as to what she told Kevin Fisher.

MS. HOFT:

Q. Do you recall telling Kevin Fischer that the Police told you they would get rid of a couple of prostitution charges you were facing?
A. They might have did told me that. I mean, I've been told so

much, you know, over the years. So I don't know what to believe and what not to believe. But yes, I did use drugs, and I do have prostitution cases, and I do have drug charges. That's the past of me. I don't do drugs and stuff anymore, so --

Q. And after you pled guilty and got the 13 or 14 years --

A. Months.

Q. Months. I'm sorry. I'm sorry. I apologize. After you got the 13, 14 months sentence in 2003, and after you talked to Detective Hein and Spano, in November of 2003 you were granted work and school release privileges. Do you remember that?

A. Um-hum.

Q. And that's a yes?

A. Yes. Yes.

Q. And I believe at the time of William's -- well, let me ask you this. Were you ever made aware that Terry Bryson testified at William's trial that he was with Maryetta Griffin and he dropped her off at 2474 North Palmer at 11:00 p.m.?

A. I don't know nothing about that.

Q. Okay. And from your memory of February 16th that wouldn't be true, right? Because you were with Maryetta?

A. I was with her and -- I was with her up until the point they said she was dead. So I don't know what no one else is saying. I for a fact know that she come to my Auntie's house and got me and I went to their house with her.

Q. And at the time of Mr. Avery's trial you testified that

you'd been convicted of 16 crimes. Do you remember that?

A. I was in the world back in the day.

Q. I hear 'ya. And after William's trial you were convicted of additional crimes, right?

A. Yeah.

Q. Between that 2005 trial and today, how many additional crimes do you think you've been convicted of?

A. Can't say many. I don't know. About two. I don't do Police anymore, so --

Q. Okay. And I don't want to, you know, embarrass you, but we have to ask you these questions. In 1998 you had a drug problem?

A. Yes, I did.

Q. And how much -- I mean, what drugs were you using?

A. Crack cocaine.

Q. Did you -- have you referred to yourself as a crack head back in those days?

A. Yes.

Q. And do you still struggle with substance abuse?

A. No.

Q. Are you currently in a dual diagnosis intensive treatment in North Dakota?

A. No.

Q. Do you receive any treatment for anything?

A. I have depression issues that I seek treatment for.

Q. Okay. And I'm sorry -- you have mental issues?
A. Yes.
Q. Are you on any medication today?
A. Just my thyroid medication.

MS. HOFT: If I can just have a moment. Just a few more questions.

Q. Do you -- we talked a little bit about Defendant Katherine Hein Spano, the Detective. And do you -- when was the last time you saw her?
A. It's been years. But I talked to her about 2 or 3 weeks ago.
Q. Okay. What did she say to you, and what did you say to her?
A. Nothing. Someone had called me and left a message. So I couldn't -- I didn't know who the person was, so I called her and asked her were they trying to reach me? And she told me they were.
Q. So you initiated the phone call with her because you knew her phone number? Or how did that happen?
A. No. I called down here and got it. I knew her name from before, so I just gave them her name and they connected me to her.
Q. I see. And that was a couple weeks ago?
A. Yeah. About 2, 3 weeks ago.
Q. And in the past has Detective Hein Spano ever given you money?

A. Yeah.
Q. And did she -- how much money did she give you over the years?
A. I don't know. $30 here. $15 here. So it wasn't much money. But yes, I was given money.
Q. And were you also allowed to keep drugs that you received when you were asked to go and buy drugs from other people?
A. Yeah, I kept my dope. Um-hum.

MS. HOFT: And that's all I have. Thank you.

THE WITNESS: All right.

THE COURT: Redirect.

**REDIRECT EXAMINATION**

**BY MS. YUAN:**

Q. Miss McCoy, I just have a few more questions.
A. Okay.
Q. Did you ever buy crack cocaine at 2474 North Palmer Street?
A. Yes.
Q. Did you ever buy it from Mr. Avery?
A. Yes.
Q. What would happen after you would buy the crack from Mr. Avery?
A. They would let me go upstairs in the attic and smoke.

MS. HOFT: Objection.

THE COURT: Overruled.

MS. YUAN:

Q. Go ahead.

A. They would let me go up in the attic and smoke it.

Q. So you would smoke the crack cocaine that you purchased at North Palmer Street in the attic?

A. Um-hum.

Q. Yes?

A. Yes.

Q. Is that typical? Would you typically smoke it there?

MS. HOFT: Objection, Your Honor.

THE WITNESS: It was a smoke house.

THE COURT: Overruled.

MS. YUAN:

Q. It was a smoke house?

A. Yeah, it was a drug and smoke house, yes.

Q. Do you know if Maryetta Griffin actually bought any drugs on February 16th, 1998?

A. I'm more than positive she did.

Q. What did you say?

A. I'm more than positive she did.

Q. If she bought drugs at the drug house, in your experience would she be smoking the drugs in the attic?

A. Um-hum.

MS. HOFT: Objection. Foundation.

THE WITNESS: Yes.

THE COURT: No, the Court will allow the answer to

stand.

MS. YUAN:

Q. That's a yes?

A. Yes.

MS. YUAN: I have no further questions for you. Thank you for your time.

THE COURT: Recross?

MS. HOFT: No, Your Honor.

THE COURT: All right. You may step down, Miss McCoy. Watch your step, please.

THE WITNESS: Okay. Thank you.

THE COURT: Next witness?

MS. YUAN: I can check in the hall. One second.

THE COURT: Okay.

MS. YUAN: Defendants call Officer Kenneth Cecil.

**OFFICER KENNETH CECIL**, called as a witness, having been first duly sworn, on oath testified as follows:

THE CLERK: Please state your full name and spell it for the record.

THE WITNESS: Kenneth S. Cecil, C-E-C-I-L.

**DIRECT EXAMINATION**

**BY MS. YUAN:**

Q. Good morning, sir.

A. Good morning.

Q. Can you please tell the jury where you're employed?

A. City of Milwaukee Police Department.
Q. And what is your rank?
A. Police Officer.
Q. How long have you been with the Milwaukee Police Department?
A. 30 years.
Q. And you said you are a Police Officer?
A. Yes.
Q. And what are your duties right now?
A. I run the Field Technology Unit.
Q. And can you describe what that entails?
A. We're in charge of the computers, the body cameras, the in-car video, the electronics technology that Officers use on the street.
Q. How long have you been in the Field Technology Department?
A. Four-and-a-half years.
Q. What were your duties prior to being in this Department, the Field Technology Department?
A. I was a Patrol Officer, District Number 5.
Q. And what were your duties then?
A. I was the radar car, basically.
Q. You said the radar car?
A. Yeah. Traffic enforcement.
Q. And I'm going to turn your attention to February 17th, 1998. Do you recall being involved in the investigation of Maryetta Griffin?

A. Yes.

Q. And can you describe for the jury your first contact with that investigation and how that occurred?

A. Sure. I was sent to North 7th Street to check a call for a body in a garage. Not very specific, other than the block. I went to the area, parked my car in the alley. First garage I went into that was open, I found her body.

Q. Okay. And Officer Cecil, I'm going to show you an Exhibit that's been marked as Defense Exhibit 1009. Do you recognize this as a report of the scene from when you responded to that report of a body in the garage?

A. Yes. This is a report by Detective DeValkenaere.

Q. And also summarizes what you saw when you responded to the scene initially, and then your activities while you're at the scene, correct?

A. Yes.

MS. YUAN: Your Honor, defense moves Defendant's Exhibit 1009 into evidence.

MR. ELSON: No objection.

THE COURT: The Court will receive it.

MS. YUAN: Thank you.

Q. So do you recall -- I showed you this report very briefly. And if you need to refresh your recollection, I can put this up on the screen for you. Do you recall what time you were sent to check out this report of a dead body?

A. Around 11:00.
Q. 11:00 in the morning?
A. Yes.
Q. And did you have a partner that day?
A. No, I did not.
Q. So you were the only Officer that responded to the scene?
A. Yes.
Q. Were you the first Officer to respond to the scene?
A. Yes.
Q. And what did you do when you got there?
A. I parked and searched. Found her in the garage. Called my Lieutenant.
Q. And you parked in the driveway leading up to the garage?
A. No, I parked in the middle of the alley.
Q. And what happened after you called your Lieutenant?
A. He said he was going to call C.I.B., and he said secure the scene.
Q. And how do you secure a scene? Just so the jury understands what you do.
A. Put Police tape out. I went to my squad, got a roll of tape, and make a big scene. Because it's easier to make it smaller down the road than it is to make it larger. Strung tape across the alley, went down a few houses, strung it across the alley there, and between the garages where I had to. Where anybody could walk to -- somebody can walk past.

Q. And how long before anybody else arrived at the scene, if you recall?
A. Not even a half an hour.
Q. Do you know who responded after you were initially at the scene?
A. Detective DeValkenaere.
Q. Can you describe for the jury what you saw inside the garage?
A. It had two like bi-fold doors. One of them was open, one was closed. It was dirty. A lot of debris, litter, tires. What I would call typical of a boarded up garage. And had a body in it on the far end of the garage from the doors.
Q. What did you notice about the body, if you can describe that for the jury?
A. She was in what we call full rigor. She was stiff. You couldn't move -- you couldn't change her arm positions or leg positions. And it was obvious to me, even, that she had been moved.
Q. What do you mean, that she had been moved?
A. When a body dies and goes into rigor, it's in -- if I died in this chair, I would go into rigor like this. If you move me and laid me on the floor, that's the position I would be in. She had her legs in the air and her head up against the wall of the garage. It wasn't -- she didn't fall there and die.
Q. So based on your observation of how her body was in full

rigor, it was your opinion that she had died someplace else?
A. Yes.
Q. And then had been moved to the garage?
A. Yes.
Q. Do you recall -- you described the garage a little bit. Do you recall if the garage was dirty? The floor was dirty?
A. Very.
Q. Do you recall what she was wearing?
A. Blue -- like a sweater. Letterman's sweater type thing. I don't know what school it was from.

MS. YUAN: Those are all of the questions I have for you. Thank you.

THE COURT: Cross examination.

**CROSS EXAMINATION**

**BY MR. ELSON:**

Q. Good morning, sir.
A. Good morning.
Q. You testified that you responded to the scene and discovered the body at around 11:00 a.m., is that right?
A. Yes.
Q. And it's certainly possible that other people in the neighborhood could have discovered that body before you got there at 11:00 a.m., isn't that right?
A. Absolutely.
Q. And you testified that it was obvious to you that she had

been moved into that garage. Do you remember that?

A. Yes.

Q. Now, you don't know where she was moved from, right?

A. No.

Q. She could have been killed in that alley, moved into the garage, right?

A. Anywhere.

Q. She could have been killed in that immediate area around the alley and moved into the garage, right?

A. Of course.

Q. You don't know where she was killed?

A. No.

MR. ELSON: No further questions.

MS. YUAN: I have nothing further, Your Honor.

THE COURT: All right. You may step down, Officer Cecil. Thank you. Let's take the morning break at this point, ladies and gentlemen. Haven't been in there -- got a later start, but this will put us pretty close to where we usually break. So please don't discuss the case. Only after all the evidence is in. We'll see you back here after the morning break.

(Whereupon the jury was excused at 10:46 a.m.)

THE COURT: Just a housekeeping matter. As far as the Court is concerned, I have a Doctor's appointment at 4 o'clock, so we're going to adjourn at 3:30.

MS. HOFT: No argument here, Your Honor.

THE COURT: Going in for a check-up on my Alzheimer's, so --

(Whereupon a recess was called by the Court. Upon conclusion of the recess, the proceedings continued as follows when the jury was returned to the courtroom at 11:07 a.m.:)

**CAMEO BARBIAN-GAYAN**, called as a witness, having been first duly sworn, on oath testified as follows:

THE CLERK: Please state your full name and spell it for the record.

THE WITNESS: Cameo Barbian-Gayan. C-A-M-E-O. Last name B-A-R-B-I-A-N, hyphen, G-A-Y-A-N.

**DIRECT EXAMINATION**

**BY MS. YUAN:**

Q. Good morning.

A. Good morning.

Q. Can you please tell the jury where you're employed right now?

A. I'm currently a senior auditor for the Department of Children and Families with the State of Wisconsin.

Q. And how long have you been doing that job?

A. Five years.

Q. Were you ever employed with the Milwaukee Police Department?

A. I was.

Q. And when were you employed with the Milwaukee Police

Department?

A. From 1981 until 2008.

Q. And can you describe your various ranks while you were employed at MPD?

A. I started out as a Police aide. Then I was a Police Officer. Then I was promoted to Detective, and I finished up my career as a Detective.

Q. What were the years you were a Detective?

A. 1992 to January of 2008.

Q. And what kind of crimes did you investigate as a Detective?

A. I started out in the Robbery Division, ultimately going to the Homicide Division.

Q. When did you begin with the Homicide Division?

A. 1994, I believe.

Q. So from 1994 until 2008 you were a homicide Detective?

A. Correct.

Q. And Miss Barbian-Gayan -- is that correct? Okay. Do you remember being involved in investigating the Maryetta Griffin homicide?

A. Yes.

Q. Did you actually respond to the scene of the crime?

A. I did.

Q. I'm actually showing you what's already been marked and entered as defense Exhibit number 1009. Is that the scene investigatory report recording what was done when you and other

Detectives and other Officers first responded to the scene?

A. That's correct.

Q. And I'm giving that to you in case you need it to refresh your recollection. But I wanted to ask, do you recall when you first responded to the scene?

A. It was about 11:30 in the morning.

Q. And this is on what date?

A. February 17th, I believe.

Q. Of 1998?

A. Correct.

Q. And when you arrived at the scene, was it already secured?

A. Yes. Uniformed Officers were already there.

Q. Sorry?

A. Uniformed personnel were already there securing the scene.

Q. And what did you do once you arrived on the scene?

A. When we got to the scene, we took over the scene.

Q. When you say we, who do you mean?

A. Myself and other Detectives that had responded, as well as the Detective Lieutenant.

Q. And so when you and other Detectives and the Detective Lieutenant respond to the scene, what happened?

A. We take over the investigation.

Q. I see. And can you describe for the jury what that entails?

A. That entails keeping -- making sure the scene is secure. Collecting anything of evidentiary value. Directing uniformed

personnel to canvas the area. Directing the identification technician and the photographers to take pictures. Bagging and collection of evidence.

Q. And do you recall what this scene looked like when you arrived there? Did you recall seeing the victim?

A. Yes.

Q. What do you recall seeing?

A. I recall an African-American female lying in the stall of a two stall garage. The garage was very dirty. There was a lot of debris around. She had on a North Division letter jacket or letter type sweater. Another shirt on underneath that. She was nude from the waist down. No shoes, no socks. She had small lacerations on her face, and a larger laceration to the right side of her head. She was laying in a semi-fetal position. Her head was to the southeast, and her feet were pointed north.

Q. And you said she was nude from the waist down. Does that include any socks or shoes?

A. She had none on.

Q. She did not have any on?

A. She did not.

Q. Did you form any opinion as to whether or not she had died in this garage?

A. Myself and other Detectives at the scene -- it appeared to us that she had been dumped there or placed there.

Q. And why was that?

A. Her feet weren't dirty. There was no signs of any struggle. You know, nothing was askew right around the body, other than the debris. And again, it was cold out. I don't think somebody would have walked in there nude from the waist down on their own volition.

Q. Do you recall if she was in full rigor when you arrived?

A. I believe she was in full rigor.

Q. I don't have any other questions for you at this time. Oh, I'm sorry. One moment. Was the victim wrapped in a rug when you arrived at the scene?

A. No.

Q. Were there any pictures of the victim wrapped in a rug?

A. Not to my knowledge, no.

MS. YUAN: Thank you. I have nothing further.

THE COURT: Cross examination.

MR. ELSON: No questions, Judge.

THE COURT: All right. You may step down, Mrs. Barbian-Gayan. Thank you. Additional witness?

MR. SMOKOWICZ: Yes, Your Honor. James DeValkenaere.

**JAMES DeVALKENAERE**, re-called as a witness, having previously sworn, on oath testified as follows:

THE COURT: Mr. DeValkenaere, you've been previously sworn and that oath still applies.

THE WITNESS: Yes, sir.

**DIRECT EXAMINATION**

**BY MR. SMOKOWICZ:**

Q.   Good morning, sir.

A.   Good morning.

Q.   Again would you tell the jury your name?

A.   James DeValkenaere.

Q.   And how old are you?

A.   I'm 66.

Q.   Where were you born?

A.   Milwaukee.

Q.   And where did you grow up?

A.   Milwaukee.

Q.   Where did you go to high school?

A.   Washington High School.

Q.   When did you graduate from Washington High School?

A.   1967.

Q.   After you graduated from Washington High School in 1967, did you go on in school right away?

A.   I went to M.A.T.C. for about a year.

Q.   And after you were at M.A.T.C. for a year, what happened next?

A.   I enlisted in the United States Army.

Q.   And what were your assignments once you enlisted in the Army?

A.   I initially enlisted as a Military Police Officer.  I then received training as an infantryman.  I was then sent to

Vietnam, and I served with the 199th Light Infantry Brigade.

Q. And how long were you deployed to Vietnam?

A. Little over a year.

Q. After your year in Vietnam, what happened next?

A. When I returned I was assigned to the Military Police that were responsible for Washington D.C., Baltimore, out of the First Army Headquarters at Fort Meade.

Q. And how long were you in that assignment?

A. Little over a year.

Q. And after that year did you remain in the Army?

A. No. I was discharged.

Q. Okay. Honorably?

A. Yes, sir.

Q. After your discharge from the Army -- and my arithmetic is a little bit off here, but would that be around 1970, '71, in that range?

A. '71.

Q. All right. Once you were discharged in 1971, what did you do next?

A. I initially was hired as a dispatcher at the Wauwatosa Police Department. I worked there for just a short time. And then I was hired as a Police Officer by the Grafton Police Department.

Q. How long did you work in Grafton?

A. About a year.

Q. And what happened at the end of that year?
A. I was hired by the Milwaukee County Sheriff's Department as a Sheriff's Deputy.
Q. And for how long did you work as a Sheriff's Deputy for Milwaukee County?
A. Just under 5 years.
Q. And at the end of that 5 year period, did you go on to a different job?
A. Yes, I did. I was hired by the Milwaukee Police Department.
Q. What year would that be?
A. 1976.
Q. And when you're hired by the Milwaukee Police Department, what happens in terms of your assignment initially then?
A. I was initially assigned to the Training Academy for a period of instruction.
Q. And the City of Milwaukee Police Department -- did it have its own Training Academy, then?
A. Yes, it did.
Q. And to your knowledge does it still have its own Training Academy?
A. Yes, it does.
Q. And so back -- what was it? 19 -- when did you start with the City of Milwaukee Police Department? '70's, I know that. '76, was it?
A. Yes, sir.

Q. Back in 1976 -- do you remember that far back? It's quite some time -- how long the Police Academy training was? Weeks? Months?
A. It was months. I want to say 4 months, but I'm not sure.
Q. And after that 4 month time frame, what happens next in terms of your assignment?
A. Then I was assigned as a uniformed Police Officer. I served at several District stations.
Q. Which District stations were those?
A. Initially I was at Number 4 District. Then I was assigned to Number 6 District Station.
Q. Where is number -- the 4th District located?
A. 69th and Silver Spring.
Q. And where is the 6th District located?
A. At that time it was at 32nd and Burnham.
Q. After those two District assignments -- well, strike that. What were your general duties as a Police Officer in those two districts?
A. General uniform patrol. Enforcement of laws, ordinances, that sort of thing.
Q. After your time there, those two District stations, what happened next in terms of your career?
A. I was then assigned to the Narcotics Unit as an undercover Officer.
Q. And what years were those?

 A. That would have probably have been '83, '84.

Q. And after that assignment?

A. Then I was assigned to the Tactical Enforcement Unit with a concurrent assignment as a crisis negotiator.

Q. Can you tell the jury a little bit about what the Tactical Enforcement Unit is?

A. The Tactical Enforcement Unit is what is commonly referred to in other areas as the S.W.A.T. Unit. Special weapons and tactics. Our assignment was primarily to respond to high risk assignments. We also looked for persons that were known to be armed suspects. We also did search warrant entries, and any type of barricaded gunman situation.

Q. You also mentioned that you worked as a crisis negotiator. Is that what you said? Or hostage negotiator? I can't remember the terms.

A. Yeah, the terms are synonymous. My responsibilities were to negotiate a peaceful resolution to a variety of situations. Whether it be a suicidal person; a suspect in a home that refuses to come out; a hostage situation. Any number of situations like that.

Q. In your experience when you -- when the Department looks for people to do that kind of work, are they looking for somebody with any particular kind of temperament?

A. I believe they would be, yes sir.

Q. What -- based on your experience, what kind of temperament

are they looking for in the people who do that kind of work?
A. I think they're looking for somebody who's dependable and level headed.
Q. Somebody who can deal with difficulties in a crisis negotiation?
A. That's true.
Q. And how long did you do that work for?
A. I remained a crisis negotiator my entire time on the Police Department.
Q. At some point did you -- did your duties or your position change?
A. Yes. In 1991 I was promoted to Detective and assigned to the Criminal Investigation Bureau.
Q. Now, in the Milwaukee Police Department, back in 1991 when you were promoted to Detective, how did -- how does that take place? Do you just go and talk to someone? Or can you explain that process?
A. It's a promotional exam. You take an exam and you are promoted according to your numeric placement on the eligible list.
Q. So when you talk about an exam, is the -- what's the nature of the examination that you have at that time?
A. It's a written examination. It starts out as a written examination regarding duties and responsibilities on the Police Department. Laws and ordinances. And then that is followed by

an oral examination, where you are examined by a panel of normally supervisory Officers from outside jurisdictions.

Q. And in any event, as a result of that examination process, you're placed on a list?

A. Yes, sir.

Q. And eventually -- and people are chosen from that list how?

A. You are chosen by your numeric placement on that list. So if you're number one, you'd be the first person hired off that list. Or promoted. And then so on.

Q. And eventually you were promoted off that list to become a Detective in 1991, correct?

A. Yes, sir.

Q. Now, you mentioned to the jury that you were assigned to something called C.I.B., is that right?

A. Yes. That's the Criminal Investigation Bureau.

Q. And back in 1991 could you describe for the jury what basically was the Criminal Investigation Bureau?

A. The Criminal Investigation Bureau was the unit of Detectives that had various branches. It had violent crimes, where the Detectives would investigate incidents of a nature of an assault, or shooting that didn't rise to homicide. There was the Robbery Unit, then there was a General Crimes Unit. The General Crimes Unit would investigate burglaries, felony thefts, things of that nature. And then there was the Homicide Unit.

Q. Were all the Detectives in that Criminal Investigation

Bureau located at one location? Or were they dispersed throughout the city?

A. The majority of them were at one location, and that would have been at the Police Administration Building. The general duty Detectives, the ones that were investigating burglaries, that sort of thing, they -- some of them did work out of the District Stations.

Q. Okay. Where -- where is the Police Administration Building located in the City of Milwaukee?

A. It's at 7th and State in the City of Milwaukee.

Q. So it's west of this building, maybe 15 blocks? Something like that?

A. Not quite, but it is west of this building.

Q. On the other side of the river, right?

A. Yes.

Q. And for those Detectives who were located in that building, where were they located within the building itself?

A. The Criminal Investigation Bureau was -- at that time was located on the fourth floor.

Q. And with respect to the Criminal Investigation Bureau, are the Detectives all in one open area? Or are they sort of separated into different rooms? How does that work?

A. Its a large bay. The Detectives have desks. The desks make up rows in the Criminal Investigation Bureau. There are no separate offices or work stations.

Q. And is the Homicide Unit itself separated in some fashion from the rest of the workers?

A. Only in the fact that it's in one corner of the bay. It's not -- it's not sectioned off. There's no office, there's no door. Just -- all their desks were in one area.

Q. The reasons for all those questions is did you have a sense of how many Detectives there were in that -- in the entire C.I.B. when you started there at that time?

A. I believe on all three shifts there was somewhere in the area of 300.

Q. So you've got -- just within C.I.B., 300 Detectives at that time?

A. Yes. Dispersed on three shifts.

Q. Okay. So that would be roughly 100 per shift?

A. Yes. The majority were on the day and early shifts, and then a smaller amount on the late shift.

Q. What's the -- for the jury's sake, the day shift. When does that start?

A. 8:00 a.m. to 4:00 p.m.

Q. How about the early shift?

A. 4:00 p.m. to midnight.

Q. And how about the late shift?

A. Late shift is midnight to 8:00 a.m.

Q. So when you get to C.I.B. in 1991, what was your first area of assignment?

A. Initially I was assigned to violent crimes.
Q. And which shift?
A. Late shift.
Q. So basically the new Detectives draw the short straw on the shifts?
A. Correct.
Q. When you were assigned -- strike that. How long did you remain in violent crimes?
A. Not very long. Month or two, and then I was assigned to homicide.
Q. And so you would have been assigned to homicide, what? In 1991? Or 1992?
A. 1991.
Q. And how long did you remain in the Homicide Unit as a Detective?
A. For the duration of my time on the Police Department.
Q. So that would have been 1991 or 2, until -- when did you leave the Department?
A. 2001.
Q. And how is it that you left the Department in 2001?
A. I retired.
Q. When you retired in 2001, did you retire completely from working?
A. No, I did not.
Q. What did you do after you retired from the Department as

a -- well, strike that. Let me make sure the jury understands this. Can you describe for the jury what a sworn Officer is?

A. A sworn Officer is an Officer that has arrest powers and is entitled to carry a weapon.

Q. And so in the Milwaukee Police Department essentially anybody who's got a -- the power to arrest and carry -- is authorized to carry a weapon is a sworn Officer. Right?

A. That's correct.

Q. After you -- when you retired -- in 2007, was it?

A. 2001.

Q. One. I'm sorry. Didn't mean to keep you on the Department another 6 years. When you retired in 2001, did you continue to work as a sworn Officer?

A. I accepted a position as a Court Security Officer contracted to the United States Marshal's Service in the Eastern District of Wisconsin.

Q. So would that be essentially one of the individuals we see work in the building here with the blue jackets? The badges and the firearms?

A. That's correct.

Q. And how long did you have a position as a Court Security Officer?

A. I was a Court Security Officer for approximately two years, and then I was promoted to a position as the lead Court Security Officer, supervising the other Court Officers in this building

and other locations in the Eastern District of Wisconsin.

Q. Now, with respect to that position, is that actually -- you're still a sworn law enforcement Officer?

A. You have limited deputization from the Marshal's Service, meaning that you have limited arrest powers, and your armed, but it only entails while you are working on the facility.

Q. After your time working as a Court Security Officer, what time did you -- or what year did you end that work?

A. In 2007.

Q. And now in 2007, what happens next?

A. In 2007 the City of Milwaukee Police Department instituted a program where they would free up full time Detectives and Sergeants from investigative duties such as background investigations, and they would bring back experienced investigators to take over those tasks as Police service specialist investigators.

Q. What are what are background investigations?

A. Background investigations are the investigations of the background of any person who is seeking employment with the Milwaukee Police or Fire Departments.

Q. So the background investigators are actually given the job of looking into the person's background to make sure that they are an appropriate choice for the Milwaukee Police Department or the Fire Department?

A. Both.

Q. And when did you start working in that position?
A. 2007.
Q. And how long did you work in that position?
A. I am still employed in that position, but I was promoted to the lead investigator. I now supervise the Background Investigation Unit.
Q. And how many people do you supervise?
A. At present it's 21 investigators.
Q. And that's a full time position?
A. Yes, it is.
Q. I want to go backwards a little bit in terms of your experience and with respect to the Homicide Division. You were there from 1991 or 2 until what date?
A. 2001.
Q. During that period of time from 1991 or 2 to 2001, did that Unit remain located in the same facility in the Police Administration Building?
A. Yes, it did.
Q. Okay. And when you started in homicide, you were on the late shift, correct?
A. That's correct.
Q. Do you remember how many Detectives there were in the Homicide Division in the late shift? And I -- for ease for you, we're going to move a little bit ahead to help maybe focus in a little bit. 1998, when Miss Griffin's homicide occurred. Were

you still on the late shift then?
A. I was on the day shift at the time.
Q. Let's back up, then. On the day shift in 1998, how many homicide Detectives were there?
A. I would estimate there were 18.
Q. And how about the early shift? Would you be familiar with that?
A. I would say pretty similar number.
Q. And how about the late shift?
A. Late shift was probably 12 to 14.
Q. When you were a homicide Detective, can you describe for the jury essentially what your duties were as a homicide Detective?
A. My duties were to investigate homicides as assigned by the Lieutenant who was in charge of the respective shift. Those would include the scene investigation of an incident, interviews of witnesses, locations and securing of evidence, the interviews of suspects, presenting evidence before the District Attorney's Office, and testifying in court.
Q. Okay. With respect to the operation of the Homicide Unit, were you as a Detective allowed to choose which homicide or homicides you would be investigating?
A. No.
Q. How was it determined who would investigate a particular homicide within that unit?
A. The Detective Lieutenant would assign you to a case. You

would take your direction from him, and then it would be your responsibility to complete that.

Q. Okay. And when you say complete that, would that be -- would that be you would be working on that case from the beginning to whenever it was solved and presented to the District Attorney? Or would from time to time you not be working on that case after some period of time?

A. You would work on the case as long as you were available to do whatever needed to be done at the direction of your supervisor. It would not be unusual for you to be called off to work on a different investigation. You might get parts of a case to work on, and that would be your only involvement in that case. There might be something like interview a certain witness. And you would complete that, and then you would be called off to do something else. You would work on the case as long as you were directed by the supervisor.

Q. It was not your job to choose how long you remain assigned to a particular homicide investigation, was it?

A. No.

Q. And whose choice was that?

A. That was the Detective Lieutenant's responsibility.

Q. And that would be your immediate supervisor?

A. Yes.

Q. Above the Detective Lieutenants, in terms of the Homicide Unit, were there any other supervisors?

A. Yes.

Q. Who would be above the Detective Lieutenants?

A. The Detective Captain.

Q. And beyond Detective Captain?

A. There was a Deputy Inspector.

Q. Going back one step in terms of the Detective Captain, would the Captain be in charge of just the Homicide Unit? Or other Detectives within the Criminal Investigation Bureau?

A. He would be in charge of not only the Homicide Unit, but other Detectives.

Q. For that particular shift, let's say, for example?

A. Yes.

Q. And did each shift have a Captain?

A. Yes.

Q. Now, you mentioned there was a Deputy Inspector above the Captain?

A. Yes.

Q. And what -- and I realize these things change within the Department, but back in the 90's when you were a homicide Detective, what was the Deputy Inspector in charge of in terms of homicide, C.I.B., beyond that. Anything, to your knowledge?

A. He was in charge of the entire Criminal Investigation Bureau. All three shifts.

Q. Okay. Now, in terms of the operation of the Homicide Unit, I'm going to ask you to consider the following example. Not

that it represents any particular indicator, just asking how they work here. Let's say a person's found to have been killed under apparent suspicious circumstances. Appears to be a homicide, as opposed to let's say a suicide. And let's say that person is found at 1 o'clock in the morning. Who would -- among the Homicide Unit, what Detectives would respond to that? How would that be chosen, first of all?

A. If it was a situation that started at 1 o'clock in the morning, all the late shift Detectives that were available would be assigned to respond to that.

Q. Even at 1 o'clock in the morning?

A. Yes.

Q. Okay.

A. And once they were there, the Lieutenant of Detectives would make a determination on who would have what responsibilities. Which Detectives would interview witnesses, which Detectives would handle the scene investigation, and so forth. They would continue to follow-up on any -- in any way they could until the next shift would come to work. At the beginning and end of every shift there was a briefing where all homicide Detectives would attend that briefing and the case would be discussed, and then whatever needed to be followed up on would be passed on to the subsequent shift.

Q. So is it fair to say that -- let's just pick an example. A person is found to have been killed on one shift, and there are

certain witnesses to it. And perhaps not all of the witnesses are interviewed during that shift. What happens then? Let's say witness Bill is not interviewed. What do you deal with? You just forget about witness Bill?

A. No. The subsequent shift would be assigned. It's referred to as follow-up. They would be given the follow-up to locate and interview that witness.

Q. So it's not as though let's say Detective -- just pick a Detective. Detective Adams is there, and he or she can't raise his hand and say even though my shift is over, I want to go interview that person. That's not the way it works, right?

A. Not at all.

Q. Focusing now on the Maryetta Griffin homicide case. Do you have any -- going back here roughly, what? 17 years. Do you have any particular recollection of the details of that homicide investigation?

A. No, I do not have an independent recollection of it. We talked about it in court. We have looked at these reports, certain reports. But as far as an independent recollection? No, I don't have any.

Q. Okay. Do you have a general recollection that you were involved in the investigation of that homicide?

A. Yes, I do.

Q. And do you recall that -- whether or not you were involved in responding to the scene?

A. Yes.
Q. Were you involved in responding to the scene?
A. Yes.
Q. Beyond responding to the scene, do you have any memory of talking to any particular witnesses?
A. No.
Q. So nobody that you talked to stood out in your mind at all after these 17 years of working for the City, for the Federal Government?
A. No.
Q. Back in 1998 do you have an estimate of about how many homicides took place in the City of Milwaukee?
A. Milwaukee was undergoing a serious homicide problem. In one year in the mid-90's we had 165 homicides, and the numbers never went below -- never went below 100.
Q. So you're talking almost one homicide every three days?
A. Yes.
Q. Maybe even more?
A. On occasions, yes.
Q. I think you were asked about this earlier, but Detective, one of the -- or Mr. DeValkenaere, one of the things that you've been asked about is a report that you prepared of an interview of William Avery. And I'm going to put it on the display here. It's been previously marked as Plaintiff's Exhibit 11-A, admitted into evidence. Given what you've testified before

about, is it correct or not that you have no recollection of this particular interview of William Avery?

A. No, I do not.

Q. So you have no recollection of this interview, right?

A. No, I do not.

Q. Okay. When you do an interview of an individual in the course of your work as a Detective in the Homicide Division, what would happen routinely? How would -- routinely would a person who's physically in the Criminal Investigation Bureau be interviewed? Let's just say a witness. Somebody comes in off the street. Says I have some information about a homicide.

A. We would sit down in an interview room and discuss the situation with them. Ask whatever it is they knew, and then ask pertinent questions to try and draw out more information.

Q. With respect to such an interview, where are the interview rooms located at that time?

A. At that time the interview rooms were located -- would be on the westerly side of the building, adjacent to the Criminal Investigation Bureau.

Q. So on the fourth floor on the west end of the building?

A. That's correct.

Q. If I have my -- I do have my directions straight. And how many interview rooms were there?

A. I believe there were 10.

Q. And would those interview rooms -- how large would they be?

A. They're not very large. They're maybe 8 by 6. Some are a little smaller than others. Some are just a little bigger. But all generally about that size.

Q. Any windows?

A. The windows are there in the rooms that face out onto State Street. Others, there are no windows.

Q. Any of them what we see on T.V. sometimes? The one way mirrors? Or one way mirror doors? Or things like that?

A. No.

Q. With respect to somebody who is being questioned as a witness in the Homicide Division, would they be handcuffed during the interview?

A. No.

Q. In fact, even if somebody is under arrest would they be handcuffed in a -- during an interview, in the interview room in the Criminal Investigation Bureau by homicide Detectives?

A. No, they would not.

Q. Why not?

A. That wouldn't be conducive to having an open discussion. There would be no need to have them handcuffed.

Q. Is there any security threat if they're not handcuffed?

A. Not particularly, no.

Q. And why is that?

A. They're on the fourth floor of the Police Administration Building. It's a very secure location. Nobody is going

anywhere.

Q. Is the door locked to the interview room?

A. It can be.

Q. Is it always locked? Or is it just Officer's preference?

A. The doors have locks and the Detectives had a key to those doors. I don't recall if all the doors locked on their own when the door was shut.

Q. What about with respect to firearms? When you're in an interview with a witness, would you have your firearm with you?

A. Never.

Q. Why not?

A. Dangerous.

Q. Someone might grab it?

A. That's correct.

Q. Now getting back to this Exhibit 11-A. You've indicated you don't have any independent recollection of this interview, correct?

A. That's correct.

Q. But when interviews like this were done, would you prepare reports of interviews?

A. Yes.

Q. And how soon after the interview was done would you prepare the report?

A. Immediately thereafter.

Q. And how would you go about preparing the report? I mean,

mechanically just describe for the jury what you would do?
A. I would take notes during the course of the interview, and then after the interview I would use those notes to prepare the report.
Q. So you wouldn't dawdle -- I mean, unless something -- an emergency happened, once it's done, you're out, you're dictating the report, right? You're preparing it?
A. Yes. The policy for the Homicide Unit was that reports would be done as soon as possible.
Q. Now, with respect to the mechanics of preparing a typewritten report like that -- how was that done?
A. We were allowed to call reports in to stenographers who would then type up the report.
Q. Now, you say you called it in to a stenographer?
A. Yes. It was by telephone, and it was recorded, and the stenographers would then type the report from that.
Q. So was the telephone right there in the interview room?
A. No. You do that at your desk.
Q. Okay. So it wasn't as if you could pick up the phone, put it down on the desk in the interview room, and just have the conversation and the stenographer hears it all, and types it up, right? That's not physically possible?
A. No, it's not.
Q. What you had to do is go out to your desk and call it in, as we would say?

A. Yes.
Q. And you call a particular number, you would get the system, right? To make the recording?
A. That's right.
Q. In your experience did you prepare accurate reports?
A. Yes.
Q. And why did you prepare reports?
A. I beg your pardon?
Q. Why were reports prepared of interviews? Why? Why would you do a report?
A. To document the information that had been received.
Q. And was it your duty to document in a particular way, in terms of truthfulness?
A. It had to be truthful.
Q. Since you have no particular direct memory of this interview, with the Court's permission I'm going to just simply have you read the first paragraph here for us. The one that begins on Monday.
A. On Monday, 3-23-98 at about 11:00 a.m. I, Detective James DeValkenaere, along with Detective Daniel Phillips, Squad 124, was advised by Lieutenant of Detectives David Kane that an individual being sought regarding the death of Maryetta M. Griffin had come into the C.I.B. This individual is identified as William D. Avery, a black male, born 11-14-71, of 3456 North 47th Street, and 3611 North 13th Street. He is commonly

referred to by the nickname of Jodi.

Q. Ask you to stop there for a moment. This paragraph refers to being advised by the Lieutenant of Detectives?

A. Yes.

Q. About this? Can you tell the jury what that basically means in terms of what we've been talking about? About Lieutenants assigning things?

A. Yes. The Lieutenant told us that this individual had come into the C.I.B., and he was to be interviewed.

Q. So was it your choice at that point to interview William Avery?

A. No.

Q. Whose choice was it?

A. That was Lieutenant Kane's choice.

Q. Sort of an order, right?

A. Yes.

Q. It's apparent that Mr. Avery was, according to the report here in the next paragraph -- you reported was wanted on warrants at that time?

A. That's correct.

Q. Although he came in voluntarily at that point to the Police Department, what's the significance of the fact included in your report that there were warrants for him? In terms of how you deal with him after you're done talking to him?

A. He would be transported to the prisoner processing section,

where he would then be processed on those warrants, and he would have to take care of those charges. That would be a separate matter.

Q. So in other words, regardless of whether or not he's coming in voluntarily, Mr. Avery at that point will not be free to leave. Not because of anything that has to do with Maryetta Griffin, but because of those warrants, right?

A. That's true.

Q. And it's not as though you had any power to say oh, you can ignore the warrants and just go home. Right?

A. No.

Q. Going to ask you to read the next paragraph for the jury, please.

A. At about 11:30 a.m. an attempt was made to interview Avery in an interview room at the C.I.B. At that time Avery advised that he was not considered a suspect in the death of Maryetta Griffin.

Q. Can I stop you there? You said at that time. You may have left a word out.

A. At that time Avery was advised that he was not considered a suspect in the death of Maryetta Griffin.

Q. Please continue.

A. And although he had other warrants for his arrest, he was being interviewed in this matter as a witness. After being so advised, Avery agreed to give a statement. Avery stated to me

that he was familiar with the house at 2474 North Palmer. He stated that some of his family lives there. Specifically, his cousin, Lorenzo Frost, who is often at the house. He stated that Frost is referred to by the nicknames of Ronnie and Doc. Avery stated that he would often go to that house to visit with Ronnie, and while he was at that house he would meet with women in the area who dope date. He stated that by dope dating he is referring to women who have sex in exchange for either money to buy drugs, or the drugs themselves.

Q. Stopping there for a moment, are you familiar, based upon your work in the Milwaukee Police Department, with the area of where 2474 North Palmer is?

A. Yes.

Q. Can you describe just kind of generally for the jury where that is?

A. That's on the northeast side of Milwaukee, about two blocks from North Avenue.

Q. And can you give kind of a ballpark estimate as to the distance between 2474 North Palmer, and 3032 North 7th Street, the location of where Miss Griffin's body was found?

A. Approximately a mile-and-a-half.

Q. And there were two other addresses. I'll bring this back up. 3456 North 47th Street. Is that very close to Palmer?

A. No, it's not.

Q. About how far away is that?

A. At least 4 miles.
Q. And what about 3611 North 13th? Is that close to Palmer?
A. No, it's not.
Q. How far away is that?
A. That address -- it would probably be two-and-a-half miles.
Q. Just for the sake of breaking this up a little bit, I'm going to ask you to read the second page of this report up to the point where you start to see the yellow.
A. Avery stated that he does know Maryetta Griffin, and he was shown a photo of Griffin, and he identified her, but stated that he knows her by the nickname of Mercedes. Avery stated that he does recall the evening of Monday, 2-16-98. He stated that around 7:00 p.m. on that evening Griffin came to the house on Palmer. He stated that several other people were present in the house. He stated that this would include a girl he knows by the name of Valerie Eubanks. He stated that also present was Lucious Goins, also known as Ray. He stated that his cousin, Lorenzo Frost, was in the home that evening, but he came and went. He stated he doesn't know if Frost was in the house when Mercedes was there.
Q. With respect to that portion, first of all, if you -- if you didn't show Mr. Avery a picture of Maryetta Griffin, otherwise known as Mercedes, would that be in this report? If you hadn't shown it to him?
A. No, it would not.

Q. So it's in this report. You would only report it if you did show him a picture, right?
A. Yes.
Q. Similarly, if he had been unable to identify her, would you have reported that?
A. Yes.
Q. So if it states in here that he did identify her, that's because he identified her to you, right?
A. That's correct.
Q. If during this interview he admitted to you that he was one of the people who operated that drug house, would that be in this report?
A. Yes, it would.
Q. And similarly, if he didn't tell you that he had any involvement in operating that drug house, would that not be in this report?
A. Yes.
Q. Can you just read now what's in the yellow highlight?
A. He stated that he and Mercedes had sex, and this was oral sex that she performed on him. He stated that this was not actually a dope date, and he didn't pay her anything for this. It was just that they had sex together.
Q. Stopping there for a moment. Once again, if he had not told you this, would you have put this in the report?
A. No.

Q. Would you only put this in the report if that's what Mr. Avery told you?

A. Yes.

Q. With respect to that statement is there anything criminal, in your experience as a Detective in the Milwaukee Police Department, your experience as a Police Officer in the Milwaukee Police Department, with two individuals who are both adults engaging in sex in 1998?

A. There is nothing criminal about that.

Q. If there had been anything in here indicating that this sex was coerced in some fashion, physically or as a result -- let's just put it as an assault or whatever, would you have -- would you have put words like that in there?

A. If that's what he had said, yes.

Q. So we can assume, since it's not in the report, he didn't say that he assaulted her?

A. No, he did not.

Q. The next portion is going to be a little long, and lead onto the next page, but I'm going to ask you to read the next portion. It will be about four lines into the next page. We'll stop when we get to the bottom here.

A. Avery stated that he and Mercedes remained in the home with other people, and they spent this time in the attic, which is accessed through the second floor of this duplex. He stated they spent some of the time upstairs playing dominoes, but a

short time later Mercedes said she was going to leave. He stated that he spoke with Mercedes, and the understanding was that she would come back later that evening. Avery stated that Mercedes then left the house alone, and he remained. He stated he stayed in the house all that evening, and that eventually he went to sleep on the couch at about 9:30 p.m. He stated that after he went to sleep, he had no other dealings with anyone else, and he is not aware of anyone else coming or going from the house. Or from the home.

He claims that he never saw Mercedes after that time. Avery stated that if Mercedes did come back to the house on Palmer later that night, he never saw her and he is not aware of her having been there. Avery further stated that he does not remember his cousin, Lorenzo Frost, staying in the home, and he thinks Lorenzo only stayed in the house for a short time that evening and he left.

Q. You can stop there. In this section you recount that what Mr. Avery told you is that Mercedes left the house at some point by herself, right?

A. That's right.

Q. And that he never saw her again, right?

A. That's right.

Q. And that's what he told -- if that's what he told you, that's what you put in this report, right?

A. That's correct.

Q. You neither added nor subtracted anything to that, right?
A. No.
Q. Okay. If you can read that bottom -- that line that begins Avery denies, until the point of the word occurred there?
A. Avery denies that there was any sale of drugs going on in the house. He denies that he was involved in any type of drug activity. And he further denies any involvement in the death of Maryetta Griffin. Avery stated that he has no idea who is responsible for her death or where this would have happened.
Q. Where this would have what?
A. Or where this would have happened -- or occurred. I'm sorry.
Q. Thank you. Mr. DeValkenaere, once again in this section did you truthfully recount that Mr. Avery told you that he was not involved in any type of drug activity in that house?
A. Yes.
Q. And did you truthfully report that he told you that he denied any involvement in the death of Maryetta Griffin?
A. Yes.
Q. And did you also truthfully report that he said to -- that he said to you that he had no idea who was responsible for her death?
A. Yes.
Q. Or where her death would have occurred?
A. Yes.

Q. Going to just skip a little bit here. On the first page you report that the interview began -- an attempt to interview him was begun at 11:30 a.m., right?

A. Yes.

Q. And on the last page you report that the interview was terminated, ended with Avery at about 7:00 p.m.?

A. Yes.

Q. In the Homicide Division, in your experience was an 8 hour interview unusually long?

A. Not at all.

Q. Okay. And based upon the report -- we'll get into this a little bit, but I think it's already in the record. There was a break taken for several hours in this interview, so maybe it's only 5 hours long, okay? Let me just ask you.

A. Yes.

Q. Is a 5 hour interview in the Homicide Division unusually long?

A. Not at all.

Q. Can you explain to the jury why interviews in the Homicide Division would take so long? Why would they -- why would it take hours?

A. Because there's a lot of information that you need to extract from someone. You need to go over details, and it all has to be done correctly. So you might talk about something 2 or 3 times to make sure that you have it straight.

Q. Okay. So in other words, if a person is just telling you something, there are certain things -- just as in court here -- they might skim over. You have to go back and ask a little bit more about this particular thing or that particular thing?
A. Correct.
Q. Is there another reason to go over it more than once?
A. To make sure that it's correct.
Q. So is that sort of like a -- I wouldn't say a memory test, but a test of whether or not the person's telling you what actually happened, as opposed to a story?
A. Yes.
Q. So if -- for example, if someone's telling you a story, in your experience, as opposed to somebody recounting what actually happened, in your experience is it hard for them to keep the details straight?
A. Yes, it is.
Q. So is that another reason why you might go over the incident more than once with the person?
A. Yes.
Q. A test of their truthfulness, reliability, or credibility?
A. Yes.
Q. Is that done for any purposes of sort of -- for want of a better word, just to torture the person?
A. No.
Q. Is that done for any purpose to try to make them lie to you?

A. No. You do not want them to lie to you.

Q. In fact, what do you want them to do?

A. You want them to tell you the truth.

THE COURT: Okay. Mr. Smokowicz, it's after 12:00, so we'll take a break. Noon break, ladies and gentlemen. We'll have you back here at 1 o'clock. Please don't discuss the case. We'll see you back here at 1:00. Have a good lunch, all right? Oh, I'm sorry. It has to be 1:30, because I have got -- I'm just reminded, I have another matter at 1 o'clock. In addition, I have a Doctor's appointment at 4:00, so for purposes of the jury, you're going to leave here at 3:30. See, that's the right response. All right. So don't discuss the case. We'll see you back here at 1:30.

(Whereupon the jury was excused at 12:04 p.m. A recess was called by the Court. Upon conclusion of the recess, the proceedings continued as follows:)

THE COURT: The Bailiff informs me we have a matter to take up?

MR. STAINTHORP: Yes, Judge. Briefly, Judge. And there's no dispute between the parties about this, but it does involve whiting out something in an Exhibit, so we wanted to raise it with you.

THE COURT: Okay.

MR. STAINTHORP: At pretrial you had ruled that while the fact that Mr. Avery was wanted on warrants was admissible,

the nature of the warrants was not. We realized that we had inadvertently submitted a report that does identify the nature of the warrants, so we were just going to white out that portion which identifies the warrants, and I believe Mr. Smokowicz agrees that that's fine.

MR. SMOKOWICZ: I have no objection. In fact, that's the report we've been talking about. Detective DeValkenaere's report. In addition to that, I believe that -- counsel and I also talked about a newspaper article that may have been admitted. It does, too, also reference that. They made a request of me that the nature of those warrants, that -- they were published in the newspaper article. That they be whited out as well. I have no objection. And, in fact, I think what should happen here, Your Honor, is I think that somebody should be permitted to withdraw the Exhibits and copy them so that they are not -- you know, we don't have jurors that go -- if the Exhibits go back in the jury room, scratching white out, or looking in the light or whatever.

THE COURT: That's fine. That can be done.

MR. STAINTHORP: Okay. Thank you, Judge.

THE COURT: Anything else?

MR. STAINTHORP: No, that's it.

THE COURT:

(Whereupon the jury was returned to the courtroom at 1:34 p.m.)

THE COURT: Mr. Smokowicz.

MR. SMOKOWICZ: Thank you, Your Honor.

Q. Mr. DeValkenaere, we're going to go back to that report. Picking up from where we were, apparently during the interview of William Avery on March 23rd, there was a break for several hours in that interview for something else that didn't involve questioning by you and Detective Phillips and Mr. Avery, correct?

A. Yes.

Q. And after the break, however, your interview of Mr. Avery continued for some time, right?

A. Yes.

Q. And I'm going to ask you to read the next paragraph from the word Avery until the word dead there.

A. Avery was again interviewed in a room at the C.I.B., and he was again advised that he was being interviewed as a witness to the death of Maryetta Griffin. Avery continued to maintain the fact that Maryetta Griffin had left the home at about 7:30 or 8:00 p.m. on Monday, 2-16-98, and he had not seen her since that time. He then stated that he does remember getting up the following morning on Tuesday, 2-17-98. He stated that at that time he was still at the residence at 2474 North Palmer. He stated that around 8:00 or 8:30 a.m. that morning, while he was at that residence, a girl he knows by the name of Joanne came to the house. He stated that Joanne is one of the girls who

frequents that house, and that Joanne hold him that Mercedes had been found killed. He stated that he had no knowledge of what had happened to Mercedes until Joanne told him this.

Q. Could you read on -- the next couple sentences until the word found dead?

A. He stated that sometime around noon on that Tuesday his cousin, Lorenzo Frost, came back to the house, and he advised Lorenzo at that time that Joanne had told him that Mercedes had been found dead.

Q. So just from the phrasing of the report, it appears what you are stating here is that after the break you again advised him -- or you and Detective Phillips again advised him that he was being interviewed as a witness, right?

A. That's correct.

Q. And from the phrasing of the next sentence there, where it states Avery continued to maintain the fact that Maryetta Griffin had left the home at or about 7:00 or 7:30 p.m. on Monday, 2-16-98, and he had not seen her since that time, that -- that was the same statement he had made to you, in effect, even before the break. That's the inference of that statement as well, correct?

MR. STAINTHORP: And Judge, just objection. I think there was a slight misreading there in terms of the times. That you said 7:00 or 7:30. And the statement says 7:30 or 8:00.

MR. SMOKOWICZ:

Q. I apologize. With that correction, it appears that in that sentence both before and after this break you report that Avery maintained that Griffin had left the home at 7:30 or 8:00 in the evening on the 16th, and he had not seen her since that time?

A. Yes.

Q. You report here that he told you that 8:00 or 8:30 that morning he was at the residence when a girl by the name of Joanne came to the house, and that she is one of the girls who frequents the house, and that she told him that Mercedes had been found killed. If he had not told you that that had happened at some time around 8:00 or 8:30, when she came to the house, would you have put that in this report?

A. No.

Q. If he had told you at that time it was in -- sometime in the morning, would you have put that in the report?

A. Yes.

Q. And you go on to state here that he stated he had no knowledge of what happened to Mercedes until Joanne told him this. Would you have put that in the report if that is not what he had told you?

A. No, I would not.

Q. Goes on to state that Lorenzo -- he told Lorenzo -- Lorenzo Frost came back to the house around noon. Would you have put that in the report if he had not told you that at that time?

A. No.

Q. It goes on to state that -- and this part we haven't read. I'm going to ask you to read the rest here, if I can. Beginning with this phrase right here. He claimed. Would you read the rest of the report?

A. He claimed to have no information as to how Joanne would have been aware of Mercedes' death or how Joanne would have had any information at 8:30 on Tuesday morning regarding what could have happened to Mercedes, when her body was not discovered until 11:00 a.m. that same morning. This interview was terminated with Avery at about 7:00 p.m.

Q. Now, with respect to this particular portion of the report, would you have indicated in here that Mr. Avery told you that he had no information as to how Joanne would have been aware of the death, or how Joanne would have had the information at 8:30, if Mr. Avery had not told you that?

A. No.

Q. Is that your signature on this report?

A. Yes, it is.

Q. This report -- can you tell the jury whether or not this report is a truthful recounting of what Mr. -- of the substance of what Mr. Avery told you about this matter on that day?

A. Yes, it is.

Q. As reflected in that report, was -- strike that. Was there somebody else in the interview room with you along with Mr. Avery during the interview?

A. Detective Phillips.
Q. And why would two Detectives be present during the interview?
A. For one, to verify what the other one says.
Q. So that it's not just one person's word against another?
A. That's correct.
Q. During the course of that interview -- strike that. Before I get to that. Prior to that interview, to the best of your memory had you ever had any dealings with Mr. Avery?
A. No.
Q. During the course of that interview did you ask Mr. Avery about other people who had been in that -- I mean -- strike that. During the course of that interview did you ever at any point handcuff Mr. Avery?
A. No.
Q. Would you have handcuffed Mr. Avery?
A. No.
Q. What about your partner, Detective Phillips?
A. No, he did not.
Q. During the course of that interview did you ever force Mr. Avery -- well, strike that. During the course of any interview of a witness would you have forced a witness to just stand, as opposed to being seated at an interview table?
A. No, I did not.
Q. What about your partner? Would he ever do something like

that?

A. No.

Q. Did you ever strike Mr. Avery during that interview?

A. No.

Q. Would you have done that?

A. No.

Q. Would there have been any reason to do that other than self protection?

A. No. And that didn't happen.

Q. Mr. Avery didn't ever make any physical threats to you or Detective Phillips, right?

A. No, he did not.

Q. Did you ever do anything physically to try to intimidate him? Such as standing over him? Or flicking a cigarette lighter near him? Or anything like that?

A. No.

Q. How about your partner, Detective Phillips?

A. No, he did not.

Q. After that interview was conducted, and it was 7 o'clock in the morning -- or 7 o'clock in the evening, what normally would have happened in terms of -- do you recall what shift you were working on that day?

A. I was working the day shift.

Q. So you were well past your -- the end of your shift at that point, right?

A. Yes.

Q. Can you -- I know you don't have any memory of that day, but can you tell the jury routinely what would have happened at that point?

A. What would have happened is that Mr. Avery, because of the other issue he had, would have been taken up to the prisoner processing section.

Q. That would have been to take care of the warrants issue?

A. Yes.

Q. And then what about with respect to you? What would have happened? What would you have done at that point?

A. As far as Mr. Avery is concerned?

Q. Or as far as you're concerned. As far as your duties at that point.

A. They were over for that day.

Q. Okay. Would you have done this report that day? Is there an indication on the report when it was -- when you dictated it, actually?

A. I don't believe so, but I would have dictated this before I left for the day.

Q. On the last page right above your signature there are some initials. Do you see them?

A. Yes, I do.

Q. And that's on Exhibit 11-A. And again, this is your report, right?

A. Yes, it is.

Q. And after that, after your initials, there are three other initials. KLB. Do you know who those are?

A. I don't know who that person is. I'm assuming that was the stenographer.

Q. And what's the significance of the date after those three initials, KLB?

A. That would have been the day that that person typed the report.

Q. So at a minimum -- do you know whether the transcriptionists work 24 hours a day? Or they just work day shifts?

A. At that time there were some working every shift.

Q. Okay. But in any event, no later than the day after this interview, this report was transcribed?

A. Yes.

Q. Were you in any way personally motivated to try to frame William Avery for the homicide of Maryetta Griffin?

A. No.

Q. After this interview did you have any further contact with him, to the best of your memory?

A. I don't recall having any further contact.

MR. SMOKOWICZ: May I just have a second, Your Honor? Thank you. That's all the questions I have.

THE COURT: Okay. Cross examination.

**CROSS EXAMINATION**

**BY MR. STAINTHORP:**

Q. Mr. DeValkenaere, I just want to make clear, even after reviewing the reports that your attorney showed you, you have no actual recollection of anything you did with respect to the Griffin investigation, is that correct?

A. No, I do not.

Q. So while your report indicates you went out to the scene, you have no actual recollection of doing that, correct?

A. I recollect going to the scene, but as far as details, I don't recollect any details, no.

Q. And obviously with respect to the interview, your report reflects that you interviewed Mr. Avery, but you have no actual recollection of that interview?

A. No, I do not.

Q. Okay. Mr. Smokowicz just asked you some questions concerning your report. I just want to ask you a couple things about that. And this is Plaintiff's 11-A. So if we go to the first page of this report, this is memorializing obviously an interview that occurred on March the 23rd, is that correct?

A. Yes, sir.

Q. And if we go to the final page there is the date of 3-24-98. You see that?

A. Yes, I do.

Q. All right. But then if we go to the first page, all the way at the top where it says date of report -- do you see that? All

the way at the top, right in the middle?

A. Yes. 3-24-98.

Q. What does that refer to?

A. That refers to the time that report was typed up. The day it was typed up.

Q. Okay. So that's not the day that it was written. That you recorded the report?

A. No.

Q. And in relation to this report, there have been other reports that we've reviewed in this case where there has been a handwritten version of the report. In this case did you make any handwritten version of any of Mr. Avery's statement?

A. No, I did not.

Q. And it's a true to say that Mr. Avery did make a statement to you, correct?

A. In my interview?

Q. Yes.

A. Yes, sir.

Q. But you didn't write up that statement and seek to have Mr. Avery review that statement, correct?

A. No, I did not.

Q. And you also -- I think you mentioned that when you were doing the interview, you would make notes, is that correct?

A. Yes.

Q. And after the interview you destroyed those notes, is that

correct?

A. Yes.

MR. STAINTHORP: That's all I have, Judge. And for the balance I will depend on my prior questioning of Mr. DeValkenaere.

THE COURT: I'm sorry?

MR. STAINTHORP: I -- I -- I obviously depend upon my prior questions of Mr. DeValkenaere.

THE COURT: Yes, of course. That's part of the record. Any redirect of that?

MR. SMOKOWICZ: Just a couple questions, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. SMOKOWICZ:**

Q. Mr. DeValkenaere, if anything extraordinary had happened in that interview, would you -- even though 17 years have passed, would you have a tendency to have a recollection of that?

A. If it was something extraordinary, possibly.

Q. You know -- I mean, a physical assault, let's say, for example?

A. Yes.

Q. Now, with respect to handwritten versus typewritten statements and reports, can you explain to the jury a little bit about the practice of doing a handwritten statement, as opposed to a typewritten report? At the time of this being done in March of 1998, what was the practice with respect to reports

about statements given by witnesses?

A. At that time I did not normally write witness statements in front of them for them to sign. You would take the information, and then dictate a report to be typed up.

Q. And why is that?

A. It was not incriminating. It was just their account of information. It wasn't felt that there was a need at that point to have them witness you writing it out. There was nothing incriminating about his statement.

Q. So in any particular case -- for example, if someone were to just be a bystander and see a homicide, would that witness's statement have been written out and have that witness sign it?

A. No.

Q. What would happen there?

A. You would take their statement, and you would call the report in.

Q. And then what would you do with your notes after that?

A. Destroy them at some point.

Q. Okay. And with respect to statements that are handwritten out, when would you do those?

A. When interviewing a suspect, the statement would be written in his presence in front of him, and he would actually -- the suspect would watch you write it out, and the suspect would have the opportunity to initial any part of it that was changed or if there was a cross-out. So the entire thing is written in the

presence of the suspect. The suspect is able to review that statement, sign it, and then if he chooses he can, in his own hand, write a statement at the end of the statement.

Q. Were there -- given what we know about this case, and the fact that there are some jailhouse informants who actually were witnesses to certain statements allegedly made by Mr. Avery, and their statements were actually handwritten out and signed by them, can you explain to the jury why that would be done? Even though that person's just a witness?

MR. STAINTHORP: Judge, I object. This is beyond the scope of my cross examination.

THE COURT: Yeah, it is beyond the scope, so the Court will sustain the objection.

MR. SMOKOWICZ: Then I have no other questions. Thank you.

THE COURT: Anything else of this witness?

MR. STAINTHORP: Nothing further, Judge.

THE COURT: Okay. You may step down, Mr. DeValkenaere. Thank you. Additional witnesses from the defense?

MR. SMOKOWICZ: Captain Heier.

**CAPTAIN TIMOTHY HEIER**, re-called as a witness, having been previously sworn, on oath testified as follows:

THE COURT: Captain Heier, you've previously been placed under oath, and that oath still applies.

THE WITNESS: Okay. Yes.

**DIRECT EXAMINATION**

**BY MR. SMOKOWICZ:**

Q. Good afternoon, sir.

A. Good afternoon.

Q. Would you for the record tell the Court and the jury your name? Your full name again, sir?

A. It's Timothy Heier. It's T-I-M-O-T-H-Y. H-E-I-E-R.

Q. And your date of birth -- or actually your year of birth, I'm sorry.

A. Year of birth 1966. 49 years old.

Q. And Captain Heier, where were you born?

A. I was born in Milwaukee, and I've lived no other City but Milwaukee. Still live here.

Q. And where did you go to high school?

A. I went to Milwaukee Lutheran High School. It's the one on 97th and Grantosa. A lot of people get those mixed up.

Q. When did you graduate from Milwaukee Lutheran?

A. 1984.

Q. After high school did you go on in school?

A. Yes. I went to U.W. Milwaukee for a few years. Worked full time, and I had two off days, so I tried to fit school in there somehow.

Q. Where were you working full time at that time?

A. I worked at Kopp's Custard, the old one on 60th and

Appleton. I was a manager there. I also had dual jobs, so I was an overachiever that way.

Q. And you were still going to school 2 days a week?

A. Yeah. Two days a week. Yep.

Q. With that schedule were you able to complete your college education at that time?

A. No. In 1991 I went to -- I started at the Milwaukee Police Department, and I went back and finished my Bachelor's Degree in 2009. I went to night school. And then I had the opportunity to go to the F.B.I. Academy in Quantico, Virginia. And subsequent to that I took classes which was through the University of Virginia. So I have 15 credits towards my Master's Degree. And that's all -- that was in -- I'm sorry. I graduated in 2013. So graduated in 2013, and went for the Master's in 2013 also.

Q. So let's make sure we get this clear on the record.

A. Okay.

Q. You finished your Bachelor's Degree in 2013?

A. Yes.

Q. And that was through a night school?

A. Yes.

Q. What night school is that?

A. Concordia College.

Q. And what was your degree in at Concordia?

A. Criminal justice.

Q. And the 15 -- you have 15 credits towards your Master's from the University of Virginia, is that right?
A. Yes.
Q. And in what area is that?
A. More towards management and leadership.
Q. Would that be in law enforcement? Or a more general management issue?
A. More general.
Q. All right. In addition to -- strike that. You mentioned that you started working in the Milwaukee Police Department in 1991, correct?
A. Yes.
Q. When were you -- do you recall when in 1991 you were actually formally hired?
A. Yeah. March 18th, 1991, I was hired. Went through the Academy.
Q. So you get hired first, and then you go to the Police Academy, right?
A. Yes.
Q. And at that time in 1991 did the Milwaukee Police Department have its only Police Academy?
A. Yes. It had their own Academy then, and it still has an Academy. We train our own people.
Q. And where is the -- where is the Academy located?
A. It's where I currently work. 6800 North Teutonia, just

north of Silver Spring.

Q. And how long in 1991 were you trained at the Academy?

A. It's for 20 weeks.

Q. After the 20 week session in the Academy, are you then a Police Officer?

A. Yes. You graduate as a Police Officer. And I was assigned to District Number 3, which was on 47th and Vliet.

Q. And how long did you stay at District Number 3?

A. I stayed until January. Being the youngest person, or the most recent graduate, I was then transferred to the downtown area. So I used to patrol this area. In January of 1992. And I stayed down here for approximately 18 months, and then I transferred to District 5, which is on 4th and Locust, because I wanted to have more activity than downtown.

Q. You said 18 months. So that would take us probably into -- somewhere in the middle of 1993, is that right?

A. Yes.

Q. And after that -- where is -- that's 4th and Locust, District Number 5?

A. Yes.

Q. Would any of these -- would either the addresses involved in this case that we've heard about be within District Number 5? For example, 3032 North 7th Street?

A. Yes, that was actually my squad area at the time.

Q. And what about 2474 North Palmer?

A. That is also in District 5.
Q. After -- or how long did you remain at District Number 5?
A. I stayed there until 1997.
Q. And during that entire time from 1993 to 1997, what rank did you have?
A. I was just a Police Officer.
Q. And what took place in 1997?
A. 1997 I became a dispatcher and was transferred to the Communications Division.
Q. Can you describe for the jury what a -- who did you work for at that point?
A. Still Milwaukee Police Department. Probably -- actually, there's a brief period, probably 2 months before being a dispatcher the Chief, Arthur Jones at the time, brought a whole bunch of Officers from various Districts and put them in a Special Operations Bureau. And that was part of the Broken Windows Campaign. That we would be put into hot spots. Hot spot policing, which is more common now, to give citations and to correct problem performance in neighborhoods. And I probably lasted about 2 months there, and then I got transferred to dispatch.
Q. Now, with respect to dispatch, just so we have that clear, do the dispatchers work for the Milwaukee Police Department?
A. Yes.
Q. And are they or are they not sworn Officers?

A. Yes, we're sworn Officers. And then you go through special training to be able to dispatch. It's a specialty. It's not general Police work. Now you're a dispatcher. Now you manage resources, computer screens, headsets.

Q. And for how long did you have to have that kind of training?

A. Oh, the training was probably 2 or 3 weeks. And then I stayed at the dispatch for two years until January of 1999, and then I was promoted to a Detective.

Q. And in that time -- we've heard a little bit from other witnesses about promotion to Detective. But in 1999 was there a process to become promoted to Detective as well?

A. Yes. There's a written test you have to take, as well as an oral interview of -- sitting before a board and answering questions.

Q. And when you were promoted to Detective in 1999, where were you assigned to?

A. I was assigned to late shift, and then I was just with a training Detective. So you pretty much take any assignment that comes in that night. It could be burglaries, robberies, violent crimes, shootings.

Q. And when you say a training Detective, what do you mean by that?

A. I shadowed or mirrored with another more veteran Detective, who would teach you what a Detective does. Investigation. More thorough scene measurements. And it's higher than an Officer,

so -- and the fact that I was a dispatcher for two years. So it was just more of a training opportunity. And it's -- everybody goes through it. Not just because I was a dispatcher.

Q. With respect to any kind of formal training, is there separate formal training to become a Detective when you are promoted? Separate from shadowing?

A. Yes. And that's, again, a 2 or 3 week Detective class. And that's held at the Academy also.

Q. Did you remain -- how long did you remain in the assignment on the late shift in the Detective Bureau?

A. Probably about 6 months. And then I was put to the early shift and I remained primarily in violent crime. I had a partner then, and I stayed doing that -- you shift out from violent crime, to actually burglary. And then ultimately I was able to -- I was chosen, hand picked for the Homicide Unit.

Q. When did you -- when were you chosen for the Homicide Unit?

A. After about a year. So sometime in 2000.

Q. When you say you were chosen or hand picked, can you explain that to the jury? How did that work?

A. Homicide is -- I testified the other day, it's a unit -- a specialized unit. You go to any homicide, any suspicious death investigation. When babies -- sudden death where a baby would die. Any high profile incidents, whether it's Officer involved shooting, or something of a larger nature, specialized Detectives in the Homicide Unit would go in and investigate

those.

Q. So who would choose the members of the Homicide Unit?

A. I was chosen by my Lieutenants.

Q. I want to make sure I heard that right. You were chosen by your Lieutenants?

A. Well, I have a specific Lieutenant at the time, and that -- he would have spoke with the homicide Lieutenants. That there was an agreement when there was an opening, someone would be chosen for that Unit. And I, at the time, happened to be the one.

Q. Okay. Now, once -- you began your work in the Homicide Unit in the year 2000, right?

A. Yes.

Q. So that's -- you're aware from reviewing materials in this matter, and from your involvement in this matter, that that's about 2 years after the homicide of Maryetta Griffin, right?

A. Yes.

Q. Is it safe to say that you were not involved in the -- in any way in the initial investigation of the homicide of Maryetta Griffin?

A. Yes. That's correct.

Q. So -- I mean, just by happenstance you weren't a Police Officer or a Detective, otherwise assigned, and you worked on this matter prior to becoming a homicide Detective, right?

A. Yes, that's correct. I would have not. I would have been

in a dispatch area, and there was no way possible I could have had any part of that initial investigation or any interviews as a result.

Q. In 2000 when you became a homicide Detective, how many shifts of homicide Detectives were there?

A. There's -- there were three shifts then. There's 3 shifts now. 8:00 to 4:00, 4:00 to midnight, and midnight to 8:00 in the morning. So it's just three shifts. At the beginning of every shift, at 4 o'clock you brief what the day shift did. And then at midnight when we leave, we brief everything that the early shift did. And it's just a round robin, around the clock. Information is passed off, shift to shift.

Q. And why -- can you explain to the jury why that's done?

A. To -- so information is passed on accordingly. So everybody has at least some working knowledge of some of the cases. You might not have worked on it, but it's passed on in case something happens. But we also have reports and files. And it's the best way that the Police Department thought would solve cases. Milwaukee Police often has people from other states, other cities, come to Milwaukee to view the Homicide Unit just to see this process, and how it works, and why it's so successful.

Q. With respect to this process -- for example, does it allow for passing off of responsibility to ensure that someone on the next shift picks up the homicide investigation?

A. Yes. Yeah. We try that -- we pass follow-up on, and/or interview. If they weren't able to interview a witness, it gets passed on. If a prisoner is in custody and they were unable to interview, it gets passed on. And it ensures all follow-up is done until the new homicide comes in. And then everything gets dropped, and generally pretty much everybody goes out to that.

Q. With respect to follow-up, is there a reason to ensure that there is follow-up like that from shift to shift?

A. Yes. We try to do as much follow-up as contemporaneous to the homicide that happens. While people are -- it's fresh in their mind. They haven't talked to people. They have the T.V. show "The First 48" on cable. People like to solve these things as fast as possible. And sometimes that's obtaining witnesses, arresting people as soon as possible. If we can find them. Because obviously they're dangerous people, and you don't want them to kill again.

Q. How long did you remain in the Homicide Unit as a Detective?

A. In 2009, May, I was promoted to the rank of Lieutenant.

Q. And in order to be promoted to Lieutenant what, if any, testing did you have?

A. Similar process. A written exam, as well as an oral rating in front of raters and they ask you questions.

Q. And how long did you -- or -- strike that. When you became a Lieutenant, where were you assigned to?

A. I stayed in the Criminal Investigation Bureau, and then I

went late shift again, and stayed late shift for probably 6 months to a year.

Q. And that's -- I'm not sure I followed you on that one. Did you go day shift and then late shift?

A. No, I stayed on early shift. I stayed 4:00 to midnight, and then I went to midnight to 8:00, and remained at the Bureau.

Q. Okay. And what part of the Criminal Investigation Bureau were you working with as a Lieutenant?

A. Violent crimes. But oftentimes -- or any crime actually that came through. But oftentimes you have to fill in as a homicide Lieutenant as staffing. Something I was very versed in.

Q. At some point eventually were you transferred at all in your rank of Lieutenant?

A. Yeah. I went -- transferred multiple times as supervisors -- the Police Department sometimes transfers people to develop them. I did probably 8 months. And everything else was clear on years, because as an Officer you stayed in locations for a long time. And in the Bureau or the Homicide Unit. But as a supervisor, I went -- from the Criminal Investigation Bureau I went to an Organized Crime Division where they dealt with more narcotics, prostitution. I did that for probably 9 months. And then I came back to the Bureau because they were under a reorganization or trying different things and trying to separate the investigations geographically. So I was

part of that reorganization.

And then in 2011 I was sent to a District which took me totally out of my comfort zone. I had to actually put on a uniform instead of wearing a suit for the past 11 years or 12 years. And I was actually a 4:00 to midnight, working at 2nd and Lincoln on the south side, back almost where it all started. Now as a Lieutenant dealing with a shift of Officers and Sergeants.

Q. And what year were you assigned to District 2?

A. 2011.

Q. So four years ago, right?

A. Yes.

Q. After -- how long did you remain a Lieutenant at District Number 2?

A. Until September of 2013. For the first time in my career, in my life, I went day shift.

Q. You were what?

A. I went day shift.

Q. And where were you assigned then?

A. I went to District 7, which is on 37th and Fond du Lac on the north side. Still a Lieutenant, still in uniform, just a different district. And day shift.

Q. And then at some point were you either transferred again? Or promoted?

A. Yes. I was promoted in February of 2014 to Captain. That

was an interview process. No written exam this time. And they chose me to be a Captain, and assigned me to the Internal Affairs Division.

Q. And in the Milwaukee Police Department is Internal Affairs what most people think of? That is, a unit that investigates allegations made against Police Officers?

A. Yes.

Q. And what's your present assignment?

A. Captain of Internal Affairs.

Q. Now, focus on the case at hand here. What we know -- the first time you were involved in this was your interview of Keith Randolph, correct?

A. Yes.

Q. By the way -- first of all, do you have any memory of this interview of Mr. Randolph on March 21st of 2001?

A. Yeah. I testified I came in at 4 o'clock, and they had this assignment waiting for me.

Q. When you came in at 4 o'clock that day, had you ever, to the best of your memory, ever heard the name Maryetta Griffin?

A. No.

Q. When you came in at 4 o'clock that day had you ever heard the name Keith Randolph?

A. Didn't mean anything to me.

Q. So when you came in that day at 4 o'clock in the afternoon, how was it decided that you were going to interview Keith

Randolph about Maryetta Griffin, or the matter involving Maryetta Griffin?

A. This was obviously organized during the day shift, and I came in. I was one person. And I had an attorney and a prisoner waiting for me to interview. Oftentimes in a case like this you don't need to prepare much, because you have no clue what they're going to say. Instead of reading hours and hours of reports. And this interview could be directed in a small portion. You don't need to be that versed in some of these cases. So it was -- start at 4 o'clock, and at 4:30 you start the interview. You just -- minor summary of what happened.

Q. Okay. Now, is this the kind of -- there was a little bit about this you might have heard of before. In your work at that time, in 2001, in the Homicide Unit, would it have been typical to take a statement from a witness where you write it out and they actually review it and sign it?

A. Yes. That's what I did, yes.

Q. That was your preference?

A. Well, he was in custody, so -- I also Mirandized him, advised him of his rights, because I don't know if he's going to be somebody that -- not knowing him, not ever meeting him, he might be a co-actor, he might be involved. He might be involved in getting rid of a body. I don't know what his involvement is. So to be on the safe side I advised him of his rights. His attorney was there. And I also wrote it out in front of him.

Q. Now, just in the more generalized sense at that time in 2001, if you're called to a scene to investigate a homicide, and you're speaking to someone in the area who may have witnessed some of the event, would you sit down there and actually write the statement out in longhand as you did here?
A. Never.
Q. How would you handle that kind of witness?
A. You just take notes, and then you file a report. You dictate a report, and some transcriptionist types it up for us.
Q. So is it fair to say that Mr. Randolph was something of an unusual witness in the sense of he's a prisoner, and he's -- you don't know, he may inculpate himself? That sort of thing?
A. Yes.
Q. And he's actually in your building, as opposed to out on the street?
A. Yes. The comfort is much different. We have a table, chairs. It's inside a well lit building, so you have the time also to write things out.
Q. With respect to interviews that are conducted at that time, in 2001, with someone like this who is from -- who is in custody, would you conduct that in an interview room?
A. Yes.
Q. And when you conduct that in the interview room, can you describe for the jury whether that person would be handcuffed? Just because they're in custody?

A. Well, it would be done in the interview room, because he's still a prisoner. You can't have somebody escape. You can't do it in an area where the public is located. Plus, he has to come up through private prisoner elevators, go back up to the jail when he's done, and ultimately would go on to the County Jail or facility -- a more permanent holding facility. He would not be handcuffed in the room. There's a table, couple chairs. Also we can offer soda, water, food, cigarettes. And it's -- in this case it was a longer interview, so we have access to those things.

Q. Okay. With respect to any firearm, would you have had a firearm with you in the room?

A. No.

Q. Why not?

A. Because you can be disarmed. Here's a prisoner. I don't know what he's arrested for. What he could have done. If he was involved in a homicide, even. He could disarm you and use the weapon against you. And you're in a secure facility. And we never take weapons when we interview prisoners.

Q. Okay. Do you recall in this interview whether or not you and another Detective interviewed him? Or whether you -- or how did that work?

A. It was my assignment. I was by myself. I subsequently wrote it out. I put all the information on it. I signed the document. Mr. Randolph also signed the document. So that

everything would be recorded.

Q. With respect to having another Detective present that day, why did that not happen?

A. Just because I was one person. This was kind of a low level assignment. There's a lot of light work to do as far as reading the files, obtaining photographs, trying to identify, again, this Little "C" who helped dispose of the body. As well as additional witnesses that could verify this.

Q. Now, with respect to this interview, before you went on into the interview room to begin obtaining the statement, did you look at all to -- your memory now as you sit here -- did you look at all at any of the details in the Maryetta Griffin homicide file?

A. I don't recall, because I don't recall if I knew at that time which one I was going to be interviewing, or if it was just going to be a cold interview. And then we tried to piece back -- I testified we have a book of all the dates and locations. I don't know if -- I don't recall -- no recollection if he -- if I knew that before or after I started at 4:30.

Q. Okay. Captain Heier, what I've put up on the video screen here with the ELMO is Exhibit 1049. Do you recognize -- I mean, obviously this is the first page of four. Do you recognize this document?

A. That -- yeah, that's my handwriting. It documents the interview of Keith Randolph.

Q. And does the first page or the top of the first page reflect when the interview began?

A. Yes. It also indicates what time I read him his rights. That being March 21st, 2001, at 4:30 p.m.

Q. Okay. So right there at the beginning, what we've got here is that you read Mr. Randolph his Constitutional rights. His Miranda warnings. Written there, right?

A. Yes.

Q. It also says there, the third line, also present when Constitutional rights were read and during interview was Randolph's Attorney, Joseph R. Caton, Jr., of the State Public Defender's Office. Do you remember Mr. Caton being present at all during the course of this interview?

A. Yes. He was there until 6:30. I know I documented somewhere in this -- either the dictated report or at the end of the report that he left at 6:30. So he would have been present when I advised his client of his rights. He would have been in there for the two hours of the interview. And then at the 6:30 mark he left. And he left his client with me to continue.

Q. Captain, I'm going to show you a document that's been marked as Exhibit 1022.

MS. HOFT: 1002, counsel?

MR. SMOKOWICZ: 1022.

Q. Document consists of 4 pages?

A. Yes.

Q. And do you recognize this document?
A. Yes. This is the called in or dictated report of the interview with Mr. Randolph.
Q. So in this situation you did both a handwritten statement that's been marked 1049, but you also did a typewritten report of the same interview that's been marked 1022, right?
A. Yes.
MR. SMOKOWICZ: Your Honor, would offer 1022.
THE COURT: The Court will receive it.
MR. SMOKOWICZ: Thank you, Your Honor.
Q. On this portion of the report that's been marked as 1022 there?
A. Yes.
Q. Do you see any portion of it referencing in your report when Mr. Caton left?
A. Yes. It says Attorney Caton was present until approximately 6:30 p.m., at which time it was agreed upon between Randolph and Caton that his attorney would leave and questioning would continue.
Q. Does that accurately state your recollection of what happened that day? That Caton was there for a couple of hours and then left?
A. Yes.
Q. And that there was a written agreement between him and his client that he could leave?

A. Yes.

MS. HOFT: Objection. Outside of the witness's knowledge.

MR. SMOKOWICZ: I'll make the foundation for that.

Q. Were you present when there was any discussion between Mr. Caton and Mr. Randolph as to whether he could leave? Mr. Caton could leave?

A. Yes. Before he left, we discussed it. That he wished to go on without his attorney.

Q. Okay. Going back now into Exhibit 1049. There is a signature there that we see towards the right hand side of the page after it says and wishes to make a statement. Do you see?

A. Yes.

Q. And is that your signature?

A. No, that's the signature of Keith Randolph. And I also dated it.

Q. So how would this just mechanically have worked that day, in terms of this written document?

A. What happens is I went through his initial statement with his Attorney present for two hours. I gathered some information. It was also in that period of time tried to read more of the file. If I had any further questions. And also to identify Spencer Caldwell as Little "C". He didn't -- the Attorney felt comfortable that he wasn't incriminating himself, and we had gone over pretty much the -- all the facts within the

first two hours, and then it would just be some lag work of reading a file and trying to find some photographs either in the file, or on the computer. And as I returned with some photographs, if he would identify -- if I was going in the right direction, he could identify it. Or I went out and got more photographs. At the completion of the interview the entire statement is read. Written in his presence, going over all the details. At that point I read the statement back to Mr. Randolph, and that's when we initial, and initial any strike-outs. If I cross something out, I want him to know about it. I don't want to document where there's cross-outs and he says I never said that. So every time I made a mistake, I brought it to Mr. Randolph's attention and he would initial it. And then I also asked if it was a true and correct statement, and he would sign the last -- the last piece of the statement.

Q. So is it fair to say that before Mr. Caton even left the room, Mr. Randolph had told you everything that he had come to tell you about in terms of what he knew about this homicide?

A. Not everything. Because again, if I had any follow-up questions -- at this point I went through as much as I could while he was there. But if -- now it's my job to read the file, familiarize myself more with it, and if there's any follow-up questions, or what else can we do. So it wasn't completed 100 percent at 6:30 when the attorney left. It continued on until I think like 11:57 p.m., which is just short of my shift.

And then it's like midnight. I get off. Not really, because I have to stay for the briefing and file reports. But if we had enough information from Mr. Randolph, that there's nothing more to add, I would finish up.

Q. Okay. But within the first two hours, at least, you didn't just simply -- it's -- you didn't just -- or did you just -- strike that. Within the first two hours you did not just read him his Constitutional rights. Have him sign. That didn't take two hours, right?

A. No. We discussed everything with his Attorney present. I mean, getting as many details as we could.

Q. So you know from your experience in this case that what basically Mr. Randolph did is he came in and he told you that he overheard some statements by Mr. Avery which Mr. -- or he was -- I shouldn't say overheard. He had a conversation with Mr. Avery in jail or prison where Mr. Avery essentially told Mr. Randolph that he had killed a woman, right?

A. Yes.

Q. And all of that came out in those first couple of hours?

A. Yes.

Q. And enough detail came out so that his lawyer was aware that Mr. Randolph wasn't saying something like yeah, Mr. Avery and I did "X" or "Y" to the woman?

A. Yes.

Q. So does this process work in such a way where this statement

gets done -- really it's the last thing that gets done after -- well, strike that. In terms of this first portion where Mr. Randolph has signed his name after having been read his rights, does that happen at the end? Or does that happen somewhere within the first few minutes? When does that happen?

A. He was read his rights immediately at 4:30, but the statement is written until the end, and that's when he signed his name.

Q. Okay. So from -- it's about 4:30 in the afternoon until midnight. There's a conversation going on. Exchange of question and answer between you and Mr. Randolph. Is that fair?

A. Yes.

Q. And it's towards the end of that time when this is actually all written out and signed?

A. Yes.

Q. In the course of that conversation, that exchange of questions and answers with Mr. Randolph, was there ever any occasion where you promised him hey, you would -- you would help him out on any charges that were pending against him?

A. No.

Q. Was there ever any occasion where you told him that if you didn't cooperate, you'd make life difficult somehow for him in prison or jail?

A. No.

Q. Was there occasion at all in the course of this conversation

where you told him hey, it didn't happen this way. It happened this way.

A. No. Whatever he told me and how it happened was documented. And at the end if you pull the last page, there's something -- that this is the truth. You know, that he acknowledged it. And I believe in this case he placed the end time of the interview at the last page.

Q. In the course of this interview did he ever tell you yeah, I'll tell you whatever you want to hear?

A. No.

Q. Did he ever tell you that in front of his lawyer? Oh, I'll tell you whatever you want to hear?

A. No.

MS. HOFT: Objection, Your Honor. This is quite leading. These last series of questions.

THE COURT: Yeah, they are, but --

MR. SMOKOWICZ: I'll rephrase the last one.

Q. At any time while his lawyer was present did he ever indicate to you a willingness to say anything?

A. No. That would be inappropriate also. I mean, his lawyer is there. And his lawyer brought him there for this purpose. I'm sure at some point the lawyer had some knowledge of some type of information he would be giving to his attorney, or that he would be giving to the Police. I can't think -- even if he was involved, his attorney would deliver him to me knowing full

well he was handing over a co-actor without having been briefed.

Q. After his signature, you write here that Mr. Randolph told you that he knew Mr. Avery, and you provide some details in here about Mr. Randolph and Mr. Avery being friends of -- knowing the family. Being a pallbearer at Mr. Avery's mother's funeral?

A. Yes.

Q. Where did you obtain those details from?

A. That was from Mr. Randolph. Everything there was from Mr. Randolph. And I inferred from that that he must be very close to the Randolph (sic) family, because being chosen for a pallbearer is somewhat of an honor, and someone must know them very closely.

Q. Further down on the first page of this statement you've written that -- about the middle of the screen now. About one week later Randolph saw a newspaper article in the Journal about Avery and actually wrote him a letter telling him to keep his spirits up. Where did you obtain that information from?

A. That is entirely from Mr. Randolph also.

Q. Looking at -- towards the bottom of this page here, you have written Randolph started looking at Appellate issues, as Randolph has his Associate's Degree and is familiar with some legal workings. Avery presented Randolph with about 8 pages of discovery, which included a handwritten statement. Randolph had read the statement, and it was out at the walking track at Dodge talking to Avery one-on-one, with no one to listen. First of

all, with respect to that information just read from the statement, what was the source of that information?

A. From Mr. Randolph.

Q. With respect to this -- looking at pages of discovery including the written -- a handwritten statement, at any time did you have any discussion with Mr. Randolph about whether or not this should be included in his statement?

A. No. I decided -- I wrote this myself based on his providing the information. As a matter of fact, if you look at the word walking and Dodge, there's little initials next to it similar to the cross-out two lines up, when I crossed out -- says legal workings, and I said -- I crossed out the word. Those are Mr. Randolph's initials. Because some errors were made. So all these -- all these words on there are from him, and authorized by him, and initialed and agreed to. And these are all his. Because I've never met Mr. Avery at this point, and I don't know if, in fact, Mr. Randolph was a pallbearer. Or that Mr. Avery's brother had died. I wouldn't know any of that stuff.

Q. And you certainly didn't tell Mr. -- did you ever tell Mr. Randolph oh, well, it would harm your credibility if you talk about the fact that you might have known something about this from discovery or some other source?

A. This is all what he said, and it's -- what he said I document. I'm a gatherer of facts. I investigate. And if he said that, that's what I put in.

Q. As you can see, I've turned to the second page of this Exhibit 1049.
A. Yes.
Q. And on the second line that's displayed on the screen, I'll read up to that point. Avery asked if he could confide in Randolph what had happened. And there's a word there regard, and it's kind of cut off.
A. Regarding the homicide.
Q. Regarding the homicide?
A. Yes. And you can see his initials, again indicating the words homicide. Oftentimes when I write this, you're writing and then when you read it out loud you realize hey, it doesn't flow real well. So then it's a matter of okay, happened regarding, and said, and you missed some words. So when you add it -- and again, it's when -- after you read it out loud that you realize this. And that's why again I bring it to his attention and say hey, I'm adding something to the statement because we just read it out loud. I read it out loud. And then I initial so that I'm adding something. And I want him to be aware of it, because he owns this statement. These are his words, and I want to make sure that he understands that I'm not just adding words wherever I want. It's something that he's aware of.
Q. It goes on to state: And said in the exact words, quote, man, what really happened, close quote. Now, you've got quote

marks there. Do you understand who you were quoting? Was it Mr. Randolph? Was it Mr. Avery? Who was it? Do you recall?

A. It's Mr. Randolph saying that he spoke to Mr. Avery, and that Mr. Avery is telling him man, what really happened? And then he continues the story. So these are how Mr. Randolph said to me that he heard Mr. Avery say that. And I wanted to capture that in quotes, as this is what Avery said to Randolph. Man, what really happened? Dot, dot. Because then he just laid it out.

Q. And it goes on to state: I kept choking the bitch, but I didn't pass out as I said in the statement to Police. That's the entire -- apparently that's the entire statement that Randolph recounted to you about -- or from Avery, right?

A. Yes.

Q. Did you suggest any of these words to Mr. Randolph?

A. No. This is, again, everything that he told me. This is his words.

Q. Did you and Mr. Randolph work together to make up a story?

A. No.

Q. Goes on to state here: Avery continued, stating that I stopped to check my pockets to see how much of the work the bitch had stolen. I wasn't sure how much she stole, but I knew some was missing. Is this all, again, part of Mr. Randolph's recounting of Mr. Avery's statement to him?

A. Yes. And these are the words Mr. Randolph said. The work.

I mean, that's -- this is his telling me in his own vocabulary. I'm not editing it. This is what he says.

Q. Randolph asked what happened next, and Avery said that he slapped the bitch again, and then started choking her some more until she collapsed. Again, did you suggest any of this to Mr. Randolph?

A. No.

Q. Did you work on putting together this story with Mr. Randolph?

MS. HOFT: Objection, Your Honor. Leading.

THE COURT: Well, it is, but it facilitates the examination, so the Court will allow it.

THE WITNESS: No, I did not tell him what to say, or conspired with him. These are all his words.

MR. SMOKOWICZ:

Q. It goes on to state: Avery said that he then had another shot of Crown Royal and re-lit a joint. Now, there's a scratch-out there. Who would have lined out those three words?

A. I would have lined that. I crossed it out because he re-lit a joint and he said, stating, fuck that bitch. So instead of -- in reading it back, it's a correction that was made by Mr. Randolph. Because again, I'm -- I don't change it. We either read it back and he didn't like it, or wanted to correct me.

Q. Is that something where you made a suggestion to him about

changing words? Or changing his story?

A. No.

Q. And as a matter of fact are there initials there?

A. Yes, he initialed. And it was something that he wanted, because he didn't want the cross-out. Again, he's in charge in the fact that he's putting his initials and he's signing at the end. So these are his words.

Q. Just going to read a little bit farther. Avery stated that he noticed that she wasn't coming to like the first time. Avery said, quote, then I panicked, close quote. Whose words, then I panicked, did you understand that to be?

A. That was Mr. Avery's words to Mr. Randolph.

Q. And then you go on to write Avery said that he, quote, called a worker, close quote. Again, whose words did you understand the, quote, called a worker, to be?

A. That Mr. Avery would have said that to Mr. Randolph, and Randolph was repeating those exact words that were used by Mr. Avery.

Q. And goes on to state: And had her wrapped up in a rug or something. In writing that portion of this report, did you consult at all with any of the crime scene reports, or photographs, or anything like that?

A. No. This was all his words.

Q. Avery said he then woke up Little "C". We'll get to that in a moment. But with respect to whoever may have been involved in

this incident, according to Mr. Randolph's account to you, did you ever suggest who might have been involved with William Avery that night?

A. No. I didn't know. I didn't know anything about who Mr. Avery was or the case until this time. And my goal was to identify who Little "C" is. Because this is somebody that ultimately disposed of a body, per Mr. Randolph telling me.

Q. So if -- if other reports in the file would have suggested -- or other statements in the file would have suggested, for example, that the only person who may have been involved in helping to dispose of the body would have been somebody named Lorenzo, or Doc, or Lorenzo Frost, do you recall at any time ever suggesting to Mr. Randolph that he should change his story to be consistent with those statements?

A. No. As a matter of fact, Lorenzo Frost being arrested with Mr. Avery earlier would have been something that would be in the file. And that would be among the first few photographs in the packages that -- he would definitely have been shown a photo of Lorenzo Frost to see if that's Little "C". Because that would be the easy way. That if that was Mr. Frost, wow, it's simple. Little "C", Lorenzo Frost. But it was not Lorenzo Frost. It was a person that now I needed to identify.

Q. And the statement goes on Little "C" came in the room and said what the -- is that word fuck there?

A. Yes.

Q. Said what the fuck you do? Avery stated that he was still fucked up and Little "C" and the worker took the girl out to the Blazer, and they all left and took her and they dumped her. Randolph asked where did they take her? And Avery said to the area of 9th and Burleigh. First of all, with respect to the location of 9th and Burleigh, did you ever suggest -- strike that. Did you ever have any discussions with Keith Randolph during this interview as to the location of where the body was deposited?

A. No.

Q. So did you ever discuss with him it might be this place, as opposed to that place? Or what have you?

A. No, it's something -- he's providing information to me. I'm not providing information to him. If he says it's 9th and Burleigh, and that's what he was told by Mr. Avery, then that's all Mr. Randolph knows. So I'm again just documenting what he says. Ultimately the body was found I believe in the 3000 block of North 7th Street, which would be not consistent with this. So it's --

MS. HOFT: Objection. Non-responsive.

MR. SMOKOWICZ:

Q. Well, based upon your experience as an Officer within that District, how far away is 9th and Burleigh from the 3000 block of North 7th?

A. It's two blocks.

Q. It goes on to state there Avery said that the girl was put in Little "C's" Blazer or sport utility vehicle, and this area was, quote, hot, close quote. Did you have an understanding what at that time Mr. Randolph meant when he was recounting this area being hot?

A. Well, that's his interpretation. These are his words. That it was hot. I don't recall -- I don't recall specifically what he said. I mean, sometimes hot would be there's a lot of Police in the area. It's a very -- it's on the radar of the Police, and that's why it's hot.

Q. In any event, did you suggest anything to Mr. Randolph, one way or the other, whether this recounting should or should not be included?

A. No, we didn't discuss it. He read it. However -- I mean, he told me -- I recorded it, but it's also read back to him, so he agreed with everything in this report.

Q. Unfortunately in the photocopying process here, automatic feeders, it looks like a portion of that bottom of this page right under the numbers 4:30 p.m. is cut off. Do you know what that was under there?

A. That would be Mr. Randolph's signature. He would have signed the bottom of each page, and that's to signify that he read the entire page. And then he signed his signature at the bottom, in addition to initialing any mistakes or additions.

Q. On the third page of this report it begins at the top there,

on line statement of prisoner continued, Randolph inquired from Avery the identity of Little "C", and Avery reminded Randolph of a meeting they had with a friend Spencer Caldwell. What's the letter right after Mr. Caldwell's name?

A. That would indicate he was a black male, and the age would be 50 or 51.

Q. Going on a/k/a -- a/k/a standing for?

A. Also known as Hank.

Q. Who lived with -- who lived north of Keefe on Port Washington road. Caldwell is his, Randolph's, girlfriend's brother. Avery described Little "C" and Randolph then reminded him -- remembered him, I'm sorry, as a black male, 36, 6-foot-1 or 6-foot-2. Is that the word slim there after that?

A. Yeah. Slim to medium build. Curl would -- that's going to be his hairstyle. And 175 pounds.

Q. And that would be a description of what person?

A. That would be the description of Little "C", and that's what I would have to work with to try to identify him.

Q. So this whole description here is provided to you so that you could go look for -- or that law enforcement, rather, could try to determine who Little "C" might be, right?

A. Yes.

Q. And that night, while you were undertaking this interview, did you take any steps to try to identify Little "C"?

A. Yes.

Q. What did you do?

A. Well, if you look at the entire paragraph, in order to get Little "C", who else would know Little "C"? And I wanted to backtrack, because he says Spencer Caldwell might know who Little "C" is. Well, how do I find Spencer Caldwell? And that would be his girlfriend's brother. So now -- so I have something to work on in order to verify -- in order to try to find out who this Little "C" is. So that's why that's included. It's more of you throw me a name, and now if you don't know who he is, I would be able to keep going and verify through other people.

I would put in a computer -- we have computers, and you can put parameters on height, weight, age, and black males similar to being 36 years old, 6-foot-1 to 6-foot-2, slim to medium. Or specifically he said 175 pounds. So the only difference would be like curl. Some people -- people change their hair constantly, so he could be bald, or he could have longer hair. So the hair doesn't apply so much, because people can shave. They can grow beards. So it would be within those parameters, to try to identify and show photographs.

Q. Would you have undertaken any of those steps yourself that night in the course of this interview?

A. Yes.

Q. What did you do?

A. Tried to identify him. I mean, this could be a huge point

in the case, to identify Little "C". And if Little "C" is not the actual killer, per Mr. Randolph he clearly is a witness. He clearly is involved. He clearly disposed of a body. So it would be in everybody's -- in our best interests to solve this case, is to try to find out who Little "C" is. Talk to him. Because he could verify Mr. Avery, and also verify who the other worker is. So now we might have two people involved in getting rid of a body. Not necessarily murdering her.

Q. Skipping around just a little bit in this statement here, at the bottom it states Randolph viewed numerous CJIS -- is that what those letters are?

A. Yeah. Viewed numerous CJIS. That's -- CJIS photos is photos that are taken at the Criminal Justice Facility, kept by the -- Sheriff's Department takes the photographs. Shares them with the Milwaukee Police Department, because it doesn't just incorporate everybody that Milwaukee arrests. It's Milwaukee County. Anybody that goes through the jail, they get a CJIS photograph taken. So showing, again, numerous photographs trying to identify Little "C".

Q. And when did that process take place, showing the photographs?

A. Between 6:30 and 11:56 p.m. So once -- once Attorney Caton leaves, it's -- that whole process of now let's look at the file. Let's look at anybody's name in there. Could that be Little "C"? Anybody that we can put together. And then going

to the computer, putting in some parameters, printing the photographs out, bringing them in to Keith Randolph. Because that's -- that would really push the case forward, if I could identify him.

Q. With respect to obtaining photographs, can you explain to the jury the process of how mechanically that actually worked? How would you get the photographs?

A. The homicide file itself has some photographs in it, because when we interview people, or if they are suspects, or we have photographs in there -- there's a whole section of photographs, so that would be a source. The others going to a computer which is located in our fourth floor -- the same floor that Mr. Randolph was on. And it's just a matter of printing them off. It's color photos, and it's printing them off and using a lot of paper. But bringing them in and saying is this the person? And when we show photographs, we don't show people's names. They're just photographs. A front photo and a side profile. It doesn't indicate height, weight, age, date of birth, anything. And the whole idea is just to identify from a photograph, not feeding somebody their name, or nickname, or him trying to put some things together. It's just off of a visual.

Q. With respect to CJIS photographs, how are those obtained? How would you have gotten them that night?

A. From the computer. Again, it's just -- Sheriff's Department takes the photographs. They're in the computer, and it's just

putting parameters. And again, when somebody says they're 35 years old, you go plus or minus like 5 years. Because some people are not good with age. Weight fluctuates, so you want to put a plus or minus in case somebody gained weight or lost weight.

Q. And I'm going to skip around a little bit on the last page. Page 4 of 4 of Exhibit 1049. The first statement reads -- or the first line reads: Randolph identified CJIS photo 817448179 as William Avery. Can you explain to the jury why you did that? Why you showed Mr. Randolph a photo?

A. Well, he had -- he'd indicated he'd known Mr. Avery very well. And then I showed a photograph that we have of a William Avery. And the reason is we don't want another person to have used William Avery's name. If my brother -- I don't have a brother, but if he got arrested and says hey, I'm William Avery, and all of a sudden I show who we think is William Avery, and he goes no, that's not the guy I'm talking about -- so what we want to do is verify that. When he says William Avery, that we have a photograph, we have the date of birth, we have all the information on file that we're talking about the same person.

Q. What, if any, kind of check does that provide on whether or not this person is telling you the truth? That he knows this person, William Avery, very well?

A. That's all -- and again, it's not providing a photo -- it's providing a photograph but not a name. It's just here is -- you

know, can you identify anybody? Is this anybody? And it's not a -- is this William Avery? And then they just respond sure. Yes. It's an identification.

Q. So when you present that photo, would you have given a name with it? Or would you just ask him something along the lines of can you tell me who this is?

A. Well, it's testing. It's -- I don't give names. It's testing. Do you know this person? And it could be with a bunch of other people. As you're showing photographs, sometimes we put them with the other ones. And then they go hey, there's William Avery. So I don't recall if it was do you recognize this person, and then -- but ultimately Mr. Randolph would have made the identification with nothing leading. Because we're trying to determine if this is the same person.

Q. And there are some notes right next to the time 11:56 p.m. Who wrote those?

A. The time that's --

Q. I'm sorry. I don't think you heard my question. There's some handwriting, there's some notations next to the left of 11:56 p.m. Who wrote those?

A. That entire 11:56 p.m., the date 3-21 of '01, and the signature is Keith Randolph. He wrote all of those.

Q. What about the stuff to the left?

A. That's consistent with my handwriting. I wrote it. And again, these are the -- we call them creature comforts. If

somebody is talking to me for 8 hours or 7-and-a-half hours, we try to make them as comfortable as possible. In this case he was given three cups of coffee. And I indicated cream and sugar. It was his birthday. Because Mr. Randolph -- I see he was given a phone call. He also was given four cigarettes and two baloney sandwiches. Prisoners in our facility are given baloney sandwiches, so it's just a matter of phoning into our jail, grabbing a couple of pre-made sandwiches, and feeding him.

Q. Now, I'm sorry. I've skipped back a page here to page 3 of the statement. And in the middle there -- pardon me -- it reads Avery stated that the worker and Little "C" unloaded the dead body, because he said he was still wasted and couldn't help. Goes on to state the offense occurred Keefe Street drug house on 19th Street. Randolph stated that he had been there previously to pick him up, as he had never been inside himself. All right. On the previous page there is a reference to -- or there is a recounting that they took the body to the area of 9th and Burleigh. Right?

A. Yes.

Q. On the next page there is reference to the offense occurred Keefe Street drug house on 19th Street. That's not the -- is the reference there the offense? Is that the reference to the killing? Or is that the reference to something else?

A. The reference is to the killing would have occurred at a drug house at Keefe and 19th Street. The investigation -- it's

inconsistent with the investigation, because Mr. Avery had a drug house in the -- something in the -- somewhere in the 2000 -- I know it was on Palmer Street, but it's in a two number. It's one of the 2002 -- I don't know what else.

Q. What attempt, if any, did you make to flag that inconsistency to Mr. Randolph and suggest that he change his story?

MS. HOFT: Objection. Mischaracterization.

THE COURT: Well, you can rephrase the question.

MR. SMOKOWICZ:

Q. What, if anything, did you do to try to keep Mr. Randolph from such an inconsistency?

A. Absolutely nothing. Again, he said 19th and Keefe. And if the other investigation determined a Palmer Street address? Again, these are his words. This is what he's telling me. I can only go with what he's telling me.

Q. Did you have any vested interest, one way or the other, in trying to make reports consistent here?

A. Absolutely not.

Q. Over the next couple of days following that interview, next two days following that interview, did you undertake any further investigative efforts in this matter?

A. After this? Nothing from -- a year later. A year-and-a-half later is the next time -- I'll strike that. I tried to follow up with identifying Little "C".

THE COURT: Are we going to go into another area?

MR. SMOKOWICZ: We are, Your Honor.

THE COURT: Well, the Court is going to have to leave in a little bit, so I don't want to miss my Doctor. You know, they -- well, I won't comment. But these guys think they're Federal Judges. So I don't want to be late. But since we're going to a new area, it wouldn't pay to spend a couple minutes on that, come back, and then you probably have to refresh what we said going into this new area anyway. That's been the Court's experience.

So what we'll do is we'll break for the weekend. Please don't discuss the case. In addition, if there's any publicity about this case, take what I said before. Ignore it. Don't look at it. Don't read it. But if you do, ignore it. And that is not evidence. And if you run into someone connected with the case over the weekend, we will acknowledge you, but we're not going to discuss the case. All right? So we'll see you back here Monday morning at 9 o'clock. All right. Have a good weekend.

(Whereupon the jury was excused at 3:16 p.m.)

THE COURT: Okay. Monday morning.

MS. HOFT: Thank you, Your Honor.

MR. SMOKOWICZ: Thank you very much, Your Honor.

* * *

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

I, HEIDI J. TRAPP, Official Court Reporter for the United States District Court, Eastern District of Wisconsin, do hereby certify that I reported the foregoing Transcript of Proceedings; that the same is true and correct as reflected by my original machine shorthand notes taken at said time and place before the Hon. Rudolph T. Randa.

___________________________________
Official Court Reporter
United States District Court

Dated at Milwaukee, Wisconsin,
this 2nd day of November, 2015.