UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
-----------------------------------------------------------------

**WILLIAM DAMON AVERY,**

                                        Case No. 11-CV-408

                    Plaintiff,

                                        Milwaukee, Wisconsin

        vs.

                                        June 8, 2015

**CITY OF MILWAUKEE, et.al.,**

                    Defendants.
-----------------------------------------------------------------

**VOLUME 6 – PAGE 870**
TRANSCRIPT OF TRIAL
BEFORE THE **HONORABLE RUDOLPH T. RANDA,**
UNITED STATES DISTRICT JUDGE, AND A JURY


**A P P E A R A N C E S**

For the Plaintiff:              People's Law Office
                                By: **Mr. John L. Stainthorp**
                                    **Ms. Janine L. Hoft**
                                    **Mr. Ben Elson**
                                Attorneys at Law
                                1180 N. Milwaukee Avenue
                                Chicago, IL  60622


For the Defendant:              Milwaukee City Attorney
                                By: **Mr. Jan A. Smokowicz**
                                    **Ms. Jenny Yuan**
                                Assistant City Attorneys
                                200 E. Wells St. – Rm. 800
                                Milwaukee, WI  53202-3551


REPORTED BY:                    HEIDI J. TRAPP
                                Federal Official Court Reporter
                                310, U.S. Courthouse
                                517 East Wisconsin Avenue
                                Milwaukee, Wisconsin 53202


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

25

1                            **I N D E X**

2  **Witness:**                                              **Page**

3   **CAPTAIN TIMOTHY HEIER**

4      Continued Direct Examination By Mr. Smokowicz...  876
       Cross Examination By Ms. Hoft...................  927
5      Redirect Examination By Mr. Smokowicz..........  959
       Recross Examination By Ms. Hoft................  962

6   **AGENT GILBERT HERNANDEZ**

7
       Direct Examination By Ms. Yuan.................  963
8      Cross Examination By Mr. Stainthorp............ 1020

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **TRANSCRIPT OF PROCEEDINGS**

2           THE CLERK:  Case Number 11-CV-408, William Avery vs.

3    City of Milwaukee, et.al.  Called for continuation of the jury

4    trial.  May I have the appearances, please.  First for the

5    Plaintiff.

6           MS. HOFT:  Good morning, Your Honor.  Janine Hoft for

7    the Plaintiff.

8           THE COURT:  Good morning.

9           MR. STAINTHORP:  Good morning, Judge.  John Stainthorp

10   for the Plaintiff.

11          THE COURT:  Good morning.

12          MR. ELSON:  Good morning, Judge.  Ben Elson for the

13   Plaintiff.

14          THE COURT:  Good morning.

15          THE CLERK:  And for the Defendants?

16          MR. SMOKOWICZ:  Assistant City Attorney Jan Smokowicz

17   for the Defendants.  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MS. YUAN:  Good morning, Your Honor.  Assistant City

20   Attorney Jenny Yuan for the Defendants.

21          THE COURT:  Good morning.  We're back here for trial.

22   We left off with the examination of a witness, but the Court has

23   received -- at the beginning of last week a motion to dismiss.

24   And then, of course, a new motion brought by the Plaintiffs

25   objecting, of course, to the motion to dismiss, but also some

1    Brady claims.  And the Court has had the opportunity to read the

2    briefs that were submitted.  The Court is going to deny both

3    motions, and I'm going to submit a written response.  I feel

4    more comfortable doing that, given the fact that it will be much

5    clearer than my oral offering this morning.  One.

6            Two, relative to the Brady motion, we have the Brady

7    motion which claims a failure to disclose the witness's -- we're

8    talking now about Kimbrough's statements.  And the Court will

9    allow, since that witness is still here and present and being

10   examined, an opportunity to question relative to that when it

11   comes to Plaintiff's case.  Plaintiff's opportunity or chance to

12   examine the witness.

13           MR. SMOKOWICZ:  Just a point of clarification.  So the

14   motion to dismiss as a matter of law is denied.  Your Honor, is

15   the other motion to dismiss -- the other motion to amend on the

16   Brady claim also denied?  I'm not quite sure I followed --

17           THE COURT:  You mean the motion for the pleadings to

18   conform to the evidence?

19           MR. SMOKOWICZ:  Yes.

20           THE COURT:  Yes.  And the -- but the Court is going to

21   allow cross examination on the issue that apparently is raised

22   in the Brady claims.

23           MR. SMOKOWICZ:  Right.  I do understand now, Your

24   Honor.  Thank you for the clarification.

25           THE COURT:  We have some other matters to take up?

1          MR. SMOKOWICZ:  Yes, Your Honor.  With respect to the

2    witness who's up there this morning, which is Captain Heier,

3    who's not been finished, I would be asking the Court to take

4    judicial notice of a document.  It's the list of judicial events

5    in the case of State vs. Antron Kent.  That's available on the

6    Circuit Access page of the Wisconsin State Court system.  I have

7    a hard copy to present to the Court for this, and I would like

8    to do that at this point and just explain the purpose here so

9    we're not doing this all in front of the jury or in a break.

10          MS. HOFT:  And, Your Honor, if we could review a copy?

11          MR. SMOKOWICZ:  I did provide a copy.  What I will be

12   asking the Court to take notice of is on Page 4 of the document

13   that I presented to the Court and provided to counsel.  The

14   January 20th, 2006, motion hearing which reflects that the case

15   was in court on defense counsel's motion to modify sentence.

16   That Mr. Williams and Captain Heier were sworn to testify, and

17   that the Court denied the motion as indicated at the last

18   sentence there.

19          And the next thing that I would ask the Court is --

20   and sorry, I'm going backwards page-wise.  But I'm actually

21   going forwards chronologically.  Item number 5 on the first

22   page, the motion hearing.  Apparently there's an appeal that --

23   intervening item 19 there.  On Page 1 the Court a year later did

24   modify the sentence, and there is no testimony at that time from

25   Captain Heier.

1          I just want to -- I think this is necessary to clarify

2    the record.  These are items that are obviously of -- can easily

3    be discerned by the Court, and it makes -- it clarifies that.

4          THE COURT:  Is there any objection?

5          MS. HOFT:  No, Your Honor.

6          MR. SMOKOWICZ:  And I would just be making a request

7    for judicial notice, then, at the end of probably Captain

8    Heier's testimony, if that's permissible by the Court.

9          THE COURT:  That's fine.  Should probably mark it as

10   an Exhibit then, too.  Anything else?

11         MR. SMOKOWICZ:  With respect to Mr. Gulbrandson

12   being -- or Detective Gulbrandson being dismissed, he was

13   obviously introduced to the jury as a party at the beginning of

14   the case.  I just don't -- I don't know when the Court would

15   wish to make note of it, but I think the jury needs to be

16   informed that he has been dismissed.  He is going to testify in

17   this case.  In our case.

18         THE COURT:  Well, then the Court would think that at

19   the close of the evidence, when I present the verdict form

20   without his name, I will inform them then that Gulbrandson has

21   been dismissed from this case.

22         MR. SMOKOWICZ:  Very good, Your Honor.  Thank you.

23         THE COURT:  And that was by stipulation, wasn't it?

24         MR. SMOKOWICZ:  Yes.  There has been an order that the

25   Court signed last week.

1          THE COURT:  Okay.  Anything else?

2          MR. SMOKOWICZ:  Not from us, Your Honor.

3          THE COURT:  Ready for the jury?

4          MR. STAINTHORP:  Yes, Judge.

5          THE COURT:  Okay.

6          (Whereupon the jury was returned to the courtroom at

7     9:27 a.m.)

8          THE COURT:  Good morning, ladies and gentlemen of the

9     jury.  I trust you had a good weekend.  But we're ready to pick

10    this case up where we left off, and that was with the

11    examination of Captain Heier.  Mr. Smokowicz, if you're ready to

12    proceed, you may.

13         MR. SMOKOWICZ:  I am, Your Honor.  Thank you.

14         THE COURT:  Captain Heier, again you've been placed

15    under oath, and that oath still applies.

16         THE WITNESS:  Yes.

17         **CAPTAIN TIMOTHY HEIER**, re-called as a witness, having

18    been previously sworn, on oath testified as follows:

19                    **CONTINUED DIRECT EXAMINATION**

20    **BY MR. SMOKOWICZ:**

21    Q.  Good morning again, sir.

22    A.  Good morning.

23    Q.  I want to go back just a little bit over something from last

24    week with respect to the handwritten statement that you wrote

25    out for and obtained from Mr. Randolph.  Near the top of the

1   statement on the second page, Page 2 of 4 here -- this is
2   Exhibit -- I apologize -- 1049, I think.  Yes.  1049.  It
3   recounts as follows:  Randolph knows this to be in the summer of
4   1998, late August.  Randolph brought up his past violent
5   behavior with woman that Randolph knows firsthand, having saw
6   the beatings Avery inflicted on his, Avery's, woman.  Having had
7   given one girl two black eyes.

8            Captain Heier, that statement there with respect to
9   violence and beating, is that something that you understood
10  Mr. Randolph was telling you about Mr. Avery's conduct?
11  A.  Yes.
12  Q.  And with respect to that conduct, did you provide any of
13  that information to Mr. Randolph?
14  A.  No.
15  Q.  Did you ever suggest anything like that to Mr. Randolph?
16  A.  No.
17  Q.  In general during the course on that interview of Keith
18  Randolph did you ever provide any information to him?
19  A.  No.
20  Q.  And did you ever make any promises to him whatsoever?
21  A.  No.
22  Q.  Following that interview of Mr. Randolph, did you undertake
23  any efforts to follow up on any of the information that he
24  provided to you?
25  A.  Yes.

1  Q.  Do you recall any of those efforts as you sit here now?

2  A.  Yes.  The -- what I wanted to accomplish was to find Little

3  "C".  To verify if he could be used as a witness.  And he also

4  would have disposed of Maryetta Griffin's body.  Based on the

5  information from Mr. Randolph, I made attempts to talk to

6  Mr. Randolph's girlfriend to see what she knew, and also to

7  point me to the direction of Mr. Spencer Caldwell, another

8  person that could identify who Little "C" was.

9  Q.  Before we move into that area, did you also prepare a

10  typewritten report with respect to the interview of Keith

11  Randolph?

12  A.  Yes.

13  Q.  I'm going to show you a document that's been marked as

14  Exhibit 1022.  Do you recognize that document?

15  A.  Yes.  This is a typewritten report.  It includes the

16  handwritten reports.  In case people can't read my handwriting,

17  that it's more clear.  And also some additional information

18  regarding the interview.

19  Q.  And you prepared this report?

20  A.  Yes.

21  Q.  And does your signature appear anywhere on the report?

22  A.  Yes.  It appears on the last page, 4 of 4.

23  Q.  And is this a document that's prepared in the normal course

24  of work as a Detective in the Homicide Division in the Milwaukee

25  Police Department back in 2001?

1    A.  Yes.

2          MR. SMOKOWICZ:  Your Honor, I'd offer Exhibit 1022.

3          MR. STAINTHORP:  Judge, I think it's already admitted.

4          THE CLERK:  It is.

5          MR. SMOKOWICZ:  It is?  Okay.  Good.

6    Q.  With respect to Exhibit 1022, do you make normally any

7    notation as to whether or not the individual is handcuffed

8    during the interview?

9    A.  Yes.

10   Q.  Okay.  In this instance can you see what's displayed on that

11   page?  Any indication of whether Mr. Randolph was handcuffed

12   during this interview?

13   A.  Yeah.  The second paragraph from the bottom, during the

14   interview Randolph was not handcuffed.

15   Q.  Is this a report that you prepared fairly quickly after the

16   interview had been completed?

17   A.  Yes.

18   Q.  And to the best of your recollection is that -- would that

19   be the normal way of doing things with respect to such

20   interviews?

21   A.  Yes.  He was a witness that came forward on his own.  He was

22   brought with an Attorney.  He was not involved in this case.  He

23   posed minimal threat to myself, given the fact that he was still

24   a prisoner in custody.  And there was no reason to handcuff him.

25   Q.  Now, with respect to the follow-up efforts.  Do you recall

being able to locate Keith Randolph's -- was it girlfriend?
A. Yes.
Q. And do you recall her name?
A. I think it was Lorraine Bowers.
Q. And what, if any, information do you recall obtaining from Miss Bowers?
A. How I could find Spencer Caldwell. And also if she had any information of who Little "C" was, and she did not.
Q. And what was the purpose of attempting to locate Spencer Caldwell?
A. Spencer Caldwell was supposedly present and could identify who Little "C" was. He had no direct knowledge of the information that Keith Randolph was presenting, but he could still further along the case in leading us to identify Little "C", who would be a witness and also would have disposed of the body.
Q. And were you able, ultimately, to locate this individual that you knew at that time as -- named Spencer Caldwell?
A. Yes. The name provided by Mr. Randolph was Spencer Caldwell, and it was later determined his last name was Bentley. Or he was arrested with us under the last name Bentley. He was interviewed and could not further the case or provide who Little "C" was.
Q. I'm going to show you a report. It's been marked as Exhibit 1024. Do you recognize that document?

1    A.  Yes.  This is a supplementary report that was transcribed.

2    I called in a report relative to my interview and follow-up.

3    Q.  Is this again a report that's prepared in the normal course

4    of business as a -- by you as a Detective in the Homicide

5    Division of the Milwaukee Police Department back in 2001?

6    A.  Yes.

7              MR. SMOKOWICZ:  Offer Exhibit 1024.

8              THE COURT:  Any objection?

9              MS. HOFT:  No objection, Your Honor.

10             THE COURT:  The Court will receive it.

11             MR. SMOKOWICZ:

12   Q.  Do you need a moment to review it?

13   A.  No, that's fine.

14   Q.  What, if any, information does this report recount in terms

15   of your being able to identify Little "C" through Mr. Bentley,

16   or otherwise known as Mr. Caldwell?

17   A.  It shows that I did conduct a follow-up on Wednesday,

18   March 21st -- or I'm sorry.  On March 21st I interviewed

19   Mr. Randolph, and then subsequently on -- two months later,

20   three months later, I was able to track down Mr. Bentley.  And

21   the last paragraph on this page, he did not know Little "C", but

22   was aware of the homicide in which his cousin, William Avery,

23   had been identified as being responsible for.

24   Q.  Based upon the information that you had at that time

25   available to you in this homicide case -- that would be Mr.

1    Avery's statement from back in March of 1998, and then

2    Mr. Randolph's statement given to you that we've had identified

3    as Exhibit 1049 -- did you present this matter for review by any

4    prosecutor at that time to charge for a homicide?

5    A.  No.  This case pretty much lead to a dead end.  I couldn't

6    corroborate information from Mr. Keith Randolph.  He provided

7    information.  He was inaccurate at two points relative to the

8    drug house being on 19th and Keefe.  There was also inaccuracies

9    relative to where the body was dropped off, 7th and Burleigh --

10   or 9th and Burleigh, which was a couple blocks over.  Very

11   close, but still a couple blocks off.  And then all the attempts

12   that we made to verify Little "C" came to a dead end, and nobody

13   furthered the case.  There wasn't enough to even present it to

14   the D.A., because it didn't move the case forward.

15   Q.  When was your next involvement in this matter?

16   A.  On August -- well, July 24th I was made aware that a call

17   came into the Criminal Investigation Bureau by a person that

18   initially wanted to remain anonymous, and that was Mr. Antron

19   Kent.  And he had additional information regarding this

20   homicide.  There were -- there was a subsequent call by

21   Mr. Kent, and that was on August 19th of 2002.  And again, for

22   reference, Mr. Keith Randolph was March of 2001, and then here

23   we are August of 2002.  We get a call that there's two witnesses

24   in Sayre, Oklahoma, at a private Correctional Institution who

25   had information on this.

1    Q.   Now, with respect to those phone calls -- first of all, did

2    any of those phone calls come to you?

3    A.   No.   These were both received by Detective Kevin Armbruster,

4    who was at the time a late shift homicide Detective.

5    Q.   And do you recall how you even became aware of those phone

6    calls?

7    A.   Yes.   During the briefings we were aware that someone had

8    come forth.   And also relative to the second updated one,

9    there's two witnesses in Oklahoma.   And would anybody be

10   available to drive down to Oklahoma and interview the witnesses?

11   And I was available and willing to take a long car drive to

12   Oklahoma.

13   Q.   With respect to the interview of Antron Kent that took place

14   in Oklahoma, did you -- were you the person asking the

15   questions?

16   A.   No.   It was pretty much both myself and Detective

17   Armbruster.

18   Q.   Give me just a second.   I have to get a document.   I'm going

19   to make sure I have had this marked.   Has 1017 already been

20   marked into evidence, Madam Clerk?

21            THE CLERK:   1017?

22            MR. SMOKOWICZ:   Yes.

23            THE CLERK:   No.

24            MR. SMOKOWICZ:

25   Q.   Okay.   I'm going to show you what's been marked as Exhibit

1   1017.  Do you recognize the document?

2   A.   This is a four page handwritten statement from Antron Kent.

3   This was written by my partner that day, Kevin Armbruster.  He's

4   not my regular partner.  We just got put together, two different

5   shifts, because we were both available for the interview.

6   Q.   Do you recognize that document?

7   A.   Yes.

8   Q.   Is that the statement that you recognize Detective

9   Armbruster to have taken of Antron Kent?

10  A.   Yes.

11  Q.   At the prison in Oklahoma?

12  A.   Yes.

13  Q.   And you have had a chance to review it before?

14  A.   Yes.

15  Q.   Do you recognize whether or not your signature is on any

16  portion of that document?

17  A.   Yes.  The fact that -- this is another poorly photocopied

18  document.  My signature appears on the bottom of each of the

19  four pages.  Specifically on the fourth page, when I signed

20  Heier higher than the cutoff.

21  Q.   Are you saying -- just so the jury is clear on this, are you

22  saying that if this had been a better copy, we'd see your name

23  on every page?

24  A.   Yeah.  You can see the remnants of my handwriting on the

25  very bottom.

1   Q.  Is this a statement that was prepared in the normal course

2   of work as Detectives in the Milwaukee Police Department by

3   Detective Armbruster in your presence?

4   A.  Yes.

5           MR. SMOKOWICZ:  I move admission of the Exhibit, Your

6   Honor.

7           MS. HOFT:  Your Honor, we do have one objection.

8   Apologetically if we can have a quick sidebar?

9           THE COURT:  Sure.

10          (Whereupon a side-bar conference was held off the

11  record.  Upon conclusion of the side-bar conference, the

12  proceedings continued as follows:)

13          MS. HOFT:  It's resolved, Your Honor.

14          MR. SMOKOWICZ:  1017 offered and admitted?

15          THE COURT:  It's received.

16          MR. SMOKOWICZ:  Thank you, Your Honor.

17  Q.  Now, at the top of this document that's being displayed to

18  the jury, this is apparently the first page of 1017, correct?

19  A.  Yes.

20  Q.  And on the first paragraph there would you describe for the

21  jury just what that paragraph is?

22  A.  First paragraph is the fact that I read Mr. Kent his Miranda

23  warnings, also known as Constitutional rights.  And that he

24  stated he understood and was willing to speak with us.  And then

25  again it identifies the location of the interview.  Sayre,

1    Oklahoma, at the North Fork Correctional Facility.

2    Q.  And there is a signature on the -- I'm going to count this I

3    hope correctly.  Fifth line?

4    A.  Yes.  There's --

5    Q.  Whose signature is that?

6    A.  There's an "X" followed by a signature and that's Antron

7    Kent, and that signifies that he agrees that he was read his

8    Miranda warnings, he understood, and was willing to speak with

9    us.

10   Q.  Okay.  The next paragraph, would you describe for the jury

11   just generally what the information contained there is?

12   A.  It's background.  Called pedigree information.  Just going

13   through his background.  How much education he had, and some

14   other family contacts.

15   Q.  And is there any indication in that paragraph of what the

16   nature of his offense was that he was in prison for?

17   A.  He said the only thing he got arrested for is mayhem.  And

18   he was given 38 years.  He has no gang affiliation or tattoos.

19   Q.  I have moved the document down towards the bottom of the

20   page there.  And there is some reference to his having knowledge

21   of Mr. Avery because of something that his cousin and Avery had

22   in common, is that right?

23   A.  Yes.

24   Q.  On the next page of the statement at the top there's some

25   indication as to -- there's some information with respect to

---

Mr. Kent and Mr. Avery and their activities in the prison at
that time, right?

A.  Yes.

Q.  What was the purpose of putting that down?

A.  Well, he had said that he had prior contact with Mr. Avery
in '98 when both their cases were through, which was consistent.
Because Mr. Avery's first case went through -- roughly started
in March of 1998.  They're both now assigned to this
correctional facility.  And what's documented there is that they
have a commonality in the fact that they take classes together.
They have recreation time and free time together.

Q.  So would that have provided them the opportunity to be able
to discuss matters in this prison?

A.  Yes.  That -- the information he's giving is from direct
contact with Mr. Avery, and not that he's hearing it from
somebody else.

Q.  Do you recall during your time in Oklahoma whether or not
you took the opportunity to try to inquire as to whether or not
there was indeed the opportunity for the two of them to be
together?

A.  Yes.  This Antron Kent, and a second person, Jeffrey
Kimbrough, and the information that they gave we verified with
the guards.  That they did -- that they had the contact that
they provided for us.  That they had these classes, rec time,
and that the times given matched up.

Mr. Kent and Mr. Avery and their activities in the prison at
that time, right?

A.  Yes.

Q.  What was the purpose of putting that down?

A.  Well, he had said that he had prior contact with Mr. Avery
in '98 when both their cases were through, which was consistent.
Because Mr. Avery's first case went through -- roughly started
in March of 1998.  They're both now assigned to this
correctional facility.  And what's documented there is that they
have a commonality in the fact that they take classes together.
They have recreation time and free time together.

Q.  So would that have provided them the opportunity to be able
to discuss matters in this prison?

A.  Yes.  That -- the information he's giving is from direct
contact with Mr. Avery, and not that he's hearing it from
somebody else.

Q.  Do you recall during your time in Oklahoma whether or not
you took the opportunity to try to inquire as to whether or not
there was indeed the opportunity for the two of them to be
together?

A.  Yes.  This Antron Kent, and a second person, Jeffrey
Kimbrough, and the information that they gave we verified with
the guards.  That they did -- that they had the contact that
they provided for us.  That they had these classes, rec time,
and that the times given matched up.

1    Q.  And perhaps I moved too fast from Page 1 to Page 2.  Is

2    there any reference on the portion of Page 1 that you see there

3    as to prior contact back in 1998 involving Mr. Kent and

4    Mr. Avery?

5    A.  Yeah, I touched on that with the second page when it said

6    reversed in 1998.  But it said that he's been in jail for 5

7    years, and knows a guy named William Avery.  He talks to William

8    because William and his cousin -- and there's a name that's

9    redacted.  They have that commonality.  He also met William in

10   the Milwaukee County Jail.  And then the second page refers to

11   1998.

12   Q.  Now, I think it's probably about the lower two thirds of

13   this page being displayed to the jury.  Can you describe for the

14   jury what's set forth there?

15   A.  Well, he indicates that Mr. Avery couldn't sleep well, and

16   he tried to communicate or tell him stuff through 2000.  Because

17   Mr. Avery said -- and then there's a quote there, I think I

18   fucked up, and then there's end quotes.  So that would again be

19   the statement that Avery gave to Mr. Kent.  But Mr. Kent

20   indicated he didn't ask about that because he didn't want to

21   know.  And then he provides the information relative to this,

22   that during a recreation period -- and he provides the correct

23   times.  1:40 to 3:30 p.m. Mr. Avery talked about not sleeping.

24   And then inquired from Mr. Kent if he could sleep.  And Mr. Kent

25   said yes.  He made peace with himself.  Then William said I

1  can't, when you kill somebody.  And Mr. Kent's cellmate -- and

2  then he provides the second person we later interviewed, Jeffrey

3  Kimbrough, was also present.  William said he had a spot, and

4  then those are -- again, were the same words that Mr. Kent

5  indicated to us was words that Mr. Avery used.  The spot.  With

6  his guy selling dope.  And his -- again, his guy -- the same guy

7  I got arrested with on a drug charge.  Lorenzo.  He says Lorenzo

8  sounds familiar.

9         William said he got prosecuted on hardly any dope at

10 all, and William said he met a girl that wanted drugs but didn't

11 have any money.  He said she was a hype.  And William came into

12 the spot with this girl saying that he fucked her, and stayed

13 the night.  William said she did smoke some dope for having sex

14 with "he", and this took place in the bedroom.  William said

15 that when he woke up in the bedroom, it was the morning time and

16 William sees her stealing dope.

17 Q.  Just going to ask you to stop there for a moment.  And let's

18 go detail by detail a little bit here.  Did you ever suggest any

19 of the first portion of this statement to Kent during this

20 interview, or at any other time, that this whole string of

21 conversation began with an inability to sleep, and screwing up,

22 and that sort of thing?

23         MS. HOFT:  Objection to the form, Your Honor.

24         MR. SMOKOWICZ:  I'll rephrase that.

25         THE COURT:  All right.

1          MR. SMOKOWICZ:

2    Q.  First of all, at any time did you ever suggest to Antron

3    Kent that a conversation between him and Mr. Avery occurred

4    during recreation class?

5    A.  No.

6    Q.  Did you ever tell Mr. Kent to put down or agree to a

7    statement that Avery told him I couldn't sleep at night?

8    A.  No.

9    Q.  For either of those items in your presence did Detective

10   Armbruster ever tell him to say either of those things?

11   A.  No.

12   Q.  In your presence did Detective Armbruster or you on your own

13   tell Mr. Kent to say things that Avery was trying to tell him?

14   Stuff like, quote, I think I fucked up, close quote?

15   A.  No.

16   Q.  Did you ever tell Mr. Kent, or Detective Armbruster in your

17   presence ever suggest to Mr. Kent that he should state that

18   Avery told him that he couldn't sleep?

19   A.  No.

20   Q.  Or that he asked Kent if he could sleep, and that he'd made

21   peace with himself?

22   A.  No.

23   Q.  And did you or Detective Armbruster in your presence ever

24   say that Avery told Kent that he couldn't sleep because he

25   killed someone?

1   A.  No.

2   Q.  Did you or Detective Armbruster in your presence ever tell

3   Kent to say that another inmate, Jeffrey Kimbrough, was also

4   present when those statements were made?

5   A.  No.

6   Q.  Did you or Detective Armbruster ever tell Kent to say that

7   Avery told him that he had a spot with his guy selling dope?

8   A.  No.

9   Q.  Did you or Detective Armbruster in your presence ever tell

10  Antron Kent to say that the guy's the same guy that got arrested

11  with Avery on the drug charge?

12  A.  No.

13  Q.  Now, there is a sentence here, Lorenzo sounds familiar.

14  That appears to indicate some kind of suggestion about the name?

15  A.  Yes.

16  Q.  Do you recall making some kind of suggestion about the name?

17  A.  I don't recall if the name was thrown out by Mr. Kent, or

18  when he said his guy is the same guy he got arrested with.  And

19  I don't know if we asked him if the name Lorenzo -- that's

20  something where we may have said did he say the word Lorenzo?  I

21  don't know.  I don't have any direct knowledge of how that

22  conversation went, other than we -- however it came up, the name

23  Lorenzo, his guy -- whether we said it, or he said Lorenzo

24  sounds familiar?  I don't know the context in that.  But we

25  documented that based on -- Mr. Kent said Lorenzo sounds

1  familiar.

2  Q.  Did you ever ask about Little "C"?

3  A.  Not that I recall at all, no.

4  Q.  Did you ever suggest to Mr. Kent that he ought to change

5  this statement to it being Little "C" as opposed to Lorenzo?

6  A.  No.

7  Q.  Did -- in your presence did Detective Armbruster ever

8  suggest to Antron Kent that it ought to be Little "C" and not

9  Lorenzo?

10  A.  No.

11  Q.  Or Lucious Goins and not Lorenzo?

12  A.  No.

13  Q.  It goes on to state William said that he met a girl that

14  wanted drugs, but didn't have any money.  Did you or Detective

15  Armbruster in your presence ever suggest to Antron Kent that he

16  should state that this is something that Avery said to him?

17  A.  No.

18  Q.  It goes on to state, the next sentence, he said she was a

19  hype.  Did either of you suggest to Avery that he should -- or

20  pardon me, Mr. Kent, that he should make that statement?

21  A.  No.

22  Q.  Or the next one, that William came into the spot with this

23  girl, saying that he fucked her and stayed the night.  Did

24  either of you suggest that detail to him?

25  A.  No.

1  Q.  It goes on to state William said she did smoke some dope for

2  having sex with "he".  This took place in the bedroom.  Did

3  either you or Detective Armbruster in your presence provide that

4  detail or information to Mr. Kent?

5  A.  No.

6  Q.  Goes on to state Williams said that when he woke up in the

7  bedroom, it was the morning time.  Did either you or Detective

8  Armbruster in your presence tell Antron Kent this detail or

9  suggest that he should include it within a statement?

10 A.  No.

11 Q.  Last statement on that page.  William sees her stealing

12 dope.  Did either you or Detective Armbruster in your presence

13 tell Mr. Kent to say this or to suggest this detail to him?

14 A.  No.  And on the bottom of this page you can see my signature

15 and my people soft number.  It goes over the signature of Kevin

16 Armbruster.  You can see the top of the "T" and the remnants of

17 my people soft number below the date.  So I signed this

18 document.

19 Q.  Can you tell the jury what a people soft number is?

20 A.  It's a payroll number.  My people soft number is 58400.  And

21 Kevin Armbruster, his is up there as 55638.  So he has a little

22 more time than me.  He was hired before I was.

23 Q.  I'm going to just have to run that sentence at the end onto

24 the next page, apparently, because that's what it does.  On the

25 bottom of Page 2 it begins William sees her stealing dope from

1   him.  Unknown where the dope was.  Did either you or Detective

2   Armbruster in your presence tell this detail to Antron Kent or

3   suggest to him that this should be included in his statement?

4   A.  No.

5   Q.  As to all of the individual statements that we've gone

6   through so far, who did all that information come from?

7   A.  This is all from Antron Kent.

8   Q.  The next sentence reads William stated -- Williams said he,

9   quote, just snapped on the bitch, close quote.  When you see

10  quotation marks like that -- first of all, can you explain to

11  the jury why certain phrases are in quotation marks in this

12  statement?

13  A.  This is from Antron Kent.  And he said these are the exact

14  words Antron told us that William told him.  So because it's

15  exact quotes, we put them in quote as he told us.

16  Q.  With respect to this sentence William said he just snapped

17  on the bitch, did you provide that information or Detective

18  Armbruster provide that information or detail to Antron Kent in

19  your presence?

20  A.  No.

21  Q.  Or tell him to say this?

22  A.  No.

23  Q.  Who did that information come from?

24  A.  Antron Kent to us.

25  Q.  I'm going to skip over -- well, the next sentence reads he

1  asked what do you mean?  He explained that he, William, jumped
2  up and William put both his hands up -- I think it's to show
3  physically what William did to this girl.  With respect to these
4  two sentences, who did that information come from?
5  A.  That came from Antron Kent.  And you can see there's -- we
6  referred to this in the Keith Randolph -- mistakes, cross-outs,
7  that we brought to the attention of Antron Kent.  Crossed it out
8  and he placed his initials over that so that it was deleted from
9  the statement, and he acknowledged it and he initialed it.
10  Q.  Did either you or Detective Armbruster in your presence
11  provide any of that information in those sentences?  Or tell
12  Antron Kent to say those things?
13  A.  No.
14  Q.  Goes on to state William does have long fingernails.  Did
15  either you or Detective Armbruster suggest that detail to Antron
16  Kent?
17  A.  I have no clue if William has long fingernails.  And that's
18  something that he told us, and we put it in there.
19  Q.  Goes on to state William said he just grabbed her and,
20  quote, choked the shit out of her, close quote.  And she grasped
21  (sic) for air, paren, making a choking noise to Antron, close
22  paren.  With respect to the details in those sentences, did
23  either you or Detective Armbruster supply any of those details
24  to Antron Kent?
25  A.  No.

1  Q.  Did either of you tell him to provide these details?

2  A.  No.

3  Q.  Where did that information come from?

4  A.  It was all from Antron Kent stating that these words came

5  from William Avery.

6  Q.  Next couple of sentences.  He said this happened on his bed.

7  He said, quote, her eyes went in the back of her head, and that

8  is what he sees at night, close quote.  Did either you or

9  Detective Armbruster provide any of those details to Antron Kent

10  for the statement?

11  A.  No.

12  Q.  Did either of you tell him what to say in the statement with

13  respect to those details?

14  A.  No.

15  Q.  Where did that information come from?

16  A.  Antron Kent to us.

17  Q.  Goes on to state he believed that the girl was dead.

18  William called his guy right away because he didn't know what to

19  do.  William -- I'll stop.  William didn't -- William called his

20  guy right away because he didn't know what to do.  William did

21  show him a picture of his guy -- and I'm not sure if I'm -- oh,

22  yes.  In a minimum or minimal secured place in Oshkosh.  With

23  respect to any of those details, did you provide any of that

24  information to -- or Detective Armbruster provide any of that

25  information to Antron Kent in your presence?

```
 1   A.   No.

 2   Q.   Did either of you tell him to say this?

 3   A.   No.

 4   Q.   Where did this information come from?

 5   A.   Antron Kent.

 6   Q.   It goes on to read his guy, Lorenzo, comes over right away.

 7   He said they put her into -- into the -- or into Lorenzo's

 8   vehicle.  With respect to those details, did either you or

 9   Detective Armbruster provide that information or tell Antron

10   Kent to provide that information to you?

11   A.   No.

12   Q.   Where did this information come from?

13   A.   Mr. Kent.

14   Q.   Goes on to state he said they put her into Lorenzo's

15   vehicle.  In later conversations William mentioned the car being

16   a sport utility vehicle, truck.  Again, with respect to those

17   details, did either you or Detective Armbruster in your presence

18   provide those details or tell those details to Antron Kent?

19   A.   No.

20   Q.   Did -- where did that information come from?

21   A.   Antron Kent to us.

22   Q.   Goes on to state Lorenzo knew where to dump the body, which

23   they dumped in the alley.  With respect to those details, did

24   you provide those details or did Detective Armbruster provide

25   those details to Antron Kent?
```

```
 1  A.  No.

 2  Q.  Where did those details come from?

 3  A.  From Antron Kent to us.

 4  Q.  Goes on to state -- states they cleaned up the truck real

 5  good, but didn't mention what they -- what they moved her in.

 6  They then went back to the spot and cleaned up the spot.  With

 7  respect to those details, did you or Detective Armbruster in

 8  your presence ever provide any such information to Antron Kent?

 9  A.  No.

10  Q.  From whom did you obtain this information?

11  A.  Antron Kent.

12  Q.  Goes on to state he got rid of the blanket and made no

13  mention of the hype having personal property there.  William

14  opened the spot up, quote, business as usual, close quote.

15  Because, quote, I had to, close quote.  With respect to those

16  details, did any of those details -- were they provided by

17  either you or Detective Armbruster in your presence to Antron

18  Kent?

19  A.  No.

20  Q.  Where did those details come from?

21  A.  From Antron Kent.

22  Q.  The next couple of sentences read:  Antron said so many guys

23  talk about killing people while in jail, so he did not believe

24  him at first, thinking he was bullshitting him.  Pardon my

25  French there, but that's what it says.  With respect to these
```

1  details, did either you or Detective Armbruster in your presence
2  provide any of those details to Antron Kent?
3  A.  No.
4  Q.  Where'd they come from?
5  A.  From Antron Kent.
6  Q.  Goes on to state Kimbrough didn't even ask questions because
7  he thought William was bullshitting them, too.  With respect to
8  those -- that detail, did either you or Detective Armbruster
9  provide those details to Antron Kent?
10 A.  No.
11 Q.  Where did those details come from?
12 A.  Antron Kent.
13 Q.  It goes on to state here he did talk to his girlfriend,
14 Amanda Washington, about this, but only in general terms.  Not
15 giving her information about what was said.  Okay.  With respect
16 to that, before you had this interview did you know anybody by
17 the name of Amanda Washington?
18 A.  No.
19 Q.  Did you have any idea of any connection between Antron Kent
20 and somebody named Amanda Washington?
21 A.  No.
22 Q.  Did either you or Detective Armbruster suggest what's in
23 that statement about Amanda Washington knowing something, but
24 not -- anything about the details in this matter?
25 A.  I lost your question.  But we didn't know anything about

1  Amanda Washington.  Never knew her before, and that -- we didn't

2  know if she had any details.

3  Q.  Where did the information come from, then?

4  A.  Antron Kent told us.  Provided the name of his girlfriend.

5  Q.  Couple lines down after that.  William has said -- pardon

6  me -- William has since been moved to a drug education area, but

7  he still talks to -- and I can't make out whether it's to him or

8  to them.  It looks like him.  With the initials A.K. next to it.

9  A.  I'm trying to catch up here.  He still talks to him -- yeah,

10 it looks like him is the -- actually could go either way, but

11 nonetheless it was initialed by Antron Kent.  Whether he --

12 Mr. Avery talks to specifically just Antron Kent, or

13 specifically to both him and --

14 Q.  Well, if you look at 1017 -- just a minute.  Can you tell a

15 little bit better which way it's scratched off?  If you look at

16 the paper version.

17 A.  I'm going to go with it could go either way.  I think Kevin

18 Armbruster called in a supplement report, so he might have more

19 direct information on that.

20 Q.  Okay.  During the course of this meeting with Antron Kent,

21 did you make any promises to him?

22 A.  No.

23 Q.  What about Detective Armbruster?  During the course of this

24 meeting, in your presence did he make any promises to Antron

25 Kent?

1   A.  No.

2   Q.  Is that circumstance also reflected in this report?

3   A.  Yes.

4   Q.  And would you read the reference or the statement there in

5   this report with respect to promises?

6   A.  Detective Armbruster and Detective Heier made no promises to

7   Antron regarding a decrease in sentence or promise to get out of

8   jail, let alone any promises.

9   Q.  Are there any initials in that sentence?

10   A.  Yes.  Antron Kent, just before the word promises.  A word is

11   crossed out.

12   Q.  Now, towards the bottom of that page there there's some

13   reference to viewing a photo array.  Can you explain for the

14   jury -- first of all, what a photo array is?

15   A.  A photo array is six individual photographs of similar

16   people.  Mr. Avery, he is one of the targets, because that's who

17   he's talking about.  But it's also 5 black males, similar age,

18   height, and weight.

19   Q.  And can you explain to the jury why you and Detective

20   Armbruster produced this photo array for Antron Kent?

21   A.  It's a couple reasons.  To test his knowledge.  Is this the

22   person you're talking to?  Can you pick him out of 6 random

23   photographs?  In which case he did.  And it also verifies that

24   the person that he's talking as William Avery is the same person

25   we know as William Avery.

1   Q.  At the bottom of this document are there any signatures?

2   A.  Yes.  It also says that he identifies William Avery, and

3   states that's the person he got this information from.  So all

4   the information came from William Avery to Mr. Kent.  Mr. Kent

5   told us, and then he affixed his signature at the end.  And also

6   signifies that he acknowledged that there were no promises made

7   to get this information, nor decrease in sentence.

8   Q.  So with respect to the document there's an "X" on -- 5 lines

9   from the bottom.  And what's after the "X"?

10  A.  That's the signature of Antron Kent.

11  Q.  And did he sign this in your presence?

12  A.  Yes, he did.

13  Q.  Underneath that there are two signatures.  Whose signatures

14  are those?

15  A.  My signature, and also my partner, Detective Kevin

16  Armbruster.

17  Q.  And whose handwriting is this?  Who wrote this out again?

18  A.  Kevin Armbruster.

19  Q.  Can you make out the time at the bottom?

20  A.  Yeah.  The interview began at 1:27 p.m. and continued until

21  4:38 p.m.  So roughly 3 hours.  Little over 3 hours.

22  Q.  And is there a date for this interview on that document at

23  the bottom as well?

24  A.  Yes.  The interview is 8-26 of '02.  And for reference we

25  got the second call on August 19th.  So the first call from

1    Antron was July 24th, a follow-up August 19th, and here we are

2    August 26th and we're already in Oklahoma talking to Antron

3    Kent.

4    Q.  Okay.  At some point while you were out in Oklahoma did you

5    also interview Jeffrey Kimbrough?

6    A.  Yes.

7    Q.  Captain Heier, I'm going to show you the top portion of the

8    three page document that's previously been marked as

9    Exhibit 1018.  Do you recognize the document from what you're

10   seeing?

11   A.  Yes.  This is the statement of Jeffrey Kimbrough.  The first

12   one was taken on the 26th.  This is now the 27th of August,

13   2002.

14   Q.  Just so we're clear on that, you mean -- the first one

15   meaning Mr. Kent's statement?

16   A.  I'm sorry.  Kent.  Kent was taken.  We finished up that one

17   at 4:38.  The day was over for the night, and then we came back

18   to the facility the next day.  And that's when this one starts.

19   Q.  Okay.  With respect to this one, also, do you recognize who

20   wrote out this statement?

21   A.  This is Detective Kevin Armbruster.

22   Q.  And with respect to this statement, does it indicate

23   anywhere anything with respect to Miranda warnings?

24   A.  Yes.  I read Mr. Kimbrough his Miranda warnings, and also

25   what's known as Constitutional rights, and that he understood

1  his rights and chose to speak with us and waived his rights.

2  And again, I read them, and then he acknowledged his

3  understanding in waiving, and he affixed his signature.

4  Q.  And where would we find his signature with respect to the

5  Miranda warning?

6  A.  It's the fifth line down.  There's an "X", and then it says

7  Jeffrey Kimbrough.

8  Q.  The next material here on this document is a summary of some

9  statements there.  Some statements with respect to background?

10  A.  Yes.

11  Q.  And there's a statement at the end that we can just see

12  here.  He had -- or no -- not under the influence of any

13  alcohol, narcotics, or medication.  And his signature there.

14  Whose signature is that?

15  A.  Jeffrey Kimbrough.

16  Q.  And why did you ask -- or why did you -- why was Kimbrough

17  asked to sign there?

18  A.  I don't know why Kevin Armbruster decided on that specific

19  spot, but we ask people -- part of the pedigree information is

20  to see how much education they have.  In this case he went to

21  the 11th grade.  We wanted to know if they can read and right.

22  And obviously both Kent and Kimbrough said they could.  And we

23  want to know how much they understand, if they have education.

24  Also we ask if they're under medication or drugs just to see if

25  they're lucid.  That they understand our questioning.  And in

1  both cases they did understand.  And in this case he -- Kevin

2  Armbruster had him sign after that.

3  Q.  Towards the bottom of the first page there, there is some

4  reference to a photo array again.  Once again, who is the photo

5  array -- or who is included within the photo array?

6  A.  It's the same process as I testified earlier.  Photograph of

7  William Avery and 5 additional random black males.  Same age,

8  height, weight.

9  Q.  And why was that done?

10  A.  To see if Mr. Kimbrough could identify William Avery from a

11  photograph.  Again, checks and balances.  Is the person he's

12  referring to -- can he identify him?  And also is it the same

13  person that we're referring to?

14  Q.  On the bottom of Page 1 there are two words that begin a new

15  sentence.  They read he sees -- and it goes onto the next

16  page -- William every day in computer class.  Now, the first

17  time he met Avery was out at a recreation area.  He believes was

18  in March of this year, 2002, with Antron Kent.  Recreation

19  starts at 1:40-p.  Then a second rec period approximately 2:35,

20  ending at about -- or ending about 3:30-p.

21        THE COURT:  Has this document been moved in?  Is this

22  1018?

23        MR. SMOKOWICZ:  Yes.

24        THE CLERK:  Yes.

25        THE COURT:  It has?  Okay.

1          MR. SMOKOWICZ:

2     Q.   With respect to those details, who provided that

3     information?

4     A.   Jeffrey Kimbrough provided this entire document to myself

5     and Detective Armbruster.

6     Q.   Did you provide any of those details about where Kimbrough

7     was in contact with Avery?  Or when he first had contact with

8     him?  Or how he had first contact with him?

9     A.   No.

10    Q.   Did you suggest any of those details to him?

11    A.   No.

12    Q.   Did you -- or, I mean, did Detective Armbruster in your

13    presence provide any of those details or suggest any of those

14    details to Jeffrey Kimbrough?

15    A.   No.

16    Q.   Now, the next section reads Antron told Avery that when he

17    gets out, he wants to go to church.  He said this because

18    Antron's Dad was a Pastor.  Avery said he wanted to but,

19    quote -- or wanted to, quote, but this is all behind him, close

20    quote.  With respect to any of those details, did you provide

21    those to Jeffrey Kimbrough?

22    A.   No.

23    Q.   Did Detective Armbruster in your presence provide any of

24    these details to Jeffrey Kimbrough?

25    A.   No.

1  Q.  Goes on to state he didn't know Avery but hung back with

2  him.  Avery said he can't sleep no more.  Antron said well, what

3  did you do?  Avery said that he had a spot getting his money.

4  He was dope dating a, quote, hype, close quote, and had sex for

5  dope.  I'll stop there.  Any of those details -- did you provide

6  any of those to Jeffrey Kimbrough?

7  A.  No.

8  Q.  Did Detective Armbruster in your presence provide any of

9  those details to Jeffrey Kimbrough?

10 A.  No.

11 Q.  With respect to those details, where did they come from?

12 A.  All from Jeffrey Kimbrough to myself and Detective

13 Armbruster.

14 Q.  Goes on to state he was dope dating a hype.  Had sex for

15 dope.  He gave her some dope and she smoked it.  He said they

16 went to sleep that night, and when he woke up in the morning

17 time, she was smoking his shit up and had the dope bag.  Any of

18 details, did you provide those to Jeffrey Kimbrough?

19 A.  No.

20 Q.  Any of these details here, did Detective Armbruster provide

21 them to Kimbrough?

22 A.  No.

23 Q.  Did you ever tell Kimbrough what to say?

24 A.  Never.

25 Q.  Did Detective Armbruster ever tell Kimbrough what to say?

```
 1   A.  No.

 2   Q.  With respect to those details, where did they come from?

 3   A.  Mr. Kimbrough.

 4   Q.  Goes on to state he said he just, quote, snapped and choked

 5   the bitch, close quote.  He demonstrated to Antron with his

 6   hands how he did this.  And said her eyes rolled in the back of

 7   her head and she made a gagging sound.  He said she stopped -- I

 8   don't know if that's breath or breathing.  But breath.  I'll

 9   stop.  Antron made a comment about his long fingernails.  He

10   realized that he killed her so he called his, quote, guy, close

11   quote, to help him get rid of her.  Avery said that his guy had

12   a truck and dumped her somewhere.  Stop right there.  Any of

13   those details -- first of all, did you provide any of those

14   details to Jeffrey Kimbrough?

15   A.  No.

16   Q.  What about Detective Armbruster?  Did he provide any of

17   those details to Kimbrough?

18   A.  No.

19   Q.  Did either of you tell him to say this?

20   A.  No.

21   Q.  Where did this information come from?

22   A.  Everything came from Mr. Kimbrough.

23   Q.  Goes on to state --

24           THE COURT:  Mr. Smokowicz, the witness just stated

25   that everything came from Mr. Kimbrough.  I don't know if it's
```

```
1   necessary to go through all the details in the report.  Perhaps
2   it could be asked if there's any information or are there any
3   details in this report that Jeffrey Kimbrough gave to you or
4   Armbruster that was provided by you or Armbruster to Kimbrough
5   before he made the statement.
6         MR. SMOKOWICZ:  I was actually at the end of, I think,
7   the details there, Your Honor.
8         THE COURT:  All right.
9         MR. SMOKOWICZ:
10  Q.  I should -- however, this interview with Detective -- or
11  with Detective Armbruster of Jeffrey Kimbrough, is there any
12  indication on the last page there as to how long this interview
13  took?
14  A.  Yeah.  This was from 12:17 until 1:33 p.m.
15  Q.  And on the last page there there's a signature at the end of
16  the body of the statement.  Whose signature is that?
17  A.  It's myself and Detective Armbruster.
18  Q.  And above your signature are there any signatures on that
19  page?
20  A.  You're going to have to go a little higher.
21  Q.  I'm sorry?
22  A.  Jeffrey Kimbrough signed this page also.
23  Q.  Did you make any promises to Jeffrey Kimbrough?
24  A.  No.
25  Q.  Did Detective Armbruster make any promises to Kimbrough?
```

1  A.  No.

2  Q.  During the course of your time out in Oklahoma, did you also

3  attempt to speak to William Avery?

4  A.  Yes.

5  Q.  This document has already been introduced and marked as

6  Exhibit 1019.  Does this document reflect truthfully and

7  correctly what occurred during that effort to interview

8  Mr. Avery?

9  A.  Yes.

10  Q.  Who prepared this document?

11  A.  I did this one.

12  Q.  With respect to this document, does it reflect how long you

13  spent with Mr. Avery?

14  A.  Yeah.  This one started at 1:40 p.m., and it continued until

15  3:10 p.m.

16  Q.  Would that include the time it took to write this out?

17  A.  No.  This was the actual speaking.  This was written after

18  the interview ended.

19  Q.  And on what date did this interview occur?

20  A.  The interview happened August 27th, 2002, at 1:40.  So the

21  last interview ended at I believe 1:27, so here we are

22  13 minutes later.  And we finished Mr. Kimbrough, and now we're

23  talking to Mr. Avery.

24  Q.  Do you recall whether or not Mr. Avery was read his Miranda

25  rights before questions were asked about any substance in this

1  case?

2  A.  Yes.  I again read the Miranda warnings, Constitutional

3  rights, to Mr. Avery.

4  Q.  And with respect to this interview, at any time did you make

5  any notation that William Avery made any confession or made any

6  statement that he acknowledged killing Maryetta Griffin?

7  A.  No, he did not.

8  Q.  Did you make any efforts to follow up on any of these

9  interviews while you were out in Oklahoma?  Other than what you

10  talked about in terms of the guards?

11  A.  Yeah, the only other piece of follow-up we could do, given

12  the information from the 3 individuals -- Mr. Kent,

13  Mr. Kimbrough, and Mr. Avery -- was Mr. Kent indicated that he

14  had spoke to his girlfriend in general terms about this.  And

15  her name was Amanda, I believe.  And we made contact with Amanda

16  to verify if she had more information or knew anything else that

17  we hadn't already gotten.  Obviously this is from Avery to Kent,

18  but now what did Kent tell Amanda?  And is it any different?

19  Q.  Captain, I want to show you a report that's been marked as

20  part of Plaintiff's Exhibit 12 in this case.  Do you recognize

21  that document?

22  A.  Yes.  This is a supplement report.  It's written by

23  Detective Kevin Armbruster relative to the statement made by

24  Amanda Washington.

25  Q.  Would you have seen that report at any time shortly after it

1   was prepared?

2   A.  Yes.

3           MR. SMOKOWICZ:  I'm going to offer this portion of

4   Exhibit 12, Your Honor.

5           THE COURT:  Has that been received already?

6           MR. SMOKOWICZ:  It has not, Your Honor.

7           THE COURT:  Any objection?

8           MS. HOFT:  No objection.  Just a clarification.  What

9   do you mean by this portion?

10          MR. SMOKOWICZ:  There are numerous pages from

11  Exhibit 12.  I'm just offering this page.  May I, Your Honor?

12          THE COURT:  The Court will receive it.  No objection.

13  What's the page reference?

14          MR. SMOKOWICZ:  Well, it's a portion of Exhibit 12

15  from the Plaintiff.  It's otherwise identified on the M-file at

16  the bottom as Page 291, and also has a Bates Number 6956 on

17  there.

18          THE COURT:  All right.

19          MR. SMOKOWICZ:

20  Q.  And with respect to this document, can you just summarize

21  for the jury what it reflects in terms of what information

22  you -- strike that.  Do you recall how you contacted Amanda

23  Washington?

24  A.  I know we went to her house, and also spoke by phone.  I

25  don't recall that she was home.  If the interview was done over

1  the phone.  But I know we made the effort to go to her house.

2  Q.  And just in general what, if any, information did she have

3  about any of these details of the conversation between Kent and

4  Avery, or Kent, Avery, and Kimbrough?

5  A.  She knew that -- she knew we were coming down to talk and

6  speak with Antron, and he might have to testify against someone.

7  But she does not know Mr. Avery, the individual.  And doesn't

8  know any information regarding what Detectives down here were

9  talking to him about.  So very general.  Nothing.  I mean, we

10  wanted to know if she had any information or any details that

11  Mr. Kent didn't tell us, and she had no additional information.

12  Just knew we were coming.

13  Q.  Is it also fair to say that she did not give you any

14  information that any of what Kent had told you was untrue?

15  Unreliable?  Made up?  Anything like that?

16  A.  Correct.

17          MS. HOFT:  Object to the form, characterization.

18          THE COURT:  Yeah, I think it's already been asked and

19  answered.  And the Exhibit says so, so --

20          MR. SMOKOWICZ:

21  Q.  As reflected in the report, when -- on what day, what time

22  was the contact with Miss Washington?

23  A.  It doesn't say.

24  Q.  Did you have any further contact with Antron Kent?

25  A.  Yes.

1   Q.   When was that?

2   A.   That was September 7th, 2004.  Which for reference is about

3   two years and one month after our initial August of 2002.  And

4   now we're two years later, September of 2004.

5          MR. SMOKOWICZ:  Your Honor, we think this has been

6   admitted, but just to err on the side of caution.

7   Q.   Captain Heier, I'm going to show you what's been marked

8   Exhibit 1026.  And can you describe that document for us?

9   A.   Yes.  This is a two page typed, called in document.  It

10  memorializes the going to Green Bay and talking to Mr. Antron

11  Kent on September 7th of 2004.

12  Q.   With respect to that interview -- or that report, rather,

13  who prepared it?

14  A.   This was prepared by my partner at the time, Erik

15  Gulbrandson.

16  Q.   So who went to Green Bay to see Antron Kent that day?

17  A.   Yes.  We both went together.

18  Q.   Have you had a chance -- did you have a chance to review

19  that report at any time shortly after it was prepared?

20  A.   Yes.

21  Q.   Based upon your review at that time, did it appear to

22  truthfully and accurately recount what happened during that

23  visit?

24  A.   Yes.

25  Q.   And is that the kind of report that's prepared in the normal

```
1   course of business at the Milwaukee Police Department, Homicide
2   Division in particular?
3   A.  Yes.
4           THE COURT:  It's already been received.
5           MR. SMOKOWICZ:  I just want to make sure, because our
6   notation was a little sketchy.
7   Q.  I'd like to direct your attention to that beginning sentence
8   in that paragraph towards the bottom that has been enlarged
9   here.  It states when comparing the information provided by
10  Kent, with the information he provided on the two previous
11  statements, it was found to be consistent in nature.  Could you
12  explain for the jury what was meant by that?
13  A.  He -- obviously we interviewed him in August, 2002.  He gave
14  a four page statement.  He was also interviewed the following
15  year by Detectives Gil Hernandez and Kathy Hein.  Here we are
16  two years after the fact.  He told us pretty much everything
17  that he had said previously.  Two years later he still
18  remembered it.  It was consistent with what he had given us, and
19  now he just had like one bit of information additionally that he
20  remembered.  That was just an additional thing, and that's what
21  was documented.
22  Q.  Okay.  But with respect to the consistent in nature, you
23  were able to hear what he had to say up in Green Bay?
24  A.  Yes.
25  Q.  And, of course, you were able to hear what he had to say in
```

916

1   Oklahoma?

2   A.  Yes.

3   Q.  Also, prior to going up to Green Bay had you had the

4   opportunity to take a look at any report or statement obtained

5   by Detectives Hein and Hernandez?

6   A.  Yes.

7   Q.  And based upon all of your knowledge at that point, what did

8   you -- what did you believe with respect to whether those

9   statements were consistent?

10  A.  Everything he said matched up in each interview.  He was

11  still willing to testify, and very cooperative.  Nothing had

12  changed.  He didn't recant.  He didn't indicate anything was

13  wrong.  There were any lies.  And everything -- and he was

14  willing to testify.  And that's the reason why we went up there.

15  Q.  During your time in Green Bay, did you suggest any details

16  to Antron Kent?

17  A.  No.

18  Q.  During that time up in Green Bay, did you tell him any

19  details?

20  A.  No.

21  Q.  Did you do anything to try to make these statements to be

22  consistent?

23  A.  No.

24  Q.  So how did this interview go?  Can you just describe for the

25  jury in general, what was the pattern here?  How did it --

1    A.   The reason we were going is -- and later on that day a

2    Criminal Complaint was prepared issuing -- which would

3    ultimately issue a warrant for the arrest of William Avery.

4    Before the warrant would be issued, Antron Kent was clearly a

5    witness that would be used to testify in court.  And we wanted

6    to make sure he was willing to do this.  Before we issued the

7    warrant for Mr. Avery, is this person going to come into Court?

8    Is everything that he said truthful?  Is it a true statement?

9    And we wanted to make sure that we could tell the D.A. that the

10   witness was going to testify.  And ultimately it's going to be

11   still a year ahead of time, but before we issued the warrant,

12   was Mr. Kent willing to go through with the whole court process

13   and testify?

14   Q.   Was there any approval process for you and Detective

15   Armbruster to travel out to Oklahoma to begin with?

16   A.   Yeah.  That's a big thing.  We just can't get up and use all

17   that gas and manpower and overtime and hotel stays.  This is

18   something that had to be approved by the District Attorney's

19   Office to move the case forward.  Just to see what these

20   people -- if it was consistent.  If it was usable information,

21   or if it was garbage.

22   Q.   What about with respect to the trip up to Green Bay?

23   A.   Yes.  We talked to the District Attorney's Office, and they

24   wanted us to go to see if Mr. Kent would testify.  So this was

25   something that was all approved with the authorization from the

1    D.A.'s Office.

2    Q.  With respect to -- with respect to continuing willingness to

3    testify after a passage of time, in your experience are there

4    issues with respect to people who are incarcerated with respect

5    to willingness to testify?

6    A.  Yeah.  I mean, 2 years after the fact maybe he just didn't

7    want to go through with it.  And again, there's -- nothing was

8    ever promised.  He gets nothing for this.  Sometimes people

9    change their mind.  Sometimes people for any amount of reasons

10   don't want to go through with this.  I mean, there's -- I

11   testified earlier there's the branding a snitch.  Somebody that

12   gets -- all of a sudden you're in Green Bay, perhaps.  Then you

13   get sent to Milwaukee.  When you come back, everybody wants to

14   know where did you go?  And for what purpose would you be put on

15   a bus to drive to Milwaukee?  So there's a lot that goes on in

16   jails when prisoners just leave for no reason and come back.

17   Everybody wants to know what happened.  So there's a lot of

18   reluctance to follow up and go through.  And that's one of the

19   reasons we went, just before the warrant was issued.  Is this

20   person willing to go all the way through this?  And in this case

21   he said he would.

22   Q.  Now, with respect to the additional information, what --

23   could you describe for the jury what additional information was

24   provided up in Green Bay by Mr. Kent?

25   A.  Detective Gulbrandson documented it.  He just added during

1   the interview that he had recalled William Avery telling him the
2   reason he dropped the body off in the area where the body was
3   found was because other bodies had been dropped at that
4   location, and he felt that this body could not be linked to him.
5   Antron Kent stated that Avery went as far as mentioning that he
6   believed that because of these other bodies in this area, the
7   F.B.I. had gotten involved in this investigation.  And Kent
8   stated that other than this information, all the other
9   information that he had previously provided was true and he had
10  nothing further to add at this time.  This is just one thing
11  that he just remembered, and he told us, and it was the only
12  thing additionally that he added, and he never redacted or took
13  back anything he said from his other 4 page statement.
14  Q.  Okay.  Now, with respect to your role, you mentioned earlier
15  that there is a Criminal Complaint that's prepared that day.
16  What role, if any, did you have with respect to the Criminal
17  Complaint?
18  A.  The Criminal Complaint is a multi-page document, and I swore
19  that it was the truth, and I ultimately affixed my signature on
20  the Complaint as a swearing, complaining witness.
21  Q.  Did you have any responsibility at that juncture to provide
22  materials to the District Attorney's Office with respect to this
23  investigation in the homicide file?
24  A.  Yes, I -- yes.
25  Q.  What was your role?

1  A.  Because I was the complaining witness, and I would have to

2  present the case to the District Attorney, I would also have to

3  provide him all the discovery.  All the reports relative to -- I

4  testified earlier, for this M-file, this murder file, that has

5  all the documentation in it.  And the District Attorney would

6  get a copy of everything, and ultimately that -- it's actually

7  two copies.  The D.A. gets every piece of paper, and the

8  defense, Mr. Avery's attorney, would get the mirrored exact copy

9  of the investigation.  It's part of the discovery.

10  Q.  Would that have included all these typewritten reports, for

11  example?

12  A.  Yeah.  Every handwritten report, every typewritten report,

13  photographs of the crime scene, the photo arrays that we

14  referenced.  They get those.  Any Crime Lab results.  Anything

15  that went up to the Crime Lab.  I know even -- there were some

16  newspaper articles.  Everything that we get we submit.  Very

17  transparent in the fact that the D.A. gets it, and the defense

18  gets a mirrored copy.  Every exact page.

19  Q.  So, for example, this document that's been marked

20  Exhibit 1005, and is a report from the Crime Lab dated

21  August 20th of 1998.  Would that be among the materials that

22  would have been provided -- or assembled and provided by you to

23  the District Attorney's Office, with a copy for the defense

24  lawyer?

25  A.  Yes.  And if you look on the bottom there's a stamp and it

says M-3431.  Our M-file, or murder file, has different
sections.  If you go to Section 9, Page 23, this is the form.
That means there's 22 pages before that, and some probably pages
after it.  So this is something that -- it follows sequentially.
That this would be in Section 9.  If the file was here, I could
pick up Section 9, and that's going to be inside.  Before,
after.  So -- and that's why they're numerically stamped, that
there's a number with it, so you can find everything before.  If
there was perhaps a page missing -- you know, if Page 4 was
missing, where would that page be?  So you could tell
something's not there.  And in this case Page 23 and anything
thereafter would have been provided.  It's a very organized,
methodical way of keeping records.
Q.  When you met with Antron Kent in Green Bay, did you make any
promises then?
A.  No.
Q.  Make any threats?
A.  No.
Q.  At some point was William Avery arrested on the charge
relating to the death of Maryetta Griffin?
A.  Yes.
Q.  Going to show you what's previously been admitted as
Exhibit 1027.  Do you recognize this document, Captain?
A.  Yes.  This is a summary of the final interview of
Mr. William Avery.  To put it in context, we met Mr. Kent and

1    signed the Criminal Complaint on the 7th of September.  And on
2    September 21st, 14 days later, he was taken into custody on the
3    warrant that was issued.
4    Q.  And with respect to this interview of William Avery, who was
5    involved in it?
6    A.  Myself and Detective Gulbrandson, the same Detective that
7    went to Green Bay.
8    Q.  And what does the report reflect with respect to this
9    interview of anything about what Mr. Avery was willing to tell
10   you about the homicide of Maryetta Griffin?
11   A.  He was read his rights, and he said he understood his
12   rights, and that he wished to invoke his right to a lawyer prior
13   to giving any statement.  And then he refused to sign the
14   statement that was prepared in his presence.
15   Q.  Recognize earlier in Plaintiff's case you were asked some
16   questions about the participation in the -- in Mr. Avery's
17   trial.  Did anyone in the course of that trial, any of these
18   individuals we've talked about -- Antron Kent, or Jeffrey
19   Kimbrough, or Keith Randolph -- did any one of them tell you, in
20   the course of your contact with them during that trial time,
21   that what they were telling was a lie?
22   A.  No.
23   Q.  Did you ever tell any one of them that they had to testify?
24   A.  No.
25   Q.  Did any one of them indicate any kind of reluctance about

1  testifying?

2  A.  At one point, only because -- well, he wished to tell me the

3  fact that there were threats made to him.  And also one of the

4  witnesses was actually put in the same holding cell as Mr. Avery

5  at the time of the trial.

6  Q.  And who was put in the same holding cell?

7  A.  That was Mr. Randolph.

8         MR. SMOKOWICZ:  Your Honor, this has not been marked

9  as an Exhibit, but we would ask the Court to take judicial

10 notice of the Wisconsin Circuit Court Access listing of events

11 in the case of State vs. Antron L. Kent, Milwaukee County Case

12 Number 1998-CF-002770.  In particular, with respect to the notes

13 made for the motion hearing on January 20th of 2006, and for the

14 notes made from the motion hearing on June 15th, 2007.

15        THE COURT:  The Court will take judicial notice of

16 that record.

17        MR. SMOKOWICZ:

18 Q.  Now, with regard to Antron Kent there's been some testimony

19 that at some time you testified in a sentence modification

20 hearing?

21 A.  Yes.

22 Q.  Okay.  The notation that the Court has taken notice of with

23 respect to -- judicial notice of with respect to the January 20,

24 2006, motion hearing, is that it is a motion for modification of

25 a sentence made by Antron Kent in that case.  Do you recall that

1    motion hearing?

2    A.  Yes.

3    Q.  What do you recall about that motion hearing?

4    A.  Antron Kent was in custody for mayhem, which referred to --

5    is a very vicious crime, as far as acid had been thrown on the

6    face of his girlfriend.  I don't believe Mr. Kent did it.

7    Somebody else did it.  But it was ultimately linked back to

8    Mr. Kent.  The family of the girlfriend that had acid filled two

9    rows of the Court for the modification hearing.  It was very

10   emotional, in the fact that they clearly did not want him to

11   receive any reduction of any sentence.  The courtroom was filled

12   by her family.  She did not appear.  And I was called as a

13   witness, subpoenaed by his attorney to testify on behalf of his

14   cooperation in this matter.

15   Q.  Was anybody else sworn to testify?

16   A.  Yes.  Assistant District Attorney Mark Williams, who was the

17   prosecuting witness (sic).

18   Q.  And he was -- with respect to Mr. Williams, did he play any

19   role in the Antron Kent prosecution -- pardon me, in the William

20   Avery prosecution?

21   A.  Yes, he was --

22            MS. HOFT:  Object, Your Honor.  Characterization.

23            THE COURT:  Well, it's a matter of record that Mark

24   Williams was the D.A. on the case.  And I think it's already

25   been admitted into evidence.

925

```
 1            MR. SMOKOWICZ:

 2   Q.  Okay.  All right.  Was he -- and he was also sworn to

 3   testify in that motion hearing?

 4   A.  Yes.

 5   Q.  And in terms of the William Avery homicide trial, that

 6   occurred when?

 7   A.  The trial happened in 2005.

 8   Q.  And so this hearing in the Antron Kent matter occurs in

 9   January of 2006, is that right?

10   A.  Yes.

11   Q.  And -- okay.  Do you recall what the outcome of that motion

12   hearing -- well, I'll strike that.  The record reflects that --

13   the record of which the Court has taken judicial notice reflects

14   that the Court denied the motion for modification at that time.

15   A.  That's correct.  He was given nothing.

16   Q.  And the judicial note of the June 15th, 2007 -- so that's

17   more than a year later -- indicates that there is a subsequent

18   hearing in which a modification was granted for a reduction of 5

19   years.  Were you at all involved in that modification hearing?

20            MS. HOFT:  Objection.  Form.  Characterization.

21            THE COURT:  Well, let's -- we've got it in as an

22   Exhibit.  Why don't we just look at the Exhibit?  See what the

23   result was from the Exhibit.

24            MR. SMOKOWICZ:

25   Q.  The Exhibit merely states Defendant Antron L. Kent in court
```

1  with Attorney Angela Kachelski.  Defendant Antron L. Kent in

2  custody.  Dennis Stingl appears for State of Wisconsin, Deputy

3  Court Clerk.  This case is in Court for defense counsel's motion

4  to modify sentence.  Sworn for the defense, Defendant Antron L.

5  Kent.  Statements by defense counsel and the State.  Court finds

6  Defendant's cooperation is a new factor, and further finds that

7  a modification of sentence is warranted.  Recommendations as to

8  modification made by counsel and Defendant.  Court grants the

9  motion for sentence modification, and reduces the original

10  sentence by 5 years.  Revised sentence is now a total of

11  33 years.  Have you had any contact with Antron Kent in any

12  other context?

13  A.  No.  Not since I testified at his hearing.

14  Q.  What about with Jeffrey Kimbrough?

15  A.  No.

16  Q.  And beforehand, in terms of before you went out to Oklahoma,

17  had you had any contact with Antron Kent?

18  A.  No.  I didn't know him or Kimbrough.  Ever.

19  Q.  And Keith Randolph?

20  A.  Never.  Until that initial meeting in 2001.

21  Q.  And anything subsequent to that?

22  A.  Nope.

23  Q.  What about William Avery?

24  A.  I never knew him before I met him in Oklahoma.  And clearly

25  I chaired the trial, so the last time I saw him would have been

1    at the trial, and haven't seen him since.

2            MR. SMOKOWICZ:  That's all I have.

3            THE COURT:  All right.  Well, let's take the morning

4    break, ladies and gentlemen of the jury, before cross

5    examination.  Please don't discuss the case.  We'll see you back

6    here after the morning break, okay?

7            (Whereupon the jury was excused at 11:06 a.m.)

8            THE COURT:  Okay.  Take a short break.

9            (Whereupon a recess was called by the Court.  Upon

10   conclusion of the recess, the proceedings continued as follows

11   when the jury was returned to the courtroom at 11:31 a.m.:)

12           THE COURT:  Miss Hoft.

13           MS. HOFT:  Thank you, Your Honor.

14                      **CROSS EXAMINATION**

15   **BY MS. HOFT:**

16   Q.  Captain Heier, you testified last Friday and continued

17   through today, right?

18   A.  Yes.

19   Q.  And you testified last Friday that you transferred from the

20   downtown area to District 5 in 1993 because you wanted more

21   activity.  Do you remember that testimony?

22   A.  Yes.  No, it's true.

23   Q.  And by more activity, you mean that there was less criminal

24   activity in the downtown area and you wanted to move to an area

25   that had more criminal activity?  Is that fair to say?

1  A.  Yes.

2  Q.  And you were eager to be involved in an area with more

3  criminal activity?

4  A.  Yes.

5  Q.  And you were involved with all 3 of the jailhouse informants

6  that testified against William Avery, correct?

7  A.  Yes.

8  Q.  And you met with each man 3 or 4 times.  Is that fair to

9  say?

10  A.  Yes.

11  Q.  And that would total approximately a dozen interrogations of

12  these jailhouse informants?

13  A.  Not interrogations.  Interrogations is more if you're a

14  criminal of something.  It's more witnesses are interviewed and

15  they're not a party to any of this crime.  They're not suspects

16  in this.  So it would be more of interviews rather than

17  interrogations.  They were cooperative people every time, so

18  anywhere -- yes, from 9 to 12.  If it's three apiece, somewhere

19  9 to 12 times.

20  Q.  Okay.  But you're quibbling with me because you want to call

21  these interviews with the jailhouse informants rather than

22  interrogations?

23        MR. SMOKOWICZ:  Object to the form of the question.

24  Argumentative.

25        THE COURT:  No, overruled.  It's cross examination.

1          THE WITNESS:  Yeah, I'd say they're interviews, and

2     you say interrogations.  Yes.

3          MS. HOFT:

4     Q.  Potato, potato?

5     A.  Yeah.

6     Q.  But in any event, 9 to 12 times you testified you've had

7     interactions with the three jailhouse informants?

8     A.  Yes.

9     Q.  And if I understand you correctly, you're indicating that

10    you considered these interviews just like any other witness?

11    A.  No.  Initially -- initially just to play it safe, I advised

12    them of their rights because I didn't know if they were

13    involved.  I didn't know what information they were going to

14    give.  So yes, I looked at it as they could possibly be

15    suspects, but then after gathering information they were just

16    witnesses, in the fact that they had information that was told

17    to them, and they were just telling me what they heard or saw.

18    Q.  But you testified on Friday, did you not, that a jailhouse

19    informant is an unusual witness?

20    A.  I don't know if I said those words, but it's unusual how so?

21    Ask a follow-up question and we'll figure this out.

22    Q.  So you don't remember testifying that a jailhouse informant

23    was an unusual witness.  But in any event, do you recall

24    testifying that a jailhouse informant was different than a

25    witness coming in off the street because they may inculpate

1    themselves, as they are already in jail?

2    A.  Yes.

3    Q.  And that was a concern to you.  So made a jailhouse

4    informant -- well, I guess what you've testified to is that's

5    why you immediately gave Miranda warnings?

6    A.  If --

7    Q.  You don't do that to every witness?

8    A.  No.

9    Q.  So you considered a jailhouse informant more like a suspect

10   when you initially interviewed them?

11   A.  Yes.

12   Q.  And with regard to Mr. Randolph, you've testified that you

13   met with him and his Public Defender right at the beginning of

14   your shift on that day.  I think it was March 21st, 2006, if I'm

15   not mistaken?

16   A.  2001.

17   Q.  2001?  And you've told us, I believe, that you didn't --

18   even though you didn't read the entire Maryetta Griffin file,

19   you did review a summary of what happened in that case from 4

20   o'clock when you first got there, until 4:30 when you went down

21   to meet with Mr. Randolph and his attorney, Mr. Caton?

22   A.  Yes.

23   Q.  And in that reviewing of the summary of the file, you knew

24   that Maryetta Griffin had been strangled or choked?

25   A.  Sure.  Yes.

1  Q.  And you also knew that Maryetta Griffin had likely been
2  sexually assaulted?

3  A.  Yes.

4  Q.  And you testified with regard to the statement you took from
5  Mr. Randolph -- and I believe -- let me just show you, I think
6  it's 1049.  I'm going to draw your attention to the fourth page.
7  You don't give a total time, but we can go back.  You say the
8  interview ended at 11:56 p.m.  Do you remember when it started?

9  A.  4:30 p.m.

10  Q.  So 7 hours?

11  A.  Yeah.  That 11:56 is actually Mr. Randolph's handwriting,
12  too.

13  Q.  I remember you telling us that.  So you're indicating that
14  this time here, 11:56, was written in by Mr. Randolph himself?

15  A.  Yes.

16  Q.  And Mr. Randolph himself indicated that the interview ended
17  after about 7-and-a-half hours, right?

18  A.  I didn't see Mr. Randolph testify, but 4:30 to 11:56 is
19  about 7-and-a-half hours, yes.

20  Q.  Right.  And I wasn't asking you what Mr. Randolph testified
21  to.  This is what you testified to, right?

22  A.  Yes.

23  Q.  That Mr. Randolph wrote when you met with him on this day.
24  Wrote in 11:56 p.m.

25  A.  Yes.

1    Q.  Did he also write March 21st, '01?

2    A.  Yes.

3    Q.  And that was the only thing on this page other than his

4    signature that Mr. Randolph affixed?

5    A.  Yes.

6    Q.  And you've also indicated on this page that Mr. Randolph was

7    not handcuffed, right?

8    A.  That's correct.

9    Q.  And is it fair to say that whenever anyone's in an interview

10   room at the C.I.B., they aren't handcuffed?

11   A.  Yeah.  Almost -- almost all of them are not handcuffed.

12   It's only somebody that would be violent or show violent

13   tendencies.

14   Q.  But for some reason you found it significant to put in this

15   statement that Mr. Randolph was not handcuffed?

16   A.  I put in every time that they aren't handcuffed for

17   circumstances similar to this where I have to testify.

18   Q.  And I believe you've indicated previously that when you do a

19   statement like this -- and obviously this is a little over three

20   page statement.  Three and a quarter page statement.  This was

21   reduced in writing after 7 hours of questioning, right?

22   A.  Probably 6 hours testimony, then writing it all out, and

23   then reading it back and going over, yes.

24   Q.  Okay.  So you're saying questioning for 6 hours, and then

25   writing and reading and making corrections, another

1    hour-and-a-half?

2    A.  Yes.

3    Q.  And if you were to have a verbatim transcript of that

4    7-and-a-half hours with the "Q" and "A", obviously it would be

5    longer than 4 pages.  Is that fair to say?

6    A.  That's -- definitely, yes.

7    Q.  And one of the other things that I think you indicated was

8    that when you do a statement and you read it over to the

9    individual after you've written it -- and if they want to make

10   any changes, you cross them out and you have that person initial

11   those changes?

12   A.  Yes.

13   Q.  And with regard to this time of 11:56 p.m., there are no

14   initials of Mr. Randolph on that time, correct?

15   A.  Yes.

16   Q.  And in speaking to Mr. Randolph and assessing the

17   information that he was providing to you, you learned that

18   Mr. Randolph was claiming to have been a pallbearer at William

19   Avery's mother Barbara's funeral?

20   A.  Yes.

21   Q.  And that meant to you that the information that Mr. Randolph

22   was giving you was actually more credible, because he was

23   claiming he was close to the family?

24   A.  Yes.

25   Q.  And you didn't do anything to check out whether that

1  information claimed by Mr. Randolph was true or not, did you?

2  A.  No, not -- no, not at that time.  I took him for his word as

3  far as the pallbearer.

4  Q.  And you didn't look at a funeral program of Barbara Avery?

5  A.  No.

6  Q.  Have you ever seen the funeral program of Barbara Avery?

7  A.  No.

8  Q.  Would it surprise you to learn that Keith Randolph is not

9  listed as a pallbearer or as an honorary pallbearer of the 12

10  individuals listed here?  Do you want to take a look at this?

11  A.  I'll take you at your word.  I believe if he's not listed,

12  he's not listed.  I just took what he said.  It's his own words,

13  and all I'm doing is recording.

14  Q.  You just took what he said, you wrote it down, and you

15  indicated that after speaking to Mr. Randolph you hit a dead

16  end.  Is that fair to say?

17  A.  Yes.

18  Q.  And you identified some inconsistencies in Mr. Randolph's

19  statement to you, correct?

20  A.  Yes.

21  Q.  And those inconsistencies led you to believe that Randolph

22  was not reliable at that time, didn't they?

23  A.  No, there's inconsistencies, but he's only going off what he

24  was told by Mr. Avery and his recollection.  Ultimately he would

25  have to go to -- and ultimately did go to a trial -- swear that

1  the testimony he's giving is true and correct.  And all those

2  inconsistencies would be therefore picked apart, similar to what

3  we're doing in a trial before a jury.  So he would have to

4  answer again for the pallbearer.  He'd answer again for the

5  inconsistencies.  Because these are all the things that they

6  would bring up and challenge him on.  So that's -- I document

7  what he says, and he has to answer for anything which he said

8  that's untruthful.

9  Q.  But after speaking to Miss Bowers and Mr. Caldwell, and

10  trying to locate Little "C", the investigation that you did came

11  to a dead end.  And you didn't do anything more at that point

12  with regard to Mr. Randolph?

13  A.  That's correct.

14  Q.  And what you learned in terms of speaking to Miss Bowers and

15  Mr. Caldwell and trying to locate Little -- this Little "C",

16  didn't what you learned tend to undermine Mr. Randolph's

17  credibility and reliability?

18  A.  No, because somehow the body was placed in a garage.

19  Somebody had carried her.  We just didn't know at that point who

20  this person was.  And it's still possible that there is somebody

21  out there, and still doesn't take away the fact that she was

22  transported from one location to the other one.  So somebody

23  exists.  Whether it's this Little "C" or called by somebody

24  else, no.  It's very probable that somehow this body got from

25  place to place.

1 Q.  But that wasn't new information, was it?  In the Griffin

2 file there was already the allegation that the body had been

3 moved from the Palmer Street address, right?

4 A.  Yes.

5 Q.  And at this time you never told anyone -- well, let me ask

6 you this.  Did it ever occur to you at that time, after getting

7 this statement from Mr. Randolph, that Mr. Randolph wasn't

8 telling the truth?

9 A.  In some things there were inconsistencies.  But in other

10 instances he may have been telling the truth.

11 Q.  So you didn't make any determination of whether he was

12 telling the truth about some things, and not telling the truth

13 about others.  Is that fair to say?

14 A.  Yes.  Yes.

15 Q.  And you didn't tell anyone about your concerns with regard

16 to these inconsistencies, correct?

17 A.  We would brief the case with other Detectives.  And at this

18 point the case was going nowhere.  It wasn't moving forward, but

19 it still wasn't worthy to take to the D.A.'s Office and try to

20 get criminal charges based on a witness that -- whose

21 information cannot be corroborated with other information such

22 as who Little "C" was.

23 Q.  So there wasn't any need to tell any other Detectives in a

24 daily briefing that you had concerns about the inconsistencies

25 in Mr. Randolph's statement, right?

1    A.  Just that -- the statement was briefed to other shifts and

2    other people that would have worked on the case.

3    Q.  I understand that.  I'm asking you a very specific question.

4    Everybody saw that report in the Maryetta Griffin file, then,

5    after you filed it in the Maryetta Griffin file, right?

6    A.  Yeah.  Anybody who would have needed to look at it, yes.

7    Q.  And you didn't put anything in that report that I found

8    inconsistencies, or I had concerns about the truth of some

9    things, and the untruth of other things?

10   A.  No.

11   Q.  And you didn't tell anybody in the D.A.'s Office that you

12   had concerns about the truth or veracity of some of the things

13   in Mr. Randolph's statement, right?

14   A.  No, because the District Attorneys would have been Mark

15   Williams and Ron Dague, and they would see the inconsistencies

16   with me, because this was one -- this is one witness.  And if

17   this person is going to move forward and testify at a jury

18   trial, there are inconsistencies relative to location.  A couple

19   locations.  The pallbearer thing?  I didn't know that.  I would

20   not have verified that.  I wouldn't think that that's going to

21   be at the public library.  It's more of a family thing.  I don't

22   know where we would find something like that.

23   Q.  You didn't look in the newspaper to see if there was any

24   funeral notice or anything like that, did you?

25   A.  I've never seen a pallbearer listed in a funeral notice, no.

1   Q.  And you -- you never gave any -- you're indicating, if I

2   understand you correctly, that there wasn't a reason to tell the

3   D.A. about your consideration or your review of this statement

4   of Mr. Randolph and its inconsistencies?

5   A.  No.  I'm sure it was discussed, because there were

6   inconsistencies relative to locations.  I mean, I don't recall

7   dates, times that we actually talked.  But this -- it was a

8   continual dialogue.  I mean, this went on for multiple years

9   relative to 2002, finding the two additional witnesses, until he

10   was finally charged.  So I'm sure we talked about the case.  I

11   don't recall specifically what was said, or dates and times, but

12   clearly it's in the document.  Nothing was hidden.  It's the

13   same document that was given to the D.A.  And the defense

14   attorney would have had that also.

15   Q.  Now, I believe you testified that toward the end of your

16   statements that you took from Mr. Kent and Mr. Kimbrough, you

17   specifically put in those statements whether or not there were

18   any promises.  Or I should say that there were never any

19   promises given to either gentleman, right?

20   A.  Yes.

21   Q.  And drawing your attention to Defendant's 1049, Page 4 of

22   the Keith Randolph statement, there's no mention in this

23   statement with regard to whether or not any promises were made

24   to Mr. Randolph.  Were you aware of that?

25   A.  It's not indicated in there, but I didn't write the other

1  two statements.  Those were written by Detective Armbruster.  He

2  may have a certain style.  But again, this was brought in by an

3  attorney, and attorneys negotiate their own -- their things.  I

4  mean, it's not done with me.  It's from attorney to attorney.

5  So there would be nothing that I could promise anybody.

6  Q.  Forgive me if I misremember, but I believe your testimony

7  last Friday was that Mr. Caton left after a couple hours?

8  A.  Correct.

9  Q.  So at the time this statement, Defendant's 1049 was written

10  and signed, Mr. Caton had been gone for more than 4 hours?

11  A.  That's correct.

12  Q.  And nowhere in Defendant's 1049 does it say that

13  Mr. Randolph was not made any promises in exchange for his

14  testimony, right?

15  A.  That's correct.  It's not documented.  But it's not

16  inconsistent with the fact that --

17  Q.  Thank you.  You've answered my question.  Now, moving on to

18  Mr. Kent.  I believe you testified that you don't know whether

19  you or Detective Armbruster gave the name Lorenzo or Lorenzo

20  Frost to Mr. Kent?

21  A.  Correct.

22  Q.  And you said you had no direct knowledge -- that was what I

23  wrote down as a direct quote of what you said.  You didn't

24  have -- you don't have any direct knowledge of who gave that

25  name to Mr. Kent.

940

A. Or if he provided the name himself, yes.

Q. You don't have any direct knowledge?

A. No.

Q. But you were there, right?

A. Back in 2002.

Q. Right.

A. That's a long time ago, yes. That's why we document. But in the way it's written, it says Lorenzo sounds familiar. I don't -- I can't say whether he said it sounds familiar, or when he said his guy, and we said okay, do you know the name? And he said no, and we said does Lorenzo? And he said sounds familiar. I don't know the context of that.

Q. I hear ya'. And you didn't say does Little "C" sound familiar?

A. No.

Q. And again your statement, which is Defendant's 1017, taken from Antron Kent -- and you just mentioned this on Page 2 about halfway down. When we first see the name Lorenzo, you indicated in here Lorenzo sounds familiar. Do you see that?

A. Yes. Written by Kevin Armbruster.

Q. And again you're saying this is written -- okay. So that's the first time that the name Lorenzo appears?

A. Yes.

Q. And then if we go to Page 3, again now -- now this name Lorenzo is being repeated, right?

1  A.  Yes.

2  Q.  If you can look here.  Now it says his guy Lorenzo comes

3  over right away.  Right?

4  A.  Yes.

5  Q.  And then -- and then it says Lorenzo knew where to dump the

6  body?

7  A.  Yeah.  And it says Lorenzo's vehicle two lines up from that.

8  Far left.

9  Q.  And another reference to Lorenzo.  So it's not sounding

10  familiar anymore.  It's just Lorenzo, right?

11  A.  Yes, but if he -- again, I didn't write it.

12  Q.  Thank you.  You've answered my question.  Now, you've

13  indicated that you showed a photo array to both Mr. Kent and

14  Mr. Kimbrough to see if they could identify William Avery's

15  picture, right?

16  A.  Yes.

17  Q.  Did you ask either of those men whether they saw any

18  newspaper article published with regard to William Avery and the

19  Maryetta Griffin homicide back in 1998?

20  A.  No, I did not.

21  Q.  So you don't know whether they saw a newspaper article or

22  not?

23  A.  I do not know.

24  Q.  And Defendant's 1042.  Did you know that the newspaper

25  article had a photograph of Mr. Avery?

1  A.  No, I did not.

2  Q.  Now, drawing your attention again -- this is Defendant's

3  1017, the end of the Antron Kent statement, where you indicate

4  Detective Heier made no promises.  And you're very specific

5  here.  Detective Heier made no promises to Antron regarding a

6  decrease in sentence, or a promise to get out of jail, let alone

7  any -- and there's something crossed out.  Promises.  And you're

8  saying that Antron Kent's signature is above that word that's

9  crossed out?

10  A.  That's his initials, yes.

11  Q.  And do you know what that word was?  You're saying this was

12  Armbruster who wrote this one?

13  A.  Yes.  Detective Armbruster wrote it.  It also says Detective

14  Armbruster and Detective Heier made no promises.  So both of us,

15  no promises were made.  I don't know what word is underneath.

16  Or crossed out.

17  Q.  But you put that reference in there, because Antron Kent

18  said what is in this for me?

19  A.  No.

20  Q.  What can you do for me?  He never said that?

21  A.  No.

22  Q.  He never said will you come testify at a brief sentencing

23  hearing?

24  A.  No.

25  Q.  He never said how can you help me?

1  A.  No.

2  Q.  And after speaking to Mr. Kent, you spoke to Amanda

3  Washington, correct?

4  A.  Yes.

5  Q.  And that lead, again, based on something Mr. Kent told you,

6  and kind of similar to what Mr. Randolph told you about Lorraine

7  Bowers, right?  Mr. Randolph told you Lorraine Bowers has some

8  information.  She's my ex-girlfriend.  Go talk to her.  And now

9  Mr. Kent is telling you Amanda Washington has some information.

10 Go talk to her.  Right?

11 A.  No, he never said she had any information.  It's different

12 from Mr. Randolph because his statement was going to lead to

13 Little "C".  So in order to get Little "C", who he couldn't

14 identify, and who he couldn't have a photo, now we have to

15 backtrack.  We have to go to Mr. Randolph's girlfriend, and then

16 Spencer Caldwell.  So there was a follow-up.  Mr. Kent never

17 said talk to Amanda.  We got the name of Amanda, but we wanted

18 to see if she could provide any information.  There's nothing

19 that Mr. Kent could have told us because he's -- Mr. Kent's in

20 jail.  Mr. Avery and Amanda wouldn't have necessarily any

21 contact.  But is there anything more that we could get?  Is

22 there any more detail from Amanda that she would have heard

23 Mr. Kent tell her or know anything.  In which case, we would

24 follow-up on.

25 Q.  Well, Mr. Kent told you that he talked to his girlfriend

1    about this, right?  His girlfriend, Amanda Washington.  You got
2    the name Amanda Washington?
3    A.  Yes.
4    Q.  And the claim by Mr. Kent that he had talked to her about
5    this from Mr. Kent, right?
6    A.  Yes.  And she was -- she was aware that Detectives were
7    coming down to talk to Mr. Kent.  But --
8    Q.  And after speaking to Miss Washington, you reached a dead
9    end on that, right?
10   A.  I believe there was a dead end to -- we weren't looking for
11   anything but more than -- is there anything else that we missed?
12   And it wasn't a dead end.  We weren't expecting anything, nor
13   did we get anything.  So it wasn't a dead end.  It was just we
14   covered our bases.  We talked to one more witness.  Because I
15   wouldn't want to be sitting here saying you were given the name
16   Amanda, and you never sought her out to interview her.  So we
17   tied up that.  That there was nothing more to add.
18   Q.  But after talking to Miss Washington, that didn't lead you
19   to consider Kent's testimony less reliable?
20   A.  Absolutely not.  That had nothing to do with Mr. Kent's
21   information.  She wouldn't have seen Mr. Avery.
22   Q.  And with regard to Mr. Kimbrough, you testified on direct
23   examination -- and again, this is Defendant's 1018, the
24   statement from Jeffrey Kimbrough.  And I believe you testified
25   you only talked to Mr. Kimbrough for an hour-and-a-half or

1  something like that?

2  A.  Yes.

3  Q.  And on direct examination you testified with regard to

4  explaining this second paragraph from his father -- from here

5  down to another signature here, right?

6  A.  Yes.

7  Q.  And you explained that those questions were to get an idea

8  of how Mr. Kimbrough was as a witness.  Is that fair to say?

9  A.  Yes.  How much education did he have, and is he

10  understanding our questioning.  And yes, it helps when we do

11  that to people.  When we talk to people.

12  Q.  And you were vetting, for lack of a better word,

13  Mr. Kimbrough's abilities and disabilities, correct?

14  A.  There were no abilities or disabilities.  He -- I mean, he

15  went to 11th grade.  He had worked a job.  He can read and

16  write.  And he's not under the influence of anything.  There was

17  nothing to indicate that he had any type of learning disability.

18  And we asked the same questions of Mr. Kent and Mr. Randolph

19  also.

20  Q.  You've never reviewed any Court information with regard to

21  Mr. Kimbrough's physical disabilities or mental disabilities?

22  A.  Nothing at all, no.  Could he understand our questions?  Did

23  he respond appropriate?  I mean, we can talk to people and

24  figure out if someone understands things.

25  Q.  That's what you were trying to figure out with

1  Mr. Kimbrough, though, right?

2  A.  We do that with everybody, with the same -- if somebody is

3  in custody, we always ask the same background questions.

4  Q.  Well, let me show you what was previously marked as Defense

5  Exhibit 1049.  There's no corresponding additional paragraph

6  with regard to Mr. Randolph's background, right?  It's just the

7  Miranda, the signature, and then it goes right into the

8  statement, right?

9  A.  Yes.

10  Q.  Now, with regard to Mr. Kent, you've indicated that when you

11  went back to talk to him he provided some additional

12  information, right?

13  A.  Yes.

14  Q.  And you never asked him why he didn't tell you that before,

15  right?

16  A.  He had -- he had a bit that he had that he remembered.  He

17  didn't remember it earlier, and he just had this bit of

18  information that he provided, and we documented it.  Because it

19  was -- it was something fresh that we didn't have before.

20  Q.  And let's review that just briefly.  When Mr. Kent first

21  called the Milwaukee Police Department, he indicated he had a

22  single conversation where Mr. Avery made incriminating

23  statements to him, right?  In April or May of 2002?

24  A.  Yeah.  I didn't talk to him in the -- I didn't talk to him

25  in the first or second interview.  The only time I saw him was

1    the third time.  I mean, it was -- he talked to Kevin Armbruster

2    twice.  I didn't ask any questions.

3    Q.  And I'm not trying to say you were somewhere you weren't.

4    I'm just trying to indicate that it was your understanding that

5    when you first got this assignment, that Mr. Kent had had a

6    single conversation that he was party to in April or May

7    of 2002, where William Avery supposedly gave incriminating

8    statements, correct?

9    A.  Yeah, but I didn't follow up with a second question.  So

10   based on just that one report by Kevin Armbruster.

11   Q.  Right.  And you were also aware that after that conversation

12   there was another conversation where now Mr. Kent was saying

13   this conversation was -- this single conversation in April or

14   May of 2002 was now supposedly overheard by a Jeffrey Kimbrough,

15   right?

16   A.  Yes.

17   Q.  That that wasn't told initially to Detective Armbruster?

18   A.  I don't know if he was asked, but no, we did not know

19   Jeffrey Kimbrough's name in the first cold call to say hey, I've

20   got information.

21   Q.  And now, 2 years later, approximately 2 years later, I

22   guess, now there's something additional that Mr. Kent is

23   allegedly remembering from this single conversation from two

24   years before, right?

25   A.  Could have multiple conversations.  I mean, that's a lot of

948

1   time, from 2002 to 2004.  He remembered it, so --

2   Q.  Did you ever establish that Mr. Kent was claiming he had

3   more than a single conversation with Mr. Avery in which

4   Mr. Avery made incriminating statements to him?

5   A.  No, but I don't know what happened.  You know, maybe they've

6   talked since.  I didn't know.  I don't know if there was more

7   conversation from 2002 to 2004.

8   Q.  And you never asked?

9   A.  I didn't ask.  It was just something that he came up and he

10  -- it was inconsistent with the other statements, and he had

11  another bit of information, which ultimately was like a sentence

12  or two long.  So it's very small.  About the F.B.I. and the

13  area.

14  Q.  So you're thinking that that additional information was

15  inconsistent with his prior -- Mr. Kent's prior statements?  Is

16  that what you're saying?

17  A.  It's not inconsistent.  It's just an additional.  I just

18  remember --

19  Q.  I'm sorry.  I misheard you.  I thought you said

20  inconsistent?

21  A.  Okay.  But I'm just explaining.  It was an additional piece

22  of information.  If we wrote 4 pages, and he has an additional

23  piece of information, it's not consistent in the fact that I'm

24  adding one piece of information.  And we documented it

25  accordingly.  And it's about two sentences long, so it's an

1  addition to the 4 pages.

2  Q.  And you knew that there were investigations of unsolved

3  homicides of female prostitutes from that area, right?

4  A.  We talked about that last time.

5  Q.  And you and I -- yes?

6  A.  Together.  Lots of talk, yes.

7  Q.  Yes.  But you were aware of that.  All right.  Now, with

8  regard to Mr. Kent, you were the lead Detective on the homicide

9  trial against William Avery, right?

10  A.  Yes.

11  Q.  Which meant you were there to assist the prosecutor, and you

12  were in court and heard all the testimony?

13  A.  Yes.

14  Q.  And with regard -- when you first met with Mr. Kent, along

15  with Detective Armbruster, Kent told you he wanted something for

16  his testimony, didn't he?

17  A.  No.

18  Q.  He never said that?

19  A.  No.

20  Q.  He never said he wanted any reduction in his sentence or

21  wanted anything in exchange for his testimony?

22  A.  Absolutely nothing, no.

23  Q.  And you just made sure, without any prompting from him, that

24  he was aware -- and you put in the statement that he was given

25  no promises?

```
 1   A.  That's correct.
 2   Q.  And you heard Mr. Kent testify that he was only testifying
 3   at William Avery's trial because it was the right thing to do.
 4   Do you recall that?
 5   A.  Yes.
 6   Q.  And that made his testimony more credible.  Would you agree
 7   with me?
 8   A.  I don't know how juries look at and weigh his testimony.
 9   That's speculating on my part on how they would do things.
10   Q.  And Mr. Smokowicz went over with you that you testified at
11   Mr. Kent's motion to modify his sentence.  His sentence
12   reduction hearing, right?
13   A.  About 10 months after the criminal trial, yes.
14   Q.  On January 20th, 2006?
15   A.  Yes.
16   Q.  Correct?
17   A.  The original trial being March of 2005, yes.
18   Q.  And the Court found at that time that the Defendant's
19   cooperation was not a new factor.  Do you recall that?  To
20   consider in resentencing?
21   A.  I don't recall what the -- what the Judge's thought process
22   was in this.
23   Q.  And that resentencing hearing was appealed, then.  And on
24   June 15th, 2007, the Court found that the Defendant's
25   cooperation was a new factor?
```

1  A.  Yeah.  I didn't find that out until the deposition in like

2  2012.  Otherwise I didn't know anything about that.

3  Q.  Okay.  But you then learned that your testimony,

4  Mr. Williams' testimony, and Mr. Kent's testimony were heard on

5  a motion to modify Mr. Kent's sentence, and he was granted a

6  year reduction in his sentence on June 15th, 2007.

7          MR. SMOKOWICZ:  Object to the form of the question.

8  It misstates the facts of the January 7th hearing.  Or the

9  January, 2007, hearing as to witness testimony.

10          THE COURT:  Well, the record speaks for its itself.

11  But he may answer, if he can.

12          THE WITNESS:  I'm aware that he got a sentence

13  modification, yes.  5 years.

14          MS. HOFT:

15  Q.  And with regard to Jeffrey Kimbrough's testimony at William

16  Avery's trial, you were present for that?

17  A.  Yes.

18  Q.  And you've testified that only one of the three jailhouse

19  informants expressed any reluctance to testify against

20  Mr. Avery, correct?

21  A.  They were -- I don't -- people were put in cells.  That was

22  a problem.  People were seen and threatened.  That's a problem.

23  There was some logistical problems throughout the whole thing.

24  And Mr. Kimbrough was actually threatened by people to testify.

25  Q.  If I -- you're now saying that Mr. Kimbrough was threatened

1   by people to testify?

2   A.   That was brought out during Court, yes.

3   Q.   Did you put that in any report?

4   A.   That was brought to the attention of the Judge and the

5   Bailiff, because people were -- they saw each other.  I mean,

6   people would be seeing Mr. Avery.  They were brought -- I

7   testified to this earlier -- with Mr. Randolph.  That they

8   were -- Mr. Randolph was placed in the exact holding cell as Mr.

9   Avery.

10  Q.   Right.

11  A.   This was brought up into the Court in the Judge's -- an open

12  court session like this, yes.

13  Q.   And that's what I was trying to get at.  You testified, if I

14  understood you correctly on direct, that Mr. Randolph was the

15  only one of the three jailhouse informants to express reluctance

16  to testify based on the fact that you claim he was put into a

17  holding cell with Mr. Avery.  Now you're saying that happened to

18  Mr. Kimbrough, too?

19  A.   Kimbrough was threatened, yes.  That, again, was brought to

20  the Judge's attention during the Court.  They called out the

21  Bailiff, and this is all in the Court transcripts.  I mean, in

22  the testimony transcripts.  Because what -- what was going on

23  with the Courts, that the witnesses who were being brought were

24  being threatened.  Were being placed and actually physically saw

25  Mr. Avery during movement before the trial.  That was a huge

1  concern for all parties involved that they had contact.  That

2  should have never happened.  The Judge addressed it with the

3  Bailiff, and separations were placed because of that.  There's

4  no report that needed to be filed, because as soon as we got

5  this information, we brought it to the attention of the Judge.

6  Q.  Did you speak to Jeffrey Kimbrough in the bullpen where he

7  was being held right before he testified at William's homicide

8  trial in March of 2005?

9  A.  Yes.

10 Q.  And did you tell anyone the substance of that conversation?

11 A.  Yes.  Because we brought it up that he felt that he was

12 threatened.  That this stuff is happening, yes.

13 Q.  You're claiming that in that conversation he told you he was

14 threatened?

15 A.  Yeah.  Afterwards.

16 Q.  He didn't tell you that he didn't want to testify?

17 A.  No.

18 Q.  He didn't express any reluctance, other than being

19 threatened about testifying?

20 A.  No.

21 Q.  He didn't tell you that what you wanted him to say wasn't

22 true?

23 A.  No.

24 Q.  And you're familiar with the Police Officer's Constitutional

25 obligations pursuant to the Supreme Court case Brady vs.

1    Maryland?

2    A.  I don't know that one.

3    Q.  You don't know Brady?

4    A.  I don't know --

5            MR. SMOKOWICZ:  Your Honor, I'm going to object to

6    this line of questioning at this point.  It's irrelevant.

7            THE COURT:  Well, the ruling is that if the

8    prosecution has any evidence that will exculpate a Defendant,

9    they have to turn it over and make it known.

10           MS. HOFT:  Thank you, Judge.

11   Q.  So now that you -- the Judge has told us the obligations

12   under Brady is for the prosecutor to provide any exculpatory

13   information to the defense in a criminal case.  Do you

14   understand that?

15   A.  Yes.

16   Q.  And do you understand as a Police Officer it's your

17   obligation that if you have -- you have information that could

18   be favorable to the defense, you have to give it to the

19   prosecutor?

20   A.  Yes.

21   Q.  And that's what we mean when we say exculpatory.  Is any

22   information that might be favorable to an individual charged

23   with a crime.

24   A.  Yes.

25   Q.  And would you agree with me that this would include letting

1  a prosecutor know that one of the witnesses was going to testify

2  falsely?  Or give false testimony?

3  A.   There was -- he didn't say he was not going to testify, or

4  testify falsely.  The conversation never happened.

5  Q.   Any witness, though, who you know is going to testify

6  falsely, you have to provide that information to the prosecutor,

7  don't you?

8  A.   Yes.

9  Q.   And if you're sitting in a courtroom and you hear -- you're

10  the lead Detective on a trial, and you hear testimony that you

11  know is false, you have to tell that to the prosecutor, too,

12  don't you?

13  A.   Specifically for what?  I don't understand what was false

14  that somebody testified to.  I mean, everybody is listening.

15  The defense, the jury.  It's all in an open courtroom with

16  everybody else.  And I don't call witnesses.  The prosecutor

17  does.  So if he knows and reads this and calls him to testify --

18  people have to weigh the testimony.  That's why we have jury

19  trials.

20  Q.   But what I'm trying to say is that you as a Police Officer

21  who's acting in the role as lead Detective assisting the State's

22  Attorney, you've had a role in questioning or interviewing or

23  interrogating some of the witnesses who then testify at trial,

24  right?

25  A.   Yes.

1   Q.  So if you know from your conversations, your interrogations,

2   your interviews with those individuals, that they are testifying

3   to something different that -- than they had testified to you,

4   or that they had told you, you would have an issue about that

5   possibly being false testimony, wouldn't you?

6   A.  Yes.

7           MR. SMOKOWICZ:  Your Honor, I'm going to object to the

8   form of the question.  It calls for a legal conclusion here at

9   this point.

10          THE COURT:  Well, no.  He answered.  And the answer

11  will stand.

12          MS. HOFT:

13  Q.  If Jeffrey Kimbrough had told you that he didn't want to

14  testify --

15  A.  -- which he didn't --

16  Q.  -- even though what he was saying was not true, you would

17  have had a Constitutional obligation to tell the District

18  Attorney who was prosecuting William Avery, correct?

19          MR. SMOKOWICZ:  Your Honor, I'm going to object to the

20  form of the question again.  It's calling for a legal

21  conclusion.

22          THE COURT:  No, overruled.  He may answer, if he can.

23          THE WITNESS:  He never said he didn't want to testify.

24  Never said he was going to testify falsely.  He never told me

25  any of this.

1           MS. HOFT:

2   Q.  Were you here with -- when Mr. Kimbrough testified in court?

3   In this courtroom?

4   A.  No.  No, I was not.

5   Q.  Assume with me that Mr. Kimbrough indicated that he told you

6   that he didn't want to testify because what he was going to

7   testify about wasn't true.

8   A.  I'd say to his face he's lying.  He never said that.

9           MR. SMOKOWICZ:  Objection, Your Honor.  And I'm going

10  to object to the form of the question.  Misstating the prior

11  testimony.

12          THE COURT:  Well, but it's a hypothetical.  And so

13  again, ladies and gentlemen, attorneys are allowed to ask

14  hypothetical questions, and the witness can give an answer.  But

15  if the facts in the hypothetical are not shown by the evidence,

16  then you can disregard the answer.  So the hypothetical was if

17  the witness told you he was going to testify falsely, were you

18  under an obligation to let the District Attorney know.  Is that

19  correct?

20          MS. HOFT:  Yes, Your Honor.

21          THE WITNESS:  Yes, I would let the District Attorney

22  know.  I would let everybody know.  It never happened.  And if

23  he said that it happened, he's lying.  Because it never

24  happened.  And ultimately he would go up to testify.  If he

25  didn't want to testify, then he would have got on the stand and

1   not testified.

2                   MS. HOFT:

3   Q.  You never told Mr. Kimbrough that he had to testify, right?

4   A.  No.

5   Q.  Just briefly, the -- Plaintiff's Exhibit 32, which is an

6   affidavit subscribed and sworn, dated November 23rd, 2010, of

7   Mr. Jeffrey Kimbrough --

8                   MR. SMOKOWICZ:  Your Honor, I'm going to object to --

9   may I be heard on this at sidebar?

10                  THE COURT:  All right.

11                  (Whereupon a side-bar conference was held off the

12   record.  Upon conclusion of the side-bar conference, the

13   proceedings continued as follows:)

14                  MS. HOFT:

15   Q.  Just one last question.  You never told Mr. Kimbrough that

16   he had to do it?  There was no going back now?

17   A.  No.

18                  MS. HOFT:  No more questions.

19                  MR. SMOKOWICZ:  I have a couple of questions, Your

20   Honor.

21                  THE COURT:  Is it just a couple?  I want to finish up

22   with this witness before lunch.  Natural flow to the case, then.

23                  MR. SMOKOWICZ:  I try not to violate that lawyer's

24   rule of a couple meaning just a couple.  But at least it means

25   two areas.  Very brief.

1                          **REDIRECT EXAMINATION**

2        **BY MR. SMOKOWICZ:**

3        Q.  I think you were shown this newspaper article before with

4        the picture of Mr. Avery.  And it is marked as Exhibit 1042.  Do

5        you recognize the notations at the bottom?

6        A.  Yeah.  That's in the M-file.  It's the same numerical

7        system.  Would be Section 13, Page 45.  So this newspaper

8        article would have been in the file and disclosed as part of

9        discovery to the prosecutor and the defense.

10       Q.  So the defense attorney for Mr. Avery would have been able

11       to become aware, if he had chosen to, to notice that this

12       newspaper article's picture was available at that time, right?

13       A.  Yes.

14               MS. HOFT:  Objection.  Speculation.

15               THE COURT:  Well, but it's already been asked and

16       answered when he said he turned over the whole file.  Which

17       would include this newspaper article.

18               MR. SMOKOWICZ:

19       Q.  With respect to Mr. Kimbrough's statement, there's been some

20       testimony elicited from you on cross examination that there's

21       no, quote, background information, close quote, about him in

22       that statement.  Could you explain to the jury why that is the

23       case?

24       A.  I think we -- there's no background taken on Mr. Randolph.

25       Not Mr. Kent.

1  Q.  Mr. Randolph, yes.

2  A.  Mr. Randolph was brought by his attorney.  The attorney -- a

3  little more officious.  A little more wants this to go faster.

4  And some of this takes a lot more time.  So for the efficiency

5  of giving the statement with his Attorney present, we don't bog

6  them down with a lot of unnecessary background information.  In

7  Sayre, Oklahoma, with -- we've got all day to talk to these

8  people.  It tends to be more slow, methodical.  And that's the

9  reason why it wasn't done with the first person.

10            MR. SMOKOWICZ:  And last but not least, Your Honor,

11  I'm going to have to have this marked as a separate Exhibit.

12  But I have a portion of the testimony from the trial of State

13  vs. William Avery, and it is a statement by Detective Heier that

14  I would like to read.  It's a prior statement by a party,

15  obviously.

16            MR. STAINTHORP:  We need to see it.

17            THE COURT:  It's an official recordation?

18            MR. SMOKOWICZ:  Yes.  It's the transcript, Your Honor.

19            MS. HOFT:  Your Honor, we do object to him being able

20  to read this Exhibit that hasn't been identified.

21            MR. SMOKOWICZ:  This is specific rebuttal to the cross

22  examination.

23            THE COURT:  What is the Exhibit, is the question.  And

24  where is it from?

25            MR. SMOKOWICZ:  Again, it's from the -- it's a portion

1  of the transcript of the proceedings in the case of State of

2  Wisconsin vs. William Avery, Case 04-CF-5022.  A page from this

3  was marked as Plaintiff's Exhibit I think 24.  But this is two

4  pages beyond that, and they are specific statements by Detective

5  Heier on the record.

6          THE COURT:  Well, it's a recorded official document

7  from that trial, one.  Two, it's offered as a prior consistent

8  statement, is that correct?

9          MR. SMOKOWICZ:  Yes, Your Honor.

10         THE COURT:  Recorded and in court.  The Court will

11 allow it.

12         MR. SMOKOWICZ:  Thank you, Your Honor.

13 Q.  At the bottom of Page 81 it begins:  Detective Heier, colon:

14 Keith Randolph.  I spoke to him and he said he was in a place --

15 in a cell placed with Mr. Avery.  The Court:  He was placed with

16 him when?  Detective Heier:  Within the last few days he's been

17 here.  The Court:  Okay.  Well, we need to make sure that

18 Mr. Avery is not housed with any of them.  The Bailiff -- I'll

19 move on to that.  The other witnesses expressed concern, because

20 they have also seen Mr. Avery and they, this last person,

21 Mr. Kimbrough, was actually threatened by other people because

22 they knew he was here to testify.  Mr. Kimbrough was threatened?

23 Detective Heier:  Yes.

24         That's all I have, Your Honor, subject to offering

25 this Exhibit into evidence.

1       THE COURT:  Okay.  Any recross of that testimony?

2       MS. HOFT:  Just briefly, Your Honor.

3                        **RECROSS EXAMINATION**

4    **BY MS. HOFT:**

5    Q.  The newspaper article Mr. Smokowicz showed you -- you've

6    indicated was in the M-file of Maryetta Griffin, right?

7    A.  Yes.

8    Q.  And, therefore, you would have reviewed that newspaper

9    article too, right?

10   A.  Yes.

11      MS. HOFT:  That's all, Your Honor.

12      THE COURT:  Okay.  We'll take a break for lunch,

13   ladies and gentlemen.  Please don't discuss the case.  Give you

14   an hour, which has been our usual customary lunch break.  So

15   we'll have you back here, then, to listen to the next witness.

16   Don't discuss the case.  Have a good lunch.

17      (Whereupon the jury was excused at 12:30 p.m.)

18      THE COURT:  Okay.  1:30.

19      (Whereupon a recess was called by the Court.  Upon

20   conclusion of the recess, the proceedings continued as 1:36

21   p.m.:)

22      **AGENT GILBERT HERNANDEZ**, re-called as a witness,

23   having been previously sworn, on oath testified as follows:

24      THE COURT:  Officer Hernandez, you have been

25   previously placed under oath, and that oath still applies.

1          THE WITNESS:  Yes, Your Honor.

2                   **DIRECT EXAMINATION**

3    **BY MS. YUAN:**

4    Q.  Good afternoon, sir.

5    A.  Good afternoon.

6    Q.  How are you currently employed?

7    A.  I'm employed with the Wisconsin Department of Justice,

8    particularly involved with the Division of Criminal

9    Investigation.  Basically what we do is we're like State Police.

10   And if there's like townships, if you would, that don't have the

11   Police forces, we're called upon to assist in any type of

12   criminal investigation.  That can be from -- anything from

13   investigation of Police Officers.  It can be anything from

14   investigating a homicide.  Then we also are very much involved

15   in internet against children -- internet crimes against

16   children, excuse me.

17   Q.  And what is your title there?

18   A.  I'm a Special Agent, and basically my tasks with them -- I'm

19   basically involved with the major crimes.  Your homicides, your

20   shootings.  And also I do -- as far as investigations, if they

21   come up, of Officers or any -- whatever is really needed, I'm

22   basically there to help.

23   Q.  And the Department is the Division of Criminal Investigation

24   for the D.O.J., is that correct?

25   A.  That's correct.

Q.  And how long have you been employed there?

2 A.  I've been employed there approximately two-and-a-half --

3 two-and-a-half years.  I was -- I started off with the Milwaukee

4 Police Department, and after 35 years -- I still didn't want to

5 retire.  I wanted to keep going.  So I went over to the

6 Department of Justice.

7 Q.  And you're doing similar things at the Department of Justice

8 now, as you were when you were at the Milwaukee Police

9 Department?

10 A.  Yes.  Yes.  Basically.

11 Q.  And you described different Departments with the Criminal

12 Investigation Unit there.  And you mentioned major crimes.  Is

13 that where you're stationed right now?

14 A.  I'm assigned to major crimes.  Again, your homicides and

15 your shootings.  I also do some work in financial crimes, also.

16 I assist in -- we have a Narcotics Unit, if you would.  And we

17 also assist them -- because we're a small unit.  I think there's

18 like 20 people in our office.  So we've got to help each other

19 out.  So I'll be involved in their search warrants.  We have

20 S.W.A.T. team, an entry team.  So we kind of help each other

21 out.

22 Q.  Do you have Police powers?

23 A.  Yes.

24 Q.  And you mentioned, of course, being employed with the

25 Milwaukee Police Department.  Can you tell the jury a little bit

964

Case 2:11-cv-00408-JPS   Filed 11/30/15   Page 95 of 205   Document 180

1    about your tenure there?  When did you begin?  And where did you

2    start in terms of the rank you started at?

3    A.  Back in 1977, right out of high school, I started my career

4    as a Police Aide, which is basically an apprenticeship.  You're

5    basically like a gopher.  You do any odd jobs that they want.

6    And that could be anything from filing, from clerical work,

7    answering phones.

8              Eventually at the age of 21 you become a Police

9    Officer.  And back then it was an 18 week course at the Police

10   Academy.  And after that I was assigned to District Number 5,

11   4th and Locust, for approximately 16 years, uniform.  And

12   eventually I wanted to get into more of the investigational

13   work, so in '93 I took the promotional exam for Detective, and I

14   was -- I worked robberies, and violent crimes, stabbings,

15   shootings, and then your homicides.

16             Subsequently myself and my partner, Katherine Spano,

17   took an interest to some of these -- these homicide

18   investigations.  And we really enjoyed them, and were asked if

19   we could assist in trying to organize a Cold Case Unit.  And

20   subsequently we did.  And we ended up going through some special

21   training and certification, and eventually we were able to -- of

22   course we came across the Walter Ellis serial killer.  And then

23   we came across several other people that were also involved in

24   homicides dating back to the 1970's.  Several cases.  We were

25   able to make a lot of families happy.  So it was very rewarding,

```
 1   but it got to a point where I guess I was the old man in the
 2   building.  And they -- you keep getting those jokes saying it's
 3   time to leave, so you start looking for something else.  And I
 4   found the Department of Justice.  I got very fortunate.
 5   Q.  And so you started as Police Officer you said?
 6   A.  As a Police Aide, then a Police Officer.
 7   Q.  Then a Police Officer.  And then you said you took the exam
 8   in 1993 to become a Detective?
 9   A.  Yes.
10   Q.  And you passed that exam?
11   A.  Yes, I did.
12   Q.  And that's considered a promotion, then, when you move from
13   a Police Officer position to a Detective?
14   A.  Yes.  Yes.
15   Q.  And once you became a Detective, you mentioned some of the
16   crimes.  You said robberies, stabbings.  Were you originally
17   investigating homicides right away when you were in the
18   Detective Bureau?  Or were you handling other cases and then
19   going over to homicide?
20   A.  You basically start off with your property crimes, which are
21   your burglars.  And then as you get more experience, they might
22   put you with the violent crimes, where you start talking about
23   more serious crimes.  And eventually, of course, when you start
24   dealing with homicides, then you want the people that are most
25   skilled.  And show that energy to be willing to pursue some of
```

1    these cases to a conclusion.  Prosecution and stuff.  You get to

2    work with the District Attorney hand-in-hand.  So it's an

3    important responsibility.  And I was blessed to be assigned to

4    it.

5    Q.  Do you remember when you actually started handling mostly

6    homicide files?

7    A.  Oh, I want to say that would have been around '96.

8    Q.  And you also mentioned your partner, Kathy Spano.  How long

9    were you and Kathy partners?

10   A.  We have been partners for 18 years.  Which is unheard of.

11   Most of your partnerships last 4, 5 years.  But we were doing

12   some good work, and our supervisors recognized that, and they

13   didn't want to break us up.  So they basically put us on this

14   Cold Case Unit.  And also we don't need a lot of supervision.

15   We're more mature.  A lot more mature than some of the younger

16   people might be.  And that's the position they put us in.

17   Q.  Just to get a little bit more background -- Special Agent

18   Hernandez, were you born in Milwaukee?

19   A.  Born in Milwaukee.  Raised in Milwaukee, yes.

20   Q.  Have you lived anywhere else other than Milwaukee?

21   A.  Milwaukee.  I grew up on the south side.  Now I live just --

22   on the west side.

23   Q.  And where did you go to high school?

24   A.  I went to Wisconsin Lutheran High School.

25   Q.  Did you have any additional education after graduating from

1    high school?

2    A.   I actually went to M.A.T.C., and I've taken some

3    certification classes during my years of law enforcement.

4    Q.   What kind of certifications did you take?

5    A.   Anything from death investigations; I've taken infant death

6    investigations; I've taken certifications in -- I went to the

7    F.B.I. -- to the F.B.I. in Quantico for two week homicide

8    investigation.  I've done a lot certifications around the

9    guidelines of investigations with children and death

10   investigations.

11   Q.   I want to turn your attention now -- I know you've been

12   here.  You testified last week.  But I want to turn your

13   attention now to the Maryetta Griffin homicide.  Do you recall,

14   were you one of the Detectives that responded to the scene when

15   Maryetta Griffin was first found dead?

16   A.   I was not.

17   Q.   Do you recall getting involved in that investigation at some

18   point?

19   A.   Oh, yes.  I became involved probably my next shift when I

20   came in.  I was informed about it, and we were told to start

21   working on it.  And -- which would mean that I was sitting in

22   all the briefings pertaining to that homicide investigation, and

23   we would update each other after beginning -- or after the shift

24   we would update each other on what -- the particulars.  What's

25   going on.  Which way the case was going.

1    Q.  Do you recall -- so once you got involved in the

2    investigation of the Griffin homicide, that would involve

3    interviewing witnesses?  Or following leads?

4    A.  Interviewing of witnesses.  Interviewing family members to

5    find out what kind of activity that this young lady was involved

6    in.  Find out her history.  A lot of times you're going to find

7    out that some of these family members don't have a lot of

8    history, because some of these kids or these young ladies are --

9    they're not going to come home every day like we would.  Like

10   work 8 hours, you come home and you have your dinner, and you

11   start your day all over.  Their lifestyle is basically no one

12   monitors them.  They're -- no one knows where they're at.

13   They're basically lost.

14   Q.  Do you remember, prior to speaking with any witnesses in the

15   investigation of Maryetta Griffin's homicide, if you knew how

16   her body was found?  And the manner of death?

17   A.  I wasn't at the crime scene, but I was privileged to look at

18   some of the crime scene photos.  And my recollection was that

19   she was found in a high school -- a North Division High School

20   sweater, blue in color, and a lot of her clothing weren't --

21   weren't present at the crime scene.

22   Q.  Do you remember how she was killed?

23   A.  She was strangled.

24   Q.  And this is information you would have known from the

25   briefings and from reviewing the file?

1    A.  Yes.

2    Q.  Did you learn anything about the victim's -- well, what did

3    you learn about the victim's I guess daily life, if anything,

4    while conducting your interviews?

5    A.  What I can -- what I can recall was basically there was no

6    accountability for her.  Where was she?  You know.  Nobody

7    seemed to know.  I remember that we knew that she was -- she was

8    a prostitute, and she would go out with -- 4, 5 nights in a row

9    without coming home.

10   Q.  Do you know anything about drug use?

11   A.  I was -- I was told about her drug use also.  There was some

12   history there.

13   Q.  Now, Detective Hernandez, during the course of your

14   investigation you did eventually interview William Avery?

15   Correct?

16   A.  Yes.  Yes, I did.

17   Q.  I want to show you what's already been marked and admitted

18   as Plaintiff's Exhibit Number 11-B, two pages.  So I'm going to

19   show you two pages, and then we'll talk about it.  Do you

20   recognize this?

21   A.  Yes.  This is a report that's filed regarding -- it's the

22   pedigree of William Avery.

23   Q.  And the date at the top there says arrest date and time.

24   March 23rd, 1998, at 1 o'clock p.m.  Do you see that?

25   A.  That's correct.

1   Q.  So that would have indicated a date and time that Mr. Avery
2   was actually arrested?
3   A.  That's correct.
4   Q.  What other information is contained here?  And why -- did
5   you call this a pedigree?
6   A.  Yes, I did.
7   Q.  What is a pedigree?
8   A.  Basically it gives us a little insight on the individual's
9   family history, parents, brothers, sisters.  There's questions
10  that are asked.  If they've ever been -- if they have children,
11  it's nice to know.  Boyfriend or girlfriend.  Employer.  I think
12  they also ask if you've been arrested of any crimes.  But
13  basically this gives us an insight of the individual as far as
14  is he answering the questions appropriately?  Is he
15  understanding -- you know, it's kind of a gauge, if you would,
16  just to try to get a nice idea if this individual understands
17  you.  Hopefully he's not on any intoxicant or anything.  If he
18  understands you and is answering your questions.
19  Q.  And now I want to show you the other page that's also part
20  of Exhibit Number 11-B.  The Plaintiff's Exhibit.  Do you
21  recognize this?
22  A.  Yes.  This is the advisement of his Miranda warnings,
23  Constitutional rights, which he was advised at 10:40 p.m. and --
24  by myself and Detective Katherine Hein at the time.  And he
25  indicated that he did not -- that -- he stated he did understand

1  and does not wish to make a statement at this time.  And he

2  signed his signature indicating --

3  Q.  That's his signature right there?

4  A.  Yes.

5  Q.  And whose handwriting is this?

6  A.  That's my partner, Katherine Hein.

7  Q.  And is that Detective Hein's signature?

8  A.  Yes, it is.

9  Q.  And is that your signature?

10  A.  That's my signature.

11  Q.  So what happened after he was advised of his rights and said

12  he did not wish to make a statement?

13  A.  We stopped talking to him.  Probably conveyed back upstairs

14  to his cell upstairs on the fifth floor.

15  Q.  And I'm sorry.  I did take that Exhibit away.  But you

16  recall that was March 23rd, 1998, at 10:40 p.m.?

17  A.  P.m., yes.

18  Q.  In the evening.  Okay.  So after Mr. Avery stated he did not

19  wish to make a statement, you and Detective Hein left?

20  A.  Yes.

21  Q.  Stopped questioning?

22  A.  We stopped questioning him, yes.

23  Q.  Do you recall if you questioned Mr. Avery the next day?

24  A.  Yes, I believe I did.  Yes.

25  Q.  Putting up here what's been marked and admitted as defense

1  Exhibit Number 1030.  Do you recognize this document?

2  A.  Yes.  This is a statement taken by myself -- and Detective

3  Dan Phillips was present.  This is -- this is my handwriting.

4  And he was advised on Tuesday, March 24th, '98 at 10 o'clock,

5  when we advised him.  Probably would have started that

6  interview.

7  Q.  And you said 10 o'clock.  It's actually -- do you see if

8  that's an a.m. or p.m. there?

9  A.  That looks like an a.m. to me.

10  Q.  It looks like it's a one page statement.  I want to draw

11  your attention to the bottom here.  And then we'll go back

12  through it.  Is that your signature there at the bottom?

13  A.  Yes.

14  Q.  And again, you have the date of March 24th, 1998?

15  A.  Yes.

16  Q.  And what is -- what's next to that?  Is that the time?

17  A.  It's 10:00 a.m. we started, 12:30 p.m. we concluded.

18  Q.  So this interview lasted only two-and-a-half hours?

19  A.  Yes.

20  Q.  Is that lengthy when it comes to homicide investigations?

21  Or -- I mean, I'm sorry.  Strike that.  A homicide interview?

22  A.  It depends.  I mean, if he would have talked continuously,

23  we probably would have more pages and longer narrative.  But

24  this one, he just indicated that he didn't want to talk after a

25  short -- we were talking.  He was talking.  And I think that was

1   12:30.  He didn't want to talk anymore.

2   Q.  Okay.  And you testified I think by looking at this

3   statement, your handwritten report of what occurred, that you

4   did advise Mr. Avery of his Constitutional rights, correct?

5   A.  Yes.

6   Q.  And that would include his right to an attorney and his

7   right to remain silent?

8   A.  That's correct.

9   Q.  You do that at the beginning of the interview?

10  A.  Yes.

11  Q.  And that's reflected at the top of this statement?  Is that

12  right?

13  A.  That is correct.

14  Q.  Okay.  And after you wrote out that he was advised of his

15  Constitutional rights, you put subject -- and that means

16  Mr. Avery, is that right?

17  A.  Yes.

18  Q.  Stated that he will make a statement.  And then is that

19  Mr. Avery's signature?

20  A.  Yes, it is.

21  Q.  Can you read for the jury the next paragraph, please?  After

22  Mr. Avery's signature?

23  A.  Can you just go down just a little?  Get the top line.  On

24  Monday, subject stated during early morning hours subject opened

25  the door for Mercedes.  Subject states that he went down to open

1  the door and let Mercedes in the house.

2  Q.  Do you remember if you knew who Mercedes was at this point?

3  A.  Oh, yes.  Yes.

4  Q.  Who was Mercedes?

5  A.  That was Maryetta Griffin.

6  Q.  How did you know that that was Maryetta Griffin?

7  A.  Because her photo was shown to numerous people from the

8  area, including the family, and that was one of the names that

9  she went by.  Mercedes.

10 Q.  Can you read that next paragraph, please?

11 A.  Subject states that he let Mercedes walk up the stairs into

12 the upper attic area.  Subject states that Mercedes wanted some

13 dope, which he sold her.  Subject states that he doesn't know

14 how much dope he sold Mercedes.

15 Q.  And where did you obtain this information that you just read

16 for the jury?

17 A.  I received -- I got this from Mr. William Avery.

18 Q.  And let's continue.  This is just a one page statement.  I'm

19 going to have you go on.

20 A.  Subject states that Mercedes sat at the table, started to

21 smoke her dope.  Subject states that he was laying on the couch

22 and fell asleep.  Subject states that he was awakened by

23 Mercedes going into his pockets, pulling out his money.  Subject

24 states that he was startled.  Subject states that he got up on

25 his feet and grabbed one of victim's hands.  Subject states that

1    Mercedes and him started to -- excuse me -- started to fight.

2    Subject states he was saying what -- quote-unquote, what are you

3    doing?  Subject states that Mercedes pulled and ran toward the

4    stairs, attempting to get away.  Subject states he doesn't

5    remember what happened.  Subject states Ronnie called and

6    subject told Ronnie get over here.  I think I killed this bitch,

7    quote-unquote.  Subject stated that Ronnie shouldn't have gotten

8    rid of the body.  Questioned subject as to how he killed

9    Mercedes.  Subject stated I'm responsible.  I just don't

10   remember how.

11   Q.  Special Agent Hernandez, towards the end there you just read

12   questioned subject as to how he killed Mercedes.  So you put

13   that in there because you asked Mr. Avery how he killed

14   Mercedes?

15   A.  Yes.  And he just kept continuing to say I'm responsible.  I

16   don't remember how.

17   Q.  Detective Hernandez, is there anywhere contained in this

18   statement that you wrote out for Mr. Avery that Mr. Avery told

19   you he choked Mercedes?

20   A.  No.

21   Q.  Is there anything anywhere contained in this statement that

22   you wrote out memorializing the interview with Mr. Avery that

23   Mr. Avery told you Mercedes only had on a letter sweater?

24   A.  No.  I was trying to ascertain more details.

25            MR. STAINTHORP:  Judge, I object to the witness

1  volunteering.  Non-responsive to questions.

2         THE COURT:  That will be sustained.

3         MS. YUAN:

4  Q.  Detective Hernandez, do you recall if you were writing out

5  the statement in front of Mr. Avery while he was talking?

6  A.  I answered this last week.  I think --

7  Q.  This might help refresh your recollection.  I'm showing you

8  what's been marked as Defense Exhibit 1032.  If you would just

9  take a look at that.  And then I will have you identify that, if

10  you can.

11  A.  This is my typed out report that -- I have the handwritten

12  one, then I dictate it into a recording so the typist can type

13  it up for me.

14  Q.  So Exhibit -- defense Exhibit 1032 was actually the

15  typewritten version of what you dictated memorializing your

16  interview of Mr. Avery?

17  A.  Yes, that's correct.

18         MS. YUAN:  Defendants move Defense Exhibit 1032 into

19  evidence.

20         THE COURT:  The Court will receive it.

21         MR. STAINTHORP:  Judge, it's a little confusing

22  because it's already in evidence.  It's a Plaintiff's Exhibit.

23         THE COURT:  Okay.

24         MS. YUAN:

25  Q.  Detective Hernandez, I want to show you Page 2 of the

1  written report, just to see if this would refresh your

2  recollection as to whether or not you wrote out the handwritten

3  portion of the statement while Mr. Avery was talking, or if that

4  was done after you had the interview with him.  Do you want to

5  read this -- this last paragraph here says during my interview,

6  Mr. Avery was offered numerous cigarettes, along with black

7  coffee.  He indicated that he also did have some soda and a

8  baloney sandwich.  At the time I, Detective Hernandez, did

9  reduce Mr. Avery's interview to writing, and upon asking him to

10 sign it, he did indicate that he rather not, and I at this time

11 concluded this interview.

12 A.   That is correct.  I basically interviewed him, then after I

13 was going to put it down in writing, and he basically indicated

14 that he wouldn't sign it.

15 Q.   Did you actually write out his statement and then show it to

16 Mr. Avery?

17 A.   Yes.  Yes.

18 Q.   And so you would have talked with Mr. Avery, gotten the

19 information from him, and then reduced it to the handwritten

20 statement that we just were looking at?

21 A.   That's correct.

22 Q.   And when you hand wrote his statement, Mr. Avery did sign

23 after the reading of his Constitutional rights, is that right?

24 A.   The first part for the Miranda warnings he signed, but after

25 I wrote it out, he refused to sign it.

1  Q.  He refused to sign at the end, regarding the contents of

2  that statement?

3  A.  That's correct.

4  Q.  And during this two-and-a-half hour interview, you did

5  provide lunch for Mr. Avery?

6  A.  Yes.

7  Q.  And he was given -- he was given cigarettes and coffee?

8  A.  That's correct.  And a baloney sandwich and some soda.

9  Q.  Special Agent Hernandez, I think you explained to the jury

10  what -- why did this interview stop with Mr. Avery?

11  A.  Mr. Avery was -- you can tell that he was upset.  He wasn't

12  crying, but he had his head down.  Like his body language.  And

13  he was telling us what was going on.  But again, not a lot of

14  details.  And I could see that -- the state of mind was kind of

15  ashamed or sad for what happened.  But he just couldn't

16  remember, he said.

17  Q.  So you do remember how -- Mr. Avery's mannerisms seemed

18  during that interview?

19  A.  Yes.

20  Q.  And I think my question -- maybe you answered that, but --

21  so just so I'm clear, why did the interview stop after

22  two-and-a-half hours with Mr. Avery saying I'm responsible?

23  A.  It stopped at his request.  He didn't want to talk anymore.

24  Q.  Do you recall interviewing Mr. Avery another time after this

25  March 24th, 1998, interview that started from 10:00 to

1   12:30 p.m.?

2   A.   I believe my next interview was with Detective Katherine

3   Hein.

4   Q.   I'm going to show you what's already been marked and

5   admitted as Plaintiff's Exhibit Number 11-F.  Does this look

6   familiar to you?

7   A.   Yes.

8   Q.   So what is this document?

9   A.   This is going to be our interview of Mr. Avery the next day,

10  starting at 5:30 p.m.

11  Q.   You said the next day.  The interview started on March 24th,

12  1998, at 5:30 p.m., is that right?

13  A.   That's correct.  That's when it started.

14  Q.   So you would have interviewed Mr. Avery that same day from

15  10:00 a.m. to 12:30 p.m., is that right?

16  A.   That's correct.

17  Q.   So it was the same day.  Just later in the evening, correct?

18  A.   Right.

19  Q.   I can show you this report, if it helps.  But I want to ask

20  you first, do you recall what Mr. Avery told you during this

21  meeting?

22  A.   On this -- on this interview here it was more kind of to go

23  over the operations of the drug house.  How he -- how it was

24  operated.  We spoke about how he would split every other

25  transaction of money or dope with his brother.  And he would

```
1    talk how they would be officially open.  If the phone was left

2    outside on the porch area, everyone knew that the house was

3    open.  They could go in and purchase.

4              And they talked about that it was a place where they

5    have could have their sex acts for the drugs upstairs in the

6    attic apartment area.  He was more friendly to talk about that,

7    about the operation of that.  But regarding the homicide, you

8    could almost sense that he wasn't going to talk to you about it.

9    But we wanted to keep him talking, and we concentrated more --

10   what I recall from that report, was more on the operations of

11   the drug house.

12   Q.  Do you recall how long this interview was with Mr. Avery?

13   A.  I want to say -- was it 9 hours?

14   Q.  I know this is a long time ago, so I don't mean to make it a

15   memory test for you.  You said you believe it was 9 hours.  Is

16   that right?  And I'll just show you what's been marked and

17   admitted as Defense Exhibit 1031.  Do you recognize that

18   document?

19   A.  Yes.  It's the handwritten version of that last typed one

20   that we looked at.

21   Q.  And whose handwriting is this?

22   A.  This is Katherine Hein's.

23   Q.  And we all know you recorded the statement -- that the

24   interview began at 5:30 p.m., correct?

25   A.  Yes.
```

1  Q.  And I'm just flipping to the last page of the handwritten

2  portion.  Do you see 2:30 a.m.?

3  A.  Yes, I do.

4  Q.  So you're correct, then.  Nine hour interview.  You

5  testified that during this interview, this March 24th, 1998,

6  interview that began at 5:30 p.m., that Mr. Avery was more

7  willing to talk to you and Detective Hein?

8  A.  Yes.  But more -- what I tend was more toward the operations

9  of the drug house.

10 Q.  So he provided you information about the drug house at that

11 time?

12 A.  Yes.

13 Q.  Do you recall if he made any incriminating statements in

14 terms of -- similar to what he stated to you in the earlier

15 interview, in terms of I'm responsible for Maryetta Griffin's

16 homicide?

17 A.  Regarding the death of the Maryetta Griffin, he did not make

18 any statement that he was responsible.  We talked more about the

19 operations of the drug house.

20 Q.  And I'm again going to turn your attention to 11-F.  That

21 report, that -- that typewritten report from that March 24th,

22 1998, interview beginning at 5:30 p.m.  The third page of that

23 report, you see that second paragraph on the bottom there?

24 A.  Where Avery stated the following?

25 Q.  Avery stated that the last time he saw the victim alive was

1   on Monday evening at about 7 o'clock p.m. after they had sex.

2   He stated that he cannot remember ever seeing her after that.

3   He stated that he does not believe he was involved in the death

4   of Mercedes, because when he passed out on the couch, the only

5   person in the house was Keisha, and she was there when he woke

6   up.

7           Does that refresh your recollection as to whether or

8   not Mr. Avery admitted any kind of responsibility involving

9   Maryetta Griffin's death?

10  A.  He indicated that he didn't believe so.

11  Q.  And that's what he told you and Detective Hein?

12  A.  Right.

13  Q.  Is it unusual for interviews last 9 hours when you're

14  investigating a homicide?

15  A.  No.  Not at all.  Not at all.  They can last up -- I think

16  Katherine was involved in one that went into the 21st hour.  So

17  it was a long one.  Everyone's different.  Every investigation

18  is different.  Some people come in and take responsibility.

19  Some people will not take responsibility.  Take a longer

20  interview.  But the bottom line is they can shut you down

21  whenever they want.  All they have to say is I don't want to

22  talk to you anymore.  And they're done.  Or we're done.

23  Q.  So I want to make sure I understand.  You said all they have

24  to do is shut you down and say they don't want to talk anymore?

25  A.  Yes.  Right.

1    Q.  So you're saying Mr. Avery could have stopped this interview

2    that lasted 9 hours at any time?

3    A.  Yes.

4    Q.  Do you remember if he was given any breaks during this

5    interview?

6    A.  Oh, yes.

7    Q.  I'm turning your attention to 1031, the handwritten portion

8    of this interview with Mr. Avery.  You see this paragraph here

9    where I'm pointing?  I, William Avery, was given numerous

10   cigarettes, coffee, water, chicken dinner, and bathroom breaks

11   during this interview?

12   A.  That's correct.

13   Q.  And was Mr. Avery given bathroom breaks and cigarettes?

14   A.  Yes, he was given -- and a chicken dinner and water.

15   Anything that -- if he needed something, if we could get it for

16   him, some comfort food or anything, we got it for him.  And so

17   there were plenty of breaks.

18   Q.  Special Agent Hernandez, I know we went over that statement

19   that you took of Mr. Avery from 10:00 a.m. to 12:30 p.m. where

20   he admits -- saying I'm responsible, I just don't remember how.

21   And I think I asked you about this last week.  Whether or not

22   you considered that statement a confession.  Do you recall that?

23   A.  Yes, I do.

24   Q.  And you don't believe that that's a confession, is that

25   right?

1  A.  That's not a confession.

2  Q.  And just so the jury is crystal clear about that, why in

3  your opinion was his statement I was -- I'm responsible -- the

4  statement he told you -- and I can put that back up.  Why was

5  that not sufficient to be a confession?

6  A.  I think what -- as an investigator you have to make sure

7  that this individual is being truthful.  And as an individual

8  that was involved in a homicide, should give you a lot more

9  details.  A lot more.  This wasn't even close.  This was

10  nothing.  And that was his choice.  He just decided to stop

11  talking at that point.  And he didn't want to talk, so I

12  couldn't get any more information from him.  Sometimes when

13  you're doing an interview of an individual --

14        MR. STAINTHORP:  Judge, I think this is going way

15  beyond the question.  At this point it's becoming narrative.  So

16  I object.

17        MS. YUAN:  I think he's answering the question.

18        THE COURT:  Yeah, the Court will allow the answer.

19        THE WITNESS:  When you're interviewing a suspect,

20  there are times during my career that there's going to be

21  some -- like an emotional roller coaster.  There's going to be

22  times where he'll hit that point where he's feeling bad about

23  what he did.  Think it's his responsibility.  Or sometimes

24  you'll even see them physically -- they'll have their head down.

25  They're -- and you know that they're going to take

1    responsibility.  But sometimes what happens is they'll stand up
2    straight, and breathe in again, and say I don't want to talk.
3    And that's how it goes back up and back down.  And I felt at the
4    point that I was talking to Mr. Avery, he was down in that
5    emotional roller coaster where he was going to take
6    responsibility, but again he shuts down.  He says I don't want
7    to talk to you no more.
8            MS. YUAN:
9    Q.  And you're talking about that 10:00 a.m. to 12:30 p.m.
10   interview when he says I'm responsible, I just don't know how.
11   But then he provides no other details?
12   A.  Exactly.
13   Q.  Did you -- you did ask him how he killed Maryetta Griffin?
14           MR. STAINTHORP:  Objection to leading questions at
15   this point.  I object to leading.
16           THE COURT:  Well, I think that's already been asked
17   and answered, too.  But he -- he asked how he killed, and you
18   were going to ask the question off of that, counsel?  Is that
19   the idea?
20           MS. YUAN:  Yes, Your Honor.  I can move on.
21           THE COURT:  Sorry?
22           MS. YUAN:  Yes, Your Honor.
23           THE COURT:  Okay.  Go ahead.  See where we go with it.
24           MS. YUAN:
25   Q.  I had asked a question previously how Mr. Avery had said I'm

1  responsible, I just don't remember how.  And then before the
2  objection I think I was asking you a question, that you did ask
3  Mr. Avery how he committed this -- how he killed Maryetta
4  Griffin?
5  A.  Yes, I did.  And he basically responded that I can't
6  remember.  Like -- but he also indicated that his brother
7  shouldn't have moved the body, indicating that the body was
8  dumped.  And when you look at the crime scene photos from the
9  garage, that's the speculation -- not speculation.  That's where
10  the investigation was leading us.  Is that the body was -- not
11  all of her clothing was there.  Her slacks were missing.  In all
12  the other Walter Ellis cases --
13        MR. STAINTHORP:  Judge --
14        THE COURT:  Yeah, the objection will be sustained.
15  The witness is now conducting a narrative.  And it's
16  unresponsive.
17        MS. YUAN:
18  Q.  Special Agent Hernandez, after taking this 10:00 a.m.
19  statement from Mr. Avery, and prior to you and Detective Hein
20  meeting with Mr. Avery at 5:30 p.m. that same day, did you take
21  this case to the District Attorney's Office?
22  A.  I may have consulted with them during the investigation,
23  because I'm normally consulting my supervisors.  And the D.A.
24  may be calling and may want to know what the status is.  So I
25  may have.

1  Q.  Do you recall if you felt that this statement taken from

2  Mr. Avery on March 24th, 1998, beginning at 10:00 a.m. -- do you

3  recall if you believe that that was enough for any type of

4  homicide charge?

5  A.  Not at all.

6  Q.  Do you know if Mr. Avery was charged with any type of

7  homicide charge as a result of his statement to you and

8  Detective Phillips at that 10:00 a.m. to 12:30 p.m.?

9  A.  No, he was not charged.

10  Q.  After your interview with Mr. Avery and Detective -- oh, the

11  interview you conducted with Detective Hein of Mr. Avery at

12  5:30 p.m. that went on to the next morning, do you recall if

13  Mr. Avery was charged with any homicide charges as a result of

14  the interviews and the investigation up to that point?

15  A.  Not with the homicide charge, no.

16  Q.  Was he charged with anything else?

17  A.  I think that that report was used during his keeper of a

18  drug house charge that he was charged with.

19  Q.  So Mr. Avery, from your recollection, was charged with some

20  drug charges as a result of investigation into Maryetta

21  Griffin's homicide?

22  A.  Yes.

23  Q.  After your interview with Mr. Avery on March 24th, the later

24  interview, the one that started at 5:30 and goes into the next

25  morning, did you continue to investigate the homicide of

1  Maryetta Griffin?

2  A.  I'm sure I did, along with the new homicides that were

3  coming in.  Because we were getting them -- in Milwaukee we had

4  a lot of them.  And constantly going from assignment to

5  assignment.  And we may have put it to the side and work on the

6  fresh homicide, and then gone back to it if any further

7  follow-up leads came up.

8  Q.  So the Maryetta Griffin homicide was not your only file that

9  you were working on in March of 1998?

10  A.  That's correct.

11  Q.  So my question is, so Mr. Avery now has been interviewed at

12  least by you -- by you that one time that we talked about, where

13  he admits responsibility but doesn't give other details other

14  than what we've seen in the statement.

15  A.  That's correct.

16  Q.  And then there's that second interview by you and Detective

17  Hein where he provides details about the drug house, but denies

18  and says he does not believe he was involved with Maryetta

19  Griffin's death.  After that, was there additional investigation

20  into trying to find -- or solve this homicide?

21  A.  I'm sure there was, but I can't tell you right now.  It's

22  been such a long time.  We -- you know, if -- we -- if they're

23  open --

24          MR. STAINTHORP:  Objection.  More narrative coming

25  here.  And it's already been answered.

1    THE COURT:  Yeah, it's been asked and answered.  This

2    was put aside hopefully for following leads, and then working on

3    other cases.

4         MS. YUAN:

5    Q.  Do you recall when Mr. Avery was charged with the drug

6    charges?

7    A.  I don't.

8    Q.  Showing you a document to see if that refreshes your

9    recollection at all as to when Mr. Avery was actually charged

10   with any of the drug charges.  This is Wisconsin Circuit Court

11   Access document printed from their website.  I'm going to show

12   you another document.  Does reviewing those documents -- does

13   that refresh your recollection at all as to when Mr. Avery was

14   charged with the drug charges related to the investigation?

15   A.  Yes.  It indicates that a Criminal Complaint was signed on

16   March 28th, 1998.

17   Q.  So that's shortly after the interview that you and Detective

18   Hein had with Mr. Avery?

19   A.  That's correct.

20   Q.  Did at some point the Maryetta Griffin homicide become a

21   cold case?

22   A.  I don't -- I don't believe it was a cold case yet.

23   Q.  You said yet?

24   A.  Eventually, yes.  Because Mr. Avery was charged with the

25   keeper of a drug house, and not a homicide.  So that case at

1  that period of time probably would have turned into kind of a

2  cold case.

3  Q.  And that's my question, really.  If you recall, if at some

4  point in the months after March, 1998, if the leads in

5  investigating the Maryetta Griffin homicide were all

6  investigated and there was not a suspect in sight?

7  A.  That's correct.  If I may --

8          MR. STAINTHORP:  No.

9          THE WITNESS:  Okay.

10          MS. YUAN:

11  Q.  After March 24th, 1998, or even March 25th, 1998, you did

12  not -- you did not interview Mr. Avery again?

13          MR. STAINTHORP:  Objection.  Leading.

14          MS. YUAN:

15  Q.  Did you interview Mr. Avery again concerning the Maryetta

16  Griffin homicide?

17  A.  No, I did not.

18  Q.  Now, I want to draw your attention to March 20th, 2003.  Do

19  you recall at some point being asked to interview 3 informants

20  related to the Maryetta Griffin homicide?

21  A.  Yes, I was.

22  Q.  And what do you recall about that?

23  A.  That there were 3 individual witnesses that came forward

24  with some information.  That they were interviewed once already

25  prior to myself and Katherine Hein going to go to another

interview. So we were asked by the District Attorney's Office
to go out and conduct these interviews of these 3 individuals to
find out what they can recall.

Q. Do you remember actually having a conversation with someone
from the District Attorney's Office?

A. Yes.

Q. Who did you have a conversation with?

A. Mark Williams. A.D.A. Mark Williams, District Attorney.

Q. So he was an Assistant District Attorney?

A. Yes.

Q. And what did A.D.A. Mark Williams say to you and Kathy Hein?

A. Basically he wanted us to --

MR. STAINTHORP: Objection. Objection. Because it's
asking an out of Court statement of a third-party. Hearsay.

THE COURT: Yeah. It normally would be hearsay, but
it's not offered for the truth of the matter asserted. It's why
he took the action he did. I assume that's what it's being
offered for, is that correct?

MS. YUAN: That's correct.

THE COURT: The objection is overruled.

THE WITNESS: I was asked to go out and re-interview
these individuals to find out if there was -- if their initial
account was still the same.

MS. YUAN:

Q. Special Agent Hernandez, I'm showing you what's been marked

1  as defense Exhibit 1034.  If you can take a look at that and
2  then identify that for the jury.
3  A.  Yes.  This is a typed report of our interview with
4  Mr. Kimbrough when he was locked up in Prairie Correctional.
5  Q.  And you said our interview.  Who do you mean by that?
6  A.  Myself and Detective Katherine Hein.
7       MS. YUAN:  Defendants move Exhibit 1034 into evidence.
8       THE COURT:  The Court will receive it.
9       MS. YUAN:
10  Q.  Detective Hernandez, you already identified -- but I want to
11  make sure we go over some of the finer points here.  I think it
12  begins with the report was being dictated by Detective Hein, is
13  that correct?
14  A.  That's correct.
15  Q.  Does this report then indicate when you and Detective Hein
16  interviewed Mr. Kimbrough?
17  A.  It indicates October 20th of 2003.
18  Q.  And I don't need to go through line by line with this
19  interview, but we can use it if you need it to refresh your
20  recollection.  Are you able to tell for the jury what you recall
21  from this interview of Mr. Kimbrough?
22       MR. STAINTHORP:  Judge, I first request that he be
23  asked as to his memory, and then if he needs to refresh his
24  recollection then he does so.  But he needs to establish his
25  memory is not --

1           THE COURT:  Well, the document has been received into

2    evidence, so he can look at the document.  Is that what you want

3    to do, counsel?

4           MS. YUAN:  Yes.  And actually I thought I was asking

5    him about his memory and then stating that if he needs to look

6    at it, he can look at the report.

7           THE COURT:  Okay.  If he can.  Fine.

8           MR. STAINTHORP:  My issue is whether he has a memory.

9    But I can deal with that.  That's okay.

10          THE COURT:  Okay.  Go ahead.

11          THE WITNESS:  I think Mr. Kimbrough -- because there

12   were 3 interviews, I'll try to keep them straight.  But I think

13   Mr. Kimbrough was the one where William Avery and Antron Kent

14   were walking around the rec, around the track, basically, and

15   Mr. Kimbrough remembers some details about Mr. William Avery

16   telling Antron Kent regarding Mr. William Avery's killing a

17   young woman.

18          MS. YUAN:

19   Q.  I'm going to draw your attention to the last paragraph on

20   that first page of Exhibit 1034.  Kimbrough indicated that

21   during the time he was at North Fork Correctional is when he

22   first met William Avery.  Is that what Mr. Kimbrough told you

23   and Detective Hein?

24   A.  Yes.  Yes.

25   Q.  And again, Kimbrough -- he indicated that he met William

1    Avery through his own cellmate, Antron Kent.  He indicated that

2    he would see Avery in a computer class and out in the

3    recreational area.  And that's what you just testified to, is

4    that correct?

5    A.  That's correct.

6    Q.  And that's consistent with your memory, is that correct?

7    A.  Yes.

8            MR. STAINTHORP:  Judge, I object.  This is continual

9    leading, and I object.

10           THE COURT:  Well, it's not leading because it's

11   reading from the Exhibit.  He's being asked if the Exhibit is

12   correct.  The Exhibit is in evidence.  The jury can look at it,

13   and he can be examined from it.  So -- and the issue here is

14   whether or not these Officers are lying and put words into the

15   witness's mouth.  That's the whole crux.  Central part of this

16   case.  And so he's asking whether or not this witness -- am I

17   correct, counsel?  Whether or not this witness told him that?

18   Or whether or not he suggested it or told him to say that?  Is

19   that correct?

20           MS. YUAN:  That's correct.

21           THE COURT:  Is that where you're going with this?

22           MS. YUAN:  Yes, that's correct.

23           THE COURT:  The Court will allow the examination.

24           MS. YUAN:

25   Q.  The report goes on, he indicated that it was sometime in

1  March of 2002 when he was with Kent out in the recreation area,

2  but he could not remember the exact time, but knows it to be in

3  the afternoon.  He indicated that Avery was also present in the

4  recreation area at that time.  He indicated that this was the

5  first time when he heard William Avery talk about being involved

6  in the homicide of a female in Milwaukee.

7  A.  That's correct.

8  Q.  That's what Mr. Kimbrough told you and Detective Hein?

9  A.  Yes.

10  Q.  Kimbrough indicated that around the time that this

11  information came out, that Antron and William were cellmates,

12  and that a lot of people from the facility -- a lot of people

13  from the facility there trust Antron Kent and go to him for

14  advice.  Did Mr. Kimbrough tell you and Katherine Hein that?

15  A.  Yes, he did.

16  Q.  He indicated that Antron Kent is a religious man.  They

17  believed that his father or his grandfather may be a Pastor, and

18  that Kent is always teaching to a lot of the inmates about the

19  Bible and about religion.  Did Kimbrough tell you that?

20  A.  Yes, he did.

21  Q.  And Kimbrough told you that about Antron Kent?

22  A.  Yes.

23  Q.  He indicated that during the same period of time he noticed

24  that William Avery was going to chapel a lot also.  That he

25  appeared to be, quote, getting closer to God, end quote.  He

1  indicated that he also believed that Avery appeared to be going

2  through a, quote, depression, end quote, at about that time, and

3  appeared to be spending a lot of time with Antron Kent in the

4  chapel.

5  A.  That's correct.

6  Q.  Did Mr. Kimbrough tell you and Detective Hein that

7  information?

8  A.  Yes, he did.

9  Q.  Had you ever met Mr. Kimbrough before going to this prison

10  to interview him in March of 2003?

11  A.  No.  That's my first contact with him.

12  Q.  The next paragraph.  He indicated on the day he heard Avery

13  speak about his homicide, that he was in the recreation area

14  with Kent and Avery.  He does indicate that there was a lot of

15  people out in the recreation yard at the time.  He indicated

16  that during the time the 3 of them were just walking and

17  talking.  Did Mr. Kimbrough tell you that?

18  A.  Yes, he did.

19  Q.  At one point he heard William Avery tell Antron Kent that he

20  wanted to talk about something that was bothering him.  He

21  indicated that Antron asked Avery if it was okay for him,

22  Jeffrey, to be with them.  And Avery said that it was, quote,

23  cool, end quote, for Jeffrey to be there, and that he was not

24  worried about Jeffrey saying anything to anyone.  He indicated

25  that he was not sure what Avery and Kent were going to be

1  talking about at that time, and really did not want to get

2  involved in anything.  So he walked behind Kent and Avery and

3  could only heard (sic) parts of the conversation that was taking

4  place.

5  A.  That's correct.

6  Q.  Is that what Mr. Kimbrough told you and Detective Hein?

7  A.  Yes, it is.

8  Q.  Did you or Detective Hein show Mr. Kimbrough any statements

9  during the time you were interviewing him?

10  A.  No.

11  Q.  Did you or Detective Hein provide any information to

12  Mr. Kimbrough about anything concerning the homicide during your

13  interview of Mr. Kimbrough?

14  A.  We did not, no.

15  Q.  The next paragraph goes:  Jeffrey indicated that he heard

16  Avery tell Kent that he was having trouble sleeping.  That

17  something was bothering him.  He indicated that Kent asked him

18  if he wanted to talk about it, and Avery said that he did.  He

19  indicated that he overheard Avery tell Kent that he had a quote,

20  spot, end quote, which he believed to mean a, quote, drug house,

21  end quote, where he was selling drugs and getting money.  Did

22  Mr. Kimbrough tell you that?

23  A.  Yes, he did.

24  Q.  He indicated that he would do a lot of dope dating at that,

25  quote, dope house, as well as sell drugs.  On one particular

1  evening he was with a, quote, hype, end quote, parentheses, dope

2  fiend, end quote -- I'm sorry, end of parentheses. And that he

3  had given this female dope fiend some drugs for sex, and that

4  she smoked it. He remembers Avery saying something about

5  falling asleep, and that when he woke up in the morning, that

6  this female dope fiend was stealing his money or stealing his

7  drugs, but he could not be sure. Did Mr. Kimbrough tell you

8  that?

9  A.  Yes, he did.

10  Q.  And he told you that that's what he overheard Mr. Avery say?

11  A.  That's correct.

12  Q.  He said that Avery told Kent that he, quote -- strike that.

13  He said that Avery told Kent that, quote, he just snapped and

14  choked the bitch, end quote. Jeffrey Kimbrough indicated that

15  he said he told Antron something about this woman's eyes rolling

16  to the back of her head, and she was making a choking sound, and

17  that this is what Avery was seeing at night when he would fall

18  asleep. This is what was bothering him. Kimbrough went on to

19  relate that Avery told Kent that the woman had stopped

20  breathing, and that he realized he had killed her. Did

21  Kimbrough tell you that?

22  A.  Yes.

23  Q.  Avery called up one of his, quote, guys, end quote, to help

24  him get rid of the body. He remembers hearing something about

25  his guy coming over with a truck, and they dumping her body

somewhere, but does not remember saying exactly where.  He
indicated that these statements were statements that Avery was
making directly to Kent, and are only bits and pieces of the
conversation.  Is that what Kimbrough --

THE COURT:  Counsel, could we -- can we go to the --
what I suggested before.  Ask the witness if there's any
information or are there any details in this report that
Kimbrough gave to the Detectives that was provided to him.

MS. YUAN:  Yes, I understand, Your Honor.

THE COURT:  And not that those were statements or
details that he gave before Kimbrough made the statement or
statements.  In other words, can we just generally say anything
in this document.  I think that's where you're going with this.
Is there anything in this document that you've told him that he
told back from you?  Or that you suggested to him that -- or
were these his words and not yours?  I mean, I think then we can
say that -- we can go to the document, can get the portions of
those documents that were suggested.  Or the witness said that
he talked about before the statement was made.  Do you
understand?

MS. YUAN:  I understand.

THE COURT:  Shorten.  Don't have to read the whole
document, say did you say this?  Did he say that?  Did you say
this?  Or did he say that?  I mean, the document is in evidence,
right?  So why don't we just ask the witness whether or not he

1  suggested this or gave the information to Kimbrough before

2  Kimbrough made the statements to him.

3       MS. YUAN:  No, I do understand, Your Honor, and I'll

4  try to shorten it up.  It's just this last page, but I do

5  understand your point.

6  Q.  Special Agent Hernandez, was there any information that's

7  contained in this report from the October 20th, 2003, interview

8  of Jeffrey Kimbrough that was provided by you or Detective Hein?

9  A.  No, nothing was provided to him.  Nothing.

10 Q.  So is it fair to say that the information contained in this

11 report memorializing you and Detective Hein's interview of

12 Mr. Kimbrough is information that came solely from Mr.

13 Kimbrough?

14 A.  Yes, it is.

15 Q.  I'm not going to read every single line, Your Honor.  But

16 Special Agent Hernandez, I did want to ask you -- in the middle

17 of this paragraph, if you would review that, did Mr. Kimbrough

18 make any statement to you and Detective Hein about how he felt

19 when he heard or overheard this statement by Mr. Avery?

20 A.  He was fearful of retaliation.

21 Q.  By who?

22 A.  By -- from Mr. Avery.

23 Q.  And Mr. Kimbrough offered that information to you and

24 Detective Hein?

25 A.  Yes.

1    Q.  Was that something that was suggested to him by you or

2    Detective Hein?

3    A.  No, not at all.

4    Q.  And just drawing your attention to the last paragraph on

5    this page.  If you will review that.  Was Mr. Kimbrough shown

6    any photographs of Mr. Kent and Mr. Avery?

7    A.  I don't remember doing that.

8    Q.  I will just draw your attention, again -- just to refresh

9    your recollection.  Can you see where I'm pointing?

10   A.  Yes.  He was shown a photo of Mr. Kent and William Avery,

11   and he positively identified the suspect he has been referring

12   to in this report.

13   Q.  Why would you show him pictures?

14   A.  Well, we want to make sure we've talking about the right

15   individual.  We want to make sure we're talking about the right

16   Antron Kent.  We want to make sure it's the right William Avery.

17   That we're all on the same page.  Is this the guy you're talking

18   about?  That's basically why we show it to him.

19   Q.  And just drawing your attention again to the last couple of

20   sentences there, beginning with Kimbrough.  If you will review

21   that.  Do you remember if you or Detective Hein asked

22   Mr. Kimbrough if he knew Mr. Kent or Mr. Avery prior to them

23   being incarcerated together?

24   A.  Right.  And he indicated he did not.

25   Q.  When you went to interview Mr. Kimbrough on October 20th,

1  2003, with Detective Hein, were you aware that he had already

2  been interviewed by other Detectives from the Milwaukee Police

3  Department?

4  A.  Yes.  Yes.

5  Q.  Did you have the prior report of what Mr. Kimbrough had told

6  other Detectives?

7  A.  Yes, I'm sure I would have reviewed them just to make sure

8  that he was -- if he was still giving the same account after

9  some time already has gone by.

10  Q.  So you wanted to be familiar with what Mr. Kimbrough had

11  told Detectives before you met with Mr. Kimbrough?

12  A.  Yes.

13  Q.  Was there anything in terms of your meeting with

14  Mr. Kimbrough in October of 2003 to make you doubt the -- or to

15  make you think it was inconsistent with what he had told

16  Detectives before?

17  A.  I just missed the very first part of your question.

18  Q.  After reviewing the reports indicating what Mr. Kimbrough

19  had told Detectives before you and Detective Hein met with him

20  in October of 2003, was there anything in terms of your

21  interview with Mr. Kimbrough that was inconsistent with what he

22  had told Detectives before?

23  A.  No, it was all consistent.

24  Q.  Special Agent Hernandez, I'm going to show what's been

25  marked as Defense Exhibit 1036.  And I will ask you to identify

1    that.  Do you recognize that document?

2    A.  Yes.  This is an interview of Randolph.

3    Q.  That's Keith Randolph?

4    A.  Yes.

5         MS. YUAN:  Defendants move Defense Exhibit 1036 into

6    evidence.

7         THE COURT:  Okay.  The Court will receive it.

8         MS. YUAN:

9    Q.  Detective Hernandez, looking at the first page of this

10   report, can you tell the jury when you and Detective Hein met

11   with Mr. Randolph?

12   A.  On Thursday, October 23rd of 2003, myself and Detective Hein

13   did interview Keith Randolph.

14   Q.  Now, is this part of the same conversation that you had with

15   Assistant District Attorney Mark Williams as to why you are now

16   interviewing Mr. Randolph?

17   A.  It's the same conversation.  He wanted us to go back and

18   verify that account.

19   Q.  So when you went to interview Mr. Randolph, it was at

20   Mr. Williams' direction?

21   A.  That's what I recall, yes.

22   Q.  And you can see in this paragraph, in case you need it to

23   refresh your recollection, but when you met with Mr. Randolph,

24   did he actually express that he thought that Detectives had

25   forgotten about him?

1   A.   Yes.   He indicated that he thought that we forgot about him.

2   Q.   What do you recall about meeting with Mr. Randolph?

3   A.   Mr. Randolph was a friend of the family.   He indicated that

4   he was a pallbearer, and that he was -- Mr. Randolph was, if you

5   would, a jailhouse attorney.   Where he would give other

6   prisoners advice.   And the best of my recollection was that

7   Avery approached him and asked him to take a look at some of his

8   paperwork.

9   Q.   Now, showing you Page 2 of this report that we were just

10  talking about that summarizes the interview with Mr. Randolph.

11  Near the middle it says Keith Randolph indicated that Avery

12  asked him to look at some of his legal papers and that he agreed

13  to do so, and he does remember reading the discovery papers that

14  were given to him by Avery.   And you were -- you just testified

15  that Mr. Randolph, per your recollection, was a jailhouse

16  lawyer?

17  A.   That's correct.

18  Q.   And that he had helped Mr. Avery in some of his legal

19  matters?

20  A.   That's correct.

21  Q.   And you and Detective Hein put right there in that report

22  that Mr. Randolph did review some discovery papers, is that

23  right?

24  A.   That's correct.

25  Q.   Where did you -- you got that information from Mr. Randolph?

1   A.  Yes, I did.

2   Q.  During your interview of Mr. Randolph -- strike that.  Did

3   Mr. Randolph tell you and Detective Hein that he wanted to --

4   that he spoke with Mr. Avery, and Avery told him he wanted to

5   tell him what really happened?

6   A.  Yes, he did tell me this.

7   Q.  And what do you recall Mr. Randolph telling you about that?

8   What Mr. Avery told him?

9   A.  Mr. Avery told Mr. Randolph again in regard to the event of

10  Maryetta -- of Maryetta Griffin's death, to the point where she

11  came over again.  And what I remember was about her going

12  through his pockets, and again he ended up fighting with her,

13  and he talked about how he choked her.  And the last part I

14  can't remember if he indicated about getting rid of the body.

15  Q.  I'll show you again the bottom of Page 2 of that Exhibit.

16  So Mr. Randolph told you that Mr. Avery told him that he was

17  with this female victim, who was a prostitute?

18  A.  That's correct.

19  Q.  And that they had done some drugs together.  And that's what

20  was recorded in this report, and that's what Mr. Randolph told

21  you and Detective Hein?

22  A.  That's correct.

23  Q.  And Mr. Randolph told you and Detective Hein that Avery told

24  him when he woke up in the morning he caught this prostitute

25  going into his pockets, stealing his dope.  Is that what

1   Mr. Randolph told you and Detective Hein that Mr. Avery told

2   him?

3   A.  Yes.

4   Q.  And as you had just said, you recall Mr. Randolph telling

5   you, Mr. Avery telling him, he choked her.  And that's here in

6   this report as well, is that right?

7   A.  That's correct.

8   Q.  So Mr. Randolph told you and Detective Hein that Avery --

9   Mr. Avery told him this woman was taking -- or stealing drugs or

10  dope from his pockets?

11  A.  That's correct.

12  Q.  Did Mr. Randolph tell you and Detective Hein that Mr. Avery

13  told him he would choke the victim and then would check his

14  pockets again?

15  A.  Yes.

16  Q.  Did Mr. Randolph tell you and Detective Hein that Avery --

17  Mr. Avery told him that he slapped the bitch again, and started

18  choking her until she passed out?

19  A.  Yes, he did.

20  Q.  Did Mr. Randolph tell you and Detective Hein that Mr. Avery

21  told him that when he realized this victim was not coming to,

22  like the first time that he had slapped and choked her, that he

23  began to panic?

24  A.  That's correct.

25  Q.  And Mr. Randolph told you that Mr. Avery told him that he

1    then called his workers, who came over and wrapped up the body

2    in a rug or something?

3    A.   That's correct.

4    Q.   Did you or Detective Hein mention to Mr. Randolph anything

5    about the victim being wrapped up in a rug?

6    A.   No.  No.

7    Q.   And you testified earlier to seeing crime scene photos, and

8    also photos of the victim, in terms of how she was found at the

9    scene?

10   A.   Yes.

11   Q.   Did you see any photos of Maryetta Griffin wrapped up in a

12   rug?

13   A.   I don't remember that.

14   Q.   What kind of -- what do you recall of photos of her?

15   A.   I just remember that she was naked, and she had her high

16   school sweater on.  Or a high school sweater on from North

17   Division.

18   Q.   Did you or Detective Hein show Mr. Randolph photographs of a

19   woman wrapped up in a rug?

20   A.   No.

21   Q.   Would you have done that?

22   A.   Never.

23   Q.   And then later on in this report -- you can see where I'm

24   indicating -- Mr. Randolph then told you and Detective Hein that

25   Mr. Avery indicated he had woke up a subject named Little "C",

1  who was asleep at the time, and that when Little "C" came into

2  the room, Little "C" was upset about what he saw.  And that's

3  what Mr. Randolph told you that Mr. Avery told him?

4  A.   Exactly.  Yes.

5  Q.   Did you or Detective Hein mention a Little "C" to

6  Mr. Randolph?

7  A.   No.

8  Q.   And Mr. Randolph told you that Mr. Avery told him that this

9  worker and Little "C" got rid of the body, basically?

10  A.   Yes.

11  Q.   And Mr. Randolph actually said to you that Mr. Avery told

12  him -- after Mr. Randolph asked him where they took the girl's

13  body -- that Mr. Avery told him it was somewhere near the area

14  of 9th and Burleigh Street?

15  A.   That's correct.

16  Q.   Did you or Detective Hein say anything to Mr. Randolph about

17  9th and Burleigh?

18  A.   No.

19  Q.   Or about Burleigh Street in general?

20  A.   No.

21  Q.   So 9th and Burleigh -- that information came from

22  Mr. Randolph?

23  A.   Yes.

24  Q.   And just directing your attention to this last full

25  paragraph on this page, Mr. Randolph told you and Detective Hein

1  that he's familiar with the drug house that Mr. Avery frequented

2  in the area of North 19th and West Keefe.  Is that correct?

3  A.  Yes.

4  Q.  Did you or Detective Hein provide those cross streets to

5  Mr. Randolph?

6  A.  No.  We wouldn't have done that.

7  Q.  And just the last part of this page here.  Mr. Randolph then

8  tells you that since he had talked with Detective Heier, that he

9  and Lorraine Bowers are no longer associated with each other.

10  And that's information that Mr. Randolph is providing to you and

11  Detective Hein?

12  A.  That's correct.

13  Q.  And he told you and Detective Hein that he's not sure if

14  she's still living at the address that's provided there, but

15  still believes that she might cooperate with the Police.  Is

16  that right?

17  A.  That's correct.

18  Q.  Special Agent Hernandez, this is that handwritten page that

19  you wrote out during your interview of Mr. Avery on March 24th,

20  1998, at 10:00 a.m. to 12:30 p.m.  Drawing your attention to

21  this paragraph where I'm indicating, you wrote down subject

22  states that he was awaken by Mercedes going into his pockets,

23  pulling out his money.  Is that correct?

24  A.  That's correct.

25  Q.  And that's what Mr. Avery told you?

1   A.  That's what he told me.

2   Q.  And this report that you and Detective Hein completed of the

3   interview with Mr. Randolph, towards the bottom here, that page,

4   Mr. Randolph was telling you that Mr. Avery told him that when

5   he woke up in the morning that he caught this prostitute going

6   into his pockets and stealing his dope.  Is that right?

7   A.  That's correct.

8   Q.  And that's what Mr. Randolph told you and Detective Hein?

9   A.  That's correct.

10  Q.  Did you tell Mr. Randolph -- well, actually Mr. Avery said

11  it was money?

12  A.  No.

13  Q.  Did you try to smooth out that inconsistency?

14  A.  No.

15  Q.  And the statement again that you wrote out recording the

16  interview that you had with Mr. Avery, Mr. Avery tells you

17  subject states he doesn't remember what happened.  Subject

18  states Ronnie called subject.  Told Ronnie get over here.  I

19  think I killed this bitch.  Subject stated that Ronnie shouldn't

20  have gotten rid of the body.  Do you know who Ronnie was when

21  you took the statement of Mr. Avery?

22  A.  I could have.  I could have.  I just don't remember at the

23  time.

24  Q.  Do you know who Ronnie is now?

25  A.  Ronald Frost.

1  Q.  Ronnie Frost?

2  A.  Ronnie Frost.

3  Q.  Just in case you need this to remember, that's what Mr.

4  Avery told you, was that Ronnie shouldn't have gotten rid of the

5  body?

6  A.  That's correct.

7  Q.  During your interview of Mr. Randolph with Detective Hein,

8  Mr. Randolph told you that Mr. Avery told him it was one of

9  Mr. Avery's workers and Little "C" that got rid of the body?

10 A.  That's correct.  That's what he told us.

11 Q.  Did you tell Mr. Randolph well, actually, it's this man

12 named Ronnie that got rid of the body?

13 A.  No, I wouldn't do that.

14 Q.  Did you try to smooth out that inconsistency in writing this

15 report?

16 A.  No, I wouldn't do that.

17 Q.  We went over this report in detail, the report memorializing

18 your interview of Mr. Randolph with Detective Hein.  Was there

19 anything in that report that was provided that Mr. Randolph said

20 to you and Detective Hein that was actually information provided

21 by you or Detective Hein?

22 A.  No information was provided to him.  None at all.

23 Q.  Did you tell Mr. Randolph I'm going to speak with the

24 District Attorney or the State's Attorney on your behalf?

25 A.  No.

1  Q.  Did you make any promises to Mr. Randolph about what you

2  would get for him if he were to help or cooperate in this

3  investigation?

4  A.  No promises were made.

5  Q.  Special Agent Hernandez, I'm showing you what's been marked

6  as Defense Exhibit 1035.  If you can review that and identify

7  that for the jury?

8  A.  This is the interview of Mr. Kent.  Antron Kent.

9  Q.  What's the date of the interview?

10  A.  Date of the interview would be October 23rd, 2003.

11  Q.  That's the same date that you and Detective Hein interviewed

12  Mr. Randolph, is that correct?

13  A.  That's correct.

14  Q.  And again, just so it's crystal clear for the jury, you and

15  Detective Hein went to interview Mr. Kent -- well, why did you

16  and Detective Hein go to interview Mr. Kent?

17  A.  Basically per the District Attorney, Mark Williams, to go

18  and re-interview these individuals to see if they're still

19  willing to cooperate, and if their -- and if their statement

20  is -- still is the same statement.

21  Q.  Did you have a chance to review this report?  Actually I'll

22  put it right back in front of you.  I did ask you to review it

23  so you could identify it for the jury.  Did you have an

24  opportunity to look over the report?

25  A.  Yes.  This is a typed version of the interview of Antron

1  Kent.

2  Q.  Is there anything contained in this report pertaining to

3  what Mr. Kent told you and Detective Hein during this interview

4  that was provided to him by you or Detective Hein?

5  A.  No information was provided to these individuals.  None at

6  all.

7  Q.  According to the report, this interview took place at

8  2:00 p.m. on October 23rd, 2003?

9  A.  Yes.

10  Q.  Mr. Kent said that he did remember being interviewed by

11  Detectives Heier and Armbruster in August of 2002?

12  A.  That's correct.

13  Q.  Did Mr. Kent tell you and Detective Hein that he was still

14  willing to cooperate with this investigation?

15  A.  Yes.

16  Q.  Did Mr. Kent tell you and Detective Hein that everything he

17  had told Detective Heier and Armbruster in that 2002 interview

18  about Mr. Avery was correct?

19  A.  That's correct.

20  Q.  Do you recall what happened during this interview with

21  Mr. Kent?

22  A.  Antron Kent related basically the -- somewhat -- or the same

23  scenario of female victim came up, and how he was -- she was

24  taking something out of his pockets.  And then Antron even

25  indicated that Mr. Avery choked her, and he even showed the

1  gesture on how he did it.  And that someone was called to remove

2  the body.

3  Q.  Showing you Page 2 of this typewritten report.

4        THE COURT:  Has that been received?

5        MS. YUAN:  Oh, I'm sorry, Your Honor.  I had the

6  witness identify this.  Defendants move Defense Exhibit 1035

7  into evidence.

8        THE COURT:  The Court will receive it.

9        MS. YUAN:

10  Q.  Okay.  So just calling your attention to the middle of this

11  paragraph here he, being Kent -- do you recall Mr. Kent telling

12  you that Mr. Avery told him that when Mr. Avery woke up in the

13  bedroom in the morning, he saw this female that he had sex with

14  stealing his dope from him?

15  A.  That's correct.

16  Q.  Do you remember Mr. Kent telling you that Mr. Avery told him

17  he could not remember exactly where this dope was?

18  A.  That's correct.

19  Q.  Do you recall Mr. Kent telling you that Mr. Avery explained

20  to him that he had jumped up and put both of his hands around

21  this female's neck?

22  A.  Yes.

23  Q.  Do you recall Mr. Kent telling you that Mr. Avery

24  demonstrated the type of choking hold?

25  A.  Yes, he did.

1  Q.  Did Mr. Kent demonstrate that for you and Detective Hein?

2  A.  Yes.

3  Q.  Do you recall Mr. Kent telling you and Detective Hein that

4  Mr. Avery told Mr. Kent that the victim was gasping for air, or

5  making a choking noise, and her eyes were going to the back of

6  her head?

7  A.  That's correct.

8  Q.  Do you recall Mr. Kent telling you that Mr. Avery told him

9  that that's what he sees when he goes to bed at night?

10 A.  That's correct.

11 Q.  Do you recall Mr. Kent telling you that Mr. Avery told him

12 he knew he killed this girl?

13 A.  Yes.

14 Q.  And that Mr. Avery then called his guy, Lorenzo, and that

15 Lorenzo came over right away.  And that he and Lorenzo placed

16 the female into a vehicle that Lorenzo owned?

17 A.  Yes, that's correct.

18 Q.  And do you recall Mr. Kent telling you and Detective Hein

19 that Mr. Avery told him that he and Lorenzo dumped this girl's

20 body somewhere?

21 A.  That's correct.

22 Q.  Did you tell Mr. Kent that Mr. Avery told you the victim was

23 stealing money from his pockets?

24 A.  No, I did not tell him anything.

25 Q.  Did you try to make the fact that Mr. Kent is telling you

1  that Mr. Avery told him she was stealing dope from someplace --

2  to try to smooth out that inconsistency with what Mr. Avery told

3  you earlier?

4  A.  No.  No.

5  Q.  Starting just at the very end here on this page he, meaning

6  Mr. Avery, indicated that it was Lorenzo who made the decision

7  on where to dump the body, and believed that it was somewhere in

8  an alley, but indicated that William was not specific at the

9  time.  Is that what Mr. Kent told you?

10  A.  Yes.

11  Q.  And did Mr. Kent then tell you that Mr. Avery told him that

12  he cleaned up -- he and Lorenzo cleaned up the truck and cleaned

13  up his spot?

14  A.  The spot, yes.  And the truck.

15  Q.  Did Mr. Kent tell you that at first he didn't believe

16  Mr. Avery?

17  A.  Yes.

18  Q.  Did Mr. Kent tell you that Mr. Avery talked to him about

19  this event more than once?

20  A.  Yes.

21  Q.  Did Mr. Kent tell you that he didn't want to ask Mr. Avery

22  any questions, because he didn't want to tip Mr. Avery off to

23  the fact that he, Mr. Kent, was going to talk to the Police?

24  A.  Yes, he did indicate that.

25  Q.  And did Mr. Kent tell you that he actually did make contact

1   with Detective Armbruster of the Milwaukee Police Department?

2   A.  Yes.

3   Q.  Did Mr. Kent tell you that he was willing to testify against

4   Mr. Avery?

5   A.  Yes, he did indicate that.

6   Q.  Again at the bottom here.  Was Mr. Kent shown a booking

7   photo of Mr. Avery?

8   A.  Yes, he was.

9   Q.  And again, why would you show Mr. Kent a booking photo of

10  Mr. Avery?

11  A.  Again, just to confirm that we're talking about the right

12  individual.

13  Q.  Special Agent Hernandez, did you make Mr. Kent any promises

14  to provide this information to you and Detective Hein?

15  A.  No promises were made.

16  Q.  Did you tell Mr. Kent that you would try to get a reduction

17  in his sentence if he were to cooperate?

18  A.  No, I did not.

19  Q.  Was the only reason that you were there to interview

20  Mr. Kent, Mr. Kimbrough, and Mr. Randolph due to the

21  instructions of the District Attorney's Office?

22  A.  Yes.

23  Q.  Up until that point when you were talking with these 3

24  informants, the Maryetta Griffin homicide was unsolved, correct?

25  A.  Yes.

1  Q.  Other than these interviews that you have just testified to

2  of Mr. Kimbrough, Mr. Randolph, and Mr. Kent, were you at this

3  time in 2002, 2003, actively investigating Mr. Avery for

4  Maryetta Griffin's homicide?

5  A.  Yes.

6  Q.  How were you investigating?

7  A.  Well, we knew that we didn't -- that we felt that he was

8  still involved, and that he was a potential suspect.  But at

9  this time all we had was the charge of keeper of a drug house.

10  We quite didn't have all of the answers, if you would.

11  Q.  After -- strike that.  You had testified earlier that Mr.

12  Avery was charged in -- on March 28, 1998, of the drug charges?

13  A.  That's correct.

14  Q.  Are you aware that he was convicted later that year in 1998

15  of the drug charges?

16  A.  Yes.

17  Q.  In 1999 and 2000, prior to Mr. Randolph contacting the

18  Milwaukee Police Department, were you actively investigating

19  Mr. Avery for the Maryetta Griffin homicide?

20  A.  No.

21          MS. YUAN:  I have no further questions right now.

22          THE COURT:  All right.  Cross examination.  But before

23  we do that, Mr. Stainthorp, we'll take the afternoon break,

24  ladies and gentlemen.  Please don't discuss the case.  We'll see

25  you back here after the break.

1    (Whereupon the jury was excused at 3:14 p.m.)

2    THE COURT:  Okay.  Take about 15.

3    (Whereupon a recess was called by the Court.  Upon

4    conclusion of the recess, the proceedings continued as when the

5    jury was returned to the courtroom at 3:38 p.m.:)

6    THE COURT:  Mr. Stainthorp.

7                    <u>**CROSS EXAMINATION**</u>

8    **BY MR. STAINTHORP:**

9    Q.  Special Agent Hernandez, would you agree with me that you

10   just testified in great detail, with great particularity, both

11   about your interview with Mr. Avery on March the 24th, and your

12   various interviews with the jailhouse informants that you

13   conducted?

14   A.  Yes.

15   Q.  You'd agree that was a great deal of detail, correct?

16   A.  Yes.

17   Q.  Were you testifying to what you actually recalled?

18   A.  I testified to what's in the report.

19   Q.  You just said you testified to what's in the report?

20   A.  And some of my recall.

21   Q.  Okay.  Well, my understanding of your testimony now for the

22   past hour was that you were testifying as though you actually

23   recalled these events.  Is that incorrect?

24   A.  I recalled what was in the report, and what was in my

25   memory.

1  Q.  So essentially -- essentially all you were doing was reading

2  in to this jury what's in your reports, correct?

3  A.  I was reading a factual report.  A correct report.  An

4  accurate report.

5  Q.  In fact, you have no recollection of the interview with

6  Mr. Avery on March the 24th, do you?

7  A.  I have some.  Yes, I do.

8  Q.  You have a very limited recollection of what's in that

9  interview on March the 24th, don't you?

10 A.  The reports are made to -- so it can help with my recall.

11 And what's in the report is factual, correct.

12 Q.  You testified at a deposition in this case, correct?

13 A.  I have.

14 Q.  And you were asked questions about the March the 24th, 1998,

15 interview with Mr. Avery, correct?

16 A.  Yes.

17 Q.  You said you had no recollection about it, correct?

18 A.  I may.  I don't recall.

19 Q.  Okay.  And you were sworn to tell the truth on that

20 occasion, correct?

21 A.  I always tell the truth.

22 Q.  Okay.  Sir, you were sworn to tell the truth when you gave

23 your deposition, correct?

24 A.  Always tell the truth, yes.

25 Q.  Were you sworn on that date?

1   A.   Yes, I was.

2   Q.   Okay.  And you, in answer to questions, said you had no

3   recollection independent of reports of that March the 24th,

4   1998, interrogation.  Correct?

5   A.   I have some recall when it comes back to me.

6   Q.   Okay.  So let's talk about that.  Then you were shown the

7   reports at your deposition, and you still essentially had no

8   recall, correct?

9   A.   I don't recall.  I probably was told to look at the reports.

10  I'm not quite -- I'm sure I was.

11  Q.   You're not quite sure?

12  A.   I'm sure I was.

13  Q.   You were shown the reports, weren't you?

14  A.   Yes.  Yes.

15  Q.   And you still essentially had almost no recall of that

16  interview on March 24th, correct?

17              MS. YUAN:  I'm just going to object that this

18  misstates his testimony from his deposition.

19              THE COURT:  No, overruled.  The answer will stand.

20              MR. STAINTHORP:

21  Q.   Go ahead.  You recall the question?  Even after reviewing

22  the reports you essentially had no recollection of that

23  interview with Mr. Avery on March the 24th, correct?

24  A.   I can't remember what exactly I indicated back then, but

25  you're asking me today?  Some things I do recall.

1  Q.  Okay.  So let's talk about -- and by the way, I thought when

2  you testified here last week, you said you had no recall of that

3  interview.  Wasn't that your testimony in front of this same

4  jury last week?

5  A.  You're going to have to show me that.

6  Q.  Okay.  You don't recall what you testified to last week?

7  A.  I'm just not sure what you're referring to, sir.

8  Q.  I'm asking you whether you -- last week, sworn to tell the

9  truth, in front of this jury, told this jury in answer to my

10 questions that you essentially did not recall the March 24th,

11 1998, interview with Mr. Avery?

12 A.  I don't recall what I told you last week.

13 Q.  Okay.

14 A.  Regarding that question.

15 Q.  Well, would that have been true last week?  If you testified

16 last week you had no recollection of that interview?

17 A.  I guess what I'm trying to get to you, and my point across,

18 is that there's times I recall upon referring to my reports.

19 And I do recall some of the things of our interview.

20 Q.  Okay.  But now you acknowledge at your deposition you were

21 shown the reports and you said you still had no recollection of

22 the major portions of your interview with Mr. Avery on

23 March 24th, is that correct?

24 A.  I don't know what portions, but I can tell you that's the

25 truth, what's written on that report.

1  Q.  Do you agree that at your deposition you were shown the

2  reports of your interview and you essentially had no

3  recollection of that interview?

4  A.  That deposition was quite a long time ago, and I don't

5  remember exactly how I answered your question, or what I

6  answered in that deposition.  I don't.

7  Q.  Okay.  Well, do you recall being asked this question.  This

8  is Page 73.  And at your deposition -- and this is line 12.

9  Okay.  Apart from what's in the reports, do you have an

10  independent recollection of any of your interviews with

11  Mr. Avery?  No, I don't.  Were you asked that question and did

12  you give that answer?

13  A.  If that's what your record says, yes, I did give that

14  answer.

15  Q.  Okay.

16  A.  And at that point maybe that was my -- what I could only

17  recall.  As I've been reading these reports for the last two

18  weeks, I've been going through all this material, and things do

19  come back.

20  Q.  Question, line 16.  Okay.  So your recollection of those

21  interviews are limited to what's in the written report?  That's

22  correct.  Were you asked that question?  Did you give that

23  answer?

24  A.  Same answer.  Again, for the last two weeks I've been

25  sitting here, reading these reports.  And the recall does come

1  back.

2  Q.  So let's talk about how this recall came back to you in the

3  last two weeks.  Were you having some discussions with people?

4  A.  No.  I had a copy of my report.  My reports that I testified

5  today, and I reviewed them.

6  Q.  Okay.  So when was it that this recall returned to you?

7  A.  I couldn't tell you.  As I sit here, I couldn't tell you.

8  Q.  You can't tell me when you recalled --

9  A.  No.  As I sit here and read these reports, things come back.

10  Little pieces come back.  That's how the brain works.

11  Q.  Okay.  Did you ever correct your deposition answer that you

12  had no recall, even after reading reports?

13  A.  I never -- this is the first time I'm testifying here in

14  front of you and this jury.

15  Q.  I'm sorry, sir.  You testified before.  You testified at a

16  deposition.  You were sworn to tell the truth, exactly the same

17  --

18  A.  Exactly like I'm doing today, counselor.  Exactly like I'm

19  doing today.

20  Q.  Did you ever approach anyone and say look, I really need to

21  correct my deposition.  I said back then I didn't remember

22  hardly anything.  And now that's changed.

23  A.  I was asked today.  And again, I told you, I spoke the truth

24  and I recall more.  And I'll probably recall more if I keep

25  reading these.  If I continue to read these reports.

```
 1   Q.  Okay.  So -- so essentially what you're doing is reading the
 2   reports.  And that's essentially what you're telling the jury,
 3   is that right?
 4   A.  I'm telling you what I can recall from those reports, which
 5   are reliable and truthful.
 6   Q.  All right.  So you gave a deposition.  You were allowed --
 7   you had an opportunity before that deposition to review your
 8   reports, correct?
 9   A.  Yes.
10   Q.  Okay.  You didn't have any recollection or any significant
11   --
12   A.  I may have had some.
13          MS. YUAN:  Your Honor, I have the same objection.  I
14   think later on in his deposition -- the Attorney's misstating
15   the deposition testimony.  I have another page and line that we
16   could read in I think for completeness.
17          MR. STAINTHORP:  Judge, counsel can read anything she
18   wants in her --
19          THE COURT:  I think we can cover that on redirect.
20          MR. STAINTHORP:
21   Q.  All right.  So you had a chance to review the reports before
22   your deposition, correct?
23   A.  More than likely, yes.
24   Q.  All right.  And that was an important event, wasn't it?  You
25   were being sued.
```

1  A.  Very important.

2  Q.  All right.  So you made an effort at that time to remember

3  what had occurred, correct?

4  A.  Yes.

5  Q.  And essentially in your deposition you couldn't remember

6  what occurred at that 3/24 session, correct?

7  A.  Correct.

8  Q.  Then you were shown the reports during the deposition,

9  right?

10  A.  Right.

11  Q.  And you couldn't recall then any significant parts of the

12  3-24-98 --

13  A.  I'm not sure what exactly you're asking.  What I do recall

14  or don't recall.

15  Q.  Well, I'm wondering how suddenly, all of a sudden, after

16  last week saying you couldn't recall --

17  A.  14, 15 years ago.  I'm trying to recall the best I can, sir.

18  Q.  Sir, let me finish.  I'm wondering how magically after last

19  week telling me, under oath, that you couldn't recall the 3/24

20  interrogation of Mr. Avery, you come in today and have an

21  extremely detailed recall of it?

22  A.  I was reading the report.  Bits and parts do come back.

23  Q.  When were you reading this report when bits and parts came

24  back?

25  A.  I answered that.  The last two weeks I've been sitting here.

1  Week-and-a-half.

2  Q.  Okay.  So last week you had a recollection.  You just didn't

3  tell us?

4  A.  I'm reading my reports, and I'm being asked questions today,

5  and I'm answering your questions, sir.

6  Q.  Okay.  But I'm wondering when this -- when this recollection

7  returned?

8  A.  I can't tell you when things -- I could sit down again and

9  start reading more, and more things might come back to me.

10  Q.  Okay.  So we never know -- we could be asking you something

11  in half an hour, and you'd be giving a different answer, is that

12  right?

13  A.  No, that's not right, sir.  That's not right at all.

14  Q.  All right.  So just to be clear, you have never corrected

15  your deposition testimony when you testified under oath that you

16  have no significant recollection of the March the 24th, 1998,

17  session with Mr. Avery.  Correct?

18  A.  I've never changed it, no.

19  Q.  No?  You don't think you've changed it?  Question:  Apart

20  from what's in the reports, do you have an independent

21  recollection of any of your interviews with Mr. Avery?  No, I

22  don't.  You don't think you've changed up from that?

23  A.  At that time, when they asked me that question, that was a

24  truthful answer.  And today they're asking me the question

25  again, how many months ago, and I'm answering it correctly and

1  truthfully.  Those reports, as I read them today, were the

2  actual recording of what took place in those interviews.

3  Q.  I understand, sir, that those are the reports.  But what I'm

4  asking you is are you just reading reports to the jury?  Or do

5  you have an independent recollection?

6  A.  I answered that question.  I told you that some bits and

7  parts do come back.  I'm not drawing a blank here.

8  Q.  Can you tell what are the bits and parts that you actually

9  have an independent recollection of?  And what are the bits and

10  parts?

11  A.  Some things I do, and some things I don't, sir.

12  Q.  Can you identify for us which of the parts you actually

13  recall?  And which of the parts you're actually just reading in

14  a report?

15  A.  I can recall the part where your client, Mr. Avery, was

16  making comments about he's responsible.  And I think I described

17  it in my deposition the first time.  How his body language was

18  kind of dropping.  And you could tell that something was

19  bothering him.  And I think I testified to that back then during

20  that.

21  Q.  Okay.  But anything else that you recall that is an actual

22  recollection, other than you just reading in a report?

23  A.  I remember testifying I think that -- the 3 interviews that

24  we did.

25  Q.  You're talking about the jailhouse interviews, correct?

1  A.  Not every detail of those interviews do I recall, but I

2  recall some things.  That's what I'm trying to explain.

3  Q.  Do you actually recall those jailhouse interviews?  Or

4  you're just reading a report?

5  A.  I remember making the comment that one of them looked like a

6  really nice young -- was wearing dark framed glasses.  Very

7  polite.  I remember commenting that during the deposition.  So I

8  do remember some things.

9  Q.  That's true.  You do.  That was about it, though, in terms

10  of your recollection of the interviews, correct?  This is the

11  guy that poured acid on his (sic) face, right?  You said he made

12  a very good impression with you?

13  A.  I believe I identified the wrong one back then.  It was

14  another one, someone told me.

15  Q.  Oh, someone told you you were wrong?

16  A.  I think I asked the counselor that was questioning me.  I

17  said I believe that one of them was very clean cut and very well

18  mannered.  And he said oh, you mean this guy.  Something like

19  that.

20  Q.  All right.  That was essentially the extent of your

21  recollection of the jailhouse interviews back when your

22  deposition was taken, correct?

23  A.  I would say that's correct.

24  Q.  All right.  In fact, you were asked this question:  Okay.

25  Do you have an independent recollection --

```
 1              MS. YUAN:  What line?  What page?

 2              MR. STAINTHORP:  Page 116, line 18.

 3              MS. YUAN:  One minute, please.  116?

 4              MR. STAINTHORP:  Yes.  116, line 18.

 5   Q.  Okay.  Do you have an independent recollection of either of

 6   those 3 interviews?  Answer:  Not independent.  No, I don't.

 7   Did you give that answer?

 8   A.  Yes, I did.

 9   Q.  Was that true then?

10   A.  At the time, yes.  But I remember more as I go on.  As I

11   read these reports, it comes back to me.

12   Q.  And again, with respect to your testimony here today, your

13   extremely detailed testimony as to those jailhouse interviews,

14   have you ever corrected this answer in your deposition that, no,

15   I don't remember those interviews?

16   A.  I don't remember -- I don't remember what I said about --

17   when those -- when you took those depositions.  And now you're

18   bringing it up to me and said well, okay.  But I'm telling you

19   today I remember more.  It's not like I'm trying to be

20   deceitful, or hide or anything.  I'm testifying off of my

21   reports, which are reliable and truthful.

22   Q.  And certainly today you testified at great length about an

23   interview that you did with Mr. Kent.  That's -- that is the guy

24   who threw the acid on his girlfriend, by the way -- Antron Kent,

25   that you did on October the 23rd of 2003.  Do you recall that
```

1    testimony?

2    A.   With whom?

3    Q.   Antron Kent.

4    A.   Yes, I referred to my reports today on that.

5    Q.   Okay.  And when you were testifying to the jury, were you

6    testifying to your recollection?  Or just to what's in the

7    report?

8    A.   A little bit of both.

9    Q.   Okay.  Which portion of it?

10   A.   I can't tell you that, sir.

11   Q.   Okay.  Well, do you remember being asked this.  Page 126,

12   line 13.

13          MS. YUAN:  One second.  126?

14          MR. STAINTHORP:  Yeah.

15          MS. YUAN:  Okay.  Thanks.

16          MR. STAINTHORP:

17   Q.   Okay.  Okay.  How about with respect to Mr. Kent?  Does

18   reviewing what's been marked as Exhibit 9, the report of the

19   interview, did that refresh your recollection of your interview

20   with Mr. Kent on October the 23rd, 2003?  Answer:  No, it

21   hasn't.  But this is an actual report that I did go up there

22   with Katherine Hein.  Were you asked that question?  Did you

23   give that answer?

24   A.   Yes, I did.

25   Q.   Okay.  So you knew you went up and interviewed Mr. Kent, but

1  you didn't --

2  A.  And at that time I said, like you said, no, it hasn't.  But

3  as time passes on, and you familiarize yourself with these

4  reports, you get more recall.

5  Q.  And you never felt the need to correct your deposition

6  testimony?

7  A.  No.  It was truthful when I made those statements, and

8  it's -- I'm being truthful with you today.

9  Q.  That is not truthful -- well, are you saying that that

10  question and answer are not truthful today?

11  A.  They're truthful.  They -- both times have been truthful,

12  sir.  Both of them.

13  Q.  You never corrected that question?

14  A.  I took an oath and that was the truth.

15  Q.  Sir, you never corrected that question and answer, have you?

16  A.  As I sit here in front of you today, as I get -- as I'm

17  doing testimony, things come back.

18  Q.  Okay.  And do they come back because people tell you things?

19  A.  Because I'm reading things, sir.

20  Q.  Well, you refer to being told that you misidentified

21  someone.

22  A.  During the proceedings of the -- when I was being

23  questioned, I said I believe that could be the guy with the

24  glasses.  I thought I was correct but he said no, I think it's

25  the other one.  And that was during their -- Mr. William Avery's

1  representative, they were questioning me.  And I said fine.  And
2  again, as time goes on, my recall probably gets better.
3  Q.  So, in fact, your testimony here today is the very first
4  time that you have given a detailed account either of the
5  interrogation of Mr. Avery, or your questioning of the jailhouse
6  informants, correct?
7  A.  Ask the question one more time.
8  Q.  Yes.  Today, this afternoon, is the very first time that you
9  have ever given testimony that describes in detail your
10  interrogation of Mr. Avery on March 24th, correct?  First time?
11  A.  Today was the first time I had the actual report, and I was
12  able to basically read off of it, that was helping me to recall.
13  Q.  Okay.  You've had the report since 1998.
14  A.  I've had them for about two months, when I was served about
15  the deposition, and I reviewed the reports.  And my memory -- I
16  think I answered those questions by memory.  And today I had the
17  opportunity to have the actual report in front of me.  And it
18  makes it a lot easier to try to recall things.
19  Q.  So suddenly, 17 years -- more than 17 years after this
20  occurred, this is the first time you're testifying to an actual
21  recollection of that interview with -- of that interrogation of
22  Mr. Avery, correct?
23  A.  My recollection is getting better.
24  Q.  Sir -- okay.  Is that correct, that today is the first time
25  you have ever testified to a detailed recollection of that

1  interrogation of Mr. Avery?

2  A.  Today was the first time I had the report in front of me,

3  and I was able to testify with it, with --

4  Q.  Sir, I'm going to ask this question until you answer it.  Is

5  today the first time you have ever testified under oath that you

6  had a detailed recollection of the interrogation of Mr. Avery?

7  A.  I had detail back then.  Some details.  Some I don't, and

8  now I've got some more details.  I'm being truthful about both

9  of those.  When I testified in both.  In my depo, and I was

10  truthful the last two times I've been up in front of you, sir.

11  Q.  It's true, isn't it, sir, that much of what you said

12  today -- first of all, much of what you testified to today in

13  terms of the March 24th, 1998, interrogation of Mr. Avery, is

14  not an actual recollection.  It's reading the report?

15  A.  That's -- that's a recording of what the -- what was said to

16  me that day, which is truthful.  Which I used every day in my

17  normal 30-some years of business, that's what we rely on, on a

18  regular basis.  Is relying on those reports.  That's why those

19  reports are so important.

20  Q.  Okay.  If you can answer my question, we'll be done much

21  sooner.

22  A.  I'm going to answer that question as truthful as I can, sir.

23  Q.  Isn't it true that much of what you testified to today, in

24  terms of the 3/24 interrogation of Mr. Avery, is not what you

25  actually recall, but just reading what's in the report?

```
 1   A.  No, I disagree with you.  And I answered that question.

 2   Some of it I do recall, and some of it, reading it helps me

 3   recall it.

 4   Q.  And you can't identify for the jury which portion is your

 5   actual recollection, and which portion is what you're just

 6   reading the report?

 7   A.  They're both truthful, and they're both accurate.

 8   Q.  Can you identify what portion of your testimony today is

 9   your actual recollection?  And what portion of your testimony

10   today --

11   A.  And I answered you.  I said I can't tell you how much is

12   recall, how much is --

13   Q.  Sir, you've got to let me finish the question, okay?

14   A.  I'm trying to answer the best I can, sir.

15   Q.  Can you identify for the jury here today what portion of

16   your testimony is your actual recollection, and what portion is

17   just reading in the 3/24 report?

18   A.  I can't tell you that.  I can't even measure that.

19   Q.  Okay.  That's fine.  You've answered.  Can you tell me in

20   terms of your interrogation of the -- or your questioning of the

21   jailhouse informants, what portion of your testimony with

22   respect to the jailhouse informants is your actual recollection,

23   and what portion is just reading in reports?

24   A.  Some of it's my recollection, but with the reports here,

25   that helps me a lot.
```

1   Q.  Okay.  And can you identify what portion is your

2   recollection, and what portion is just reading in reports?

3   A.  No, I can just tell you that they're truthful and accurate.

4   Q.  That's fine.  Now, you did testify here today that the

5   3-24-1998 interrogation of Mr. Avery ended when he said he did

6   not want to continue it, correct?  That was your testimony?

7   A.  Yes.

8   Q.  Did you put that in your 3/24 report?

9   A.  I think I documented that he requested not to speak to

10  anyone, and there's a time right there.

11  Q.  Okay.  So why don't you -- you know, I'm going to give it to

12  you.  Just let you read it.  Tell me where in that report is it

13  documented that Mr. Avery -- that you document that Mr. Avery

14  said he doesn't want to continue speaking with you?

15          MR. SMOKOWICZ:  Counsel, pardon me, but can you tell

16  us what document you showed?

17          MR. STAINTHORP:  Yes, the typewritten 3/24 report.

18          MS. YUAN:  What's the Exhibit Number?

19          MR. STAINTHORP:  I'll get it for you in a second.

20  There it is.

21          THE WITNESS:  I think in my handwritten portion when I

22  was right in front of him, I think there's a conclusion time in

23  there.

24          MR. STAINTHORP:

25  Q.  It's not in that typewritten portion, is it?

1  A.  It's not in this one, but I believe it was in that one.

2  Q.  Okay.  So why don't I show you -- and the report he was just

3  reviewing is 1032, and now I'm going to show you 1030.  So this

4  is the handwritten report.  Show me where it is in there?

5  A.  It indicates that the report started at 10:00 a.m., and it

6  was concluded at 12:30 p.m.

7  Q.  Sir, you understand my question?

8  A.  I understand your question.

9  Q.  You just said that it was in the handwritten report that he

10  requested that the interview not continue, right?  You just

11  testified to that?

12  A.  Yes.

13  Q.  Where is it?

14  A.  It's not on here.

15  Q.  It's not?

16  A.  No.

17  Q.  It's not in either report, is it?

18  A.  It's not on here, and it's not on that one.

19  Q.  Okay.  So did you just make that up?

20  A.  No, I didn't make that up.  He terminated the interview and

21  it was done.

22  Q.  Is that a memory that came from --

23  A.  It's part of my recall, yes.

24  Q.  So even though you testified today that Mr. Avery requested

25  that the interview terminate, you failed to record that in

either the typewritten or the handwritten report, correct?
A. Yes. But the conclusion time is 12:30, which is two-and-a-half hours.
Q. Right. If, in fact, Mr. Avery had not requested that the interview continue, that the interrogation cease, you would have continued it, right?
A. If he -- I'm sorry. If he would have said no, I don't want to talk no more?
Q. If he did not say that, you would have --
A. Did not say what, sir?
Q. That he wanted the interrogation to cease, you would have continued the interrogation?
A. That's totally incorrect. If he didn't want to talk, I wouldn't talk to him.
Q. Not my question. You need to listen. If Mr. Avery didn't say I want this interrogation to end, you would have continued the interrogation?
A. If he said I want to continue to talk, we would continue to talk. If he said I don't want to continue to talk, we would stop at that moment.
Q. And actually my question was a little different, because my question was if he did not affirmatively say I want this interrogation to end, you would have continued that interrogation?
A. No. If he would have said I want to stop, I would stop.

1  Q.  I think you're still not understanding my question.  If
2  Mr. Avery didn't affirmatively say I want this to stop, you
3  would have continued that interrogation?
4  A.  If he would have asked for a lawyer, it would have stopped.
5  Q.  Okay.  If Mr. Avery didn't affirmatively say I want this
6  interrogation to stop, that interrogation would have continued,
7  correct?
8  A.  That interview was terminated at his request.
9  Q.  Okay.  And you just failed to record that anywhere?
10  A.  Yeah, I did.  I started at 10:30, it was done by 12:30, sir.
11  Did I put the line on there?  Sometimes I -- you know, I didn't
12  write down that he decided to stop.  But at 12:30 that interview
13  was stopped.  After --
14  Q.  Well if, in fact, he did say I want this interrogation to
15  end, that's a very significant comment, isn't it?
16  A.  It's over.  We're done.
17  Q.  Its not just over --
18  A.  12:30 it was terminated.  It's done.
19  Q.  It's not just over for you.  It's over for anyone else who
20  wants to interrogate him unless he affirmatively says I changed
21  my mind, correct?
22  A.  12:30 was when the interview was done, and it was only a
23  two-and-a-half hour interview.  Would I have loved to go on
24  longer and get more information?  More facts?  Yes.  But it
25  stopped.

1    Q.  And actually there is nowhere in either of these reports

2    that you indicate you would have loved to go on longer, is

3    there?

4    A.  That's what I'm thinking up here.  But I don't have to write

5    anymore, because he indicated he didn't want to speak to us

6    anymore.  That's why we stopped it.  This was a 2 -- 2 hours and

7    a half interview, sir.  It was stopped.

8    Q.  Sure.  It's a short interview.  So if, in fact, what had

9    happened was that he had asked for the interview to stop, you

10   would have made sure to record that?

11   A.  And I didn't, but I put the conclusion was 10:30.  12:30,

12   excuse me.  12:30.

13   Q.  The times are on there.  There's no question about that.

14   A.  They're on there for a reason, because we were done at that

15   point.  The beginning time, and the finish time.

16   Q.  Well, you weren't done, were you?  Because if, in fact, you

17   were interrogating Mr. Avery, you've testified you want to

18   get -- you wanted to get way more information than is in these

19   reports.

20   A.  He stopped it at 12:30, sir.

21   Q.  Okay.  But if Mr. Avery didn't say I want to stop, you

22   wanted to get more information from him.

23   A.  I always want to get more information.  But if he stops, he

24   stops.  We're done at 12:30.

25   Q.  Well, you said you don't think this is a confession?

```
 1   A.  I don't, sir.

 2   Q.  Okay.  It has several very inculpatory statements in it,

 3   doesn't it?

 4   A.  Yes, it does.

 5   Q.  We went over this last week, but you know obviously Ms.

 6   Griffin was murdered.  And here you have Mr. Avery, according to

 7   your account, saying he's responsible for the murder, correct?

 8   A.  That's correct.

 9   Q.  Saying he was in a fight with her?

10   A.  That's correct.

11   Q.  So it's highly inculpatory.  It may not have all the details

12   of a full confession, correct?

13   A.  It doesn't.

14   Q.  And with respect to the handwritten statement, which you

15   keep on referring to as Mr. Avery's statement, but is in fact in

16   your handwriting, there's nowhere in that statement where you

17   indicate that you showed it to Mr. Avery and he didn't sign it.

18   Correct?

19   A.  In my typed version I asked him if he's willing to sign it,

20   and he didn't want to sign it.

21   Q.  That's your typed version, right?  The typed version wasn't

22   available on 3/24, was it?

23   A.  Wouldn't have been done, no.

24   Q.  No.  The version that you had in this unusually short

25   interrogation --
```

1    A.  I'm sorry.  Go ahead.  Go ahead.

2    Q.  Strike that.  I'll rephrase it.  The version that you had in

3    this interrogation of Mr. Avery on 3/24, nowhere indicates that

4    you read it to him, showed it to him, or asked him to sign it,

5    does it?

6    A.  I read it back.  He refused to sign, sir.  Not on this

7    version.  It's on the typed one, which is -- this is a summary,

8    and so is that.  But that one only has like he had a bathroom

9    break, he had coffee.  You know, it has a little more

10   information on what we did, as far as what food I gave him.

11   What break.  And I showed him, and he didn't want to sign it.

12   And he didn't want to sign it.

13   Q.  The only version that you had when you're in the room with

14   Mr. Avery is the handwritten version.  And let's identify this

15   by Exhibit Number 1030, correct?

16   A.  Yes, sir.

17   Q.  That's the only version you have?

18   A.  Yes, sir, it is.

19   Q.  There's nowhere in that version that indicates that you

20   asked him to sign it, is there?

21   A.  On the typed one it is, sir, which is the copy -- which is a

22   summary of this one.

23   Q.  Do you not understand my questions?  I'm referring --

24   A.  But you're --

25   Q.  I'm sorry.  I'm referring to 1030.  I'm asking with respect

1  to that Exhibit, is there anywhere in that Exhibit that

2  indicates you asked him to sign it, and he wouldn't sign it?

3  A.  No. And that's his writing.

4  Q.  Is there anywhere in this Exhibit 1030 which indicates that

5  he read that statement?

6  A.  Not in this one, no.

7  Q.  Is there anywhere in that statement which indicates -- 1030,

8  the handwritten statement, which indicates you read it to him?

9  A.  Not on this one.

10  Q.  Okay.  I want to change focus a little bit to what you

11  started off testifying about, and that was in your testimony

12  about your work with respect to William Ellis.  Do you recall

13  that testimony?

14  A.  Walter Ellis.

15  Q.  You recall that testimony?

16  A.  About Walter Ellis?

17  Q.  I'm sorry.  Walter Ellis.  Apologize.  Do you recall that

18  testimony?

19  A.  I'm sure if we start to talk about it, I'll recall exactly

20  what you're referring to.

21  Q.  Okay.  Well, you in fact were involved in the investigation,

22  as you noted, of several homicides of women who were engaged in

23  prostitution and drugs, correct?

24  A.  Yes.

25  Q.  And in the course of that investigation, you eventually

1   identified that several of the cases had in common that there
2   was biological material that was -- that could be linked to Mr.
3   Ellis, correct?
4   A.  At some point we knew that they all linked, and then later
5   on we found out that -- we identified Walter Ellis.
6   Q.  And you -- with respect to the Griffin case, you became
7   aware in 2010 that there was biological material in the Griffin
8   case that was attributable to Walter Ellis, correct?
9   A.  I can't tell you the exact time or year, because I was
10  working -- because we were basically --
11  Q.  Sir, okay.  The year doesn't matter.
12  A.  Well, it does matter, because I don't know exactly when --
13  when I knew about the Maryetta Griffin profile being on her.  I
14  believe that the case was almost a cold case, and your client
15  was doing charges on the dope house.  I was concentrating on the
16  new cases.
17  Q.  Okay.  So you didn't care so much about the --
18  A.  It's not that I didn't care, sir.  I was dealing with the
19  link in front of me.  We're talking about hundreds of cases that
20  we're going over and we're looking at the series of -- of the
21  profile on the same victims.
22  Q.  Right.
23  A.  It was much later when we were able to say hey, that's --
24  Walter Ellis is hooked up with these.
25  Q.  And you were intent on bringing criminal charges against

1  Mr. Ellis for all of the cases for which he could be --

2  A.  Excuse me?

3  Q.  You were intent on assisting in bringing criminal charges in

4  the criminal investigation of Mr. Ellis.  To bring charges

5  against him for all the homicides which he could be linked to,

6  correct?

7  A.  I was working on one case.  The Maryetta Griffin case and

8  his involvement.

9  Q.  I'm talking about now you're involved with the Cold Case

10  Unit, right?

11  A.  Yes.

12  Q.  Through your work with the Cold Case Unit you match up

13  biological material from several cases to Mr. Ellis?

14  A.  Yes.

15  Q.  Right?  And part of your investigation was that you were

16  concerned about making sure that Mr. Ellis was charged with all

17  the crimes with which he could be connected, correct?

18  A.  On Mr. Ellis, yes.

19  Q.  Yeah.  Ellis.  All right?  You were concerned about that?

20  A.  If he was responsible, I wanted to -- yeah, I did.

21  Q.  All right.  And then -- and to refresh your recollection,

22  Mr. Ellis was charged with 7 of the homicides in 2009.  Would

23  you disagree with that?

24  A.  I wouldn't disagree with you, no.

25  Q.  And then in 2010 you were aware that there was D.N.A.

1  testing that showed that the biological material found in the

2  mouth of Ms. Griffin was also connected to Walter Ellis,

3  correct?

4  A.  Sometime, yes.

5  Q.  All right.  And you became aware of that through a report

6  from the Crime Lab, correct?

7  A.  I believe so, yes.

8  Q.  All right.  And in the course of -- in the course of

9  investigating Mr. Ellis and his involvement in the various

10  homicides, you would have researched other cases with which

11  Mr. Ellis was charged, correct?

12  A.  Oh, yes.

13  Q.  All right.  And I'm going to show you --

14          MR. STAINTHORP:  I'm going to mark this 34.

15  Q.  Ask you to look at that.

16  A.  It's a battery complaint.

17  Q.  And the person who was charged in the battery is Walter

18  Ellis, is that correct?

19  A.  Yes.  His name is listed on here.

20  Q.  Right.  And it gives a date of birth, is that correct?

21  A.  I don't see the date of birth.

22  Q.  You don't see the date of birth?  It's right where it says

23  D.O.B.

24  A.  There it is.  Okay.

25  Q.  Do you see that?

```
 1  A.  Yes, I do.

 2  Q.  Okay.  Is -- the date of birth is 6-24-1960?  You see that?

 3  A.  Yes.

 4  Q.  Gives his middle name as Walter (sic)?

 5  A.  Yes.

 6  Q.  Gives his address, correct?

 7  A.  Yes.

 8  Q.  And just showing you what's already been marked in evidence

 9  as Plaintiff's Exhibit Number 1.  With respect to the name

10  Walter Earl Ellis, does that appear to be the same?

11  A.  Yes.

12  Q.  And with respect to the date of birth, does that appear to

13  be the same?

14  A.  Yes.

15          MR. STAINTHORP:  I'd move Plaintiff's Exhibit 34 into

16  evidence.

17          THE COURT:  All right.

18          MS. YUAN:  Your Honor, I guess I just object as to

19  relevance.

20          THE COURT:  The Court will receive it.

21          MR. STAINTHORP:  Thank you.

22  Q.  And that would be the type of material that in the course of

23  your investigation of Mr. Ellis you would review, correct?  Like

24  other charges?

25  A.  Was that complaint in '95?
```

1  Q.  No, that was --

2  A.  The battery complaint?

3  Q.  That was the battery complaint, yeah.

4  A.  In 1995?

5  Q.  Actually -- yes, '95.

6  A.  If I became aware of it, I would look at it, yeah.

7  Q.  And now I'll show you what's going to be marked as

8  Plaintiff's Exhibit 35, and ask if you can identify what that

9  is.  Do you recognize that that's the -- a document called the

10 Wisconsin Circuit Court Access, reflecting a charging of a

11 person?

12 A.  Against Mr. Ellis.

13       MS. YUAN:  Your Honor, I would just object to this

14 Exhibit.  It's a converted case for the Wisconsin Circuit Court

15 Access.  There's no details.  I mean, there's some Statute

16 numbers listed.  I think it's incomplete in terms of the

17 information provided on this document.

18       MR. STAINTHORP:  I have no objection to supplementing

19 it.

20       THE COURT:  I'm sorry?

21       MR. STAINTHORP:  I don't care if counsel wants to

22 supplement it.

23       MS. YUAN:  I'm just saying you can't tell from looking

24 at this document what it's really representing, because it says

25 right there on the second page, it's a converted case.  On the

1    first page there's no description as to what the charges are.

2                THE COURT:  Yeah.  Well --

3                MR. STAINTHORP:

4    Q.  Would this be the type of document that you would review in

5    researching Mr. Ellis?

6    A.  I would.  I mean, if I was aware of it.

7    Q.  And this would reflect a criminal charge against Mr. Ellis,

8    correct?

9    A.  I don't know what the criminal charge is.

10   Q.  Well, it lists the various Statutory --

11   A.  And I don't -- off the top of my head I don't know if that's

12   a battery?  I don't know what you're referring to here.

13   Q.  But once again, it has the date of birth of Mr. Ellis,

14   correct?

15   A.  6-24-60.

16   Q.  And an address, correct?

17   A.  Yes.

18   Q.  Appears to be the same Walter Ellis?

19   A.  Yes.

20   Q.  And by that I mean the same Walter Ellis who was charged in

21   the --

22   A.  This is in 1997.

23   Q.  Right.  1997.  But this is the same Walter Ellis who was

24   charged in 2009, correct?  It appears to be?

25   A.  It appears to be.

1    Q.  All right.  And then I'll show you what I'm marking as

2    Plaintiff's Exhibit 36.

3              MR. SMOKOWICZ:  Judge, may we approach about this?

4              THE COURT:  Yes.  We have to find out what these

5    documents are.

6              (Whereupon a side-bar conference was held off the

7    record.  Upon conclusion of the side-bar conference, the

8    proceedings continued as follows:)

9              MR. STAINTHORP:

10   Q.  Now, sir, when the D.N.A. results in the Maryetta Griffin

11   case -- and in particular the D.N.A. results with respect to the

12   oral swab came back and matched Walter Ellis, you then requested

13   additional investigation by the Crime Lab, didn't you?  Because

14   you wanted to see if there was additional -- if there was other

15   information, other biological evidence, that you could connect

16   up to Mr. Avery.  Do you remember doing that?  Okay.  Let me

17   refresh your recollection, because there has been testimony here

18   from Ms. Polakowski from the Crime Lab that you -- once you got

19   the results back on the oral swab from Maryetta Griffin

20   connecting it up to Mr. Ellis, and not to Mr. Avery, you then

21   requested additional testing of fingernail scrapings, correct?

22   A.  I wouldn't disagree with you.

23   Q.  And, in fact, fingernail scrapings where there's a fight or

24   struggle can be extremely important evidence, can't they?

25   A.  Yes, sir.

1    Q.  Because the victim of the fight or the struggle will often

2    scratch the assailant, correct?

3    A.  Yes, sir.

4    Q.  And so there will often be biological material that can be

5    found under the fingernails of the victim attributable to the

6    person who attacked that person?

7    A.  That's correct.

8    Q.  And you know that in the -- in the Maryetta Griffin case,

9    the fingernail scrapings came back and Mr. Avery was excluded as

10   the source of any of the biological material in the fingernail

11   scrapings, correct?

12   A.  That's correct.

13   Q.  All right.  And so with respect to the Maryetta Griffin

14   case, when it came back with the D.N.A. results, you were

15   essentially furthering the investigation to see if there was

16   additional evidence that you could find that would implicate

17   Mr. Avery, correct?

18   A.  Not implicate Mr. Avery.  I was just looking to see well, if

19   we had the oral swabs done, why don't we do the fingernails?

20   Sometimes even do the anal cavity, also, to see if there's

21   different profiles.

22   Q.  Okay.  And, in fact, with the -- with respect to the

23   Maryetta Griffin case, you were also investigating Walter Ellis

24   to see if he could be a suspect in the Griffin case, correct?

25   A.  Yes.

1    Q.  Okay.  And that's when the D.N.A. results came back that you

2    looked into whether he could be a potential perpetrator in the

3    Maryetta Griffin case, right?

4    A.  As who could be a perpetrator?

5    Q.  Walter Ellis.  Or was that something you weren't even

6    willing to look at?

7    A.  I wouldn't say that.

8    Q.  So -- well, were you investigating -- after the D.N.A.

9    results came back, showing that it was Walter Ellis's D.N.A.,

10    Walter Ellis's sperm in the mouth of Maryetta Griffin, were you

11    investigating to see whether Walter Ellis could be connected up

12    to the Maryetta Griffin homicide?

13    A.  I was trying to compare, see what -- identify -- identify,

14    not target, identify where the evidence would lead me to.  And

15    that's the fingernail -- addition of D.N.A. of fingernails.  And

16    I was also trying to identify what other homicides that Walter

17    Ellis may have been involved in.

18    Q.  Okay.  Why don't we take this -- have this back in front of

19    you.  Now, you've already said that's one of the things you

20    would have considered.  And so one of the things you would want

21    to see is where Mr. Ellis was living at the time of the Maryetta

22    Griffin homicide, correct?

23    A.  I'm not -- I don't -- I know his name, his birthday.  His

24    address would be nice, yes.  Okay.

25    Q.  Well, you've got his address there.

1   A.  Right.

2   Q.  What's the address noted for Mr. --

3   A.  Can I first read this to see what kind of complaint this is?

4   Q.  No.  I want you to tell me what address is on there for

5   Mr. Ellis.

6   A.  3037 North 6th Street.

7   Q.  And where is 3037 North 6th Street in relationship to where

8   Ms. Griffin's body was found at 3032 North 7th Street?

9   A.  Across the alley?

10  Q.  It's right across the alley, isn't it?

11  A.  Yes.

12  Q.  Mr. Ellis lived right across the alley from where Ms.

13  Griffin's body was found, correct?

14  A.  Yes.

15  Q.  Did you realize that back in 2010?

16  A.  I don't remember seeing this.  I may have seen this, but I

17  don't remember seeing this.

18  Q.  Did you research --

19  A.  I don't know if I still had even Walter Ellis identified.

20  You keep referring to this exact time zone, and I'm telling you,

21  I'm not sure about what happened -- what -- what sequence as far

22  as the identification of Walter Ellis, and if I had that

23  information at this point or that point.  You keep referring

24  that I did, and I can't agree with you.

25  Q.  I'm talking to you about a situation that existed -- and

1    exactly the date doesn't matter -- but it's in 2010.  When the

2    D.N.A. has come back and it's Walter Ellis's sperm that's in

3    Maryetta Griffin's mouth.  At that point did you investigate

4    whether Walter Ellis could have been responsible for Maryetta

5    Griffin's homicide?

6    A.  I'm sure I would have.

7    Q.  Did you write any reports saying you did?

8    A.  We compared Walter Ellis's profile to hundreds and hundreds

9    to see if they hit in the databank first.  And once the hit

10   came, then we could work on that case.

11   Q.  Okay.  Did you write any reports saying that you had

12   investigated Walter Ellis in relationship to whether he was

13   guilty of the Maryetta Griffin homicide, and not Mr. Avery?

14   A.  I would respond to the results from the Crime Lab.  I was

15   sending evidence out.  If they came back with the hit, well

16   let's look at that file.  Let's look at this file.

17   Q.  So tell me.  It came back with a hit.  It came back with a

18   hit to Walter Ellis, not William Avery.  So what did you do as

19   one of the main investigating Detectives?

20   A.  The Crime Lab report would have been --

21   Q.  Sir, let me finish.  What did you do as one of the main

22   interrogating -- investigating Detectives on the Maryetta

23   Griffin homicide to determine if, in 1998, you got it wrong, and

24   that Walter Ellis was -- excuse me, sir -- Walter Ellis was

25   guilty of the Maryetta Griffin homicide, not Mr. Avery?

1  A.  Walter Ellis was in custody for the drug house at that

2  point.

3  Q.  You're getting your names confused.

4  A.  Just as you did.  Mr. Avery was in custody for the drug

5  house, not the homicide yet.

6  Q.  I'm asking you in 2010.  Mr. Avery's in prison, convicted

7  based on your work in the homicide case.  At that point what --

8  when you -- the results come back, the semen in Maryetta

9  Griffin's mouth is Walter Ellis, no question about it.  What did

10 you do to investigate whether Walter Ellis rather than William

11 Avery was guilty of the Maryetta Griffin homicide?

12 A.  If I -- you indicated that I sent out the fingernails?  Then

13 I wouldn't disagree with you on that.

14 Q.  Okay.  And the fingernails came back.  Didn't help at all in

15 terms of showing that Mr. Avery did it, right?  Because he was

16 excluded.

17 A.  At that point.  Like I said, in the first testimony that all

18 that proves to me is that he had sex with her.  Not that he

19 killed her.

20 Q.  Okay.  What else did you do to investigate whether Mr. Ellis

21 was guilty of the Maryetta Griffin homicide, not Mr. Avery?

22 A.  We investigated hundreds of homicides with females across

23 the whole city, trying to determine what exactly -- what

24 connection did Walter Ellis have to each one of these.  And did

25 I check Maryetta Griffin?  I don't know if I did or not.

1  Q.  That isn't my question.  My question was something
2  completely different.
3  A.  I'm trying to answer your question.  You asked me what I
4  did.
5  Q.  I'm asking you with respect to the Maryetta Griffin
6  homicide, not any other.  The Maryetta Griffin homicide.  In
7  2010 you've got the results back, the D.N.A. results, that shows
8  Walter Ellis's semen in Maryetta Griffin's mouth.  What did you
9  do as one of the primary investigating Detectives on the case
10 against Mr. Avery to determine whether it was Mr. Ellis who was
11 guilty of the Maryetta Griffin homicide, and not Mr. Avery?
12 A.  At some point -- I believe at some point one of the
13 Detectives, if not myself, may have gone over to the District
14 Attorney's Office and let them know.
15 Q.  Anything else?
16 A.  I can't think of anything else.  I'm not saying I didn't.  I
17 just can't think if I did anything else.
18 Q.  Okay.  How about -- I'll offer this as 37.  Showing you what
19 I'm marking as Exhibit 37.  Did you look at a map of Milwaukee
20 to see where Mr. Ellis lived in relationship to where the body
21 of Maryetta Griffin was found?
22 A.  Did we look at a map?
23 Q.  Yes.
24 A.  Where?  What?
25 Q.  Where Mr. Ellis lived in 1998.

1 A.  We had a larger map of the city, and that area also where we

2 had victims labeled.  Where we found the victims.

3 Q.  My question is this.  Did you look at a map of the City of

4 Milwaukee to see where Mr. Ellis lived in 1998, compared to

5 where Ms. Griffin's body was found in the garage?

6 A.  At some point once we developed -- we were able to do maybe

7 a pattern and history of where he lived, I would go with that.

8 It was -- I think once we identified him, now we can do more of

9 a search where he lived in the past.

10 Q.  Why did where he lived in the past have anything to do with

11 where he was in --

12 A.  Because we want to tie him with the victims.

13 Q.  Okay.  I'm talking about Maryetta Griffin.  1998.  Why would

14 where he lived other than 1998 be important in terms of whether

15 he was involved in the Maryetta Griffin homicide?

16 A.  We're trying to identify where these victims were found.

17 These female victims.  These prostitutes, where they were found.

18 How they were related.  Where possibly Ellis lived.  Or anybody

19 -- any other potential suspect.

20        MR. STAINTHORP:  Judge, I'd move for the admission of

21 Exhibit 37, which is a map of the City of Milwaukee showing

22 where Mr. Ellis lived and where the body was found.

23        THE COURT:  Any objection?

24        MS. YUAN:  Your Honor, I'm not sure if the witness

25 actually identified this as being the map.  But I don't think we

1    have an objection.

2             THE COURT:  All right.  The Court will receive it.

3             MR. STAINTHORP:

4    Q.  Okay.  Now, you knew from your examination, your

5    investigation, that the body of Maryetta Griffin was found in a

6    garage on the alley.  That was your testimony here today,

7    correct?

8    A.  Yes.

9    Q.  So that would be right where the "N" is on the North 7th,

10   correct?

11   A.  Yes.

12   Q.  And 3037 North 6th Street would be in this lot, which has

13   apparently now been demolished, correct?

14   A.  It looks like there was a building there that's not there

15   anymore.

16   Q.  Right.  So, in fact, the location where Mr. Ellis lived in

17   1998 was directly across from the garage where Ms. Griffin's

18   body was found, correct?

19   A.  Correct.  But I don't know when I had that information, sir.

20   I don't know when.  Or where in my investigation.

21   Q.  You don't know if you checked that out?

22   A.  I don't know if I had that information.

23   Q.  Well, did you attempt to find where Mr. Ellis lived in 1998?

24   A.  I would say that we focussed more in on Mr. Walter Ellis

25   when we identified his profile.  Now we have a common

1   denominator of a link and that focus to him at that time.  But I

2   don't know when I had that information.  I think I had it

3   towards the end when we identified his profile.  Now we know who

4   he is.  Now we can concentrate on him.

5   Q.  So that would have been information that was available to

6   you at the time that the D.N.A. results came back in 2010,

7   finding Walter Ellis's sperm in Maryetta Griffin's mouth?

8   A.  Well, if you're telling me it was 2010 when we got the

9   results, it was identifying the profile.  It wasn't identifying

10  the identity of that profile, which was Walter Ellis.  And I

11  don't know when I got Walter Ellis.  We had an unknown profile.

12  If you say 2010, I'll agree with you.  But it took some more

13  footwork to try to identify this profile.  And that consisted of

14  going through thousands and thousands of names of victims

15  that -- of sexual assaults.  Of homicide victims we were

16  checking --

17  Q.  -- sir --

18  A.  -- I'm just trying to tell you the amount of work that we

19  were doing here.

20  Q.  That has nothing to do --

21  A.  -- it does, sir.  Because I didn't have that information.

22  I'm the investigator.  I'm trying to tell you, I need to do my

23  investigation.  And at that time we had a lot of data to go

24  through.

25  Q.  You didn't do a thing in terms of checking out the D.N.A. in

1   the Maryetta Griffin case?

2   A.  Sir, I sent out hundreds of D.N.A. samples to the Crime Lab.

3   Q.  And you didn't send out Maryetta Griffin's D.N.A.?

4   A.  At the time -- at that time --

5   Q.  -- you didn't.

6   A.  At that time when your client knew something about Walter

7   Ellis and asked us to check into it through the D.A.'s Office,

8   that's when we looked at it.  But your client was still doing

9   time on the --

10   Q.  You didn't look at it at all.  The D.N.A. went over --

11   A.  -- I'm going to tell you, I may have looked at it.  I just

12   can't tell you, because I was investigating thousands and

13   thousands of names.

14   Q.  The D.N.A. went over to the Crime Lab pursuant to the

15   instruction from the District Attorney, and then the result came

16   back to you, correct?  Do you recall that?

17   A.  Yes.

18   Q.  And it came back to you just because you'd been the

19   recipient of all the other D.N.A.?

20   A.  Yes, that's correct.  Hundreds and hundreds.

21   Q.  So that -- at that point, which I'll submit to you was 2010,

22   at that point you knew that it was Walter Ellis's semen?

23   A.  I don't believe I did, sir.  We had a profile that came back

24   linking -- the profile linking -- that this profile was in

25   Maryetta Griffin's mouth.  And I still didn't have that --

1  anything with that profile.  I'm going by my -- the best of my

2  recall.  I don't think we had that name yet, because we were

3  still trying to identify Walter Ellis.

4  Q.  Okay.  We'll have to find it some other time.  Sir, there's

5  been testimony --

6      MS. YUAN:  Can we take this Exhibit off the board if

7  you're done using it?  Thank you very much.

8      MR. STAINTHORP:  Sure.

9  Q.  There has been testimony in this case from both Deanna

10  Lankford and Ms. Polakowski from the Crime Lab that the

11  connection to Walter Ellis was in 2010.

12  A.  The same profile, sir?

13  Q.  Yes.

14  A.  But the name of that profile?  The profile was still

15  unknown.  That's my recollection.

16  Q.  Okay.  So if there has been testimony in this case that --

17  which has been unrebutted, uncontested, that in 2010 the Crime

18  Lab connected the sperm from Mr. Ellis to -- excuse me, the

19  sperm from Maryetta Griffin to Mr. Ellis, you don't accept that?

20  A.  You're almost there.  What I'm trying to tell you is I don't

21  think I had the name of Walter Ellis.  We had the same profile

22  that linked all these women, including Maryetta Griffin.  But I

23  don't think we had the name of that person yet.

24  Q.  Mr. Ellis was charged in 2009, correct?

25  A.  For the homicides?

1   Q.  Seven homicides.

2   A.  Okay.

3   Q.  And that was based upon linking his D.N.A. to each of the 7

4   homicides, correct?

5   A.  So -- okay.  So -- so I understand you.  So Walter Ellis was

6   convicted in 2009?

7   Q.  No, no.  Walter Ellis was charged in 2009.  Do you want to

8   see the Complaint?

9   A.  No, no, I'm with you.

10  Q.  Okay.  And that was based upon biological material from each

11  of the 7 victims being linked up through D.N.A. to Walter Ellis,

12  correct?

13  A.  Okay.

14  Q.  So at that point Mr. Ellis's D.N.A. was known, correct?

15  A.  Yes.  I wasn't sure about -- but you said he was charged.

16  That helped me out.  Okay.

17  Q.  So then in 2010 when Mr. Avery requests that the biological

18  material from the Maryetta Griffin case be tested, Mr. Ellis's

19  D.N.A. was known.

20  A.  Okay.

21  Q.  So there's no question of matching it up to an unknown.

22  This was known.  You accept that now?

23  A.  I do.  I do.  I just -- you helped me out when you told me

24  he was charged on that date.

25  Q.  All right.  So at that point, when the result came back

1    initially connecting the semen in the mouth to Mr. Ellis, my

2    question was what investigation you did at that point to

3    determine whether Mr. Ellis, rather than Mr. Avery, was

4    responsible for the Maryetta Griffin homicide?  And I believe

5    you said you think you went to talk to the D.A.?  Correct?

6    A.  Yes.

7    Q.  You didn't do anything else, correct?

8    A.  I sent the fingernails out also.

9    Q.  You sent the fingernails out, correct?

10   A.  Yes.

11   Q.  And the fingernails came back that Mr. Ellis was not --

12   could not be excluded, correct?

13   A.  Correct.

14   Q.  But he couldn't be included, either?

15   A.  Correct.

16   Q.  And -- but Mr. Avery was excluded as the source of the

17   biological material in the fingernail clippings.  Do you recall

18   that?

19   A.  Mr. Avery was -- it was in the mouth?

20   Q.  No.  Mr. Avery was also excluded from the fingernail

21   clippings, right?

22   A.  Right.  Right.  Right.

23   Q.  So there's no biologic -- strike that.  So at that point

24   would it not have been important to you to know that Walter

25   Ellis lived right across the street, right across the alley,

1  from where Ms. Griffin's body was discovered?

2  A.  It's important, but I can't tell you what time I knew that

3  during my investigation.

4  Q.  Well, certainly Mr. Ellis's address was available to you,

5  wasn't it?

6  A.  Yes.

7  Q.  And we already marked Exhibit 34, which showed his address

8  at the 3037 North 6th Street, correct?

9  A.  Yes.

10  Q.  And then I just showed you a new Exhibit, Exhibit 38.  You

11  see that?  I'm sorry.  I must have taken it.  Exhibit 38?

12  A.  Yes.

13  Q.  You see that that has the same address?

14  A.  Yes.

15  Q.  And that's an additional criminal charge against Mr. Ellis,

16  correct?

17  A.  There's some Statutes.  Yes.  Second degree reckless injury.

18  Yes.

19  Q.  And actually do you -- and that shows that the criminal

20  charges were filed I believe on March the 12th of --

21  A.  '98.

22  Q.  '98.  Correct?  Is that correct?

23  A.  That's correct, sir.

24  Q.  All right.  So just a few weeks after the Maryetta Griffin

25  homicide?

1    A.   Right.

2    Q.   Okay.  And so this -- and actually do you recall the facts

3    of this particular case?

4              MS. YUAN:  Counselor, are you showing him Exhibit 38?

5              MR. STAINTHORP:  Yes.

6              MS. YUAN:  I don't have a copy of that.

7              MR. STAINTHORP:  Oh, I'm sorry.

8              THE COURT:  Has that been admitted?

9              MS. YUAN:  I don't believe so.

10             MR. STAINTHORP:  No.

11   Q.   Exhibit 38.  Is that the type of material that you would

12   have investigated in the course of a thorough investigation into

13   a homicide?

14   A.   Again, yes, I would have.  I don't know how fast I would

15   have gotten to it, because of the amount of cases that we were

16   working on at the same time.

17   Q.   But that's the type of material that would have been

18   available to you?

19   A.   That's what I looked at in the past during the

20   investigation.

21   Q.   And that would indicate to you or would demonstrate to you

22   that as of March the 12th of 1998 Mr. Ellis lived across the

23   alley from the garage in which Maryetta Griffin's body was

24   found?

25   A.   But I didn't have this at the time after Maryetta Griffin's

1    death.

2    Q.  I understand that.  Of course you didn't.  Okay.  I

3    understand that.  But in 2010 that would have been information

4    which would have been useful and important to a homicide

5    investigator doing a thorough investigation of who was liable

6    for the death of Maryetta Griffin, correct?

7    A.  It's helpful.

8    Q.  Well, evidence -- evidence that someone lived across the

9    alley from where a body was found is a little more than helpful,

10   isn't it?

11   A.  What I'm trying to explain to you is this is not the only

12   case I was working on.  We were trying -- we were getting a lot

13   of other cases with the serial killer thinking that he did more.

14   Which accounts for documents and documents and documents.

15   Q.  And did you check out the Maryetta Griffin case to determine

16   whether in the Maryetta Griffin case he did more?  Because

17   Mr. Ellis wasn't charged in that original Indictment with the --

18   A.  I'm sure I did some extensive work.  I can't say exactly

19   what.

20   Q.  Did you document that in any manner?

21   A.  I'm sure I must have, yeah.  Not necessarily in this report.

22   Could have been on another.

23   Q.  So if there is no report documenting any additional

24   investigation you did in the Maryetta Griffin case, once you

25   knew that the semen in the mouth of Maryetta Griffin was from

1  Ellis, not Avery, then would you agree with me you didn't in

2  fact do that investigation?

3  A.  There was a Crime Lab report that was filed into the

4  homicide folder indicating that.

5  Q.  I agree.  There's a Crime Lab report.  Other -- if you had

6  done additional investigation, it would be documented, correct?

7  A.  Right.

8  Q.  So if there is no such documentation, you didn't do that

9  work, correct?

10  A.  There should have been a letter of transmittal that I would

11  have filed sending the evidence out to the Crime Lab.

12  Q.  You didn't send it out to the Crime Lab, so there wouldn't

13  be, would there?

14  A.  Initially?

15  Q.  You didn't send it out.

16  A.  Initially I think --

17  Q.  I'm talking about 2010.

18  A.  I don't know.

19  Q.  But at any rate, if there is no report indicating you did

20  any additional investigation, once you got the D.N.A. back in

21  the Griffin case, then that would indicate that you did not do

22  any investigation?

23  A.  That's not correct.

24  Q.  Well, did you do investigation and then not file reports?

25  A.  There's some things that I do during my -- my -- my normal

1   day, but basically I can be calling witnesses to see if they

2   have any knowledge.  And if that means that they did have some

3   knowledge, I would go out and talk to them.  I might get

4   involved in stopping someone on the street and talk about it.  I

5   don't file a report on everything.  And the reason I don't, is

6   because there are -- they have very little evidentiary value.

7   And I don't -- I mean, guy says hey, I read about it in the

8   newspaper.  Okay.  So he read about it.

9   Q.  Well, how about finding out that -- or realizing that Walter

10  Ellis lived across the alley from where Maryetta Griffin's body

11  was found?  Would that be an important fact to note in a good

12  faith investigation?

13  A.  I did answer that would be important.

14  Q.  Okay.  And did you ever record that in the investigation

15  into the Griffin homicide?

16  A.  I recall that we had -- in our Task Force that we had a

17  chart of all of our victims and their addresses, and when Walter

18  Ellis was developed, I think there may have been a chart.

19  Q.  All right.  With respect to the Maryetta Griffin homicide,

20  did you ever file a report saying boy, I just realized this oral

21  swab comes back, and it's Walter Ellis's semen.  I now realize

22  that he lived right across the alley from where the body was

23  found.  Did you ever file such a report?

24  A.  I don't recall me filing one.

25          MS. YUAN:  If you're done with that Exhibit, I ask it

```
 1   be removed.

 2               MR. STAINTHORP:  Judge, just a minute.

 3               THE COURT:  Okay.

 4               MR. STAINTHORP:  Judge, that's all I have.

 5               THE COURT:  Okay.  Any redirect?

 6               MS. YUAN:  Yes, I do, Your Honor.

 7               THE COURT:  How long is it?

 8               MS. YUAN:  I think it might be more than just a few

 9   questions, Your Honor.

10               THE COURT:  All right.  Then we'll have the witness

11   back tomorrow morning, ladies and gentlemen, because it is 5

12   o'clock.  And so you know what I'm going to say.  Don't discuss

13   the case among yourselves, only after all the evidence is in.

14   We'll see you back here tomorrow morning, 9 o'clock.

15               (Whereupon the jury was excused at 4:59 p.m.)

16               THE COURT:  Tomorrow morning, 9 o'clock.

17               MS. YUAN:  Yes, Your Honor.  If we could, can we put

18   on the record that sidebar where the Court was not going to

19   admit Exhibit 35 and 36?

20               THE COURT:  Yes.

21               MR. STAINTHORP:  And, Judge, what I would -- I would

22   move into evidence Exhibit 38, since I think the witness has now

23   acknowledged that this would be important information if, in

24   fact, he was investigating the homicide in 1998.  And this

25   relates to the address of Mr. Ellis on March the 12th, 1998.
```

1070

1    MS. YUAN:  Well, Your Honor, I guess my objection to

2    this would just be it's irrelevant.  This doesn't establish --

3    it may establish his address in 1998.  It doesn't establish that

4    this was information that this witness had in 2009 when Walter

5    Ellis was on the radar for this death.

6         THE COURT:  That's true.  The question was, though,

7    why did you fail to find that out.  Is that correct?

8         MR. STAINTHORP:  Yes.  That's true.

9         THE COURT:  So he's asking why -- understand that he

10   was saying he investigated countless leads.  He had countless

11   homicides.  Found out, according to this testimony that went

12   down that Walter Ellis was -- D.N.A. was discovered, and that

13   his address ultimately turns out to be across the alley from

14   where the body was found in 1998.  And 38 indicates the address,

15   correct?

16        MR. STAINTHORP:  Yes.

17        THE COURT:  The witness was asked well, would that

18   have been important to you, and he said yes.  In fact, he was

19   asked that twice.  And he said yes.  So the question is why

20   didn't you have that information when you were looking into the

21   Maryetta Griffin homicide after Walter Ellis's D.N.A. was

22   discovered?  Isn't that important?

23        MS. YUAN:  Your Honor, Plaintiff's Exhibit Number 1 is

24   the Complaint against Walter Ellis when he's charged in 2009

25   with these homicides.  When his identity is known to the

1  Homicide Department.  And at that time his address is a

2  different address.  It's 2827-A West Bobolink Avenue.  So --

3          THE COURT:  Right.  That's in the evidence.  But at

4  the time of the murder it was at 30 -- wherever that was.

5          MR. STAINTHORP:  3037 North 6th Street.

6          THE COURT:  3037 North 6th Street, which is a short

7  distance away from 3032 North 7th Street.  And the question

8  asked is well, once you knew that Walter Ellis was a possible

9  suspect in the Maryetta Griffin case, wouldn't it have been

10  important to find out that -- where Walter Ellis lived in 1998?

11  So the idea is that this is another effort on the part of this

12  witness to not do his job.

13          MR. STAINTHORP:  That's it.  That's true, Judge.

14          THE COURT:  I mean, that's the whole case.  They

15  didn't do their job.  They lied and everything else.  I mean,

16  I'm saying what the case is.  Not commenting on the evidence.

17  So I'll allow the Exhibit.  What is that?  38?  It's a Criminal

18  Complaint?

19          MS. YUAN:  No, it's a Wisconsin Circuit Court Access

20  Document, 2 pages, 1998.

21          THE COURT:  Why can't we resolve this by stipulating

22  what Walter Ellis's address at the time was.  And then we don't

23  have to admit that.  We'll just put it on the record, that

24  Walter Ellis lived at that address in 1998.

25          MR. STAINTHORP:  Well, just because I want to be able

1    to show that this was -- that this document -- that he could
2    have found that out very easily.
3            THE COURT:  Okay.  Yeah.  The Court will receive it,
4    then.
5            MR. STAINTHORP:  Thank you, Judge.
6            THE COURT:  Okay.  See you at 9 o'clock.
7                              *     *     *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1   UNITED STATES DISTRICT COURT

2   EASTERN DISTRICT OF WISCONSIN

3

4           I, HEIDI J. TRAPP, Official Court Reporter for the

5   United States District Court, Eastern District of Wisconsin, do

6   hereby certify that I reported the foregoing Transcript of

7   Proceedings; that the same is true and correct as reflected by

8   my original machine shorthand notes taken at said time and place

9   before the Hon. Rudolph T. Randa.

10

11                          _____
                            Official Court Reporter
12                          United States District Court

13

14  Dated at Milwaukee, Wisconsin,

15  this 10th day of November, 2015.

16

17

18

19

20

21

22

23

24

25