UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------

**WILLIAM DAMON AVERY,**

                                    Case No. 11-CV-408

                Plaintiff,

                                      Milwaukee, Wisconsin

    vs.

                                      June 9, 2015

**CITY OF MILWAUKEE, et.al.,**

                Defendants.
----------------------------------------------------------------

**VOLUME 7 – PAGE 1075**
TRANSCRIPT OF TRIAL
BEFORE THE **HONORABLE RUDOLPH T. RANDA,**
UNITED STATES DISTRICT JUDGE, AND A JURY


<u>**A P P E A R A N C E S**</u>

For the Plaintiff:             People's Law Office
                                By: **Mr. John L. Stainthorp**
                                    **Ms. Janine L. Hoft**
                                    **Mr. Ben Elson**
                                Attorneys at Law
                                1180 N. Milwaukee Avenue
                                Chicago, IL  60622


For the Defendant:           Milwaukee City Attorney
                                  By: **Mr. Jan A. Smokowicz**
                                    **Ms. Jenny Yuan**
                                Assistant City Attorneys
                                200 E. Wells St. – Rm. 800
                                Milwaukee, WI  53202-3551


REPORTED BY:                 HEIDI J. TRAPP
                                Federal Official Court Reporter
                                310, U.S. Courthouse
                                517 East Wisconsin Avenue
                                Milwaukee, Wisconsin 53202


Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1

**I N D E X**

2

**Witness:**                                                      **Page**

3

 **AGENT GILBERT HERNANDEZ**

4
   Redirect Examination By Ms. Yuan................ 1079
   Recross Examination By Mr. Stainthorp.......... 1096

5

**LIEUTENANT KEVIN ARMBRUSTER**

6
   Direct Examination By Mr. Smokowicz............ 1115

7
   Cross Examination By Mr. Elson................. 1149
   Redirect Examination By Mr. Smokowicz.......... 1158

8
   Recross Examination By Mr. Elson............... 1161
   Redirect Examination By Mr. Smokowicz.......... 1163

9

**DETECTIVE KATHERINE SPANO**

10
   Direct Examination By Ms. Yuan................. 1164

11
   Cross Examination By Ms. Hoft.................. 1225
   Redirect Examination By Ms. Yuan............... 1244

12
   Recross Examination By Ms. Hoft................ 1244

13

**DETECTIVE ERIK GULBRANDSON**

14
   Direct Examination By Mr. Smokowicz............ 1245
   Cross Examination By Mr. Elson................. 1253

15

16

17

18

19

20

21

22

23

24

25

1    **TRANSCRIPT OF PROCEEDINGS**

2         THE CLERK:  Case Number 11-C-408, William Damon Avery

3    vs. The City of Milwaukee, et.al.  Called for continuation of

4    the jury trial.  May I have the appearances, please.  First for

5    the Plaintiff.

6         MS. HOFT:  Good morning.  Janine Hoft for the

7    Plaintiff.

8         THE COURT:  Good morning.

9         MR. STAINTHORP:  John Stainthorp for the Plaintiff.

10        THE COURT:  Good morning.

11        MR. ELSON:  Good morning, Judge.  Ben Elson for the

12   Plaintiff.

13        THE COURT:  Good morning.

14        THE CLERK:  And for the Defendant?

15        MR. SMOKOWICZ:  Assistant City Attorney Jan Smokowicz.

16   Good morning, Your Honor.

17        THE COURT:  Good morning.

18        MS. YUAN:  Good morning, Your Honor.  Assistant City

19   Attorney Jenny Yuan for the Defendants.

20        THE COURT:  Good morning.  The Bailiff informs me we

21   have a couple matters to take up before the jury comes in?

22        MR. SMOKOWICZ:  Briefly, Your Honor.  With respect to

23   two documents that had been either offered or admitted

24   previously, but we wanted to make a record of it.  The C-CAP

25   record relating to State vs. Antron Kent, which I believe was

1  offered yesterday to the Court for judicial notice purposes.

2  Wasn't, I suppose, formally offered as an Exhibit.  I'm doing

3  that now.  It has been marked as Exhibit 1055.

4          THE COURT:  Okay.  The Court has already received it.

5          MR. SMOKOWICZ:  With respect to the one page statement

6  from -- or report, rather, from Detective -- then Detective

7  Kevin Armbruster relating to contact with Amanda Washington,

8  that was among the materials that was part of Exhibit 12 from

9  the Plaintiffs.  That one page has been removed from their

10 Exhibit book.  It's now been marked as Plaintiff's Exhibit 12-A.

11 I wanted to offer that -- indicate that for the record.  And if

12 that has not been offered, I would want to offer that as well.

13         THE COURT:  Okay.  There's no objection to that?

14         MR. STAINTHORP:  What Exhibit is that?

15         MR. SMOKOWICZ:  12-A, as in Albert.

16         MR. STAINTHORP:  Okay.

17         MR. SMOKOWICZ:  It was part of Exhibit 12.

18 Plaintiff's.

19         THE COURT:  All right.  So we're ready for the jury?

20         MS. YUAN:  Yes, Your Honor.

21         THE COURT:  Okay.

22         (Whereupon the jury was returned to the courtroom at

23 9:13 a.m.)

24         THE COURT:  Good morning, ladies and gentlemen of the

25 jury.  We left off with the Defendant's redirect, and we'll pick

1  it up at that point.  Miss Yuan?

2  **AGENT GILBERT HERNANDEZ**, re-called as a witness,

3  having been previously sworn, on oath testified as follows:

4  **REDIRECT EXAMINATION**

5  **BY MS. YUAN:**

6  Q.  Good morning, Special Agent Hernandez.

7  A.  Good morning to you.

8  Q.  I want to start off with -- I had objected at one point

9  during your cross examination about wanting to read in another

10  portion of your deposition transcript, which I'm going to do

11  now.  My argument then was for completeness sake.  And just to

12  refresh your recollection, yesterday you were read in a portion

13  from your deposition that was taken on July 23rd, 2012, Page 73,

14  lines 12 to 18.  And the question starts with:  Okay.  Apart

15  from what's in the reports, do you have an independent

16  recollection of any of your interviews with Mr. Avery?  The

17  answer:  No, I don't.  Question:  Okay.  So your recollection of

18  those interviews are limited to what's in the written report?

19  Answer:  That's correct.

20  And the other portion that I'd like to read in starts

21  on Page 79 of your deposition.  So just a few pages further on,

22  lines 5 to 15.  The question begins:  Okay.  Do you recall your

23  interview of Mr. Avery and Detective Phillips on March 24th,

24  1998?  Answer:  I kind of do, yes.  Question:  Okay.  What do

25  you recall about this interview?  Answer:  I recall that

1  Mr. Avery became emotional and -- Question:  What do you mean by

2  become emotional?  Answer, like sorry or upset with himself.

3  Question:  Was he crying?  Answer:  I knew he was up -- he was

4  emotional.  As far as not crying crying, but you could tell he

5  was upset at himself.

6         Special Agent Hernandez, you were asked a few

7  questions yesterday as well regarding your reports.  The -- both

8  the typewritten report and the handwritten report.  The

9  handwritten report that you actually wrote out memorializing

10 your interview with Mr. Avery while you were there with Mr. --

11 with Detective Phillips.  And then you were also asked questions

12 about the report that was dictated memorializing that interview.

13 Do you recall those questions?

14 A.  Yes.

15 Q.  From yesterday?

16 A.  Yes, I do.

17 Q.  And specifically you were asked questions from Attorney

18 Stainthorp regarding whether or not either one -- either the

19 handwritten report that you wrote, or the typewritten report,

20 contained a statement that Mr. Avery terminated the interview.

21 Or words to that effect.  Do you recall that?

22 A.  Yes.

23 Q.  And do you recall that you -- you testified after reviewing

24 both the handwritten report and the typewritten report that

25 those words were not contained in either report?

1  A.  That's correct.

2  Q.  Okay.  I just want to show you -- and I know you were shown

3  this yesterday, but this is again defense Exhibit 1032, which is

4  a copy of your typewritten report.  And going to the second

5  page, I just want to direct your attention to first this first

6  full paragraph here.  And really to the last sentence of that

7  first full paragraph.  Can you read that into the record,

8  please?  Starting with "he"?

9  A.  He at this time indicated that he was not interested in

10 signing anything and I, Detective Hernandez, concluded my

11 interview.

12 Q.  And actually I guess for it to make more sense -- and I

13 apologize.  Let's actually read the whole paragraph.  I think

14 that would make more sense.  You could start with "it should

15 be".

16 A.  It should be noted that I, Detective Hernandez, while

17 conducting this interview in the presence of Detective Dan

18 Phillips, advised this subject that I would now attempt to take

19 this summary of the subject's account and attempt to reduce it

20 to a written report.  He at this time indicated that he was not

21 interested in signing anything and I, Detective Hernandez,

22 concluded my interview.

23 Q.  So why would you put that portion of the paragraph in your

24 written report?  What does that signify?

25 A.  He indicated that he didn't wish to sign anything.  That he

 1  didn't want to basically talk anymore, and at that point I

 2  concluded my interview.

 3  Q.  And then further down let's read this last paragraph.  The

 4  last paragraph of the report, please.  During my interview.

 5  Beginning with that.

 6  A.  During my interview Mr. Avery was offered numerous

 7  cigarettes, along with black coffee.  He indicated that he also

 8  did have some soda and a baloney sandwich, period.  At that time

 9  I, Detective Hernandez, did reduce Mr. Avery's interview to

10  writing, and upon asking him to sign it he did indicate that he

11  rather not, and I at this time concluded this interview.

12  Q.  And Mr. Hernandez, you were asked a lot of questions about

13  whether or not you actually put in the report the fact that Mr.

14  Avery said I want to terminate this report, or I want to stop

15  talking.  And we've gone over the report, and that's -- those

16  words aren't there, is that correct?

17  A.  That is correct.

18  Q.  But you did indicate that Mr. Avery didn't want to sign the

19  report?

20  A.  He didn't want to sign the report.  At that point he didn't

21  want to talk, either.  He says I don't want to sign it, and I

22  don't want to talk.  So at that point I wrote the report out and

23  again asked him if he wanted to sign it, and he again refused to

24  sign anything and we were done.

25  Q.  And you did write the report out.  And I will show you what

1  has been marked as defense Exhibit 1030, this handwritten one

2  page report.  You did write that out while Mr. Avery was still

3  in the interview room?

4  A.  In his presence, yes.

5  Q.  In his presence.  And, in fact, Mr. Avery's signature is on

6  the report just only after the Constitutional rights.  That

7  section where it indicates that his Constitutional rights were

8  read?

9  A.  That is correct.

10 Q.  And what is your practice in your experience as a homicide

11 Detective in writing out statements for suspects?  In terms of

12 once you're done with the statement, what is your practice?

13 A.  I read it back to them, and -- I read it to them and they

14 follow along.  I ask them to follow along because if there's any

15 corrections, I want them to make the corrections in front of me

16 so we can initial it and show that there was a change on that

17 report, and that he was aware of it by putting his initials on

18 there.

19 Q.  If the suspect does not want to make any initials, even if

20 there's some changes that they say oh, you've got to make this

21 change or that change, can you do anything about that?

22 A.  No, I cannot.

23 Q.  Can you force them to put their initials down?

24 A.  No.  No, I wouldn't do that.

25 Q.  I just want to ask -- since as you were asked a lot of

1 questions, and I know during your answers yesterday there were

2 some things that you just didn't recall. Can you tell the

3 jury -- explain to the jury, back in 1998 when this homicide

4 occurred, approximately how many homicides, if you recall,

5 occurred in 1998 in the City of Milwaukee?

6         MR. STAINTHORP: Judge, this is beyond the scope of my

7 examination.

8         THE COURT: Yeah, and I think it's already in the

9 record.

10         MS. YUAN: Okay.

11         THE COURT: This witness and other witnesses.

12         MS. YUAN: Okay. I'll move on.

13 Q. Do you recall how many homicides -- how many homicide

14 investigations you were working on back in 1998?

15 A. Well, basically there were three shifts of Detectives. And

16 as these homicides came in, initially we would all work on them.

17 And at times they would be coming in like one every 2 or 3 days.

18 So you have a new homicide. You've got to start working it.

19 It's very important to start investigating these homicides as

20 soon as possible, because the sooner that you do get on them,

21 there's a solve-ability -- the solve-ability factor is higher.

22 The longer you wait -- the longer you wait, you may have a

23 problem locating witnesses, and it makes it more difficult. So

24 along with Maryetta Griffin's homicide, we were also working

25 other homicides.

1    Q.  Do you recall a number at this point?  How many you were

2    working on back in 1998?

3    A.  I know that for the year we would probably be up like in

4    around 70's or the 80th in homicide rates, victims.  So we -- I

5    couldn't tell you exactly how many at one time I was working,

6    but it was multiple cases.

7    Q.  Multiple cases at the same time?

8    A.  Yes.

9    Q.  And that's just what occurred in 1998.  Are there also cold

10   cases that were still needing to be investigated back in 1998?

11   A.  That's correct.  There are cold cases.

12   Q.  Did you have a Cold Case Unit back at that time?

13   A.  No, we did not.

14   Q.  So how did -- how were cold cases investigated back in 1998?

15   A.  Basically what would happen was the -- let's say there was a

16   case sitting there for 2 or 3 years.  Your supervisor will say

17   here, you take this one, you take this one, and work on those.

18   And so I would have like maybe 1 or 2 homicide cold cases that I

19   would work on along with the new ones that were coming in.  And

20   that responsibility was shared by everybody, as far as --

21   everybody was assigned like 2 or 3 cases to work on.

22   Q.  Would that be 2 or 3 cold cases to work on?

23   A.  Yes.

24   Q.  In addition to the active homicides that had just occurred?

25   A.  Yes.  Yes.

1    Q.  And that would be true then, for 1999, 2000, until you went

2    to the Cold Case Unit?

3    A.  That is correct.

4    Q.  Can you estimate for the jury how many homicides, then, you

5    were working on before you retired from the Milwaukee Police

6    Department?  From 1998 until you retired?

7    A.  Hundreds.

8    Q.  Hundreds?

9    A.  Yes.

10   Q.  Special Agent Hernandez, I'm going to show you what's been

11   marked as Plaintiff's Exhibit 1.  I don't know that you've been

12   shown this before.  Do you recognize this document, though?

13   A.  The what?  I'm sorry?

14   Q.  Do you recognize this document?

15   A.  Yes.  It's a Criminal Complaint listing Walter Ellis.

16   Q.  I'm just going to flip to the last page so it helps.  Do you

17   see the date when this document was signed?

18   A.  This Complaint was signed September 10th of 2009.

19   Q.  And who is the complaining witness?

20   A.  My partner, Detective Kathy Hein.

21   Q.  And that's your former partner?

22   A.  Yes.

23   Q.  Okay.  So again, showing you the first page.  You can see

24   that there is four counts on this first page.  I don't know if

25   you can see that bottom part here.  So I'm showing you the

1   bottom, Count 4?

2   A.  Yes, I see four counts.

3   Q.  Okay.  And looks like those are four counts of first degree

4   intentional homicide, is that right?

5   A.  That's correct.

6   Q.  Do you recall reviewing this document?

7   A.  Oh, I reviewed it, yes.

8   Q.  Prior to it being filed back in 2009?

9   A.  I reviewed it, yes, I did.

10  Q.  You did.  And again -- and the Defendant in this case is

11  Walter Ellis, is that right?

12  A.  That's correct.

13  Q.  And I know you -- I just want to make sure I know what you

14  remember.  Do you recall that at some point Walter Ellis was

15  charged with 7 homicides as it related to the D.N.A. testing

16  that was eventually performed?

17  A.  That's correct.

18  Q.  Do you remember after your investigative work identified

19  Walter Ellis, and his D.N.A. was collected, and once all those

20  links of those -- of his D.N.A. to the unsolved homicides of

21  these other female victims was identified, do you recall if

22  there was additional investigative work that you performed on

23  any of those other unsolved homicides once it was linked to

24  Walter Ellis's D.N.A.?

25  A.  The ones that are --

1       MR. STAINTHORP:  Excuse me.  Object to form.  I don't
2   understand the question.

3       MS. YUAN:  I can ask the question again.

4       THE COURT:  Did he work on the unsolved murders after
5   the D.N.A. was analyzed?

6       MS. YUAN:  Yes.  That's my question.

7       THE COURT:  And after Walter Ellis was charged in the
8   7.

9       MR. STAINTHORP:  The question is in addition to the 7
10  charged?

11      THE COURT:  Yes.  That's the way I understood it.  Is
12  that correct?

13      MS. YUAN:
14  Q.  My question is after the D.N.A. of Walter Ellis was
15  identified and linked to the various women, was there -- if
16  Special Agent Hernandez recalls doing any additional
17  investigation on those particular cases that were linked to
18  Walter Ellis?
19  A.  Yes, yes, there was.  That's about the time when these --
20  when -- when these were all linked together, and we were --
21  myself and Katherine, Detective Hein, were in a panic.  Because
22  we gotta do something here.  This is bigger than both of us.
23  It's just two of us.  And we went to our Captain and we went
24  to -- eventually they ended up giving us a larger room.  They
25  gave us like three more Detectives.  I believe there were three

1   at that time.  And we also seeked out the help from the D.A.'s

2   Office.  The F.B.I. came on board.  We actually started a

3   hotline, if you would, where we put out a newscast or a hotline

4   number.  If anybody had information, to please call us.  And

5   that generated thousands of potential names that we were going

6   through.

7           We were also checking the -- continuously checking

8   the -- we would pull out one folder, and let's determine if

9   there was any evidence as far as can -- that can go out to the

10  Crime Lab.  And that was also a large amount.  I'm talking

11  hundreds of cases.  We also got involved with what's called --

12  how do I describe it to you?  It was basically a large -- a

13  database.  But we would have to put names in so we could like

14  almost cross -- that individual checked out.  That individual

15  was checked off.  So a lot of this took a lot of time to set up.

16  And also again, there was -- maybe now there's 5 of us that are

17  doing this work.  The F.B.I. subsequently came in and suggested

18  a couple things for us.  The D.A.'s Office was there also.  And

19  also at that time the Department of Justice was called in.  And

20  we were all trying to -- well, they did.  Everybody was able to

21  help out in some way with equipment that could make our job be

22  faster, more efficient.  And so there was a lot of work.

23  Q.  And you were mentioning sending things out.  Do you mean

24  that after Walter Ellis's D.N.A. was linked to some of these

25  unsolved homicides, that you were trying to send out other

1    biological materials to be tested in other unsolved matters?

2    A.  In the unsolved homicides, yes.

3    Q.  That's what you meant?

4    A.  That's what I meant.  Going back as far as 10, 20 years.

5    Just going back, trying to get the stuff out to the Crime Lab.

6    Q.  So you were going through multiple cold cases and sending

7    out if there was biological material available?

8    A.  Right.  And plus we had the regular cold cases where Walter

9    Ellis wasn't involved that we were also concentrating on.

10   Q.  So what you're describing really, if I understand correctly,

11   is after Walter Ellis's identity was known, that you were really

12   investigating Walter Ellis and his other possible victims, is

13   that right?

14   A.  Yes.

15   Q.  Did you remember trying to question Walter Ellis about the

16   homicides where he was linked to?

17   A.  I remember talking with Walter Ellis.

18   Q.  Would he talk to you?

19   A.  He basically indicated that he wanted a lawyer, so I wasn't

20   able to proceed later on.

21   Q.  So do you remember if you were by yourself?  Or were you

22   with a partner at that point?

23   A.  It would have been with Detective Katherine Hein.

24   Q.  And when -- what happened when Mr. -- maybe you said this.

25   When Walter Ellis said he wanted a lawyer, what happened at that

1 point?

2 A. Well, then we continued on the investigation. Making a

3 stronger case. Seeing if there was anymore cases that were

4 involved.

5 Q. And that just involved, again, sending out biological

6 material to the State Crime Lab to be tested, right?

7 A. Right.

8 Q. What would happen to your interview with him once he asked

9 for a lawyer?

10 A. I had some contact with him in the -- we ended up getting a

11 search warrant of his cell -- I believe it was his cell. But I

12 had a conversation with him where he indicated to me that one

13 day I'll tell you everything, Gilbert. And I never had that

14 opportunity, because he passed when he was in prison.

15 Q. And just to refresh your recollection, I'm going to show you

16 Page 56 of your deposition, lines 22 to 25.

17 A. Do you want me to read this?

18 Q. No. Just read it to yourself, please.

19       MR. STAINTHORP: Well, I object, Judge. He said he

20 had a recollection. He just testified in the same manner that

21 he testified in the deposition.

22       MS. YUAN: I think there's something that's added to

23 that at the end.

24       THE COURT: What's the objection?

25       MR. STAINTHORP: I'll withdraw. Go ahead.

```
 1              THE COURT:  Okay.

 2              MS. YUAN:

 3    Q.  Does that refresh your recollection as to what -- the full

 4    statement of what Walter Ellis may have said to you when you

 5    tried to talk to him?

 6    A.  Yes.

 7    Q.  And what is that?

 8    A.  That he did indicate some day I'll tell you -- I'll tell

 9    you -- I'll tell you everything.

10    Q.  But that he wanted a lawyer?

11    A.  But that he wanted a lawyer, yes.

12    Q.  Special Agent Hernandez, you were asked a number of

13    questions yesterday as well during your cross examination as to

14    whether or not you personally did any additional investigation

15    into the Griffin homicide after the 2010 D.N.A. report linking

16    Walter Ellis to the biological material found on the oral swab

17    from Maryetta Griffin.  Do you recall that?

18    A.  Yes, I recall that.

19    Q.  Is it possible that other Detectives performed additional

20    investigation into the Griffin homicide after Walter Ellis's

21    D.N.A. was linked to the biological material found on her?

22    A.  It's possible, yes.

23    Q.  I don't want you to read that out loud, but I'm handing you

24    a report and ask that you review it and see if you can -- then I

25    want to ask you some questions about that.
```

1    MR. STAINTHORP:  I ask counsel if you can just

2    identify the date of the report so we can be clear?

3    MS. YUAN:  Sure.  I've given Special Agent Hernandez a

4    May 11th, 2010, report.  I believe it was written by Detective

5    Keith Kopcha (phonetic) but I have to take the report back and

6    check that.  And it involves an interview with Detective -- of

7    Detective Kopcha and Eric Villareal (phonetic) and some of their

8    investigation.

9    THE WITNESS:  Okay.

10   MS. YUAN:

11   Q.  Thank you.  So after reviewing that report -- and now was I

12   correct in identifying it?  That's a May 11, 2010 report by

13   Detective Kopcha?

14   A.  Yes.  Yes.

15   Q.  And does that report indicate that he and Detective

16   Villareal conducted follow-up into the homicide of Maryetta

17   Griffin?

18   A.  That is correct.

19   Q.  And does that report indicate that those two Detectives

20   attempted to interview Mr. Avery regarding any knowledge he may

21   have had concerning Walter Ellis?

22   A.  Yes, they did.

23   Q.  I'm now showing you -- and again, please read it to

24   yourself.  A May 13, 2010 report by the same Detectives.  Again,

25   it appears to be follow-up investigation into the Maryetta

1  Griffin homicide at that point in time?

2  A.  Yes, it's an interview regarding an individual by the name

3  of Derrick Crawley.

4  Q.  And really, -- and I know I'm giving you this and you're

5  right on the stand there.  And if you want to skim it, that's

6  fine.  But my question really is, is this a report indicating

7  that there was additional investigation -- once Walter Ellis's

8  D.N.A. was linked to Maryetta Griffin, that there was additional

9  investigation into the Maryetta Griffin homicide?

10 A.  Yes, they were interviewing Derrick Crawley regarding his

11 relationship with that address at 3032 North 7th Street.  The

12 history.

13 Q.  And you weren't involved in this investigation?  You're not

14 in the report.  I didn't see that.

15 A.  No, I'm not involved in this.

16 Q.  And similarly with the May 11, 2010, report that I showed

17 you just a minute ago, were you involved in that investigation?

18 Of going back to interview Mr. Avery to ask if he had any

19 knowledge of Walter Ellis?

20 A.  No, I wasn't.

21 Q.  I just have one more to show you, and that's a May 26, 2010

22 report.  And if you could just review that really quickly?

23 A.  Yes.  On May 26, 2010, Detective Kopcha interviewed a

24 Valerie Eubanks.

25 Q.  And again, this is a continuation of the investigation of

1  Maryetta Griffin after Walter Ellis's D.N.A. was linked to her

2  -- biological material found on her?

3  A.  Yes, correct.  He interviewed Valerie Eubanks.  And there's

4  mention of a James Hamilton, which was also related to that

5  house on -- where Maryetta was last seen walking into.

6  Q.  And you weren't involved again in this investigation?  In

7  this particular investigation?

8  A.  No, I was not.

9  Q.  Would the District Attorney's Office have been alerted once

10  Walter Ellis's D.N.A. was connected to Maryetta Griffin?

11  A.  Yes.

12  Q.  And who decides if an individual is going to be charged with

13  a crime?

14  A.  That would be the Milwaukee County District Attorney.  I

15  bring my cases to them, they review it.  Or anything that would

16  change along -- with any of the cases, they will make the

17  determination if they're going to prosecute or pursue with it or

18  not pursue with it.

19  Q.  So I've shown you Plaintiff's Exhibit 1 where it's a

20  Criminal Complaint and Walter Ellis was the Defendant, and there

21  was first degree homicide charges.  Who made the decision to

22  charge in that matter against Walter Ellis?

23  A.  That's A.D.A. Mark Williams.

24  Q.  So if there is D.N.A. material linking Walter Ellis to those

25  victims, and Walter Ellis is charged, Mark Williams is the only

1  person making that decision?

2  A.  Yes.

3  Q.  Did you know anything about Walter Ellis in 1998?

4  A.  No.

5  Q.  Were you aware of his identity in 1998?

6  A.  No.

7  Q.  Did you know anything about Walter Ellis in 2003?

8  A.  No.

9           MS. YUAN:  I have no further questions.

10          MR. SMOKOWICZ:  Your Honor, Your Honor -- Miss Yuan,

11  Miss Yuan --

12          MS. YUAN:  Oh, I'm sorry.  One moment.

13  Q.  What unit was Detective Villareal, Detective Kopcha in back

14  in 2010?

15  A.  That would have been the Cold Case Unit.  Those were the

16  two -- I said three additional Detectives.  I stand corrected.

17  There were two.  And that was Eric Villareal and Keith Kopcha.

18          MS. YUAN:  Those are all the questions I have.  Thank

19  you.

20          THE COURT:  Recross?

21          MR. STAINTHORP:  Yes, Judge.

22                    **RECROSS EXAMINATION**

23  **BY MR. STAINTHORP:**

24  Q.  Special Agent Hernandez, you were just shown three reports.

25  A.  That's correct, sir.

1  Q.  And the first one that you were shown, the May 11th, 2010?

2  A.  Yes, sir.

3  Q.  I want to show you that one.  With respect to that portion

4  of the investigation, essentially if you look at the second

5  page, the Detectives pursuing that investigation were attempting

6  to discover new evidence in relationship to Mr. Avery and his

7  potential -- any connection to the Griffin homicide, correct?

8  A.  I don't -- I don't --

9  Q.  Well, let me call your attention to this paragraph here.

10  A.  Okay.

11  Q.  Where they're listening to Mr. Avery's phone calls.  Do you

12  see that?

13  A.  Yes.

14  Q.  All right.  And so they're attempting to -- or they're

15  actually listening to Mr. Avery's phone calls to see if he says

16  something incriminating about the Maryetta Griffin homicide,

17  correct?

18  A.  I don't know what's in their mind.

19  Q.  Well, why would the Detectives be listening to Mr. Avery's

20  phone calls unless they were attempting to gain information or

21  gain evidence that Mr. Avery knew something incriminating about

22  the Griffin crime?

23  A.  I can't speculate, but as an investigator, if I go out to

24  interview --

25  Q.  You know, if you can't speculate, that's fine.

1  A.  I just want to answer it.

2  Q.  Well, it sounds to me --

3  A.  I'd like to answer it.

4  Q.  It sounds to me like you don't know.

5  A.  Well -- okay.

6  Q.  Is that correct?  All right.  Let's just deal with the

7  facts.  The fact is that they go to the prison, correct?

8  A.  Right.

9  Q.  And this is after -- so this is May the 11th of 2010.  We've

10  already established by that time the D.N.A. from Maryetta

11  Griffin has come back showing it's Walter Ellis's sperm in

12  Maryetta Griffin's mouth, correct?

13  A.  Yes.

14  Q.  All right.  So at that time, in terms of this further

15  investigation, they're going to the prison where Mr. Avery is

16  located, correct?

17  A.  That's correct.

18  Q.  And they're -- initially they're trying to interview

19  Mr. Avery, correct?

20  A.  That's correct.

21  Q.  And then they're listening to Mr. Avery's phone calls,

22  correct?

23  A.  Which was brought up by the Captain of that prison.  And

24  which you normally do sometimes.  You check the logs.  You check

25  the phone calls.  That's what they were doing.

1  Q.  So they're essentially investigating whether Mr. Avery in

2  these phone calls is indicating some knowledge of or some

3  evidence in relationship to the Maryetta Griffin homicide?

4  A.  I don't know that.

5  Q.  Okay.  Well, if you're listening to phone calls of

6  Mr. Avery, is it reasonable to assume that you're actually

7  conducting an investigation of Mr. Avery in relationship to the

8  Walter Ellis -- the Maryetta Griffin homicide?

9  A.  I don't know what the Detectives were thinking, but that

10  evidence was shown to them, and they were reviewing it.  I don't

11  know what was in their mindset as far as are they trying to -- I

12  guess they're probably looking for further truth of what's going

13  on.

14  Q.  Okay.  Now, the next report that you were just shown -- and

15  this is the one which is dated May the 26th of 2010.  Do you see

16  that one?

17  A.  Yes, sir, I do.

18  Q.  And this is the interview with Valerie Eubanks?

19  A.  Yes, sir.

20  Q.  And again, the investigation is in relationship to Mr. Avery

21  and persons -- and other persons who were connected to him,

22  right?  Including Lorenzo Frost and Lucious Goins?

23  A.  Those were all individuals names that came up in the

24  investigation.

25  Q.  Okay.  And so would you agree that this investigation --

1 this portion of the investigation also is attempting to gain

2 information from Ms. Eubanks that would connect Lorenzo Frost,

3 William Avery, and Lucious Goins to the homicide of Maryetta

4 Griffin?

5 A.  What they're doing is they're investigating the homicide of

6 Maryetta Griffin.

7 Q.  And they're doing that by going to Ms. Eubanks and

8 attempting to generate some evidence of a connection between

9 Mr. Avery, Mr. Frost, and Mr. Goins to the homicide of Maryetta

10 Griffin, correct?

11 A.  I'm not sure what exactly they were doing, sir.

12          MS. YUAN:  Counsel, I'm just going to object.  Please

13 show him the full report.  You're misrepresenting the evidence

14 to him.

15          MR. STAINTHORP:  Counsel, the full report --

16          MS. YUAN:  The second page, too.

17          MR. STAINTHORP:  Second page.

18          THE COURT:  Counsels, don't argue among yourselves.

19 What's the objection?

20          MS. YUAN:  Your Honor, I'm objecting.  I believe

21 Attorney Stainthorp is misrepresenting this report to the

22 witness.

23          THE COURT:  Well, he can select pieces from the

24 report.  You can cover it on redirect.

25          MR. STAINTHORP:  And I would like to state for the

1   record that I resent that.  I am showing two pages, and I resent

2   any indication in this record that I am misrepresenting anything

3   to this witness.  I'm showing him the entire report.

4           THE COURT:  Well, that is not an appropriate

5   objection.  But it's noted on the record.

6           MR. STAINTHORP:

7   Q.  It's true to say that with respect to this portion of the

8   investigation, the Detectives are attempting to discover from

9   Ms. Eubanks whether she is aware of any connection between

10  Mr. Avery, Mr. Frost, and Mr. Goins and the Griffin homicide,

11  correct?

12  A.  They're showing photos of Walter Ellis, William Avery, and

13  Derrick Crawley.  They showed photos of Terry Bryson, Lucious

14  Goins, and of Lorenzo Frost.

15  Q.  Okay.  So again, this is an attempt to obtain information

16  that would connect William Avery and his associates -- that

17  would be Mr. Frost and Mr. Goins --

18  A.  Sure.  They're doing an investigation.

19  Q.  Excuse me.  Let me finish the question, okay?

20  A.  Yes, sir.

21  Q.  It's true to say that in this portion of the investigation,

22  they're once again trying to connect, through Ms. Eubanks,

23  William Avery up to the murder of Maryetta Griffin, correct?

24  A.  Or Walter Ellis.

25  Q.  With respect to the third report that you were just shown by

1   your attorney -- showing you all three pages of this report --

2   this relates to an investigation which is primarily an interview

3   with Derrick Crawley, is that correct?

4           THE COURT:  That's the 5-13 report?

5           MR. STAINTHORP:  Yeah.  I'm sorry.  This is the

6   5-13-2010.

7           THE WITNESS:  This is an interview of Derrick

8   Crawley, sir.

9           MR. STAINTHORP:

10  Q.  Right.  And again, this interview for a substantial portion

11  of it is focussed on Mr. Avery, correct?  In particular, page 2.

12  Feel free to look at as much as you want of that report.

13  A.  Speaking to Mr. Crawley regarding --

14  Q.  No, no.  We're not reading it into the record.  It's not in

15  the record.  I'm just asking you to -- after reviewing it,

16  whether you agree with me that a portion of that investigation

17  is attempting to determine whether Mr. Crawley has any

18  information that would associate Mr. Avery with the murder of

19  Maryetta Griffin?

20  A.  Okay.

21  Q.  So do you recall my question?

22  A.  No.

23  Q.  Okay.

24  A.  Sorry.

25  Q.  So I was asking you whether it's fair to say that a

1  substantial portion of this report -- not the entire portion,

2  but a substantial portion is attempting to find information --

3  and this especially appears on Page 2 -- that would connect

4  Mr. Avery up to the murder of Maryetta Griffin, correct?

5  A.  Crawley indicates that he knew him.  Your client.

6           THE COURT:  I didn't hear that answer.

7           THE WITNESS:  I'm so sorry, Your Honor.  Crawley

8  indicates that he knew Mr. Avery.

9           MR. STAINTHORP:

10  Q.  And in particular -- and this is from some years past,

11  correct?

12  A.  Yes, sir.

13  Q.  And in particular, Mr. Crawley is questioned as to whether

14  he had seen Mr. Avery in the neighborhood in which Ms. Griffin's

15  body was found, correct?

16  A.  Yes.

17  Q.  Now, you did testify under -- pursuant to questions by your

18  attorney that you did recall that Mr. Avery became emotional

19  during the interview -- or the interrogation that you conducted

20  on March the 24th?

21  A.  That's correct.

22  Q.  Okay.  Did you consider that to be inculpatory?  Or do you

23  consider that now to be inculpatory?

24  A.  That was my opinion.

25  Q.  Okay.  Can you tell me where in your reports you report

1    that?

2    A.  We don't put our opinions on reports.  It's factual

3    statements, sir.

4    Q.  Can you tell me where in your report you assert that

5    Mr. Avery became emotional during that interview on the morning

6    of March the 24th, 1998?

7    A.  Once again, I do not put my opinions on these reports.

8    Q.  Okay.  I'm not asking you about opinions.  I'm asking about

9    facts.  Where in those reports do you report that Mr. Avery

10   became emotional?

11   A.  That's an opinion, sir.  I answered your question.  That's

12   an opinion from my experience of doing thousands of interviews.

13   As a father, I can pretty much tell when someone is not happy

14   with themselves or they're depressed.  That's an opinion, sir.

15   Q.  And that's important, isn't it?

16   A.  Yes, sir.

17   Q.  Okay.  And it's not in your report, is it?

18   A.  No, it's not.

19   Q.  And just to be clear, in case it wasn't clear already, there

20   is nowhere in either of those reports that you indicate that

21   Mr. Ellis wanted to terminate the questioning about --

22              THE COURT:  Mr. Avery?

23              MR. STAINTHORP:  I'm sorry.  Did I say -- I'm sorry.

24              THE COURT:  Yes.

25              MR. STAINTHORP:

1   Q.  To be clear, there is nowhere in those reports that you

2   record that Mr. Avery indicated that he wanted that

3   interrogation session to end, correct?

4   A.  As I stated yesterday, it was over at 12:30.  It was

5   terminated.  And no, I did not put it in there.

6   Q.  Okay.  Thank you.  Now, you were asked some questions

7   pursuant to questioning by your attorney -- oh, actually before

8   I get to that, let me just go back to when you were talking

9   about all these additional cases that you sent out in 2010 or

10  2009 and 2010 to attempt to make a connection with Walter Ellis.

11  Do you recall that?

12  A.  Yes.

13  Q.  And so you were indicating that there were hundreds, if not

14  thousands of cases, is that correct?

15  A.  Of cases?

16  Q.  Yeah.  That you sent out for analysis?

17  A.  I would say probably -- I think I investigated -- I sent out

18  a whole lot.

19  Q.  Okay.

20  A.  I kept going back.

21  Q.  So you sent out a lot of cases?

22  A.  Yes.

23  Q.  To determine whether there was a connection between

24  Mr. Ellis's D.N.A., which has now been discovered, correct?  And

25  the D.N.A. recovered in these other cases, correct?

1   A.  Yes.

2   Q.  All right.  You didn't send out Mr. Avery's case, did you?

3   A.  No, I didn't.

4   Q.  Okay.  And of those cases that you did send out, there were

5   9 that came back showing a connection between Mr. Ellis's D.N.A.

6   and biological material in the case?

7   A.  There were 9 that were charged.

8   Q.  No.  There actually were 7.

9   A.  Seven.  Okay.  Seven.  Thank you.

10  Q.  So there were the 7 that were charged.  And then there was

11  the -- the -- there also was a connection made in the Jessica

12  Payne case, correct?

13  A.  Yes.

14  Q.  And that was a case where Chaunte Ott had been convicted of

15  that murder, correct?

16  A.  Yes.

17  Q.  And then subsequently, once the D.N.A. associating with

18  Mr. Ellis came out, his conviction was vacated, correct?

19  A.  One more time?  Which case?

20  Q.  This is the -- Jessica Payne is the victim.

21  A.  Thank you.

22  Q.  Chaunte Ott is the person who was convicted.

23  A.  Okay.

24  Q.  And when the D.N.A. connecting it to Mr. Ellis came out, his

25  conviction was vacated?

1  A.  I'm aware of that, yes.

2  Q.  And another case was the Carron Kilpatrick victim, correct?

3  A.  That's correct.

4  Q.  And in that case a different person was charged with the

5  crime, correct?

6  A.  That's correct.

7  Q.  And that person would actually -- was actually found not

8  guilty at trial, correct?

9  A.  I remember that, yes.

10 Q.  And then -- so subsequently, although it wasn't work that

11 you did, the D.N.A. results in the Maryetta Griffin case came

12 back, and those also showed that Mr. Ellis was associated with

13 biological materials found in that case, correct?

14 A.  That's correct.

15 Q.  So of all those cases that you sent out, 10 of them were

16 associated with Mr. Ellis?

17 A.  That's correct.

18 Q.  And -- okay.  Now, going back, and for purposes of

19 completeness, let's deal with the -- you were read some

20 questions from your deposition by your attorney.  And I want to

21 read you some additional questions and the answers from your

22 deposition, and ask you if you were asked these questions and

23 gave these answers.  First excerpt is at Page 72, line 16.

24 Question:  Okay.

25        MS. YUAN:  One second, counsel.  What line?

1    MR. STAINTHORP:  16.

2    MS. YUAN:  I object.  I don't think that this is -- I

3 don't think this is part of -- I don't think this would make the

4 deposition testimony that was read in more complete.  I don't

5 think it's at all part of that one question.

6    MR. STAINTHORP:  Judge, it has to do with Mr. --

7 Special Agent Hernandez's recollection.

8    THE COURT:  Okay.  The Court will allow it.

9    MR. STAINTHORP:

10 Q.  Question:  Okay.  And were you involved in getting Mr. Avery

11 to come into the Department for an interrogation?  Answer:  I

12 may have.  Okay.  Do you have any recollection of being involved

13 in that?  Answer:  Not of bringing him down, no.  Okay.  Do you

14 have a recollection of interviewing him?  Answer:  I saw that I

15 did have an interview with him.  1 or 2, I believe.  Question --

16 and now I'm going to Page 73, line 7.  Question:  It sounded to

17 me that you were just referring to the reports that you reviewed

18 that documented your interviews with Mr. Avery, correct?

19 Answer:  Yes.  Question:  Okay.  Apart from what's in the

20 reports, do you have any independent recollection of any of your

21 interviews with Mr. Avery?  Answer:  No, I don't.  Question:

22 Okay.  So your recollection of those interviews are limited to

23 what's in the written report?  Answer:  That's correct.

24    Do you remember being asked those questions and giving

25 those answers?

```
 1  A.  I believe that's what I said, if that's documented, yes.
 2  Q.  Okay.  Now on Page 77, line 15.
 3           MS. YUAN:  Line 15?
 4           MR. STAINTHORP:  Correct.
 5  Q.  Question:  Was Monday, March the 23rd, 1998, at 10:40 p.m.
 6  your first interaction with Mr. Avery?  Answer:  To the best of
 7  my knowledge, I believe this would be the first time.  Question:
 8  Okay.  What do you recall about this initial interview with
 9  Mr. Avery?  Answer:  I -- well, what I -- I don't recall the
10  actual interview itself.  But as the report reflects, that he
11  was advised of and did not wish to speak with us at this time.
12  Do you recall that testimony?
13  A.  That document is correct.
14  Q.  And then going to Page 79 -- and this just for context.
15  This is the portion that your attorney read to you.  Line 5.
16  Okay.  Do you recall your interview with Mr. Avery and Detective
17  Phillips on March 24th, 1998?  Answer:  I kind of do, yes.
18  Okay.  What do you recall about this interview?  I recall that
19  Mr. Avery became emotional and -- Question:  What do you mean by
20  emotional?  Answer:  Like sorry or upset with himself.  Then on
21  line 22, Question:  What did you do during the first part of the
22  interview?  Answer:  I'm sure we talked regarding the homicide
23  itself and the investigation.  You're saying you're sure you
24  did.  But do you have a specific recollection of the first part
25  of this interrogation?  Answer:  No, I don't.  Do you recall
```

1  that testimony?

2  A.  I recall that.

3  Q.  And going down to line 10.  Okay.  So before the portion you

4  were just testifying where you recall Mr. Avery getting

5  emotional, do you recall any aspects of the interrogation?

6  Answer:  What my report reflects-- Question:  Yes.  Is that he

7  was indicating that I'm responsible.  I'm responsible.  And that

8  Ronnie should never have gotten rid of the body.  Was that your

9  testimony?

10  A.  Yes.

11  Q.  Okay.  And that you're testifying from your report.  What

12  your report reflects, correct?

13  A.  That's correct.

14  Q.  Line 82.

15          MS. YUAN:  Page 82?

16          MR. STAINTHORP:  I'm sorry.  Page 82.  And this in the

17  context --

18          MS. YUAN:  What line?

19          MR. STAINTHORP:  I'm going to start at line 11, but

20  I'll just add some context.  You're being asked about the

21  statements that you assert Mr. Avery made in the 3/24 morning

22  interrogation session.  Question:  Did you ask Mr. Avery to

23  provide any of those details?  Answer:  I'm sure I did.

24  Question:  Do you have a specific recollection of --  Answer:

25  No, I don't.  Question:  You're saying you're sure you did ask

1  him to provide details about his alleged responsibility in this

2  homicide, but you don't have a specific recollection of doing

3  so? Correct? Answer: That's correct. Was that your

4  testimony?

5  A.  Yes.

6  Q.  Then we'll go down now to Page 83, just below this. Line

7  one. Starting at line one. Question: Okay. Did you provide

8  any details to Mr. Avery about the homicide or anything you knew

9  about the investigation? Answer: I don't remember what exact

10  details I gave him back then. Question: Okay. Did you give

11  Mr. Avery any -- any false details about the investigation to

12  try and elicit a confession? Answer: I don't remember.

13  Question: Okay. You may have done, but you don't recall?

14  Answer: I could have, but I don't remember. Question: That

15  would have been one technique you may have used to obtain a

16  confession from a suspect, correct? Answer: I find that, yes,

17  correct. Question: Okay. But you don't recall whether you did

18  that on this particular interrogation or not? Answer: I don't

19  recall. Was that your testimony?

20  A.  Yes, that's correct.

21  Q.  And then going down now to Page 90. And this is line 15.

22          MS. YUAN: One second. Okay.

23          MR. STAINTHORP:

24  Q.  And I'm just going to read line 15. Question: Other than

25  anything you have testified to already about what you recall

1  about what you said or what Mr. Avery said to you -- and then

2  there's some -- a statement that's not relevant.  Is there

3  anything else you recall other than what you've already

4  testified?  Answer:  No, not that I can recall right now.

5  A.  Right now.

6  Q.  That was your testimony, correct?

7  A.  Right now is the magic word.  Right now.

8  Q.  And this is after you --

9  A.  That was how long ago, sir?

10  Q.  I'm sorry.  Counsel --

11  A.  I'm sorry.  Go ahead.

12  Q.  This is after you've reviewed the Police reports, correct?

13  A.  Yes.

14  Q.  Okay.  And after you have already been deposed about this

15  case.  This is on page 90.  So you've already been deposed for a

16  considerable length of time, correct?

17  A.  Yes.  I don't remember exactly what time, but I'm sure if

18  you say it is.

19  Q.  Going down, Page 91.  And there's an incorrect time in here,

20  but I'll read it anyhow.  And it's referring to the morning

21  interrogation on 3/24.  So the question is -- and this is line

22  7.  Do you have a recollection as to why this interrogation came

23  to an end?  And then there is an incorrect time at 2:30 p.m.

24  Answer:  I don't.  Either -- I don't.  Do you recall being asked

25  that question and giving that answer?

1   A.  Yes.  I don't recall, but that's a true document.

2   Q.  And then going down to Page 93.  Page 93, line 25.  You're

3   being asked about how you were recording the interview.

4   Question:  Were you also taking notes on a steno pad or memo

5   book?  Answer:  I don't remember.  I can tell you what my

6   practice is.  Well, I don't remember.  Did you give that

7   testimony?

8   A.  Yes.

9   Q.  Going down to Page 95.  And again talking about the same

10  interview that occurred on the morning of March the 24th.  Line

11  9.  Question:  Okay.  Did Mr. Avery review the statement?  Do

12  you recall that?  Answer:  I don't recall if he reviewed it.

13  Down to line -- did you give that testimony?

14  A.  Yes, I believe so.  If that's what the document states.

15  Q.  Going down to line 15.  Okay.  And you can't recall one way

16  or the other if he had an opportunity to review it or to make

17  any corrections?  Answer:  I know we offered it.  I don't

18  remember if he did or not.  Did you give that testimony?

19  A.  Yes.

20  Q.  Now going to the later interrogation session.

21          MS. YUAN:  I think this is out of scope.  I did not

22  read anything regarding that during my redirect.  My testimony

23  there -- my questioning there was limited specifically to the

24  March 24th, 1998, interview.

25          MR. STAINTHORP:  Well, this is an interrogation on the

1    same day, Judge.  Just one later.

2              THE COURT:  Well, but that wasn't covered on

3    recross -- or redirect.  So the Court will sustain the

4    objection.  Outside the scope.

5              MR. STAINTHORP:

6    Q.  So now we'll go to Page 113.  Now we're dealing with the --

7    your work with respect to the jailhouse informant.

8              MS. YUAN:  Same objection, Your Honor.  I did not

9    question this witness regarding any of the jailhouse informants

10   during my redirect.

11             THE COURT:  That's true also, so the Court will

12   sustain the objection.

13             MR. STAINTHORP:  Well, Judge, I think it's somewhat

14   related to the -- I mean, there is -- there was some testimony

15   in relation to subsequent work that was done by others with

16   respect to going to the jail.

17             THE COURT:  But none of that was of the jailhouse --

18   we're talking now about Randolph Kimbrough?

19             MR. STAINTHORP:  Yeah, we are.

20             THE COURT:  That wasn't covered on redirect, so the

21   Court will sustain the objection.

22             MR. STAINTHORP:  All right.  Judge, that's all I have.

23             THE COURT:  Anything else from this witness?

24             MS. YUAN:  I have nothing further.  Thank you.

25             THE COURT:  All right.  You may step down, Detective.

1   Or Special Agent, now, Hernandez.

2          THE WITNESS:  Thank you, sir.

3          THE COURT:  Let's start the next witness.  We've only

4   been an hour in court.  So next witness, please.

5          MR. SMOKOWICZ:  Call Kevin Armbruster.

6          THE COURT:  Unless someone desperately needs a break.

7   Detective Armbruster, you've previously been placed under oath,

8   and that oath still applies.

9          THE WITNESS:  Yes.

10          **LIEUTENANT KEVIN ARMBRUSTER**, recalled as a witness,

11   having been previously duly sworn, on oath testified as follows:

12                    **DIRECT EXAMINATION**

13   **BY MR. SMOKOWICZ:**

14   Q.  Good morning, sir.

15   A.  Good morning.

16   Q.  Would you remind the jury of your full name, please?

17   A.  Kevin Armbruster.

18   Q.  And what's your present rank, sir?

19   A.  Lieutenant of Police.

20   Q.  Lieutenant Armbruster, where were you born?

21   A.  Right here in Milwaukee.

22   Q.  And where did you grow up?

23   A.  In Milwaukee.

24   Q.  And where did you go to high school?

25   A.  Pius High School.

1   Q.  And when did you graduate from Pius?

2   A.  1988.  '87, sorry.

3   Q.  And after you graduated from high school in 1987, did you go

4   on in education, at all?

5   A.  Yes.

6   Q.  Where did you -- where did you follow-up with that?

7   A.  I attended M.A.T.C. at first, and then Mount Senario

8   College.

9   Q.  And with respect to M.A.T.C., what did you go to M.A.T.C.

10  for?

11  A.  That was very basic classes for Police Science.

12  Q.  And what years did you attend M.A.T.C.?

13  A.  I started it in '88.  I believe I was finished there at --

14  within a couple of years.  My education was prolonged because I

15  was also on the Police Department, so I was doing full time

16  Police, and then day or night classes depending on what shift I

17  was at.  So my whole college experience is a good 8 years, I

18  think I finished.  Finally.  So maybe 1 or 2 classes a semester.

19  Q.  And did you end up getting a degree from M.A.T.C. in 1990?

20  A.  I ended up getting the degree from Mount Senario.

21  Q.  When did you start attending Mount Senario?

22  A.  Somewhere in the early 90's.  And I wish I knew when I

23  graduated.  I think it was somewhere in '96?  It's a guess.  I

24  really don't know.

25  Q.  And what degree did you get from Mount Senario College?

1  A.  That was a Bachelor's in Police Science.

2  Q.  Now, we touched a little bit about where you worked, but

3  let's just go back.  Once you graduated from Pius in 1987, did

4  you start working at that point?

5  A.  Yes, I did.

6  Q.  Where did you start working?

7  A.  After high school I worked at a -- like a psych hospital,

8  outpatient facility.  I also did blueprinting, drafting work for

9  a tool and die shop.  But all that was fairly limited because I

10  got hired with the Police Department in '88.

11  Q.  Okay.  And when you say the Police Department, what Police

12  Department are we talking about?

13  A.  City of Milwaukee.

14  Q.  So when you get hired in 1988 -- strike that.  Before we get

15  that, how old are you, sir?

16  A.  I'm 46?  7?  I was born in '69.

17  Q.  Okay.  With respect to the Milwaukee Police Department, when

18  you started in 1988, what position did you have at that point?

19  A.  I worked third shift job at -- doing fingerprinting.  Worked

20  in our identification division.  Also helped with booking

21  prisoners.

22  Q.  Were you a Police -- a full sworn Police Officer at that

23  point?

24  A.  I was a Police Aide, which is another word for like a cadet.

25  Prior to being 21 years of age, you could be hired by the Police

1  Department and work there.  You just don't have Police powers

2  until you turn 21.

3  Q.  So when you turned 21, were you able then to enter the

4  Academy?

5  A.  Yes.

6  Q.  And that would be the Milwaukee Police Department's Academy?

7  A.  Yes.

8  Q.  And for how long -- well, that would be about 1990, roughly?

9  A.  Yes.  1990 I started.

10  Q.  And how long was your recruit training in the Academy in

11  1990?  Approximately?

12  A.  Four months.  Five months.

13  Q.  After you graduated from the Academy, what was your first

14  assignment out of -- in the Police Department?

15  A.  I was assigned to the third shift, District Number 3,

16  patrol.

17  Q.  And where is District Number 3 located?

18  A.  At that time it was located on 47th and Vliet.  So the north

19  side of Milwaukee.

20  Q.  And for how long were you a Patrol Officer in the Third

21  District?

22  A.  I was within the Third District for almost 6 years, but

23  within that District I was only a uniformed patrol for a couple

24  of years.

25  Q.  What happened after the first 2 years?

1  A.  I think it was based on my young appearance at the time, I

2  ended up doing a lot of undercover work.  Plain clothes, special

3  assignments.  Drug, gangs investigations.

4  Q.  And when you talk about youthful appearance and being

5  undercover, what was the nature of those investigations?

6  A.  I did prostitution, escort investigations.  I did underage

7  drinking.  We had Marquette University there.  We had U.W.

8  Milwaukee.  I did drug buys.  That's primarily the undercover

9  work I did.

10  Q.  Okay.  After that 6 years in District Number 3, what

11  happened next?

12  A.  Brief -- a brief stint on day shift patrol, which lasted a

13  week, and then they put me day shift undercover.  And then

14  shortly after that, I think it was within -- it's within that

15  year I got promoted to Detective.  And then I went back third

16  shift again.

17  Q.  So that would be, what?  About 1996?  Somewhere in that

18  range?

19  A.  '97.

20  Q.  When you were promoted to Detective, what was the first

21  assignment that you had?

22  A.  The first job assignment, meaning the unit I was on, was our

23  Violent Crimes Unit.  That investigates all shooting -- could be

24  stabbing -- related crimes just short of homicide.  Sometimes

25  you do work on homicides, but the Homicide Unit takes care of

1   those investigations.

2   Q.  And how long did you remain in the Violent Crimes Section?

3   A.  Two -- almost 2 years.  Year-and-a-half, 2 years.

4   Q.  So that would take us to somewhere around 1999?

5   A.  Yes.

6   Q.  What happened in 1999?

7   A.  I was moved to the Homicide Unit, third shift.

8   Q.  And for how long did you remain in the Homicide Unit?

9   A.  Until 2002.

10  Q.  What happened in 2002?

11  A.  I was asked to be assigned to a Federal Task Force.  It was

12  with the Bureau of Alcohol, Tobacco, and Firearms.  It was kind

13  of a unique position for someone from our Department.  That I

14  would physically be assigned in a different work location.  I

15  didn't report to the Police Department anymore.  I reported to

16  some building downtown and did long term gang, drug

17  investigations, violent crime and firearm related

18  investigations.

19  Q.  And for how long did you remain in that assignment with this

20  Joint Task Force, beginning in 2002?

21  A.  I was almost there 8 years.  Eight-and-a-half years.  My

22  hair was nice and long.  Long goatee.  Long hair.

23  Q.  And so that takes us to about 2010, roughly?

24  A.  Yes.

25  Q.  What happened in 2010?

A.  I went back to our Police Department to investigate bank

robberies and case management for a short time before I went to

investigate -- moved to the Sensitive Crimes Division, which --

that investigated like child abuse, sexual assaults, missing

persons.

Q.  How long did you remain in Sensitive Crimes?

A.  Until April of last year.

Q.  So that would be April of 2014?

A.  Yes.

Q.  And what happened in April of 2014?

A.  I then was promoted to Lieutenant.

Q.  And upon promotion, what was your assignment?

A.  I was assigned and I currently am assigned to the Central

Investigations Division.  That incorporates supervising

Detectives, some Sergeants, Officers, in criminal

investigations.  That's within District 3 and District 5, which

is basically the north side, the central city, from the east

side all the way west to Tosa.

Q.  And what are the nature of the crimes that the Central

Investigation Division investigates?

A.  From critical incidents, meaning Police related Officer

involved shootings to some homicide investigations.  Initially

all violent crimes, shootings, stabbings, carjackings,

robberies, burglaries -- just about anything -- anything you see

on the news pretty much would be stuff we would investigate.

1    Q.  And your normal shift at this time?

2    A.  My shift hours?

3    Q.  Yes.

4    A.  Are 11:00 a.m. to 7:00 p.m., but they fluctuate.

5    Q.  Okay.  Lieutenant, I know we've seen this document on more

6    than one occasion in this case, but do you recognize this as the

7    report that you prepared of the initial contact that you had

8    with the person who later identified himself as Antron Kent?  Or

9    who identified himself as that, but asked to remain confidential

10   at that time?

11   A.  That is correct.

12          THE CLERK:  Is this 1020?  I don't show this as being

13   entered.

14          MR. SMOKOWICZ:  Well, I apologize.

15   Q.  Take a look at that.

16   A.  (Witness so responds.)

17   Q.  Lieutenant, have you now had an opportunity to review that

18   document?

19   A.  Yes.

20   Q.  And can you identify it for the jury, please?

21   A.  Yes.  This is a report that I created after the initial

22   phone call by Antron Kent.

23   Q.  And is this a document that you would prepare normally in

24   the course of your work at that time as a Detective in the

25   Homicide Division?

1    A.  Yes.

2           MR. SMOKOWICZ:  Your Honor, I offer Exhibit 1020 into

3    evidence.

4           MR. ELSON:  No objection.

5           THE COURT:  The Court will receive it.

6           MR. SMOKOWICZ:

7    Q.  Does this basically recount the conversation that you had --

8    or the information that you obtained from the person later

9    identified as Antron Kent at that time, on July 24th of 2002?

10   A.  Yes.

11   Q.  Okay.  With respect to this report, did you provide any of

12   the details to Antron Kent?

13   A.  No.  I didn't even know about it.

14   Q.  Okay.  Let's back up a little bit, refresh everybody on this

15   one.  How is it that you -- how is it that you became involved

16   with this phone call?

17   A.  This is the one that they had paged for any homicide

18   Detective to pick up a phone call.  And then when no one did,

19   they instructed me to do it, so I answered the phone.

20   Q.  Now, prior to this conversation, where you were given the

21   name William Avery by the person making the phone call to the

22   Department, had you ever heard of William Avery before?

23   A.  No.

24   Q.  Had you done any work whatsoever -- I know you didn't get

25   into the Homicide Division until what was it?  About 1999, was

1  it?

2  A.  Correct.

3  Q.  In that time from 1999 until the year 2002, on July 24th,

4  had you done any work on the Maryetta Griffin homicide

5  investigation?

6  A.  No.

7  Q.  With respect to this statement in particular, how did you go

8  about just preparing this report?  What did you do, just in

9  general?

10  A.  Just taking the initial information over the phone, and then

11  checking to see what case this even involved.  And then

12  eventually I spoke with the Assistant District Attorney, Ron

13  Dague, who had prosecuted Mr. Avery, and asked him about the

14  information about what was charged, and anything that was going

15  on.  If there's still ongoing work as far as a homicide

16  investigation.

17  Q.  So when the phone call comes in, do you tell this person to

18  sit on hold for awhile while you go and get any file material?

19  A.  No.

20  Q.  How did it work in terms of mechanically.  You picked up the

21  phone.  Then what happened?

22  A.  You listen.  You take down the information that, you know,

23  he's given you.  You don't -- I knew nothing about it, so until

24  you look at what he's talking about, you get an idea of what

25  case he's even talking about.  Sometimes you get information.

1    People will call and they'll give you information.  And then,

2    you know, understand the person's already charged and convicted

3    on it.  So, you know, there's not much to do on it.  It's just

4    taking the information and --

5    Q.  So is it fair at that point when you were writing these --

6    making notes on the conversation with Antron Kent, did you know

7    Antron Kent at all?

8    A.  No.

9    Q.  Did he ask for you by name?

10   A.  No.

11   Q.  Had you ever worked with Antron?  Or to the best of your

12   memory have you ever worked with Antron Kent in any other case?

13   A.  No.

14   Q.  With respect to what he was telling you, you know, just kind

15   of summarizing what's here, is that he was with another

16   individual by the name of William Avery in the pod in Sayre,

17   Oklahoma.  Did you know anything about either of these two

18   inmates in Sayre, Oklahoma, at that time?

19   A.  No.  I didn't even know where Sayre, Oklahoma, was.

20   Q.  And with him talking about -- bragging about beating a

21   homicide case, or being convicted of a drug case, had you had

22   any knowledge of William Avery being convicted of any drug case

23   at that point?

24   A.  No.

25   Q.  And what about in terms of beating a homicide case?  Had you

1  had any information like that?

2  A.  No.

3  Q.  With respect to then some of the details that are in here,

4  that Avery was at, quote, the spot, close quote.  One of his

5  customers he sells dope to didn't have any money, so they had

6  sex for dope.  Any of those details -- did you know any of them

7  before or during this phone conversation?

8  A.  No.

9  Q.  This is all coming from whom?

10  A.  This is coming from Antron Kent.

11  Q.  And then the next detail.  After having sex, they fall

12  asleep.  He wakes up.  She's stealing dope.  Smoking dope in the

13  room.  How about those details?  Did you know any of that?

14  A.  I did not.

15  Q.  And who did that come from?

16  A.  Mr. Kent.

17  Q.  And I'm just going to read the rest here in terms of he

18  wakes up, he snapped, got up, started to choke her, not

19  breathing anymore, but he did not name -- states it was his

20  buddy got arrested for the drug case.  His guy came over, moved

21  the dead body to the trunk of the vehicle, to an alley where

22  they dumped her.  All of those details, who did that come from?

23  A.  Mr. Kent.

24  Q.  Did you have anything in front of you?  Any document, any

25  report, anything to make any suggestions to him about any of

1  these details at that time while you're on the phone talking to

2  him?

3  A.  No.

4  Q.  Now, there's a next portion of the report that reads:  I

5  then investigated this further and found William Avery was

6  listed as a suspect, and the individual that was arrested with

7  him -- well, let me stop there.  As a suspect.  Can you explain

8  to the jury what that means about finding out that he was a

9  suspect?

10  A.  I mean, being a suspect is just that -- you talking about

11  the drug charge?  Or does it matter?

12  Q.  When you wrote this report, you say here that you'd done

13  some investigation and found out that he was listed as a

14  suspect.  What do you mean by listed as a suspect?  In what?

15  A.  I guess a suspect is a term that, you know, either he -- he

16  was out of custody, listed as a suspect, or he could be in

17  custody and he's a suspect.  He just hasn't been found guilty, I

18  guess.

19  Q.  And what charge was that in connection to?  Or what crime?

20  If you recall?

21  A.  In the homicide.

22  Q.  Okay.  And where would you have found that kind of

23  information, that he was listed as a suspect there?

24  A.  Within our, I guess, database.

25  Q.  And it goes on to state here the individual that was

1  arrested with him on this and for the drug charges was a Lorenzo

2  Frost.  Is that the first time you were aware of the name

3  Lorenzo Frost?

4  A.  Yes.

5  Q.  And how did you become aware of that name?

6  A.  Also listed within that database.

7  Q.  Okay.  The report goes on to state that you spoke with

8  Assistant District Attorney Ronald Dague.  Did you know

9  Mr. Dague at that point?

10  A.  I did.

11  Q.  And how is it that you came to talk to him?

12  A.  Just being in court and seeing him.

13  Q.  And this document goes on to report that he stated he is the

14  one who prosecuted Avery and Frost on the drug cases.

15  A.  Yes.

16  Q.  Is that what he told you?

17  A.  Yes.

18  Q.  Lieutenant, what I have put up on the screen there now is

19  the first page of Exhibit 1021.  And this had been previously

20  discussed in some degree, in your testimony here.  Do you

21  recognize this document?

22  A.  Yes.

23  Q.  And this is the -- a subsequent report that you prepared

24  with respect to another phone conversation that you had with the

25  person later identified as Antron Kent, right?

1  A.  Yes.

2  Q.  With respect to -- and this report is dated August 20, 2002.

3  Is that the date of the report at the top there?

4  A.  Yes.

5  Q.  And there's also a date on the second page there of

6  8-20-2002.  Can you explain to the jury why that date is there?

7  A.  Our reports are dictated, and the person who typed it,

8  whoever W-H-U is, would put their initials that they dictated it

9  for me on that date.

10 Q.  So it would -- it would actually be typed up on the 20th of

11 August of 2002, right?

12 A.  Yes.

13 Q.  And on its face in the second paragraph of the report

14 reports a contact on August 19th of 2002, right?

15 A.  Yes.

16 Q.  Now, just to be clear about this here, in that paragraph it

17 relates or recounts that you have spoken to this contact on

18 numerous occasions.  Do you recall how many times you had spoken

19 to Antron Kent between that July date in 2002 -- we just saw

20 there, that was July 24th, and then this date in August here.

21 August 19th?

22 A.  As I testified before, it was over -- about 5 times.  Around

23 that.

24 Q.  And the other occasions where you did speak to him but did

25 not -- did you prepare any other reports on those occasions

1    except for these two?

2    A.  No.

3    Q.  And why is that?

4    A.  There was nothing new to report.  I don't have contact with

5    him, so I wanted him to continue to call back so I can, you

6    know, speak with him at some point, since I didn't -- I didn't

7    have a way to call him.  He had to call me.

8    Q.  Okay.  So when you say there's nothing new, what are you

9    talking about, nothing new?  What do you mean by that?

10   A.  You know, like after the first call, I didn't know anything

11   about this case.  I didn't know if he'd call back and if he

12   would even call back.  That, you know, I'd tell him, you know,

13   thanks for your time.  You know, we're not investigating this

14   anymore.  Or, you know, I don't know what the results would be

15   until I looked at the case.

16   Q.  Okay.  But in terms of nothing new, did -- in particular,

17   did Antron Kent in any of those conversations where you didn't

18   prepare a separate report tell you anything new about any

19   conversations that he had with William Avery?

20           MR. ELSON:  Objection, leading.

21           THE COURT:  Well, it is.  The Court will allow it.

22           MR. SMOKOWICZ:  I can rephrase it, Your Honor.

23   Q.  What, if anything, did Antron Kent tell you about any

24   additional details of conversation that he might have had with

25   Avery in any of those unreported conversations?

 1   A.  There was nothing of value that he didn't tell me that first

 2   time.

 3   Q.  Okay.  Is it worthwhile preparing your report if someone

 4   goes through a conversation but just simply repeats basically

 5   what you've already heard?

 6   A.  I mean, it's already documented.  We don't routinely

 7   document phone calls that, you know, come in.

 8   Q.  And do you routinely document if you have a conversation

 9   with a witness more than once, and you documented the first

10   conversation, if that person just really -- just basically

11   restates what he or she has already told you?

12   A.  No, we don't do that.

13   Q.  What substance was added in this conversation that would

14   cause you to make a report of it here?

15             THE COURT:  Which conversation?

16             MR. SMOKOWICZ:  This conversation that's the subject

17   of 1021.  The August 19, 2002, conversation.  Thank you, Your

18   Honor.

19             THE WITNESS:  He added the fact that the buddy that he

20   was arrested with had owned a vehicle or used a vehicle to move

21   a body.  He also added the fact of a cellmate.

22             MR. SMOKOWICZ:

23   Q.  And that would be what person?

24   A.  That was Mr. Kimbrough.  I think it was Jeffrey Kimbrough.

25   Q.  On the second page there you do indicate in the report of

1  the August 19th conversation that you told Kent that two

2  Detectives would probably be coming down to speak with him

3  regarding this.  And that Kent asked that you be one of the two

4  Detectives.  Do you have any recollection of why -- if he said

5  why he wanted you to be one of the people going there?

6  A.  It was just that -- it was probably a comfort thing.  It's

7  someone you talked to and it happens every now and then.

8  Q.  In any of the numerous -- in any of the two documented

9  conversations, or any of the conversations that you did not

10  document, did you make any promises to Antron Kent about his

11  sentence?

12  A.  No.  I would never do that.

13  Q.  And why not?

14  A.  I just -- I have never done that.  It's not up to me to tell

15  anyone anything like that.  I don't make decisions like that.  I

16  always tell people just to put themselves in the best position

17  possible.

18  Q.  Okay.  Do you have the power over -- of sentencing or

19  resentencing over people who are in prison?

20  A.  Do I have power?  No.

21  Q.  Who has the power to do that, to your -- based on your

22  experience?

23  A.  It would be the Judge.

24  Q.  Now, on the first page of this report, Lorenzo Frost's name

25  is in the -- towards the bottom there in parentheses.  Why was

1   it put in parentheses?  Do you have a memory?

2   A.  Yeah.  That's because he did not tell me a name of Lorenzo

3   Frost.  It's only reference to me doing the investigation

4   paperwork-wise so the reader could understand who -- if they

5   have a question, who the buddy was that -- his term -- you could

6   reference that in a report.

7   Q.  During any of these phone calls that you had with Antron

8   Kent, did you make any threats to him?

9   A.  No.

10  Q.  During any of these phone calls with Antron Kent, did you

11  supply any details of the homicide to him?

12  A.  No.

13  Q.  By the time of this last phone call on August 19th of 2002,

14  had you become somewhat familiar with the Griffin homicide at

15  that point?

16  A.  Yes.

17  Q.  Can you describe for the jury what -- how you became

18  familiar.  And if you have a recollection, the degree to which

19  you are familiar with it at that point?

20  A.  My degree of recollection is very basic.  Looking up through

21  our database on the computer.  In 2002 we're talking -- I think

22  there were like IBM computers.  I don't -- if some of you guys

23  remember the DOS systems.  And so it's very basic information.

24  It's nothing like today that you can get all Police reports.

25  Q.  Had you actually gone to look at the Police reports at all

1  in this matter?

2  A.  Eventually, yes.  Eventually I had the homicide file.  I

3  don't recall to what degree I looked through the file.  I know

4  the supplement reports would be important to understand what was

5  going on, and what part of the investigation, and where it was

6  at.

7  Q.  Okay.  And do you recall reviewing any of those

8  supplementary reports prior to this August 19th, 2002

9  conversation?

10  A.  I don't remember if I had the homicide file by that time or

11  not.  I did by the time I went down to Oklahoma.

12  Q.  Okay.  Now, with respect to traveling to Oklahoma, at that

13  point -- strike that.  This is in August of 2002.  And I think

14  you described for the jury before that at some point you moved

15  over to this A.T.F. unit, is that right?

16  A.  Yes.

17  Q.  And when -- when were you moving to the A.T.F. unit?

18  A.  Pretty much as soon as I got back from this.  This was the

19  end of things.  I already knew I was leaving, getting

20  transferred, and this was pretty much it.

21  Q.  So did you expect to be pursuing this homicide investigation

22  any further after you returned from Oklahoma in August of 2002?

23  A.  No.  I was told that I was not going to be part of that.

24  Q.  And were you involved in making the arrangements to go to

25  Oklahoma?

1  A.  I was.

2  Q.  And can you explain for the jury how it was arranged that

3  you would be going to Oklahoma with -- turned out to be Captain

4  Heier, right?

5  A.  Yes.

6  Q.  Were you -- before I get there, were you and Captain Heier

7  partners at that time?

8  A.  No, we were not.

9  Q.  Do you recall how it is that you and Captain Heier ended up

10  traveling to Oklahoma?

11  A.  He was in the Homicide Unit, but we worked different shifts,

12  and so we never worked together.  But the supervisor in charge

13  of the Homicide Unit I assume picked him.  I don't know why or

14  how that came about, but said he'd be going down with me.

15  Q.  Okay.  And now with respect to the arrangements in order to

16  go to Oklahoma, can you describe for the jury -- you indicated

17  you were involved in that.  How did that happen?

18  A.  This was done by the District Attorney's Office.  They're

19  the ones that authorize any kind of travel to do investigation.

20  Also you are going to a prison out of State, so you do have to

21  have contact with the prison.  I had contact with the supervisor

22  down in Oklahoma.  Even though we're law enforcement, still got

23  to be put on a visitor list and set up things that way.

24  Q.  Okay.  And did you make all of those arrangements?  Or did

25  somebody else make them for you?

1   A.  I did the prison portion.  As far as the D.A.'s Office, I

2   was part of that.  Not fully.

3   Q.  How would that be done?  Would that be done by you talking

4   to some Assistant District Attorney?  Or is there something in

5   writing?  Or how does that work?

6   A.  Right.  It would be speaking with the District Attorney, and

7   then there's -- basically they authorize it, because there's

8   travel expenses and stuff.

9   Q.  And do you remember who you spoke to about this?

10  A.  That would be Mark Williams.

11  Q.  And in order to do this, did you provide any details to

12  Mr. Williams?

13  A.  From what I had.  The Police reports.

14          THE COURT:  All right.  Mr. Smokowicz, we're going to

15  take the morning break at this point.  We'll pick it up at that

16  point, ladies and gentlemen of the jury.  Please don't discuss

17  the case.  We'll see you back here after the morning break.

18          (Whereupon the jury was excused at 10:56 a.m.)

19          THE COURT:  Okay.  Take about 15.

20          (Whereupon a recess was called by the Court.  Upon

21  conclusion of the recess, the proceedings continued as when the

22  jury was returned to the courtroom at 11:21 a.m.:)

23          THE COURT:  Mr. Smokowicz?

24          MR. SMOKOWICZ:  Thank you, Your Honor.

25  Q.  Lieutenant Armbruster, returning to the travel and the

1  interviews that you did in Oklahoma, what I put on the ELMO is

2  Exhibit 1017, which is a handwritten statement of Antron Kent.

3  You were present for this -- for the giving of the statement by

4  Mr. Kent, right?

5  A.  Yes.

6  Q.  And do you recognize whose handwriting this is?

7  A.  That is my handwriting.

8  Q.  Okay.  And there is a signature about four lines, five lines

9  down.  Whose signature is that?

10  A.  Antron Kent.

11  Q.  And was that signed in your presence?

12  A.  Yes, it was.

13  Q.  Just mechanically in terms of that signature, as opposed to

14  the rest of the statement, and the first part of that paragraph

15  there about Miranda warnings, how did that work in terms of your

16  interview of Kent at that time?  Was part of this done, and then

17  all of it -- and then the rest of it done?  How does that work?

18  A.  Well, the first -- that first part is done -- as far as the

19  Miranda, and that you're acknowledging the Miranda portion of

20  it.  The next portion is essentially the -- like background or

21  pedigree information.  And his signature is affixed to that

22  also.

23  Q.  So would that -- would like the first paragraph have been

24  done, this paper was turned over to him, and then signed, and

25  then similarly with the next paragraph?

1   A.  The Miranda is always done and signed.  The pedigree -- I

2   don't recall as far as what -- as far as this was done.  But

3   that one, I will do either at the end or during.

4   Q.  And who wrote this out for Kent?

5   A.  I wrote that one.

6   Q.  And then does his signature appear on this page -- little

7   cut off here.  I'll try the best, but Page 4 of 4.  Does Kent's

8   signature also appear on this?

9   A.  Yes.

10  Q.  Is that -- where is it on this page?

11  A.  At the bottom of the page, right after the last sentence.

12  Q.  Okay.  And then there are two signatures below that?

13  A.  Yes.

14  Q.  And whose signatures are those?  Do you recognize them?

15  A.  It's Detective Heier, and then I assume mine.  I can't see

16  it on my screen.

17  Q.  Oh, I'm sorry.  That silly blue thing is there.

18  A.  Yes.

19  Q.  And whose is below Detective Heier?

20  A.  That would be my signature.

21  Q.  There are some times written?

22  A.  Yes.

23  Q.  What are the times written on the bottom of Page 4?

24  A.  That would be 1:27 p.m. to 4:38 p.m.

25  Q.  What is the significance of those two times?

1  A.  That signifies the start of the interview time, and the end

2  of the interview time.

3  Q.  Other than writing out this statement, what role did you

4  have in the interview?

5  A.  Participating in the interview.

6  Q.  Would you have asked all the questions?  Some of the

7  questions?  None of the questions?

8  A.  Some.

9  Q.  And does this report -- have you had a chance to look at it

10  before?

11  A.  Yes.

12  Q.  Does this statement truly and accurately recount the details

13  that were provided to you by Antron Kent on that day back in

14  August of 2002?

15  A.  Yes.

16  Q.  With respect to this statement, during the course of that

17  interview did you make any promises to Antron Kent?

18  A.  No.

19  Q.  With respect to this statement, during the course of that

20  interview did Detective Heier make any promises to Antron Kent?

21  A.  No.

22  Q.  Prior to this statement being taken, did you make any

23  promises to Antron Kent?

24  A.  No.

25  Q.  Were you are aware of any contact between Detective Heier

1  and Antron Kent before this interview?  Detective Heier, as

2  opposed to you?

3  A.  Correct.  I -- no, not at all.  He did not know him.

4  Q.  With respect to threats, did you make any threats to Antron

5  Kent during any of those phone conversations you had with him?

6  A.  No.

7  Q.  What about during this interview?

8  A.  No.

9  Q.  Did you provide any details to Antron Kent during this

10  interview about -- that would -- that ended up in this

11  statement?

12  A.  No, I did not.

13  Q.  Okay.  Now, there is a reference in here, and you've seen

14  it -- and let's talk about it.  On Page 2 right above where my

15  pen is and it reads:  His guy is the same guy that he got

16  arrested with on a drug charge.  Lorenzo sounds familiar.  First

17  of all, is that your handwriting?

18  A.  Yes, it is.

19  Q.  Okay.  Do you have any recollection of how the name Lorenzo

20  came up in this context?

21  A.  Yes.

22  Q.  Would you please describe that for the jury?

23  A.  Lorenzo came up as far as when we were asking about his guy,

24  Antron couldn't recall any name.  So we gave him several names

25  during the interview, just randomly.  Like do you know Jeff, do

1   you know Terrence, do you know -- and when you say Lorenzo, he

2   said that sounds familiar.  And you go on to other names.  It's

3   almost like a photo identification, if you will.  You've got one

4   person you're interested in, but yet you surround them with, you

5   know, pictures of 5 more people so it gives an unbiased

6   recollection.

7   Q.  At any point during the course of this interview did Antron

8   Kent indicate any interest with respect -- or any concerns with

9   respect to his cooperation and the prison sentence that he was

10  serving at that time?

11  A.  Did he ask -- did he have an interest?

12  Q.  Yes.

13  A.  Yes, he did.

14  Q.  What do you recall him telling you?

15  A.  I mean, he wanted a -- he wanted to get credit for, you

16  know, information to get time off on his sentence.

17  Q.  And what did you tell him about that?

18  A.  That I wouldn't make any guarantees.  That you put yourself

19  in the best position you can.  I mean, to be honest, it was

20  Antron Kent.  And I really -- the crime he committed, I really

21  could have cared less.  I think he should have not gotten

22  anything off, but that's just my personal opinion.

23  Q.  With respect to witnesses in general, in your experience in

24  law enforcement do witnesses other than jailhouse informants

25  have motivations sometimes?

1  A.  Yes.

2  Q.  And can you describe for the jury some of the motivations

3  you've encountered that people may have when you talk to people

4  about various crimes?

5  A.  Some motivations -- when you come to -- could be motivated

6  by money.  Some informants are paid to do things.  Some

7  informants would like, you know, assistance in, you know,

8  warrants.  Or some reduction in sentence.  Some informants might

9  have some type of motive of, you know, retaliation.  Or getting

10 back at someone.  It's just -- just trying to figure out what

11 the motivation of informants are.  Jailhouse informants?

12 They're don't have really a money motivation.  Some of them

13 actually might want you to put money on their books, you know,

14 so they can buy cigarettes or something of that nature.  But

15 most of jailhouse are attempting to get some type of

16 consideration in a sentence reduction or modification.

17 Q.  And in this situation did you make any promises to do

18 anything to try to help Antron Kent?

19 A.  No, I did not.

20 Q.  I'll now put on the monitor here the first page of what's

21 been marked as Exhibit 1018.  Do you recognize this as the

22 statement that you prepared with respect to Jeffrey Kimbrough?

23 A.  Yes.

24 Q.  And with respect to Kimbrough's statement, can you -- do you

25 recognize whose handwriting that is?  That is the body of the

1    statement?

2    A.  That's also my handwriting.

3    Q.  So as with Antron Kent, did you write this out?

4    A.  Yes, I did.

5    Q.  And then did you -- strike that.  Before we go any further

6    with respect to Antron Kent's statement, before he signed it

7    what, if any, steps did you do to make sure that he agreed with

8    it?

9    A.  It was read back in its entirety to him.  It was explained

10   to him that if there was any corrections or changes that needed

11   to be made, it is his statement.  It's not my statement.

12   Q.  With respect to Mr. Kimbrough what, if anything, did you

13   tell him before he signed it?

14   A.  Same -- same thing.  The same response.

15   Q.  Okay.  And was he -- you read the report to him and he

16   listened to it?

17   A.  Yes.  I would read it back to him, and it would be in the

18   presence of him.  That he can read along.

19   Q.  And do you remember -- you wrote this out as well.  Do you

20   remember whether you asked any questions during the course of

21   that interview?

22   A.  Some.

23   Q.  Did Mr. Kimbrough ask you for any kind of assistance and any

24   kind of promises?

25   A.  No.  I don't recall that.

1   Q.   And did you make any promises to him?

2   A.   No.

3   Q.   What about threats?  Did you threaten Mr. Kimbrough at all

4   during his interview?

5   A.   No.  No.

6   Q.   And what about facts?  Did you provide him with any facts?

7   A.   No.

8   Q.   During both of these interviews was there anybody else

9   present aside from Mr. Kent and Mr. Kimbrough?

10  A.   Yes.

11  Q.   Who would that be?

12  A.   Detective Heier.

13  Q.   Did he make any promises, threats, or give any details to

14  Kent during the interview with him?

15  A.   No.

16  Q.   What about with respect to Kimbrough.  Did Detective Heier

17  make any promises, threats, or provide any details?

18  A.   No, he did not.

19  Q.   At the bottom of the Exhibit that's on the screen there,

20  1018, Exhibit 1018, on the bottom of the third page that's

21  displayed on that screen there are some times there again,

22  right?

23  A.   Yes.

24  Q.   What are the times?

25  A.   12:17 p.m. and 1:33 p.m.

1   Q.  What are the significance of those times?

2   A.  The start and ending time of the interview.

3   Q.  So this is about an hour and 15 minute long interview, is

4   that right?

5   A.  Yes.

6   Q.  Okay.  Did you have a chance to interact with Jeffrey

7   Kimbrough during that interview?

8   A.  Yes.

9   Q.  Did he appear to you to be able to answer your questions?

10  A.  Yes.

11  Q.  Did he appear to you to have recall of the events?

12  A.  Yes.

13  Q.  With respect to what's shown on the screen now on the first

14  page, from 1018, this is a listing of what you referred to as

15  the pedigree, right?

16  A.  Yes.

17  Q.  And it lists a father's name, address, mother's name,

18  address, and three brothers and either address or city in which

19  they live, right?

20  A.  Yes.

21  Q.  And ages, of course?

22  A.  Yes.

23  Q.  Where did you get that information from?

24  A.  From Mr. Kimbrough.

25  Q.  Did he have any problems remembering parents' names,

1    siblings, ages, that sort of thing?

2    A.   No.

3    Q.   This last document that's on the screen is Exhibit 1020 --

4    1019.  Do you recognize that document?

5    A.   Yes.

6    Q.   What is it?

7    A.   That is the interview with William Avery, and that is in the

8    handwriting of Detective Heier.

9    Q.   Do you remember having any role in this interview with

10   Mr. Avery?

11   A.   Yes.

12   Q.   What did you do there?

13   A.   I was present in the interview.  Taking part in the

14   interview.

15   Q.   Did you ask him any questions?  Do you want to review that

16   for a minute?

17   A.   I can't read that.

18   Q.   Let me show you this.  My question was do you recall what

19   part, if any, you played -- or role that you played in the

20   interview of William Avery?

21   A.   Just speaking to him with -- interviewing him with Detective

22   Heier.

23   Q.   Okay.  And do you recall him at some point wanting to leave

24   the room?

25   A.   Yes.

1  Q.  And was he allowed to leave the room?

2  A.  At the end, yes.

3  Q.  And how did that happen?  How did it take place?

4  A.  He was done with the interview, and it was -- I got up to

5  ring the buzzer to let him out.  Or to get a guard, I should

6  say.  Not to let him out, but he got to the door prior to me and

7  was let out into the hallway area.

8  Q.  And that's how things came to an end?

9  A.  Yes.  It was -- to describe it, it was in a room this size.

10  You know, with a desk here.  So there was quite a -- it was in

11  their library area.  So there was quite a distance to the door.

12  And I remember that, because I -- you're in a prison.  You're a

13  guest in the prison.  And he walked out into the hallway without

14  the guard, and I kind of thought all right, this is -- I'm going

15  to get in trouble for letting him out into the population.  But

16  the guard said it was fine.  He knew where to go, so --

17  Q.  And the time spent there was from 1:40 in the afternoon

18  until 3:10 in the afternoon?

19  A.  Yes.

20  Q.  During the course of that interview did you make any threats

21  to Mr. Avery?

22  A.  No.

23  Q.  Did you strike him in any way?

24  A.  No.

25  Q.  Did you use any kind of force against him?

1  A.  I did not.

2  Q.  Did you -- for want of a better word, put any words in his

3  mouth here with respect to this statement?

4  A.  I did not.

5  Q.  How about Detective Heier during this time?  Did he make any

6  threats?

7  A.  No.

8  Q.  Did he employ any force against William Avery?

9  A.  No.

10  Q.  And to the best of your recollection, looking at this

11  statement, did he put any -- did he truthfully and accurately

12  recount what Avery did in that statement?

13  A.  Yes.

14  Q.  Lieutenant, after these three interviews you traveled back

15  from Oklahoma to Wisconsin, right?

16  A.  Yes.

17  Q.  And did you have any further involvement in the matter after

18  that?  In the investigation of Maryetta Griffin's homicide?

19  A.  I did not.

20  Q.  And did you even have the opportunity to talk to the

21  District Attorney, Mr. Williams, afterwards about how the

22  interviews went?

23  A.  Detective Heier did that.

24  Q.  So you did not even have a role in that at all, is that

25  right?

1  A.  Yes.

2  Q.  All right.  That's all the questions I have.  Thank you.

3         THE COURT:  Cross examination.

**CROSS EXAMINATION**

4

5  **BY MR. ELSON:**

6  Q.  Lieutenant Armbruster, you just testified on direct

7  examination about this interview with Antron Kent in Oklahoma,

8  where -- and particularly about the portion of your report which

9  shows that you suggested the name Lorenzo to him.  Do you recall

10 that testimony?

11 A.  Yes.

12 Q.  And you just testified that in addition to the name Lorenzo,

13 you suggested other names to him.  And I think you said you

14 suggested the names Terrence and Jeff to him?

15 A.  I was just throwing that out.  I don't know exactly if

16 that's it.

17 Q.  But you recall your testimony that you have a recollection

18 of giving Mr. Kent other names besides Lorenzo during that

19 meeting.  That's what you testified to, right?

20 A.  That is correct.

21 Q.  Remember giving a deposition in this case?

22 A.  Yes.

23 Q.  And you were sworn to tell the truth during that deposition?

24 A.  Yes.

25 Q.  This is Page 128.

1    MR. SMOKOWICZ:  Just a second.

2    MR. ELSON:

3  Q.  128, line 17.  Question:  Okay.  A couple sentences down it

4  looks like it says, quote, Williams said he had a spot with his

5  guy selling dope.  The guy is the same guy that he got arrested

6  with on a drug charge.  Lorenzo sounds familiar.  End quote.  Do

7  you see that part of the statement?  Answer:  Yes.  Question:

8  Did you convey to Mr. Kent the name Lorenzo?  Because it says

9  here Lorenzo sounds familiar.  Answer:  I'm not sure if I did or

10 Detective Heier did, but Mr. Kent was telling that portion of

11 the story to us about this guy that he got arrested with.  Drug

12 charges.  I recall him like thinking what was -- like he

13 remembered the name, but couldn't remember to us.  Question:  So

14 somebody, you or Detective Heier, gave him the name?  Answer:

15 Yeah, they mentioned it, yes.  Question:  Did you give him any

16 other names?  Answer:  Not that I can recall.  Question:  Okay.

17 Did you test him by giving him a different name than a real name

18 to see if he was telling the truth?  Answer:  I can't recall.  I

19 know I do that with other individuals.  Question:  Did you do it

20 here?  Answer:  I don't recall if I did that on this one or not.

21 Do you remember giving those answers to those questions?

22 A.  Yes.

23 Q.  But now you're coming into court and saying you do remember

24 that he -- that you gave him other names?

25 A.  That is correct.

1  Q.  You also testified on direct examination that you didn't

2  remember whether you reviewed the Maryetta Griffin homicide file

3  prior to your August 19th, 2002, phone conversation with Antron

4  Kent.  Do you remember that testimony?

5  A.  Today?  Yes.

6  Q.  Today.

7  A.  Yes.

8  Q.  This is deposition Page 42.  Starting at line 19.  Question:

9  What did you do after the phone call with Mr. Kent?  This phone

10  call?  What did you do next with the information that he

11  provided?  Answer:  Tried to research and figure out what crime

12  he was talking about.  Question:  How did you research what

13  crime he was talking about?  Answer:  There are -- I went

14  through a database where you put in different criteria.  I

15  believe it was just having the Avery name pop up in the

16  database.  Question:  Okay.  What information do you recall

17  reviewing from the database when you put in Mr. Avery's name?

18  Answer:  I believe then it went to this current case, Maryetta

19  Griffin.  Question:  Did you pull up Police reports in the

20  Griffin homicide investigation?  Or what information did you

21  pull up?  Answer:  I'm sure -- I don't know if I did it now in

22  your time frame.  I don't know if I did that all that day,

23  because I was getting off.  I might have done it the next day or

24  next couple days.  But yes, I would have looked, reviewed the

25  Police reports that were associated with that case.  Question:

1   What Police reports do you recall reviewing that were associated

2   with the Griffin homicide?  Answer:  It would be whatever is in

3   our Police file.  Do you remember giving those answers in

4   response to those questions?

5   A.  Yes.

6   Q.  And those questions were about what you did after that first

7   phone call with Mr. Kent that occurred on July 24th, 2002,

8   right?

9   A.  Yes.

10  Q.  And your first contact with Kent by phone was July 24th,

11  2002.  We went over that.  And you wrote a report about that

12  conversation, right?

13  A.  Yes.

14  Q.  And it's been established that between July 24th, 2002, and

15  August 19th, 2002, you had numerous conversations with Kent,

16  right?

17  A.  Yes.

18  Q.  And it's also been established that you didn't write any

19  reports about these numerous conversations, right?

20  A.  Correct.

21  Q.  And on direct examination you told Mr. Smokowicz that the --

22  one of the reasons or the reason you didn't write any reports

23  recording these numerous contacts you had with Mr. Kent, because

24  there was nothing of value that he didn't tell you in the first

25  conversation you had with him.  Do you recall telling that to

```
 1   the jury?

 2   A.  Yes.

 3   Q.  But isn't it true that in your initial conversations that

 4   you had with Kent that he told you he was doing this to get a

 5   reduction in his sentence?

 6   A.  Yes.

 7   Q.  And, in fact, you asked him in these initial conversations

 8   why are you doing this?  And he told you it was to get a

 9   reduction in his sentence, right?

10   A.  He did mention it.

11   Q.  And you didn't put that in any of your reports, did you?

12   A.  He's an informant.  That's what they do.

13   Q.  Okay.  Well, isn't that important information, the fact that

14   this man was telling you that the reason he was doing this was

15   to get a reduction in his sentence?

16   A.  We wouldn't document informant information like that.

17   Q.  You wouldn't document the fact that he told you that the

18   reason he was doing this was to get a reduction in his sentence?

19   That's your testimony?

20   A.  They're informants.  They're -- that's why we don't put

21   their name in the report.  That's the whole --

22   Q.  His name is in the report eventually, isn't it?

23   A.  When we went and talked to him, correct.

24   Q.  Yes.  And when you talked to him, he told you and Detective

25   Heier, who was there, that the reason he was doing this was to
```

1  get a reduction in his sentence.  He said that again to you,

2  didn't he?

3  A.  Down there?  Yes.

4  Q.  Yes.  That was the second time he told you that, right?

5  A.  What do you mean?

6  Q.  He told you that in the initial phone conversations that you

7  had with him, didn't he?

8  A.  Yes.

9  Q.  And he told it to you again when you met with him in

10 Oklahoma?

11 A.  Correct.

12 Q.  And Detective Heier was present at that meeting with you

13 when he told you that?

14 A.  Yes.

15 Q.  And there is nowhere in any of your reports, including that

16 report of your interview with him in Oklahoma, did you document

17 the fact that he told you that he was doing this to get a

18 reduction in his sentence, did you?

19 A.  No, you're correlating the informant being him.  A lot of

20 times when you document an informant, you now know what the

21 bigger picture is.  That the informant is Antron Kent.  But when

22 you say you have an informant, that's the whole part of being

23 anonymous.  And as you go down there, I never referred to him as

24 the informant, Antron Kent.  I just went and talked to Antron

25 Kent.

1   Q.  Well, whether you referred to him as the informant or not,

2   is not what I'm getting at.  What I'm getting at --

3   A.  Well, it's important.

4   Q.  Well, what I'm trying to establish is that you never

5   documented in any of your reports your first conversation with

6   him, your second conversation with him, or your interview with

7   him in Oklahoma that he had said to you that the reason he's

8   doing this is to get a reduction in his sentence.  You didn't

9   document that, did you?

10  A.  No.  That's what I'm telling you.

11  Q.  You didn't, right?

12  A.  We would not put that in there.  I'm telling you, I would

13  not put informant stuff in there.

14  Q.  Okay.  And you don't think that that was important

15  information to include in your Police report?

16  A.  No.

17  Q.  Isn't that information that Mr. Avery could have used to

18  defend himself in the criminal case?

19          MR. SMOKOWICZ:  Objection.  Calls for speculation.

20  It's argumentative at this point.  Also calls for a legal

21  conclusion.

22          THE COURT:  Yeah, the Court will sustain the

23  objection.

24          MR. ELSON:

25  Q.  Sir, do you know what impeachment evidence is?

1    MR. SMOKOWICZ:  Same objection, Your Honor.

2    THE COURT:  He can answer, if he knows.

3    THE WITNESS:  Impeachment is when someone testifies

4  one way, but you have information saying against.  Is that

5  close?

6    MR. ELSON:

7  Q.  Sure.  In a criminal trial it's important for a Defendant to

8  be able to impeach witnesses who testify against him, isn't it?

9  A.  Yes.

10  Q.  And so if a Defendant has information that he could use to

11  impeach a witness at his criminal trial, that would be important

12  information for the Defendant, right?

13  A.  And I would bring it up, then, too.  That would help.

14  Q.  And you know that you have an obligation as a Police

15  Officer, that when you receive impeachment evidence from a

16  witness that you interview, you have to document that.  You have

17  to include it in your Police report, right?

18  A.  I'm not understanding -- I don't -- I think we disagree on

19  that, but --

20  Q.  Okay.  So it's your understanding that if you interview a

21  witness and they provide you with information that you would

22  consider to be impeachment information, you don't have to

23  document that in a Police report?

24  A.  You're saying document.  I'm disagreeing with that.  I say

25  no.

1  Q.  Okay.  You understand that your Police reports are turned

2  over to the prosecutor, and then in turn turned over to the

3  Defendant, right?

4  A.  Yes.

5  Q.  So the Defendant is able to read your Police reports and

6  find out what information you received from witnesses that you

7  interviewed, right?

8  A.  Correct.

9  Q.  And if there were impeachment evidence contained in your

10 Police report, that's something that the Defendant could use to

11 defend himself at trial, isn't that right?

12 A.  Yes.  In this case you're talking about as being an

13 informant.  Impeachment evidence.

14 Q.  Yes.

15 A.  And that's -- and I have been involved in that.

16 Q.  I think you answered my question.

17 A.  Okay.

18 Q.  Do you recall -- you testified under direct examination that

19 you were involved in the Violent Crimes Detective Unit in '97

20 and '98, is that right?

21 A.  Yes.

22 Q.  Do you recall investigating a case where -- involving Walter

23 Ellis in 1998?

24          MR. SMOKOWICZ:  Objection.  Relevance.

25          THE COURT:  Yeah.  Sustained.

1    MR. ELSON:  No further questions.

2    THE COURT:  Redirect.

3                    **REDIRECT EXAMINATION**

4    BY MR. SMOKOWICZ:

5    Q.  Lieutenant, in that first report of that phone

6    conversation -- in fact, in that second report of the subsequent

7    phone conversation, did you include Antron Kent's name in there?

8    A.  In the second?

9    Q.  In the reports.  The typewritten reports, as opposed to the

10   -- here, just -- let's take this first one here.  This is

11   Exhibit 1020.  How did you refer to Antron Kent in this

12   document?

13   A.  As an inmate.

14   Q.  Okay.  And did you refer to him by name?

15   A.  No.

16   Q.  What did you indicate about his name, one way or the other?

17   A.  I indicated that he would like to remain anonymous for now.

18   Q.  Going forward in time, if you would put Antron -- not put

19   Antron Kent's name in there but put in that an inmate from

20   Sayre, Oklahoma, originally from Milwaukee, serving a 38 year

21   sentence on mayhem contacted me, would that kind of information

22   be useful even if you tried to keep him anonymous?  For someone

23   to identify who that is?

24   MR. ELSON:  Objection to the form.

25   THE COURT:  I think it can be rephrased.

1         MR. SMOKOWICZ:

2 Q. Okay. Let me rephrase the question. In your experience

3 would providing detailed information about an inmate's

4 whereabouts, terms of sentence, and home address -- would that

5 kind of information -- would it be possible for someone to be

6 able to identify that person?

7 A. That would, yes. And it would -- well, yes. It would

8 defeat the whole purpose of them being anonymous.

9 Q. And drawing your attention to 1021, is there also a

10 reference in there as to whether or not he wanted to be named?

11 A. Yes, there's -- I wrote in there that he would like to

12 remain anonymous.

13 Q. So once again, if you had put in a statement to the effect

14 of this anonymous person wants assistance with a mayhem

15 conviction for 38 years, and other details like that, would that

16 kind of information, if this went nowhere, be -- unfortunately

17 allow a person who's anonymous to be discovered?

18 A. How did you word that question?

19 Q. Everybody --

20 A. Putting a name to the report at this time would defeat the

21 purpose of remaining anonymous.

22 Q. And similarly, identifying information of any kind, would

23 that defeat the purpose?

24 A. Yes.

25 Q. And why would someone contacting you from prison want to

1   remain anonymous?

2   A.  Because they don't want other people, inmates knowing.  I

3   mean, they are locked up in the same area with them.  Could

4   be -- could turn out badly for them.

5   Q.  Now, in your experience in law enforcement have you had

6   other occasions where you've obtained information from some type

7   of informant?

8   A.  Yes.

9   Q.  And in those situations have you been questioned about their

10   motives as well?

11   A.  Have I questioned them?

12   Q.  No.  Have you been questioned by defense counsel, let's say,

13   for example?

14   A.  Yes, I have.

15   Q.  So based on the your experience, are defense counsel

16   knowledgeable as to a motivation that a jailhouse informant

17   might have?

18           MR. ELSON:  Objection.  Relevance.  Form.  Leading.

19           THE COURT:  Well, it goes to the examination relative

20   to the impeachment, so the Court will allow the answer, if he

21   can answer.

22           THE WITNESS:  I have -- yes, I do know.  I have

23   testified based on informants.  There's different hearings just

24   for informants, also.

25           MR. SMOKOWICZ:

1   Q.  And are lawyers, in your experience, aware of the kind of

2   motivation that a jailhouse informant might have?

3   A.  Yes.

4   Q.  Lastly, with Exhibit 1017 here, there's a reference on the

5   last page to promises.  Would you restate that?  Or would you

6   just read that for the jury, please?

7   A.  Detective Armbruster and Detective Heier made no promises to

8   Antron regarding a decrease in sentence or a promise to get out

9   of jail, let alone any promises.

10  Q.  Is that true?

11  A.  That is very true.

12          MR. SMOKOWICZ:  That's all I have.

13          THE COURT:  Recross of that redirect?

14                   **RECROSS EXAMINATION**

15  **BY MR. ELSON:**

16  Q.  You were just answering some questions about impeachment

17  evidence.  Are you aware that Mr. Kent testified at Mr. Avery's

18  criminal trial, and that he was in fact asked these questions

19  and gave these answers?  This is Exhibit 20, which is in

20  evidence.

21  A.  I'm not aware of that.

22  Q.  I'm going to read them to you.

23          MR. SMOKOWICZ:  Your Honor, I would object.  Lack of

24  foundation here.

25          THE COURT:  Well, if it's already in evidence, there

1  doesn't need to be any foundation.

2          MR. ELSON:  Thank you, Judge.

3  Q.  Question:  Do you expect any benefit from this?  Answer:

4  No.  Question:  Then why are you telling the jury this today?

5  And why did you tell the Police this?  Answer:  Because from the

6  simple fact that -- I mean, I'm trying to change my life, which

7  I've done.  And when he told me this, I really thought it was a

8  joke.  But after finding -- learning what I knew, he ended up

9  saying it was true, basically.  And I decided then I'd be

10  willing to come to Court and tell what I know.  What he'd said

11  to me.

12          That was the testimony of Antron Kent at William

13  Avery's criminal trial.  He didn't say anything about the reason

14  he's doing this is to receive a benefit and get a reduction in

15  his sentence, did he?

16  A.  I wasn't there.

17  Q.  And if Mr. Avery's -- if Mr. Avery had a Police report that

18  said that Mr. Kent had said those things to you, he could have

19  used that to impeach Mr. Kent on that testimony, couldn't he?

20          MR. SMOKOWICZ:  I'm going to object to the form.

21  Question calls for speculation.

22          THE COURT:  No.  He can answer, if he can.

23          THE WITNESS:  I guess I wasn't even aware of this at

24  all.

25          MR. ELSON:

1  Q.  The question is he could have used your Police report if it
2  said that Antron Kent told you that the reason he was doing this
3  was to receive a reduction in his sentence.  He could have used
4  that as impeachment evidence against Mr. Kent at trial based on
5  those questions and answers, right?
6  A.  If I had put that in the report.
7  Q.  Yes.
8  A.  Which I wouldn't have.
9          MR. ELSON:  Okay.  No further questions.
10          THE COURT:  Anything else of this witness?
11          MR. SMOKOWICZ:  Yes, Your Honor.
12                    **REDIRECT EXAMINATION**
13  **BY MR. SMOKOWICZ:**
14  Q.  Later on in that same testimony at Page 64 I'm going to ask
15  you -- I know you said you weren't present, but I'm going to ask
16  you to assume the following questions were asked by Mr. Avery's
17  lawyer, and the following answers were given by Mr. Kent.
18  Question:  Mr. Kent, you said you weren't expecting any benefit
19  from this cooperation?  Answer:  No.  Question:  Anybody offer
20  you -- ever offer you any benefits?  Answer:  No, sir.  Did you
21  offer Antron Kent any benefits?
22  A.  No.
23  Q.  Did you -- what, if anything, did you -- did you take any
24  steps to make it clear that you wouldn't be able to give him any
25  benefits?

```
 1  A.   Yes.
 2              MR. ELSON:  Objection.  Outside the scope.
 3              THE COURT:  It is outside the scope, so sustained.
 4              MR. SMOKOWICZ:  No further questions, Your Honor.
 5              MR. ELSON:  Nothing else.
 6              THE COURT:  Okay.  You may step down, Lieutenant
 7  Armbruster.  Now we'll take a break for lunch, ladies and
 8  gentlemen.  So we'll have you back here -- we'll keep the
 9  customary hour, so 1:10.  Don't discuss the case.  We'll see you
10  back here after lunch, okay?
11              (Whereupon the jury was excused at 12:06 p.m.)
12              THE COURT:  Okay.  1:10.
13              (Whereupon a recess was called by the Court.  Upon
14  conclusion of the recess, the proceedings continued as follows
15  when the jury returned to the courtroom at 1:20 p.m.:)
16              **DETECTIVE KATHERINE SPANO**, recalled as a witness,
17  having been previously sworn, on oath testified as
18  follows:)
19              THE COURT:  Officer Spano, you've previously been
20  placed under oath, and that oath still applies.
21              THE WITNESS:  Yes, sir.
22              THE COURT:  Miss Yuan?
23              MS. YUAN:  Thank you, Your Honor.
24                        **DIRECT EXAMINATION**
25  **BY MS. YUAN:**
```

1  Q.  Good afternoon, Detective Spano.

2  A.  Good afternoon.

3  Q.  Detective, I was hoping you could tell the jury a little bit

4  about your background.  Where are you currently employed?

5  A.  I'm employed with the Milwaukee Police Department in the

6  Homicide Unit.  The Cold Case Unit.

7  Q.  And when did you begin with the Milwaukee Police Department?

8  A.  In 19 -- January of 1988.

9  Q.  And when you started with the Milwaukee Police Department,

10  can you tell the jury your progression in terms of rank and

11  position?

12  A.  Sure.  I was a uniform Officer on patrol in District Number

13  3 from January of 1988 until June of 1994.  I was then promoted

14  to Detective in 1994, and I've held that position since.

15  Q.  So as a uniformed Officer, what kind of cases were you

16  handling or responding to?

17  A.  Just about everything.  As a uniformed Officer, Patrol

18  Officer, you respond to everything.  Do a lot of traffic stops,

19  conduct any kind of call for Police service during that time.

20  Domestic violence, shootings, burglaries.  We would be the first

21  responding Officer to those incidences.

22  Q.  And you said you were promoted in 1994 to the position of

23  Detective.  How were you promoted?

24  A.  Well, you have to take a written test, for the -- take a

25  Detective exam, a written test.  You have to pass an oral exam

1  and oral interview.  And then you're ranked according to your

2  test scores.

3  Q.  And once you were promoted to Detective, what kind of cases

4  were you handling once you first went to the Detective Bureau?

5  A.  When I was first assigned to the Detective Bureau, I worked

6  in the Robbery Unit.  I worked there for just a few months.  I

7  think maybe 4 months.  From there I was transferred to the

8  Violent Crimes Unit.  I was there for maybe another 8 -- 8

9  months.  And from there I went to the Homicide Unit.

10 Q.  So how many different units were there within the Detective

11 Bureau?

12 A.  There's quite a few.  At least at that time there was quite

13 a few.  I mean, there was an Arson Unit.  There was a Sensitive

14 Crimes Unit.  The Unit that handles sexual assaults and crimes

15 against children.  There was a crimes against -- well, Violent

16 Crimes is crimes against person.  But there was a Gold and

17 Silver Unit.  There was a Burglary Unit, Robbery Unit.  Again,

18 violent crimes, homicide.  There were quite a few.

19 Q.  Can you tell me what year you were in the Homicide Unit for

20 the Detective Bureau?

21 A.  I started in the -- I believe it was the summer of '95 that

22 I was transferred to the Homicide Unit.  And I've been there

23 technically ever since.  In 2007, late 2007 myself and my

24 partner at that time, Detective Gilbert Hernandez, were assigned

25 to a Cold Case Homicide Unit.

1   Q. So once you were assigned to the Cold Case Unit, did you

2   only exclusively worked on cold cases?

3   A. For the most part. For the most part, in the beginning we

4   were working just on cold cases. Just unsolved homicides. In

5   the recent past, because of the workload, and staffing cuts, and

6   retirements, I've been called in to do some new investigations.

7   But not too many.

8   Q. And then just backing up a little bit more so we can get an

9   understanding of your background, where were you born?

10   A. I was born in Eau Claire, Wisconsin.

11   Q. And where do you currently live?

12   A. I live in Milwaukee.

13   Q. Have you always lived in Wisconsin?

14   A. Yes. When my family -- when I was about 2, my family moved

15   down to the Eagle, Mukwonago area out in Waukesha County. I

16   grew up there, mostly out in the country.

17   Q. Where did you go to high school?

18   A. Mukwonago High School.

19   Q. And when did you graduate?

20   A. 1968.

21   Q. And I know we talked about your employment history with the

22   Milwaukee Police Department. Did you have other employment

23   history prior to beginning with the Milwaukee Police Department?

24   A. Yes. If my mind -- going backwards. Prior to the Milwaukee

25   Police Department I worked for the State of Wisconsin. I was a

1  Court Reporter in the Court system here in Milwaukee.  I did

2  that for maybe 8, 9 years.  Prior to that I worked at some

3  different companies throughout Milwaukee.  I worked for the

4  Teledyne Corporation as a secretary.  Just before that I went --

5  or I'm sorry, just after Teledyne is when I -- around that time

6  I worked at Teledyne -- I want to say in '76, I quit there.  I

7  had a son, my second child, and went back to school to go to be

8  a Court Reporter.  Prior to Teledyne I think I worked at Alverno

9  College as a secretary for a few years.  Prior to that, I think

10  right out of high school, I worked for a company called

11  Harnischfeger Corporation as a secretary.  That's here in West

12  Milwaukee.  I did that for a couple of years.

13  Q.  And did you have any other schooling after graduating from

14  high school?

15  A.  I did some -- well, I went to -- obviously to school for

16  court reporting.  I also took some police science classes at

17  M.A.T.C. throughout the course of -- while I was working as a

18  Court Reporter and had the goal to get onto the Police

19  Department.

20  Q.  And turning your attention now to your time when you were

21  with the Homicide Department --

22  A.  Yes.

23  Q.  Did you have a regular partner?

24  A.  Yes.

25  Q.  And who was that?

1    A.  My -- the partner I had most of my -- the time in the

2    Homicide Unit was Detective Gilbert Hernandez.  We became

3    partners I want to say October of '95.  I went to the Homicide

4    Unit first.  I was there for a couple of months and Detective

5    Hernandez came shortly after me.

6    Q.  Now, prior to testifying today, did you have an opportunity

7    to review any Police reports concerning homicides of female

8    prostitutes in Milwaukee between the years of 1979 and 2007

9    involved with drug use?

10   A.  Yes, I did.

11   Q.  Detective Spano, I'm going to show you what's been marked as

12   Plaintiff's Exhibit Number 4.  It's actually a two page

13   document.  I don't know if you've been shown this before.  It

14   has been shown in court.  You see it's Exhibit Number 4 here.

15   But this is the first page, and I'm going to zoom out.  See if

16   we can get this whole map on the screen.  But I want to show you

17   the second page first.  You can see from the second page this

18   appears to be a timeline, and it spans from 1986 to 2007.  Do

19   you see that?

20   A.  Yes, I do.

21   Q.  And actually my question before -- so you actually before

22   testifying today were able to review homicides involving female

23   prostitutes and drug -- involved in drug use actually going back

24   even further than 1986?

25   A.  Yes.  That was a big portion of the work that Detective

1    Hernandez and I did, especially when we first came to the Unit.

2    So yes, I did do that recently also.

3    Q.   Showing you now the map.  So the first page of Exhibit 4.  I

4    don't know if you can tell, there's actually -- the victims are

5    on the sides there, both on the left and the right.  That there

6    are actually 10 victims and 10 stars that's on this map.  I'm

7    not sure if you can -- might be a little hard to see, but --

8    A.   I can see them, yes.

9    Q.   Okay.  And again I believe this map is supposed to represent

10   the span from 1986 to 2007.  And these are all the women that

11   had D.N.A. linked to Walter Ellis?

12   A.   Yes.  These are Walter Ellis's victims, yes.

13   Q.   And you're familiar with that fact?

14   A.   Yes.

15   Q.   Can you tell the jury, based on reviewing reports and your

16   own memory, if there were other homicides of female prostitutes

17   involved in drug use from the span of 1979 to 2007 that you

18   could add to this map?

19   A.   Yes, there are.

20   Q.   About how many?

21   A.   I would say probably another 24, 25 approximately.

22   Q.   And of those 24, 25, those are additional victims that you

23   would add to this map?

24   A.   Yes.

25            MS. HOFT:  Objection to form.

1       MS. YUAN:

2   Q.  Are those -- are those -- are those 24, 25 additional

3   victims -- do you know where their bodies were found?

4   A.  Yes.  General.  General.

5   Q.  Generally?

6   A.  Generally, yes.

7   Q.  Where would that be?

8   A.  Well, I would say approximately 21 of them were on the north

9   side.  Maybe 3 or 4 may have been on the south side of

10  Milwaukee.

11  Q.  And in looking at this map here, is this a map of the north

12  side?

13  A.  This is a map of a portion of the north side, yes.

14  Q.  So then would there be an additional 21 stars that you could

15  add to this map on the north side?

16  A.  Yes.

17      MS. HOFT:  Objection.  Mischaracterizes this witness's

18  testimony.

19      THE COURT:  Well, the question would have to be

20  phrased would this portion of the north side -- question was

21  asked whether it was the north side.  It can be re-asked.

22      MS. YUAN:

23  Q.  Of the 21 additional victims that you had mentioned

24  involving a prostitute involved in drug use, that their bodies

25  were found on the north side, would they be -- would those

1  additional 21 stars -- could they be added to this map of the

2  north side?

3  A.  Probably an additional 18, maybe.  Probably an additional 18

4  to this map.

5  Q.  Now, generally speaking, then, of the 24 to 25 female

6  homicide victims that were involved in prostitution and drug use

7  from 1979 to 2007, in addition to the 10 that were linked to

8  Walter Ellis, of those 24 to 25 was D.N.A. evidence sent out on

9  those cases?

10  A.  Yes.

11  Q.  Do you remember when?

12  A.  Well, I know when Detective Hernandez and I came to the Cold

13  Case Unit, we resubmitted all the evidence in the female

14  prostitute drug related homicides.

15  Q.  So that would have been at least, then, when you came to the

16  Cold Case Unit in late 2007?

17  A.  Yes.

18  Q.  Did any of those 24 or 25 victims that we've been talking

19  about, did any D.N.A. from those victims link to Walter Ellis?

20  A.  They did not.

21  Q.  I want to turn your attention now to the investigation into

22  Maryetta Griffin's homicide.  You were involved in that

23  investigation?

24  A.  Yes.

25  Q.  Do you recall when you became involved in that?

1   A.  I want to say the day after.  No, I think the day that it

2   happened.  I came in on the early shift, the second shift, and

3   started working on it.

4   Q.  Did you respond to the scene?

5   A.  No, I was not on the scene.

6   Q.  Were you at some point aware of what the scene looked like

7   and how the victim was found?

8   A.  Yes.

9   Q.  And how did you become aware of that?

10   A.  Through crime scene photographs that I had access to.

11   Q.  Do you recall how the victim was found?

12   A.  Yes.

13   Q.  Can you describe for the jury what you recall?

14   A.  She was found in a garage in an alley between North 6th

15   Street and North 5th Street.  I believe she was found towards

16   the back of the garage.  She was naked from the waist down.  She

17   had a letter jacket -- a high school blue and white letter

18   jacket on.  She had some visible injuries, I remember, to her

19   face.  There was some evidence -- you know, potential evidence

20   scattered around, I remember.

21   Q.  Do you recall the manner of death?

22   A.  Yes.  It was strangulation.

23   Q.  Would you have been aware of those details prior to

24   conducting any interviews of any witnesses or suspects?

25   A.  Yes.

1    Q.  Do you recall interviewing or meeting with Mr. Avery on

2    March 23rd of 1998?

3    A.  I do.

4    Q.  Prior to meeting with Mr. Avery, what at that point did you

5    know -- did you know anything about Mr. Avery?

6    A.  I knew about his involvement in the drug house at 2474 North

7    Palmer Street.  That was information that was coming in shortly

8    after the homicide of Miss Griffin.  And we were learning that

9    from various witnesses.

10   Q.  I'm showing you what's been marked as Defense Exhibit 1029.

11   A.  Yes, ma'am.

12   Q.  Is that your handwriting?

13   A.  It is.

14   Q.  Okay.  So this is -- can you describe for the jury what this

15   is?

16   A.  This is a statement form.  It's like an addendum to the

17   arrest report.  So it is a form we use to write out supplemental

18   reports about our interrogations or our interviews of suspects.

19   Q.  And what does this -- well, what does this document actually

20   memorialize?

21   A.  What took place during an interview with Mr. Avery or any

22   suspect that we talk to.

23   Q.  So here on this document it says that you met with Mr. Avery

24   in the presence of Detective Hernandez on March 23rd, 1998, at

25   10:40 p.m., is that correct?

1    A.  That is correct.

2    Q.  And what happened at that time?

3    A.  At 10:40 is when I advised Mr. Avery of his Constitutional

4    rights, Miranda warnings.  I told him obviously what we wanted

5    to talk about, and he indicated that he didn't want to make a

6    statement at that time.

7    Q.  So what happened once he indicated he didn't want to make a

8    statement?

9    A.  The interview stopped.  I asked him -- I wrote out the fact

10   that I had advised him of his rights.  I asked him to sign it.

11   He did so.  And that he indicated that he did not want to make a

12   statement at that time, and the interview was terminated.

13   Q.  So that is his signature right there?

14   A.  That is.

15   Q.  One of the rights you would have advised him of was the

16   right to remain silent?

17   A.  Exactly.

18   Q.  And the right to have an attorney present?  Or have an

19   attorney?

20   A.  Correct.

21   Q.  And this is your signature below Mr. Avery's signature?

22   A.  It is.

23   Q.  Now, the next day, March 24th, 1998, do you recall meeting

24   with Mr. Avery or interviewing Mr. Avery on that date?

25   A.  Yes, I did.

1   Q.  Do you recall what time that was?

2   A.  I believe it was 5:40 in the afternoon.  5:30, 5:40 in the

3   afternoon.

4   Q.  Do you know -- or were you aware prior to meeting with

5   Mr. Avery on March 24th, 1998, that he had made a statement to

6   Detective Hernandez and Detective Phillips that same day?

7   A.  Yes, I learned that.

8   Q.  And how would you be aware of that?

9   A.  I'm sure when I came into work at 4 o'clock and I met with

10  Detective Hernandez, he would have informed me about that.

11  Q.  Are you aware of what Mr. Avery told Detective Hernandez and

12  Detective Phillips during that earlier interrogation?

13  A.  Vaguely, yes.

14  Q.  What do you recall?

15  A.  I remember that Mr. Avery had told Detective Hernandez and

16  Detective Phillips that he was in the drug house with Mercedes.

17  That they had smoked some -- did some cocaine.  Took some

18  cocaine.  And that he had fallen asleep at one point, and that

19  when he woke up he -- she was going through his pockets, and he

20  chased her or she started to run out of the house, words to that

21  effect, and claimed that that was the last time he saw her.  And

22  he couldn't remember what had happened after that.

23  Q.  Do you know when that interview took place?

24  A.  It was in the morning during the day shift.  I don't

25  remember the exact times.

1  Q.  I'm showing you what's been marked as Exhibit -- Plaintiff's

2  Exhibit 11-F.  And this is a copy of a report that you dictated?

3  A.  Yes.

4  Q.  And what is this report memorializing?

5  A.  This is a typewritten version of the statement that I took

6  from -- it's a typewritten version of the handwritten statement

7  and the verbal statement that I had taken from Mr. Avery that

8  night.

9  Q.  Okay.  Actually looking at this report, does that refresh

10  your recollection as to the time as to when your interview with

11  Mr. Avery took place?

12  A.  Yes.  It was on March 24th, 1998, at 5:30 p.m.

13  Q.  You're very close.  You said 5:30.  Do you know when it

14  ended?

15  A.  Yes.  It went rather long.  2:30 in the morning, I believe.

16  Q.  And what was the reason you were questioning Mr. Avery at

17  this time?

18  A.  Well, I believed that -- and we all believed that Mr. Avery

19  had more information to offer.  Regarding I think the

20  information that he had provided to Detective Hernandez and

21  Detective Phillips, kind of made us all feel that maybe he had a

22  little more information to tell us.

23  Q.  And during this interview with Mr. Avery at 5:30 --

24  beginning at 5:30 p.m. on March 24th, 1998, did he tell you

25  anything about where he was working at that time?

1   A.  Yes.

2   Q.  What did he tell you?

3   A.  He told us that he had just started in the beginning of

4   February to sell drugs at the house at 2474 North Palmer Street.

5   Q.  Did he tell you why he started working there?

6   A.  His cousin, Ronnie, or Lorenzo Frost, had been selling drugs

7   out of that house, and Lorenzo Frost wanted to get out of the

8   business and asked Mr. Avery to take over.

9   Q.  So Mr. Avery told you that he was running the drug house?

10  A.  Yes.

11  Q.  Was he running it with anybody?

12  A.  No, not really.  I think he was running -- he would give

13  part of the proceeds, I believe, to Mr. Frost.  Lorenzo Frost

14  would get some of the money.  I think there were some

15  prostitutes that would come there and help out.  I think a

16  younger gentleman from the neighborhood, or might have been a

17  relative of Lorenzo Frost, that he came there to assist from

18  time to time.

19  Q.  Did Mr. Avery tell you if he knew Mercedes or Maryetta

20  Griffin before he started working at this drug house?

21  A.  Not before.  Not before he started working there.  He had --

22  was not familiar with her.

23  Q.  So actually I'll just refer you to your report here.  This

24  last full paragraph.  It states Avery stated that he had never

25  met Mercedes, Maryetta Griffin, before working at 2474 North

1   Palmer Street, and stated that she had come to that drug house

2   several times before her death.  Is that what Mr. Avery told

3   you?

4   A.  Yes, it is.

5   Q.  Did Mr. Avery tell you anything about what occurred at this

6   drug house?

7   A.  Yes.  He said that a lot of prostitutes would come to the

8   area to either buy drugs, or they would have their -- hold their

9   dope dates at that residence.  Inside that residence.

10  Q.  Did Mr. Avery tell you what dope dating meant?

11  A.  Yes, he did.  That it was exchanging sex for money, or sex

12  for drugs.  One or the other.

13  Q.  Did he tell you that that was occurring at that drug house?

14  A.  Yes, he did.

15  Q.  Did he tell you in terms of what the hours of operations

16  were for this drug house?

17  A.  It was open around the clock, 24 hours.

18  Q.  During your interview of Mr. Avery, did you have occasion to

19  show him any photographs?

20  A.  I showed him a picture of Maryetta Griffin.  I showed him a

21  picture of Lorenzo Frost.

22  Q.  And why would you have done that?

23  A.  To make sure that -- who it was that he was talking about.

24  That he was speaking about.

25  Q.  Did Mr. Avery tell you anything about -- what, if anything,

1   did Mr. Avery tell you about consuming alcohol or his practices

2   in that regard?

3   A.  I remember Mr. Avery talking about his alcohol problem.  He

4   had -- I think he told me that he had a drinking problem since

5   he was very young.  I think he said 8 years old.  He drank on --

6   I think on a daily basis.

7   Q.  Did you question Mr. Avery about what happened on

8   February 16th, 1998?

9   A.  Yes, I did.

10  Q.  And what, if anything, did Mr. Avery tell you about that?

11  A.  On the date of February 16th, which is obviously the day

12  before Maryetta Griffin was found, the drug house was actually

13  closed for the day during the day.  He came -- later at night it

14  was closed, because I think a relative of Lorenzo Frost lived in

15  the downstairs.  An uncle or a stepfather.  I think it was a

16  stepfather of Lorenzo Frost.  And that that person would have

17  his young daughter come to visit him on Sundays, so they closed

18  the operation down during the day.  And I think he indicated

19  that he opened it back up sometime in the evening, either 5:00

20  or 6 o'clock.

21  Q.  So Mr. Avery told you that he came to the drug house

22  later -- later on February 16th, 1998?

23  A.  Yes, he did.

24  Q.  And actually you put that in your report, right?  Where I'm

25  pointing.  He stated that he then went to the Palmer Street

1  address shortly after 5:00 p.m. on Monday and was let in by Ray?

2  A.  Yes.  Yes.

3  Q.  What else did Mr. Avery tell you about February 16th, 1998?

4  A.  He said that Mercedes, Maryetta Griffin, had come to the

5  house at about 6:30.  She came over to buy some drugs.  He

6  mentioned that Lorenzo Frost was there.  Came after Mercedes and

7  stayed until about 7:00.

8  Q.  And that's in your report, right?

9  A.  Yes, that is in the report.  He indicated at that time he

10 had sex with Maryetta Griffin, oral sex, penis to mouth.  And

11 that Mercedes left after that.

12 Q.  So that's information that you got from Mr. Avery?

13 A.  Correct.

14 Q.  What did Mr. Avery tell you after that?

15 A.  I think after that he talked about a young girl named Keisha

16 that was at the house.  She was, I think, the alleged girlfriend

17 of Goins, Lucious Goins.  That she was there during the evening.

18 That I think he was smoking marijuana with her.  They were alone

19 in the apartment at that time or the duplex.  I think he said

20 that he tried put some moves on Keisha, but Keisha wouldn't have

21 anything to do with it.

22 Q.  You put all that in your report as well, right?  The

23 description about Mr. Avery telling you about Keisha being there

24 that evening?

25 A.  Right.  Yes.  He also said that a prostitute known as Little

1    Bit -- that was her street name -- Little Bit had come over

2    during the evening also, and he did say that it was about

3    12:30 at night that she had come over, and that he sent her out

4    to get some beer at what they call the bootleg place.

5    Q.  And again, you put all of that, what Mr. Avery told you,

6    into your report?

7    A.  Right.

8    Q.  Did he tell you -- what, if anything, did he tell you about

9    once Little Bit was sent off to get some more beer?  Did she

10   come back?

11   A.  She did come back, and I think she brought some beer and

12   some -- something called a fifth of rose.  A fifth of rose in a

13   Nitrane bottle.  I'm not sure what that is.  But some Colt-45

14   beer.

15   Q.  You're not really sure what a Nitrane bottle is?

16   A.  No.  Had no clue.

17   Q.  Why did you put that in your report?

18   A.  Because it's what he said.

19   Q.  What Mr. Avery told you?

20   A.  Yes.  What Mr. Avery told me.

21   Q.  What else did Mr. Avery tell you in terms of what happened

22   on February 16th?

23   A.  He said that after Little Bit had come back, that they

24   partied for a few more minutes.  Maybe 15 or 20 minutes.  And

25   after that he partied with Keisha for awhile.  He laid down on

1    the couch.  Keisha went to bed.  I think she was sleeping in a

2    different bedroom.  That no one else was in the house.  He

3    watched T.V. for a little while, and then waited for Doc.

4    Q.  Do you know who Doc is?

5    A.  Doc is Lorenzo Frost, I thought.

6    Q.  Did he tell you what happened -- what happened after he was

7    watching T.V. and waiting for Doc?

8    A.  He indicated that another prostitute that he knew from the

9    area by the name of Joanne had called him several times looking

10   for Doc.  And she had also told him that Mercedes was found

11   dead.

12   Q.  Did Mr. Avery tell you what time Joanne told him that

13   Mercedes was dead?

14   A.  I think it was in the morning.  She -- I think he said when

15   he got up in the morning -- that it was in the morning when

16   Joanne had called and told him that she was dead.  She indicated

17   that Doc had come over about noon or 12 o'clock to pick up some

18   of the money.  They were staying around for 30 or 40 minutes.

19   They woke up Keisha and told Keisha that she had to leave.

20   Ronnie then took Avery to his house to drop off some money, and

21   that he later took a cab back to the house.  And he never heard

22   anything more about Mercedes' death at that time.

23   Q.  Okay.  And I just want to make sure, since we do have your

24   report here -- I'm going to go -- starting at this first full

25   paragraph that you can see.  In the report it says Avery stated

1  that he then partied with Keisha for awhile, drinking beer, and
2  he then laid down on the couch and Keisha went to -- and Keisha
3  went to bed.
4  A.  Yes.
5  Q.  He, meaning Mr. Avery, stated that the next thing he
6  remembers is waking up on the couch, and Keisha was asleep in
7  the west side bedroom.
8  A.  Yes.
9  Q.  And that's what you recall.  That Keisha was sleeping
10  someplace else in the house?
11  A.  Yes.  Yes.
12  Q.  He stated that no one else was in the house at the time.
13  And that's what Mr. Avery told you?
14  A.  Yes.
15  Q.  He stated that he watched T.V. for a little while and waited
16  for Doc, and we talked about that.  And that's what Mr. Avery
17  told you?
18  A.  Yes.
19  Q.  And that's why you put it in the report?
20  A.  Exactly.
21  Q.  Avery stated that during the time that he was waiting for
22  Doc, Joanne, another known prostitute, called several times
23  looking for Doc.  Avery stated that he could not be sure what
24  time it was, but stated that Joanne told him that Mercedes was
25  dead.  Avery stated that he believed Doc came by about

1  12:00 p.m. or so on Tuesday to pick up some of the money. He
2  stated that they sat around for 30 or 40 minutes, woke up Keisha
3  and told her she had to leave. Avery stated that Ronnie then
4  took him, Avery, to his house to drop off some money, and later
5  took a cab back to the house. He stated that he never heard
6  anything more about Mercedes' death. He stated that he was mad
7  that someone was killing his girls. And that's in your report.
8  And -- is that information -- where did you get that information
9  from?
10  A.  From William Avery.
11  Q.  From Mr. Avery?
12  A.  Yes.
13  Q.  And that's why you put it in the report?
14  A.  Exactly, yes.
15  Q.  And you testified that you thought it was in the morning
16  when Joanne told him about Mercedes' death, but that's not in
17  this -- in this particular report, correct?
18  A.  Correct.
19  Q.  After Mr. Avery told you that, did he tell you anything
20  regarding what they were going to do with the drug house?
21  What -- in terms of what he and Lorenzo Frost --
22  A.  Yes.  I know he worked it for a little while after the death
23  of Mercedes, probably not more than a week.  And I think it was
24  the following Sunday when Lorenzo Frost told him they had to
25  close the house down.  That his stepfather, who lived in the

1  lower, was upset about the Police contact.  The Police that were

2  responding to the area.

3  Q.  And you actually put that in your report as well.  You

4  actually see that right there?

5  A.  Yes.  Yes.

6  Q.  And then further on the second full paragraph toward the

7  bottom here, your report states Avery stated that the last time

8  he saw this victim alive was on Monday evening at about 7:00

9  p.m. after they had sex.  He stated that he cannot remember ever

10  seeing her after that.  And who told you that information?

11  A.  Mr. Avery.

12  Q.  And that's why that's in your report?

13  A.  Correct.

14  Q.  He stated that he does not believe he was involved in the

15  death of Mercedes, because when he passed out on the couch the

16  only person in the house was Keisha, and she was there when he

17  woke up.

18  A.  Correct.

19  Q.  That's what Mr. Avery told you?

20  A.  It is.

21  Q.  So during this interview Mr. Avery denied responsibility --

22  or denied involvement in Miss Griffin's death?

23  A.  He did.

24  Q.  And you recorded that accurately in your report?

25  A.  Yes.

1    Q.  Towards the bottom here, the interview was then terminated

2    at this time, 2:30 a.m., and this entire handwritten report was

3    then read back to William Avery.  Now, you're summarizing

4    because -- and I'll show you, you had actually written out a

5    handwritten version?

6    A.  I did.

7    Q.  Because what we're looking at is a typed version, and there

8    was nobody typing up this report while you were interviewing Mr.

9    Avery.

10   A.  That's correct.

11   Q.  How does the typed version get prepared?

12   A.  We call in -- at that time we were calling in through a

13   dicta -- almost like a Dictaphone over the telephone, and

14   some -- one of our clerks would listen to that and just type it

15   from the recording.

16   Q.  And when would you dictate your typewritten -- your report

17   to be typewritten?

18   A.  In this case, since it went so late, it probably was done

19   the next day.

20   Q.  So you're documenting here in your typewritten report that

21   Mr. Avery was offered the opportunity to sign the handwritten

22   report that you wrote out while you were interviewing him?

23   A.  Yes.

24   Q.  And then it goes on however, William Avery refused to sign

25   the PA45 report, indicating that it was a true and correct

1  statement, and refused to sign a statement indicating that he

2  was given cigarettes, coffee, water, a chicken dinner, and

3  numerous bathroom breaks during this interview.  Again, Avery

4  refused to affix his signature to this report.  Again, the

5  interview was terminated at 2:30 a.m. on March 25th, 1998?

6  A.  Correct.

7  Q.  And I'm not going to go through the handwritten version line

8  by line, since we just looked over your report, but I am going

9  to show you what's been marked as defense Exhibit 1031.  Can you

10  identify this for the jury, please.

11  A.  Yes.  This is a copy of the handwritten report I took from

12  Mr. Avery on the night of March 24th, 1998.

13  Q.  So it began on March 24th at 5:30 p.m.?

14  A.  Correct.

15  Q.  And you do see that 5:30 p.m.?

16  A.  Yes.

17  Q.  And there's a statement where the Constitutional rights were

18  read, first paragraph there.  And there's an "X".  And here what

19  did you write there?

20  A.  Refused to sign.

21  Q.  So did you give Mr. Avery an opportunity to sign right

22  there?

23  A.  Yes, I did.

24  Q.  Showing you the last page of the handwritten report.

25  A.  Yes, ma'am.

1  Q.  Right here, this is a true and correct statement by me

2  regarding this incident.  And this -- you wrote this out for

3  Mr. Avery to sign?

4  A.  I did.

5  Q.  And again there's the "X", and he refused to sign there?

6  A.  Yes.

7  Q.  And then the paragraph after that I, William Avery, was

8  given numerous cigarettes, coffee -- what is that?  Water, a

9  chicken dinner, and bathroom breaks during this interview, but

10 he also refused to sign that acknowledgement, is that right?

11 A.  He did, yes.

12 Q.  So this is about a three-and-a-half page handwritten report

13 that you prepared.  When would you have prepared this report?

14 A.  During the interview with Mr. Avery.

15 Q.  And after you prepared this report, this three-and-a-half

16 page handwritten report for Mr. Avery, what would you have done

17 once you had written out this report?

18 A.  And after he refused to sign it?

19 Q.  Well, I guess let's back up, then.  Before he refused to

20 sign it, what is your practice once you write out the report?

21 A.  I would -- I'm sorry.

22 Q.  Go, please.

23 A.  I would have reviewed that report with Mr. Avery.  I would

24 have sat next to him, asked him to read it with me.  I would

25 have read it to him.  I would have asked him to make any

1    corrections.  This is -- pretty much told him this is your

2    version of what you're telling me today.  We want it, you know,

3    to be accurate, so you need to let me know if there's any

4    changes you want to make to the report.  And that's the purpose

5    of explaining to him when we read it back that -- that his

6    signature at the end is an indication that he agrees to it.

7    That it's a truthful and accurate report.

8    Q.  And is your practice to read the report -- the handwritten

9    report just once?

10   A.  Yes.  I mean, there might be times when we'd have to read it

11   over again.  I don't remember if that occurred with Mr. Avery.

12   Q.  And if there are any changes in the handwritten version,

13   what is your practice typically?

14   A.  If there's any changes, whether it's something I miswrote

15   myself, or any changes that Mr. Avery wanted me to make, I would

16   have him initial that.

17   Q.  Now, if Mr. Avery refused to initial it, what do you do?

18   A.  There's nothing I can do.  I can't -- that's his right to

19   not sign anything.

20   Q.  After this report and this interview, this March 24th that

21   went into the 25th interview of Mr. Avery, was Mr. Avery charged

22   with the homicide of Maryetta Griffin?

23   A.  He was not.

24   Q.  Was Mr. Avery charged with any sexual crimes against

25   Maryetta Griffin?

1  A.  He was not.

2  Q.  There is this one portion in this report where Mr. Avery --

3  where you put in here Mr. Avery told you that he had oral sex

4  with Maryetta Griffin on February 16th, 1998.  Do you recall

5  that?

6  A.  Yes.

7  Q.  And that's something that Mr. Avery told you?

8  A.  It is.

9  Q.  You didn't put in this report that Mr. Avery told you he

10  strangled Maryetta Griffin?

11  A.  I did not.

12  Q.  You didn't put in this report any other details -- saying

13  Mr. Avery told you details about how Maryetta Griffin's body was

14  found?

15  A.  I did not.

16  Q.  And you were aware of those details prior to interviewing

17  Mr. Avery on March 24th, 1998?

18  A.  Yes, I was.

19  Q.  In fact, you were aware that Mr. Avery had made some

20  admissions to your partner, Detective Hernandez, earlier that

21  day?

22  A.  That's right.

23  Q.  But you didn't put any of those admissions into this report?

24  A.  I did not.

25  Q.  Is it fair to say that you only put in this report what Mr.

1    Avery told you?

2    A.  Yes.

3    Q.  Detective Spano, after this March, 1998, interview with Mr.

4    Avery, do you recall if he was charged with any drug charges?

5    A.  Yes, he was.

6    Q.  Do you recall if there was additional investigation into the

7    Maryetta Griffin homicide after this interview we're talking

8    about, with Mr. Avery?

9    A.  There was some further work done on it.  Some additional

10   interviews that probably went on for a couple of months.  But

11   nothing led anywhere, to anybody else.

12   Q.  So how would you describe the Maryetta Griffin case, then,

13   after those few months of additional investigation in 1998?

14            MS. HOFT:  Object to form.  Asked and answered.

15            THE COURT:  Overruled.  She may answer.

16            THE WITNESS:  Could you repeat that again?

17            MS. YUAN:

18   Q.  How would you describe the status of the Maryetta Griffin

19   homicide after the few months of additional investigation back

20   in 1998?

21   A.  It just got cold.  There was just nothing additional.  No

22   further suspects that were developed.  No other leads were

23   developed at that time.

24   Q.  Were you actively investigating Mr. Avery as a homicide

25   suspect in 1998 after this interview?

1  A.  Well, for a short time, sure.  I mean, we would certainly

2  try to obtain additional information, but nothing developed.

3  Q.  And after that period where nothing was developing, the few

4  months, were you still actively investigating Mr. Avery as a

5  suspect in the Maryetta Griffin homicide?

6  A.  We were investigating whoever it was that killed Maryetta

7  Griffin.  We were investigating all of that.  Mr. Avery was a

8  suspect, and we were looking for any other additional

9  information.

10  Q.  Once the Maryetta Griffin homicide became cold, and you

11  described that as there was -- you followed up on leads, and

12  there was nothing further to go -- there's nowhere further to

13  go, were you -- what were you working on then while in the

14  Homicide Department?

15  A.  Other unsolved -- other homicides.  Other homicides that

16  were ongoing, that were new, that were happening every day.

17  Q.  So this is later in 1998, 1999, 2000?

18  A.  Correct.

19  Q.  So you're working other homicides at that point?

20  A.  Yes.

21  Q.  Do you recall how many homicides you were actively working

22  on in 1998?

23  A.  Well, I think in 1998 there were probably -- I'm going to

24  guess about 120 homicides in that year.  In some form or another

25  we learn about each of them through our briefings.  We probably

1   would have been involved in at least a third of those.

2   Q.  So over 30?

3   A.  Probably.  Probably.  That's a good guess, yes.

4   Q.  And you're saying we.  Are you referring to you and your

5   partner?

6   A.  I'm referring to myself and Detective Hernandez and the

7   other Detectives that were on the early shift with us.  The

8   second shift at that time.

9   Q.  Okay.  And you were limiting that amount in terms of the

10  number of homicides, and then the number you may have been

11  working on to just the year of 1998?

12  A.  Yes.  That was just 1998, yes.

13  Q.  So in 1999 would that number be about the same in terms of

14  homicides other than the ones you were working on?

15  A.  I remember 1999 it was pretty high.  It was about 140?

16  Maybe 144, 45 homicides that year.  So, sure.

17  Q.  And so if we talk about 1999, that's just 140,

18  approximately, homicides that occurred in that year?

19  A.  Yes.

20  Q.  So you're actively working on those homicides?

21  A.  Yes.

22  Q.  And there are presumably other homicides that don't get

23  solved from the prior years?

24  A.  Absolutely.

25  Q.  What happens to those?

1  A.  Well, they become -- as much as what we can, all of us in

2  the Homicide Unit, we're assigned to continue working on those

3  that grew a little bit cold.  That just weren't going anywhere.

4  So we each kind of got a couple of cases to work on at the time.

5  So they would kind of get back burnered, because the priority

6  was always the new ones that were coming in.

7  Q.  And why the priority of the new ones?

8  A.  It's because they're -- the probability or the possibility

9  of solving a homicide is very, very high within the first 48

10  hours, 72 hours.  Because that's when your witnesses are around.

11  Your evidence is still there.  It's fresh in peoples' minds.  So

12  it's a priority that the new ones get worked on right away.

13  Q.  And you testified to you and other Detectives maybe having a

14  few colder -- or cases that hadn't been solved yet.  Who

15  assigned those cases?

16  A.  Our supervisors will usually assign them to us.

17  Q.  So you as a Detective back in 1998, '99, 2000, did you have

18  the ability to decide I'm going to work on this cold case?

19  A.  Yes.  Usually if it was a case that we -- I want to say we.

20  I mean Detective Hernandez -- if we did a lot of work on the

21  case, we kept it.  We kind of took ownership of it.  And that

22  was I think real common amongst all of the different squads.

23  You kind of took ownership.  The bosses were okay with that.

24  Q.  Do you recall if you were doing any work on the Maryetta

25  Griffin case in 1999, 2000?

1  A.  I did not.

2  Q.  So you recall that you did not?

3  A.  Correct.  Excuse me, Miss Yuan.  I know Mr. Avery was in

4  trial I think in '99.  Oh, no.  No.  I'm sorry.  Disregard.  I

5  was wrong.  I think his trial was in '98 for the drug charges.

6  Q.  Detective Spano, do you recall being asked to get involved

7  again in the Maryetta Griffin case in 2003?

8  A.  Yes, I was.

9  Q.  What do you recall about that?

10  A.  I remember that Detective Heier and Detective Armbruster

11  became involved through some information they received from a

12  confidential informant through -- from some phone calls from

13  some visits that they had made to some prisons.  And I know they

14  were in contact and communication with the District Attorney's

15  Office regarding that information.

16  Q.  Do you know specifically who they were in contact with?

17  A.  Yes.  That was Mark Williams.

18  Q.  And why would it have been Mark Williams?

19  A.  Well, Mark Williams initially reviewed the case of William

20  Avery regarding the Maryetta Griffin homicide.  He reviewed that

21  to determine whether or not he was going to issue charges

22  against Mr. Avery, which he did not.  And so he would have -- he

23  would have maintained possession of that case if it came back

24  later.  At a later time.

25  Q.  So you're telling the jury how you became involved again in

1    2003.  And I think you were saying that Detective Heier and

2    Armbruster had gotten contacted by an informant?

3    A.  Yes.

4    Q.  And how else did you -- how -- please continue in describing

5    how you and Detective Hernandez got involved?

6    A.  Like I say, in -- I think it was August of 2003 -- might

7    have been October of 2003, Detective Heier approached myself and

8    Detective Hernandez and asked us if we would be willing to do

9    some interviews, some re-interviews of people that they had

10   already spoken to.  Mostly to find out whether or not they would

11   still be willing to cooperate with the investigation and testify

12   in Court, if necessary.  And I assume that was -- I'm pretty

13   sure that was because he had been communicating with Mark

14   Williams about the case.

15   Q.  Show you what's been marked Exhibit 1034, it's already been

16   admitted.  Do you recognize this report?

17   A.  Yes.

18   Q.  And what is this?

19   A.  This is a typed version of a report that I dictated of our

20   interview, meaning myself and Detective Hernandez, of Jeffrey

21   Kimbrough.

22   Q.  And this took place on October 20th, 2003?

23   A.  It did.

24   Q.  It looks like this interview took place at about 2:00 p.m.

25   at Stanley Correctional, is that right?

1    A.  Actually it was at Prairie Correctional.  I think I

2    corrected it there and didn't correct it in the second -- at the

3    end of the sentence.

4    Q.  So that's actually in Minnesota?

5    A.  It is, yes.

6    Q.  Do you recall what it is that Mr. Kimbrough told you and

7    Detective Hernandez?

8    A.  I remember that Mr. Kimbrough told us that he first met

9    William Avery through another cellmate or another prisoner,

10   cellmate, named Antron Kent.  And that I think happened at -- it

11   says North Fork Correctional.  And that he would see Avery from

12   time to time at the prison.  He indicated that at one time he

13   was with Keith Randolph, another prisoner, and William Avery,

14   and they were in the rec area.

15   Q.  I'm going to refer you to your report, because I think

16   actually you said Keith Randolph, and I want to make sure we get

17   this right.

18   A.  Okay.

19   Q.  So -- that's okay.  I know there's a lot of names.  Looking

20   at this last paragraph on this report, the report states

21   Kimbrough indicated that during the time he was at North Fork

22   Correctional is when he first met William Avery.  He indicated

23   that he met William Avery through his own cellmate, Antron Kent.

24   A.  That's correct.

25   Q.  Does that refresh your recollection?

1  A.  Yes, it does.  Yes.

2  Q.  You said Keith Randolph.  Did you mean Keith Randolph?

3  A.  No, I meant Antron Kent.

4  Q.  How do you know the name Keith Randolph?

5  A.  I also interviewed Keith Randolph.

6  Q.  Are you aware that he was another informant in this case?

7  A.  Yes.

8  Q.  So you were familiar with his name?

9  A.  Yes.

10  Q.  So what did Mr. Kimbrough tell you about his interaction or

11  knowledge of Mr. Avery?

12  A.  He indicated that in March of 2002 he was with his cellmate,

13  Mr. Kent, in a recreation area, and that William Avery was there

14  also in the rec area.  And he overheard William Avery talking

15  about some involvement in a homicide of a female in Milwaukee.

16  Q.  And you did record that in this report?

17  A.  Yes.

18  Q.  And this information that's contained in your report,

19  that's -- where did you get that information?

20  A.  From Jeffrey Kimbrough.

21  Q.  Did Mr. Kimbrough tell you anything about Mr. Kent?

22  A.  Yes.  He mentioned that a lot of prisoners -- a lot of

23  people from the prison would go and talk with Mr. Kent to get

24  advice from him.  They considered him a religious man.  I think

25  something about his father was a Pastor or a Minister.  He

1    also -- yeah, that he was teaching a lot of the inmates about

2    the Bible and about religion.

3    Q.  And that's what you recalled that Mr. Kimbrough told you

4    about Mr. Kent?

5    A.  Yes.

6    Q.  And actually in your report you do put that he, meaning

7    Mr. Kimbrough, indicated that Antron Kent is a religious man.

8    They believe that his father or grandfather may be a Pastor, and

9    that Kent is always teaching to a lot of the inmates about the

10   Bible and about religion.

11   A.  Yes.

12   Q.  And where did you get that information?

13   A.  From Mr. Kimbrough.

14   Q.  And that's why you put it in your report?

15   A.  Yes.

16   Q.  Did Mr. Kimbrough tell you anything about what he noticed

17   about Mr. Avery?

18   A.  Just that Mr. Avery appeared to be getting closer to God.

19   That he was becoming a little more spiritual.  Going to the

20   chapel.  Appeared to be going through maybe some depression at

21   the time.  Those were his words.

22   Q.  And again, that's information you got from Mr. Kimbrough?

23   A.  Yes.

24   Q.  What, if anything, did Mr. Kimbrough tell you about what

25   Mr. Avery told him about a homicide?

1   A.  I think that he overheard Avery talking to Kent.  He was

2   kind of walking behind him as they were talking, and Mr. Kent

3   was asking Avery how he was feeling.  If he was okay.  I know

4   Kent asked Mr. Avery if it was okay for Jeffrey to kind of

5   listen in on the conversation, and Mr. Avery was okay with that.

6   He wasn't -- he didn't know for sure what they were going to be

7   talking about at that time, and he really didn't want to get

8   involved, so he kind of stepped back and kind of walked behind

9   Mr. Kent and Mr. Avery and heard parts of the conversation at

10  that time.

11  Q.  So that's what Mr. Kimbrough told you?

12  A.  It is.

13  Q.  Mr. Kimbrough told you that he didn't know what Mr. Kent and

14  Mr. Avery were going to talk about?

15  A.  Correct.

16  Q.  And that's what you put in your report?

17  A.  Yes.

18  Q.  And Mr. Kimbrough told you that he didn't really want to get

19  involved, so that's why he was hanging back?

20  A.  Yes.

21  Q.  Walking behind Mr. Kent and Mr. Avery?

22  A.  Yes.

23         MS. HOFT:  Objection.  Leading, Your Honor.  Pretty

24  redundant.

25         THE COURT:  It is.  The Court will allow it.

1    MS. YUAN:

2    Q.  What else did Mr. Kimbrough tell you about what Mr. Avery

3    said about a homicide?

4    A.  I know that Mr. Avery told Kent that he was having trouble

5    sleeping.  That something was bothering him.  He overheard Avery

6    talk about a spot that he had, meaning a drug house where he was

7    selling drugs and getting money.  He would do a lot of dope

8    dating at that drug house, as well as he admitted selling drugs.

9    He heard Mr. Avery indicate that on one night he was with a hype

10   or a dope fiend, and that he had given the female some drugs for

11   sex, and that she had smoked drugs.  He remembered that Avery

12   was saying something about falling asleep, and that when he woke

13   up in the morning that the female dope fiend was stealing his

14   money and stealing his drugs.

15   Q.  Well, actually I want to make sure -- in your report you

16   said was stealing his money or stealing his drugs.  Is that

17   right?

18   A.  Yes.  Stealing his money or stealing his drugs.  But he

19   couldn't be sure.

20   Q.  And again, you got that information from Mr. Kimbrough?

21   A.  Yes.

22   Q.  That's not information that you or Detective Hernandez

23   provided to Mr. Kimbrough?

24   A.  No, no.  Not at all.

25   Q.  What else did Mr. Kimbrough then tell you about what

1    Mr. Avery said?

2    A.   Mr. Avery then told Antron Kent that he just snapped and

3    choked the bitch.

4    Q.   Did Mr. Kimbrough tell you whether or not there was any

5    description of what the woman looked like?

6    A.   There was.  He overheard Avery telling Kent that the woman's

7    eyes were rolling in the back of her head.  That she was making

8    a choking sound, and those are the things that were bothering

9    him at nighttime, that he couldn't sleep.  The woman had stopped

10   breathing.  He realized that he had killed her.  Apparently

11   called some guys to come and help him get rid of the body.  Some

12   guy came over in a truck and that they dumped her body

13   somewhere.  But I don't think Mr. Kimbrough heard where that

14   was.  Or he didn't say where it was.

15   Q.   And again, all that information that's in your report

16   regarding the description that Mr. Kimbrough was providing you

17   was -- all -- all came from Mr. Kimbrough, correct?

18   A.   Correct.

19   Q.   And it's what he's telling you that he overheard Mr. Avery

20   say to Mr. Kent?

21   A.   Yes.

22   Q.   In the middle of this paragraph here, Mr. Kimbrough then

23   says what your report says is he, meaning Mr. Kimbrough, was

24   very uncomfortable overhearing them, because he thought he could

25   go to jail for having information and for not telling the Police

1    about it.  Is that what Mr. Kimbrough told you?

2    A.  It is.

3    Q.  He also indicated that he did not trust Avery, and feared

4    that he was somebody that would retaliate if he ever told anyone

5    about what he heard.  Is that what Mr. Kimbrough told you?

6    A.  Yes.

7    Q.  He indicated that he does not remember Avery ever stating

8    the name of who this woman was, but only knew that she was a

9    dope fiend or prostitute in the area where we was selling drugs.

10   Is that what Mr. Kimbrough told you?

11   A.  Yes.

12   Q.  He could not remember any other specific information that

13   Avery told -- I'm sorry, that Avery said about his involvement

14   in this incident, and did not speak with him about it ever again

15   during his time in Oklahoma.

16   A.  Correct.

17   Q.  Now, do you recall, did Mr. Kimbrough tell you that it was

18   Mr. Kent's idea to go to the Police?

19   A.  He told us that Kent told him that he went to the Police.

20   That he was talking with Detectives from Milwaukee.  And they

21   wanted to know if Mr. Kimbrough would be willing to come forward

22   and tell us this information.

23   Q.  And you wrote in your report he, meaning Mr. Kimbrough,

24   indicated that Antron did convince that it was the right thing

25   to do, to come forward and tell the Police about what he heard.

1   Is that what Mr. Kimbrough told you?

2   A.  Yes.

3   Q.  So Mr. Kimbrough told you that Antron Kent convinced him

4   that it's the right thing to do, to come forward?

5   A.  Exactly.

6   Q.  And you put that in your report?

7   A.  Yes, I did.

8   Q.  During your interview of Mr. Kimbrough, did you show him any

9   photographs?

10  A.  Yes, I showed pictures of Mr. William Avery and Antron Kent

11  to Mr. Kimbrough.

12  Q.  And again, why would you do that?

13  A.  Just to confirm who we were actually speaking about.

14  Q.  Did Mr. Kimbrough tell you if he knew or was familiar with

15  Mr. Avery or Mr. Kent prior to being incarcerated with him?

16  A.  No.  And he also wasn't familiar with the Milwaukee area.

17  He was not familiar with him prior to this.

18  Q.  And the last page here just shows that this is a report that

19  you dictated?

20  A.  Yes.

21  Q.  Detective Spano, is there anything that was contained in

22  your report memorializing your interview of Mr. Kimbrough that

23  came from you or Detective Hernandez?

24  A.  No.

25  Q.  Is all that information contained in your report of the

1  interview of Mr. Kimbrough information that came from Mr.

2  Kimbrough?

3  A.  It did.  Yes, it did.

4  Q.  I'm showing you what's been marked as defense Exhibit 1035.

5  It's been admitted into evidence already.  What is this

6  document?

7  A.  This is a typewritten version of an interview I did with

8  Antron Kent in -- no, I'm sorry.  In Green Bay.  Yes, in Green

9  Bay Correctional, on October 23rd, 2003.

10 Q.  So this is Antron Kent, correct?

11 A.  It is Antron Kent.

12 Q.  This is actually just 3 days after you had interviewed

13 Mr. Kimbrough?

14 A.  Yes.

15 Q.  And you were there with Detective Hernandez?

16 A.  I was.

17 Q.  Do you recall what Antron Kent told you during this

18 interview?

19 A.  We confirmed that the information that he had provided to

20 Detective Heier and Armbruster earlier -- in earlier interviews

21 was the truth.  He indicated that he met William Avery at the

22 Milwaukee County Jail during a booking process.  And that they

23 later became acquaintances at the Oklahoma facility.  They were

24 cellmates for awhile.  Got to know each other.  Took some

25 classes together.  They had recreational and free time together.

1  He indicated that several months before he spoke with Armbruster

2  and Heier that William Avery had told him this story about

3  having trouble sleeping at night.  That something was bothering

4  him.  That he appeared to be depressed.

5          MS. HOFT:  Objection, Your Honor.  I'm going to object

6  to not only the narrative, but what we're doing is just reading

7  a document that all of us can see.

8          THE COURT:  Well, the document does speak for itself.

9  Is this being offered for the same reasons the other ones were?

10         MS. YUAN:  It is, Your Honor.  And I can speed it up

11 by asking more pointed questions.  I want to just -- as the

12 Court knows, I want to make sure that this witness will say

13 where this information came from.

14         THE COURT:  Like where did all the information in this

15 report come from?

16         MS. YUAN:  Right.  I mean, this document does speak

17 for itself, but I -- you know, it's her report and I do want to

18 ask her questions as to the veracity and where some of this

19 information came from.

20         THE COURT:  Okay.

21         MS. YUAN:

22 Q.  Detective Spano, do you recall what Mr. Kent told you about

23 what Mr. Avery told him concerning -- concerning a homicide?

24 A.  Yes.  Mr. Avery had told Antron Kent that he had something

25 that was bothering him.  That he was having trouble making piece

with himself.  That it wasn't about the drug case.  That it was
about killing someone.  He said that he didn't ask any questions
initially, but that Avery went on to explain that he had a drug
house, was selling drugs with a guy, and the guy is the same guy
that he was arrested with on the drug case, which -- and that
his first name was Lorenzo.

Q.  Okay.  And did Mr. Kent tell you that Mr. Avery told him at
some point he was with the victim, fell asleep, woke up to her
stealing dope from him?

A.  Yes.  Yes.

Q.  And that's in your report, right?

A.  It is.

Q.  And did Mr. Kent tell you that he couldn't remember exactly
where the dope was?

A.  Right.  He doesn't remember what Mr. Avery said about that.

Q.  So he couldn't tell you if it was coming from the pockets,
or some other location?

A.  Correct.

Q.  And you were aware during this interview that there had been
some statements by individuals that there was something being
taken from Mr. Avery's pockets, correct?

A.  Correct.

Q.  And you didn't supply that information to Mr. Kent?

A.  No.  No, I did not.

Q.  Did Mr. Kent tell you that he then, quote, just snapped on

1   the bitch, end quote?

2   A.  Yes.

3   Q.  Did Mr. Kent tell you that Mr. Avery explained to him that

4   what he meant by that was that he put both of his hands around

5   this female's neck and demonstrated a choking type of hold?

6   A.  Yes.

7   Q.  Did Mr. Kent actually demonstrate that for you?

8   A.  He did.

9   Q.  Did Mr. Kent tell you that Mr. Avery told him he just,

10  quote, choked the shit out of her, end quote, and that she was

11  gasping for air or making a choking noise?

12  A.  Yes.

13  Q.  Did Mr. Kent tell you that Mr. Avery told him that her eyes

14  went and rolled into the back of her head?

15  A.  Yes, he did.

16  Q.  Did Mr. Kent tell you that Mr. Avery told him that that's

17  what he sees and that's what's bothering him at night?

18  A.  Right.  He sees that at nighttime when he goes to sleep.

19  Q.  Did Mr. Kent tell you that Mr. Avery told him he knew he

20  killed this victim and he called his guy Lorenzo?

21  A.  Yes.

22  Q.  And that Lorenzo came over right away and they put this

23  female in a vehicle and dumped the body someplace?

24  A.  Yes.

25  Q.  So this is again a little bit different than what

1   Mr. Kimbrough told you, where it was just a guy was called.

2   A.   Right.

3   Q.   Unidentified.

4        MS. HOFT:   Objection, Your Honor.

5   Mischaracterization.

6        THE COURT:   Well, it was a leading question.   The

7   question is, is this different than what Kimbrough told you?   If

8   it's asked that way, then it's not objectionable.

9        MS. YUAN:

10  Q.   Detective Spano, we just talked about how you testified that

11  Mr. Kent told you that Mr. Avery told him that after he knew he

12  killed this girl, he then called his guy Lorenzo.   Is that

13  different than what Mr. Kimbrough told you and Detective

14  Hernandez on October 20th, 2003?

15  A.   Yes.

16  Q.   How is that different?

17  A.   I don't think Kimbrough was told the name Lorenzo.   I don't

18  think he had the name Lorenzo.   It was just a guy.   His guy.   Or

19  a guy.

20  Q.   Mr. Kimbrough didn't identify Lorenzo in his interview with

21  you?

22  A.   Correct.

23  Q.   Did Mr. Kent tell you that Mr. Avery told him it was Lorenzo

24  that made the decision as to where they were going to dump the

25  body?

1  A.  Yes.

2  Q.  Did Mr. Kent tell you anything about whether or not he

3  believed Mr. Avery?

4  A.  He did not at first.  He thought he was B.S.-ing.

5  Q.  What else did Mr. Kent tell you about how it came to be that

6  he ended up contacting the Police?

7  A.  He thought it was the right thing to do.  I think that was

8  what it was.  He thought it was the right thing to do, to call

9  the Police and report it.

10  Q.  Did Mr. Kent tell you whether or not he had any personal

11  knowledge of what happened?

12  A.  He said he did not.  He was specifically asked whether or

13  not he had seen any newspaper articles or T.V. stories, and he

14  said that he had not seen any.

15  Q.  And actually I'll indicate here in your report -- it's in

16  your report he indicated -- he, being Mr. Kent -- that he did

17  not have any personal knowledge about this incident prior to

18  William Avery telling him about it.  That he does not remember

19  seeing anything on the news about it and was not familiar with

20  the area where this incident took place.

21  A.  Yes.

22  Q.  And you testified that Mr. Kent was specifically asked if he

23  had seen anything on the news?

24  A.  Yes.  He was asked.

25  Q.  And he told you he hadn't?

1   A.  Correct.

2   Q.  And that's why that's in your report?

3   A.  Exactly.

4   Q.  Did Mr. Kent see any of Mr. Avery's discovery?

5   A.  He didn't indicate that he did.  I'm sure that if I asked

6   him what he knew about the case, that I would have asked him if

7   he saw reports and documents, but he didn't indicate that he

8   had.

9   Q.  There's nothing in your report -- in this report of your

10  interview of Mr. Kent indicating that Mr. Kent had seen any of

11  Mr. Avery's discovery in any of his prior cases.

12  A.  That's correct.

13  Q.  Do you recall being deposed in this case?

14  A.  Yes.

15  Q.  Do you recall if you were deposed on June 28, 2012?

16  A.  Yes.

17  Q.  Do you recall being asked questions about interviewing

18  informants in this Maryetta Griffin matter?

19  A.  Vaguely.

20  Q.  Vaguely.  Do you recall if --

21  A.  These informants?

22  Q.  Kent and Kimbrough and Randolph.  You had mentioned

23  Randolph.

24  A.  Yes, I think that -- I remember talking about that in the

25  deposition.

1   Q.  Do you recall being asked questions about your involvement

2   in interviewing these informants prior to being allowed to see

3   any of the reports that we were just going over?

4   A.  Yes.

5           MS. HOFT:  Objection.  Form.

6           THE COURT:  No.  Overruled.  She may answer.

7           MS. YUAN:

8   Q.  Do you recall if during your deposition you may have stated

9   that you believed Mr. Kent may have seen some discovery of

10  Mr. Avery's?

11  A.  Oh, I do remember that.  Yes, yes, I remember that.

12  Q.  Can you explain that?  Why you would have said that in your

13  deposition?

14  A.  I think I misspoke in my deposition about who saw the

15  discovery, but I'm pretty sure I corrected myself later when I

16  realized it was actually Mr. Randolph that had told me about

17  seeing the discovery.

18  Q.  I'm showing you defense Exhibit 1036.  And what is this?

19  A.  This is, again, a typewritten version of an interview I did

20  of Keith Randolph at Stanley Correctional on October 23rd, 2003.

21  Q.  And again, you're with Detective Hernandez?

22  A.  Yes.

23  Q.  Did Randolph tell you anything about his relationship with

24  Mr. Avery?  Of having a relationship -- whether or not he had a

25  relationship with Mr. Avery?

1  A.  Yes.  I think he knew the family.  I think he knew the

2  mother.  I think he was a pallbearer at the mother's funeral, so

3  he -- he was familiar with him.

4  Q.  And you actually put that in your report.  He indicated that

5  he was a pallbearer at the funeral of Avery's mother, Barbara?

6  A.  Yes.

7  Q.  And that's information that you got from Mr. Randolph?

8  A.  Correct.

9  Q.  Did Mr. Randolph tell you whether or not he saw any news

10  accounts of -- involving the homicide?  Or Mr. Avery?

11  A.  He did.  He told me that he saw the news reports or news --

12  either newspaper or news story, and that when he saw the news,

13  he wanted to reach out to Mr. Avery and he wrote him a letter, I

14  believe.

15  Q.  You actually put that in your report.  Says here, the last

16  sentence of this first page, he indicated that he does remember

17  seeing either a news report or a newspaper article about the

18  arrest of William Avery, and wrote William a letter telling him

19  to take care of himself and to keep his spirits up?

20  A.  Correct.

21  Q.  Do you recall if Mr. Randolph told you whether or not he

22  reviewed any discovery of Mr. Avery's?

23  A.  He did say that he reviewed some discovery.  Some legal

24  papers of Mr. Avery's, yes.

25  Q.  And you actually put that in this report as well?

1  A.  Yes.

2  Q.  Here in the middle of the paragraph your report states Keith

3  Randolph indicated that Avery asked him to look at some of his

4  legal papers, and that he agreed to do so, and that he does

5  remember reading the discovery papers that were given to him by

6  Avery.  He indicated that Avery wanted him to look over his case

7  to see if there was anything that could -- that he could do on

8  appeal and just to get some legal advice from him about his

9  case.  He indicated that he does believe that he may have taken

10  some notes on legal papers that were provided to him by Avery,

11  and that these notes may be in some boxes that he gave to his

12  girlfriend, Lorraine Bowers, when he got out of prison.  Where

13  did that information come from?

14  A.  From Keith Randolph.

15  Q.  And again, you didn't hide that fact, that Mr. Randolph told

16  you he saw some discovery and legal papers of Mr. Avery, is that

17  correct?

18  A.  Correct.

19  Q.  You put that right in your report?

20  A.  Yes.

21  Q.  What did Mr. Randolph tell you -- what, if anything, did

22  Mr. Randolph tell you about what Mr. Avery told him concerning a

23  homicide?

24  A.  Well, he indicated that again, that he was meeting Mr.

25  Avery.  That they were in the recreation yard.  That Avery

1  wanted to confide in him about something that was bothering him.

2  He was having trouble sleeping.  Told him he wanted to tell

3  somebody what really happened on the night that the homicide

4  took place.  Avery told him that he was in his spot, I'm sure

5  referring to his drug house, and that he was with a female

6  victim who was a prostitute.  They were doing drugs, and that

7  when he woke up in the morning that he had caught the prostitute

8  going through -- either stealing his -- going through his

9  pockets or stealing his drugs.  And again, Avery had indicated

10  to him that he just kept choking the bitch.  Avery told him that

11  she didn't pass out like she had originally -- like he had

12  originally told the Police, but that he started to choke her

13  again.

14  Q.  Did Mr. Randolph tell you anything about what Mr. Avery did

15  once -- after that point?

16  A.  He tried to figure out how much money she had stolen from

17  him, and that he kept slapping the bitch.  Started choking her

18  until she passed out.

19  Q.  And actually I'm going to stop you.  I'm just going to read

20  from down here.  That he, and I believe that means Mr. Avery,

21  caught this prostitute going into his pockets, stealing his

22  dope.  And that's what Mr. Randolph told you that Mr. Avery told

23  him?

24  A.  Correct.

25  Q.  And later on Keith Randolph indicated that Avery told him

1  that during this incident he would slap the bitch around, check

2  his pockets again to see how much of the drugs she had taken,

3  choke her again, and check his pockets again.  And that's what

4  Mr. Randolph told you?

5  A.  It is.

6  Q.  And I just want to make sure, because I think you said

7  money, but Mr. Randolph told you that Mr. Avery believed drugs

8  had been taken?

9  A.  Exactly.  Drugs.

10  Q.  At some point did Mr. Randolph tell you that Mr. Avery told

11  him he realized that the victim wasn't coming to?

12  A.  Yes.

13  Q.  And what else did Mr. Randolph tell you about what Mr. Avery

14  told him?

15  A.  Well, he started to panic, and that he kind of assumed that

16  she may be dead.  He called some workers over.  I think he told

17  Mr. Randolph -- Avery told Mr. Randolph that somebody he knew as

18  Little "C" had come to help him get rid of the body.

19  Q.  So in the report -- and that's what you put in your report,

20  that Mr. Randolph told you that Mr. Avery told him he then

21  called one of his workers, who came over, and they wrapped up

22  the body in a rug or something.  He indicated that he had woke

23  up a subject named Little "C", who was asleep at the time, and

24  that when Little "C" came into the room, Little "C" was upset

25  about what he saw?

1  A.  Correct.

2          THE COURT:  Counsel, why are you offering all of this?

3  This Exhibit is in the record, and the Exhibit has been

4  testified to.  That this is the statement that Mr. Randolph gave

5  to this Detective.  So why do we have to ask whether or not

6  that's what Mr. Randolph told her?

7          MS. YUAN:  I will move on, Your Honor.

8          THE COURT:  Okay.

9          MS. YUAN:  Thank you.

10  Q.  Detective Spano, during your interview of Mr. Randolph, did

11  you make any promises to him about any reduction in sentence?

12  A.  I did not.

13  Q.  Did Mr. Hernandez make any promise to him about reduction in

14  sentence?

15  A.  He did not.

16  Q.  During your interview of Mr. Randolph -- strike that.  You

17  testified that you reviewed crime scene photos, is that correct?

18  A.  Yes.

19  Q.  And did you see photos of the victim?

20  A.  Yes.

21  Q.  And the victim at the scene?

22  A.  Yes.

23          THE COURT:  That's been asked and answered, counsel.

24          MS. YUAN:

25  Q.  Did you see any photos of the victim wrapped up in a rug?

1  A.  No.

2  Q.  Did you show any photos to Mr. Randolph of anybody wrapped

3  in a rug?

4  A.  Absolutely not.

5  Q.  Detective Spano, during your investigation of the Griffin

6  homicide, did you become familiar with somebody named Patricia

7  McCoy?

8  A.  Yes.

9  Q.  And how did you become familiar with her?

10  A.  I can't remember if -- initially how we -- I think we were

11  called over to the Criminal Justice Facility.  I think she was

12  in custody.  Or someone referred us to her.  I think the first

13  interview we did she was in custody.  I just don't remember how

14  we made that contact.  She was a prostitute that worked in that

15  area, and I'm sure we were going over there to talk to her to

16  see what she may know about Maryetta Griffin's homicide.

17  Q.  Did you talk to Patricia McCoy more than one time?

18  A.  Yes.

19  Q.  Do you recall if you ever gave Patricia McCoy any money?

20  A.  I could have.  I could have.  I don't have a clear

21  recollection of that, but I could have.

22  Q.  Can you explain the circumstances as to when or why you

23  would give Patricia McCoy any money?

24  A.  I certainly never gave her any money before I ever spoke

25  with her, or for payment of information.  Because she really

1    didn't provide any specific facts about the homicide.  But we

2    became familiar with each other.  We knew that she worked in

3    that area.  My partner and I, especially during the beginning

4    stages of this investigation, would travel around that area and

5    talk to some of the ladies of the evening in the hopes that they

6    would provide us with information.  I'm sure during some of

7    those contacts, and many times throughout my career I have run

8    into people on the street that have asked me for money, and I --

9    you know, if it's 5 bucks for cigarettes, or 5 bucks for a bus

10   pass, or for a meal, I've done that.  And I'm sure -- I just

11   don't have a specific recollection of Miss McCoy, but I wouldn't

12   deny that.

13   Q.  Do you recall ever using Patricia McCoy as a confidential

14   informant to do a controlled drug buy?

15   A.  No.

16   Q.  Now, if you were to have used Patricia McCoy as a

17   confidential informant, or to do a controlled drug buy, would

18   she ever be allowed to keep the drugs after the controlled buy?

19   A.  Absolutely not.

20   Q.  One moment.  Detective Spano, did you make any promises to

21   Antron Kent during your interview with him?

22   A.  I did not.

23   Q.  Any promises made to Jeffrey Kimbrough for his cooperation

24   in this matter?

25   A.  I did not.

 1         MS. YUAN:  I don't have any further questions.  Thank

 2    you.

 3         THE COURT:  Okay.  Well, might be a good time to take

 4    an afternoon break, ladies and gentlemen, before we do the cross

 5    examination.  So we'll do that.  Please don't discuss the case.

 6    Only after all the evidence is in.  We'll see you back here

 7    after the afternoon break.

 8         (Whereupon the jury was excused at 2:41 p.m.)

 9         MR. SMOKOWICZ:  Your Honor, just for clarification,

10    since Detective Gulbrandson is no longer formally a party, I

11    assume sequestration order works for him?  He's to stay out?

12         THE COURT:  Yup.

13         MR. SMOKOWICZ:  Thank you, Your Honor.

14         THE COURT:  Yes, I should say.

15         MR. SMOKOWICZ:  Just want to make sure I don't allow

16    him in here and we have an issue.

17         THE COURT:  Okay.

18         (Whereupon a recess was called by the Court.  Upon

19    conclusion of the recess, the proceedings continued as follows:)

20         MR. STAINTHORP:  Judge, before the jury comes in, can

21    I just raise two things?

22         THE COURT:  Sure.

23         MR. STAINTHORP:  We -- the other day we had -- with

24    respect to Plaintiff's Exhibit 28 and 29, which are the

25    testimony of Hernandez and Phillips at the criminal trial, we

1   had moved the admission of those Exhibits.  That being the

2   transcripts.  And at that time it -- so this is the record from

3   the criminal trial.  And you had not made a decision as to those

4   two Exhibits, though you had admitted another portion of the

5   transcript that we had proposed, that being Antron Kent.  So I

6   just want to note that we do still have pending the request to

7   admit 28 and 29, and we would re-assert our request that they be

8   admitted.

9        THE COURT:  What was the defense position on those

10  Exhibits?

11       MR. SMOKOWICZ:  Well, Your Honor, at that point I

12  think our concern was that there was no indication as to why

13  they'd be used -- put into evidence in this case for any purpose

14  whatsoever.  And as a matter of fact, as opposed to Antron

15  Kent's deposition, where a portion of it was read in and used

16  for cross examination purposes, neither of these have been used

17  for any purpose in any portion of this trial at this point.

18       MR. STAINTHORP:  That's actually not quite accurate.

19       MR. SMOKOWICZ:  Well, if it is, then I would like

20  to -- I'd like to know, Your Honor, what it's been used for, and

21  what portion of it's being offered for --

22       MR. STAINTHORP:  So the reason for moving it into

23  evidence is that in these very, very short portions of

24  transcript -- I think Phillips is 3 or 4 pages, and Hernandez is

25  maybe 5 -- they identify and move into evidence the statement

1  that they claim they got from Mr. Avery.  So that's the sole

2  purpose of moving it into evidence.  It also, Judge, obviously

3  is --

4         MR. SMOKOWICZ:  Well, Your Honor, there's been no

5  dispute about that.  And as to the extent -- or to the extent as

6  to Phillips, I recall he was asked about that.  I don't know

7  about -- anything about Hernandez, but it's duplicative at this

8  point.  It's not necessary at this point.  They've provided

9  testimony, period.  It's not used for cross examination

10 purposes.  It's not used to challenge credibility on this.

11 There's been no reluctance on this.  I don't understand the

12 purpose, and we would object.

13        THE COURT:  Well -- but the purpose that

14 Mr. Stainthorp indicated was to support the testimony that is

15 already in the record.  That these reports were used at trial as

16 evidence?

17        MR. STAINTHORP:  Yes, that is it, Judge.

18        THE COURT:  And that's the sole purpose for doing so?

19        MR. STAINTHORP:  Yes.  That's the sole purpose.

20        THE COURT:  Well, it is duplicative.  And when were

21 these offered prior to this point?

22        MR. STAINTHORP:  These were offered on June the 4th.

23        THE COURT:  And --

24        MR. STAINTHORP:  As part of the trial record in the

25 underlying case.

1        THE COURT:  Upon the -- June 4th, upon the -- this
2   case, June 4th.

3        MR. STAINTHORP:  Yes.  June 4th of this case.

4        THE COURT:  Who was the witness on the stand at the
5   time?

6        MR. STAINTHORP:  I don't think there was a witness on
7   the stand.  We just offered them as part of the official record
8   from the criminal case.

9        THE COURT:  Well, they are an official record, and
10  it's a very limited amount, and doesn't require any cross
11  examination at the trial, so there isn't that problem with the
12  information being not subject to cross examination.  So the
13  Court will receive them, as long as that's all it is.

14       MR. STAINTHORP:  That's it.

15       THE COURT:  Submission that Officer, you recognize
16  this Exhibit?  Yeah, it's 29.  This is the statement you took
17  from "X"?  Yes.  Admitted?  Yes.  I think that's what it says,
18  then.  We'll review -- are you going to use them in this cross
19  examination?

20       MR. STAINTHORP:  No.  They were just out there on the
21  table, and I just didn't want to forget.

22       THE COURT:  Okay.  We're all set?  Housekeeping, I
23  have to leave at quarter to 5:00.  Got to follow-up on my
24  Doctor's appointment.

25            (Whereupon the jury was returned to the courtroom at

1   3:09 p.m.)

2           THE COURT:  Miss Hoft.

3           MS. HOFT:  Thank you.

4                 **CROSS EXAMINATION**

5   **BY MS. HOFT:**

6   Q.  Good afternoon.

7   A.  Good afternoon, ma'am.

8   Q.  I asked you some questions last week, so I'm going to try

9   not to ask you those same questions again, all right?  So stop

10  me and let me know if you think I start to do that.  I think

11  when the City Attorney Miss Yuan stopped questioning you, she

12  was talking about an individual named Patricia McCoy?

13  A.  Yes.

14  Q.  And when was the last time you saw Patricia McCoy?

15  A.  Boy, I probably last saw her -- might have been during

16  the -- maybe the trial.  The drug trial I think of Mr. Avery.

17  Q.  You didn't see her in 2005 during the trial of Mr. Avery

18  being tried for homicide?

19  A.  Oh, I could have.  She could have been there, yes.  Yes.

20  Q.  And do you recall speaking with her two weeks ago?

21  A.  I did not speak with her two weeks ago.

22  Q.  You don't recall two weeks ago her calling the Milwaukee

23  Police Department and asking to speak to you?

24  A.  No.

25  Q.  So have you had any telephone conversations with her since

1  2005?

2  A.  The last conversation I believe that I had with Patricia

3  McCoy was on the telephone during the Walter Ellis investigation

4  when he had -- when he was identified on the D.N.A. as the

5  D.N.A. profile.  I believe we made phone contact with her, and

6  other Detectives in the Unit went to wherever she's living now

7  to interview her.  But it was just a phone conversation.

8  Q.  Okay.  So in 2010 or something like that?

9  A.  Yeah, would have been 2009.

10  Q.  Okay.  And you testified that you may have given Patricia

11  McCoy $5.00 here or there?

12  A.  I might have.

13  Q.  You don't have any recollection of actually giving her any

14  money?

15  A.  I don't.

16  Q.  And you wouldn't have given her up to $20 at a time?

17  A.  No.

18  Q.  And you didn't give her any money for gas for her vehicle?

19  A.  I don't believe she had a vehicle.

20  Q.  And how many times do you think you may have given her $5 or

21  so?

22  A.  Maybe 2 or 3 times.  If it was even her.  2 or 3 times,

23  maybe.

24  Q.  And you knew that she testified at the homicide trial

25  against Mr. Avery?

1  A.  Yes.

2  Q.  And did you ever record anywhere any of these payments to

3  Miss McCoy that you may have made?

4  A.  They weren't payments.  They were gifts, I guess.

5  Q.  Okay.  Did you ever record anywhere the gifts that you gave

6  Miss McCoy?

7  A.  No.  I have no reason to.

8  Q.  Did you ever tell anyone that you had given Miss McCoy any

9  money at all?

10  A.  No.

11  Q.  Did you ever tell the District Attorney prosecuting William

12  Avery that you ever gave Miss McCoy any money of any amount?

13  A.  I don't remember if I ever gave her any money for sure.  So

14  I don't remember any conversations like that.

15  Q.  Okay.  So you don't think you told the District Attorney

16  that you gave her any money?

17  A.  Right.

18  Q.  And back to 1998, you've indicated that you started working

19  on the Griffin investigation from day one, you think, right?

20  A.  Yes.

21  Q.  And you had a 9 hour interrogation with Mr. Avery on

22  March 24th, I believe, starting at 5:30, is that right?

23  A.  Yes.  That's right.

24  Q.  And you've previously testified that you knew about the

25  statements that had been previously given to other Detectives,

1  including DeValkenaere, Phillips, and your partner, Hernandez,

2  right?

3  A.  Yes.

4  Q.  And prior to meeting Mr. Avery at 5:30, did you meet with

5  anyone else other than the other Detectives before that 9 hour

6  interrogation?

7  A.  Other than the Detectives?  I'm sorry?

8  Q.  Right.  Anybody else that you recall?

9  A.  Not really.  I would have met with my partner.  We would

10  have talked about the case.  I may have been in a briefing at

11  the start of my shift to talk about everything that was going

12  on.

13  Q.  Because back then, I think it was a Tuesday, March 24th,

14  your shift started about 4 o'clock, right?

15  A.  Correct.

16  Q.  So the first thing you would do is have the briefings with

17  the other Detectives, right?

18  A.  Yes.

19  Q.  Do you recall having a meeting with Mark Williams -- well,

20  let me ask you this.  Back in 1999 there were different District

21  Attorneys that you took cases to for different crimes, right?

22          MS. YUAN:  You said 1999?

23          MS. HOFT:  Sorry.  Probably 1999, too, but thank you.

24  Q.  1998?

25  A.  Yes.

1    Q.   And you would take drug offense cases to Ron Dague, I think

2    his name is?

3    A.   Yes.   Or anyone in the Drug Unit at that time.

4    Q.   Okay.   But Ron Dague was in the Drug Unit at that time?

5    A.   He was.

6    Q.   And you would take any homicide cases to a District Attorney

7    by the name of Mark Williams, right?

8    A.   Yes.

9    Q.   Do you recall speaking to Mark Williams right after you got

10    to work on March 24th at approximately 4:30, prior to that 9

11    hour interrogation with Mr. Avery?

12    A.   I could have.   I just don't have a recollection of it.   I

13    could have.

14    Q.   Is there anything that would refresh your recollection?

15    A.   I don't know.

16    Q.   Well, if I were to show you a notation in your memo book for

17    Tuesday, March 24th, 1998, 4:30 meeting with Mark Williams --

18    and I'm reading from Page 40 -- about 40 of Defendant's Exhibit

19    1046.

20          MS. YUAN:   Give me a moment, please.

21          MS. HOFT:   I made an additional copy.

22          MS. YUAN:   I have a copy.

23          MS. HOFT:

24    Q.   So if I --

25          THE COURT:   What was the Exhibit number?

1       MS. HOFT:  It's a copy of this witness's memo book

2  that was identified as Defendant's Exhibit 1046.

3       THE COURT:  Oh, 1046.

4       MS. HOFT:  Yes.

5       THE COURT:  Okay.  I thought you said --

6       MS. HOFT:  It's about a 60 page document, and I have

7  taken out one page.

8  Q.  Let me show you what we've marked as 1046, Page 40.

9  A.  Yes.

10  Q.  And is that your handwriting?

11  A.  That is my handwriting.

12  Q.  And does that appear to you to be a page out of your memo

13  book that you kept back in 1998?

14  A.  Yes.

15  Q.  And does that refresh your recollection that you did have a

16  meeting with Mark Williams at 4:30 on Tuesday, March 24th, 1998?

17  A.  Yes.

18  Q.  But you don't recall any of the contents of that meeting,

19  right?

20  A.  I could -- believe the contents of the meeting were

21  probably -- no, I really don't.  I'm sorry.  I don't have any

22  recollection.

23  Q.  You were going to say you could guess, but you don't want to

24  do that, right?

25  A.  Exactly.  Exactly.

1  Q.  And is there any other indication --

2          MS. YUAN:  Counsel, did you move this?

3          MS. HOFT:  I'm sorry.  I would seek leave to admit

4  Exhibit 1046, Page 40.

5          MS. YUAN:  There's no objection.

6          THE COURT:  The Court will receive it.

7          MS. HOFT:

8  Q.  And you should be able to see this on your screen, but this

9  is the page from your memo book, and it's titled on the left

10  side Tuesday, March 24th, 1998, correct?  And the next line

11  indicates something -- Hein and Hernandez?

12  A.  Squad 124, Hein and Hernandez, yes.

13  Q.  Squad 124, okay.  And then is it fair to say at 4:09 there

14  was a C.I.B. briefing?

15  A.  That would have been 4 o'clock.  That's 4 o'clock.

16  Q.  Okay.  And that's the briefing that you discussed where the

17  Detectives on the shift previous meet with the Detectives coming

18  on and talk about the cases that are being investigated?

19  A.  With supervisors present, yes.

20  Q.  And then the next entry you've made is 4:30, meeting with

21  Mark Williams.  And the entry after that is 5:30, William Avery.

22  Is that correct?

23  A.  Yes.

24  Q.  And back in 1998, after the interview with Mr. Avery, you

25  also spoke to a Keisha Kenya Hall, correct?

1   A.  I don't remember exactly when that interview took place.  I

2   think I did speak with her.

3   Q.  And do you recall when you spoke to her that she

4   corroborated that she had been at 2474 Palmer late in the

5   evening of February 16th, to early in the morning February 17th?

6   A.  Yes, she did.

7   Q.  And I believe you testified on direct examination that if

8   you've done a lot of work on a case, in other words if a

9   homicide Detective has done a fair amount of investigation on

10  the case, that they then take some kind of ownership over that

11  case so they get first crack at additional evidence or

12  investigation that may be needed?

13  A.  I guess I don't know what you mean by that.

14  Q.  Okay.  Well, you were answering a question of Miss Yuan's

15  about how homicide investigations get assigned out?

16  A.  Yes.

17  Q.  And it sounded like a lot of times they're whatever the

18  supervisor wants to assign to you.  Kind of randomly.  Or

19  arbitrarily, is that fair to say?

20  A.  That happens sometimes, yes.

21  Q.  But on other occasions if you've done a lot of work

22  previously on a case, if investigations come up in that case,

23  you keep some kind of ownership over that case and may ask to be

24  assigned?

25  A.  That may happen from time to time.  Also the supervisors

1  make that decision if something would come in, something new.  A

2  new lead.  A new -- somebody walked into the building and said

3  they had information.  A supervisor is going to look at that

4  case and see who's the most familiar with it, because that would

5  make sense.  That maybe that Detective would handle it.

6  Q.  What did you mean when you said if a homicide Detective has

7  done a lot of work on a case they take on some kind of ownership

8  of that case?  What did you mean by ownership?

9  A.  I think we take responsibility for it, or we invest a lot of

10  time and effort into it, and a lot of emotional involvement in

11  some of these cases.  That happens from time to time.

12  Q.  And so that ownership and investment would continue until

13  the case would be solved?

14  A.  Probably.

15  Q.  And you have discussed at length on direct that you had

16  something to do with each of the jailhouse informants who were

17  involved in this case, correct?

18  A.  Yes.

19  Q.  And you were made aware with regard to Keith Randolph back

20  in 2001?  Before you had an opportunity to interview him?

21  A.  I knew of his interview with Detective Heier and

22  Gulbrandson.

23  Q.  And did Detective Heier have any conversation with you about

24  his sense of the reliability or credibility of that initial

25  information that was garnered from Keith Randolph?

1  A.  Not that I remember.

2  Q.  And did you ever raise any concerns about the reliability of

3  any of the 3 jailhouse informants in this case?

4  A.  I didn't raise any concern, no.

5  Q.  And is it fair to say that the -- and I know you talked

6  about it on direct -- some of the issues with regard to

7  differences in the jailhouse informant statements.  But would

8  you agree with me that the jailhouse informants substantively

9  matched the statement that supposedly was given by William Avery

10 on March 24th?

11 A.  Yes.  In some respects.

12 Q.  And at the time you interviewed -- you and Detective

13 Hernandez interviewed Antron Kent, did you know that

14 Armbruster -- Detectives Armbruster and Heier had given the name

15 Lorenzo to Antron Kent?

16 A.  I would have read the report, but I don't know what you mean

17 by that.  That they provided the name Lorenzo.  I guess I don't

18 know what --

19 Q.  Well, did Armbruster or Heier ever tell you that when

20 Mr. Kent was first talking to them, he didn't know the name of

21 the person who supposedly helped move the body of Miss Griffin

22 from 2474 North Palmer?

23 A.  I don't remember them telling me any specifics about their

24 conversation.  I just read the report.

25 Q.  Okay.  So you don't know whether or not they gave any

1    details to Mr. Kent?

2    A.  Correct.

3    Q.  And when you spoke to Keith Randolph, he indicated to you

4    that he'd been a pallbearer at William Avery's mother Barbara's

5    funeral?

6    A.  Correct.

7    Q.  And you didn't do any checking out to see if that was true

8    or not, right?

9    A.  No, I did not.

10   Q.  And would that affect your assessment of his reliability if

11   it turned out that he had not been a pallbearer or an honorary

12   pallbearer at Mrs. Avery's funeral?

13   A.  The fact that he knew her name was Barbara?  I knew that her

14   name was Barbara, so --

15   Q.  How did you know that?

16   A.  From the pedigree information I had obtained from Mr. Avery

17   early on.  So I believed that in that way it was verified.  I

18   felt that it was verified.

19   Q.  So you didn't need to do any further verification?

20   A.  Not really, I didn't.

21   Q.  And when you were -- well, strike that.  Now, you testified

22   at Mr. Avery's homicide trial, correct?

23   A.  Yes.

24   Q.  And you testified at just one short period of time at his

25   homicide trial?

1  A.  I think so.

2  Q.  I think you testified on two occasions at a pretrial motion,

3  but only once at the trial?

4  A.  I believe it was one time at the trial.

5  Q.  And you did not testify at William Avery's trial anything

6  about Kenya Hall, correct?

7          THE COURT:  I didn't -- anything about what?

8          MS. HOFT:  Kenya Hall.  Sorry.

9          THE WITNESS:  Keisha Kenya Hall?  I don't know if I

10  was asked.  I don't remember.

11          MS. HOFT:

12  Q.  Okay.  But you -- well, let me show you what we've marked.

13  It's only 3 pages.  What we've marked as Plaintiff's Exhibit 30

14  for identification.  Have you had an opportunity to review those

15  3 pages?

16  A.  Yes.

17  Q.  And does that refresh your recollection that that was your

18  testimony at the -- at the homicide trial of Mr. Avery?

19  A.  Yes.

20  Q.  And nowhere in your testimony do you mention that William

21  told you that after Maryetta Griffin left earlier that evening

22  that it was he and Kenya Hall who slept overnight at the Palmer

23  Street address from February 16th to the morning of February

24  17th?

25  A.  I wasn't asked those questions, so I would not have

1    answered.

2    Q.  And you didn't tell anybody that information?

3    A.  No, I wouldn't have at the trial.

4    Q.  And when you testified about -- well, when you testified on

5    direct examination about your interrogation with Mr. Avery from

6    5:30 on March 24th up to 2:30 a.m. the next day, March 25th, you

7    mentioned that he told you something about a Little Bit?  A

8    person named -- referred to as Little Bit?

9    A.  Yes.

10   Q.  And that Little Bit was sent out for alcohol?

11   A.  Yes.

12   Q.  And that alcohol I guess was some kind of Nitrane bottles?

13   A.  Yes.

14   Q.  Or rose or something?

15   A.  Yes.

16   Q.  And during that -- what was it?  Nine hour interview, did

17   you talk to Mr. -- did you talk to Mr. Avery about other days in

18   February other than the 16th and the 17th?

19   A.  The 16th, 17th, and I think the week after.  We did the week

20   after the homicide.

21   Q.  You didn't -- didn't you talk to him about the workings of

22   the drug house from when he first started working there in early

23   February?

24   A.  Oh, yes.  In -- yes, in early February.  Yes.

25   Q.  And didn't he tell you that he had sent Little Bit out for

1  alcohol two weeks prior to February 16th?

2  A.  I don't remember that.  I thought he said the night of the

3  16th Little Bit had come over.  He could have.  I don't remember

4  that.

5  Q.  You could have been mistaken about that date?

6  A.  I'm pretty sure he -- I'd have to see the report, but I'm

7  pretty sure he said that night.  That he sent Little Bit out on

8  the 16th.  On the night of the 16th, the morning of the 17th.

9  Q.  But if I understand you correctly, you're indicating that he

10  could have told you that that happened earlier with Little Bit?

11  A.  I don't remember that.  I don't remember that.

12  Q.  Now, with regard to your further investigation in this case,

13  you have created a cold case review document, correct?

14  A.  I did.

15  Q.  And in that cold case -- well, let me just show you what

16  Defendants marked 1025, in case you need to refresh your

17  recollection.  But in that cold case review, or that document

18  entitled Milwaukee Police Department cold case review -- which

19  is dated and submitted by you at the end, May 11th, 2010.

20  A.  Yes, ma'am.

21  Q.  On page -- well, let me ask you this.  Do you recall putting

22  in that cold case review that you spoke to an individual who was

23  also a prostitute in that area by the name of Rhondalyn Scott?

24  A.  Yes, I do.

25  Q.  And that Rhondalyn Scott had told you that she last saw the

1  victim -- and we're talking about Maryetta Griffin here -- late

2  on Monday evening, and she was wearing the North Division

3  sweater and a red wig.  Do you recall recording that in your

4  cold case review?

5  A.  Yes, she did tell us that.

6  Q.  And you also put in your cold case review at the end of your

7  description of William Avery, that -- the last sentence, that

8  William Avery didn't believe he was involved in Miss Griffin's

9  death because the only person in the house was Keisha Kenya

10  Hall, and she was there when he woke up?

11  A.  Correct.

12  Q.  You put that in your cold case review, right?

13  A.  Yes.

14  Q.  And this cold case review which you submitted in May of

15  2010, this was after the semen of Walter Ellis had been

16  identified as being in the oral cavity, for lack of a better

17  phrase, in the mouth of --

18  A.  Oral swabs.  The swabs from the mouth.

19  Q.  The oral swabs that had been taken from Maryetta Griffin

20  were linked to Walter Ellis, right?

21  A.  That's when I did this review, correct.

22  Q.  Okay.  And when you did this review, part of doing this

23  review was -- I think as Detective Hernandez talked to us about

24  -- you sent a lot of other unsolved homicides in to be tested

25  for D.N.A. to see if there were any other cases that linked to

1   Walter Ellis, right?

2   A.   Correct.

3   Q.   And I think Detective Hernandez testified there were

4   hundreds or thousands of cases that were sent for additional

5   D.N.A. testing?

6          MS. YUAN:  I'm just going to object.  That that

7   misstates the prior testimony.

8          THE COURT:  It's what?

9          MS. YUAN:  I believe that misstates Detective

10  Hernandez's testimony.

11         THE COURT:  Well, I know he said there were thousands

12  of calls, hundreds of cases.  But we can clarify that.  The

13  witness can answer the question if that is the case.  Thousands

14  of cases that were sent up to the Crime Lab.

15         THE WITNESS:  Could you restate the question?

16         MS. HOFT:

17  Q.   Sure.  Why don't I just ask you, how many cases do you

18  think, unsolved homicides, you sent in to be checked to see if

19  there was any link with Walter Ellis?

20  A.   We sent in many cases during the time that Detective

21  Hernandez and I started the Cold Case Unit.  Probably hundreds

22  of cases.  Female homicide cases?  Probably the amount that I

23  talked to about with Miss Yuan.  Probably 35?  40 cases?

24  Q.   Okay.  And if I'm understanding you correctly, you're

25  indicating that this didn't really have anything to do with

1  Walter Ellis.  This was just what you did in the Cold Case Unit.

2  You sent cases for additional D.N.A. testing, right?

3  A.  Correct.

4  Q.  And then after that was all done, there were 10 cases that

5  again were linked to Walter Ellis?

6  A.  When we first came to the Cold Case Unit in late 2007, there

7  were 3 cases that were linked.  And Detective -- by D.N.A.  No

8  named suspect.  No one was in the database that belonged to that

9  D.N.A.  And Detective Hernandez and I were assigned to work on

10  those in the beginning, in the inception of the Cold Case Unit

11  that we started.  So we worked on those.  After that, probably

12  during that same year, maybe even later in the year we looked at

13  all of the females that were unsolved that could be linked in

14  any way to anybody.

15  Q.  And the 3 that were initially linked were Joyce Mims, number

16  8, and Jessica Payne, number 7.  And what other one?

17  A.  They were linked in 2003.  And Quithreaun Stokes was linked

18  in 2007, just before Detective Hernandez and I went to the Cold

19  Case Unit.

20  Q.  I see.  I see.  So Jessica Payne and Joyce Mims were

21  connected, and then Quithreaun Stokes was connected after that?

22  A.  Correct.

23  Q.  And then all of the cases were sent in to see if there were

24  any other links?

25  A.  Yes.  Or see if there was any profiles developed.  Not

1   necessarily just a link to these three.  But to see if any of

2   them were solve-able.  To see if any of them had D.N.A. profiles

3   on them.  For anybody.

4   Q.  Any of the other unsolved homicides that you had.

5   A.  Exactly.

6   Q.  To see if there was any D.N.A. evidence in those women of

7   Mr. Ellis?

8   A.  We looked at those cases to determine who could be --

9   anybody.  Who is responsible for these women?  It didn't -- we

10  weren't just targeting Ellis.  We didn't have Ellis when we did

11  that.  We didn't know anything about Walter Ellis when we

12  submitted all of that evidence for D.N.A.  We had no idea who

13  Mr. Ellis was.  We were looking for suspects, for perpetrators,

14  trying to develop, number one, if there are any -- if there is

15  any D.N.A. profiles.  Is there anything that -- you know, could

16  they be identified?  Do we know who they are?  And if not, if we

17  have a profile, and we don't know who that profile belongs to,

18  we're going to investigate further and try to find a match.  Not

19  just to Walter Ellis, or to these three.  But to any -- any --

20  just to complete the work on any of them.

21  Q.  Sure.  And -- but you didn't send in the D.N.A. evidence of

22  Maryetta Griffin.  That was done at the request of the D.A. as a

23  result of Mr. Avery's letter to him?

24  A.  That's correct.  That's correct.

25  Q.  And you didn't do any investigation into any connection

1   between Walter Ellis and Maryetta Griffin once the D.N.A.

2   evidence came back that Mr. Ellis's D.N.A. was on the oral swab?

3   A.  I think that we did a complete work-up on Mr. Ellis when he

4   was identified to all of his victims, including Maryetta

5   Griffin.  That would have been done throughout our

6   investigation.  Once -- once it was connected to Mr. Avery, I'm

7   sure we would have done interviews to see who -- how they could

8   have been connected, or how they knew about.  We certainly

9   learned that Mr. Ellis was affiliated with the drug house at

10  2474 North Palmer Street.  That we found out once he had been

11  identified, and once Mr. Avery had made his requests.

12  Q.  And did you also -- would it also have been helpful to know

13  whether Mr. Ellis had been seen with the victim?  Or whether he

14  lived in the vicinity of where the victim's body was found?

15  A.  We -- again, we did a complete work-up of Mr. Ellis, and all

16  of the addresses that he lived at during that entire period of

17  time.  So yes, we did do that.

18  Q.  Okay.

19  A.  And again, to repeat myself, we did find out that Mr. Ellis

20  was affiliated, or made frequent stops, or knew about the drug

21  house at 2474 Palmer Street.

22  Q.  And did you also learn that Mr. Ellis in 1998 lived at 3037

23  North 6th Street, just across the alley from where Maryetta

24  Griffin's body was found?

25  A.  Yes, we did.

1  MS. HOFT:  No questions.  Thank you.

2  THE COURT:  Redirect?

3  MS. YUAN:  One moment, Your Honor.

4  **REDIRECT EXAMINATION**

5  **BY MS. YUAN:**

6  Q.  Detective Spano, do you still have that Exhibit 1025 in

7  front of you, which is your cold case review?

8  A.  Yes, I do.

9  Q.  And if you turn to the fourth page, you have questions

10 about -- including information from Rhondalyn Scott?

11 A.  Yes.

12 Q.  Was your cold case review based on a review of the M-file of

13 Maryetta Griffin?

14 A.  Yes, it was.

15 Q.  And you see where Rhondalyn Scott is noted on that page,

16 there's a page number after that name, Page 111.  What would

17 that refer to?

18 A.  That would refer to the page number in the M-file.  In the

19 homicide file that her interview is contained on.

20 MS. YUAN:  That's all I have.  Thank you.

21 MS. HOFT:  Just one question based on that.

22 **RECROSS EXAMINATION**

23 **BY MS. HOFT:**

24 Q.  So if I understand you correctly, the information that you

25 provided with regard to what Rhondalyn Scott told the Milwaukee

1   Police Department, that came from interviews back in 1998?

2   A.  It did.

3           MS. YUAN:  That's it.  Thank you.

4           THE COURT:  All right.  You may step down, then,

5   Detective Spano.  Thank you.  Additional witnesses?

6           MR. SMOKOWICZ:  Detective Gulbrandson.  I have to get

7   him from out in the hallway, Your Honor.

8           THE COURT:  Okay.  Ladies and gentlemen of the jury, I

9   have to leave at quarter to 5:00 today.

10          **DETECTIVE ERIK GULBRANDSON**, called as a witness,

11  having been first duly sworn, on oath testified as follows:

12          THE CLERK:  Please be seated.  State your name and

13  spell it for the record.

14          THE WITNESS:  Erik Gulbrandson.  E-R-I-K.

15  G-U-L-B-R-A-N-D-S-O-N.

16                          **DIRECT EXAMINATION**

17  BY MR. SMOKOWICZ:

18  Q.  Good afternoon, sir.  Where did you grow up?

19  A.  Grew up in Ripon, Wisconsin.

20  Q.  And what was your date of -- year of birth?

21  A.  1970.

22  Q.  And where did you go to school?  High school?

23  A.  Went to Ripon High School.

24  Q.  After Ripon High School, you had gone to school where?

25  A.  I went to Carroll College.  It's now Carroll University in

1   Waukesha.

2   Q.  And when did you graduate from high school?

3   A.  1988.

4   Q.  And how about college?

5   A.  1993.

6   Q.  And what do you have your degree in -- from Concordia?  It's

7   Concordia, right?

8   A.  Carroll College.  Carroll University now.

9   Q.  Okay.

10  A.  It's in criminal justice, with a minor in communications.

11  Q.  And what about in terms of full time employment?  What was

12  your first full time job?

13  A.  Non-summer employment, first full time job was after

14  graduating from college.  I was already a part time employee at

15  the Waukesha County Juvenile Detention Center.  I then became a

16  full time employee there before moving on to the Waukesha County

17  Jail.

18  Q.  And how long did you work in the Waukesha County Jail,

19  slash, Juvenile Center?

20  A.  The Juvenile Detention Center -- I was there for about one

21  year and about a half a year prior to moving on to the Waukesha

22  County Jail, where I was there for a year-and-a-half.

23  Q.  And at the conclusion of that time period what happened

24  next?

25  A.  Then after that I became -- I was hired by the Milwaukee

1   Police Department in December of 1995.

2   Q.  What was your position when you were hired?

3   A.  I was a Police Officer, and I was assigned to District One,

4   which is the downtown area.

5   Q.  And for how long did you work in the downtown area?

6   A.  I worked in the downtown area until 1999, and then I was

7   transferred to a unit called the Street Crimes Unit, which is a

8   city wide unit that addresses -- that works hand-in-hand with

9   the Tac Squad, our S.W.A.T. Team, and we address problem areas

10  in the city.  If there's an event that's taking place, we go to

11  that area.  If there's trouble in a certain area of the city, we

12  saturate that area and address that.

13  Q.  And for how long did you work in that position?

14  A.  I worked in that until December of 2001, and then I went --

15  became a member of the Tac Squad Unit for 6 months, and then I

16  was promoted to the rank of Detective.

17  Q.  To the rank of what?

18  A.  Detective.

19  Q.  What year were you promoted to Detective?

20  A.  That was in June of 2002.

21  Q.  And how long have you remained as a Detective?

22  A.  I'm still in that position right now.

23  Q.  And in June, 2002, when you became a Detective, were you

24  assigned to a particular area or unit?

25  A.  I was.  I was assigned to Violent Crimes Division, and I was

1   assigned late shift hours.

2   Q.  And at some point did your assignment change within the

3   division?

4   A.  It did.  After about 6 months of doing that, I then became a

5   Sensitive Crimes Division Detective, which is focussing in on

6   sexual assaults, missings, and crimes of that nature.  Sexual

7   assaults of children.

8   Q.  How long did you remain in that assignment?

9   A.  I was in there for -- that position about one year, and then

10  I became -- I was assigned to the Homicide Unit.

11  Q.  So what year did you become assigned to the Homicide Unit?

12  A.  February of 2004.

13  Q.  And from February, 2004, how long did you remain in the

14  Homicide Unit?

15  A.  I'm still in that Unit.  I've been in there ever since.

16  Q.  Okay.  You recall being involved in any way in the

17  investigation of the Maryetta Griffin homicide?

18  A.  Yes.

19  Q.  And do you remember what your first involvement was with

20  respect to that investigation?

21  A.  Sure.  On September 7th, 2004, I went with then Detective

22  Tim Heier -- he was my partner.  We went up to Green Bay

23  Correctional and interviewed a subject by the name of Antron

24  Kent.

25  Q.  Had you any information about this homicide before you went

1  up there for that interview?

2  A.  Other than what Detective Heier told me, no.

3  Q.  So had you even had the chance to review any reports or

4  anything of that nature before you went up to Green Bay?

5  A.  No.

6  Q.  Once you went up to Green Bay, did you -- what role did you

7  take in that interview?  Did you ask questions?  Were you just a

8  witness?  What were you?

9  A.  I was more of support.  I kind of took some notes, sat back.

10  Detective Heier previously had contact with Mr. Kent.  He had

11  the report.  He sat and spoke to him, and I just noted kind of

12  our time that we started the interview, and then I did take

13  notes when there was additional information provided.

14  Q.  With respect to that interview, did -- at any time did

15  Detective Heier -- strike that.  With respect to that interview,

16  at any time during that interview did Antron Kent say he wanted

17  anything for his help in this matter?

18  A.  No.

19  Q.  With respect to that interview, at any time did Detective

20  Heier offer any help to Antron Kent for his assistance in this

21  matter?

22  A.  No.

23  Q.  What about you?  Did he ask you for any help?

24  A.  No.

25  Q.  And did you offer any help?

1   A.   No.

2   Q.   Did you offer any details about the -- about the homicide?

3   A.   No.

4   Q.   What about Detective Heier?

5   A.   Provide any details?

6   Q.   Yes.

7   A.   No.  No.

8   Q.   Did anybody make any threats against Antron Kent during this

9   interview?

10  A.   No.

11  Q.   You mentioned earlier that there was an additional detail he

12  provided during this interview, is that right?

13  A.   Correct.

14  Q.   What was the additional detail, to your understanding, that

15  he -- your memory, that he provided during this interview?

16  A.   Mr. Kent added -- he said there was one additional thing

17  that he remembered.  He said that they took the body to this

18  particular location, because other bodies had been dumped there.

19  And then Mr. Kent said he also believed that the F.B.I. was

20  involved in the investigation.

21  Q.   Investigation of what?

22  A.   Of this homicide.  Homicide of Miss Griffin.

23  Q.   I'm going to show you what's been previously marked as

24  Exhibit 1026, and ask you to identify the document.

25  A.   Okay.  This is a copy of a report that I created based on

1   our trip to Green Bay, and our interview with Mr. Kent.

2   Q.  To the best of your recollection, does that accurately

3   recount all the significant parts of that interview?

4   A.  It does.

5   Q.  Is this report signed by anybody?

6   A.  It's signed by me, and a Lieutenant as well.

7   Q.  And you prepared this report?

8   A.  I did.

9   Q.  After that interview was completed, did you and Detective

10   Heier return to Milwaukee?

11   A.  Yes.

12   Q.  And after you returned, do you recall any further work on

13   the case that day?  Or within a day of that case?

14   A.  We met with Assistant District Attorney Mark Williams.

15   Advised him of the interview of Mr. Kent, and the additional

16   details.  And then Detective Heier signed a Complaint on that

17   particular day.

18   Q.  Subsequent to that, did you have any further involvement in

19   this matter?

20   A.  Yes.

21   Q.  What was your next involvement in this matter?

22   A.  Two weeks later on Tuesday, April 21st.

23   Q.  April?

24   A.  Excuse me?

25   Q.  You said April.

1   A.   I'm sorry.  September 21st.  On that day we conducted the

2   in-custody interview of William Avery.

3   Q.   When you say we, who conducted that interview?

4   A.   That was Detective Tim Heier and myself.

5   Q.   And where did that interview take place?

6   A.   It took place at the CIB, room number 413.

7   Q.   And how long was that interview?  Do you have a sense?

8   A.   The interview was 28 minutes.  It was from 8:36 p.m. to

9   9:04 p.m.

10  Q.   And did Mr. Avery make any statement to either you or

11  Detective Heier during that time frame about his involvement in

12  the homicide of Maryetta Griffin, if any?

13  A.   No.  He invoked his right to an attorney.

14  Q.   And did you prepare a report relating to that?

15  A.   I did.

16  Q.   I'm going to show you what's been marked as Exhibit 1027.

17  Do you recognize that report?

18  A.   Yes.  This report is a dictated version of the handwritten

19  report that I had done at the time of the interview.

20  Q.   With respect to that report, does it -- what does it

21  reflect, if anything, about Mr. Avery's willingness to talk

22  about the homicide?

23  A.   It states that he wished to invoke his right to a lawyer

24  prior to giving any statement.

25  Q.   And who signed that report?

1  A.  Me, as well as a Lieutenant.

2  Q.  During that interview of Mr. Avery, did you make any threats

3  to him?

4  A.  No.

5  Q.  Did Detective Heier make any threats to him?

6  A.  No.

7  Q.  Did you in any other way attempt to coerce him to confess to

8  that homicide?

9  A.  No.

10 Q.  Did Detective Heier make any efforts to coerce him to

11 confess to that homicide?

12 A.  No.

13          MR. SMOKOWICZ:  Thank you.  That's all I have.

14          THE COURT:  Cross examination.

15                    **CROSS EXAMINATION**

16 **BY MR. ELSON:**

17 Q.  Detective Gulbrandson, your only involvement in the Maryetta

18 Griffin homicide investigation was to go with Detective Heier to

19 Green Bay Correctional Institute and interview Antron Kent in

20 September of 2004, right?

21 A.  That, as well as the subsequent interview, yes.

22 Q.  And the subsequent interview.  And by the time you saw

23 Antron Kent, he had already been interviewed on a number of

24 occasions by Detectives Armbruster, Heier, Hernandez, and Hein,

25 right?

1  A.  Correct.

2  Q.  And Armbruster and Heier had interviewed him in Oklahoma,

3  right?

4  A.  Correct.

5  Q.  And Hein and Hernandez had interviewed him in Green Bay?

6  A.  Yes.

7  Q.  And you have no personal knowledge of what occurred during

8  those interviews, right?

9  A.  Correct.

10  Q.  You don't know what Antron Kent said to those Detectives,

11  and you don't know what those Detectives said to Antron Kent,

12  right?

13  A.  Well, they actually -- when I met with Antron Kent, he

14  confirmed the previous two statements that he had provided as

15  accurate.  So --

16  Q.  But in terms of those interviews that those Detectives

17  conducted with Mr. Kent, in Oklahoma and previously in Green

18  Bay, you weren't present for those interviews, so you don't know

19  what was said between the Detectives and Mr. Kent, correct?

20  A.  That's correct.

21  Q.  Now -- and I think you said in the interview of Mr. Kent

22  that you and Heier -- Detective Heier conducted, Detective Heier

23  did most of the talking, right?

24  A.  That's correct.

25  Q.  And Detective Heier already knew Antron Kent from

1  interviewing him previously, right?

2  A.  Yes.

3  Q.  And Detective Heier had previously gone over Mr. Kent's

4  story with him in Oklahoma, right?

5  A.  Correct.

6  Q.  And Mr. Kent went over this story again in an interview that

7  you and Detective Heier did with him in Green Bay, right?

8  A.  Correct.

9         MR. ELSON:  No further questions.

10         THE COURT:  Any redirect?

11         MR. SMOKOWICZ:  No redirect, Your Honor.

12         THE COURT:  All right.  You may step down, Detective

13  Gulbrandson.  Additional witnesses?

14         MR. SMOKOWICZ:  The Defendants do not have any

15  additional witnesses.  Subject to introduction of any Exhibits,

16  at this point we would rest.

17         THE COURT:  Okay.  Let's have a side-bar conference,

18  please.

19         (Whereupon a side-bar conference was held off the

20  record.  Upon conclusion of the side-bar conference, the

21  proceedings continued as follows:)

22         THE COURT:  Well, ladies and gentlemen of the jury,

23  you've heard the defense rests.  The Plaintiff has rested.

24  We've had a conference as to how we're going to proceed from

25  here.  And as I indicated at the start of the trial, what we're

1 going to do is now listen to the closing arguments of the

2 attorneys.  But that's not just going to happen like that.  They

3 have to have time to prepare their closings, Exhibits, and get

4 organized in that regard.

5        In addition, I have to advise you on the instructions

6 of law that I'm going to give you.  And we also, in that

7 connection, always have what we call an instruction conference

8 with the attorneys as to those instructions of law that I will

9 ultimately give you.  That takes some time.

10        So you're going to get out earlier than quarter to

11 5:00 today.  You will come back tomorrow.  Because we're going

12 to take that up now.  Take up these other matters tomorrow

13 morning.  Also need some time tomorrow morning.  So what we're

14 going to do is we will have you back here at 12:30, and then you

15 will hear the closing arguments of the attorneys, and I will

16 instruct you in the law.  And then you will go into the jury

17 room and deliberate on the case.  Okay?  That's the way it's

18 planned right now.  And that's the way it should work.

19        Now, you've heard all the evidence in this case, and

20 it becomes very tempting to discuss the case.  As I have said

21 throughout the trial, please don't.  And I said only after

22 you've heard the closing arguments of the attorneys and I've

23 instructed you in the law and you're actually in the jury room

24 deliberating on the case after you picked a foreperson to

25 preside over your deliberations, okay?  So we'll see you

1 tomorrow at 12:30.  Have a good evening, okay?

2           (Whereupon the jury was excused at 4:07 p.m.)

3           THE COURT:  Okay.  You may be seated.  We will put the

4 sidebar conference and the offer of proof relative to the

5 rebuttal that was being offered out of the Claim -- Notice of

6 Claim.

7           MR. STAINTHORP:  Yes, Judge.

8           THE COURT:  Mr. Stainthorp.

9           MR. STAINTHORP:  With respect to the rebuttal evidence

10 that the Plaintiffs wish to offer in this case, this evidence

11 would be direct rebuttal to the testimony of Detective Hernandez

12 which was offered during the Defendant's case in chief.  That he

13 did not offer any suggestions to Mr. Avery.  That he did not

14 pose hypotheticals to Mr. Avery.  That he did not provide Mr.

15 Avery with suggestions as to how this crime occurred.

16           This is particularly important in this case, because

17 up until Detective Hernandez -- or former Detective Hernandez

18 testified in the Defendant's case in chief, he had disavowed,

19 for the most part, any recollection of the interrogations that

20 he had conducted with Mr. Avery.  He had said repeatedly I don't

21 remember.  I don't remember.  He had been asked at his

22 deposition what went on during those interrogations.  I don't

23 remember.  I don't remember.  And even in his testimony in our

24 side of the case, that was his testimony.  I don't remember.  I

25 have no recollection.  Then in the Defendant's side of the case,

1   he comes out with a very detailed recollection, alleged

2   recollection of the various interrogations.

3        So in that context, it is now important for us, very

4   important, critically important, for us to be able to offer some

5   evidence in rebuttal of that. And what we have here, and what I

6   was proposing to read to the jury, are portions of the Notice of

7   Claim which has already been entered into evidence, without

8   objection. And this is the Notice of Claim filed by Mr. Avery

9   in 1998. In November of 1998. And that is what I proposed to

10  do in rebuttal. And at sidebar the Court indicated it was not

11  inclined to allow me to do that. So I would like to make an

12  offer of proof as to what I would read in.

13          THE COURT: Okay.

14          MR. STAINTHORP: Portions of this Notice of Claim. So

15  this is -- my offer of proof is that on or about November

16  the 27th, 1998, Mr. Avery filed a Notice of Claim. Contained

17  within this Notice of Claim is the following. Quote --

18          MR. SMOKOWICZ: Your Honor, just to follow along, so

19  that I can, what page?

20          MR. STAINTHORP: We're starting on Page 1. But -- and

21  I'm going to go sequentially, but there's going to be big gaps

22  where I'm just leaving stuff out. Quote, Monday, March 23rd,

23  1998, at 9:30 a.m. I presented myself to the C.B.I. - slash

24  C.I.B., where I met Detective Daniel Phillips and Detective

25  James DeValkenaere, at which time they informed me that all they

1    wanted was for me to be a witness to a homicide that was totally

2    alien to me.  I informed them that I didn't know anything about

3    the homicide.

4           Then there's a break, and I'm going down to the

5    portion right above the excised portion.  They started asking me

6    if I sold dope out of that house, and if I dope dated the woman

7    in question.  Did she steal anything from me?  I answered no,

8    no, to all the questions.  They kept asking the same question

9    over and over.  I could see that they didn't believe.  Started

10   asking for a lawyer.  Detective Phillips, quote, it wouldn't

11   work that way.

12          The next section I'm proposing to read is at the end,

13   at the -- towards the bottom of Page 2, and it relates to

14   questioning during the morning interrogation session on March

15   the 24th, 1998.  This time they were saying that I knew what

16   happened to that woman.  Saying, quote, you did it, Jody.  You

17   and your cousin, end quote.  I kept telling them that I didn't

18   hurt her or know who did.  Detective Phillips started asking me

19   if I ever been in trouble like this before.  I told him no,

20   because I ain't in no trouble, because I ain't did nothing.  His

21   favorite saying was, quote, rule number one, you're fucked.

22   Rule number two, how can I minimize rule number one?  I would

23   just say that I didn't hurt that woman or know who did.

24          The next portion appears on the next page.  And again,

25   relates to the interrogation on 3/24, and appears around the

middle of the page, towards the end -- towards the middle of the

first -- wrong paragraph, actually.  Quote:  I kept asking for a

lawyer the whole time they were questioning me.  They kept

saying it don't work that way.  So Detective Hein would leave

the interrogation room, and Detective Phillips would come in.

He and Detective Hernandez out of the blue started saying that I

admitted to killing the woman.  I would respond, quote, no I

didn't.  You all is lying to me, end quote.  Detective Phillips

would be saying stuff like how else would someone know that the

woman had been killed when her body wasn't reported until about

11:00 or 12:00?

Then there is a gap.  And then the next portion is

towards the bottom of Page 3.  By the time Detective Hein had

come into the room and Detective Phillips had left, Detective

Hernandez started saying that I had admitted to the killing to

him and Detective Phillips.  In front of Detective Hein I would

ask if I could have an attorney, and they would say it don't

work that way.  They had me where I could hear the phone.  So

whenever it would ring, Detective Hein would go out to answer

the phone.  That's when Detective Hernandez would start telling

me what happened to that woman.  The story that they released to

the newspaper.  When Detective Hein would come back in,

Detective Hernandez would start saying that Jody, I can't tell

you what happened.  You have to tell us what happened, end

quote.  I was getting very frustrated with all those same

questions.  I wanted them to leave me alone.  So I tell them

hypothetically speaking, I think that could happen.  But it

didn't.  The Detective, Gilbert Hernandez, would start saying,

quote, Jody, just forget the bond you and Ron made.  I would --

end quote.  I would tell them, quote, ain't nobody made no bond,

end quote.  He started saying Ron told them that I killed that

woman.  I would say no, he didn't.

        And down about 10 lines from there, referring to

Detective Hernandez, the Notice of Claim states:  He, Hernandez,

found out that I had been shot in my head before, so he started

saying I blank out and didn't remember I killed that woman.  I

would tell him that didn't happen.

        The next portion is at the -- right at the bottom of

Page 5.  And I'm going on to Page 6.  Starting so then Detective

Hernandez start telling me, Ron panicked and helped dump that

woman body.  I would respond no, he didn't.  He would know it

would be easier to explain if something like that had happened,

because he was telling me that woman fell down the stairs and

broke her neck.  I would tell him my grandmother didn't raise no

coward, and if that did happen, I would take responsibility for

my action.  He start saying you called Ron and said something.

Get over here, I think I killed the bitch.  I was telling him

no, I didn't.  I knew he was lying, because I don't have no

phone number to Ron.  Then I told him okay, check the phone

records to see if a phone call was made to Ron that night.  He

1 | was saying Ron helped me dump that woman body. I would tell him

2 | no, he didn't.

3 | And that's the end of the portion I would propose

4 | reading, Judge.

5 | THE COURT: Okay. That offer of proof has been made.

6 | Any response from the defense as to that offer? Or the Court's

7 | ruling?

8 | MR. SMOKOWICZ: As to that offer, Your Honor, I would

9 | note now that it's been laid on the record -- at least the first

10 | couple of -- three portions have to do with Detective Phillips

11 | and Detective DeValkenaere, and nothing to do with the proposal

12 | to address what Detective Hernandez said or may have allegedly

13 | suggested. Furthermore, as I indicated at the sidebar, this is

14 | not appropriate rebuttal evidence. It would have been the

15 | subject of cross examination. The document had been apparently

16 | admitted -- we did, I believe, according to our notes, either

17 | reserve the right to make an objection, or did make an

18 | objection.

19 | We do object to this, Your Honor. This is -- this is

20 | an improper attempt to put in a prior statement. Prior

21 | consistent statement. But it's also -- in any event, it's

22 | inappropriate rebuttal here because this is evidence that is not

23 | in response to any surprise. It's not new evidence. It's

24 | evidence that's already been in there. It's not a new witness.

25 | It's not a new document. It's already been put into evidence.

1    Rebuttal evidence is just that, something new.  Something that's

2    not been heard by the jury in response to an unexpected

3    statement by the Defendants, and it's inappropriate.

4            THE COURT:  Okay.  You made those arguments at

5    sidebar.  I was just asking if you had any more comments about

6    the offer of proof?

7            MR. SMOKOWICZ:  And I did add the first couple of

8    points, obviously.

9            THE COURT:  It was the Court's ruling at sidebar that

10   it wasn't rebuttal.  And the Court -- I don't know if I

11   referenced at sidebar, I said something like the Exhibit or that

12   testimony was already in the record.  And it was, through Mr.

13   Avery, who indicated -- and was examined when the Court admitted

14   Exhibit 6, about the Notice of Claim that he filed I believe

15   back in November of '98 or whatever that is.  November 27th,

16   '98.  And he testified very clearly that nothing he was accused

17   of is true.  That they made up the confession and that -- words

18   to that effect.  And that he did not commit the murder.  So it's

19   something that is already in the record and the Court,

20   therefore, didn't treat it as rebuttal testimony subsequent to

21   Hernandez's denial that he didn't do that.  And Avery also

22   testified, from the Court's memory, that Hernandez told him at

23   the time you've got to tell us, otherwise we can't help you.

24   Words to that effect.  It was sort of a -- that he created these

25   hypotheticals, and he said that this may have happened, and

1  that's the way they examined me.  And then it was ultimately --

2  the hypothetical was turned into what was actually a confession.

3  Inculpating testimony.  And -- because the witness has testified

4  that they didn't think this was a complete confession of

5  something that was good enough for the D.A.  But in any event,

6  those all were put -- words put into his mouth.  And I can't

7  remember all of the testimony, but the Court is convinced that

8  this was already offered and is not rebuttal testimony.  So that

9  record is made.

10       So tomorrow morning let's meet here at 9:00 and then

11  go over instructions, okay?

12       MR. STAINTHORP:  And just one other point, Judge.  You

13  did indicate at sidebar that we were certainly entitled to argue

14  what's in the Notice of Claim?

15       THE COURT:  Yes.  That's in the record, it's in the

16  evidence, so it can be argued.

17       MR. STAINTHORP:  Okay.  Thank you.

18       THE COURT:  So 9 o'clock tomorrow morning.  And we

19  will have an instruction conference.

20       MR. STAINTHORP:  Very good, Your Honor.

21       MR. SMOKOWICZ:  Very good, Your Honor.  Thank you.

22       THE COURT:  Thank you.

23                    *    *    *

24

25

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WISCONSIN

3

4            I, HEIDI J. TRAPP, Official Court Reporter for the

5    United States District Court, Eastern District of Wisconsin, do

6    hereby certify that I reported the foregoing Transcript of

7    Proceedings; that the same is true and correct as reflected by

8    my original machine shorthand notes taken at said time and place

9    before the Hon. Rudolph T. Randa.

10

11                          _____

12                          Official Court Reporter
                            United States District Court

13

14   Dated at Milwaukee, Wisconsin,

15   this 20th day of November, 2015.

16

17

18

19

20

21

22

23

24

25