UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
----------------------------------------------------------------

**WILLIAM DAMON AVERY,**

                                        Case No. 11-CV-408

                        Plaintiff,

                                        Milwaukee, Wisconsin

        vs.

                                        June 10, 2015

**CITY OF MILWAUKEE, et.al.,**

                        Defendants.
----------------------------------------------------------------

**VOLUME 8 – PAGE 1266**
TRANSCRIPT OF TRIAL
BEFORE THE **HONORABLE RUDOLPH T. RANDA,**
UNITED STATES DISTRICT JUDGE, AND A JURY


**A P P E A R A N C E S**

For the Plaintiff:            People's Law Office
                              By: **Mr. John L. Stainthorp**
                                  **Ms. Janine L. Hoft**
                                  **Mr. Ben Elson**
                              Attorneys at Law
                              1180 N. Milwaukee Avenue
                              Chicago, IL  60622


For the Defendant:            Milwaukee City Attorney
                              By: **Mr. Jan A. Smokowicz**
                                  **Ms. Jenny Yuan**
                              Assistant City Attorneys
                              200 E. Wells St. – Rm. 800
                              Milwaukee, WI  53202-3551


REPORTED BY:                  HEIDI J. TRAPP
                              Federal Official Court Reporter
                              310, U.S. Courthouse
                              517 East Wisconsin Avenue
                              Milwaukee, Wisconsin 53202


Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

## <u>TRANSCRIPT OF PROCEEDINGS</u>

1

2  THE CLERK:  Case Number 11-CV-408, William Damon Avery

3  versus the City of Milwaukee, et.al.  Called for continuation of

4  the jury trial.  May I have the appearances, please.  First for

5  the Plaintiff.

6  MS. HOFT:  Good morning, Your Honor.  Janine Hoft for

7  the Plaintiff.

8  THE COURT:  Good morning.

9  MR. STAINTHORP:  Judge, John Stainthorp for the

10  Plaintiff.

11  THE COURT:  Good morning.

12  MR. ELSON:  Good morning, Judge.  Ben Elson for the

13  Plaintiff.

14  THE COURT:  Good morning.

15  THE CLERK:  And for the Defendants?

16  MR. SMOKOWICZ:  Assistant City Attorney Jan Smokowicz

17  for the Defendants.  Good morning, Your Honor.

18  THE COURT:  Good morning.

19  MS. YUAN:  Good morning, Your Honor.  Assistant City

20  Attorney Jenny Yuan for the Defendants.

21  THE COURT:  Good morning.  Well, the Court took some

22  time here, went through the instructions.  I didn't pay much

23  attention to the verdict forms, so the Court has given you a

24  form that it's going to submit, because I think it's an

25  appropriate combination of the way the verdict form was framed

1    by both parties.  And it also incorporates the claims that the

2    Plaintiff makes and has made and that were absent from the

3    Defendant's verdict form, which simply had a fabrication

4    relative to the due process claim -- fabrication of testimony

5    relative to the due process claim.  I still think it's --

6    Question Number 1 is phrased appropriately, because the

7    instruction relative to that first claim, a violation of due

8    process incorporates the definition of that as being the

9    fabricated testimony that was the cause of the criminal

10   conviction of William Avery.

11           So I'm going to go through this, and then you can

12   offer some suggestions.  But the Court is going to present in

13   this fashion, and I will explain why.  Did -- Question 1:  Did

14   any of the following Officers fabricate testimony that was the

15   cause of the criminal conviction of William Avery?  And then

16   lists all the Officers.  Gulbrandson being absent from the

17   formal verdict form because he's no longer a party.

18           Goes on, if you answered no to all parts of Question

19   1, then you need not answer any of the remaining questions.

20   However, if you have answered yes to any part of Question 1,

21   then answer Question Number 2.  Goes into the claim that

22   involves the intervention.  Failure to intervene.  Did any of

23   those Defendants fail to intervene to prevent the use of

24   fabricated testimony?  And I suppose you could say did any of

25   those Defendants be answered yes to, but that would not mean --

1  that is incorrect. The reason the Court -- it should read did

2  any of the Defendants fail to intervene. Because -- not those

3  Defendants, but did any of the Defendants fail to intervene to

4  prevent the use of fabricated testimony. Because as it relates

5  to Question Number 1, you could have answered yes to several of

6  the Defendants in Question 1, and no to some of the others. But

7  those who answered no, who may not have fabricated the

8  testimony, could have failed to intervene.

9       So the second question is did any of the Defendants

10 fail to intervene to prevent the use of fabricated testimony.

11 If you have answered yes to any of the Defendants in Questions 1

12 or 2, then answer Question Number 3. Did any of those

13 Defendants conspire to use fabricated testimony that was a cause

14 of the conviction of William Avery? And, of course, that

15 incorporates those people in 1 and 2 that yes answers were

16 given.

17       The conspiracy charge, of course, by definition and

18 the instruction states it is those who have the intent to commit

19 an unlawful act. If you've answered no to the previous

20 Defendants, then they hadn't engaged in the act, so they

21 couldn't possibly have conspired to do that. So that's why that

22 question is framed that way.

23       Did any of the Defendants conspire to use fabricated

24 -- did any of those Defendants conspire to use fabricated

25 testimony that was the cause of the conviction of William Avery.

 1   And then we list all of the Defendants, however, so that we

 2   leave it up to the jury to determine what -- who those

 3   Defendants were that they answered yes to.

 4        I thought about putting the question this way:  Did

 5   any of those Defendants who you answered yes to in the previous

 6   two questions use fabricated testimony -- conspired to use

 7   fabricated testimony.  But since we have been doing all of this,

 8   all the Defendants, leave it up to the jury.  I think it's

 9   pretty clear that they can't answer yes to any of the Defendants

10   that had conspired if they didn't answer yes to any of those

11   Defendants in the previous two questions.

12        Now, if you've answered yes to any part of Questions

13   1, 2, or 3, then answer Question 4:  Did the City of Milwaukee

14   have a policy, practice, or custom of fabricating evidence to

15   secure criminal convictions?  Yes or no.  If you've answered

16   yes, then answer Question 5.  Was the City of Milwaukee's

17   policy, practice, or custom a cause of William Avery's criminal

18   conviction?  Yes or no.  If you've answered yes to any of the

19   previous questions, then answer Question Number 6.  We award

20   Plaintiff's compensatory damages in the amount of -- and then

21   there's a blank spot.  And then it goes on, if you've answered

22   no to all parts of Questions 1, 2, or 3, then you need not

23   answer Question Number 7.  However, if you answered yes to any

24   part of Questions 1, 2, or 3, then answer Question Number 7 as

25   to any Defendant to which you answered yes.  And that is what

1    amount of money, if any, do you award the Plaintiff as punitive

2    damages against the following Defendants:  And then all the

3    Defendants are listed.  And again, the jury's to answer as to

4    those Defendants if they've answered yes to any part of

5    Questions 1, 2, or 3.  So that I think is the correct verdict

6    form.  And any comments?

7             MR. ELSON:  Yes, Judge.  A couple things on Question

8    Number 1.  It lists the Defendants -- it calls the Defendants

9    the Officers, whereas in Question Number 2 it refers to them as

10   the Defendants.  For consistency sake should we change Officers

11   in Question Number 1 to the Defendants?

12            THE COURT:  Probably should change Officers to

13   Defendants.

14            MR. ELSON:  Yes.  That's what I mean.

15            THE COURT:  Okay.  Yeah.  You're right.  Did the

16   following Defendants fabricate testimony.  It's consistent with

17   2.

18            MR. ELSON:  And then in Question Number 1, 2, and 3, I

19   believe testimony should be changed to evidence.  Did any of the

20   following Defendants fabricate evidence that was a cause of the

21   criminal conviction of William Avery, as opposed to fabricate

22   testimony.

23            THE COURT:  Exactly.

24            MR. ELSON:  And the same with Question Number 2.  Did

25   any of the Defendants fail to intervene to prevent the use of

1  fabricated evidence.  As opposed to testimony.  And Number 3 as

2  well, changing the word testimony to evidence.

3           THE COURT:  Okay.  And that's consistent with Question

4  Number 4, which uses evidence.  It then is consistent

5  throughout, and that's more accurate.

6           MR. ELSON:  And then the last thing, Judge, Question

7  Number 4 regarding the Monell claim.  Our jury instruction

8  characterizes the Monell claim as policy of the City of

9  Milwaukee to not adequately investigate homicides.  So we would

10 suggest that the language in Question Number 4 be changed to

11 read did the City of Milwaukee have a policy, practice, or

12 custom of inadequately investigating homicides at the time

13 material evidence was fabricated.

14          THE COURT:  Run that by me again?

15          MR. ELSON:  Sure.  Did the City of Milwaukee have a

16 policy, practice, or custom of inadequately investigating

17 homicides at the time material evidence was fabricated?  For

18 Question Number 4.

19          THE COURT:  Did the City of Milwaukee have a policy,

20 practice, or custom of inadequately investigating homicides --

21 and how did you phrase that?

22          MR. ELSON:  Of inadequately investigating homicides at

23 the time material evidence was fabricated.

24          THE COURT:  Well, but that answers the liability

25 question in that question.  It's almost stating that there was

1    material -- that investigating homicides -- let's do it this

2    way.  Did the City of Milwaukee have a policy, practice, or

3    custom of inadequately investigating homicides at the time in

4    question which led to the --

5            MR. ELSON:  At the time in question?  I think at the

6    time in question would be fine.

7            THE COURT:  Okay.  Which led -- let's say time in

8    question which led to the fabricating of evidence that resulted

9    in criminal convictions.  Did the City of Milwaukee have a

10   policy, practice, or custom of inadequately investigating

11   homicides at the time of -- at the time in question which led to

12   the fabricating of evidence that led to the -- that led to

13   criminal convictions.

14           Did the City of Milwaukee have a policy, practice, or

15   custom of inadequately investigating homicides at the time in

16   question which led to the fabricating of evidence that led to

17   criminal convictions?

18           MS. HOFT:  Going to use led twice?

19           THE COURT:  Sorry.

20           MS. HOFT:  I was suggesting using resulting in

21   criminal convictions.  Rather than using the word led twice.

22           THE COURT:  Resulting in criminal convictions instead

23   of that led to?

24           MR. STAINTHORP:  Yes.

25           THE COURT:  Did the City of Milwaukee have a policy,

1  practice, or custom of inadequately investigating homicides at

2  the time in question which led to the fabricating of evidence,

3  resulting in criminal convictions.  I like your tie, by the way,

4  Mr. Stainthorp.  Okay.  Anything else about this verdict form?

5          MR. ELSON:  Nothing else, Judge.

6          MR. SMOKOWICZ:  Your Honor, from the Defendants?

7          THE COURT:  Yes.

8          MR. SMOKOWICZ:  With respect to the change from

9  evidence and testimony in Questions 1, 2, and 3, I think the

10  Court actually properly stated it in all those 3 questions.

11  Referring to testimony rather than evidence.  Because there is

12  no indication of the fabrication of anything other than

13  testimony.  That may be confusing to the jury to refer to it in

14  a more generic fashion.  The entire case has to deal with

15  testimony of the three individuals.  And, of course, I assume

16  perhaps whatever argument the Plaintiff will make about his own

17  statement.  And those are all -- that's all that's there.

18          With respect to also Question 1 and Question 3 in

19  terms of conviction, I'm concerned here about criminal

20  conviction.  Because the jury has heard twice about -- I mean,

21  has heard much evidence about two convictions here.  One for the

22  drug charge, and one for the homicide charge.  And the Court may

23  wish to, in this question, focus it on the homicide conviction.

24          THE COURT:  Change criminal to homicide?  Which is the

25  cause of the homicide conviction of William Avery?

1   MR. SMOKOWICZ: Technically it was actually party to a
2   crime of homicide, but I think that's just confusing to the
3   jury. And then although I sat silent here while the Plaintiffs
4   made their request for a change to Question 4, so the Court
5   could write out the question that they suggested, I object -- we
6   object to the form of that question that's being changed now.
7   First of all, the length makes it unduly confusing I think to
8   the jury. And again, I think that policy, practice, or
9   custom that has to be focussed on here is fabricating evidence.
10  Otherwise, the jury's going to start to think -- may be confused
11  as to some argument about something else, such as not having
12  D.N.A. evidence available to it earlier, or something of that
13  sort.
14      THE COURT: Well, I don't think that should be a
15  concern with this language, because the inadequate investigation
16  of homicides is connected to -- the inadequate investigation
17  relates to the fabricating of evidence. I think that's pretty
18  specific.
19      MR. SMOKOWICZ: All right. And just for the record,
20  we're going to -- I'm going to make a -- we're going to make a
21  motion to -- certain motions here at the end of the case still,
22  and one of the motions we would make would be to dismiss both
23  the conspiracy and the punitive damages claim, as well as the
24  Monell claim. So for the record I guess I have to object to the
25  questions on those items.

1    THE COURT: Right.

2    MR. SMOKOWICZ: And since we'll also be making a

3    motion to dismiss Mr. DeValkenaere separately, I will make a

4    motion as to that, too.

5    THE COURT: Okay. Well, let's take care of the

6    instructions first. The better practice now that we have the

7    jury answering these questions -- close to having the jury

8    answer these questions, is to have the jury answer the

9    questions. The Seventh Circuit has, in fact, suggested that

10   it's probably the better form, particularly when we're talking

11   about analysis of evidence, and the factual basis for the

12   claims, and whether or not they're proven. So what I'm saying

13   is that I'll probably deny those motions.

14   MR. SMOKOWICZ: I got that impression from the

15   statement there, Your Honor, but I think particularly with

16   respect to one other motion I need to make, I have to make it as

17   a matter of record, or otherwise I've --

18   THE COURT: Of course the standard is the evidence

19   looked at in the light most favorable to the party moved

20   against. And that's a tough row to hoe, and as I said, the

21   Seventh Circuit directs the Court to avoid the question if it's

22   possible. And that is possible if the jury comes back with a

23   verdict in favor of the Defendants. If it doesn't, then that

24   motion can be renewed and you've preserved the record.

25   MR. SMOKOWICZ: My only concern, just so the Court's

1   aware of it, is with respect to the 50(a) motion that we made,

2   the motion to dismiss as a matter of law.  There's a case,

3   Szmaj, S-Z-M-A-J, versus AT&T, and the citation is 291 F.3d 955,

4   and in particular Page 957.  And the Court of Appeals I think

5   made fairly clear -- it's a slightly different version of Rule

6   50(a) and 50(b), but made very clear that a Defendant that makes

7   a motion to dismiss as a matter of law at the close of the

8   Plaintiff's case forfeits any subsequent motion after a verdict

9   if they don't renew that motion at the close of all evidence.

10  So that's why we would -- I mean, I have to make a record just

11  on that -- that I'm making the motion.

12          THE COURT:  Right.  And the Court just acknowledged

13  that.

14          MR. SMOKOWICZ:  Okay.

15          THE COURT:  It's on the record.

16          MR. SMOKOWICZ:  Okay.  Good enough.

17          THE COURT:  So we will go with the verdict form which

18  we've just discussed.  Relative to the instructions --

19          THE SECRETARY:  Are we changing testimony to evidence?

20  Or are we leaving it testimony?

21          THE COURT:  Well, that's right.  We didn't -- we went

22  into a different matter because the Court didn't take up the

23  objection -- that the Court altered testimony to evidence.  The

24  argument is that the testimony that was gleaned -- the evidence

25  that was gleaned during the course of this investigation

1   resulted in the testimony, of course. So I think evidence is

2   the appropriate term here. The -- or at least some of the

3   evidence gathered resulted in testimony at trial. So the

4   statements made by whoever, Randolph, Kent, Kimbrough, et

5   cetera, or Mr. Avery himself, were evidence. Statements which

6   are not categorized as testimony at that point, but become

7   testimony when they're admitted into the record at trial. So I

8   think we're going to leave evidence instead of testimony. So

9   that answers your question, Madam Secretary?

10          THE SECRETARY: And what about homicide conviction

11  instead of criminal conviction?

12          THE COURT: And homicide conviction instead of

13  criminal conviction, to answer the concern of the Defendants

14  that there were two convictions in this case. Drug conviction

15  and homicide.

16          MR. SMOKOWICZ: Just so the Court knows, Question 3

17  has no description of which conviction. So I guess we'd have to

18  insert the word homicide there.

19          THE COURT: All right. The Court will add homicide

20  there also. I think -- okay relative to --

21          MR. SMOKOWICZ: And, Your Honor -- I'm sorry. Miss

22  Yuan pointed out to me we have the word criminal in Question

23  Number 5, too. And 4.

24          THE COURT: You know, now that I look at that, that is

25  true. Did the City of Milwaukee have a policy, practice, or

1  custom of inadequately investigating homicides at the time in

2  question which led to the fabricating of evidence, resulting in

3  -- how about the homicide conviction of Mr. Avery?

4          MR. ELSON:  Yes.

5          THE COURT:  Then it's more specific and tailored and

6  it's consistent with the previous questions.

7          MR. ELSON:  Would you leave out Question Number 5,

8  then?

9          THE COURT:  Yes.  Because if you answer yes to the

10 question in the way I've just framed it, that's causal.  So 4

11 would be did the City of Milwaukee have a policy, practice, or

12 custom of inadequately investigating homicides at the time in

13 question which led to the fabricating of evidence resulting in

14 the homicide conviction of William Avery?  And then if you've

15 answered yes to Question 4, then answer Question Number 6.

16 Well, wait a second.

17         MR. SMOKOWICZ:  Question 6 becomes Question 5.  Right.

18         MR. ELSON:  Question 6 will become Question 5.

19         THE SECRETARY:  Don't you have to put if you answered

20 yes to any of the previous questions?

21         THE COURT:  Then answer question 5.  So Question 5 is

22 out, but Question 6 becomes Question 5 except with the preface

23 to Question 5, and that is -- that remains.  If you answered yes

24 to any of the previous questions, then answer Question Number 5.

25 We award the Plaintiff compensatory damages in the amount of.

1   And then Question Number 7 becomes Question Number 6.

2           MR. SMOKOWICZ:  And the instruction right before it,

3   if you answered no instruction.  The reference to 7 becomes the

4   reference to 6.

5           THE COURT:  Right.  Okay.  The instructions were

6   fairly consistent.  The Court -- let's go over those.  The Court

7   would give the function of the Court and jury, which is -- these

8   are some of the Court's standard instructions.  The evidence,

9   which I've already explained to the jury prior to trial.

10  Testimony of the witnesses.  Deciding what to believe.  Weighing

11  the evidence.  What is not evidence.  And direct and

12  circumstantial evidence, definition.  Interviewing witnesses.

13  Court's standard instruction.  Number of witnesses.  Plaintiff's

14  instruction relative to the Fifth Amendment assertion by

15  Mr. Kent.  Any objection to that?

16          MR. SMOKOWICZ:  No, Your Honor.

17          THE COURT:  And then the parties and the claims, which

18  is proposed instruction by the Plaintiff.  I think that's a nice

19  explanation.

20          MR. SMOKOWICZ:  Your Honor, except I think both sides

21  agree there need to be some changes to it.

22          THE COURT:  Relative to the causes of actions that

23  have been eliminated?

24          MR. SMOKOWICZ:  Well, that's one of them.  The other

25  one is Mr. Gulbrandson's name is in the first paragraph.

 1          THE COURT:  Right.  That's out.

 2          MR. SMOKOWICZ:  And I think the suggestion we had

 3  between the two of us was in the second paragraph to read the

 4  Plaintiff claims that the Defendants violated his civil rights.

 5  Failed to intervene to prevent the violation of his civil rights

 6  and conspired to violate his civil rights.  And then the rest of

 7  that sentence is struck.

 8          THE COURT:  Okay.  And that tailors the causes of

 9  action.

10          MR. ELSON:  Yes.

11          THE COURT:  Follows it.  Okay.

12          THE SECRETARY:  So violated the civil rights.  Failed

13  to intervene to prevent the violation of his civil rights?

14          MR. SMOKOWICZ:  Yes.  And conspired to violate his

15  civil rights.

16          MR. ELSON:  And then delete from the word maliciously

17  to --

18          THE COURT:  Right.  First claim instruction.

19          MR. SMOKOWICZ:  Your Honor, before we get to that,

20  Page 11 there's a requirement of personal involvement.

21          THE COURT:  Yeah, the Court is going to give that

22  instruction.

23          MR. SMOKOWICZ:  Again --

24          THE COURT:  Gulbrandson is out.

25          MR. ELSON:  Judge, one point on that.  The Seventh

1    Circuit pattern instruction says that if there's a failure to

2    intervene claim included in the case, that they suggest that the

3    failure to intervene claim come directly after this instruction.

4    And that the claim be prefaced with the word however.  Because

5    there could be some confusion as it relates to the failure to

6    intervene claim, because at the end of the personal involvement

7    claim it says you may not hold any one of these individuals

8    liable for what other employees did or did not do, but the

9    failure to intervene claim modifies that.

10        THE COURT:  Right.  At the end of that personal

11   involvement instruction would say however, and then you go right

12   into the second claim, which is Plaintiff's second claim is that

13   Defendants Hernandez, Phillips, Hein, Heier, Armbruster and

14   DeValkenaere failed to intervene to stop the violation of

15   Plaintiff's due process rights.

16        MR. ELSON:  Yes.

17        MR. SMOKOWICZ:  So the second claim, the instruction

18   on the second claim will come right after the requirement of

19   personal involvement?  Is that the notion here?

20        THE COURT:  Yes.  Requirement of personal involvement.

21   And then we do that before we got to -- well, we do claim one

22   first.  And then -- then we'd have the requirement of personal

23   involvement.

24        Now, relative to the violation of due process claim,

25   the Court has the first paragraph reading the Plaintiff's first

1    claim is that Defendants Hernandez, Phillips, et cetera,

2    violated his Constitutional right to due process of law by

3    fabricating evidence.  Okay?  That's what the allegation is.

4    That's the core of the case.  To succeed on this claim as to the

5    particular -- now, the Defendants one, knowingly fabricated.

6    Participated in the fabrication.  And that's where the

7    Defendants' proposed instruction -- and they have to prove

8    number 3 from the Defendants' fabrication of evidence elements

9    instruction.  So the Defendant fabricated or participated in it

10   using materially false evidence that -- quote, the Defendant and

11   the witness knew the testimony given by the witness against the

12   Plaintiff was false.

13        MR. ELSON:  I think -- I mean, it seems that there

14   might be a problem with the word testimony again, Judge.

15   Because --

16        THE COURT:  Evidence.  Okay.  Yeah.  The evidence

17   given by the witness against the Plaintiff was false.

18        THE SECRETARY:  So inserting that before number 2?

19        THE COURT:  Number 2.  And then number 2 in the

20   Plaintiff's due process instruction becomes number 3, and the

21   Plaintiff was damaged as a result of the fabrication.

22        MS. HOFT:  So, Your Honor, you're saying that

23   Defendants' number 3 would then become Plaintiff's -- would go

24   into Plaintiff's instruction as number 2?

25        THE COURT:  Number 2, yeah.

1    MS. HOFT:  And my only issue is with that sentence

2 both Defendant and the witness.  We would propose that it read

3 both Defendant and the witness knew that evidence against the

4 Plaintiff was false.  Because the issue of testimony versus

5 evidence.  Statements versus testimony.  The admission of

6 statements versus the presenting of testimony.

7    MR. SMOKOWICZ:  Your Honor, I thought that was just

8 addressed by Mr. Elson, and I thought the suggestion was both

9 Defendant and witness knew the evidence given by the witness was

10 false.

11    THE COURT:  She wants given by the witness.  It's just

12 evidence against the Defendant was false.

13    MR. ELSON:  Yes.  Because evidence given by the

14 witness with is ambiguous.

15    THE COURT:  Given by the witness.  It ultimately

16 becomes the witnesses at trial, which is the deprivation of

17 liberty.  But it's the evidence that we're focusing in on, and

18 the evidence wherever it stood.  However, has to be shown that

19 Defendant and the witness knew the evidence against the

20 Defendant was false.

21    MR. SMOKOWICZ:  That's fine, Your Honor.

22    THE COURT:  And the Plaintiff's instruction goes right

23 into the definition of materiality.  But there should be that

24 concluding paragraph about if you proved each of these things by

25 a preponderance, then you should find.  If, on the other hand,

 1  you find that it failed to prove, then you should find -- and

 2  that should be -- that should be included in the Plaintiff's

 3  instruction as the concluding paragraph.

 4          MR. ELSON:  I think there should also be a definition

 5  of fabricated, Judge, which we did not include in our proposed

 6  instruction.  But I have a suggestion, if the Court would like

 7  to hear it.

 8          THE COURT:  Sure.

 9          MR. ELSON:  The dictionary definition of fabricated is

10  evidence that was created or made up.  Or -- yeah, created or

11  made up.  So we would say I will now define the term fabricated.

12  Fabricated evidence is evidence that was created or made up.

13  And then define the term material as we have it in our proposed

14  instruction.

15          MR. SMOKOWICZ:  Your Honor, we would object.  I don't

16  think there's any need for a definition of -- there's a

17  dictionary definition.  I think this jury is well educated.

18  I -- certainly they're not confused about what the word

19  fabricated or fabrication means.

20          MR. ELSON:  Well, it's not a common word, Judge.  In

21  the Whitlock case, which is the fabrication case, they used the

22  word create and the word manufacture interchangeably with

23  fabricate.

24          THE COURT:  Okay.  The Court will give that over the

25  objection of defense.  And where we'll do that is in the

1   violation of due process claim. The Court indicated it was

2   going to add the fabrication of evidence elements from the

3   Defendants' Number 3 as an element in the due process. So

4   that's number -- as I indicated, that's number 2. Number 3

5   is -- then number 2 in the Plaintiff's instruction becomes

6   number 3. And then we have the definition of material. With

7   regards to that, fabricated evidence is considered material if

8   it would have a reasonable likelihood of affecting the outcome

9   of the case. And then that would be -- right there would be a

10  fabrication -- what was the definition?

11              MR. ELSON: Evidence that was created or made up.

12              THE COURT: So it would be fabricated evidence.

13              MR. ELSON: Is evidence that was created or made up.

14              THE COURT: Evidence that was created or made up. And

15  then the final concluding paragraph, then if you find that the

16  Plaintiff has proved each of these things.

17              MR. ELSON: And one other issue, Judge. We think

18  there should be an instruction on the burden of proof, the

19  preponderance of the evidence.

20              THE COURT: Yeah. That was absent. I was going to

21  raise that question.

22              MR. ELSON: Yes. And I believe that the Defendants

23  agree with that, and I think the place to insert it would be

24  right before the first claim, since the preponderance of the

25  evidence is referenced in the first claim.

1       THE COURT:  Yes.

2       MR. ELSON:  And I have a suggestion for that.  Should

3  I read it?

4       THE COURT:  Is your suggestion the standard

5  instruction?

6       MR. ELSON:  It's a slight modification of the pattern

7  instruction.

8       THE COURT:  Do you agree with that, Mr. Smokowicz?

9       MR. SMOKOWICZ:  I think we should just stay right with

10  the pattern instruction.  It's straightforward here.

11       MR. ELSON:  The pattern instruction references if you

12  find and if you decide.  And I don't believe those phrases are

13  used in the instructions, so I -- in the modified version that I

14  created I left that out and just focussed on preponderance of

15  the evidence, and what the definition of preponderance of the

16  evidence is, as opposed to mentioning if you find or if you

17  decide, which is in the pattern instruction.

18       MR. SMOKOWICZ:  Your Honor, here's the perfect example

19  of why the reference to if you find or if you decide has to be

20  included here.  The Court is adding in the paragraph from the

21  Defendant's proposed instruction on fabrication of evidence.  At

22  the last paragraph there, on Page 17, and the very first words

23  there, are if you find.  And the words in the second sentence

24  there is if, on the other hand, you find.

25       THE COURT:  Let me cut this short.  It's the policy of

1   the Court, having been reversed on more than one occasion by the

2   Seventh Circuit, we'll take the Seventh Circuit's admonition

3   that it's the safer practice to follow the pattern instructions.

4   And having just had lunch with one the 7th Circuit Judges who

5   was on the pattern committee, I was told to do that.  Even at

6   lunch.  I'm going to follow the pattern instructions.

7           MR. ELSON:  That's fine, Judge.

8           THE COURT:  Bill Bauer, by the way.  And then

9   conspiracy.  Was there any alteration of that?

10          MR. ELSON:  Not from the Plaintiff, Judge.  Other than

11  removing Gulbrandson's name from the first sentence.

12          MR. SMOKOWICZ:  And, obviously, consistent with our

13  position, Your Honor, we would object to giving the instruction

14  on conspiracy.  Because we don't believe that there is evidence

15  of it.  But if the Court -- obviously we recognize the Court's

16  ruling, and other than the exclusion of the name Gulbrandson, we

17  do not object to the form as proposed by the Plaintiff.

18          THE COURT:  Then the Court will give that.  And then

19  the claim against the City.  Any objection to the way that's

20  framed?  Except the Court is going to add definition from the

21  Defendants' -- in other words, the Court would give the sixth

22  claim, or the policy claim as -- was labeled as the sixth claim

23  originally.  The paragraph which the last -- or the last two

24  sentences from the liability instruction offered by the defense,

25  the City is not responsible simply because it employed each

1  Officer -- I suppose we should change that to Defendant to be

2  consistent.  The City of Milwaukee is liable if the Plaintiff

3  proves that the Defendants' actions -- Defendant or Defendants'

4  actions in denying the Plaintiff the right to a fair trial was a

5  result of its official policy.

6          MR. ELSON:  I'm sorry, Judge.  Where are you reading

7  from?  What page?

8          THE COURT:  This is 29 of the original instructions

9  submitted.  And then that's the last two sentences of Page 29

10  added onto your -- added onto the policy claim.

11          MR. ELSON:  I see.  Okay.

12          THE COURT:  And then the Defendants' definition of

13  official policy.  I've used that in other cases.

14          MR. SMOKOWICZ:  So just to be clear, the Court is

15  intending to give the two last sentences there on the liability

16  of municipality instruction.  Changing the word Officer and --

17  Officer or Officers to Defendants?

18          THE COURT:  Yes.

19          MR. ELSON:  And with regard to the definition of

20  official policy, the first two bullet points of rule or

21  regulation passed by the City of Milwaukee legislative body,

22  that doesn't apply to this case, so --

23          MR. SMOKOWICZ:  Well, Your Honor, I would object to

24  excluding any of that there, because if there's no evidence of

25  it the jury still needs to know that that's what an official

1    policy is.

2           THE COURT:  Yeah, I think that context is important in

3    considering the issue of official policy.  Even though it's not

4    in the record that -- there's not evidence in the record that it

5    was a rule or regulation passed by the City legislative body.

6           MR. ELSON:  Then can we insert an "or" after the first

7    bullet point?  And then also an "or" after the second bullet

8    point?  So that the jury can understand that it can be any of

9    the three?

10          THE COURT:  Sure.

11          MR. SMOKOWICZ:  I think that's consistent with the

12   law, Your Honor.  We would not object.

13          THE COURT:  Okay.

14          MR. ELSON:  And then the third bullet point.  A custom

15   of fabricating witness evidence.  That is inconsistent with how

16   we've characterized the claim in the verdict form, and in our

17   jury instruction.  I think it should be a custom of not

18   adequately investigating homicides at the time in question.

19          THE COURT:  Any objection to that, Mr. Smokowicz?

20          MR. SMOKOWICZ:  I do, Your Honor.  The nature of the

21   claim is evidence fabrication.  I think it's misleading and

22   inappropriate to argue that it was just somehow a habit of not

23   adequately investigating.  That makes it sound like we need to

24   have a perfect investigation, which is not the law.

25          MR. ELSON:  Well, it should track what we did with the

1    verdict form.

2           THE COURT:  Well, it tracks with the verdict form,

3    one.  And two, it's not the fabrication of witness that's -- of

4    this claim.  It's the inadequate policy that leads to the

5    fabrication.  So the Court will do that.  What was that language

6    again?  Custom of inadequate investigation?  Was that --

7           MR. ELSON:  Inadequately investigating homicides at

8    the time in question.  Which led to the fabrication of evidence

9    resulting in the homicide conviction of William Avery.  I guess

10   leaving out the resulting in part.  So --

11          MR. SMOKOWICZ:  I'm not following where you're making

12   this change in that third bullet point.

13          MR. ELSON:  It would read a custom of fabricating --

14   I'm sorry.  A custom of inadequately investigating homicides at

15   the time in question, which led to the fabrication of evidence

16   that is persistent and widespread.

17          THE COURT:  How about this.  The custom was

18   inadequately investigating homicides at the time in question

19   that was persistent and widespread which led to the homicide --

20   so that it -- the City's -- so that it was the City's standard

21   operating procedure.

22          MR. ELSON:  Yes.

23          THE COURT:  That led to the criminal conviction of

24   William Avery.

25          MR. STAINTHORP:  I think the led to the criminal

1  conviction comes in the subsequent --

2           MS. HOFT:   In the elements instruction.

3           THE COURT:   The custom of inadequately investigating

4  homicides at the time in question that was persistent and

5  widespread so that it was the City's standard operating

6  procedure, which led to the conviction -- homicide conviction of

7  William Avery.

8           MS. HOFT:   I don't think in this definition of what an

9  official policy or -- or one of the three possible ways an

10 official policy can be shown, that we have to include the

11 causation requirement of the conviction of William Avery.   I

12 think --

13          MR. SMOKOWICZ:   Your Honor, quite to the contrary.   I

14 would object if it didn't connect the two, because it has to be

15 causally related.

16          MS. HOFT:   It absolutely does have to be causally

17 related, but in the way that it's written, as the Defendants

18 propose it, there's no mention of causation.

19          MR. SMOKOWICZ:   Well, let's go back here.   We do have

20 a causation -- assuming that the Court is giving the last

21 sentence on the liability of municipality on Page 29, that does

22 have the causation in it.   That being the case, if we're just

23 defining here the term official policy, I would now concur that

24 we do not have to then re-include the requirement of causation.

25 So that that third bullet point I -- it appears -- it sounds

 1   like it's going to read a custom of inadequately investigating

 2   homicides at the time in question that was persistent and

 3   widespread so that the -- so that the -- so that it's the City

 4   of Milwaukee's standard operating procedure, period.

 5            THE COURT:  So that it was the City of Milwaukee's

 6   standard operating procedure.  Okay.

 7            MR. STAINTHORP:  And, Judge, moving forward could I

 8   add a point?

 9            THE COURT:  Sure.  Where is that?

10            MR. STAINTHORP:  Okay.  So Page 25 entitled cause.

11   Obviously this was written with respect to the State law claims.

12   So I -- we have talked with the Defendants, and I think we have

13   a proposed amendment to this cause instruction.  And while it

14   says in answering Question 5 -- but it should be -- it should be

15   as to all the --

16            MR. SMOKOWICZ:  Liability questions?

17            MR. STAINTHORP:  Liability questions.  Okay.  So I

18   guess I don't have a proposal as to the first phrase.  But after

19   that, when it says you must decide whether someone's negligence?

20   We proposed deleting negligence and substituting actions.  Then

21   keep the instruction as is on the second sentence.

22            Then for the third sentence where it says someone's

23   negligence, say someone's act instead of negligence caused the

24   injury if it was a substantial factor in producing the injury.

25   Then for the next sentence, an injury may be caused by one

 1    person's act, instead of negligence.  Or by the combined acts,

 2    rather than negligence of two or more people.

 3            But how about going back to the first phrase and just

 4    saying -- deleting entirely the first phrase and just saying you

 5    must decide whether someone's actions caused the injury, or

 6    whether a Defendant's.  Because then that incorporates the City

 7    as well as the individual Defendants.

 8            THE COURT:  Any Defendants?

 9            MR. STAINTHORP:  Or whether a Defendant.

10            THE COURT:  Any of the Defendants.

11            MR. STAINTHORP:  Yeah.  Okay.

12            THE COURT:  Is that acceptable, Mr. Smokowicz?

13            MR. SMOKOWICZ:  Yes.  In that form.

14            MR. STAINTHORP:  And then the second paragraph on

15    Page 25 is deleted in its entirety.

16            THE COURT:  Okay.  Agreed?

17            MR. SMOKOWICZ:  Yes, Your Honor.

18            THE COURT:  Damages are the same, I believe.

19            MR. ELSON:  There was one issue with the damages

20    instruction on Page 31.  At the end of the first paragraph it

21    says on that claim.  Those three words should be deleted.

22            MR. SMOKOWICZ:  I'm sorry.  I did not follow.  What

23    page is that on?

24            MR. ELSON:  Page 31.

25            THE COURT:  Right.

1    MR. ELSON:  The words at the end of the first
2 paragraph, on that claim, those words should be deleted.  It
3 should just say the Plaintiff is entitled to recover.  I believe
4 that's consistent with the instruction you proposed.  That the
5 Defendants proposed.
6    THE COURT:  Okay.  Any difference on the compensatory
7 damages?  Looks like it's the same.
8    MR. ELSON:  Well, the Defendant left out mental and
9 emotional pain and suffering, which we would obviously want
10 included, and is included in our proposed instruction.  And also
11 any loss of normal life that the Plaintiff experienced to the
12 present.  That's not included in the Defendants' proposed
13 instruction, but it is included in ours.  And the Defendants
14 include a nominal damages instruction, which I think is
15 inappropriate in this case, and we didn't include that in our
16 proposed instruction.
17    THE COURT:  Okay.  Anything else on this?  I'll give
18 the Plaintiff's instruction, then.
19    MR. SMOKOWICZ:  The -- I would -- we would object to
20 the any loss of normal life portion.  I think that's duplicative
21 of the physical, mental, and emotional pain and suffering.
22 Nobody is talking about torture here.  Nobody is talking about
23 physical injury where there's bodily pain.  So that's not going
24 to be confusing.  We're all talking about the emotional
25 suffering that someone has from being incarcerated.  And so this

1 makes -- making it a separate item makes it sound like it's

2 somehow separate and additional.

3          MR. ELSON:  It's in the pattern instruction.

4          THE COURT:  Yeah.  Loss of normal life is acceptable

5 to the Court, so the Court will include that.  And then punitive

6 damages.

7          MR. ELSON:  I believe those are exactly the same,

8 Judge.

9          THE COURT:  Yes.  Looks that way.  And then, of

10 course, the selection of a foreperson.  Communication with the

11 Court.  The Allen instruction.  Use of electronic devices.

12          MR. SMOKOWICZ:  I have no problem with any of those.

13 For the record, we would object to giving the punitive damages

14 instruction, as we don't think there's evidence to support

15 punitive damages.

16          THE COURT:  The Court disagrees.

17          MR. ELSON:  One other -- something we just noticed on

18 Page 44, the last paragraph.  It says the 12 of you.  That

19 should be changed to the 9 of you.

20          THE COURT:  Nine.  Okay.

21          MS. YUAN:  Or can we just say all of you?

22          MR. ELSON:  Or all of you.

23          THE COURT:  Okay.  Anything else?

24          MR. ELSON:  Nothing else.

25          THE COURT:  All right.  We'll get these instructions

1    to you.

2          MR. STAINTHORP:  Judge, there's another issue that we

3    want to raise, which is that we would like to again propose that

4    there be a Brady instruction.  I've -- we've, as you know,

5    previously made that motion.  You denied it.  We believe that

6    since that time there has been additional evidence of Brady

7    violations by the Defendants in this case, and relating to their

8    knowledge that the evidence that was being presented by the

9    jailhouse informants was incorrect.  Also related to the fact

10   that there was knowledge that Mr. Kent in particular was looking

11   for benefits with respect to his testimony.  And that was not

12   disclosed.  And with respect to the payments to Ms. McCoy, which

13   were also not disclosed.  So we would again request that there

14   be a Brady instruction to the jury.  That they be allowed to

15   determine whether the Plaintiff's rights under Brady were

16   violated.

17         THE COURT:  Okay.  The Court is going to deny that.  I

18   don't think it rises to that level, considering the testimony of

19   Detective Hein, in particular, and also Detective Armbruster

20   involved in that initial conversation with Kent.  But without

21   going into all of the facts that would support it, I'm going to

22   deny that motion.  And it's made part of the record.

23         MR. SMOKOWICZ:  Your Honor, I have a couple of things.

24   Housekeeping with respect to Exhibits.  With regard to

25   Defendant's Exhibit 1052, that is the Avery deposition

1  transcript.  It was used for cross examination purposes during

2  his testimony.  It was offered as an Exhibit.  We do not ask the

3  Court to provide the entire transcript to the jury; however,

4  since it's been marked as an Exhibit, we are offering it for the

5  purpose that it was used here, and to have it included within

6  the record.

7           THE COURT:  Well, whether the jury sees it or not, the

8  Court, as I indicated I think earlier, has the policy that we'll

9  give the jury what they ask for, unless there's an objection

10  from either party at the time.  And we'll iron that out at that

11  time.  But has 1052 been admitted?

12           MR. SMOKOWICZ:  No.  That's why I'm making the motion

13  now to admit it.

14           THE COURT:  Is there any objection to having it

15  admitted as a piece of evidence?

16           MR. STAINTHORP:  Judge, we object to it being admitted

17  en masse.  We think if there are specific portions that were

18  questioned about during the interrogation, or were brought out

19  during the interrogation, yes, they are part of the --

20           THE COURT:  I think that was your request, wasn't it,

21  Mr. Smokowicz?  That just that part of it be admitted?

22           MR. SMOKOWICZ:  Well, we offer the entire transcript

23  as an Exhibit.  The Court's indicated to me, at least, or the

24  Court's Clerk indicated to me that the entire transcript should

25  be marked as an Exhibit.  I only did read a portion from it.

 1    But -- and I'm not offering anything beyond that for the jury to

 2    consider.  But I do think in order to include it within the

 3    record of this case, it has to be offered as an Exhibit.  And

 4    just simply -- I'm asking the Court to accept it on that grounds

 5    as an Exhibit.

 6            THE COURT:  So it would be accepted as an Exhibit, but

 7    only as to that particular portion that was offered?

 8            MR. SMOKOWICZ:  Right.

 9            MR. STAINTHORP:  No objection then, Judge.

10            THE COURT:  And the Appellate Court cannot look at

11    that if it goes that way.  Cannot look at the rest of the

12    Exhibit, because it wasn't evidence in the case.

13            MR. SMOKOWICZ:  Right.  Then with -- I don't know

14    whether it's been -- whether I need to beat a dead horse here,

15    but just to make clear, we are making a motion to dismiss as a

16    matter of law at the end of the entire evidence.  We are making

17    a motion to dismiss Detective DeValkenaere at the end of the

18    evidence.  We're making a motion to dismiss the punitive damages

19    claim, and the conspiracy claim, and the Monell claim.

20            THE COURT:  Okay.  The Court's ruling is on the

21    record.

22            MS. HOFT:  Your Honor, in the vein of Exhibits,

23    Plaintiff's Exhibit 4, it was brought to our attention, was

24    never moved into evidence.  It began in opening statement as a

25    demonstrative evidence, but throughout this trial --

1    THE COURT:  Any objection to that being received,

2  Mr. Smokowicz?

3    MR. SMOKOWICZ:  No, Your Honor.

4    THE COURT:  The Court will receive it.

5    MS. HOFT:  I'm going to put it back up on the table.

6    THE COURT:  Anything else before we break?

7    MR. ELSON:  Nothing from the Plaintiff, Judge.

8    MR. SMOKOWICZ:  Nothing from the Defendants, Your

9  Honor.

10    THE COURT:  Okay.  Get ready to go, and we'll get

11  those instructions to you before we start the closings.

12    MR. SMOKOWICZ:  12:30, Your Honor?

13    THE COURT:  That's when the jury's back.  So yeah.

14    MR. SMOKOWICZ:  Okay.

15    THE COURT:  Do you need some more time?  Tomorrow

16  morning?

17    MR. SMOKOWICZ:  I think we can do it.

18    THE COURT:  And I had the time, because I didn't have

19  to go back to the Doctor.

20    MR. STAINTHORP:  Judge, do you want to set time

21  limits?  Or do you set any time limits?

22    THE COURT:  I leave it up to counsel.  I don't like to

23  put restrictions on counsel, but we're all professionals.  We

24  know what's going to lose a case and what's not.  You go on and

25  on, you can lose a jury.  The mind disengages when the seat

 1   takes over, as they say.

 2              MR. STAINTHORP:  Okay.  Thank you, sir.

 3              THE COURT:  Alright.  See you at 12:30.

 4              (Whereupon a recess was called by the Court.  Upon

 5   conclusion of the recess, the proceedings continued as follows:)

 6              THE COURT:  We're ready for the jury?

 7              MR. SMOKOWICZ:  Two matters, Your Honor.

 8              THE COURT:  Sorry?

 9              MR. SMOKOWICZ:  Two matters, Your Honor.  I apologize.

10   One thing is just a reminder.  We still have not mentioned to

11   the jury that Mr. Gulbrandson has been dismissed.  And I did

12   believe the Court was going to make an indication to them of

13   that.  Second thing, I think both sides overlooked a requested

14   instruction that should be given, unfortunately, on expert

15   witnesses.

16              THE COURT:  Expert witnesses?

17              MR. SMOKOWICZ:  1.21.

18              THE COURT:  Okay.  The Court will give that expert

19   witness instruction.  And the Court will advise the jury when

20   they come in that per stipulation Detective Gulbrandson has been

21   dismissed from the case as a Defendant.

22              MR. SMOKOWICZ:  Thank you, Your Honor.  I'm sorry

23   about missing that instruction before.

24              THE COURT:  Well, I thought about it, but you're the

25   guys that drafted the instructions.  I figured you might want to

1   include that under the general credibility of the witness

2   instruction, so -- I suppose we should have the language that

3   you're free to disregard the testimony even of an expert witness

4   if you find that the factors suggest that it should be done.

5   So -- no problem.

6               MR. SMOKOWICZ:  Thank you, Your Honor.

7               THE COURT:  Other than that, we're all set?

8               MR. SMOKOWICZ:  There's a typo I see on Page 12 of the

9   instructions, Your Honor.

10              THE COURT:  Page 12?

11              MR. SMOKOWICZ:  Yes.

12              THE COURT:  I usually catch those up here.

13              MR. SMOKOWICZ:  Just so that you see it's on the

14  second line, second paragraph, prove both.  And there are three

15  factors now.

16              THE COURT:  Okay.

17              MR. SMOKOWICZ:  Thank you, Your Honor.

18              THE COURT:  Thank you.

19              (Whereupon the jury was returned to the courtroom at

20  12:49 p.m.)

21              THE COURT:  Good afternoon, ladies and gentlemen of

22  the jury.  As indicated, we're now ready for the closing

23  arguments of the attorneys, after which I will instruct you in

24  the law that should govern you in your deliberations, and then

25  you will go into the jury room and deliberate on the case.  The

1    Plaintiff has the burden, so the Plaintiff goes first.  And Miss

2    Hoft, if you're ready you may proceed.

3            MS. HOFT:  Thank you, Your Honor.  Members of the

4    jury, first of all I want to thank you on behalf of my

5    colleagues, Ben Elson and John Stainthorp.  But also most

6    importantly on behalf of our client, William Avery.  We really

7    appreciate the time and the patient attention you've given to

8    this case in the last 7 days of testimony.  And we appreciate

9    that you're considering this important case.

10           Milwaukee Police Department Detectives, Defendants

11   Hernandez, and Phillips, DeValkenaere, and Hein-Spano, and

12   Heier, and Armbruster caused William Avery to be wrongfully

13   convicted of the murder of Maryetta Griffin.

14           THE COURT:  Maybe I'll interrupt.  You've heard the

15   list of Defendants that counsel has just mentioned.  And not

16   included in that is Detective Gulbrandson.  It was mentioned at

17   the start of the case.  But by stipulation of the parties

18   Detective Gulbrandson has been dismissed as a Defendant in this

19   case.  And that's why you did not hear Miss Hoft mention his

20   name as a Defendant just now.  I'm sorry to interrupt, Miss

21   Hoft.

22           MS. HOFT:  Thank you, Your Honor.  The claims in this

23   case involve due process and the administration of justice.  Due

24   process ensures the rights and equality of all citizens.  The

25   Constitutional claims brought in this case are fundamental to

1   all of us.  That no one can take the liberty of another without

2   due process of law.  And that a violation of due process is a

3   violation of the Constitution, for which you must find a remedy

4   in this case, and assess damages, and provide William Avery a

5   measure of justice.

6        We know that William Avery did not kill Maryetta

7   Griffin.  You heard William's testimony that he did not kill

8   her, and he never told anyone that he did.  There was absolutely

9   no physical evidence suggesting that William Avery had anything

10  to do with the death of Maryetta Griffin.  There was nothing on

11  her body.  There was nothing at the scene where they claim her

12  killing occurred.  There was nothing in the car they claim

13  transported her body to where it was found.  There was nothing

14  found with her body.  There was evidence that among Maryetta

15  Griffin's injuries was a gash to her head, suggesting that there

16  would be blood evidence where she was killed.

17       In fact, William Avery, as we now know, was excluded

18  by D.N.A. evidence back in 1998 that had been recovered from an

19  oral swab taken from Maryetta Griffin's mouth showing the

20  presence of semen.  William was excluded also by D.N.A. evidence

21  recovered from Maryetta Griffin in terms of her fingernails.

22  And those fingernails show that there was -- there was the

23  presence of 3 other individuals, not William Avery.  Which means

24  Maryetta Griffin may have fought for her life.  But William

25  Avery had nothing to do with her murder.

1    And you heard the evidence about Walter Ellis.  That

2 Walter Ellis was convicted of 7 other murders which occurred in

3 a similar manner within a similar area of the north side of

4 Milwaukee.  Debra Harris.  Tanya Miller.  Irene Smith.  Florence

5 McCormick.  Sheila Farrior.  Joyce Mims.  And Quithreaun Stokes.

6 Those 7 individuals Walter Ellis pled no contest to being

7 convicted of murdering those 7 women.  And of the 10, the only

8 -- 10 of all the unsolved homicides that the Defendants talked

9 to you about, only 10 were connected to Walter Ellis.  The other

10 3, in addition to the 7 that Walter Ellis was convicted of based

11 on a plea of no contest, were Jessica Payne.  Jessica Payne, her

12 homicide -- a man by the name of Chaunte Ott was charged with

13 her homicide.  He spent 12 years in prison, and he was later

14 exonerated when the D.N.A. evidence came back that there was

15 D.N.A. evidence in Jessica Payne that implicated Walter Ellis.

16    Carron Denise Kilpatrick.  She -- her homicide was

17 charged to a man by the name of Curtis McCoy.  That was Miss

18 Kilpatrick's boyfriend at the time that she died.  Curtis McCoy

19 was charged with her homicide, but the system did the right

20 thing, and he was found not guilty.  He received a fair trial

21 after that -- after that nightmare began for him, where he was

22 wrongfully charged but he was not wrongfully convicted.

23    That leaves us the tenth victim of Walter Ellis,

24 Maryetta Griffin.  And the murder of Maryetta Griffin and the

25 charges of that murder against William Avery caused him to be

1   wrongfully convicted, and that is why we are here today.  And in

2   addition, in 1998, when Maryetta Griffin -- when Maryetta

3   Griffin was murdered, Walter Ellis lived right across the alley.

4   Walter Ellis lived at 3037 North 6th Street.  Maryetta Griffin's

5   body was found at 3032 North 7th.

6           In 2012 the Wisconsin State Claims Board concluded by

7   clear and convincing evidence -- the Board concluded by clear

8   and convincing evidence that he, William Avery, was innocent of

9   the crime for which he was convicted, and did not by his act or

10  failure to act contribute to his conviction.

11          The Judge will instruct you in this case after I speak

12  to you, and then I believe Mr. Smokowicz will speak to you, and

13  then you will hear from my colleague, Mr. Stainthorp -- the

14  Judge will read you instructions.  And the Judge will instruct

15  you that William Avery must prevail in this case if he proves

16  his claims by a mere preponderance of the evidence.  This means

17  more probably true than not.  In order for you to find for

18  William, you only need to find that the evidence tips slightly

19  in our favor.  More probably true than not.  51 percent to

20  49 percent.

21          William Avery was wrongfully convicted of the murder

22  of Maryetta Griffin through the Defendants' actions in creating

23  false statements incriminating him.  At the murder trial William

24  was convicted based on incriminating statements that they say he

25  made to Detectives, and that later they said he made to 3

1    jailhouse informants.

2            The house of cards built by the Defendants that

3    convicted William Avery started with the false report created by

4    Defendant Detectives Hernandez and Phillips after a claimed

5    approximately 2 hour interrogation.  And you know the one, the

6    only report falsely claiming that William awoke with Miss

7    Griffin going into his pockets.  They fought.  He doesn't

8    remember what happened, but he called Ronnie and told Ronnie

9    that he thought he had killed her.  That William said he was

10   responsible, but he just doesn't remember how.

11           William Avery never made those statements.  Common

12   sense tells you that you do not confess to something you did not

13   do.  That you could not have done.  And make no mistake, the

14   Defendants at that time thought this was a confession.  You

15   heard Defendant Hein-Spano yesterday tell you that -- what

16   happened when she first got in to work that day after this false

17   statement was created by Hernandez and Phillips.  She heard

18   about this statement, and she was briefed on the tunnel vision

19   of where this investigation was going, to railroad William

20   Avery.

21           And what happened at 4:30?  They met with the homicide

22   prosecutor.  They met with Mark Williams.  And I submit to you

23   Mark Williams told them for the first time this is not a

24   confession.  You gotta be kidding me.  This is not enough.  They

25   were caught, they were embarrassed, they had to find another

1    way.

2          Within months of this incident, William explained this

3    nightmare in his Notice of Claim to the Attorney General.  And

4    that was 17 years ago.  And he again told you in his testimony

5    from this witness stand in this case.  He explained how they

6    spoke to him.  That they kept asking me if I killed her.  They

7    asked me, did she steal anything from me?  They were saying that

8    I knew what happened.  They were saying that I did it.  They

9    started saying I admitted to killing her.  They said Lorenzo and

10   I killed her together, and Lorenzo had already taken a deal.  I

11   wanted them to leave me alone.  They told me what happened to

12   the woman, what was released in the newspaper.  They -- I wanted

13   them to leave me alone, so I told them hypothetically that could

14   have happened, but it didn't.  Mr. William Avery kept saying no,

15   no, no.  He did not hurt that woman.  They created a false

16   statement incriminating him.  Defendants DeValkenaere and

17   Hein-Spano created false statements that William incriminated

18   himself by saying he had oral sex with Maryetta Griffin.  We

19   know that that is not true, and William did not say that to

20   anyone.

21          Defendants DeValkenaere, Phillips, Hernandez, and

22   Hein-Spano denied William's request for a lawyer, saying it

23   doesn't work that way, and you'll get a lawyer soon enough.

24   Defendant Hein-Spano admitted to paying money to another witness

25   who testified at William's criminal trial.  She told you that.

1  Hein-Spano admitted that after you heard the testimony of

2  Patricia McCoy that Hein-Spano paid her money.

3        Defendants Heier and Armbruster, later assisted by

4  Defendants Hernandez and Hein, created false statements that

5  William incriminated himself to 3 jailhouse informants.  You

6  heard the testimony of Keith Randolph and Jeffrey Kimbrough that

7  they were fed information by the Defendants.  Randolph was

8  promised that he would receive help on his criminal sentence in

9  return for his testimony.

10        Again, the Judge will instruct you to use your common

11  sense.  You know those jailhouse informants didn't agree to

12  testify out of the goodness of their hearts.  Defendants Heier

13  and Armbruster admitted on the stand that they provided -- at

14  least that they provided Antron Kent with the name Lorenzo.

15  Defendant Heier observed Antron Kent testify at William's murder

16  trial that he was -- that he, Kent, was testifying in order to

17  do the right thing.  And not because he was expecting help to

18  reduce his own criminal sentence.

19        All 4 Defendants met with these jailhouse informants

20  numerous times to shore up their testimony.  Jeffrey Kimbrough

21  and Keith Randolph came into this courtroom and told you their

22  statements incriminating William Avery were false and untrue.

23        Before his testimony at William's criminal trial,

24  Jeffrey Kimbrough testified to you that he told Defendant Heier

25  he didn't want to go through with it.  He didn't want to go

through with testifying falsely.  But Defendant Heier told him
he had to go through with it.  And the issues that the
Defendants may try and raise with regard to the additional
gruesome details -- the eyes rolling back in the head that were
provided supposedly by Antron Kent and Jeffrey Kimbrough.  You
again can use your common sense.  Those details were no secret.
Those details were known by everyone.  Everyone knew that
Maryetta Griffin was strangled.  Everyone knows how an
individual gets strangled.  They're choked.  And we all can
envision what happens when an individual gets choked.  It
doesn't make any sense.

Armbruster admitted that Kent wanted a reduction in
his sentence.  Antron Kent has taken the Fifth Amendment and
refused to answer any questions about his testimony.  Again, the
Judge will instruct you that you may infer that this means
Antron Kent fears he may incriminate himself now if he tells the
truth.

Police practices expert Mr. Waller told you that
jailhouse informant testimony must be tested and reliable.
Defendant Heier admitted that a Detective must determine whether
a witness statement is usable testimony or, in his words,
garbage.  All of the Defendants knew these statements of the
jailhouse informants were garbage, and now you do, too.

Mr. Waller also testified that a homicide
investigation must determine the truth about what happened.  And

1  we know the truth was not discovered until much later in this

2  case with regard to the responsibility of Walter Ellis for

3  Maryetta Griffin's murder.  Mr. Waller also explained that a

4  reasonable, honest, and ethical Detective cannot simply decide

5  that a crime occurred in a certain way, reject evidence that

6  doesn't fit, and proceed with tunnel vision.  These Defendants

7  had tunnel vision.  They rejected all evidence that didn't fit

8  their false theory that William Avery was responsible for the

9  murder of Maryetta Griffin.

10           And we have great respect for the Police.  Solving

11  crimes is important work.  We can all agree on that.  And

12  particularly with regard to homicide offenses.  But the Judge

13  will instruct you that sympathy must play no part in your

14  verdict.  Any sympathy that you have for a Police Officer's

15  difficult job must not influence you in your decision in this

16  case.

17           And investigations -- homicide investigations must not

18  be done with a motivation of clearing cases, but they must be

19  done with an eye for the truth.  Not just to justify a report

20  that contains a fabricated false statement by a man innocent of

21  murder.  Defendants still remain to this day steadfast that they

22  do not care what the truth is.  They continue their tunnel

23  vision to this day.  They continue their defamation of William

24  Avery to this day.  We are here because the Defendants refused

25  to provide full and fair compensation for what they did, so we

1    brought this case to trial.  To you.

2           The Judge will instruct you that William Avery brings

3    three claims related to the violation of his due process rights.

4    Violation of due process, failure to intervene, and conspiracy.

5    The Judge will instruct you -- you'll hear these instructions in

6    a bit -- that a violation of due process is shown when, one, a

7    Defendant knowingly fabricated, or created, or made up evidence,

8    or participated in the fabrication of material false evidence

9    used to convict the Plaintiff at trial.  And that both the

10   Defendant and the witness knew the evidence against the

11   Plaintiff was false, and that the Plaintiff was damaged as a

12   result.

13          We know that Defendants Hernandez and Phillips created

14   the March 24th incriminating statement attributed to William

15   Avery.  We also know that Defendants DeValkenaere and Hein-Spano

16   created the false statement attributed to William Avery.  That

17   he engaged in oral sex with Maryetta Griffin.  And in addition,

18   the statements of the jailhouse informants were also used to

19   convict William Avery.  Those statements were also false, and

20   Defendants Heier, Armbruster, later assisted by Hernandez and

21   Spano, participated in creating them.  All of these statements

22   were incriminating, and all were used at William's trial to

23   convict him of a murder that he did not commit.  You absolutely

24   must find for the Plaintiff on the due process claim, because it

25   is at least more probably true than not true.

1    Before I talk about how William Avery was damaged, let

2  me tell you about the final claim which Plaintiff brings, which

3  is a policy claim against the City of Milwaukee.  This claim, as

4  the Judge will instruct you, has to do with the unconstitutional

5  practices of the Milwaukee Police Department in investigating

6  homicides.  If you find that evidence in this case was

7  fabricated, you may also find that the policies of the Milwaukee

8  Police Department caused that fabrication.

9    You have heard testimony from Mr. Waller that these

10 Defendants did not follow reasonable Police practices.  It is

11 also clear from what we looked at a minute ago with regard to 10

12 cases that were connected to Walter Ellis, they got 3 wrong.

13 You have heard that the Milwaukee Police Department did not even

14 train its Detectives, nor was there a bit of policy with regard

15 to the use of testimony of jailhouse informants.  Defendant Hein

16 testified to that last week.  Absolutely no policies, absolutely

17 no training.  A jailhouse informant is like any other witness.

18 Defendant Hein also testified -- Hein-Spano, I'm sorry -- she

19 also testified yesterday she doesn't report or record when she

20 makes payments of money to witnesses who testify in criminal

21 cases.

22    Defendant Armbruster testified that he would not

23 report or record evidence that he knew could be used for

24 impeachment in criminal trials, or statements that could be used

25 by defense attorneys to undermine the credibility of a witness

1  who would testify against an individual.  A witness who would

2  have a motive other than to tell the truth.  A motive such as to

3  gain some personal benefit or consideration.  Jailhouse

4  informants.

5        Mr. Waller explained that a Milwaukee Police

6  Department Officer presented these concerns about inadequate

7  homicide investigations to the City of Milwaukee at their Police

8  and Fire Commission.  That those concerns were real, and that a

9  Police Officer himself brought them to the Police and Fire

10 Commission, indicating that there were inadequate

11 investigations.  And the concern was to clear cases and not to

12 find the truth, particularly in certain types of homicides in

13 certain areas of the city.

14        Now, finally, I want to talk to you a little bit about

15 William Avery, and how he was affected by this and damaged by

16 the Defendants.  And William Avery back in 1999 participated in

17 the devastating drug culture that we all abhor.  This was a

18 decade-and-a-half ago.  And as I told you in opening, that is

19 not what this case is about.  Defendants have continued to

20 obscure the truth by bringing up the drug charges.  The drug

21 activity.  The Constitution applies to all of us, even when we

22 are at our lowest.

23        You heard William testify last week.  And it was

24 obviously difficult for him to articulate this nightmare to you

25 with specificity and tell you in clear detail exactly, point by

1    point, what happened to him.  I will tell you this about William

2    Avery.  He is a brave man.  His trust in people and his faith in

3    the system was clearly shattered by what happened to him.  But

4    he is putting his faith in a jury one more time, and that is

5    you.  Each and every one of you.

6           And no one likes to talk about money.  They say that

7    that's the number one issue that married couples argue about the

8    most.  But our civil system of justice is based on the idea that

9    wrongdoers must pay money damages.  Here the Defendants caused

10   William Avery to sit in prison for 6 years for something he did

11   not do.  We suggest you compensate him at $1 Million per year

12   for a total of $6 Million.  But it is up to you to set the

13   amount.  Any amount that you think is fair.  You can't give

14   William Avery back what he lost.  Nobody can give those 6 years

15   back to him.  And we can't undo what happened to him.  But you

16   can give him a measure of justice.

17          Judge Randa will explain to you that if you find any

18   Defendant liable on any of the Plaintiff's claims, then you must

19   set a monetary amount of compensatory damages.  And you may

20   award punitive damages to punish the Defendants and deter future

21   misconduct.  If you are falsely imprisoned for a crime you did

22   not commit, then you are punished beyond anyone's imagination.

23          The world is not fair.  And it messes with your mind.

24   You heard William describe prison a little bit.  The heat, and

25   the cold, the regimentation, the strip searches and being away

1  from his family. He missed out on holiday and other family

2  gatherings. Seeing his kids. Their life events and

3  graduations. He told you when he was released about the

4  adjustment period. To becoming reacquainted with his now adult

5  children. And most importantly, he told you what it was like to

6  be branded a murderer. And that he will wear that brand like a

7  jacket that he will never be able to remove.

8          And if William was unable to completely convey how

9  important family is to him, his daughter Cynthia Tyler and

10  Sirena Avery, along with his aunt Debra Fenceroy made that point

11  very clear. William Avery is blessed with a supportive family.

12  His daughters talked about the kinds of things their father does

13  for them and with them. The time they spend together and how

14  William Avery enjoys his grandsons now. They obviously enjoy

15  spending time with him, and they've been doing that since his

16  release from prison. Very often.

17          Both daughters describe how their father was

18  distraught at being charged with murder, and struggled with

19  issues upon his release from prison. They noticed their father

20  is wary and more reserved. How he has difficulty trusting

21  people.

22          And Miss Fenceroy is a retired registered nurse, and

23  she described the paranoia she now sees in her nephew. And it

24  was hard for William to hear this testimony, and it's hard to

25  relive this nightmare. And you may have noticed at one point in

1    Miss Fenceroy's testimony, William even had to leave the

2    courtroom.  Count all this in when you are measuring up the

3    price of justice for William Avery.

4         This is a tragic and gruesome tale, and we mourn the

5    loss of the 10 women whose lives were taken at the hands of the

6    serial killer Walter Ellis.  These Defendants compounded this

7    tragedy by causing the wrongful conviction of William Avery.

8         And you've been very patient, and I will close now, as

9    this is my last opportunity to speak with you.  I again thank

10   you for your service and your careful attention.  I leave you

11   with a prayer and a plea of justice for William Avery.

12        THE COURT:  Mr. Smokowicz?

13        MR. SMOKOWICZ:  Thank you, Your Honor.  Good

14   afternoon, ladies and gentlemen.  On behalf of all the

15   Defendants, and Miss Yuan, and myself, I want to thank you for

16   the patience and courtesy and time that you've extended to the

17   Defendants.  There's not just one party to this case, obviously.

18   There's not just one interest in this case.  There are two sides

19   to this lawsuit.  And on behalf -- on all of our behalfs we

20   appreciate that you were willing to spend the time and listen to

21   all of the evidence.  Not just some of the evidence, not just

22   one side of the case, as opposed to the other.  And that you

23   will fairly and dispassionately consider both sides of the case

24   when you deliberate this matter.

25        I also want to apologize to the extent that this isn't

1   Hollywood.  Or this isn't working like Hollywood.  While this is

2   a very electronic courtroom, and there have been a lot of

3   electronic displays here, there have been times when there's

4   been some pauses, and there probably will be some pauses today

5   during my closing to you.

6       We're all used to Hollywood productions and T.V.

7   productions.  And the way things go in court.  And there's all

8   of a sudden one Exhibit, all of a sudden another, and everything

9   is scripted, and answers are short, and witnesses are on for 5

10  minutes.  That's not the way it can and does work in the system

11  in real life.

12      In order to assist you in this matter in analyzing

13  this -- the verdict that you'll be having to answer, perhaps it

14  is easier to look at that verdict as a framework for you, and to

15  organize my one opportunity to speak to you at this time about

16  the evidence.  The days, the waves and waves of evidence that

17  you've experienced in this case.

18      The first question that you will be asked on the

19  verdict is whether any of the remaining Defendants fabricated

20  evidence that caused the homicide conviction of William Avery.

21  And there will be one place for yes or no for each of the

22  remaining Defendants.  Defendant Hernandez, Defendant Phillips,

23  Defendant Spano, Defendant Heier, Defendant Armbruster and

24  Defendant DeValkenaere.  I would submit to you that the answer

25  to all of these should be no.  And let me explain why.  And

1    let's organize this evidence in that fashion.

2         The first two people that you hear about in this case,

3    among these Defendants, is Defendant DeValkenaere and Defendant

4    Phillips.  The two Detectives at that time who had the

5    opportunity initially to question William Avery.  And you are

6    being asked whether they fabricated evidence in this matter.

7    Did they falsely report?  Did they falsely create a statement?

8    In their report of their initial interview, 11-A, on the third

9    page they report without equivocation, without reservation, that

10   Mr. Avery at that time denied any involvement in the death of

11   Maryetta Griffin.  Period.  End of story.

12        They're being -- particularly Detective DeValkenaere,

13   is being accused of falsely reporting here not the fact of sex,

14   but the statement -- the statement by Mr. Avery at that first

15   interview where he doesn't talk about being involved in this

16   drug house.  Where he minimizes his involvement in that matter.

17   Where all he says is effectively that he frequents that house.

18   Or he's gone there from time to time.  And that he has his

19   cousin, who lives there and owns the house -- he didn't say

20   anything about operating the drug house, but he does say -- at

21   least he says and they report he says -- that he had sex with

22   Maryetta Griffin.

23        You heard Detective DeValkenaere.  He has no memory

24   particularly of this interview 17 years later.  But he said

25   look, if he said it, I'd put it in the report.  If he didn't say

1  it, I wouldn't put it in the report.  If there is an effort to

2  fabricate evidence to cause a conviction of William Avery in

3  this case, as opposed to other people who you know were at that

4  house that night and you know, therefore, could have had contact

5  with Maryetta Griffin -- and that would have included Lorenzo

6  Frost and Lucious Goins, perhaps, and Terry Bryson.  A person

7  you will hear about in a minute a little bit more.  Boyfriend of

8  Maryetta Griffin.

9          There has been no evidence of any motive on the part

10 of these two Defendants or any of the others, for that matter,

11 as to why they would choose to pin any kind of charge on William

12 Avery at all.  With respect to harming Maryetta Griffin.

13 Furthermore, if there was an effort to do that sort of thing,

14 there is no evidence that a report like this, which would tend

15 to undermine that, and which would tend to support Mr. Avery's

16 position, was in any way hidden from him or his criminal defense

17 lawyer at the time of the homicide trial.

18          And please bear in mind when you think about thoughts,

19 or attempts, or whatever, or practices, or what have you of

20 coverups, or certain coverups -- look at the bottom of this

21 page.  M-3431, Section 4, Page 20 -- and I don't know if that's

22 2 or 7, because I'm just reading it off the screen here.  But

23 the point is, this is the homicide file.  It has its own number,

24 3431.  This is a section of that homicide file.  Section 4.  And

25 every page, you heard testimony yesterday, is sequentially

1  numbered.  And if there's something missing, if there's

2  something taken out, it's obvious to see.  But in any event,

3  there was no deep-sixing.  There was no effort, there was no

4  action on the part of Detective Phillips or Detective

5  DeValkenaere to hide, to keep away, to work on a fabrication

6  here of a statement from William Avery.

7          Next.  Next, of course, comes the statement of

8  Mr. Avery himself.  Let's take a look at that again.  As I said,

9  not Hollywood.  Sometimes the documents are not quite where I

10  expect them to be.  Mr. Avery's statement, as you may recall,

11  and you will have the opportunity if you wish to look at it, as

12  has been pointed out, does not say this is how I did it.  Does

13  not say her eyes rolled back in her head.  Does not even say I

14  choked her.  None of those things are in there.  In fact, what's

15  in that statement is a recounting of I fought with her.  I had a

16  fight.  Something happened.  I grabbed her.  I don't know what

17  happened after that.  There's nothing about wrapping her up in a

18  rug.  There's nothing about her being partially naked.  None of

19  those things are in there.  None of those details.

20          The accusation is that knowing the facts of the crime

21  scene, that Detective Hernandez somehow just simply wrote out a

22  statement out of his own thought processes about how this,

23  quote, might have happened, close quote.  And purported that to

24  be words that William Avery said to him.  That makes absolutely

25  no sense here.  It makes no sense, given what you know happened

1    beforehand in terms of the denial that's reported, and reported

2    honestly.  It makes no sense in the sense that it's not

3    completely detailed.  If you're going to -- if you're going to

4    fabricate a confession, why would you fabricate (a) a confession

5    that's not complete, or (b) a confession that -- a confession

6    that you have no reason to -- as to Mr. Avery, as opposed to

7    Mr. Frost, Mr. Goins, Terry Bryson -- why would you -- why would

8    you pick him?  There's been no evidence of any kind of motive

9    here to do this.

10        There has been evidence that Mr. Hernandez -- that

11   Detective Hernandez wrote what William Avery said.  That he did

12   so in a situation where there was no evidence of hours and hours

13   and hours of questioning.  It wasn't the 9 hour period in the

14   third interrogation.  It wasn't the longer interrogation in the

15   first questioning session where it was just witness question.

16   The moral to this story is that statement with all of its

17   limitations was not enough.  The case would not have gone

18   anywhere.  Detective Hernandez says he took it to the D.A. for

19   only one reason.  To administratively clear it.  Because he knew

20   this wasn't going to go anywhere.  He knew it wasn't enough.  He

21   knew it wasn't a confession.  And that's where it would have

22   ended.

23        There it is.  There is the statement.  There is the

24   statement, with all of its limitations, in two-and-a-half hours.

25   And you know later that same day Detective Spano and Detective

1  Hernandez attempted to speak to Mr. Avery, and he exercised his

2  right not to talk to them.  And that's reported.  That's not

3  contradicted.  There's no statement here -- no fanciful, no made

4  up, no details here, let's add in how it happened kind of

5  statement.  There's nothing indicating fabrication.  An

6  intentional fabrication by these Officers.

7          Later on the 23rd -- on the 24th, I'm sorry, and into

8  the 25th in a much longer statement or interrogation do these

9  Detectives produce a statement of a fabricated statement?

10 Fabricated evidence that -- in which Mr. Avery says I did it,

11 and this is how I did it?  They don't do that.  Instead, they

12 report on Exhibit 1031 that he states the last time he saw the

13 victim alive was on Monday evening at about 7:00 p.m., and that

14 he cannot remember ever seeing her after that.  And that he does

15 not believe he was involved in the death of Mercedes, because

16 when he passed out on the couch, the only person in the house

17 was Keisha.

18         This is evidence not of fabrication.  This is evidence

19 of taking whatever statement and honestly reporting whatever

20 statement is provided to them from Mr. Avery.  Furthermore,

21 perhaps in some ways most importantly, to assess this case of

22 diverse Officers at diverse times and at diverse circumstances,

23 somehow each and every one of them working to convict an

24 individual by fabricating evidence?

25         There is the August, 1998, blood test result that is

1  on page -- begins on Page 23 of Section 9 of the M-file.  And as

2  Captain Heier testified, a copy of each and every page in that

3  file, including each and every page in the lab report section,

4  is copied and brought over to the prosecutor.  And a second copy

5  is brought over at that same time for the defense lawyer.

6          So I submit you need to inquire if it's more likely

7  than not that somehow these and other Officers are fabricating

8  evidence, why they would include a test result that was received

9  by the Milwaukee Police Department in 1998, in September, 6

10  years, 7 years before any prosecution of William Avery?  And

11  thus, long before any need to turn over this file existed.  And

12  when it happened -- and what's in this?  Not only excludes

13  William Avery, and Lorenzo Frost, and Terry Bryson from certain

14  things, but it also reports that there's a foreign D.N.A. of

15  someone else that's not known.  Doesn't that -- isn't that

16  powerful evidence to ensure that William Avery could have had a

17  fair trial?  Isn't that honest reporting of both what one group

18  of people says, the jailhouse informants, reporting that William

19  Avery said something to him?  And on that same time that William

20  Avery made some admissions on one occasion?  And at the same

21  time there is this evidence that there's somebody else out

22  there.

23          If there is an effort to fabricate evidence, if

24  there's an effort to frame, in effect, William Avery, this is

25  the last kind of thing that a -- what is really being described

 1  as nefarious Police Officers -- you know, people who are -- who

 2  are -- my goodness, not just -- not just putting blinders on,

 3  but intentionally trying to create a case.  Why would they --

 4  why would they give tremendous evidence like this, which Miss

 5  Lankford didn't talk about in her questioning.  Sharon

 6  Polakowski, the person we brought in, who did this test, brought

 7  this out.  And Miss Lankford only mentioned it on her cross

 8  examination.

 9         Now, William Randolph's statement.  First of all, when

10  you're talking about William Randolph, and Antron Kent, and

11  Jeffrey Kimbrough, the Plaintiff in this case, Mr. Avery, is

12  asking you to believe, what?  Them now?  When they say they lied

13  and they were told to lie by the Police?  When they wrote out --

14  when they signed statements that said something?  When two of

15  them went to court and raised their right hand and said

16  something?  And now they're believable?  If they do that again?

17  That's the basis for their case, is that somebody who says I

18  lied when it was convenient once, I lied when I thought it would

19  help me once, now says well, I'm in prison.  I was threatened in

20  the past.  Actually that was a lie then, and now it would be

21  truthful.

22         I ask you to consider that their testimony about the

23  Defendant Detectives is simply not credible evidence to support

24  a case against these Detectives, who had no reason whatsoever to

25  frame, to fabricate evidence, to intentionally -- and the

1  instruction that you're going to be given here on this is that

2  the Defendant Detectives knowingly fabricated or participated in

3  the fabrication of false and -- material false evidence.  That

4  the Defendant Detective and the witness each knew the evidence

5  was false.  Rather, what I submit to you is that the Defendant

6  Detectives had no reason to fabricate.

7       That Detective Heier had no reason, no prior contact

8  with this case.  All of a sudden he gets contacted by an

9  attorney for Mr. Randolph, who's got a story.  Maybe that story

10  came from the newspaper.  Maybe it came from some discovery that

11  Mr. Randolph saw.  But did Detective Heier conceal that in the

12  report?  No, he did not.  And as a matter of fact, those two

13  items appear right there on the first page of the report that

14  Detective Heier prepared.  For any defense lawyer to see.  Look,

15  Keith Randolph saw some newspaper article.  That's obvious.  All

16  you have to do is look in the newspaper article that's in the

17  homicide file.  Keith Randolph saw some discovery.  All you have

18  to do is talk to Mr. Avery and ask him what did Keith Randolph

19  see?  He saw these documents.  This is what he saw.

20       Captain Heier, then Detective Heier, did not conceal

21  anything.  He took his statement from the man who said to his

22  attorney I want to talk to the Detectives because I have

23  information about a family friend who committed a murder and who

24  admitted it to me.  That's not the stuff of some Detective

25  running out, looking randomly for a witness who's vulnerable and

1  willing to say anything and saying hey, buddy, I'll do this for

2  you if you -- you know, if you just say something for me.  This

3  is somebody who comes to him through his attorney, after he's

4  told his attorney what he has to tell the Police.  And whose

5  attorney stays there for awhile, for a couple of hours, so he

6  can tell the Police Detective what he has to say about this

7  homicide.

8          And even with this, even with this statement by Keith

9  Randolph, as Captain Heier explained to you, there was still no

10 prosecution.  There was still no basis for a homicide charge.

11 Where does this case rise and fall in terms of the homicide

12 charge?  It doesn't come into existence.  It doesn't get filed.

13 Nothing happens until Antron Kent calls, out of the blue, from

14 several states away, never having had any contact with any of

15 these Detectives and says I have some information from an inmate

16 here who tells me he beat a murder rap, and is telling me some

17 details about how he did it.  And ends up conveying those

18 details to Detectives -- to a Detective who had never worked on

19 the file, who wasn't looking for anyone, who wasn't trying to

20 figure out who killed Maryetta Griffin in 2002.  And, in fact,

21 just starts writing.

22          This is also not the stuff of someone who is

23 fabricating evidence.  Antron Kent took the Fifth.  Antron Kent

24 took the Fifth about whether or not he lied to the Police.

25 Whether or not the Police provided him with any promises.

1  Whether or not the Police gave him any details.  Why?  Because

2  that would all incriminate him.  Because he did lie to the

3  Police.  Because they didn't give him details.  Because they

4  didn't make promises to him.  They didn't have to.

5       Now, where did he get the information from?

6  Apparently he got it from somewhere that no one has been able to

7  figure out.  Could it have come from, as he said, in his report?

8  Or in his statement?  He thought well, William Avery was just

9  bullshitting?  Just making up a story, trying to look tough in

10  prison?  Talked about a murder?  Had some details?  Details that

11  are not in the statement.  Details that may have been made up.

12       And Jeffrey Kimbrough got up there and said on this

13  stand, yes, I lied.  But not only did he say I lied in that

14  criminal trial and in those statements, he says every one of

15  those lies came from Antron Kent.  Not the Police.  Antron Kent.

16  With the exception of a couple of details that he threw in there

17  to make it a more convincing statement.  He said that.  And

18  there's been some insinuation that he's not -- he's not

19  intellectually capable or whatever.  But he had all of those

20  details on more than one occasion.  He testified in the criminal

21  trial.  He maintained a story in that criminal trial.  And he

22  came in here and answered every question and appeared to

23  understand every question and answered.

24       But the crucial thing he says is that information did

25  not come from a Detective.  It came from Antron Kent.  Those two

1  men, those are the culprits.  They are the people who are not

2  sitting in that defense table and should be.  Not good, hard

3  working, well meaning, dedicated, honest Police Officers.  But

4  two culprits.  Two people from Oklahoma who never, never, never

5  did anything but lie.  And lie convincingly, unfortunately.

6  They are the ones who caused Mr. Avery to have a homicide trial.

7  Not Detectives conspiring.  Not Detectives getting together.

8  Not Detectives putting together some kind of story.  They didn't

9  have -- this is -- this is ridiculous in terms of a claim that

10  they put together a story.  Who put together the story?  Those

11  two men in Oklahoma.

12          There's no evidence that -- there's a claim, there's

13  an argument, but there's no evidence that on the subsequent

14  occasions when Detective Spano and Detective Hernandez went to

15  see them, or when the former Defendant in this case, Detective

16  Gulbrandson, went to see Kent on the last occasions, and

17  Detective Heier, that in any of those situations they were told

18  the story or re-told the story by the Detectives.  None of that

19  evidence came in.  They had a story.  They had a story to keep.

20  They kept that story, even when they went to separate prisons.

21  Green Bay, Minnesota.  Talked about separately.

22          Talking about being hoodwinked, talking about checks

23  and balances, you're going to be instructed that you can

24  disregard testimony of an expert.  Dennis Waller.  A man who has

25  never run a major metropolitan Police Department.  A man who

1  has -- who says he did a couple of homicide investigations, but

2  really didn't provide you with any details.  Now, being a Police

3  administrator can be something you can learn about to some

4  degree, but it's not like being a Professor of physics.  It is

5  something where it is much more akin to being a Professor of a

6  practical science.  Or a teacher of a practical science.  The

7  more you do, the more responsibility you have.  The better you

8  are, the more knowledgeable you are.

9       He says well, they missed the boat on Walter Ellis.

10  There's a pattern of stars here.  He doesn't ask about any other

11  homicides.  You heard that yesterday from Detective Spano.

12  There's 19 others, just women, prostitutes or drug related, on

13  that same map that weren't shown in there.  There's no apparent

14  pattern.

15       In terms of -- in terms of what a -- what a policy or

16  what a procedure would look like, Mr. Waller doesn't suggest any

17  of that.  He didn't have a pattern policy.  He didn't have

18  something where he could say okay, this is line 3 of the

19  Milwaukee Police Department policy, or the Chicago Police

20  Department policy, or the Los Angeles Police Department policy,

21  or something like that.  Or the International Association of

22  Chiefs of Police policy.  Their suggestion on how to deal with

23  jailhouse informants.

24       If something like that existed, do you think he would

25  have brought it?  Of course he would have.  Of course he would

1  have.  Because he didn't want to admit that what was unusual

2  about this situation, what made this situation believable, was

3  that three different individuals who did not -- two of whom knew

4  each other, but they didn't know the third person, and vice

5  versa, in three -- in two different institutions, and then later

6  three different institutions, because Kent and Kimbrough were

7  separated, had a recounting of a confession by William Avery.

8  　　　　　Now, what happened that night, as Detective Hernandez

9  says, we'll never know.  We don't have all the details.  Pieces

10  are missing.  Maybe there was a fight.  Maybe somebody got --

11  maybe Miss Griffin was actually injured, knocked out, what have

12  you, taken out.  And then encountered, God forbid, Walter Ellis.

13  And perhaps, because in the light of day, after that, William

14  Avery felt guilty.  Felt responsible.  Even though, as he

15  ultimately said, I didn't kill her.  But all of that is in

16  there, including crucial D.N.A. evidence, back in 1998.  This is

17  not the stuff of an effort of 6 Defendants to fabricate evidence

18  to convict a person of homicide.

19  　　　　　So going back to this verdict form, question one, in

20  all of the parts, "A" through "F", should be answered no.  There

21  is an instruction that if you do that, you do not need to answer

22  any of the remaining questions.

23  　　　　　Question 2 just asks you about did they -- did any of

24  the Defendants fail to intervene to prevent the use of

25  fabricated evidence?  And lists the same Detectives.  You do not

1  need to answer that question, because none of them fabricated

2  evidence.

3  Question 3, did any of the Defendants conspire to use

4  fabricated evidence?  There is no evidence whatsoever of a

5  conspiracy here, I would submit.  And in any event, because you

6  answered no to Question 1, you do not need to answer Question 3.

7  Something that has not been addressed in the initial statement

8  of closing by Miss Hoft.

9  Question 4 talks about the policy, practice, or

10  custom.  You will hear that that is defined by the Judge in a

11  particular way.  And if I can just have a second, I will get to

12  that.  But one of the things that you will hear, that you can

13  find a policy based on, is something that the Chief did.

14  There's no indication that any Chief of Police did anything,

15  issued any policy statement, or any regulation by the City's

16  Common Council.

17  Last is a custom of investigating inadequately

18  homicides at the time in question that led to the fabrication of

19  evidence that was persistent and widespread so that it was the

20  City of Milwaukee's standard operating procedure.  There has

21  been no evidence of that except for one complaint by a Detective

22  about one matter that you've had virtually no details from.

23  That it involved "X" number of cases, and a hundred homicide

24  cases, or these 20, or these 50, or anything of that sort.  And

25  certainly nothing about that the entire Homicide Division was

1  practicing that.

2          Because you have answered Question Number 1 -- or I

3  submit you should answer Question Number 1 no, you do not need

4  to answer the question on damages.  However, this is my only

5  opportunity to talk about things in this verdict.  And so I must

6  take the opportunity to address this.  Cannot -- we cannot fail

7  to at least talk about this.  With respect to that Question 5,

8  compensatory damages, Plaintiff has suggested $6 Million.  Other

9  than talking about the fact that Mr. Avery suffered some

10 humiliating -- admittedly humiliating times in prison, while he

11 was in there for homicide, and while other than talking about

12 the fact that he was certainly separated from the freedom of

13 life and the freedom of dealing with his family, there is

14 nothing particularly concrete, scientific, about the number of

15 $6 Million.  No number that can be suggested here is that way.

16         I would suggest $750,000 if you have to answer that

17 question.  There is really no way to explain one particular

18 number over another here.  So there has been some evidence about

19 Mr. Avery's family life, and the loss of his family connection.

20 What hasn't been addressed, of course, was the evidence

21 indicating that Mr. Avery had all kinds of problems before he

22 even went into prison the first time on drug charges.  That he

23 was an addict.  That he was an alcoholic.  That he did not have

24 a very good family relationship then.

25         Lastly, there's a question here about punitive

1   damages.  We would submit that there has been no showing of the

2   kind of intent that is required to answer that question as to

3   any of the individual Defendants.  The Court will instruct you

4   about punitive damages.  And the Judge will explain to you that

5   in order to assess those, you must prove by a preponderance of

6   the evidence that they should be assessed, and that the

7   Officers' conduct was malicious or in reckless disregard of the

8   Plaintiff's rights.

9           Once again, there has been no evidence of malice here.

10  There has been no evidence of why -- of any of these Officers

11  ever knowing William Avery before they either interviewed him or

12  got involved in this case.  There's no evidence of malice.

13  There's no evidence of any indication of reckless disregard of

14  his rights.

15          As Detective DeValkenaere has said, what he wrote is

16  what was said.  And that's all these Officers did.  In that

17  regard, in terms of whether it's an honest report of what was

18  said, they reported what was said.  Thank you very much.

19          THE COURT:  Mr. Stainthorp.

20          MR. STAINTHORP:  Thank you, Judge.

21          THE COURT:  You maybe want to take this off the

22  screen?

23          MR. SMOKOWICZ:  Oh, I'm sorry, Your Honor.

24          MR. STAINTHORP:  Good afternoon, ladies and gentlemen

25  of the jury.  What we're going to ask you to do in this case,

and what we've been asking you to do throughout this trial, is

follow the evidence. The evidence in the case. Not what might

have been. Not what someone imagines might be some piece of the

puzzle that after 17 years hasn't been found. But what are the

facts in the case? We are asking you to follow the evidence.

Ms. Hoft talked to you about the burden. Our burden

of evidence. That we have to show that it's more likely than

not. That's it. It's not beyond a reasonable doubt. It's not

the standard Mr. Avery had to satisfy to get his certification

of innocence from the State of Wisconsin that was clear and

convincing. Here it's a preponderance of evidence. And

actually if there's a piece of the puzzle that you think you

don't have, and you would like to know, believe me, these

attorneys have been working on this case for years. People have

been working on this case for years. If there's a piece of the

puzzle that you haven't been presented with, it doesn't exist.

You are deciding this case based on the evidence, not

based on some imagined incident that occurred on February

the 16th to the 17th. Not on what might have happened. Is

there was a fight, and then Ms. Griffin was injured, and then

she was taken out somewhere, and then she happened to fall into

the clutches of Walter Ellis. No. You're deciding on the

facts. And the Judge will actually instruct you on what is

evidence, and what is not evidence. Someone's imagination as to

what might have been is not evidence.

1    So we want you to follow the evidence.  We want you to

2 follow the evidence as to the jailhouse informants.  And I know

3 you've been listening a lot this week to what the jailhouse

4 informants said about Mr. Avery.  And it's tough to listen to.

5 It is tough to listen to.  Because when you see that evidence on

6 the surface, it sounds terrible.  It's awful.  I mean, they're

7 describing a murder.  And they're describing Mr. Avery admitting

8 to that murder.  But I just want to be sure that you realize

9 that all of that, all of those statements which were gone

10 through in excruciating detail here, are all worthless.

11    We know that the statement of Mr. Kimbrough and

12 Mr. Randolph are worthless because they came in here and they

13 said it.  And apparently the Defendants accept Mr. Kimbrough's

14 testimony.  We also know that Antron Kent's statement is

15 worthless.  It's worthless because he wouldn't even come in here

16 and testify.  He just took the Fifth Amendment, so it was

17 pointless to bring him in.  So we just read his deposition.

18    But there's an interesting thing, actually.  And in

19 the Notice of Claim -- I'm sorry, the Claims Board decision that

20 was -- this was the decision in which the State of Wisconsin

21 found that Mr. Avery, by clear and convincing evidence, is

22 innocent.  And I just want to call your attention to one portion

23 of this, where we know what Mr. Kent would have said if, in

24 fact, he had come in here.

25    MR. SMOKOWICZ:  Your Honor, I'm going to object.  This

1  is hearsay.

2          MR. STAINTHORP:  Judge, this is in evidence.

3          THE COURT:  Well, the document is in evidence.

4          MR. STAINTHORP:  So this is the evidence in this case.

5  This is the Claims Board decision, which states one of the

6  inmates who recanted --

7          THE COURT:  Let me just correct that.  It's the

8  evidence in that case.  The Claims Board.

9          MR. STAINTHORP:  Yes.  Yes.

10         THE COURT:  Not in this case.

11         MR. STAINTHORP:  Absolutely.  But obviously -- yes.

12 One of the inmates who recanted, Jeffrey Kimbrough, also stated

13 that the third individual who testified against the claimant,

14 Kimbrough's cell mate, had told Kimbrough that he was lying

15 about the claimant in order to get a reduced sentence.  So we

16 know from this that Kent had already admitted to Mr. Kimbrough

17 that he was, in fact, lying.  So all of these jailhouse

18 informants, all of their statements implicating Mr. Avery, are

19 worthless.

20         Now, we want you to follow the evidence as to

21 Mr. Avery's innocence.  And frankly, after this trial I was

22 unsure what position the Defendants were going to take, because

23 they'd never explicitly said, is Mr. Avery innocent?  Is he not?

24 I believe we have now heard a statement by the Defendants that

25 they acknowledge that he is innocent.  But just -- I will --

1 since I didn't think that was absolutely crystal clear -- I

2 mean, you heard the evidence. You know the evidence. There's

3 no physical evidence tying Mr. Avery to the murder of Mercedes

4 Griffin. No D.N.A. No evidence from the search of 2474 North

5 Palmer. No evidence from the search of the Blazer. Lorenzo

6 Frost's Blazer. That the evidence from people who were there in

7 the house supports Mr. Avery.

8          Lakesha Kent, also -- Lakesha Hall, I'm sorry, also

9 called Kenya Hall, her evidence. She was there in the house

10 that night. She was there on February 16th. No fight. Nothing

11 happened. Maryetta Griffin was there earlier in the evening and

12 left. Precisely what Mr. Avery said.

13          Rhondalyn Scott. Remember we heard some evidence

14 about that. Rhondalyn Scott. Another prostitute who knew and

15 was good friends with Mercedes. She said she'd seen her out on

16 the street. Out on the street late at night on February 16th.

17 So shortly before she was murdered. She'd seen her out on the

18 street. Lorenzo Frost. No evidence that he was in any way

19 involved in this homicide.

20          And then, of course, we have at the D.N.A. evidence

21 with respect to Walter Ellis. So the sperm that was found in

22 Mr. Ellis's (sic) mouth. The pattern of homicides. Very

23 similar homicides that had happened across northern Milwaukee.

24 The north side of Milwaukee over several years. And then, of

25 course, we have the evidence that Mr. Ellis -- and Mr. Ellis

1    living right across the alley from where the body was found.   I

2    mean, maybe 50 feet away?  That's about it.  So we have that

3    evidence.

4          We actually have -- I believe Mr. Avery's request for

5    D.N.A. analysis.  You've seen that he is the one who initiated

6    the request for D.N.A. analysis.  Two things from that.  First

7    of all, why on earth would he request D.N.A. analysis if he

8    believed there was any possibility that his D.N.A. would be

9    found on Mercedes Griffin?  Any possibility.  I mean, he would

10   know that with D.N.A. examination, if they find your D.N.A. on

11   the victim, you're sunk.  You're done.  You're over.  So it

12   shows that.  Why would he ask for D.N.A. analysis if, in fact,

13   he had any involvement?

14         But more precisely, more additionally, why would he

15   ask for D.N.A. analysis if, in fact, he'd had oral sex with

16   Maryetta Griffin on the 16th?  He would know that that would

17   show up.  But, of course, it didn't show up.  It didn't show up,

18   because it didn't happen.  The statement about oral sex,

19   although obviously not as important as the statement about the

20   murder itself, that statement was also false, and that

21   statement, which was acknowledged to be inculpatory by Defendant

22   Hein, that statement which tied Mr. Avery even closer to Ms.

23   Griffin, that was a false statement.  And, of course, we know

24   that the State of Illinois (sic) has now acknowledged that Mr.

25   Avery is innocent.

1    Follow the evidence.  Follow the evidence, even if it

2 contradicts your hunch.  That is what Mr. Waller, the expert

3 told you.  Now, sure, he hasn't been head of a big Police

4 Department.  He's been in this field as an academic.  Studying

5 the area.  A consultant in the area.  For what?  30 years?  He's

6 been certified as an instructor by law enforcement agencies.

7 He's got to instruct law enforcement agencies.  He has the

8 expertise.  He knows what he's talking about.  And what he says,

9 follow the evidence.

10    And the biggest problem with Detectives is when you

11 have that tunnel vision.  And you start thinking that you know

12 what happened.  Is it okay for Police Officers to have hunches?

13 Have suspicions?  Of course it is.  Of course it is.  Can Police

14 Officers have theories in the case?  Of course they can.  But

15 what they cannot do is make the evidence -- fabricate the

16 evidence, create the evidence, to fit their theories.

17    Here you had the opportunity to see Defendant

18 Hernandez.  And Defendant Hernandez showed you on the stand that

19 he does not follow the evidence.  He follows his preset ideas.

20 His unsupported theories.  Faced with the evidence of the semen

21 in Walter -- Walter Ellis's semen in Mercedes' mouth, he didn't

22 follow the evidence.  Faced with the fact that Walter Ellis

23 lived across the alley from where the body was found, Defendant

24 Hernandez did not follow the evidence.  Faced with the finding

25 of the State of Wisconsin that Mr. Avery is innocent, Defendant

1   Hernandez did not follow the evidence.  He still feels that he's

2   guilty.  So he's not following the evidence.  Faced with the

3   accounts of the people who were with Mr. Avery on the night of

4   the 16th, which fully supported his alibi, Defendant Hernandez

5   would not follow the evidence.

6        Faced with the fact that all of the jailhouse

7   informants have either recanted formally in testimony or have

8   told others that they lied, he did not follow the evidence.

9   Faced with all of this evidence, Detective Hernandez did not

10  follow the evidence.  He told you he thinks William is still

11  guilty.

12       Let's look at the crucial interrogation.  The March

13  the 24th morning interrogation.  Phillips and Hernandez go into

14  that interrogation.  Very suspicious of William.  They think

15  he's involved.  First of all, he's an obvious target.  He's

16  running the drug house.  Okay.  A terrible -- a terrible thing

17  to do.  He's running a drug house.  He's involved in illegal

18  activity.  Secondly, he undoubtedly was with Ms. Griffin the

19  night before she's murdered.  No question about that.  He's

20  always acknowledged that.

21       Third thing they know, that Mercedes is murdered.  Not

22  an accidental death.  She's murdered.  Phillips has this theory

23  that when prostitutes are victims of homicide, they often are

24  the people who have initiated the criminal activity, by trying

25  to rob the person they were with.  He's going in with that

1    perspective.  Phillips used hypotheticals, where he would

2    suggest to people he was interrogating what might have occurred.

3        Now, Detective Hernandez -- let me just finish this

4    thought, and I'll get to Detective Hernandez.  The Detectives

5    also believe it's very suspicious that Mr. Avery, in his prior

6    statement to the Police, had said he knew about -- that Maryetta

7    was dead early in the morning.  8:00, 8:30.  Something around

8    that.  And they say well, the body wasn't reported until 11:00.

9    So that's highly suspicious.

10       Of course they're wrong.  There's a Police report

11   which I brought out, showed them.  The body was discovered by 8

12   o'clock in the morning.  So it's perfectly understandable that

13   he would know that she's murdered by 8 o'clock in morning.

14       But to go back to Detective Hernandez.  Detective

15   Hernandez told you in his second round of testimony, the one

16   where he remembered stuff, that he would not use hypotheticals.

17   But I then read in a portion of his deposition.  Okay -- and

18   this is talking about the March the 24th interrogation.  Okay.

19   Did you provide any details to Mr. Avery about the homicide or

20   anything you knew about the investigation?  Answer:  I don't

21   remember what exact details I gave back then.  Okay.  Did you

22   give any -- Mr. Avery any false details about the investigation

23   to try and elicit a confession?  I don't remember.  Okay.  You

24   may have done?  But you don't recall?  I could have, but I don't

25   remember.  Question:  That would have been one technique you may

1   have used to obtain a confession from a suspect, correct?

2   Answer:  I find that, yes, correct.

3            So Detective Hernandez did use that method of

4   providing information to suspects.  He acknowledged it in his

5   deposition.  He denied it up here.  But he did use that method

6   of supplying information to his suspect.

7            We look at this interrogation.  It's very dissimilar

8   to the other interrogations in this case.  It's very short.

9   It's two-and-a-half hours.  We know that the previous day the

10  interrogation, with some breaks for other things, went from 11

11  o'clock in the morning, to 7 o'clock at night.  So 8 hours.  We

12  know the interrogation later that day went from 5:30 at night to

13  2:30 in the morning.  About 9 hours.  This one's two-and-a-half

14  hours.  It's incomplete.  And yet there's no indication in any

15  of the reports that William at any time cut that off.  Nothing

16  written saying Mr. Avery would no longer answer any questions.

17  Nothing in any of those reports.  And, in fact, when asked at

18  his deposition, why did the interrogation end?  Detective

19  Hernandez says -- well, he's asked.  Question.  Do you have any

20  recollection as to why this interrogation came to an end?  I

21  don't.  I don't.  Now on the stand he said something different.

22  On the stand he says oh, Mr. Avery wouldn't answer any more

23  questions.  That's not what he said at his deposition.  He said

24  he didn't recall why it ended.

25            We also know -- well, let me actually go straight into

1   that interrogation.  We actually do know how the interrogation

2   proceeded, and we know it because of the Notice of Claim filed

3   by Mr. Avery in November of 1998.  And that's the Notice of

4   Claim that was mentioned by Ms. Hoft in her closing.  He

5   describes what happens.  He says the Detectives suggested to him

6   that Mercedes stole from him.  That the Detectives suggested to

7   him that he and his cousin, Lorenzo, did it.  The Detectives in

8   -- that he describes in his Notice of Claim how the Detectives

9   said they were suspicious of him because he knew about the death

10  before supposedly the body was found.

11          He described how hypotheticals were used in the

12  interrogation, and how he would agree to use them, but then

13  would tell the Detectives it didn't happen that way.  The Notice

14  of Claim describes how the Detectives suggested to him that

15  there was a bond between him and Lorenzo.  Described how the

16  Detectives suggested that he blanked out and didn't remember.

17  Apparently they learned that at one point he'd been -- he had a

18  head injury, and so then they suggested well, did you blank out?

19  Is that how it happened?  They suggested to her that Mercedes,

20  Maryetta Griffin, fell down the stairs and broke her neck.  They

21  suggested to William that he called Ron and said I think I

22  killed the bitch.

23          Now, as I just said, at his deposition former

24  Detective Hernandez said he didn't know whether he provided any

25  information to William.  Now, of course, in the second round of

1    testimony, he says he does know, and he denies it.  But I think

2    you will find that former Detective Hernandez is not a reliable

3    witness.

4            One other thing I want to address before we leave that

5    portion of the 3/24 statement.  There's an interesting portion

6    of the statement, and it's the portion of the statement where,

7    according to Detective Hernandez and Detective Phillips, that

8    his cousin, Lorenzo Frost, called the house.  And according to

9    the statement, it's at that point that Mr. Avery, according to

10   this, said to Ronnie get over here.  I think I killed this

11   bitch.

12           Okay.  Obviously we'll get to whether that's

13   inculpatory or not later.  But that's really interesting,

14   because now, up until this point, we know there's no recording,

15   so there's no one taking a video, no one taking audio, no

16   stenographer.  No -- the person not being asked to write it out

17   themselves.  So there's no -- there's no way of checking out

18   whether this was, in fact, said.  But now there is.  Now there

19   is a way of checking out what was said.  Because if there was a

20   phone call made, there's going to be a record of the phone call.

21   You go get the phone records.  You go see, was there a call from

22   Lorenzo Frost to the house at 2474 North Palmer on February

23   the 16th?  And of course the Police would do that.  Of course

24   investigators would do that.  And there is no evidence in this

25   case that there was any record of any phone call being made from

1  Lorenzo Frost to that house.  Nothing.  So we know that this

2  statement is completely false.

3       Now, obviously in this case, second time around,

4  Detective Hernandez claimed that he had knowledge.  He had

5  information about the 3/24 interview.  And the classic way to

6  determine reliability of a witness is you take their testimony

7  at one point, and you compare it to what happened at another

8  point.  And I submit to you that when you compare Detective

9  Hernandez's testimony, you will find that he is not a reliable

10 witness.

11      When I first -- when I put Detective Hernandez on the

12 stand in our side of the case -- and this happened so fast you

13 might even have missed it.  I knew what he said in the

14 deposition.  I knew he said in the deposition I have no

15 recollection of the interview of Mr. Avery on March 24th.  Other

16 than the fact he did recall that he got emotional.  Although

17 that's not in his report, by the way.  But he had claimed at his

18 deposition he recalled that.

19      So you might even have missed it.  Because it was a

20 single question.  Detective Hernandez, you don't have any

21 recollection of the 3/24 interrogation, is that correct?  That's

22 correct.  That's what he said.  I knew from his deposition that

23 he had said at his deposition that he essentially had no

24 recollection, substantive recollection, of interviewing the

25 jailhouse informants.  So again, it's a single question when I'm

1    putting him on.  Detective Hernandez, you don't remember the

2    substance of the interviews you had with the jailhouse

3    informants, do you?  No, I don't.  That was last week.

4          When he came on in his side of the case, and suddenly

5    started coming out with this font of information, I'll tell you,

6    I almost fell off my chair.  How could this guy -- I'm sorry.

7    How could this person, who the week before had told me he had no

8    recollection of the 3/24 interview, he had no recollection

9    substantively of the inmate interviews, how could he suddenly

10   come out with this very detailed account of both the

11   interrogation, and both -- and going off to interview the

12   inmates?

13         And then on the second time around, after he testified

14   to you, he represented to you this was his memory.  That was his

15   testimony.  He didn't represent well, I -- you know, I don't

16   really remember, but my report says this.  No.  He represented

17   to you this is my testimony.  Then, when I got up to cross

18   examine him, he acknowledged well, it's not really my memory.

19   Some of it is, and some of it isn't.  I said well, what is and

20   what isn't?  Well, I can't really identify that.  So some of it

21   is from the report.  Some of it I remember.  But I can't tell

22   you what it is.

23         So he misrepresented to you.  He told you some things

24   that were not reliable, in terms of his testimony.  He created

25   his testimony to suit the results.  He created his testimony to

1   reach his goal.  He created his testimony to manipulate the

2   truth.  The same way he created the testimony of William Avery.

3   He created the statement of William Avery on March the 24th to

4   support his hunch.  He did have a hunch.  He thought William

5   maybe was involved.  But he then created the evidence to support

6   his hunch.

7        Now, why is innocence important in this case?  It's

8   important in this case because if Mr. Avery is innocent, the

9   3/24 statement is impossible.  Mr. Smokowicz has suggested that

10  it's not inculpatory.  Okay.  I'm sorry.  A person is murdered.

11  A person who is a suspect then supposedly says I got into a

12  fight with the person who's murdered?  Then supposedly said I

13  was struggling with the person who was murdered?  Then calls up

14  his friend and says I think I killed the bitch?  Then describes

15  moving the body?  That's a highly inculpatory statement.  True,

16  it may not meet the standards of a full scale confession.

17  Doesn't have details, that's true.  But it is highly

18  inculpatory.  It's impossible.  Why would a person who's

19  innocent make that kind of statement?  It just can't be.

20       You don't leave your common sense behind when you come

21  into a jury box.  Common sense tells you it cannot be that a

22  person in a very short interrogation, not describing -- not

23  describing physical abuse, not describing any extent of mental

24  coercion, that someone would make this highly inculpatory

25  statement?  Mr. Smokowicz said oh, it was no big deal to make

1   the statement.  Well, Detective Hernandez in one of his few

2   moments of candor on the stand?  Admitted that that statement

3   was the most inculpatory piece of evidence against Mr. Avery at

4   his criminal trial.

5           We know that Mr. Avery is innocent.  If Mr. Avery is

6   innocent, then that statement is impossible.  Look at what it

7   caused.  It went to the D.A.  It concentrated suspicion.  The

8   D.A. is believing that this is a reliable account by the Police

9   Officers.  The D.A. relies upon Police Officers being reliable.

10  D.A. relies upon it, but says -- actually, look at that.  After

11  the statement, Detective Hein goes to see D.A. Williams.  He's

12  the homicide D.A.  Why would she go to see the homicide D.A. if

13  they don't consider this statement highly inculpatory?

14          Then they attempt to do a more extensive

15  investigation.  Detective Hernandez on the stand tried to tell

16  you well, that later interrogation on the 24th?  That didn't

17  have to do with the murder.  That had to do with the operation

18  of the drug house.  That's complete rubbish.  Plaintiff's 11-F

19  is the account of that interview.  True, the first page, or

20  about two thirds of the first page deals with how the drug house

21  operates.  Page 2, all about Maryetta Griffin.  Page 3, all

22  about Maryetta Griffin.  And all the way up to the end, all

23  about Maryetta Griffin.  So Detective Hernandez, trying to tell

24  you that this interrogation didn't deal with the murder of

25  Maryetta Griffin is hogwash.

1     So the damage -- let's follow the evidence.  Let's see

2  what damage this statement did.  It concentrated suspicion on

3  Mr. Avery from the D.A.  The D.A. says they need more evidence.

4  They go back to try and get more evidence.  They don't get any

5  evidence that -- from Mr. Avery that he's involved with the

6  Griffin homicide.  So the day before they don't have any

7  significant evidence.  The same day later, they don't get any

8  significant evidence.  The only time they claim to get any

9  significant evidence is this one very strange 2 hour,

10  2-and-a-half hour interrogation.

11     We know that the other damage that's caused by this

12  statement, it gets released to the newspaper.  And you've seen

13  that report.  We've seen the report.  1042, Exhibit 1042, man

14  admits to killing, report says.  So while Detective Hernandez

15  can say well, isn't about the murder.  While Mr. Smokowicz can

16  say oh, this wasn't a big deal.  The newspaper sure as heck

17  recognized it was a big deal.  Man admits to killing.  Because

18  that's what happened, according to the statement.  This was

19  absolutely an admission to killing.  Any attempt to minimize it

20  is just absurd.

21     So it's published in the newspaper.  Mr. Avery's

22  picture is in the newspaper.  Other Police Officers rely upon

23  this Police report.  Inmates see it.  The jailhouse inmates see

24  it.  They can make up stories.  Used to bring a homicide charge.

25  It's used at the trial.  It's not like the D.A. said oh, I'm not

1  gonna use that evidence, you know.  True, it has some defects,

2  but the D.A. -- absolutely.  That was the star -- that was the

3  centerpiece of the evidence.  Man admits to killing.  So any

4  attempt to minimize the inculpatory nature of that statement is

5  absurd.  It's used to convict Mr. Avery.  It's used to sentence

6  him to 40 years in prison.  And that statement, that false

7  statement, causes this whole cascade of events that ends up with

8  Mr. Avery facing essentially the rest of his life in prison.

9          Briefly, the policy claim against the City of

10  Milwaukee.  You have evidence here mostly about -- you have --

11  most of the evidence you have is about 10 cases.  As Ms. Hoft

12  said, the 10 cases that were -- that were eventually linked to

13  Mr. Ellis.  As Ms. Hoft said, 3 of those, 3 out of 10 turn out

14  to be wrong.  There's a 30 percent failure rate in these

15  homicide investigations.  That's significant evidence of a

16  policy of flawed investigations on the part of the City of

17  Milwaukee.

18          Also, you saw some of the reasons why.  You saw that

19  Detective Hein-Spano -- oh, yeah, I gave money to people.  But

20  I -- you know, I gave money to cooperating witnesses, but I

21  didn't record it.  You heard from Ms. McCoy.  The Defendants'

22  own witness.  Yeah, I was cooperating, and I do controlled drug

23  buys.  And then I get to keep the drugs.  Never reported.

24          When Detective Armbruster, up there -- he seemed to

25  think it was amusing that he didn't record impeaching

1    information.  He, of course -- he said well, yeah, I didn't

2    record that Antron Kent was looking for benefits in this case.

3    I knew it was impeaching, but I didn't record it.

4         Defendant Heier.  Now, Defendant Heier, he was told by

5    Mr. Kimbrough I don't want to go ahead with testifying because

6    it's not true.  What could be more significant impeachment

7    evidence than that?  A witness telling you it's not true.  Yet

8    he made no record of that.  He did not advise anyone of that.

9    That's how these false convictions occur.  Then Defendant Heier,

10   sitting there in court, as the Court Detective during the trial

11   of Mr. Avery, hearing Antron Kent testify that no one -- that he

12   never requested benefits for his testimony -- but we know from

13   Detective Armbruster he did.  Detective Armbruster said oh,

14   yeah, yeah.  He was asking -- he wanted to get his prison term

15   reduced.  Heier sitting there, hearing this, does nothing.

16        In fact, what Defendant Heier does is perjure himself.

17   He was asked -- and this is at the criminal trial of Mr.

18   Avery -- this is Defendant's Exhibit 1054.  So remember, this is

19   after Defendant Heier has been sitting in the prison listening

20   to Antron Kent say you know, I want to get something from this.

21   I want to get some reduction on this.  So then Defendant Heier

22   is asked at Mr. Avery's trial, did you tell him you'd get

23   anything from this?  No.  Did he ever ask you for anything?  No,

24   sir.  And why did he tell you he's doing this?  He said he has

25   to sleep with this, knowing what was told to him.  He felt it

1  was the right thing to do. Well, if you believe Detective

2  Armbruster, that's not true.

3          So that's how these false convictions occur and that,

4  apparently is the modis operandi. No one felt this was a big

5  deal. It was almost like are you kidding? Of course we don't

6  record this. That's how these false convictions occurred.

7          Follow the evidence. The Defendants in this case have

8  repeatedly falsified evidence. Heier -- I just went through

9  some of the evidence that he falsified. Allowing -- failing to

10 tell anyone that Kimbrough said it was a lie before he

11 testified. Sitting there while Kimbrough -- while Kent tells

12 lies. Telling lies himself at the criminal trial of Mr. Avery.

13 Mr. Armbruster -- Detective Armbruster, I'm sorry, or

14 Lieutenant, I believe. Helping to fabricate the Kimbrough

15 statements. DeValkenaere, less involved. But he did have the

16 false statement about sex. Detective Hein-Spano also less

17 involved, but also involved in fabricating the inmate

18 statements. But the primary person who's responsible, the

19 primary person who's responsible for creating the most

20 inculpatory evidence in this case, are Mr. Hernandez and

21 Phillips.

22          So follow the evidence. The only reasonable

23 explanation here is that that 3/24 statement didn't happen. And

24 it certainly didn't happen in the way that Detective Hernandez

25 represented it to happen. And you may remember the first time

1  around when he's up there, I said if there's any doubt, you have

2  to record that.  Detective DeValkenaere said if there's any

3  doubt about what you heard?  If there's any question about

4  whether this was -- whether you got it right?  You've got to

5  record that.  Because this is crucial.  If you give information

6  to a witness, you've got to record that.  Because you may just

7  be getting that information spit right back at you.  But they

8  didn't do that.

9      Detective Hernandez and Phillips created a report that

10  claimed that Mr. Avery had unequivocally said I killed Mercedes.

11  What other explanation is there for that?  For the statement?  I

12  killed Mercedes.  I got in a fight.  She's dead.  I moved her

13  body.  Not that she left the house and then ran into Walter

14  Ellis somewhere on the street.  No.  She's in the house.  She's

15  killed.  Her body was moved.

16      So we ask you to award appropriate damages for Mr.

17  Avery.  And I just want to make one comment.  Six years in

18  prison.  Six years of strip searches.  Six years of not having

19  your freedom.  Six years of being told what to do.  Six years

20  not being able to go outside into the free world.  That's only

21  worth $750,000?  Why is that?  Is that because Mr. Avery is

22  considered somehow lesser entitled to Constitutional

23  protections?  Well, obviously he's not.  Mr. Avery is entitled

24  to all the Constitutional protections that we all have.  And in

25  this case, 750,000, as a suggested damage award fails to reflect

1  that he has those same rights as everyone else, and he should

2  get a fully compensatory damages award.  Thank you very much.

3          THE COURT:  Now, ladies and gentlemen, I'm going to

4  read the jury instructions to you.  I have given you some of

5  these instructions prior to the trial, so some of that might be

6  repetitive.  But you've seen and heard all the evidence, and now

7  you've heard the arguments of the attorneys.  And you have two

8  duties as a jury.  First, you decide the facts from the evidence

9  in this case.  And this is your job and your job alone.  Your

10  second duty is to apply the law as I give it to you now.  You

11  must follow these instructions.  And you all indicated before

12  the start of the trial that you would, even if you disagree with

13  them.

14          Now, each of the instructions is important.  Perform

15  these duties fairly and impartially.  Do not allow sympathy, or

16  fear, or prejudice, or public opinion to influence you.  You

17  should not be influenced by any person's race, sex, color,

18  religion, national ancestry.

19          Nothing I say now, or I said during the course of the

20  trial, is meant to indicate any opinion on my part about what

21  the facts are or about what your verdict should be.  You are the

22  sole deciders of the facts.

23          The evidence consists of the testimony of the

24  witnesses, the Exhibits admitted into evidence, and

25  stipulations.  And a stipulation is an -- as I said earlier --

1   is an agreement between both sides that certain facts are true,

2   and that a person would give -- would have given certain

3   testimony that's contained in the stipulation.

4   You must decide whether the testimony of each of the

5   witnesses is truthful and accurate in part, in whole, or not at

6   all.  As well as what weight, if any, you give to the testimony

7   of each witness.

8   In evaluating the testimony of any witness, you may

9   consider, among other things, the witness's intelligence, the

10  ability and opportunity the witness had to see, hear, or know

11  the things that the witness testified about.  The witness's

12  memory.  Any interest, bias prejudice the witness may have had

13  or has.  The manner of the witness while testifying.  And the

14  reasonableness of the witness's testimony in light of all the

15  evidence in the case.

16  You should use common sense in weighing the evidence.

17  And consider the evidence in light of your own observations and

18  experiences in life.  In our lives we often look at one fact and

19  conclude from it that another fact exists.  In the law we call

20  this an inference.  And you are allowed, as a jury, to draw and

21  make reasonable inferences.  Any reasonable inferences you make

22  must be -- well, any inference you make -- inferences you make

23  must be reasonable, and must be based again on the evidence in

24  the case.

25  You have heard the phrases direct evidence and

circumstantial evidence.  Direct evidence is evidence that directly proves a fact.  Circumstantial evidence is evidence that indirectly proves a fact.  As an example, direct evidence that it is raining is testimony from a witness who says I was outside a minute ago and I saw it raining.  Circumstantial evidence that it is raining is the observation of someone entering the room carrying a wet umbrella.

Now, you are to consider both direct and circumstantial evidence.  The law does not consider one better than the other.  It's up to you to decide how much weight to give any evidence, whether it is direct evidence or circumstantial evidence.

Certain things are not evidence, and I've talked about this a bit before.  I will list them again.  First, testimony and Exhibits that I struck from the record.  And I don't recall doing that in any significant way during the course of the trial, but any that I may have, or that I told you -- any evidence that I told you to disregard, that must not be considered.

Anything that you may have seen or heard outside the courtroom, which I stressed earlier, is not evidence and must be entirely disregarded.  And that includes any press, radio, internet, television reports that you may have seen or heard.  Such reports are not evidence, and your verdict must not be influenced in any way by any such publicity.

1       Third, questions and objections by the lawyers are not

2   evidence.  Attorneys have a duty to object to what they think

3   and believe are -- when a question is improper, and you should

4   not be influenced by any objection by the attorneys or by my

5   ruling on it.

6       Fourth, the lawyers' statements and anything that the

7   lawyers say in a Court of law is not evidence, as I indicated at

8   the start of the trial.  The purpose of these statements, both

9   opening statements and final or closing arguments, is to discuss

10  the issues and the evidence.  If the evidence as you remember

11  differs from what the lawyers said, it is your memory that

12  counts.

13      You're advised that it's proper for an attorney to

14  interview any witness in preparation for trial.

15      In addition, you may find the testimony of one witness

16  or a few witnesses more persuasive than the testimony of a

17  larger number.  You need not accept the testimony of the larger

18  number of witnesses.

19      You have heard a witness, Antron Kent, claim his Fifth

20  Amendment privilege against self incrimination in response to

21  questions here at trial.  You may, but are not required to draw

22  an inference from Mr. Kent's invocation of his Fifth Amendment

23  privilege that truthful answers to the questions he was asked

24  would have incriminated him.

25      Now, the Plaintiff in this case is William Avery.  And

 1    I will refer to him, as I continue these instructions, as the

 2    Plaintiff.  Or as Mr. Avery.  The Defendants in this case are

 3    the City of Milwaukee, Gilbert Hernandez, Daniel Phillips,

 4    Katherine Hein-slash-Spano, Timothy Heier, Kevin Armbruster, and

 5    James DeValkenaere, who are current or retired Milwaukee Police

 6    Officers.  And I will refer to them as Defendants.

 7         The Plaintiff claims that the Defendants violated his

 8    civil rights, failed to intervene to prevent the violation of

 9    his civil rights, and conspired to violate his civil rights.  As

10    to the City of Milwaukee, the Plaintiff contends that a policy

11    or widespread practice of the City caused the violation of his

12    civil rights.

13         The Defendants deny each of the Plaintiff's claims.

14    And you must give separate consideration to each claim and to

15    each Defendant.

16         Now, when I say a particular party must prove

17    something by, quote, a preponderance of the evidence, or when I

18    use the expression if you find, quote, close quote, or quote, if

19    you decide, close quote, this is what I mean.  When you've

20    considered all the evidence in the case, you must be persuaded

21    that it is more probably true than not true.

22         The Plaintiff's first claim is that Defendants

23    Hernandez, Phillips, Hein/Spano, Heier, Armbruster, and

24    DeValkenaere violated his Constitutional right do due process of

25    law by fabricating evidence.  To succeed on this claim as to a

1   particular Defendant you are considering, the Plaintiff must

2   prove the three following things by a preponderance of the

3   evidence.

4          First, the Defendant knowingly fabricated or

5   participated in a fabrication of material false evidence used to

6   convict the Plaintiff at trial.

7          Two, both the Defendant and the witness knew the

8   evidence against the Plaintiff was false.

9          And three, the Plaintiff was damaged as a result of

10   the fabrication.

11          The term fabrication will now be defined.  And it is

12   -- fabricated evidence is evidence that was created or made up.

13          I will now define the determine material.  With regard

14   to Plaintiff's criminal trial, fabricated evidence is considered

15   material if it would have had a reasonable likelihood of

16   affecting the outcome of the case.

17          Now, if you find that the Plaintiff has proved each of

18   these things by a preponderance of the evidence, then you should

19   find for the Plaintiff and go on to consider the question of

20   damages.  If, on the other hand, you find that the Plaintiff has

21   failed to prove any of these things by a preponderance of the

22   evidence, then you should find for the Defendants, and you will

23   not consider the question of damages.

24          Now, Plaintiff must prove by a preponderance of the

25   evidence that Gilbert Hernandez, Daniel Phillips, Katherine

1    Hein/Spano, Timothy Heier, Kevin Armbruster, or James

2    DeValkenaere were personally involved in the conduct that the

3    Plaintiff complains about.  You may not hold any one of these

4    individuals liable for what other employees did or did not do.

5         However, the Plaintiff's second claim is that

6    Defendants Hernandez, Phillips, Hein/Spano, Heier, Armbruster,

7    and DeValkenaere failed to intervene to stop the violation of

8    Plaintiff's due process rights.  Specifically, the Plaintiff

9    alleges that each of these Defendants knew that one or more of

10   the other Defendants violated his due process rights, but failed

11   to stop the violation, and should therefore be held liable.

12        To succeed on this claim, the Plaintiff must prove

13   each of the following things by a preponderance of the evidence

14   as to the particular Defendant you are considering:

15        First, that Plaintiff's due process rights were

16   violated by one or more of the Defendants.  That the relevant

17   Defendant in the claim knew that one or more of the Defendants

18   violated the Plaintiff's due process rights.  Three, that the

19   relevant Defendant had a realistic opportunity to stop the

20   violation of the Plaintiff's due process rights.  Four, that the

21   relevant Defendant did not take reasonable steps to stop the

22   violation of the Plaintiff's due process rights, despite his

23   opportunity or her opportunity to do so.  And five, as a result,

24   the Plaintiff's due process rights were violated as defined in

25   the first claim.

1       The Plaintiff's third claim is that Defendants

2  Hernandez, Phillips, Hein/Spano, Heier, Armbruster, and

3  DeValkenaere conspired to deprive him of his right to due

4  process of law by fabricating false evidence.  A conspiracy is

5  an agreement to accomplish an unlawful purpose, or to accomplish

6  a lawful purpose by unlawful means.

7       To succeed on this claim, the Plaintiff must prove

8  each of the following things by a preponderance of the evidence

9  as to the particular Defendant you are considering.

10      First, the Plaintiff must prove there was an agreement

11 between two or more persons to fabricate false evidence.  The

12 Plaintiff must prove that the participants shared this common

13 purpose.  He does not have to prove there was a formal agreement

14 or plan in which all involved met together and worked out the

15 details.  He also does not have to prove that each participant

16 knew all the details of the conspiratorial plan, or the identity

17 of all the participants.

18      Two, the Defendant knowingly became a member of the

19 conspiracy with the intention to carry out the conspiracy.

20      Three, one or more of the conspirators committed an

21 act in an effort to carry out the conspiracy.

22      And four, as a result, the Plaintiff's due process

23 rights were violated as defined in the first claim.

24      Now, you must decide whether any of the Defendants'

25 actions caused the injury.  This question does not ask about the

1 cause, but rather a cause, because an injury may have more than

2 one cause.  Someone's act caused the injury if it was a

3 substantial factor in producing the injury.  An injury may be

4 caused by one person's act, or by the combined acts of two or

5 more people.

6          There's a policy claim against the City of Milwaukee.

7 That's the fourth claim.  And that claim is that the City of

8 Milwaukee had a policy or widespread practice that caused a

9 violation of his right to due process of law.

10          To succeed on this claim, the Plaintiff must prove

11 each of the following things by a preponderance of the evidence.

12 One, material evidence was fabricated.  These terms have the

13 same definition that I provided in connection with the

14 Plaintiff's first claim.

15          Two, at the time of the fabrication it was the policy

16 of the City of Milwaukee to not adequately investigate

17 homicides.  As used in this case, the term policy means a

18 widespread practice that is so permanent and well-settled that

19 it constitutes a custom or practice.

20          Three, the policy as I described it in paragraph 2

21 caused the fabrication of material evidence.

22          Now, the City of Milwaukee is not responsible simply

23 because it employed any such Defendant.  The City of Milwaukee

24 is liable to Plaintiff if the Plaintiff proves by a

25 preponderance of the evidence that the Defendant or Defendants'

1  actions in fabricating evidence denied Plaintiff the right to a

2  fair trial as a result of its official policy.

3      When I use the term official policy, I mean a rule or

4  regulation passed by the City of Milwaukee's legislative body,

5  or decision or policy statement made by the Chief of the

6  Milwaukee Police Department, who is the policy making official

7  of the City of Milwaukee; or a custom of inadequately

8  investigating homicides at the time in question, which led to

9  the fabrication of evidence that was consistent and widespread

10 so that it was the City of Milwaukee's standard operating

11 procedure.  A persistent and widespread pattern may be a custom

12 even if the City of Milwaukee has not formally approved it, so

13 long as the Plaintiff proves that a policy making official knew

14 of the pattern and allowed it to continue.

15     Now, if you find in favor of the Plaintiff on any of

16 his claims, then you must determine what amount of damages, if

17 any, the Plaintiff is entitled to recover.  If you find in favor

18 of the Defendants on all of the Plaintiff's claims, then you

19 will not consider the question of damages.

20     Damages are -- he has -- damages as compensatory

21 damages are defined.  If you find in favor of the Plaintiff on

22 one or more of his claims, then you must determine the amount of

23 money that will fairly compensate him or for any injury that you

24 find he sustained as a direct result of the Defendant's wrongful

25 conduct.  This is called compensatory damages.  The Plaintiff

1    must prove his damages by a preponderance of the evidence.  Your

2    award must be based on evidence, and not speculation or

3    guesswork.  This does not mean, however, that compensatory

4    damages are restricted to the actual loss of money.  They

5    include the mental and emotional aspects of injury, even if they

6    are not easy to measure.

7          You should consider only the following types of

8    compensatory damages:  Any physical, mental, and emotional pain

9    and suffering that the Plaintiff experienced to the present, and

10   any loss of normal life that the Plaintiff experienced to the

11   present.

12         No evidence of the dollar value of any physical,

13   mental, or emotional pain and suffering, or of the value of loss

14   of a normal life has been or needs to be introduced.  There is

15   no exact standard for setting the damages to be awarded on

16   account of these facts.  You are to determine an amount that

17   will fairly compensate the Plaintiff for any injury he has

18   sustained.

19         Now, if you find for the Plaintiff, you may, but are

20   not required to, assess punitive damages against the Defendants.

21   The purpose of punitive damages are to punish a Defendant for

22   his or her conduct, and to serve as an example or warning to the

23   Defendant and others not to engage in similar conduct in the

24   future.

25         The Plaintiffs must prove by a preponderance of the

1    evidence that punitive damages should be assessed against the

2    Defendants.  You may assess punitive damages only if you find

3    that his or her conduct was malicious or in reckless disregard

4    for Plaintiff's rights.  Conduct is malicious if it is

5    accompanied by ill will or spite, or is done for the purpose of

6    injuring the Plaintiff.  Conduct is in reckless disregard of

7    Plaintiff's rights if, under the circumstances, it reflects

8    complete indifference to Plaintiff's safety or rights.

9         If you find that punitive damages are appropriate,

10   then you must use sound reason in setting the amount of these

11   damages.  Punitive damages, if any, should be in an amount

12   sufficient to fulfill the purposes that I have described to you,

13   but should not reflect bias, prejudice, or sympathy toward

14   either or any party.

15        In determining the amount of any punitive damages, you

16   should consider the following factors:  The reprehensibility of

17   the Defendants' conduct; the impact of the Defendants' conduct

18   on the Plaintiff; the relationship between the Plaintiff and the

19   Defendant; the likelihood that the Defendant would repeat the

20   conduct if an award of punitive damages is not made; and the

21   relationship of any award of punitive damages to the amount of

22   actual harm the Plaintiff suffered.

23        Now, upon retiring to the jury room, ladies and

24   gentlemen, select one of your number as the foreperson.  And the

25   foreperson will preside over your deliberations and will be your

1    representative here in court.

2              Forms of verdict have been prepared for you, and I

3    will read those.  Question 1:  Did any of the Defendants

4    fabricate evidence that was the cause of the homicide conviction

5    of William Avery?  And then all of the Defendants are listed.

6    I'm not going to name them all again.  And then there's a yes or

7    no beside or alongside your answer.

8              Now, if you answered "no" to all parts of Question 1,

9    then you need not answer any of the remaining questions.

10   However, if you answered "yes" to any part of Question 1, then

11   answer Question 2.

12             Question 2:  Did any of the Defendants fail to

13   intervene to prevent the use of fabricated evidence?  And then

14   again there's a listing of all the Defendants.  And it goes on

15   after that, if you answered "yes" to any of the Defendants in

16   Questions 1 or 2, then answer Question 3.

17             Question 3:  Did any of those Defendants conspire to

18   use fabricated evidence that was a cause of the homicide

19   conviction of William Avery?  And then there's a listing of all

20   the Defendants, again.  If you answered "yes" to any part of

21   Questions 1, 2, or 3, then answer Question Number 4.

22             Question Number 4.  Did the City of Milwaukee have a

23   policy, practice, or custom of inadequately investigating

24   homicides at the time in question which led to the fabrication

25   of evidence resulting in the homicide conviction of William

 1    Avery?  Answer:  "Yes" or "no".

 2            If you've answered "yes" to any of the previous

 3    questions, then answer Question Number 5.

 4            Question Number 5:  We award the Plaintiff

 5    compensatory damages in the amount of -- and then there's a

 6    blank spot for that award.

 7            If you answered "no" to all parts of Questions Numbers

 8    1, 2, or 3, then you need not answer Question Number 6.

 9    However, if you answered "yes" to any part of Question Numbers

10    1, 2, or 3, then answer Question Number 6 as to any Defendant to

11    which you answered "yes".

12            Question Number 6:  What amount of money, if any, do

13    you award the Plaintiff as punitive damages against the

14    following Defendants.  And then the Defendants are listed, and

15    there's a blank line beside each of those listed Defendants.

16            It goes on to state dated at Milwaukee, Wisconsin,

17    this blank day of June, 2015.  There's a spot for the signature

18    of the foreperson, and then next to that spot for the signature

19    of the foreperson there's a place for that foreperson to print

20    his or her name.

21            Now, take these forms to the jury room, and when

22    you've decided -- when you've reached a unanimous verdict,

23    agreement on the verdict, then the foreperson will sign and date

24    it, and you will give it to the Bailiff.  Advise the Bailiff,

25    and when you advise the Bailiff, then he'll bring you back into

1    the courtroom when you've reached that verdict.

2         Now, I do not anticipate that you will need to

3    communicate with me.  If you do need to communicate with me, the

4    only proper way is in writing.  The writing must be signed by

5    the foreperson.  Or if he or she is unwilling to do so, by some

6    other juror that you select.  The writing should be given to the

7    Bailiff, who will give it, in turn, to me.  And I will respond

8    either in writing or by having you return to the courtroom so

9    that we can respond -- so that I can respond orally.

10         Now, during your deliberations you must not

11   communicate with or provide any information to anyone by any

12   means about this case.  And you should -- you may not use any

13   electronic device or media, such as the telephone, a cell phone,

14   smart phone, iPhone, Blackberry, or computer, the internet, any

15   internet service -- you know, when I first started out doing

16   this, I didn't have to give this instruction because there were

17   only phones.  And we didn't have phones in the jury room.

18         Any text or instant messaging service, any internet

19   chat room, blog, or website such as Facebook, MySpace, LinkedIn,

20   You Tube or Twitter to communicate to any person any information

21   about this case, or to conduct any research about this case

22   until I accept your verdict.

23         In other words, you cannot talk to anyone on the

24   phone, correspond with anyone, or electronically communicate

25   with anyone about this case.  You can only discuss the case in

1   the jury room with your fellow jurors during deliberations.  And

2   I expect that you will inform me as soon as you become aware of

3   another juror's violation of this requirement that I just read

4   to you.

5          Now, the verdict must represent the considered

6   judgment of all the jurors -- of each juror, excuse me.  Your

7   verdict, whether it's for or against the parties, also must be

8   unanimous.  As I indicated, you should make every reasonable

9   effort to reach a verdict.  In doing so, you should consult with

10  one another, express your own views, listen to the opinions of

11  your fellow jurors, discuss your differences with an open mind.

12  Do not hesitate to change or re-examine your own views and your

13  opinion if you come to believe it is wrong, but you should not

14  surrender your honest beliefs about the weight or effect of the

15  evidence solely because of the opinions of your fellow jurors,

16  or solely for the purpose of returning a unanimous verdict.

17         The 9 of you should give fair and equal consideration

18  to all the evidence, and deliberate with the goal of reaching

19  agreement which is consistent with the individual judgment of

20  each juror.  You are the impartial judges of the facts.

21         Now, Madam Clerk, would you swear the Bailiff, please.

22         (Whereupon the Bailiff was duly sworn.)

23         THE COURT:  All right.  Ladies and gentlemen, you will

24  be given a copy of these instructions that I gave you.  But

25  would you now follow the Bailiff.

1       (Whereupon the jury was excused at 3:05 p.m.)

2       THE COURT:  Any objection to the instructions as read?

3       MR. ELSON:  Not from the Plaintiff.

4       THE COURT:  We'll abide the decision of the jury.

5  Relative to Exhibits?  The Court's policy is to let them see

6  what they ask for.  Any objection to that?

7       MR. STAINTHORP:  No.

8       MR. SMOKOWICZ:  There are a couple of Exhibits that

9  are marked as not to go to the jury, and that would be

10 consistent with our --

11      THE COURT:  If they're marked not to go to the jury,

12 then they won't go to the jury.  And the Clerk will make sure

13 that that is observed.  All right.  We'll abide the jury.

14      MR. STAINTHORP:  Okay.  Thank you, Judge.

15      MR. SMOKOWICZ:  Thank you.

16                      *     *     *

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF WISCONSIN

3

4              I, HEIDI J. TRAPP, Official Court Reporter for the

5    United States District Court, Eastern District of Wisconsin, do

6    hereby certify that I reported the foregoing Transcript of

7    Proceedings; that the same is true and correct as reflected by

8    my original machine shorthand notes taken at said time and place

9    before the Hon. Rudolph T. Randa.

10

11                        _____

                          Official Court Reporter
12                        United States District Court

13

14   Dated at Milwaukee, Wisconsin,

15   this 30th day of November, 2015.

16

17

18

19

20

21

22

23

24

25